# EXHIBIT C

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

JOHN EWALT
17 SOUTH HIGH STREET
SUITE 1220
COLUMBUS, OH 43215,

          PLAINTIFF,

       VS.

GATEHOUSE MEDIA OHIO HOLDINGS II INC
CORPORATION SERVICE CO
50 WEST BROAD STREET
SUITE 1330
COLUMBUS, OH 43215,
         DEFENDANT.

19CV-08-6859

**CASE NUMBER**

**** SUMMONS ****　　　　08/22/19

TO THE FOLLOWING NAMED DEFENDANT:
     GATEHOUSE MEDIA OHIO HOLDINGS II INC
     CORPORATION SERVICE CO
     50 WEST BROAD STREET
     SUITE 1330
     COLUMBUS, OH 43215

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY
COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY:   JOHN EWALT
     17 SOUTH HIGH STREET
     SUITE 1220
     COLUMBUS, OH 43215,

                   PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF
THE PLAINTIFF'S ATTORNEY IS:
     TOM SHAFIRTEIN
     ALLEN STOVALL NEUMAN
     SUITE 1220
     17 S HIGH ST
     COLUMBUS, OH 43215

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S
ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY
OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE
OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER
MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A
COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY:  TORREY TAYLOR, DEPUTY CLERK

(CIV370-S03)



MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

JUDGE D. HAWKINS

JOHN EWALT
ET. AL.,

        PLAINTIFF,

      VS.

GATEHOUSE MEDIA OHIO HOLDINGS II INC,

        DEFENDANT.

19CV-08-6859

**CASE NUMBER**

CLERK'S ORIGINAL CASE SCHEDULE
--------------------------------

LATEST TIME
OF OCCURRENCE

| | |
|---|---|
| CASE FILED | 08/22/19 |
| INITIAL STATUS CONFERENCE | ******** |
| INITIAL JOINT DISCLOSURE OF ALL WITNESSES | 01/09/20 |
| SUPPLEMENTAL JOINT DISCLOSURE OF ALL WITNESSES | 03/05/20 |
| DISPOSITIVE MOTIONS | 05/28/20 |
| DISCOVERY CUT-OFF | 06/11/20 |
| DECISIONS ON MOTIONS | 07/23/20 |
| FINAL PRE-TRIAL CONFERENCE/ORDER (OR BOTH) | 08/06/20 0900AM |
| TRIAL ASSIGNMENT | 08/31/20 0900AM |

NOTICE TO ALL PARTIES
---------------------

    ALL ATTORNEYS AND PARTIES SHOULD MAKE THEMSELVES FAMILIAR WITH THE
COURT'S LOCAL RULES, INCLUDING THOSE REFERRED TO IN THIS CASE SCHEDULE.
IN ORDER TO COMPLY WITH THE CLERK'S CASE SCHEDULE, IT WILL BE NECESSARY
FOR ATTORNEYS AND PARTIES TO PURSUE THEIR CASES VIGOROUSLY FROM THE DAY
THE CASES ARE FILED. DISCOVERY MUST BE UNDERTAKEN PROMPTLY IN ORDER TO
COMPLY WITH THE DATES LISTED IN THE RIGHT-HAND COLUMN.

                    BY ORDER OF THE COURT OF COMMON PLEAS,
                    FRANKLIN COUNTY, OHIO

__/__/__
DATE

_____
MARYELLEN O'SHAUGHNESSY, CLERK

(CIV363-S10)

## MARYELLEN O'SHAUGHNESSY

## FRANKLIN COUNTY CLERK OF COURTS
## GENERAL DIVISION, COURT OF COMMON PLEAS

**CASE TITLE:** JOHN EWALT ET AL -VS- GATEHOUSE MEDIA OHIO     **CASE NUMBER: 19CV006859**
**HOLDINGS II INC**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
COMPLAINT

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
GATEHOUSE MEDIA OHIO HOLDINGS II INC
CORPORATION SERVICE CO
50 WEST BROAD STREET
SUITE 1330
COLUMBUS, OH  43215

---

JUVENILE CITATIONS ONLY:

   HEARING TYPE:

   __ Date already scheduled at  :  Courtroom:

---

**Electronically Requested by:** TODD H NEUMAN
**Attorney for:**

**THIS PAGE INTENTIONALLY LEFT BLANK**

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | |
|---|---|
| **John Ewalt,** on behalf of himself and all others similarly situated,<br>**c/o Allen Stovall Neuman Fisher & Ashton**<br>**17 S. High Street, Suite 1220**<br>**Columbus, OH 43215,**<br><br>and<br><br>**Steve Wylie,** on behalf of himself and all others similarly situated,<br>**c/o Allen Stovall Neuman Fisher & Ashton**<br>**17 S. High Street, Suite 1220**<br>**Columbus, OH 43215,**<br><br>*Plaintiffs,*<br><br>*v.*<br><br>**GateHouse Media Ohio Holdings II, Inc., d/b/a**<br>**The Columbus Dispatch,**<br>**c/o Statutory Agent**<br>**Corporation Service Company**<br>**50 West Broad Street, Suite 1330**<br>**Columbus, OH 43215**<br><br>*Defendant.* | Case No. _____<br><br><br>Judge _____<br><br><br>**JURY DEMAND ENDORSED**<br>**HEREIN** |

## CLASS ACTION COMPLAINT

Plaintiffs John Ewalt and Steve Wylie (collectively, "Plaintiffs"), on behalf of themselves and all those similarly situated, for their Complaint against Defendant GateHouse Media Ohio Holdings II, Inc., d/b/a The Columbus Dispatch ("GateHouse"), state as follows:

## INTRODUCTION

1.    This case arises from GateHouse's shameless attempt to deprive its customers—subscribers to The Columbus Dispatch ("The Dispatch")—of the benefit of their bargains.

2.    In 2015, GateHouse purchased The Dispatch, which had been family owned and operated for more than a century.

3.    Shortly thereafter, GateHouse instituted the deceptive practices that are the subject of this litigation.

4.    Specifically, GateHouse advertises and offers fixed-length subscriptions to The Dispatch (e.g., 13 weeks, 26 weeks, 52 weeks) for specific prices, and its customers enter into these subscription agreements reasonably expecting that GateHouse will provide The Dispatch for the number of weeks stated in those subscription agreements.

5.    But that is not what those customers receive.

6.    Instead, GateHouse reduces its customers' fixed-length subscriptions by sending its customers unsolicited "premium" editions and decreasing the length of those subscriptions based on the supposed value of these premium editions.

7.    The purported basis for these premium editions is GateHouse's terms of sale, which are buried in GateHouse's subscription agreements and which are constantly being revised without notice to or consent from Gatehouse's customers.

8.    In most instances, these so-called premium editions have no connection to the subscriptions to The Dispatch—the item for which those customers agreed to pay—and are all but worthless.

9.    Examples of such premium editions include (1) a cook book; (2) a calendar; (3) a health guide; (4) a puzzle book; (5) a dog magazine; and (6) Columbus Monthly (a publication

2

owned by GateHouse or an affiliate)[1].

10.    Further, GateHouse, through its modification of its terms of sale, unilaterally establishes (1) inflated prices for these premium editions (currently, $9.00 per premium edition); and (2) the frequency of these premium editions (currently, up to 3 per month, or 36 per year).

11.    Therefore, under the current terms of sale, GateHouse is supposedly entitled to charge a customer $324 a year—*almost as much as a 52-week subscription for daily delivery*—for unrequested premium editions.

12.    Upon information and belief, to reduce the likelihood that its customers would notice charges for premium editions, GateHouse does not separately bill customers for those premium editions.

13.    Rather, as noted above, GateHouse reduces the length of its customers' subscriptions based on the arbitrary value that GateHouse assigns to these premium editions.

14.    Thus, a customer who purchases a 52-week subscription for The Dispatch could only receive The Dispatch for 30 weeks—or even less, depending on the number of premium editions that GateHouse issues.

15.    Worse yet, because GateHouse does not bill separately for these premium editions, customers whose subscriptions are automatically renewed are unlikely to ever notice that those subscriptions have been shortened.

---

[1] The $9.00 charge for Columbus Monthly is particularly appalling because (1) a customer can currently obtain 12 issues of Columbus Monthly for only $18 (or $1.50 per issue); and (2) many customers already receive Columbus Monthly. Since GateHouse or its affiliate owns Columbus Monthly, GateHouse knows that many subscribers to The Dispatch already receive Columbus Monthly and still charges those subscribers $9 for a second copy of Columbus Monthly.

16.    Through this deceptive scheme, GateHouse is able to foist unwanted premium editions on unsuspecting customers and prevent those customers from receiving the subscriptions for which those customers paid.

17.    If that were not enough, customers generally cannot receive copies of their invoices online, and when a customer receives a paper invoice, *GateHouse assesses that customer an indefensible $9.00 fee* (which, of course, shortens the customer's subscription even further).

18.    GateHouse's deceptive intent is evident from what GateHouse chose not to do.

19.    If GateHouse genuinely wanted to provide premium content to its customers in a reasonable, transparent manner, GateHouse would have (1) provided its customers with the option not to receive premium editions; (2) clearly and conspicuously disclosed the terms related to its premium editions; (3) billed separately for premium editions (rather than reducing the agreed-upon subscription length); (4) provided advance notice regarding the exact number, cost, and type of premium editions; (5) charged reasonable rates for premium editions; (6) provided premium editions that were news related; and (7) provided customers with online access to their invoices.

20.    GateHouse, of course, took none of these steps.

21.    Moreover, GateHouse's misconduct does not appear to be isolated to The Dispatch.

22.    In early 2017, several GateHouse affiliates in Massachusetts were accused of deceptively reducing their customers' subscriptions through the issuance of premium editions, and upon information and belief, those GateHouse affiliates agreed—prior to the commencement of the lawsuit in Massachusetts—to pay more than $2 million to reimburse those customers.

4

23.     Alarmingly, after its affiliates paid millions of dollars for engaging in this deceptive practice, GateHouse not only continued this practice, but actually dramatically increased the charges for and frequency of its premium editions.

24.     With this action, the Plaintiffs seek to obtain redress on behalf of themselves and those who have also been subjected to GateHouse's unscrupulous business practices and to prevent GateHouse from continuing to exploit its customers.

## PARTIES, JURISDICTION, AND VENUE

25.     Plaintiffs John Ewalt and Steve Wylie are Ohio residents.

26.     Defendant Gatehouse Media Ohio Holdings II, Inc. d/b/a The Columbus Dispatch is a corporation that, upon information and belief, has its principal place of business in Columbus, Ohio.

27.     Venue is proper in this Court pursuant to Ohio Rule of Civil Procedure 3(C)(2), (3), and (6).

28.     The Court has personal jurisdiction over GateHouse pursuant to R.C. § 2307.382(A)(1) because GateHouse transacts business in this State, and the claims alleged herein arise from those business transactions.   The Court also has personal jurisdiction over GateHouse pursuant to R.C. § 2307.382(A)(2) because GateHouse contracted to supply goods and services in this state, and the claims alleged herein arise from those contracts.

29.     The Court's exercise of jurisdiction over GateHouse is consistent with due process because (1) GateHouse purposefully avails itself of the privilege of acting in this state or causing a consequence in this state; (2) the case arises from GateHouse's activities in this state; and (3)

GateHouse has a substantial enough connection with this State such that the Court's exercise of jurisdiction is reasonable.

30.　　Upon information and belief, two-thirds or more of the members of the Classes and the Consumer Subclass (defined below) are citizens of Ohio, as is GateHouse.

31.　　Upon information and belief, (1) two-thirds or more of the members of the Classes and the Consumer Subclass (defined below) are citizens of Ohio; (2) GateHouse, the only defendant in this matter, is a citizen of Ohio; (3) the principal injuries alleged in this action were incurred in Ohio; and (4) during the 3-year period preceding the filing of this action, no other class action has been filed asserting the same or similar factual allegations against GateHouse Media Ohio Holdings II, Inc.

## BACKGROUND FACTS

32.　　The Dispatch was founded in 1871, and in 1905, the paper was purchased by the Wolfe family.

33.　　For more than 100 years, the Wolfe family owned and operated The Dispatch.

34.　　However, in 2015, The Dispatch was acquired by GateHouse, which is part of a large newspaper conglomerate that own hundreds of newspapers across the country.

35.　　At all times relevant to this case, The Dispatch has advertised and sold fixed-length subscriptions (e.g., 13 weeks, 26 weeks, 52 weeks) at stated prices to its customers.

36.　　Upon information and belief, The Dispatch, prior to the acquisition by GateHouse, would infrequently publish special/premium editions that were news related and would charge a relatively small amount for these special/premium editions.

37.    For example, in the early 2010s, The Dispatch would provide a Thanksgiving edition for a charge of $1.25.

38.    But, upon information and belief, after the purchase by GateHouse, The Dispatch quietly implemented new terms governing premium editions, and GateHouse carefully crafted those terms to materially shorten the length of its customers' subscriptions without those customers ever knowing.

39.    Specifically, under GateHouse's terms of sale, GateHouse does not separately bill for these unsolicited premium editions.

40.    Rather, GateHouse wrongfully reduces the length of its customers' subscriptions based on the value that GateHouse assigns to these premium editions.

41.    Over time, GateHouse has increased both the charges for and frequency of these premium editions to further decrease the length of its customers' subscriptions. For example, during a six-month period in 2017, GateHouse increased the charges/frequency relating to premium editions 4 separate times.

42.    Upon information and belief, the following table reflects changes in terms relating to premium editions:

| Date | Maximum Charge Per Premium Edition | Maximum Frequency | Maximum Charges for Premium Editions Per Year |
|------|------|------|------|
| 2011-2016 | $1.25 | 1 per year (Thanksgiving Edition) | $1.25 |
| July 2016 | $3.00 | 8 per year | $24 |
| March 2017 | $3.00 | 10 per year | $30 |

7

Franklin County Ohio Clerk of Courts of the Common Pleas- 2019 Aug 23 2:54 PM-19CV006529

| July 2017 | $3.00 | 12 per year | $36 |
| August 2017 | $4.00[2] | 13 per year | $52 |
| September 2017 | $4.00 | 2 per month (24 per year) | $96 |
| February 2018 | $5.00 | 2 per month (24 per year) | $120 |
| May 2019 | $9.00 | 3 per month (36 per year) | $324 |

43.     Thus, under the current terms of sale, GateHouse is supposedly entitled to distribute $324 worth of premium editions in a given year—*or nearly the amount for a 52-week subscription for daily delivery*.

44.     Incredibly, these premium editions typically have nothing to do with the news.

45.     Instead, under the guise of providing premium content, GateHouse distributes (1) cook books; (2) calendars; (3) health guides; (4) puzzle books; (5) dog magazines; and (6) other non-news publications.

46.     GateHouse does not adequately disclose premium-edition-related terms to its customers with clear, conspicuous language at the time that it offers its fixed-length subscriptions and only provides notice to existing subscribers by updating the terms of sale on The Dispatch's website.

---

[2] The August 2017 terms of sale are actually inconsistent on the maximum charge for premium editions, with one section stating that the maximum charge would be $3.00 and another section stating the maximum charge would be $4.00. The same terms of sale also state, in one section, that the maximum number of premium editions would be 12, but, in another section, that the maximum number would be 13.

8

47.     If a subscriber enrolls in the automatic payment program (i.e., The Dispatch's EZ pay option), then a subscription automatically renews, notwithstanding the shortened subscription due to premium-edition charges.

48.     Because EZ pay customers automatically have their subscriptions renewed, these EZ pay customers are not advised that The Dispatch has shortened the length of their subscriptions.

49.     Also, upon information and belief, in a further effort to prevent its customers form uncovering its misconduct, GateHouse does not allow its customers to view billing statements online.

50.     Currently, when a customer obtains a paper billing statement, GateHouse assesses an unconscionable $9.00 fee to that customer.

51.     Upon information and belief, this $9.00 charge is unconnected to the actual cost incurred in generating such a paper billing statement.

52.     The $9.00 paper statement fee is not properly disclosed to customers.

53.     Upon information and belief, GateHouse's misconduct was malicious because GateHouse engaged in that misconduct with a conscious disregard for the rights of other persons when there was a great probability of causing substantial harm.

54.     Upon information and belief, GateHouse engaged in aggravated/egregious fraud because GateHouse's fraudulent/deceptive wrongdoing was particularly gross.

### FACTUAL ALLEGATIONS RELATING TO THE NAMED PLAINTIFFS

55.     Plaintiff John Ewalt is a senior citizen and has been a subscriber of The Dispatch for more than 30 years.

56. Currently, he receives daily delivery of the Dispatch, and he receives paper statements.

57. Plaintiff Steve Wylie is a subscriber to The Dispatch and has received Thursday-Sunday delivery for approximately 5 years.

58. He also has access to The Dispatch online, and he is registered for auto-pay.

59. Plaintiffs John Ewalt and Steve Wylie have received premium editions from The Dispatch and have had their subscriptions shortened by GateHouse based on those premium editions.

60. Plaintiff John Ewalt has been billed $9 paper statement fees and has had his subscription shorten based on those excessive fees.

## CLASS ACTION ALLEGATIONS

61. Plaintiffs John Ewalt and Steve Wylie bring this action on behalf of themselves and the members of the following class ("Premium Edition Class"):

   a. All persons who purchased a fixed-length subscription for delivery of The Dispatch and had the length of the subscription shortened based on charges for one or more premium editions.

62. Plaintiffs John Ewalt and Steve Wylie are members of the Premium Edition Class.

63. The Premium Edition Class does not include persons who are employees, legal representatives, officers, or directors of GateHouse or of other entities affiliated GateHouse. The Premium Edition Class also does not include the judge assigned to this case or his or her staff.

64. Plaintiffs John Ewalt and Steve Wylie bring this action on behalf of themselves and members of the following subclass ("Consumer Subclass"):

10

Franklin County Ohio Clerk of Courts of the Common Pleas- 2019 Aug 22 7:54 PM-19CV006932

   a. All consumers who purchased a fixed-length subscription for delivery of The
      Dispatch and had the length of the subscription shortened based on charges for one
      or more premium editions.

65. Plaintiffs John Ewalt and Steve Wylie are members of the Consumer Subclass.

66. The Consumer Subclass does not include persons who are employees, legal representatives, officers, or directors of GateHouse or of other entities affiliated with GateHouse. The Consumer Subclass also does not include the judge assigned to this case or his or her staff.

67. Plaintiff John Ewalt brings this action on behalf of himself and the following class ("Statement Fee Class," and together with the Premium Edition Class, the "Classes"):

   a. All persons who purchased a fixed-length subscription to The Dispatch; were
      assessed a fee in excess of $1.00 for a paper statement; and had the length of the
      subscription shortened based on the paper statement fee.

68. The Statement Fee Class does not include persons who are employees, legal representatives, officers, or directors of GateHouse or of other entities affiliated with GateHouse. The Statement Fee Class also does not include the judge assigned to this case or his or her staff.

69. Plaintiff John Ewalt is a member of the Statement Fee Class.

70. The Classes and the Consumer Subclass may be expanded or narrowed by amendment based on information obtained through further investigation or discovery in this lawsuit.

71. All the requirements of Rule 23 for class certification are met for the Classes and the Consumer Subclass.

72. Members of the Classes and the Consumer Subclass are so numerous that joinder is impracticable, as required by Rule 23(A)(1).

11

73. Upon information and belief, The Dispatch has more than 100,000 subscribers, and the Classes and the Consumer Subclass each have thousands of members.

74. Upon information and belief, the exact number of members of the Classes and the Consumer Subclass, as well as the names and addresses for those members, will be readily identifiable from information and records of GateHouse.

75. Common questions of law and fact exist as to all members of the Classes and the Consumer Subclass, as required by Civ. R. 23(A)(2), because there is a common nucleus of operative facts surrounding GateHouse's practices regarding premium edition charges and the accompanying shortening of subscriptions.

76. There is a standard subscription agreement that presents common evidence on which to base class-wide liability against GateHouse.

77. Moreover, The Dispatch's billing practices for premium editions/paper statement fees are consistent throughout the Classes and the Consumer Subclass.

78. Common questions of law and fact include, without limitation, the following:

    i. Whether GateHouse devised a scheme to shorten its customers' subscriptions through the provision of premium editions/paper statement fees, and if so, whether such conduct breached the duty of good faith;

    ii. Whether GateHouse's agreements with its customers are form, adhesion contracts;

    iii. Whether GateHouse breached the duty of good faith by issuing items that were unrelated to news as premium editions;

    iv. Whether GateHouse was entitled to unilaterally modify the terms of its subscription agreements with its customers, and if so, when those modifications breached the duty of good faith;

    v. Whether GateHouse provided adequate notice of the change in its terms of sale by simply posting those terms of sale on its website;

    vi. Whether GateHouse breached the duty of good faith by failing to provide proper notice of changes to the terms of sale;

    vii. Whether GateHouse breached its duty of good faith by steadily increasing the number of premium editions and the charges for premium editions;

12

viii. Whether GateHouse breached the duty of good faith by charging excessive paper statement fees;

ix. Whether GateHouse breached its subscription agreements by issuing publications or content that should not qualify as "premium editions";

x. Whether GateHouse violated the CSPA by advertising fixed-length subscriptions without any intention of providing the subscription for the term advertised;

xi. Whether GateHouse violated the CSPA by failing to clearly and conspicuously disclose material limitations for its offers in close proximity to those offers;

xii. Whether GateHouse violated the CSPA by requiring customers to enter into one-sided agreements that allowed for unilateral modifications;

xiii. Whether GateHouse violated the CSPA by continuously changing its terms of sale without providing proper notice;

xiv. Whether GateHouse violated the CSPA by issuing premium editions that were not related to the news;

xv. Whether GateHouse violated the CSPA by entering into agreements that purported to unreasonably limit its customers' recovery;

xvi. Whether GateHouse violated the CSPA by entering into agreements that purported to unreasonably limit the timeframe for its customers to recover;

xvii. Whether GateHouse violated Ohio's Deceptive Trade Practices Act by representing that its goods and services had characteristics, benefits, and quantities that those goods and services did not have;

xviii. Whether GateHouse's agreements with its customers (as interpreted by GateHouse) are unconscionable;

xix. Whether GateHouse's agreements with its customers (as interpreted by GateHouse) are illusory;

xx. Whether GateHouse has been unjustly enriched by payments applied for premium editions and paper statement fees;

xxi. Whether the Classes and the Consumer Subclass are entitled to injunctive relief; and

xxii. Upon information and belief, the affirmative defenses raised by the Defendants.

79. Plaintiffs' claims are typical of the claims of the members of the Classes and the Consumer Subclass because all of the claims of the Plaintiffs and the Classes and the Consumer Subclass arise from the same course of conduct of GateHouse, i.e., the charging for premium editions in a misleading manner and the systematic overcharging of customers for paper statements.

80.    Additionally, the Plaintiffs' claims are based on the same legal theories advanced on behalf of the Classes and the Consumer Subclass.

81.    Plaintiffs will fairly and adequately protect the interests of the Classes and the Consumer Subclass because Plaintiffs do not have any conflicts of interests or any interests that are antagonistic to the interests of the members of the Classes or the Consumer Subclass.

82.    Plaintiffs have also retained counsel who are experienced and competent practitioners in the area of complex class action litigation and who are capable of and committed to devoting the necessary resources to this matter.

83.    Finally, Plaintiffs and their counsel will prosecute this action vigorously on behalf of the Classes and the Consumer Subclass.

84.    The Classes and the Consumer Subclass meet the requirements of Civ. R. 23(B)(1).

85.    Pursuing separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to the members of the Classes and the Consumer Subclass and could result in incompatible standards for GateHouse's conduct in light of the various forms of relief pleaded in this Complaint.

86.    Pursuing separate actions by individual members of the Classes and the Consumer Subclass would create a risk of adjudications with respect to individual members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

87.    The Classes and the Consumer Subclass also meet the requirements of Civ. R. 23(B)(2).

14

88.    GateHouse has acted or failed to act in a manner that applies generally to Plaintiffs and to all the members of the Classes and the Consumer Subclass.

89.    GateHouse's course of conduct arises from subscription agreements whose terms of sale are purportedly applicable to all subscribers to The Dispatch, including the Plaintiffs and members of the Classes and the Consumer Subclass.

90.    Thus, final injunction and/or declaratory relief against GateHouse is appropriate, as it could provide recovery for the Classes and the Consumer Subclass or prevent future harm by prohibiting GateHouse from shortening subscription periods with improper charges.

91.    Certification of the Classes and the Consumer Subclass is also appropriate under Civ. R. 23(B)(3).

92.    Common questions of law and fact predominate over questions that may affect only individual class members.

93.    The common legal and factual questions derive from a common nucleus of operative facts regarding GateHouse's liability to Plaintiffs and other members of the Classes and the Consumer Subclass for assessing unfair charges that shorten the subscriptions of the Plaintiffs and members of the Classes and the Consumer Subclass.

94.    Additionally, upon information and belief, the evidence will not vary between the different members of each of the Classes and the Consumer Subclass, so there will be few, if any, questions that only affect individual members.

95.    Class action certification is also the superior method for the fair and efficient adjudication of this controversy.

15

96.     Class certification would overcome the problem posed by the potentially small recoveries that individual members might receive, which, in the absence of class treatment, do not provide the incentive for any individual class member to bring an individual action to prosecute his or her claims.

97.     Certification would permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments inherent in multiple individual actions.

98.     The benefits of class certification, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

99.     As described above, the questions of law and fact common to members of each Class and the Consumer Subclass predominate over any questions affecting only individual members.

100.    Additionally, the desirability of concentrating the litigation in this Court is obvious, as The Dispatch maintains its primary office in Franklin County, and upon information and belief, the vast majority of subscribers to The Dispatch are located in central Ohio.

## COUNT I: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (As To The Plaintiffs, The Classes, And The Consumer Subclass)

101.    Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

16

102.     Plaintiffs and members of the Classes and the Consumer Subclass entered into fixed-length subscription agreements with GateHouse, and the Plaintiffs, the Classes, and the Consumer Subclass performed on those agreements by paying for the fixed-length subscriptions.

103.     Under those subscription agreements, GateHouse purportedly reserved the right to alter those subscriptions agreements through the modification of GateHouse's terms of sale.

104.     The subscription agreements contained an implied term of good faith and fair dealing, and this implied term prevented GateHouse from, among other things, (1) engaging in deceptive practices aimed at reducing the length of the fixed-length subscriptions of the Plaintiffs, the Classes, and the Consumer Subclass; (2) exercising discretion under the subscription agreements in an unreasonable, dishonest, or bad-faith manner; (3) modifying the terms of the subscription agreements in order to deprive the members of the Classes and the Consumer Subclass of the benefits of their bargains; (4) attempting to take opportunistic advantage of the Classes and the Consumer Subclass; (5) attempting to evade the spirit of the bargains; and (6) abusing the power to specify terms under the subscription agreements.

105.     GateHouse breached its duty of good faith by, among other things, (1) attempting to materially reduce the length of its customers' fixed-length subscriptions through unwanted premium editions; (2) failing to adequately disclose its policy relating to premium editions; (3) failing to disclose that premium editions reduced the length of customers' fixed-length subscriptions; (4) failing to adequately disclose its policy relating to paper statement fees; (5) abusing its power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (6) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (7) failing to

17

provide customers access to electronic billing statements; and (8) charging excessive paper statement fees.

106.    As a direct and proximate result of GateHouse's breaches of the implied covenant of good faith and fair dealing, the Plaintiffs, the Classes, and the Consumer Subclass have suffered damages because, among other things, the Plaintiffs, the Classes, and the Consumer Subclass have not received the benefits of their subscription agreements, have overpaid for their subscriptions to The Dispatch, and have paid excessive charges for paper statements.

107.    Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

### COUNT II: BREACH OF CONTRACT
### (As To The Plaintiffs, The Classes, And The Consumer Subclass)

108.    Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

109.    Plaintiffs and members of the Classes and the Consumer Subclass entered into fixed-length subscription agreements [3] with GateHouse, and Plaintiffs, the Classes, and the Consumer Subclass performed on those agreements by paying for the fixed-length subscriptions.

110.    Upon information and belief, at all relevant times, The Dispatch's terms of sale defined the "product" subject to the subscription agreements as the delivery of The Dispatch, not the delivery of premium editions.

---

[3] GateHouse already has copies of the subscription agreements, and as a result, the Plaintiffs are not attaching the subscription agreements to the Complaint.

18

111. GateHouse breached those fixed-length subscription agreements by failing to deliver The Dispatch (the "product") for the agreed-upon length at the agreed-upon price based on GateHouse's issuance of premium editions.

112. In the alternative, even assuming that GateHouse is entitled to reduce the length of its customers' subscriptions through the issuance of premium editions, GateHouse still breached its subscription agreements by delivering items that did not constitute "premium editions."

113. Specifically, GateHouse's terms of sale provided that GateHouse could make additional charges for premium editions and that the charges for the premium editions could shorten the subscription length for the Plaintiffs.

114. However, the term "premium edition" is not defined in the terms of sale.

115. The plain, ordinary meaning of the term "premium," includes, among others, "of exceptional quality or greater value than others of its kind; superior." *Premium*, DICTIONARY.COM https://www.dictionary.com/browse/premium (last visited July 9, 2019).

116. The plain, ordinary meaning of the term "edition" includes, among others, "one of a series of printings of the same book, newspaper, etc., each issued at a different time and differing from another by alterations, additions, etc." *Edition*, DICTIONARY.COM https://www.dictionary.com/browse/edition?s=t (last visited July 9, 2019).

117. The premium editions issued by GateHouse did not constitute "premium editions" as that term is ordinarily used. A true *premium* edition would provide "exceptional quality" or "greater value" as compared to a non-premium edition. And an *edition* would constitute a publication that is "one of a series of printings of the same . . . newspaper."

19

118.     In fact, many of the premium editions were not newspapers at all. By way of example, GateHouse has sent calendars and cook books and charged these items as premium editions, even though these items are clearly not newspapers with added value.

119.     By shortening the subscription length for the Plaintiffs, the Premium Edition Class, and the Consumer Subclass through the issuance of items that were not "premium editions," GateHouse breached the subscription agreements.

120.     GateHouse also breached the subscription agreements by charging excessive paper statement fees and using those fees to reduce the agreed-upon length of subscriptions of members of the Statement Fee Class.

121.     As a direct and proximate result of GateHouse's breaches of contract, the Plaintiffs, the Classes, and the Consumer Subclass have suffered damages because, among other things, the Plaintiffs, the Classes, and the Consumer Subclass have not received the benefits of their subscription agreements, have overpaid for their subscriptions, and have paid excessive charges for paper statements.

122.     Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000

## COUNT III: VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT, R.C. § 1345.01 ET SEQ.
### (As To The Plaintiffs And The Consumer Subclass)

123.     Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

124.     Plaintiffs and members of the Consumer Subclass are "consumers" within the scope of the Ohio Consumer Sales Practices Act ("CSPA").

125.  The subscription agreements between the Plaintiffs and the members of the Consumer Subclass, on the one hand, and GateHouse, on the other hand, constitute "consumer transactions" within the scope of the CSPA.

126.  GateHouse is a "supplier" within the scope of the CSPA because GateHouse engages in the business of effecting and soliciting consumer transactions.

127.  The CSPA prohibits suppliers from engaging in unfair, deceptive, or unconscionable acts.

128.  Among other things, the CSPA provides that it is a deceptive practice for a supplier to represent (1) that the subject of the consumer transaction has characteristics or benefits that it does not have or (2) that a specific price advantage exists, if it does not.

129.  The CSPA also provides that in determining whether conduct is unfair or deceptive, a "court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended." R.C. § 1345.02(C).

130.  The FTC has stated, among other things, that "accurate information in the text may not remedy a false headline because consumers may glance only at the headline" and that "[w]ritten disclosures or fine print may be insufficient to correct misleading representations." FTC Policy Statement on Deception (1983).

131.  The CSPA further provides that in determining whether an act is unconscionable, a court should consider "[w]hether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the

21

consumer transaction"; and "[w]hether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier." R.C. § 1345.03(B)(3) & (5).

132. GateHouse engaged in unfair, deceptive, and/or unconscionable acts in violation of the CSPA by, among other things, (1) advertising fixed-length subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making fixed-term subscription offers; (3) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse intended to issue; (4) requiring customers to enter into one-sided agreements that purported to permit GateHouse to unilaterally alter the parties' agreement; (5) continuously changing its terms of sale; (6) abusing its power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (7) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (8) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (9) requiring customers to enter into agreements that purport to unreasonably limit the timeframe for a customer to file suit; and (10) charging customers an excessive paper statement fee.

133. GateHouse, by virtue of Chapter 109:4-3 of the Ohio Administrative Code and various decisions of Ohio courts, has been on notice that it is violating several provisions of the CSPA and has committed those violations of the CSPA after such regulations were issued and such decisions were available for inspection pursuant to R.C. § 1345.05(A)(3).

134. Under O.A.C. 109:4-3-02(A)(1):

22

It is a deceptive act or practice in connection with a consumer transaction for a supplier, in the sale or offering for sale of goods or services, to make any offer in written or printed advertising or promotional literature *without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions.* Disclosure shall be easily legible to anyone reading the advertising or promotional literature and shall be sufficiently specific so as to leave no reasonable probability that the terms of the offer might be misunderstood.

135. Further, O.A.C. 109:4-3-02(C) provides that a "statement of exclusions, reservations, limitations, modifications, or conditions which appears in a footnote to an advertisement to which reference is made in the advertisement by an asterisk or other symbol placed next to the offer being limited is not in close proximity to the words stating the offer."

136. O.A.C. 109:4-3-02(D) also includes an internet-specific rule relating to material disclosures:

It is a deceptive act or practice in connection with an offer made on the internet, to make any offer *without stating clearly and conspicuously, in close proximity to the words stating the offer, any material exclusions, reservations, limitations, modifications, or conditions.* Disclosures should be as near to, and if possible on the same screen, as the triggering offer. If scrolling or a hyperlink is necessary to view the disclosure, the advertisement should guide consumers with obvious terms or instructions to scroll down or click on the hyperlink. Hyperlinked disclosures should lead directly to the disclosed information and not require scrolling or clicking on any additional hyperlinks.

137. Under O.A.C. 109:4-3-03(B)(1), it is

[A] deceptive and unfair act or practice for a supplier to make an offer of sale of any goods or services when such offer is *not a bona fide effort to sell such goods or services.* An offer is not bona fide if...[a] supplier uses a statement or illustration or *makes a representation in any advertisement* which would create in the mind of a reasonable consumer, *a false impression* as to the grade, quality, *quantity*, make, model, year, price, value, size, color, utility, origin or any other material aspect of the offered goods or services in such a manner that, upon subsequent disclosure or discovery of the facts, the consumer may be induced to purchase goods or services other than those offered.

23

138. Under O.A.C. 109:4-3-09(B) it is "a deceptive act or practice for a supplier to furnish similar goods of equal or greater value when there was no intention to ship, deliver, or install the original goods ordered."

139. In the following actions, a court determined that conduct that is substantially similar to the conduct of GateHouse was unfair, deceptive, and/or unconscionable:

a. *State of Ohio ex rel. Yost v. Thrifty Propone, Inc., et al.*, Medina County Common Pleas Case No. 16 CIV0008, P.I.F. # 3300 (July 3, 2019) (Defendant violated R.C. § 1345.02 by continually changing terms and conditions and enforcing terms and conditions that were not applicable at the time of the consumers' purchase).

b. *State of Ohio ex rel. Montgomery v. Explorer, Micro, Inc.*, Franklin County Common Pleas Case No. 02CVH32695, P.I.F. # 10002089 (Defendant's terms and conditions were substantially one-sided because those terms and conditions gave the defendant the unconditional right to unilaterally changes those terms and conditions and the defendant could limit refunds to current costs).

c. *William J. Brown v. Marlin E. Cole*, Richland County Common Pleas Case No. 75-579, P.I.F. # 10000123 (November 5, 1979) (Defendant violated CSPA by, among other things, representing that TV guide would be provided in a greater quantity than intended).

d. *State of Ohio ex rel. Dewine v. Add Source, LLC*, Delaware County Common Pleas Case No. 14-CVH-10574, P.I.F. # 1003183 (February 11, 2015) (Defendant violated R.C. § 1345.02(B)(8) by advertising for a specific price that was not actually charged).

e. *State of Ohio ex rel. Dewine v. Form Giant LLC*, Hamilton County Common Pleas Case No. 1307550, P.I.F. # 10003139 (May 9, 2014) (Defendant violated R.C. § 1304.02(A) and O.A.C. 109:4-3-02 by failing to clearly and conspicuously disclose material limitations).

f. *Lardakis v. Martin*, Summit County Court of Common Pleas Case No. CV 94 01 0234, P.I.F. # 1436 (Aug. 8, 1994) (A defendant "engaging in any fraudulent oral or written misrepresentations, or otherwise conveying factually incorrect information to clients" as well as "accepting money for consumer services knowing that the consumer will not receive the services for which she has paid" constitutes unfair practices).

g. *State ex rel. Petro v. Level Propane Gases, Inc.*, Delaware County Court of Common Pleas No. 01-CVH 01-018, 2003 WL 24289604, at *5 (2003) (Defendant was liable under the CSPA for utilizing or enforcing any provision purporting to reserve to the defendant the unfettered right to modify the contract with a consumer unilaterally and "making offers in written or printed advertisements without stating clearly and conspicuously in close proximity to the words stating the offer any

material exclusions, reservations, limitations, modifications, or conditions to obtaining the offered [goods] and/ or the offered price").

h. *State ex rel. Fisher v. Kennedy,* Butler County Court of Common Pleas No. CV94-10-1652, P.I.F. # 10001510 (June 27, 1995) (Defendants violated the CSPA by charging customers for services not authorized by the customers).

i. *State ex rel. Cordray v. Trump Travel,* Franklin County Court of Common Pleas No. 06-CVH-08-11085, P.I.F. # 2811 (Oct. 29, 2009) (Defendants violated the CSPA by utilizing advertisements that notified consumers of a free trip without clearly and conspicuously, in close proximity to the offer, stating all material limitations to the offer and by conveying a misleading impression regarding the quality of the consumer transaction).

j. *In re Vonage Holdings Corp.,* State of Ohio Office of Attorney General Consumer Protection Section, P.I.F. # 2817a (July 19, 2011) (Respondent must disclose, "in close proximity to the offer of the discounted service plan or discounted equipment, all material limitations including, but not limited to . . . existence of any fees or charges solely applicable to the discounted service or equipment offer that must be paid to receive the discounted service or equipment" and "the time period of any discounted service plan").

140. As a direct and proximate result of GateHouse's violations of the CSPA, the Plaintiffs and the members of the Consumer Subclass have suffered damages because, among other things, the Plaintiffs and members of the Consumer Subclass have not received the benefits of their subscription agreements and have overpaid for their subscriptions to The Dispatch.

141. Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000

## COUNT IV: DECLARATORY JUDGMENT
### (As To The Plaintiffs And The Consumer Subclass)

142. Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

143. There is a present dispute between the Plaintiffs and members of the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether GateHouse's conduct addressed above violates the CSPA.

144.     Real and justiciable controversies exist between the Plaintiffs and members of the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether GateHouse's conduct addressed above violates the CSPA.

145.     Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Consumer Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms.

146.     A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

147.     Pursuant to R.C. § 2721.01 et seq., R.C. § 1345.09(D), and Civ. R. 57, Plaintiffs and the Consumer Subclass request a declaration that GateHouse engaged in unfair, deceptive, and unconscionable conduct in violation of the CSPA by, among other things, (1) advertising fixed-length subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making fixed-term subscription offers; (3) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse intended to issue; (4) requiring customers to enter into one-sided agreements that purported to permit GateHouse to unilaterally alter the parties' agreement; (5) continuously changing its terms of sale; (6) abusing its power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (7) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (8) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (9) requiring customers to enter into agreements that purport to

26

unreasonably limit the timeframe for a customer to file suit; and (10) charging customers an excessive paper statement fee.

## COUNT V: VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT, R.C. § 4165.01 ET SEQ.
### (As To The Plaintiffs, The Premium Edition Class, And The Consumer Subclass)

148.    Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

149.    Plaintiffs and the members of the Premium Edition Class and the Consumer Subclass are "persons" as defined in R.C. § 4165.01(D).

150.    GateHouse is a "person" as defined in R.C. § 4165.01(D).

151.    For the reasons previously stated, GateHouse engaged in deceptive trade practices in violation of R.C. § 4165.02(A)(7) because GateHouse represented that its goods/services have "characteristics," "benefits," or "quantities" that they do not have.

152.    GateHouse willfully engaged in trade practices in violation of R.C. § 4165.02, knowing those practices to be deceptive.

153.    As a direct and proximate result of GateHouse's violations of the ODTPA, the Plaintiffs, members of the Premium Edition Class, and members of the Consumer Subclass have suffered damages because, among other things, the Plaintiffs, members of the Premium Edition Class, and members of the Consumer Subclass have not received the benefits of their subscription agreements and have overpaid for their subscriptions to The Dispatch.

154.    Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000

### COUNT VI: DECLARATORY JUDGMENT
**(As To The Plaintiffs, Premium Edition Class, And The Consumer Subclass)**

155. Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

156. As laid out above, GateHouse has attempted to unilaterally modify the terms of sale of the subscription agreements in a manner that would deprive the Plaintiffs and the members of the Premium Edition Class and the Consumer Subclass of the benefits of their bargains.

157. The subscription agreements are form, adhesion agreements, and upon information and belief, the Plaintiffs and members of the Premium Edition Class and the Consumer Subclass were unable to negotiate the subscription agreements.

158. There is a present dispute between the Plaintiffs and members of the Premium Edition Class and the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether (1) the subscription agreements (as interpreted by GateHouse) are unconscionable; (2) the contractual limitations on liability in the subscription agreements are unconscionable; and (3) the limitations on the timeframe for filing suit in the subscription agreements are unconscionable.

159. Real and justiciable controversies exist between the Plaintiffs and members of the Premium Edition Class and the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether (1) the subscription agreements (as interpreted by GateHouse) are unconscionable; (2) the contractual limitations on liability in the subscription agreements are unconscionable; and (3) the limitations on the timeframe for filing suit in the subscription agreements are unconscionable.

28

160.     Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Premium Edition Class and the Consumer Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms.

161.     A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

162.     Pursuant to R.C. § 2721.01 et seq. and Civ. R. 57, Plaintiffs, the Premium Edition Class, and the Consumer Subclass request a declaration that (1) the subscription agreements (as interpreted by GateHouse) are unconscionable; (2) the contractual limitations on liability in the subscription agreements are unconscionable; and (3) the limitations on the timeframe for filing suit in the subscription agreements are unconscionable.

## COUNT VII: DECLARATORY JUDGMENT
### (As To The Plaintiffs, The Premium Edition Class, And The Consumer Subclass)

163.     Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

164.     As laid out above, GateHouse has attempted to unilaterally modify the terms of sale of the subscription agreements in a manner that would deprive the Plaintiffs and the members of the Premium Edition Class and the Consumer Subclass of the benefits of their bargains.

165.     Thus, under GateHouse's interpretation of the subscription agreements, GateHouse retains the unlimited right to determine the nature and extent of its performance and to eliminate its promises to the Plaintiffs, the Premium Edition Class, and the Consumer Subclass.

166.     There is a present dispute between the Plaintiffs and members of the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether the subscription agreements (as interpreted by GateHouse) are illusory agreements.

29

167. Real and justiciable controversies exist between the Plaintiffs and members of the Consumer Subclass, on the one hand, and GateHouse, on the other, regarding whether the subscription agreements (as interpreted by GateHouse) are illusory agreements.

168. Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Premium Edition Class and the Consumer Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms.

169. A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

170. Pursuant to R.C. § 2721.01 et seq. and Civ. R. 57, Plaintiffs, the Premium Edition Class, and the Consumer Subclass request a declaration that the subscription agreements (as interpreted by GateHouse) are illusory agreements.

## COUNT VIII: UNJUST ENRICHMENT
### (As To The Plaintiffs, The Classes, And The Consumer Subclass)

171. Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

172. The Plaintiffs and members of the Classes and the Consumer Subclass conferred a benefit on GateHouse by, among other things, paying for premium editions and for inflated paper statement fees.

173. GateHouse, at all times relevant to this lawsuit, knew of the benefits conferred upon it.

174. Because GateHouse obtained these benefits through deception and other wrongful conduct, it would be unjust for GateHouse to retain these benefits.

30

175. As a direct and proximate result of GateHouse's unjust enrichment, the Plaintiffs, the Classes, and the Consumer Subclass have suffered damages.

176. Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

## COUNT IX: INJUNCTIVE RELIEF
### (As To The Plaintiffs, The Classes, And The Consumer Subclass)

177. Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

178. The Plaintiffs, the Classes, and the Consumer Subclass all have a strong likelihood of success on the merits of the claims addressed herein and will continue to suffer irreparable harm if the conduct of GateHouse is not enjoined.

179. Further, R.C. § 1345.09(D) expressly provides that consumers can seek an injunction against an act or practice that violates the CSPA, while R.C. § 4165.03 provides for injunctive relief to a person likely to be damaged by a violation of R.C. § 4165.02(A).

180. An injunction is warranted based on the balance of the hardships. If the Court declines to issue an injunction, GateHouse will continue to wrongfully charge its customers for premium editions and paper fee statements.

181. An injunction would not harm third parties, and the public interest would be served by the issuance of an injunction preventing GateHouse's willful violations of the CSPA and ODTPA.

182. Therefore, the Plaintiffs, the Classes, and the Consumer Subclass request an injunction precluding GateHouse from (1) charging for premium editions without proper

disclosure; (2) charging inflated paper statement fees; and (3) engaging in any other violation of the CSPA.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes and the Consumer Subclass, request that judgment be granted against GateHouse as follows:

A. That the Court certify the Classes and the Consumer Subclass pursuant to Rule 23 of the Ohio Rules of Civil Procedure, and direct to the members the best notice practicable under Civ. R. 23;

B. Appointment of the Plaintiffs as Class Representatives for their respective Classes and the Consumer Subclass;

C. Appointment of the undersigned as Class Counsel for the Classes and the Consumer Subclass;

D. On Counts I-III, V, and VIII, an award of damages and/or restitution in an amount in excess of $25,000, which will be more specifically determined at trial;

E. An award of punitive damages in an amount in excess of $25,000, which will be more specifically determined at trial;

F. On Count IV, a declaratory judgment that GateHouse engaged in unfair, deceptive, and unconscionable conduct in violation of the CSPA by, among other things, (1) advertising fixed-length subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making fixed-term subscription offers; (3) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse intended to issue; (4) requiring customers to enter into one-sided agreements that purported to permit GateHouse to unilaterally alter the parties' agreement; (5) continuously changing its terms of sale; (6) abusing its power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (7) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (8) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (9) requiring customers to enter into agreements that purport to unreasonably limit the timeframe for a customer to file suit; and (10) charging customers an excessive paper statement fee;

G. On Count VI, a declaratory judgment that (1) the subscription agreements (as interpreted by GateHouse) are unconscionable; (2) the contractual limitations on liability in the subscription agreements are unconscionable; and (3) the limitations on the timeframe for filing suit in the subscription agreements are unconscionable;

H. On Count VII, a declaratory judgment that that the subscription agreements (as interpreted by GateHouse) are illusory agreements;

32

I.   On Count IX, injunctive relief enjoining GateHouse from (1) charging for premium editions without proper disclosure; (2) charging inflated paper statement fees; and (3) engaging in any other violation of the CSPA;

J.   Plaintiffs' costs and expenses, including reasonable attorneys' fees;

K.   Pre- and post-judgment interest; and

L.   Additional relief, at law or in equity, that the Court deems just.


Respectfully submitted,


   /s/ Todd H. Neuman
Todd H. Neuman        (0059819)
Rick L. Ashton        (0077768)
Jeffrey R. Corcoran   (0088222)
Tom Shafirstein       (0093752)
Allen Stovall Neuman Fisher & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:    (614) 221-8500
Facsimile:    (614) 221-5988
E-mail:       neuman@aksnlaw.com
              ashton@asnfa.com
              corcoran@asnfa.com
              shafirstein@asnfa.com
*Counsel for Plaintiffs*


## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.


   /s/ Todd H. Neuman
Todd H. Neuman        (0059819)


33

**THIS PAGE INTENTIONALLY LEFT BLANK**

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
373 SOUTH HIGH STREET
COLUMBUS, OHIO 43215-4579



**CERTIFIED MAIL**

USPS CERTIFIED MAIL



9214 8901 1952 2805 6956 35

U.S. POSTAGE ⟩⟩ PITNEY BOWES

ZIP 43215 $ 006.55⁰
02 4W
0000361018 AUG 26 2019

19CV-08-6859   H3   ADDR: 1
  93752     TOM SHAFIRTEIN

F O R W A R D I N G   S E R V I C E   R E Q U E S T E D

        EWALT
GATEHOUSE MEDIA OHIO HOLD
CORPORATION SERVICE CO
50 WEST BROAD STREET
SUITE 1330
COLUMBUS, OH
        43215



4321519CV06859EWALT