**IN THE UNITED STATES DISTRICT COURT**    **Exhibit 1**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **John Ewalt, Steve Wylie, and Bonnie Navarre,** on behalf of themselves and all others similarly situated, | **Case No. 2:19-cv-4262** |
| *Plaintiffs*, | **Chief Judge Algenon L. Marbley** |
| *v.* | **Magistrate Judge Kimberly A. Jolson** |
| **GateHouse Media Ohio Holdings II, Inc., d/b/a The Columbus Dispatch, Copley Ohio Newspapers, Inc., GateHouse Media, LLC, and Gannett Co., Inc.,** | |
| *Defendants*. | |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>
**(DEMAND FOR JURY TRIAL ENDORSED HEREIN)**

Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre, on behalf of themselves and all those similarly situated, for their Complaint against Defendants GateHouse Media Ohio Holdings II, Inc., d/b/a The Columbus Dispatch ("GateHouse Ohio"), Copley Ohio Newspapers, Inc. ("Copley Ohio"), GateHouse Media, LLC, and Gannett Co., Inc. (collectively, the "GateHouse Defendants"), state as follows:

<u>**INTRODUCTION**</u>

1. This case arises from the GateHouse Defendants' shameless attempt to deprive their customers—subscribers to *The Columbus Dispatch* ("The Dispatch") and the *Akron Beacon Journal* ("The Beacon") (collectively, the "GateHouse Newspapers")—of the benefit of their bargains.

2.      For years, the GateHouse Defendants have purchased reputable local newspapers and abused the trust and loyalty of the subscribers of those newspapers with unauthorized charges to those subscribers' prepaid accounts.

3.      For instance, in 2015, GateHouse Ohio purchased The Dispatch, which had been family owned and operated for more than a century.

4.      Shortly thereafter, the GateHouse Defendants instituted the deceptive practices that are the subject of this litigation.

5.      Specifically, the GateHouse Defendants advertise and offer term subscriptions to The Dispatch (e.g., 13 weeks, 26 weeks, 52 weeks) for specific prices, and their customers enter into these agreements ("Subscription Agreements") reasonably expecting that the GateHouse Defendants will provide The Dispatch for the number of weeks stated in those Subscription Agreements.

6.      But that is not what those customers receive.

7.      Instead, the GateHouse Defendants reduce their customers' term subscriptions by sending their customers unsolicited "premium editions" and decreasing the length of those subscriptions based on the value the GateHouse Defendants arbitrarily assign to these premium editions.

8.      To make up for declining subscription revenue, the Gatehouse Defendants have continued to increase the frequency of and price for these premium editions.

9.      In most instances, these so-called premium editions have no connection to the subscriptions to The Dispatch—the actual item customers purchase—and are all but worthless.

10.     Examples of such premium editions include (1) a calendar; (2) a pet magazine

2

(titled "Happy Pets"); (3) a health guide; (4) a puzzle book; (5) a cookbook; (6) publications on the summer of 1969 and The Great Depression (with pictures primarily pulled from various sources on the internet such as Wikipedia and Flickr); and (7) Columbus Monthly (a publication owned by GateHouse Ohio or an affiliate)[1].

11.     As examples, two of those premium editions—the summer of 1969 and the pet magazine—are attached hereto as Exhibits A and B.

12.     To justify these premium editions, the GateHouse Defendants rely on their online terms of sale ("Terms of Sale"), which are constantly being revised without notice to or consent from subscribers.

13.     The GateHouse Defendants, through their modification of The Dispatch's Terms of Sale, purport to unilaterally establish (1) inflated prices for these premium editions (currently, $9.00 per premium edition); and (2) the frequency of these premium editions (currently, up to 3 per month, or 36 per year).

14.     Therefore, under the current Terms of Sale for The Dispatch, the GateHouse Defendants are supposedly entitled to charge a customer *$324 a year* for unrequested premium editions.

15.     The GateHouse Defendants are well aware that subscribers to The Dispatch (and to their other newspapers) do not want premium editions.

---

[1] The $9.00 charge for Columbus Monthly is incredible given that a customer can currently obtain 12 issues of Columbus Monthly for only $18 (or $1.50 per issue). This increased circulation of Columbus Monthly also presumably increases the advertising revenue that the GateHouse Defendants receive for the publication.

16.     To reduce the likelihood that their customers would notice charges for premium editions, the GateHouse Defendants do not separately bill customers for those premium editions.

17.     Rather, as noted above, the GateHouse Defendants reduce the length of their customers' subscriptions based on the arbitrary value that the GateHouse Defendants assign to these premium editions.

18.     Thus, a subscriber of The Dispatch does not receive the newspaper for the full term of the subscription.

19.     As an example, Plaintiff Bonnie Navarre, on or about September 8, 2019, purchased a 52-week subscription for Sunday delivery for approximately $1 per week.

20.     On December 1, 2019, she received an invoice indicating that her subscription expired on November 9, 2019—*about 8 weeks after the start her subscription period*—and that she actually owed The Dispatch $3.40.

21.     In other words, after receiving a mere 15% of her subscription, she was told that her subscription had prematurely ended and that she still needed to pay The Dispatch for the equivalent of 3 more weeks.

22.     Then, on December 15, 2019, she received another renewal notice stating that she now owed $12.40 (or the equivalent of 12 weeks—more weeks than she actually received).

23.     When she contacted customer service for an explanation of why she only received the paper for approximately 8 weeks, she was given the runaround.

24.     The GateHouse Defendants also do not disclose that customers can opt out of receiving and paying for premium editions because the GateHouse Defendants know that too many of their customers would choose to this option.

4

25.     Through this deceptive scheme, the GateHouse Defendants foist unwanted premium editions on unsuspecting customers and prevent those customers from receiving the subscriptions for which those customers paid.

26.     If that were not enough, subscribers to The Dispatch generally cannot receive copies of their invoices online, and when a customer receives paper invoices, *the GateHouse Defendants assess that customer $9.00 per invoice* (which, of course, shortens the customer's subscription even further).

27.     This $9.00 paper statement fee bears no relation to the cost of generating and sending a paper invoice.

28.     In fact, just a few years ago, the GateHouse Defendants only charged $1.00 for paper invoices.

29.     Though the GateHouse Defendants have worked to conceal their misconduct, that misconduct has not gone entirely unnoticed.

30.     Specifically, the Better Business Bureau has received a pattern of complaints from GateHouse Ohio consumers claiming "*their yearly subscriptions run out long before the year is over, they have trouble contacting customer service, and they cannot get an accurate invoice*[.]"[2]

31.     The GateHouse Defendants' deceptive intent is evident from what the GateHouse Defendants chose not to do.

32.     If the GateHouse Defendants genuinely wanted to provide premium content to their customers in a reasonable, transparent manner, the GateHouse Defendants would have (1) clearly

---

[2] [https://www.bbb.org/us/oh/columbus/profile/newspaper/gatehouse-media-ohio-holdings-ii-inc -0302-802/details#all-alerts]

5

and conspicuously disclosed the terms related to their premium editions (rather than using examples that misleading suggest premium editions are rare and inexpensive); (2) billed separately for premium editions (rather than reducing the agreed-upon subscription length); (3) disclosed that a customer can opt out of receiving premium editions; (4) provided advance notice regarding the exact number, cost, and type of premium editions that customers will receive; (5) charged reasonable rates for premium editions; (6) provided premium editions that were news related; and (7) provided customers with online access to detailed billing summaries.

33.     The GateHouse Defendants, of course, took none of these steps.

34.     Moreover, the GateHouse Defendants' misconduct is not isolated to The Dispatch.

35.     The GateHouse Defendants have also acquired The Beacon and subjected the subscribers of this newspaper to their premium-edition practices and paper statement fees.

36.     Indeed, the GateHouse Defendants' misconduct is not even limited to Ohio.

37.     In early 2017, GateHouse Media, LLC and its Massachusetts affiliates were sued for deceptively reducing their customers' subscriptions through the issuance of premium editions, and GateHouse Media, LLC and its Massachusetts affiliates agreed—prior to the commencement of the lawsuit—to pay up to $5.6 million to reimburse those customers on a class-wide basis.

38.     Alarmingly, after GateHouse Media, LLC and its Massachusetts affiliates agreed to pay millions of dollars for engaging in this deceptive practice, the GateHouse Defendants not only continued this practice, but actually dramatically increased the charges for and frequency of their premium editions.

39.     With this action, the Plaintiffs seek to obtain redress on behalf of themselves and those who have also been subjected to the GateHouse Defendants' unscrupulous business practices

and to prevent the GateHouse Defendants from continuing to exploit their customers by raiding those customers' prepaid accounts to shore up the GateHouse Defendants' bottom line.

## PARTIES, JURISDICTION, AND VENUE

40.     Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre are Ohio residents.

41.     Defendant Gatehouse Media Ohio Holdings II, Inc. d/b/a The Columbus Dispatch is a corporation that conducts business in Columbus and throughout Ohio.

42.     Copley Ohio Newspapers, Inc. is a corporation that conducts business throughout Ohio and owns the Akron Beacon Journal.

43.     GateHouse Media, LLC is a limited liability company that conducts business throughout Ohio through its subsidiaries and/or affiliates.

44.     Gannett Co., Inc. (f/k/a New Media Investment Group Inc.) is a corporation that conducts business throughout Ohio through its subsidiaries and/or affiliates.

45.     GateHouse Ohio, Copley Ohio, and GateHouse Media, LLC are all direct or indirect subsidiaries/affiliates of Gannett Co., Inc.

46.     There is significant overlap in management and control of the GateHouse Defendants.

47.      Gannett Co., Inc. (through Denise Robbins and others) and GateHouse Media, LLC (through Lee Knapp and others) directed and participated in the premium-edition practices and paper-statement-fee practices at issue in this case.

48.     The GateHouse Defendants view themselves as a consolidated enterprise, as evidenced by GateHouse Ohio's recent disclosure in this case of its list of competitors.

7

49.     In that disclosure, GateHouse Ohio identified itself as a subsidiary of Gannett Co., Inc. and accordingly designated as competitors "all print and digital newspapers, magazines, websites, and other organizations that provide information regarding news, politics, sports, and other current events in the United States[.]"

50.     The Court has personal jurisdiction over the GateHouse Defendants pursuant to R.C. § 2307.382(A)(1) because the GateHouse Defendants transact business in this State, and the claims alleged herein arise from those business transactions.   The Court also has personal jurisdiction over the GateHouse Defendants pursuant to R.C. § 2307.382(A)(2) because the GateHouse Defendants contracted to supply goods and services in this state, and the claims alleged herein arise from those transactions.

51.     The Court's exercise of jurisdiction over the GateHouse Defendants is consistent with due process because (1) the GateHouse Defendants purposefully availed themselves of the privilege of acting in this state or causing a consequence in this state; (2) the case arises from the GateHouse Defendants' activities in this state; and (3) the GateHouse Defendants have a substantial connection with this state such that the Court's exercise of jurisdiction is reasonable.

## BACKGROUND FACTS

### I.     The GateHouse Defendants

52.     Newspapers are in the credibility business; the GateHouse Defendants are in the business of exploiting that credibility.

8

53.     Over the past several years, GateHouse Media [3] acquired numerous respected, trusted local publications and then instituted the deceptive practices described herein.

54.     Upon information and belief, GateHouse Media's acquisition-focused business model was dictated by hedge fund Fortress Investment Group.

55.     Prior to the merger between GateHouse Media and Gannett, Fortress managed GateHouse Media in exchange for a fee of 1.5% of GateHouse Media's assets and 25% of GateHouse Media's profits.

56.     Not surprisingly, then, GateHouse Media, under Fortress' management, focused on acquisition and short-term profits at the expense of the newspapers they ran.

57.     GateHouse Media's practice of acquiring newspapers and draining the life from those newspapers rightfully received criticism.

58.     In a scathing critique of the recent merger between GateHouse Media and Gannett, the NewsGuild-Communications Workers of America detailed the GateHouse Defendants' "cash extraction" model. [4]

59.     The NewsGuild observed that the Fortress management agreement was set to terminate at the end of 2021, and that by the time of termination of the agreement, Fortress will likely have extracted *$250 million* from GateHouse Media between 2014 and 2021.

---

[3] For the purposes of this section, the term "GateHouse Media" refers to pre-merger New Media Investment Group and its GateHouse subsidiaries.  In 2019, New Media Investment Group merged one of its subsidiaries with Gannett Co., Inc.  Though GateHouse was effectively acquiring Gannett, as part of the merger/acquisition, New Media Investment Group (the parent of the GateHouse entities) renamed itself Gannett Co., Inc. and now operates under that name.

[4] A true and accurate copy of the NewsGuild analysis is attached hereto as Exhibit C.

60.     The GateHouse Defendants' myopic premium-edition and paper-statement-fee practices fit perfectly within this cash-extraction scheme.

61.     Though these practices damage the newspapers run by the GateHouse Defendants and destroy the goodwill these newspapers have spent decades building, these practices lead to millions of dollars in short-term profits that can be paid as dividends to shareholders and as management fees to Fortress.

62.     The GateHouse Defendants' misconduct addressed herein is malicious because the GateHouse Defendants engage in that misconduct with a conscious disregard for the rights of other persons when there is a great probability of causing substantial harm.

63.     The GateHouse Defendants engage in aggravated/egregious fraud because the GateHouse Defendants' fraudulent/deceptive wrongdoing is particularly gross.

64.     The GateHouse Defendants also engage in the misconduct addressed herein in bad faith.

## II.     <u>The Columbus Dispatch</u>

65.     The Dispatch was founded in 1871, and in 1905, the paper was purchased by the Wolfe family.

66.     For more than 100 years, the Wolfe family owned and operated The Dispatch.

67.     The Dispatch, prior to the acquisition by GateHouse Ohio, would infrequently publish special/premium editions that were news related and were tied to an occasional holiday and would charge a relatively small amount for these special/premium editions.

68.     For example, in the early 2010s, The Dispatch would provide a Thanksgiving edition for a charge of $1.25.

69.     The Dispatch's Thanksgiving edition was substantially similar to its regular editions.

70.     However, in 2015, The Dispatch was acquired by GateHouse Ohio.

71.     Since the acquisition by GateHouse Ohio, The Dispatch has advertised and sold term subscriptions (e.g., 13 weeks, 26 weeks, 52 weeks) at stated prices to its customers.

72.     Subscribers assent to those Subscription Agreements reasonably expecting the GateHouse Defendants will deliver The Dispatch for the stated term.

73.     Subscribers do not assent to the Terms of Sale, and those Terms of Sale are not incorporated into the Subscription Agreements, because, among other things, those Terms of Sale are merely posted on The Dispatch's website and subscribers are never required to acknowledge or agree to those Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale).[5]

74.     The GateHouse Defendants also may bury notice of their Terms of Sale in The Dispatch, but this notice does not, and cannot, modify the parties' Subscription Agreements because modification of a contract requires the assent of both parties (not just notice from one party to another of proposed terms).

75.     Under The Dispatch's Terms of Sale, the GateHouse Defendants do not separately bill for these unsolicited premium editions.

---

[5] The Terms of Sale are also unenforceable for a number of other reasons, including that those Terms of Sale are constantly being revised without notice to or authorization from subscribers; incorporation of those Terms of Sale would result in hardship and surprise; the Terms of Sale are illusory; and the Terms of Sale are unconscionable.  And even if the Terms of Sale were enforceable, the GateHouse Defendants still breached the Terms of Sale by failing to deliver the "product" under the Terms of Sale and sending publications that did not qualify as "premium editions," as explained more fully below.

76.     Rather, the GateHouse Defendants wrongfully reduce the length of customers' subscriptions based on the arbitrary value that the GateHouse Defendants assigns to their premium editions.

77.     If the GateHouse Defendants wanted to provide premium editions in a reasonable, transparent manner, the GateHouse Defendants could easily include the cost for premium editions in the advertised price for a subscription[6], disclose in advance the expected frequency and cost for premium editions for the subscription period, or list the cost for premium editions separately and allow customers to purchase (or decline to purchase) premium editions.

78.     But the GateHouse Defendants do not take these steps because they know that their customers do not want to pay for premium editions.

79.     Over time, the GateHouse Defendants have increased both the charges for and frequency of these premium editions to further decrease the length of customers' subscriptions.

80.     In early 2016, The Dispatch's Terms of Sale provided that every subscription would include "Thanksgiving Day, Memorial Day, July 4th, Labor Day and Columbus Day" premium editions.

81.     These Terms of Sale further provided that subscribers would receive no more than 6 premium editions per calendar year and that each premium edition would cost up to $2.

82.     Since then, the GateHouse Defendants have increased the amount they can charge per year for premium editions by 2,700%.

---

[6] In response to the above-referenced pattern of complaints with the Better Business Bureau, GateHouse Ohio noted that it was looking at a "one rate" option and was testing this option in other markets.   [*See* https://www.bbb.org/us/oh/columbus/profile/newspaper/gatehouse-media-ohio-holdings-ii-inc-0302-802/details#all-alerts]

83.     Indeed, during just a six-month period in 2017, the GateHouse Defendants increased the charges/frequency relating to premium editions 4 separate times.

84.     The following table reflects changes in by The Dispatch's Terms of Sale relating to premium editions:

| Date | Maximum Charge Per Premium Edition | Maximum Frequency | Maximum Charges for Premium Editions Per Year |
|------|-----------------------------------|-------------------|----------------------------------------------|
| 2011-2016 | $1.25 | 1 per year (Thanksgiving Edition) | $1.25 |
| January 2016 | $2.00 | 6 per year | $12 |
| July 2016 | $3.00 | 8 per year | $24 |
| March 2017 | $3.00 | 10 per year | $30 |
| July 2017 | $3.00 | 12 per year | $36 |
| August 2017 | $4.00 | 13 per year | $52 |
| September 2017 | $4.00 | 2 per month (24 per year) | $96 |
| February 2018 | $5.00 | 2 per month (24 per year) | $120 |
| May 2019 | $9.00 | 3 per month (36 per year) | $324 |

85.     At times, the Terms of Sale have been internally inconsistent.

86.     For example, in the August 2017 Terms of Sale, one section stated that the maximum charge would be $3.00, while another section stated the maximum charge would be $4.00.

87.     The same Terms of Sale also stated, in one section, that the maximum number of premium editions would be 12, but, in another section, that the maximum number would be 13.

13

88.     At present, as laid out above, the GateHouse Defendants, under the Terms of Sale, are supposedly entitled to distribute $324 worth of premium editions in a given year.

89.     What is more, though the GateHouse Defendants have recently revised their other premium-edition disclosures, those disclosures are ***still*** misleading.

90.     In their current subscription/renewal invoices, the GateHouse Defendants give the following example to demonstrate their premium edition policy:

> As an illustrative example, if you select a subscription of up to ***12 weeks*** at a cost of $48.00, and ***2 premium editions at $2.00 each are published*** and delivered to you during that subscription period, your subscription will be shortened by 1 week, because the weekly cost of the subscription is $4.00 per week and the premium edition charges total $4.00. Depending upon the length of your subscription and the timing of the publication and delivery of premium editions, ***you will not be charged for any premium editions if none are published and delivered to you during your subscription***. As such, in that case only, the length of your subscription will not be shortened.

91.     In the last 12 weeks of 2019, the GateHouse Defendants issued 6 premium editions at a total cost of ***$52.50—more than 13 times the cost for premium editions in the above example, and more than the entire amount of the subscription in the above example***.

92.     If the GateHouse Defendants wanted to properly disclose their premium edition practices, the GateHouse Defendants would have provided examples that were consistent with their past practices.

93.     Incredibly, the GateHouse Defendants' premium editions typically have nothing to do with the news.

94.     Since 2016, The Dispatch has distributed the following premium editions:

| Date | Charge | Description |
|------|--------|-------------|
| **2016** | | |
| 03/06/16 | $2.00 | Columbus Monthly - Spring Edition |
| 05/30/16 | $2.00 | Columbus Monthly - Summer Entertainment Guide |

14

| 07/04/16 | $2.00 | Columbus Monthly - Best of Columbus |
| 08/24/16 | $2.50[7] | This Week - Friday Night Football |
| 09/05/16 | $2.50 | Dispatch Sports Extra |
| 09/25/16 | $2.50 | Columbus Monthly - Fall Restaurant Guide |
| 11/24/16 | $2.50 | Thanksgiving – Dispatch's Biggest Paper |
| 12/12/16 | $2.50 | 2017 Dispatch Photo Calendar |
| **2016 Total Premium Editions: 8** | | |
| **2016 Total Cost: $16.00 (EZ Pay) - $18.50** | | |
| **2017** | | |
| 02/13/17 | $3.00 | Columbus Monthly - Best New Restaurants |
| 03/20/17 | $3.00 | Mind Gym/Puzzle Book |
| 04/22/17 | $3.00 | Columbus Monthly - City Guide |
| 05/29/17 | $3.00 | Dispatch Summer Entertainment Guide |
| 06/24/17 | $3.00 | Columbus Monthly - Best of Columbus |
| 07/22/17 | $3.00 | Mind Gym/Puzzle Book |
| 08/21/17 | $3.00 | This Week - Friday Night Football |
| 09/09/17 | $3.00 | Everyday Heroes |
| 10/07/17 | $3.00 | Mind Gym/Puzzle Book |
| 11/23/17 | $3/$4 | Thanksgiving – Dispatch's Biggest Paper |
| 12/09/17 | $3/$4 | 2018 Dispatch Photo Calendar |
| **2017 Total Premium Editions: 11** | | |
| **2017 Total Cost: $33.00-$35.00** | | |
| **2018** | | |
| 01/13/18 | $4.00 | Mind Gym/Puzzle Book |
| 02/10/18 | $4.00 | Columbus Monthly - Best New Restaurants |
| 03/17/18 | $4.00 | Columbus Monthly – City Guide |
| 04/21/18 | $5.00 | Mind Gym/Puzzle Book |
| 05/26/18 | $5.00 | Summer Fun Guide |
| 06/30/18 | $5.00 | Columbus Monthly – Best of Columbus |
| 07/21/18 | $5.00 | Mind Gym/Puzzle Book |
| 08/19/18 | $5.00 | This Week - Friday Night Football |
| 09/09/18 | $5.00 | Everyday Heroes |
| 09/29/18 | $5.00 | Mind Gym/Puzzle Book |
| 10/21/18 | $5.00 | Columbus Monthly -10 Best Restaurants Guide |
| 10/31/18 | $5.00 | Mind Gym/Puzzle Book |
| 11/18/18 | $5.00 | Holiday Cookies |
| 11/22/18 | $5.00 | Thanksgiving – Dispatch's Biggest Paper |
| 12/09/18 | $6.00 | 2019 Dispatch Photo Calendar |
| 12/30/18 | $6.00 | Columbus Monthly - Health Edition |

---

[7] For the last five premium editions of 2016, EZ Pay customers paid $2.00, rather than $2.50.

| **2018 Total Premium Editions: 16** | | |
|---|---|---|
| **2018 Total Cost: $79.00** | | |
| **2019** | | |
| 01/13/19 | $6.00 | Mind Gym/Puzzle Book |
| 02/10/19 | $6.00 | Columbus Monthly – Best New Restaurants |
| 03/17/19 | $6.50 | Columbus Monthly – City Guide |
| 03/31/19 | $6.50 | Spring Cookbook & Entertainment Guide |
| 04/14/19 | $6.50 | Mind Gym/Puzzle Book |
| 05/26/19 | $7.00 | Summer Fun Guide |
| 06/02/19 | $7.00 | Travel Guide USA |
| 06/16/19 | $7.00 | Happy Pets |
| 06/30/19 | $8.50 | Columbus Monthly - Best of Columbus |
| 07/14/19 | $7.00 | Mind Gym/Puzzle Book |
| 07/28/19 | $8.00 | Summer of '69: A Look Back |
| 08/11/19 | $7.50 | Mayo Clinic Guide to Healthy Eating |
| 08/25/19 | $7.50 | Fall Cookbook |
| 09/08/19 | $7.50 | Everyday Heroes |
| 09/29/19 | $8.50 | Mind Gym/Puzzle Book |
| 10/13/19 | $8.50 | Columbus Monthly – Restaurant Guide |
| 10/27/19 | $8.50 | Thanksgiving Cookbook |
| 11/10/19 | $8.50 | Morningstar Guide to Investing |
| 11/28/19 | $9.00 | Dispatch Thanksgiving |
| 12/15/19 | $9.00 | 2020 Photo Calendar |
| 12/29/19 | $9.00 | 2020 Tips from Time & Money |
| **2019 Total Premium Editions: 21** | | |
| **2019 Total Cost: $159.50** | | |

95.     As reflected in the table, from 2016 to 2019, the GateHouse Defendants have increased actual premium edition charges by 862% for non-EZ pay subscribers and nearly 1,000% for EZ pay subscribers.

96.     The premium edition prices are not reasonable and have no connection to the cost of creating and sending those premium editions.

97.     Rather, premium edition charges are used to make up for revenue shortfalls that the Gatehouse Defendants face.

98.　More specifically, the stock of Gannett Co., Inc. is publicly traded, and the Gatehouse Defendants have used premium editions as a way to minimize losses caused by a decline in their core business.

99.　The GateHouse Defendants also fill their premium editions with advertisements and earn additional revenue from those advertisements.

100.　As noted above, the GateHouse Defendants rely on their Terms of Sale to justify their premium edition practices, yet they do not require customers to affirmatively acknowledge or agree to the Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale) and do not adequately disclose premium-edition-related terms to their customers with clear, conspicuous language at the time that they offer their term subscriptions.

101.　Moreover, the GateHouse Defendants do not provide notice of changes to their Terms of Sale (other than by simply posting those Terms of Sale on The Dispatch's website).

102.　If a subscriber enrolls in the automatic payment program (i.e., The Dispatch's EZ pay option), then a subscription automatically renews, notwithstanding the shortened subscription due to premium-edition charges.

103.　Because EZ pay customers automatically have their subscriptions renewed, these EZ pay customers are not advised that The Dispatch has shortened the length of their subscriptions.

104.　The GateHouse Defendants even encourage subscribers to sign up for the EZ pay option so those subscribers will be less likely to notice the shortening of their subscription lengths.

105.　Also, in a further effort to prevent their customers form uncovering their misconduct, the GateHouse Defendants do not allow their customers to view detailed invoices or billing summaries online.

17

106. Currently, when a customer requests a paper invoice, the GateHouse Defendants charge an unconscionable $9.00 fee per invoice.

107. This $9.00 charge is unconnected to the actual cost incurred in generating such a paper invoice.

108. The $9.00 paper statement fee is not disclosed to customers in the Terms of Sale; the GateHouse Defendants' position is that the paper statement fee is permissible because the parties' agreement does not expressly prohibit such a fee.

109. Obtaining a detailed billing summary from the GateHouse Defendants is either difficult or impossible.

110. In 2019, Sharon Ewalt called customer service for The Dispatch numerous times to obtain a summary of her payment history.

111. She was told repeatedly that she would receive a payment summary.

112. She was eventually informed that the GateHouse Defendants would not provide this information, as reflected in the following exchange during her call with customer service:

[GateHouse Supervisor]: Ma'am, I understand that you're asking confirmation of the last three years of payments that we've taken from your behalf?

[Sharon Ewalt]: Yes, for two years, if you can't do three.

…

[GateHouse Supervisor]: We used to offer the ability to receive a confirmation of your payment. But that changed. Our billing department no longer offers that, and that is no longer, uh, something we can fulfil. *If you would like to confirm your payments, you can go to your online subscription manager, but through there, you can only see the last payment we deducted. You won't have any history beyond that*.

[Sharon Ewalt]: Ok, that doesn't make any sense, that other people have gotten this.

[GateHouse Supervisor]: The reason why ma'am is that we had a recent change in our billing system. *We no longer offer confirmation to anything*. Not in an email or written way. We have it verbally and we have it through our website.

18

113.    Sharon Ewalt is not alone; both Steve Wylie and Bonnie Navarre were unable to obtain detailed billing summaries from the GateHouse Defendants.

114.    Other customers also consistently call to complain about receiving unsolicited premium editions.

115.    As noted above, the Better Business Bureau has received a pattern of complaints from GateHouse Ohio consumers claiming "***their yearly subscriptions run out long before the year is over, they have trouble contacting customer service, and they cannot get an accurate invoice***[.]"[8]

116.    The GateHouse Defendants—apparently expecting their customers would seek redress for this gross misconduct—included provisions in their Terms of Sale that purport to (1) limit GateHouse Ohio's and Copley Ohio's liability to "an amount equal to the amount you pay for the product or Website for one month" (without similarly limiting the subscribers' liability); and (2) require subscribers to file claims within one year of when the subscriber "could first bring the claim" (without limiting GateHouse Ohio's and Copley Ohio's ability to assert claims).

117.    The foregoing provisions are all commercially unreasonably, and there is no need for the GateHouse Defendants to impose such one-sided terms.

118.    The GateHouse Defendants, as noted above, have not simply exploited customers of The Dispatch.

**III.    The Akron Beacon Journal**

119.    The Beacon, like The Dispatch, was family-owned for decades.

_____

[8] [https://www.bbb.org/us/oh/columbus/profile/newspaper/gatehouse-media-ohio-holdings-ii-inc-0302-802/details#all-alerts]

120.    In April of 2018, the GateHouse Defendants acquired The Beacon.

121.    The Beacon, like The Dispatch, has implemented unreasonable premium-edition practices and charges unreasonable paper statement fees.

122.    The Beacon, like The Dispatch, advertises and sells term subscriptions.

123.    The Beacon, like The Dispatch, posts Terms of Sale on its website that purport to govern the issuance of premium editions.

124.    Currently, when a subscriber signs up through The Beacon's website, the subscriber is informed that the subscriber may be charged up to $6 for each premium edition and may receive up to 1 premium edition per month.

125.    Nevertheless, according to The Beacon's current Terms of Sale, subscribers may receive up to 3 premium editions per month at a charge of up to $9.00 per premium edition.[9]

126.    The Beacon, like The Dispatch, has issued unwanted premium editions to customers and shortened the length of those customers' subscriptions based on the value arbitrarily assigned to those premium editions.

127.    Upon information and belief, The Beacon, like The Dispatch, has also charged its customers excessive paper statement fees and shortened the length of those customers' subscriptions based on the paper statement fees.

**FACTUAL ALLEGATIONS RELATING TO THE NAMED PLAINTIFFS**

128.    Plaintiff John Ewalt is a senior citizen and has been a subscriber of The Dispatch for more than 30 years.

---

[9] Oddly, The Beacon's Terms of Sale refer throughout to The Dispatch, not to The Beacon.

129.    Currently, he receives daily delivery of The Dispatch, and he receives paper statements.

130.    For years, he has paid the printed invoices he has received from GateHouse Ohio, including the following 2019 invoice,[10] which makes no reference to the Terms of Sale or to premium editions:



131.    Plaintiff Steve Wylie is a subscriber to The Dispatch and has received Thursday-Sunday delivery for approximately 5 years.

_____

[10] Plaintiff John Ewalt received the above invoice in an email directly from The Dispatch.   The complete email exchange is attached hereto as Exhibit D.

132.    He also has access to The Dispatch online, and he is registered for EZ pay/auto-pay.

133.    GateHouse Ohio has been unable to provide any invoices or renewal notices directed to Steve Wyle that disclose the GateHouse Defendants' premium edition practices.

134.    Plaintiff Bonnie Navarre received Sunday delivery of The Dispatch.

135.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre have received premium editions from The Dispatch and have had their subscriptions shortened based on those premium editions.

136.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre did not learn that The Dispatch was reducing the length of their subscriptions through the issuance of premium editions until shortly before they asserted their claims in this lawsuit.

137.    Plaintiff John Ewalt was charged the following improper paper statement fees: $1.00 on April 28, 2017; $1.00 on July 3, 2017; $2.00 on September 28, 2017; $2.00 on December 18, 2017; $2.00 on May 29, 2018; $2.00 on August 12, 2018; $2.00 on October 28, 2018; $9.00 on December 30, 2018; $9.00 on February 3, 2018; and $9.00 on June 10, 2019.

138.    He had his subscriptions shortened based on these excessive paper statement fees.

139.    He did not learn that The Dispatch was reducing the length of his subscriptions through paper statement fees until shortly before the filing of this lawsuit.

## CLASS ACTION ALLEGATIONS

140.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre bring this action on behalf of themselves and the members of the following class ("Premium Edition Class"):

     a.    All persons who purchased a term subscription for delivery of The Dispatch or The Beacon and had the length of the subscription shortened based on charges for one or more premium editions.

141.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre are members of the Premium Edition Class.

142.    The Premium Edition Class does not include persons who are employees, legal representatives, officers, or directors of the GateHouse Defendants or of other entities affiliated with the GateHouse Defendants.  The Premium Edition Class also does not include the judge assigned to this case or his or her staff.

143.    The Plaintiffs reserve the right to create one or more subclasses for the Premium Edition Class.

144.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre bring this action on behalf of themselves and members of the following subclass ("Premium Edition Subclass"):

     a.    All consumers who purchased a term subscription for delivery of The Dispatch or The Beacon and had the length of the subscription shortened based on charges for one or more premium editions.

145.    Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre are members of the Premium Edition Subclass.

146.    The Premium Edition Subclass does not include persons who are employees, legal representatives, officers, or directors of the GateHouse Defendants or of other entities affiliated with the GateHouse Defendants.   The Premium Edition Subclass also does not include the judge assigned to this case or his or her staff.

147.    The Plaintiffs reserve the right to create one or more subclasses for the Premium Edition Subclass.

148.   Plaintiffs John Ewalt brings this action on behalf of himself and the following class ("Statement Fee Class"):

    a.   All persons who purchased a term subscription to The Dispatch or The Beacon; were assessed a fee for a paper statement; and had the length of the subscription shortened based on the paper statement fee.

149.   The Statement Fee Class does not include persons who are employees, legal representatives, officers, or directors of the GateHouse Defendants or of other entities affiliated with the GateHouse Defendants.   The Statement Fee Class also does not include the judge assigned to this case or his or her staff.

150.   Plaintiff John Ewalt is a member of the Statement Fee Class.

151.   The Plaintiffs reserve the right to create one or more subclasses for the Statement Fee Class.

152.   Plaintiffs John Ewalt brings this action on behalf of himself and the following class ("Statement Fee Subclass," and together with the Premium Edition Class, the Premium Edition Subclass, and the Statement Fee Class, the "Classes"):

All consumers who purchased a term subscription to The Dispatch or The Beacon; were assessed a fee for a paper statement; and had the length of the subscription shortened based on the paper statement fee.

153.   The Statement Fee Subclass does not include persons who are employees, legal representatives, officers, or directors of the GateHouse Defendants or of other entities affiliated with the GateHouse Defendants.   The Statement Fee Subclass also does not include the judge assigned to this case or his or her staff.

154.   Plaintiff John Ewalt is a member of the Statement Fee Subclass.

24

155.    The Plaintiffs reserve the right to create one or more subclasses for the Statement Fee Subclass.

156.    The Classes may be expanded or narrowed by amendment based on information obtained through further investigation or discovery in this lawsuit.

157.    All the requirements of Rule 23 for class certification are met for the Classes.

158.    Members of the Classes are so numerous that joinder is impracticable, as required by Rule 23(a)(1).

159.    The GateHouse Newspapers have hundreds of thousands of subscribers, and the Classes each have thousands of members.

160.    The exact number of members of the Classes, as well as the names and addresses for those members, will be readily identifiable from information and records of the GateHouse Defendants.

161.    Common questions of law and fact exist as to all members of the Classes, as required by Federal Rule of Civil Procedure 23(a)(2), because there is a common nucleus of operative facts surrounding the GateHouse Defendants' practices regarding premium-edition and paper-statement charges and the accompanying shortening of subscriptions.

162.    Subscribers enter into standard Subscription Agreements and the GateHouse Defendants attempt to impose standard Terms of Sale and standards practices on their customers, so there is common evidence on which to base class-wide liability against the GateHouse Defendants.

163.    Moreover, the GateHouse Defendants' billing practices for premium editions/paper statement fees are consistent throughout the Classes.

164. Common questions of law and fact include, without limitation, the following:

    i. Whether the GateHouse Defendants devised a scheme to shorten customers' subscriptions through the provision of premium editions/paper statement fees, and if so, whether such conduct breached the duty of good faith;

    ii. Whether the GateHouse Defendants' Subscription Agreements with customers are form, adhesion contracts;

    iii. Whether the GateHouse Defendants breached the duty of good faith by issuing items that were unrelated to news as premium editions;

    iv. Whether the GateHouse Defendants are entitled to unilaterally modify the terms of their agreements with their customers, and if so, whether those modifications breached the duty of good faith;

    v. Whether the GateHouse Defendants provided adequate notice of the change in their Terms of Sale by simply posting those Terms of Sale on their website;

    vi. Whether the GateHouse Defendants breached the duty of good faith by failing to provide proper notice of changes to the Terms of Sale;

    vii. Whether the GateHouse Defendants breached the duty of good faith by failing to disclose that subscribers can opt out of receiving premium editions;

    viii. Whether the GateHouse Defendants breached the duty of good faith by failing to disclose the type, price, and number of premium editions to the customer at the time of entering into the Subscription Agreements;

    ix. Whether the GateHouse Defendants breached their duty of good faith by steadily increasing the number of premium editions and the charges for premium editions to make up for declining subscription revenue;

    x. Whether the GateHouse Defendants breached the duty of good faith by charging excessive paper statement fees;

    xi. Whether the GateHouse Defendants breached their agreements with customers by issuing publications or content that do not qualify as "premium editions";

    xii. Whether the GateHouse Defendants violated the CSPA by advertising term subscriptions without any intention of providing the subscription for the term advertised;

    xiii. Whether the GateHouse Defendants violated the CSPA by failing to clearly and conspicuously disclose material limitations for their offers in close proximity to those offers;

    xiv. Whether the GateHouse Defendants violated the CSPA by requiring customers to enter into one-sided agreements that allowed for unilateral modifications;

    xv. Whether the GateHouse Defendants violated the CSPA by continuously changing their Terms of Sale without providing proper notice;

    xvi. Whether the GateHouse Defendants violated the CSPA by issuing premium editions that were not related to the news;

xvii. Whether the GateHouse Defendants violated the CSPA by entering into agreements that purported to unreasonably limit their customers' recovery;

xviii. Whether the GateHouse Defendants violated the CSPA by entering into agreements that purported to unreasonably limit the timeframe for their customers to recover;

xix. Whether the GateHouse Defendants violated Ohio's Deceptive Trade Practices Act by representing that their goods and services had characteristics, benefits, and quantities that those goods and services did not have;

xx. Whether the GateHouse Defendants' Terms of Sale are unconscionable;

xxi. Whether the GateHouse Defendants' Terms of Sale are illusory;

xxii. Whether the GateHouse Defendants have been unjustly enriched by payments applied for premium editions and paper statement fees;

xxiii. Whether the Classes are entitled to injunctive relief; and

xxiv. Upon information and belief, the affirmative defenses raised by the GateHouse Defendants.

165. The Plaintiffs' claims are typical of the claims of the members of the Classes because all of the claims of the Plaintiffs and the Classes arise from the same course of conduct of the GateHouse Defendants, i.e., the charging for premium editions in a misleading manner and the systematic overcharging of customers for paper statements.

166. Additionally, the Plaintiffs' claims are based on the same legal theories advanced on behalf of the Classes.

167. The Plaintiffs will fairly and adequately protect the interests of the Classes because the Plaintiffs do not have any conflicts of interests or any interests that are antagonistic to the interests of the members of the Classes.

168. The Plaintiffs have also retained counsel who are experienced and competent practitioners in the area of complex class action litigation and who are capable of and committed to devoting the necessary resources to this matter.

169. Finally, the Plaintiffs and their counsel will prosecute this action vigorously on behalf of the Classes.

27

170.     The Classes meet the requirements of Federal Rule of Civil Procedure 23(b)(1).

171.     Pursuing separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to the members of the Classes and could result in incompatible standards for the GateHouse Defendants' conduct in light of the various forms of relief pleaded in this Amended Complaint.

172.     Pursuing separate actions by individual members of the Classes would create a risk of adjudications with respect to individual members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

173.     The Classes also meet the requirements of Federal Rule of Civil Procedure 23(b)(2).

174.     The GateHouse Defendants have acted or failed to act in a manner that applies generally to the Plaintiffs and to all the members of the Classes.

175.     The GateHouse Defendants' course of conduct arises from standard Subscription Agreements and Terms of Sale that are purportedly applicable to all subscribers to the GateHouse Newspapers, including the Plaintiffs and members of the Classes.

176.     Thus, final injunction and/or declaratory relief against the GateHouse Defendants are appropriate, as it could provide recovery for the Classes or prevent future harm by prohibiting the GateHouse Defendants from shortening subscription periods with improper charges.

177.     Certification of the Classes is also appropriate under Federal Rule of Civil Procedure 23(b)(3).

178.     Common questions of law and fact predominate over questions that may affect only individual class members.

28

179. The common legal and factual questions derive from a common nucleus of operative facts regarding the GateHouse Defendants' liability to the Plaintiffs and other members of the Classes for assessing unfair charges that shorten the subscriptions of the Plaintiffs and members of the Classes.

180. Additionally, upon information and belief, the evidence will not vary between the different members of each of the Classes, so there will be few, if any, questions that only affect individual members.

181. Class action certification is also the superior method for the fair and efficient adjudication of this controversy.

182. Class certification would overcome the problem posed by the potentially small recoveries that individual members might receive, which, in the absence of class treatment, do not provide the incentive for any individual class member to bring an individual action to prosecute his or her claims.

183. Certification would permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments inherent in multiple individual actions.

184. The benefits of class certification, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

185. As described above, the questions of law and fact common to members of each Class predominate over any questions affecting only individual members.

186.    Additionally, the desirability of concentrating the litigation in this Court is obvious, as the vast majority of subscribers to the GateHouse Newspapers are located in Ohio.

## COUNT I: BREACH OF CONTRACT
### (As To The Plaintiffs And The Classes)

187.    Plaintiffs, individually and on behalf of the Classes, reincorporate the preceding paragraphs as if fully rewritten here.

188.    Plaintiffs and members of the Classes entered into the Subscription Agreements with either GateHouse Ohio or Copley Ohio, and Plaintiffs and the members of the Classes performed on those Subscription Agreements by paying for the term subscriptions.

189.    The Terms of Sale are not incorporated into the Subscription Agreements, because, among other things, (1) those Terms of Sale are merely posted online; (2) those Terms of Sale are constantly being revised without notice to subscribers; (3) incorporation of those Terms of Sale would result in hardship and surprise; (4) the Terms of Sale are illusory; and (5) the Terms of Sale are unconscionable.

190.    Since the Terms of Sale of not incorporated into the Subscription Agreements of the Plaintiffs and the members of the Classes, the GateHouse Defendants are not entitled to reduce the length of the Subscription Agreements through the issuance of premium editions.

191.    GateHouse Ohio and Copley Ohio therefore breached those Subscription Agreements by failing to deliver the GateHouse Newspapers for the agreed-upon length at the agreed-upon price based on their improper charges for premium editions.

192.    In the alternative, even if the Terms of Sale are incorporated into the Subscription Agreements, the GateHouse Defendants still breached the Subscription Agreements and Terms of Sale by failing to deliver the defined "product" for the agreed-upon term.

193.    Specifically, the term "product" is defined by the Terms of Sale (for both The Dispatch and The Beacon) to include "any paid subscription service available from The Columbus Dispatch, including home delivery of our print publication, access to our Website and our E-Edition digital replica via supported devices."

194.    The term "product," however, does not include premium editions.

195.    The GateHouse Defendants thus breached the Subscription Agreements by delivering premium editions (rather than the "product") for the agreed-upon term.

196.    Further, and again in the alternative, even assuming the Terms of Sale were incorporated into the Subscription Agreements, and even assuming the Terms of Sale allowed for the delivery of "premium editions," GateHouse Ohio and Copley Ohio still breached their agreements by delivering items that did not constitute "premium editions."

197.    The term "premium edition" is not defined in the Terms of Sale.

198.    The plain, ordinary meaning of the term "premium," includes, among others, "of exceptional quality or greater value than others of its kind; superior." *Premium*, DICTIONARY.COM https://www.dictionary.com/browse/premium (last visited July 9, 2019).

199.    The plain, ordinary meaning of the term "edition" includes, among others, "one of a series of printings of the same book, newspaper, etc., each issued at a different time and differing from another by alterations, additions, etc." *Edition*, DICTIONARY.COM https://www.dictionary.com/browse/edition?s=t (last visited July 9, 2019).

200.    The premium editions issued by GateHouse Ohio and Copley Ohio did not constitute "premium editions" as that term is ordinarily used.  A true *premium* edition would

provide "exceptional quality" or "greater value" as compared to a non-premium edition.   And an *edition* would constitute a publication that is "one of a series of printings of the same…newspaper."

201.    In fact, many of the premium editions were not newspapers at all.  By way of example, GateHouse Ohio and Copley Ohio have sent calendars, pet magazines, and cookbooks and charged these items as premium editions, even though these items are clearly not newspapers with added value.

202.    By shortening the subscription length for the Plaintiffs, the Premium Edition Class, and the Premium Edition Subclass through the issuance of items that were not "premium editions," GateHouse Ohio and Copley Ohio breached their agreements.

203.     The Subscription Agreements also do not authorize the GateHouse Defendants to shorten their customers' subscriptions through inflated charges for paper statement fees.

204.    Indeed, even the GateHouse Defendants' one-sided Terms of Sale do not authorize the GateHouse Defendants to shorten the length of their customers' subscriptions based on paper statement fees.

205.    GateHouse Ohio and Copley Ohio therefore also breached the Subscription Agreements by charging excessive paper statement fees and using those fees to reduce the agreed-upon length of subscriptions of members of the Statement Fee Class.

206.    As a direct and proximate result of GateHouse Ohio's and Copley Ohio's breaches of contract, the Plaintiffs and the members of the Classes have suffered damages because, among other things, the Plaintiffs and the members of the Classes have not received the benefits of their Subscription Agreements, have overpaid for their subscriptions, and have paid excessive charges for paper statements.

207.    Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
### (As To The Plaintiffs And The Classes)

208.    Plaintiffs, individually and on behalf of the Classes, reincorporate the preceding paragraphs as if fully rewritten here.

209.    Plaintiffs and members of the Classes entered into Subscription Agreements with either GateHouse Ohio or Copley Ohio, and the Plaintiffs and the members of the Classes performed on those agreements by paying for the term subscriptions.

210.    The Terms of Sale are not incorporated into the Subscription Agreements, because, among other things, (1) those Terms of Sale are merely posted online; (2) those Terms of Sale are constantly being revised without notice to subscribers; (3) incorporation of those Terms of Sale would result in hardship and surprise to subscribers; (4) the Terms of Sale are illusory; and (5) the Terms of Sale are unconscionable.

211.    However, in the alternative, even if the Terms of Sale were incorporated into the Subscription Agreements, the duty of good faith and fair dealing prevented GateHouse Ohio and Copley Ohio from, among other things, (1) engaging in deceptive practices aimed at reducing the length of the term subscriptions of the Plaintiffs and the members of the Classes; (2) exercising discretion under the Terms of Sale in an unreasonable, dishonest, or bad-faith manner; (3) modifying the Terms of Sale in order to deprive the members of the Classes of the benefits of their bargains; (4) attempting to take opportunistic advantage of the Classes; (5) attempting to evade the spirit of the bargains; and (6) abusing the power to specify terms.

212. GateHouse Ohio and Copley Ohio breached their duty of good faith by, among other things (1) attempting to materially reduce the length of their customers' term subscriptions through unwanted premium editions; (2) failing to adequately disclose their policy relating to premium editions; (3) failing to have customers acknowledge or agree to the Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale); (4) failing to adequately disclose that premium editions reduced the length of customers' term subscriptions; (5) failing to inform customers that they can opt out of receiving premium editions; (6) failing to disclose in advance the type, specific price, and number of premium editions GateHouse Ohio and Copley Ohio intended to issue; (7) failing to adequately disclose their policy relating to paper statement fees; (8) abusing their power to specify Terms of Sale by steadily increasing the frequency of and charges for premium editions; (9) issuing cookbooks, puzzle books, etc. as "premium editions" when these items are unrelated to the distribution of news; (10) failing to provide customers access to electronic billing statements; and (11) charging excessive paper statement fees.

213. As a direct and proximate result of GateHouse Ohio's and Copley Ohio's breaches of the implied covenant of good faith and fair dealing, the Plaintiffs and the members of the Classes have suffered damages because, among other things, the Plaintiffs and the members of the Classes have not received the benefits of their Subscription Agreements, have overpaid for their subscriptions to The Dispatch, and have paid excessive charges for paper statements.

214. Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

## COUNT III: VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT, R.C. § 1345.01 ET SEQ.
### (As To The Plaintiffs And The Premium Edition Subclass And Statement Fee Subclass)

215.   Plaintiffs, individually and on behalf of the Premium Edition Subclass and Statement Fee Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

216.   Plaintiffs and members of the Premium Edition Subclass and Statement Fee Subclass are "consumers" within the scope of the Ohio Consumer Sales Practices Act ("CSPA").

217.   The Subscription Agreements between the Plaintiffs and the members of the Premium Edition Subclass and the Statement Fee Subclass, on the one hand, and GateHouse Ohio and Copley Ohio, on the other hand, constitute "consumer transactions" within the scope of the CSPA.

218.   The GateHouse Defendants are "suppliers" within the scope of the CSPA because the GateHouse Defendants engage in the business of effecting and soliciting consumer transactions.

219.   The CSPA prohibits suppliers from engaging in unfair, deceptive, or unconscionable acts.

220.   Among other things, the CSPA provides that it is a deceptive practice for a supplier to represent (1) that the subject of the consumer transaction has characteristics or benefits that it does not have or (2) that a specific price advantage exists, if it does not.

221.   The CSPA also provides that in determining whether conduct is unfair or deceptive, a "court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the

35

"Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended."  R.C. § 1345.02(C).

222.    The FTC has stated, among other things, that "accurate information in the text may not remedy a false headline because consumers may glance only at the headline" and that "[w]ritten disclosures or fine print may be insufficient to correct misleading representations." FTC Policy Statement on Deception (1983).

223.    The CSPA further provides that in determining whether an act is unconscionable, a court should consider "[w]hether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction"; and "[w]hether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier." R.C. § 1345.03(B)(3) & (5).

224.    GateHouse Ohio and Copley Ohio engaged in unfair, deceptive, and/or unconscionable acts in violation of the CSPA by, among other things, (1) advertising term subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making term subscription offers; (3) failing to have customers acknowledge or agree to the Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale); (4) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse Ohio and Copley Ohio intended to issue; (5) failing to inform customers that they can opt out of receiving premium editions; (6) requiring customers to enter into one-sided agreements that purported to permit GateHouse Ohio

36

and Copley Ohio to unilaterally alter the parties' agreement; (7) continuously changing their Terms of Sale; (8) abusing their power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (9) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (10) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (11) requiring customers to enter into agreements that purport to unreasonably limit the timeframe for a customer to file suit; (11) failing to properly disclose their paper statement fees; (12) charging customers excessive paper statement fees; and (13) refusing to provide detailed billing summaries that clearly and conspicuously show premium edition charges and paper statement fees.

225.    There is significant overlap in management and control of the GateHouse Defendants, and the GateHouse Defendants view themselves as a consolidated enterprise.

226.    Further, Gannett Co., Inc. (through Denise Robbins and others) and GateHouse Media, LLC (through Lee Knapp and others) directed and participated in the above CSPA violations of Gatehouse Ohio and Copley Ohio.

227.    The GateHouse Defendants, by virtue of Chapter 109:4-3 of the Ohio Administrative Code and various decisions of Ohio courts, have been on notice that they are violating several provisions of the CSPA and have committed those violations of the CSPA after such regulations were issued and such decisions were available for inspection pursuant to R.C. § 1345.05(A)(3).

228.    Under O.A.C. 109:4-3-02(A)(1):

It is a deceptive act or practice in connection with a consumer transaction for a supplier, in the sale or offering for sale of goods or services, to make any offer in written or printed

37

advertising or promotional literature *without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions.* Disclosure shall be easily legible to anyone reading the advertising or promotional literature and shall be sufficiently specific so as to leave no reasonable probability that the terms of the offer might be misunderstood.

229. Further, O.A.C. 109:4-3-02(C) provides that a "statement of exclusions, reservations, limitations, modifications, or conditions which appears in a footnote to an advertisement to which reference is made in the advertisement by an asterisk or other symbol placed next to the offer being limited is not in close proximity to the words stating the offer."

230. O.A.C. 109:4-3-02(D) also includes an internet-specific rule relating to material disclosures:

It is a deceptive act or practice in connection with an offer made on the internet, to make any offer *without stating clearly and conspicuously, in close proximity to the words stating the offer, any material exclusions, reservations, limitations, modifications, or conditions*. Disclosures should be as near to, and if possible on the same screen, as the triggering offer. *If scrolling or a hyperlink is necessary to view the disclosure, the advertisement should guide consumers with obvious terms or instructions to scroll down or click on the hyperlink*. Hyperlinked disclosures should lead directly to the disclosed information and not require scrolling or clicking on any additional hyperlinks.

231. Though the Plaintiffs filed their case in August 2019, as of March 2020, the GateHouse Defendants were *still* violating this provision by advertising term subscriptions without disclosing, on the same screen, their premium edition practices.

232. A true and accurate copy of an offer for The Dispatch from March 23, 2020 is attached as Exhibit E.

233. Under O.A.C. 109:4-3-03(B)(1), it is:

[A] deceptive and unfair act or practice for a supplier to make an offer of sale of any goods or services when such offer is *not a bona fide effort to sell such goods or services*. An offer is not bona fide if…[a] supplier uses a statement or illustration or *makes a representation in any advertisement* which would create in the mind of a reasonable consumer, *a false impression* as to the grade, quality, *quantity*, make, model, year, price,

value, size, color, utility, origin or any other material aspect of the offered goods or services in such a manner that, upon subsequent disclosure or discovery of the facts, the consumer may be induced to purchase goods or services other than those offered.

234. Under O.A.C. 109:4-3-09(B), it is "a deceptive act or practice for a supplier to furnish similar goods of equal or greater value when there was no intention to ship, deliver, or install the original goods ordered."

235. In the following actions, a court determined that conduct that is substantially similar to the conduct of the GateHouse Defendants was unfair, deceptive, and/or unconscionable:

a. *State of Ohio ex rel. Yost v. Thrifty Propone, Inc., et al.*, Medina County Common Pleas Case No. 16 CIV0008, P.I.F. # 3300 (July 3, 2019) (Defendant violated R.C. § 1345.02 by continually changing terms and conditions and enforcing terms and conditions that were not applicable at the time of the consumers' purchase).

b. *State of Ohio ex rel. Montgomery v. Explorer, Micro, Inc.*, Franklin County Common Pleas Case No. 02CVH32695, P.I.F. # 10002089 (Defendant's terms and conditions were substantially one-sided because those terms and conditions gave the defendant the unconditional right to unilaterally changes those terms and conditions and the defendant could limit refunds to current costs).

c. *William J. Brown v. Marlin E. Cole*, Richland County Common Pleas Case No. 75-579, P.I.F. # 10000123 (November 5, 1979) (Defendant violated CSPA by, among other things, representing that TV guide would be provided in a greater quantity than intended).

d. *State of Ohio ex rel. Dewine v. Add Source, LLC*, Delaware County Common Pleas Case No. 14-CVH-10574, P.I.F. # 1003183 (February 11, 2015) (Defendant violated R.C. § 1345.02(B)(8) by advertising for a specific price that was not actually charged).

e. *State of Ohio ex rel. Dewine v. Form Giant LLC*, Hamilton County Common Pleas Case No. 1307550, P.I.F. # 10003139 (May 9, 2014) (Defendant violated R.C. § 1304.02(A) and O.A.C. 109:4-3-02 by failing to clearly and conspicuously disclose material limitations).

f. *Lardakis v. Martin*, Summit County Court of Common Pleas Case No. CV 94 01 0234, P.I.F. # 1436 (Aug. 8, 1994) (A defendant "engaging in any fraudulent oral or written misrepresentations, or otherwise conveying factually incorrect information to clients" as well as "accepting money for consumer services knowing that the consumer will not receive the services for which she has paid" constitutes unfair practices).

g. *State ex rel. Petro v. Level Propane Gases, Inc.*, Delaware County Court of Common Pleas No. 01-CVH 01-018, 2003 WL 24289604, at *5 (2003) (Defendant was liable under the CSPA for utilizing or enforcing any provision purporting to

reserve to the defendant the unfettered right to modify the contract with a consumer unilaterally and "making offers in written or printed advertisements without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions to obtaining the offered [goods] and/ or the offered price").

h. *State ex rel. Fisher v. Kennedy,* Butler County Court of Common Pleas No. CV94-10-1652, P.I.F. # 10001510 (June 27, 1995) (Defendants violated the CSPA by charging customers for services not authorized by the customers).

i. *State ex rel. Cordray v. Trump Travel*, Franklin County Court of Common Pleas No. 06-CVH-08-11085, P.I.F. # 2811 (Oct. 29, 2009) (Defendants violated the CSPA by utilizing advertisements that notified consumers of a free trip without clearly and conspicuously, in close proximity to the offer, stating all material limitations to the offer and by conveying a misleading impression regarding the quality of the consumer transaction).

j. *In re Vonage Holdings Corp.*, State of Ohio Office of Attorney General Consumer Protection Section, P.I.F. # 2817a (July 19, 2011) (Respondent must disclose, "in close proximity to the offer of the discounted service plan or discounted equipment, all material limitations including, but not limited to . . .  existence of any fees or charges solely applicable to the discounted service or equipment offer that must be paid to receive the discounted service or equipment" and "the time period of any discounted service plan").

236. As a direct and proximate result of the GateHouse Defendants' violations of the CSPA, the Plaintiffs and the members of the Premium Edition Subclass and Statement Fee Subclass have suffered damages because, among other things, the Plaintiffs and members of the Premium Edition Subclass and Statement Fee Subclass have not received the benefits of their Subscription Agreements and have overpaid for their subscriptions to the GateHouse Newspapers.

237. Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

### COUNT IV: DECLARATORY JUDGMENT
### (As To The Plaintiffs And The Premium Edition Subclass And Statement Fee Subclass)

238. Plaintiffs, individually and on behalf of the Premium Edition Subclass and Statement Fee Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

239.    There is a present dispute between the Plaintiffs and members of the Premium Edition Subclass and Statement Fee Subclass, on the one hand, and the GateHouse Defendants, on the other, regarding whether the GateHouse Defendants' conduct addressed above violates the CSPA.

240.    Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Premium Edition Subclass and Statement Fee Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms, and who may be unable to recover those damages if the GateHouse Defendants continue to have financial issues.

241.    A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

242.    Pursuant to R.C. § 2721.01 et seq., R.C. § 1345.09(D), and Federal Rule of Civil Procedure 57, Plaintiffs, the Premium Edition Subclass, and the Statement Fee Subclass request a declaration that the GateHouse Defendants engaged in unfair, deceptive, and unconscionable conduct in violation of the CSPA by, among other things, (1) advertising term subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making term subscription offers; (3) failing to have customers acknowledge or agree to the Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale); (4) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse Ohio and Copley Ohio intended to issue; (5) failing to inform customers that they can opt out of receiving premium editions; (6) requiring customers to enter

41

into one-sided agreements that purported to permit GateHouse Ohio and Copley Ohio to unilaterally alter the parties' agreement; (7) continuously changing their Terms of Sale; (8) abusing their power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (9) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (10) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (11) requiring customers to enter into agreements that purport to unreasonably limit the timeframe for a customer to file suit; (11) failing to properly disclose their paper statement fees; (12) charging customers excessive paper statement fees; and (13) refusing to provide detailed billing summaries that clearly and conspicuously show premium edition charges and paper statement fees.

## COUNT V: VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT, R.C. § 4165.01 ET SEQ.
### (As To The Plaintiffs And The Classes)

243.    Plaintiffs, individually and on behalf of the Classes, reincorporate the preceding paragraphs as if fully rewritten here.

244.    Plaintiffs and the members of the Classes are "persons" as defined in R.C. § 4165.01(D).

245.    The GateHouse Defendants are each a "person" as defined in R.C. § 4165.01(D).

246.    For the reasons previously stated, the GateHouse Defendants engaged in deceptive trade practices in violation of R.C. § 4165.02(A)(7) because the GateHouse Defendants represented that their goods/services have "characteristics," "benefits," or "quantities" that they do not have.

42

247.     The GateHouse Defendants willfully engaged in trade practices in violation of R.C. § 4165.02, knowing those practices to be deceptive.

248.     As a direct and proximate result of the GateHouse Defendants' violations of the ODTPA, the Plaintiffs and the members of the Classes have suffered damages because, among other things, the Plaintiffs and the members of the Classes have not received the benefits of their Subscription Agreements and have overpaid for their subscriptions to the GateHouse Newspapers.

249.     Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

## COUNT VI: DECLARATORY JUDGMENT
**(As To The Plaintiffs And The Premium Edition Class And Subclass)**

250.     Plaintiffs, individually and on behalf of the Premium Edition Class and Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

251.     As laid out above, GateHouse Ohio and Copley Ohio have attempted to unilaterally modify the Terms of Sale without notice to or authorization from the Plaintiffs and the Premium Edition Class and Subclass and in a manner that would deprive the Plaintiffs and the members of the Premium Edition Class and Subclass of the benefits of their bargains.

252.     The Subscription Agreements and the Terms of Sale are form, adhesion agreements, and the Plaintiffs and members of the Premium Edition Class and Subclass were unable to negotiate the Subscription Agreements or the Terms of Sale.

253.     The Terms of Sale contain a number of unreasonable, one-sided, non-mutual provisions:

- GateHouse Ohio and Copley Ohio reserve the right to modify the terms at any time "without notice to you." [Terms of Sale at § 1.]

- GateHouse Ohio's and Copley Ohio's liability is limited to "an amount equal to the amount you pay for the product or Website for one month." [Terms of Sale at § 5.] By contrast, the subscriber's liability is not so limited.
- Subscribers must file claims within one year of when the subscriber "could first bring the claim[,]" but GateHouse Ohio's and Copley Ohio's ability to assert claims is not similarly limited. [Terms of Sale at § 9.]
- GateHouse Ohio and Copley Ohio are entitled to assign their rights and obligations under the Terms of Sale, but subscribers are precluded from assigning their rights. [Terms of Sale at § 7.]
- GateHouse Ohio and Copley Ohio can provide notices under the Terms of Sale via email, but subscribers cannot provide notice via email. [Terms of Sale at § 10.]
- GateHouse Ohio and Copley Ohio purportedly have the right to send subscribers $324 worth of premium editions per year and to shorten subscription lengths based on those premium editions. [Terms of Sale at § 1.4.] According to the GateHouse Defendants, these premium editions need not even relate to the news.

254.    There is a present dispute between the Plaintiffs and members of the Premium Edition Class and Subclass, on the one hand, and GateHouse Ohio and Copley Ohio, on the other, regarding whether (1) the Terms of Sale are unconscionable; (2) the contractual limitations on liability in the Terms of Sale are unconscionable; and (3) the limitations on the timeframe for filing suit in the Terms of Sale are unconscionable.

255.    Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Premium Edition Class and Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms, and who may be unable to recover all or part of a judgment against the GateHouse Defendants.

256.    A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

257.    Pursuant to R.C. § 2721.01 et seq. and Federal Rule of Civil Procedure 57, Plaintiffs, the Premium Edition Class, and the Premium Edition Subclass request a declaration that (1) the Terms of Sale are unconscionable; (2) the contractual limitations on liability in the Terms

44

of Sale are unconscionable; and (3) the limitations on the timeframe for filing suit in the Terms of Sale are unconscionable.

## COUNT VII: DECLARATORY JUDGMENT
### (As To The Plaintiffs And The Premium Edition Class And Subclass)

258. Plaintiffs, individually and on behalf of the Premium Edition Class and Subclass, reincorporate the preceding paragraphs as if fully rewritten here.

259. As laid out above, GateHouse Ohio and Copley Ohio have attempted to unilaterally modify the Terms of Sale without notice to or authorization from the Plaintiffs and the Premium Edition Class and Subclass and in a manner that would deprive the Plaintiffs and the members of the Premium Edition Class and Subclass of the benefits of their bargains.

260. Thus, under GateHouse Ohio's and Copley Ohio's interpretation of the Terms of Sale, GateHouse Ohio and Copley Ohio retain the unlimited right to determine the nature and extent of their performance and to eliminate their promises to the Plaintiffs and the Premium Edition Class and Subclass.

261. There is a present dispute between the Plaintiffs and members of the Premium Edition Class and Subclass, on the one hand, and GateHouse Ohio and Copley Ohio, on the other, regarding whether the Terms of Sale are illusory.

262. Speedy relief is necessary to preserve the rights of the Plaintiffs and members of the Premium Edition Class and Subclass, who remain exposed to further damages through the additional charges for premium editions and the shortening of their subscription terms, and who may be unable to recover all or part of a judgment against the GateHouse Defendants.

263. A declaratory judgment will terminate the uncertainty and controversy giving rise to this dispute.

264.     Pursuant to R.C. § 2721.01 et seq. and Federal Rule of Civil Procedure 57, Plaintiffs and the Premium Edition Class and Subclass request a declaration that the Terms of Sale are illusory agreements.

## COUNT VIII: UNJUST ENRICHMENT
### (As To The Plaintiffs And The Classes)

265.     Plaintiffs, individually and on behalf of the Classes, reincorporate the preceding paragraphs as if fully rewritten here.

266.     The Plaintiffs and members of the Classes conferred a benefit on the GateHouse Defendants by, among other things, paying for premium editions and for inflated paper statement fees.

267.     The GateHouse Defendants, at all times relevant to this lawsuit, knew of the benefits conferred upon them.

268.     Because the GateHouse Defendants obtained these benefits through deception and other wrongful conduct, it would be unjust for the GateHouse Defendants to retain these benefits.

269.     As a direct and proximate result of the GateHouse Defendants' unjust enrichment, the Plaintiffs and the members of the Classes have suffered damages.

270.     Those damages will be more specifically proven at trial but are reasonably believed to be in excess of $25,000.

## COUNT IX: INJUNCTIVE RELIEF
### (As To The Plaintiffs And The Classes)

271.     Plaintiffs, individually and on behalf of the Classes, reincorporate the preceding paragraphs as if fully rewritten here.

272. The Plaintiffs and the members of the Classes all have a strong likelihood of success on the merits of the claims addressed herein and will continue to suffer irreparable harm if the conduct of the GateHouse Defendants is not enjoined, particularly given that the GateHouse Defendants may be unable to pay all or part of a judgment against them.

273. Further, R.C. § 1345.09(D) expressly provides that consumers can seek an injunction against an act or practice that violates the CSPA, while R.C. § 4165.03 provides for injunctive relief to a person likely to be damaged by a violation of R.C. § 4165.02(A).

274. An injunction is warranted based on the balance of the hardships. If the Court declines to issue an injunction, the GateHouse Defendants will continue to wrongfully charge their customers for premium editions and paper fee statements.

275. An injunction would not harm third parties, and the public interest would be served by the issuance of an injunction preventing the GateHouse Defendants' willful violations of the CSPA and ODTPA.

276. Therefore, the Plaintiffs and the members of the Classes request an injunction precluding the GateHouse Defendants from (1) charging for premium editions without proper disclosure; (2) charging inflated paper statement fees; and (3) engaging in any other violations of the CSPA.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request that judgment be granted against the GateHouse Defendants as follows:

A. That the Court certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, and direct to the members the best notice practicable under Federal Rule of Civil Procedure 23;

B. Appointment of the Plaintiffs as Class Representatives for their respective Classes;

C. Appointment of the undersigned as Class Counsel for the Classes;

D. On Count I, damages against GateHouse Ohio and Copley Ohio in an amount in excess of $25,000, which will be more specifically determined at trial;

E. On Count II, damages against GateHouse Ohio and Copley Ohio in an amount in excess of $25,000, which will be more specifically determined at trial;

F. On Count III, damages against the GateHouse Defendants, jointly and severally, in an amount in excess of $25,000, which will be more specifically determined at trial;

G. On Count V, damages against the GateHouse Defendants, jointly and severally, in an amount in excess of $25,000, which will be more specifically determined at trial;

H. On Count VIII, damages against the GateHouse Defendants, jointly and severally, in an amount in excess of $25,000, which will be more specifically determined at trial;

I. An award of punitive damages in an amount in excess of $25,000, which will be more specifically determined at trial;

J. On Count IV, a declaratory judgment that the GateHouse Defendants engaged in unfair, deceptive, and unconscionable conduct in violation of the CSPA by, among other things, (1) advertising term subscriptions without a bona fide, good faith intention of providing the subscription for the term advertised; (2) failing to clearly and conspicuously disclose material limitations relating to premium editions when making term subscription offers; (3) failing to have customers acknowledge or agree to the Terms of Sale (e.g., by checking a box that indicates assent to the Terms of Sale); (4) failing to disclose, in advance of issuing the premium editions, the type, specific price, and number of premium editions GateHouse Ohio and Copley Ohio intended to issue; (5) failing to inform customers that they can opt out of receiving premium editions; (6) requiring customers to enter into one-sided agreements that purported to permit GateHouse Ohio and Copley Ohio to unilaterally alter the parties' agreement; (7) continuously changing their Terms of Sale; (8) abusing their power to specify terms of the subscription agreements by steadily increasing the frequency of and charges for premium editions; (9) issuing cookbooks, puzzle books, etc. as "premium" editions when these items are unrelated to the distribution of news; (10) requiring customers to enter into agreements that purport to limit the customers' recovery to a de minimis amount; (11) requiring customers to enter into agreements that purport to unreasonably limit the timeframe for a customer to file suit; (11) failing to properly disclose their paper statement fees; (12) charging customers excessive paper statement fees; and (13) refusing to provide detailed billing summaries that clearly and conspicuously show premium edition charges and paper statement fees;

K. On Count VI, a declaratory judgment that (1) the Terms of Sale are unconscionable; (2) the contractual limitations on liability in the Terms of Sale are unconscionable; and (3) the limitations on the timeframe for filing suit in the Terms of Sale are unconscionable;

L. On Count VII, a declaratory judgment that that the Terms of Sale are illusory agreements;

M. On Count IX, injunctive relief enjoining the GateHouse Defendants from (1) charging for premium editions without proper disclosure; (2) charging inflated paper statement fees; and (3) engaging in any other violations of the CSPA;

48

N.  Plaintiffs' costs and expenses, including reasonable attorneys' fees;

O.  Pre- and post-judgment interest; and

P.  Additional relief, at law or in equity, that the Court deems just.



Respectfully submitted,


  /s/ Todd H. Neuman
Todd H. Neuman        (0059819)
Rick L. Ashton        (0077768)
Jeffrey R. Corcoran   (0088222)
Tom Shafirstein       (0093752)
Allen Stovall Neuman Fisher & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:    (614) 221-8500
Facsimile:    (614) 221-5988
E-mail:       neuman@aksnlaw.com
              ashton@asnfa.com
              corcoran@asnfa.com
              shafirstein@asnfa.com
*Counsel for Plaintiffs*



## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.


  /s/ Todd H. Neuman
Todd H. Neuman        (0059819)

**Exhibit A**



GAT02_00001697






# SIMPLE SOLUTIONS WITH MAXIMUM POTENTIAL!

Custom Glide-Out™ Storage Solutions Designed & Built for Your Existing Cabinets & Pantry.

Call Now!
50% OFF INSTALL*

ShelfGenie®
EVERYTHING WITHIN REACH™

Schedule your free design consultation today
(614) 636-4290

*Applies to purchases of 5 or more Classic or Designer Glide-Out™ shelves. Lifetime warranty valid for Classic or Designer Solutions.

ACCREDITED BUSINESS
BBB

50% OFF INSTALLATION
Expires 9/30/2019*

GAT02_00001698

# ABOUT THIS SECTION

If 1969 seemed like an iconic, turbulent, relentless year, it's because it was. The year that started with the swearing-in of a new president was fractured by war and murder, yet balmed by pioneering cultural and technological innovation.

If you use an ATM, shop at Walmart (outside of Arkansas), fly on a 747, watch "Sesame Street" or use the internet, you have 1969 to thank.

## STAFF

Writer
**JOHN SUCICH**

Editor
**LISA GLOWINSKI**

Copy editors
**MICHAEL TOESET**
**CHRISSY YATES**

Art Director
**TONY FERNANDEZ-DAVILA**

Cover:
**More Content Now photo illustration**

©2019 GATEHOUSE MEDIA LLC ALL RIGHTS RESERVED

## Table of Contents

**4** Summer events

**11** Also in 1969

**20** Inventions and firsts

**24** The moon landing

**26** Pop culture

**35** Photos

Summer of '69
A TURNING POINT IN HISTORY

GAT02_00001699

## SUMMER EVENTS

From the celebratory to the tragic to the inspirational, the summer of 1969 was filled with events that could serve as the lone highlight of most other years. Here's a look at that eventful summer:

## Cuyahoga River burns

On June 22, the Cuyahoga River in Cleveland "caught fire" when a passing train sent off sparks that ignited pieces of debris coated in oil in the polluted river. The river had caught fire about a dozen times in the preceding century, and though this wasn't the most expensive fire or the one that caused the most damage, it was the one that drew the most attention. It helped inspire Congress to create the Environmental Protection Agency, and led the state of Ohio and the city of Cleveland to invest more money in the cleanliness of the river. There has not been another fire there since.



The 1969 Cuyahoga River fire was extinguished in 30 minutes so no photos of it exist. This photo is from the 1952 fire, which Time magazine used in its report to illustrate the dangers of pollution. [FLICKR/ENVIRONMENTAL PROTECTION AGENCY]

GAT02_00001700

SUMMER EVENTS

Summer of '69



The Chappaquiddick Incident. [YOUTUBE]

## Chappaquiddick

As Apollo 11 prepared to land on the moon, a different story grabbed the headlines. On July 18, Massachusetts Sen. Ted Kennedy drove a car off a bridge on Chappaquiddick Island, resulting in the death of Mary Jo Kopechne. The car landed upside down in a tidal pond, and while the 37-year-old Kennedy survived, his 28-year-old companion — a political operative who had worked on Sen. Robert Kennedy's presidential campaign — did not.

Edward Kennedy did not immediately report the accident, and ended up pleading guilty to leaving the scene of an accident, receiving a two-month jail sentence — which was suspended — and a temporary driving ban. He did not resign from the Senate, but any hopes he or his supporters might have harbored for a presidential run were dashed — he announced he would not run for president in 1972.

GAT02_00001701



SUMMER EVENTS

**Summer of '69**

## Moon landing

On July 20, Neil Armstrong and Buzz Aldrin set foot on the moon, making good on President Kennedy's challenge issued in 1961 to, in paraphrase, land a man on the moon and return him safely to Earth before the decade is out. The Apollo 11 mission, which consisted of Michael Collins in addition to Armstrong and Aldrin, was the culmination of a decade of work that involved tragedy in addition to the ultimate accomplishment.

The United States made incremental progress with each venture into space, suffering a setback in 1967 when Apollo 1's crew was killed in a fire during a launch simulation. NASA halted manned flights for more than 20 months after the accident, and by 1969 everything was back on track.

In March the Apollo 9 mission tested the lunar landing module, and in May Apollo 10 orbited above the moon in the final test run. That set the stage for Armstrong's immortal words, televised live back on Earth: "That's one small step for (a) man, one giant leap for mankind."

PHOTO: WIKIPEDIA

GAT02_00001702

# Summer of '69

## SUMMER EVENTS

## Manson Family murders

In July and August, eight people were killed by Charles Manson and his followers as part of "Helter Skelter," a war that Manson told his followers would happen in the summer of 1969. The first murder, of music teacher Gary Hinman, took place in July, and a little more than a week later five people were killed at the home of director Roman Polanski and actress Sharon Tate.

Polanski was not home at the time of the attack, but Tate, writer Wojciech Frykowski, coffee heiress Abigail Folger, celebrity hair stylist Jay Sebring and a friend of the family's gardener, Steven Parent, were all murdered by Manson's followers, dubbed the "family." The next night Manson led a group of his followers to the home of super-market executive Leno LaBianca and killed him and his wife, Rosemary.

Manson and his "family" were arrested in October, and in early 1971 Manson and some of his followers were sentenced to life in prison.

Charles Manson, the notorious criminal who upended the 1960s with the Tate-LaBianca killings, died in 2017.

Charles Manson

Grave of actress Sharon Tate, her baby Paul Polanski, mother Doris Tate and sister Patricia Tate at Holy Cross Cemetery in Culver City, California (Saint Ann's Section, lot 152, grave 6).

PHOTOS: WIKIPEDIA



A scene from **Woodstock**. [WIKIPEDIA]

**Woodstock Music Festival poster.**
[FLICKR]

**SUMMER EVENTS**

## Woodstock

From Aug. 15 to 18 in Bethel, New York, the Woodstock Music & Art Fair drew about half a million people to Max Yasgur's dairy farm for a weekend of free concerts. Heavy rains didn't dampen the spirits of the people who made the trip, or the 32 musicians who performed. Those performers included Creedence Clearwater Revival, the first big-name band to sign on and lend the festival credibility. Richie Havens, who kicked off the weekend Friday evening with a 45-minute set; and Jimi Hendrix, the final performer of the weekend early on Monday morning.

GAT02_00001704

SUMMER EVENTS

## Hurricane Camille

On Aug. 18 Hurricane Camille made landfall along the Mississippi Gulf Coast as one of only three hurricanes in history to hit the United States as a Category 5 storm, the most powerful designation. The storm destroyed buildings and knocked down trees and power lines in Mississippi and Alabama, and caused high tides that damaged property and flooded roads. Winds were well over 100 mph, but exact numbers aren't known because the storm destroyed all of the wind-recording instruments in the area. It made landfall.

The storm killed 143 people in Alabama. Mississippi and Louisiana, and another 153 died from catastrophic flooding in Virginia. Almost 9,000 others suffered injuries from the hurricane.

*The storm killed 143 people in Alabama. Mississippi and Louisiana, and another 153 died from catastrophic flooding in Virginia.*



**The aftermath of Hurricane Camille.** [NOAA CENTRAL LIBRARY HISTORICAL COLLECTIONS]



Summer of '69
A SUMMER OF LIVING HISTORY

SUMMER EVENTS

## Stonewall riots

The summer began with some of the tumult that characterized earlier years in the decade. On June 28 in New York City's Greenwich Village, police raided the Stonewall Inn, a gay club. Police routinely checked gay clubs for any activities they could cast under their wide net of "disorderly conduct." Police made 13 arrests for alcohol violations as well as for violations of New York state's gender-appropriate clothing statute. Customers and residents of the neighborhood began to gather at the Stonewall Inn, angry about the police's rough handling of patrons and the overall harassment by officers. The gathering resulted in a violent riot that morning, and then over the next five days protestors gathered, sometimes numbering in the thousands. The uprising led to the creation of a number of gay rights organizations and served as a unifying force for LGBT activism.

This picture was taken on Pride Weekend in 2016, days after President Obama announced the Stonewall National Monument and less than two weeks after the Pulse nightclub shooting in Orlando.
[WIKIPEDIA]

GAT02_00001706



Aerial view of Miami's Orange Bowl during Super Bowl III. [FLICKR/FLORIDAMEMORY]

## ALSO THAT YEAR

The legendary events of the summer of 1969 certainly dominated the headlines, but there were newsworthy events throughout the year.

Summer of '69
A TURNING POINT IN HISTORY

## SUPER BOWL III

## Super Bowl III

In the sports world the year was bookended by a couple of underdog stories from New York. On Jan. 12 the New York Jets upset the Baltimore Colts in Super Bowl III — the third AFL-NFL Championship Game, but the first to go by what would become the iconic name "Super Bowl." The Jets beat the heavily favored Colts 16-7, becoming the first AFL team to beat an NFL team, and adding legitimacy to the merger between the two leagues. The win also backed up Jets quarterback Joe Namath's guarantee the week leading up to the Super Bowl that the Jets would win the game.



**Summer of '69**
A SUMMER RIGHT IN HISTORY

**ALSO THAT YEAR**

## Nixon is sworn in

Richard M. Nixon was sworn in as the 37th president of the United States on Jan. 20, ending a tumultuous decade of what would end up as one of the country's most tumultuous presidencies. In 1973, Vice President Spiro Agnew would resign, facing a charge of income tax evasion, and in 1974 Nixon would resign from the presidency after the Watergate scandal.

**Richard Nixon being inaugurated as the 37th president of the United States.**
[WIKIPEDIA PHOTOS]

**Richard Nixon throwing out the opening pitch at a Washington Senators game, 1969.**

GAT02_00001708



ALSO THAT YEAR

Sirhan Sirhan on Feb. 9, 2016, the day before his 15th parole hearing.

## Sirhan Sirhan sentenced

In April, Sirhan Sirhan was convicted for shooting Robert Kennedy in June 1968. Sirhan was given the death penalty, though when California abolished capital punishment in 1972, his sentence was commuted to life in prison.

Sirhan, vocal in his opposition to Israel, shot and killed Kennedy, who expressed support for Israel while campaigning for the Democratic presidential nomination, at a gathering in Los Angeles after winning the California primary.

Mugshot taken on May 23, 1969.
[WIKIPEDIA PHOTOS]

**ALSO THAT YEAR**



# WANTED

SAN FRANCISCO POLICE DEPARTMENT

OCTOBER 18, 1969

**WANTED FOR MURDER**

90-69

ORIGINAL DRAWING

REVISED DRAWING

Supplementing our Bulletin 87-69 of October 13, 1969. Additional information has developed since suspect known as "ZODIAC".

WM, 35-45 Years, approximately 5'8", Heavy Build, Short Brown Hair, possibly with Red Tint, Wears Glasses. Armed with 9 MM Automatic.

Available for comparison: Slugs, Casings, Latents, Handwriting.

ANY INFORMATION:
Inspectors Armstrong & Toschi
Homicide Detail
CASE NO. 696314

THOMAS J. CAHILL
CHIEF OF POLICE

Police sketches of the Zodiac Killer.

**Zodiac Killer symbol.** [WIKIPEDIA PHOTOS]

**Zodiac-Bomb diagram.**

## Zodiac Killer

On July 5, a man phoned the Vallejo Police Department in California to report and claim responsibility for shooting a couple the day before. The caller also took credit for the murder of two high school students on Dec. 20, 1968, in Benicia, California.

The caller was not found, but three weeks later, letters were received at the Vallejo Times Herald, the San Francisco Chronicle and The San Francisco Examiner, again taking credit for the killings. On Aug. 7 another letter was received at The San Francisco Examiner with the salutation, "Dear Editor This is the Zodiac speaking."

Letters and calls from the Zodiac Killer continued into the 1970s, as did killings and abductions. The Zodiac claimed responsibility for 37 deaths, but investigators only confirmed five, plus two attempted murders. By the late 1970s the killer seemed to vanish, and police still don't know the killer's identity.

GAT02_00001710

ALSO THAT YEAR

Summer of '69



Members of Company D (Ranger), 151st Infantry, Indiana Army National Guard, posed for a photograph in Vietnam. The unit served in theater from December 1968 to January 1970. [U.S. ARMY PHOTO]

## First Vietnam troop withdrawal

After United States troop totals in Vietnam reached their peak in April at 543,400, on July 7 the U.S. conducted the first stage of disengagement from the Vietnam War. A battalion of the U.S. 9th Infantry Division made up the first 814 soldiers of 25,000 that were withdrawn from Saigon.

On July 25, President Nixon signaled a drawdown of troops from the country. He formalized the so-called Nixon Doctrine in an address to the nation Nov. 3.

There would be more increments in the withdrawal, but the last troops didn't leave Vietnam until January 1973.



Marines prepare to board the USS Paul Revere, August 1969. [USMC ARCHIVES]

GAT02_00001711



ALSO THAT YEAR

Summer of '69

Joe Pignatano, Eddie Yost and Yogi Berra in September 1969. [WIKIPEDIA]

## 'Miracle Mets'

It was New York on top of the sports world again when the "Miracle Mets" won the World Series, upsetting the Baltimore Orioles on Oct. 16 on baseball's biggest stage. The Mets, celebrated as lovable losers, had never had even a winning season since their inception in 1962. They won 100 games in the 1969 regular season, and though the Orioles won 109 games, the Mets won the World Series four games to one.

Just two months after New York City celebrated the Apollo 11 crew with a ticker tape parade, there was another such parade, this one for the World Series champion New York Mets.

GAT02_00001712

ALSO THAT YEAR



Photo taken by U.S. Army photographer Ronald L. Haeberle on March 16, 1968, in the aftermath of the My Lai massacre. [WIKIPEDIA]

## My Lai massacre revealed

Though what became known as the My Lai massacre happened in March 1968, it wasn't revealed to the public until November 1969 when a soldier spoke to journalist Seymour Hersh about it. Ron Ridenhour was an American soldier who heard about the massacre but had not participated in it, and had appealed to different levels of government to talk about it but received no response before he spoke with Hersh.

The report said 504 people were killed by a company of American soldiers in the village of My Lai during the Vietnam War, and Army officials tried to cover it up. After the report, the Army ordered an inquiry. The report recommended 28 officers be charged for their involvement, and in the end 14 were charged and one was convicted.

GAT02_00001713

## ALSO THAT YEAR

### Summer of '69



Rep. Alexander Pirnie (R-NY) drawing the first number for the Selective Service draft, Dec. 1, 1969. [WIKIPEDIA]

## First draft

Even as the United States was conducting troop withdrawals, on Dec. 1 the country held its first draft lottery since World War II. Each birthdate drawn from a lottery was assigned a number from 1 through 365, determining the order by which men born between 1944 and 1950 would be called to serve.

The draft came two weeks after the Moratorium March on Washington, which attracted more than 500,000 demonstrators against the war.

GAT02_00001714



The Rolling Stones perform "Sympathy For The Devil" at Altamont, 1969, as Hells Angels members stand guard. [YOUTUBE]

ALSO THAT YEAR

## Altamont Festival

The Altamont Festival on Dec. 6 was intended to be a West Coast version of Woodstock. A lack of planning, though, resulted in details being ironed out at the last minute, and the event is remembered more for the violence that accompanied it than its music.

The free concert was put together by the Rolling Stones as a way to finish their tour of the United States. They would headline the event that would also feature the Grateful Dead; Jefferson Airplane; Crosby, Stills, Nash, and Young; and Santana. But it wasn't until just a couple of days before the show that a venue was nailed down — the Altamont Speedway, about 60 miles east of San Francisco, where security would be handled by motorcycle gang the Hells Angels.

A brawl during Jefferson Airplane's set resulted in a singer being knocked unconscious, and the Grateful Dead canceled their appearance. During the Stones' set a Hells Angel member stabbed a man to death in what was later ruled self-defense. Three other people died in accidents at the concert.

# INVENTIONS AND FIRSTS

1969 saw technological breakthroughs, inventions and the debut of some familiar brands that are still around today.



**The very first router: The Interface Message Processor** (FLICKR / ANDREW "FASTLIZARD4")

## ARPANET

A major technological innovation came with ARPANET, which became the basis for the internet. The Advanced Research Projects Agency funded the project, with the goal of sharing information over great distances. In October the first successful message was sent, from UCLA's Network Measurement Center to the Stanford Research Institute. Before long the University of California-Santa Barbara and the University of Utah were also connected, and it quickly expanded to the East Coast, where other universities were able to link up with the network.

Unix was born in 1969 out of the mind of Ken Thompson, a computer scientist at Bell Laboratories.
[WIKIPEDIA]



## Unix

Another breakthrough came with the development of Unix at AT&T's Bell Labs in 1969, which was built upon throughout the 1970s. This stable, multi-user, multi-tasking operating system also helped lay the groundwork for future developments in the computing world.

**1969: First U.S. ATM starts doling out money.**
[WIKIPEDIA]

## ATM

Although the automated teller machine made its debut in London in 1967, 1969 saw the first ATM installed in the United States. A Dallas-based engineer is credited with pioneering the development and deployment of the invention, first used in September at a Chemical Bank branch in Rockville Center, New York.

**Summer of '69**
A TURNING POINT IN HISTORY

GAT02_00001716

# INVENTIONS AND FIRSTS



**Wendy's flagship restaurant in Dublin, Ohio.** [WIKIPEDIA]

## Wendy's

On Nov. 15, Dave Thomas opened his first restaurant — in Columbus, Ohio — naming it Wendy's in honor of his daughter. Wendy's had the first modern drive-through window among fast-food restaurants. Thomas opened a second restaurant in Columbus in 1970, and by 1976 Wendy's had opened or franchised 500 restaurants, even expanding into Canada. In the 1980s Thomas became more well-known when he began starring in Wendy's commercials, something he did until his death in 2002.

## Laser printer

At Xerox's research facility in New York, Gary Starkweather developed the first designs for a laser printer. He is credited with creating the first fully formed concept of using a laser to recreate an image on a copier drum to print onto paper. Although the first commercial laser printers wouldn't be released until the mid-1970s, the benefits of faster, high-volume printing were obvious immediately.



## Boeing 747

On Feb. 9, the 747 first took flight. The first "jumbo jet" was a response to the increased demand for air travel around the world. Boeing built a new plant in Everett, Washington, to build the plane. The test flight in February was followed by a 4-hour, 5 minute flight from Seattle to New York in December, which was the public's first view of the plane.

**The Boeing 747 prototype is currently at the Museum of Flight on Boeing Field in Seattle. The prototype is named after the city of Everett, Washington, where it was constructed.**
[WIKIPEDIA]

## INVENTIONS AND FIRSTS

### Summer of '69

## Concorde test

Another milestone took place in the air March 2, when the first Concorde made its test flight in France. It took off from Toulouse, and the successful test flight by pilot Andre Turcat lasted 27 minutes. The plane's speed during the test flight never exceeded 300 mph, though the plane could fly at a speed of more than 1,300 mph, cutting the flying time between London and New York from more than seven hours to about three and a half. The plane itself never took off the way it was hoped — it began flying commercially in 1976 and had its last flight in 2003.



Concorde's first flight: Supersonic travel (1969). [YOUTUBE]



Original prototype of Liotta-Cooley Artificial Heart. [FLICKR / KARON FLAGE]

## Artificial heart

On April 4 in Houston, the world's first artificial heart was implanted at St. Luke's Hospital. The device was given to a 47-year-old man who was dying of heart failure and waiting for a transplant. It kept him alive for three days until a human heart was available. The Liotta-Cooley Artificial Heart was named for Dr. Domingo Liotta, who invented it, and Dr. Denton Cooley, who performed the implant, and is part of the collection of the Smithsonian Institution in Washington.

GAT02_00001718

**INVENTIONS AND FIRSTS**

Summer of '69



The CDC's Rubella Fighter membership cards.
[HISTORY OF VACCINES]

## Rubella vaccine

In 1969 the German measles (rubella) vaccine became available in the United States. This came on the heels of the mumps vaccine in 1967 and the measles vaccine in 1968, and in 1971 the combination MMR (measles, mumps, rubella) vaccine was licensed for use.

## the gap

### Gap

Donald and Doris Fisher raised $63,000 for a clothing store and on Aug. 21 they opened the first Gap retail store in San Francisco. The store originally sold Levi's jeans and records, and became very popular very fast. It earned $2 million in its second year of operation, opening a second store in San Jose in 1970. Gap grew to become a more upscale clothing company over the years and expanded exponentially.



Sam Walton's original Walton's Five and Dime store in Bentonville, Arkansas, now serving as The Walmart Museum, seen in September 2006. [WIKIPEDIA]

## Walmart

Though Sam Walton opened the first Walmart store in Rogers, Arkansas, in 1962, and the chain had already grown to 24 stores in 1967, in 1969 the company officially incorporated as Wal-Mart Stores Inc. That led to it becoming a publicly traded company in 1970, and being listed on the New York Stock Exchange in 1972. Walmart would eventually become the No. 1 retailer in the United States.

# First on the moon

**N**eil Armstrong stepped from the Apollo 11 lunar lander onto the surface of the moon in July 1969.

"That's one small step for (a) man, one giant leap for mankind," came the static-interrupted communication from a quarter of a million miles away from Earth. Armstrong's ghostly black and white image accompanied that transmission after he stepped from the ladder of the lunar lander. For the first time, someone walked on a surface other than that of Earth. The image was seen and the words were heard by billions watching TV and listening on radio. It was a moment that had been years in the making; the efforts of many people in many disciplines in many countries.

Yes, it was an American who was first; but that the world exulted in the accomplishment. Now — 50 years on — we look back at that effort, and find new awe in the deed. It was achieved with technology that is primitive by today's standards. The feats of the crews of the six lunar landings have not been repeated since the last of twelve astronauts walked on the moon in December 1972.





The remotely operated camera that captured this image had been placed before launch on an adjacent lander leg.

## The crew

For each Apollo 11 astronaut, the lunar mission was his second, and last, spaceflight. Each was born in 1930; Neil Armstrong died in 2012 following complications from heart surgery.


**Neil Armstrong**, commander; joined NASA in 1962. He and David Scott were the crew of Gemini 8 in March 1966, when they performed the first docking of two spacecraft. Prior to joining NASA, he flew 78 missions in the Korean War as a Navy fighter pilot. Later, he was a test pilot, he flew the X-15 seven times, among other craft.


**Buzz Aldrin**, lunar module pilot; joined NASA in 1963. He and Jim Lovell were the crew of Gemini 12 in November 1966, when he performed extravehicular activities (EVAs) three times for a total of more than 5 hours. Prior to NASA, he was an Air Force fighter pilot who flew 66 combat missions in the Korean War.


**Michael Collins**, command module pilot; joined NASA in 1963. He and John Young were the crew of Gemini 10 in July 1966, when they made rendezvous with two spacecraft and Collins performed two EVAs. Prior to NASA, he was an Air Force fighter pilot, although he didn't fly combat missions. He became a pilot at the U.S. Air Force Experimental Flight Test Pilot School in 1960.

## The space race

The time between the launch of the first manned orbit of Earth (Yuri Gagarin of the U.S.S.R. in Vostok 1 for one orbit in April 1961) and the first manned moon landing (Apollo 11 in July of 1969) was a little more than eight years. It seemed a longer.



## To moon and back  (Diagram not to scale)

00:00:00 Indicates hours, minutes and seconds after liftoff



The lunar round trip had been accomplished by Apollo 8 and 10, but neither had landed on the surface. This diagram shows some of the important events of the round trip to the moon — a journey that lasted about eight days and eight hours.

Launch from Florida

Splashdown in Pacific Ocean 200:11:16

Parachutes deploy at 10,000 ft. altitude

S-IVB engine ignition 400,000 ft. altitude

CM/SM separation 200:52:26

S-IC engine ignition 00:00:00

S-IC engine cutoff; stage separation S-II 00:02:41

S-II engine ignition 00:02:43

S-II engines cutoff; S-IVB ignition 00:09:08

S-IVB engine ignition 199:23:26

CSM docks with LM; S-II separation from S-IVB 03:24:03

S-IVB separation from S-IVB 75:58:40

SM engine midcourse correction 02:41:40

SM engine midcourse correction 04:34:56

SM engine, 4th ignition

SM engine, 3rd ignition; midcourse correction 152:11:44

## Saturn V rocket assembly

This diagram shows the individual sections that were stacked to make the rocket.

**Escape tower**
An emergency rocket to pull command module away from the rest of the assembly.

**Command module (CM)**
The only part of the rocket to make the round trip to the moon and back. The three astronauts reclined during launch, moved about freely (slightly) in zero gravity, and reclined again for reentry.

**Lunar module (LM)**
During launch from Earth, four legs partially folded. Later, panels opened, the four legs folded.

**Service module (SM)**
Provided most of the mission and life-support for the single rocket gave its thrust for the return journey.

**Instrument unit**
Guidance systems for the Saturn V rocket.

**Third stage (S-IVB)**
The portion of the rocket that achieved Earth orbit, along with the modules above it, and powered them toward the moon. Its single engine was fueled by 67,000 gallons of liquid hydrogen and about 19,000 gallons of liquid oxygen.

**Interstage adapter**
The adapter ring connected the second and third stages, which were different diameters.



GAT02_00001720

**SUMMER OF '69** | The Columbus Dispatch | Sunday, July 28, 2019      **25**

Sources: NASA; space.com; wikipedia.com; Smithsonian Air & Space Museum

MARK FREISTED/GATEHOUSE MEDIA

## Skyscraper

At about 360 feet tall, the Apollo spacecraft and Saturn V rocket exceeded the length of a football field. It dwarfed the previous launch vehicles Mercury-Atlas and Gemini-Titan II combinations. All are drawn here to the same scale.

Capsule

Apollo and Saturn V

Lunar module

Mercury and Titan II

Atlas

Third stage engine during launch.

**Second stage (S-II)**
The engines of this stage were fueled by tanks containing 260,000 gallons of liquid hydrogen and 80,000 gallons of liquid oxygen. It burned those amounts in about 6 minutes.

**Interstage adapter**
The adapter ring connected the first and second stages, and also covered the second stage engines during launch.

**First stage (S-I)**
The five engines of this stage were fueled from two tanks containing about 200,000 gallons of kerosene and about 315,000 gallons of liquid oxygen. It burned those amounts in less than 3 minutes.

USA
NASA

## The early U.S. manned spaceflight program

The six Project Mercury manned missions were flown between May 1961 and May 1963. The one-astronaut crews were instructive in tolerance of liftoff stress, work in zero-gravity and pressurized spacesuits. It carried enough food, water and oxygen for about one day.


1960 cutaway rendering

The 10 Project Gemini manned missions were flown between March 1965 and November 1966. The two-astronaut crews established abilities to endure longer space flights (including an 8-day and a 14-day mission); to perform extravehicular activities (or spacewalks); and pilot rendezvous and docking activities with other space vehicles. Those activities were crucial for the development of a lunar landing capability. The Gemini craft did not have an escape tower, but had ejection seats similar to those in fighter jets (though they were never used in launches).

1964 cutaway rendering
Capsule
Adapter

Flight was controlled from the ground, with back-up astronaut controls. A heat shield protected the bottom of the capsule during reentry into the Earth's atmosphere. Parachutes deployed at about 10,000 feet and the capsule landed in the ocean, with an inflated flotation collar. Recovery was made by helicopters and crew from Navy ships.

The Apollo programs manned missions were flown between October 1968 and December 1972. Two crews of three astronauts made Earth orbit-only missions — Apollo 7 and 9. Three made moon orbits and returned — Apollo 8, 10 and 13 (which had an explosion in the service module that cancelled a planned landing). Six made lunar landings — Apollo 11, 12, 14, 15, 16 and 17. More than 840 pounds of lunar rock was returned, some gauged to be 4.6 million years old. The program's dominant use of integrated circuits, spurred many advancements in that field.


1967 cutaway rendering
Command module (folded in transit)
Service module
Lunar module

## A short visit after a long journey

Armstrong descended the ladder first, joined by Aldrin about 20 minutes later. Altogether they spent about 2.5 hours exploring an area around them the size of a baseball field. They set up experimental equipment, collected rock samples and took photographs.

Then, they reboarded the LM. Following a sleep period, they fired the ascent rocket.

The top half of the lander was lifted into orbit to redock with the command module and Collins. The bottom half of the lunar module remained on the surface.


Aldrin's helmet reflects Armstrong and the lunar lander.

Lunar module
Ladder
Ladder access hatch
Deflectors
Thrusters
Window
Docking window
Hatch for docking with command module

(Command module makes multiple orbits)

midcourse correction  122:11:44
Ignition, 2nd midcourse correction
midcourse correction  75:05:01
Liftoff  105:19:00
Landing  70:72:17
Final SM engine ignition; descent engine ignition
3rd midcourse correction  126:16:57
Rendezvous  108:09:05
SM engine ignition; separates LM, jettisoned
LM begins descent  69:28:13
Equipment transferred from LM to CSM  80:20:14
crew transferred from LM to CSM
CSM/LM docking
69:59:32


Gagarin

tenser period, since it was part of a wider geopolitical contest between the U.S. and the U.S.S.R.

Just six weeks after Gagarin's orbit, President John Kennedy addressed a rare joint session of Congress on May 25, 1961. For both technological landing and global prestige, he set the objective of a safe moon landing and return of an American crew before the end of the decade.

For a time it seemed as though the Soviets were ahead of the U.S. in every space endeavor — from the first satellite (Sputnik in October 1957) to the first extra-vehicular activity (Alexei Leonov, 12 minutes in March 1965) to the first probe to make a soft landing on and transmit the surface of the moon (Luna 9 in February 1966). The U.S. accomplished a "first" that will last.

Kennedy



The Beatles arrive at John F. Kennedy International Airport on Feb. 7, 1964, sparking a "British Invasion" of music and culture in the U.S. [WIKIPEDIA PHOTOS]

From the beginning of what would become hit shows to the end of the Beatles, 1969 was a huge year in popular culture. Here's a look at some of the highlights:

*Summer of* **'69**
A TURNING POINT IN HISTORY

## The Beatles

- **Rooftop performance:** In January the Beatles gave their final public performance on the rooftop of the Apple Records offices in London.

- **Iconic photo:** On Aug. 8 photographer Iain Macmillan took the picture outside the recording studio that would be the cover of the "Abbey Road" album — the four members of the Beatles walking across a zebra crossing (crosswalk), away from the studio where they had spent so much of the 1960s.

- **"Abbey Road":** In September the band's 11th album and the last for which all four Beatles participated was released. It was also in September when John Lennon told his bandmates he would be leaving the Beatles.

GAT02_00001722

27

## AN OUTSTANDING YEAR FOR POP CULTURE



## Music

Led Zeppelin's debut, self-titled album was released in January. "Led Zeppelin II" came out in October that year. In May, The Who released their rock opera "Tommy," and in December the Rolling Stones released "Let It Bleed."

In March, John Lennon married Yoko Ono, and they held two "Bed-Ins" to promote world peace and protest the Vietnam War, one on their honeymoon in March and a second in late May.

Jimmy Page performing in Chicago on April 10, 1977, during Led Zeppelin's last North American tour.

Yoko Ono with John Lennon in March 1969.

AN OUTSTANDING YEAR FOR POP CULTURE

Summer of '69

## Television

• **"The Brady Bunch"**: Here's the story of a lovely lady ... whose show premiered Sept. 26. The sitcom, created by Sherwood Schwartz, starred Florence Henderson and Robert Reed as Carol and Mike Brady, whose blended family included a live-in housekeeper played by Ann B. Davis. The show, which had prominent guest stars from the pop culture and sports world of the time, ran until 1974 and boomed in popularity after it went into syndication.

• **"Sesame Street"**: Debuting Nov. 10, "Sesame Street" would go on to become the most widely viewed children's program in the world. The show featured a mix of actors, animation and, of course, Jim Henson's Muppets.

• **"Scooby-Doo"**: The animated show (with some live-action versions mixed in) has seen many evolutions over the years, but it began as a Saturday morning cartoon in 1969 on CBS. "Scooby-Doo, Where Are You!" was a big success for Hanna-Barbera Productions and eventually moved to ABC.

• **"Frosty the Snowman"**: 1969 was the premiere of the classic Rankin/Bass Christmas special, a cartoon based on the song. "Frosty" aired for the first time Dec. 7 and has been replayed every year since.

• **"Star Trek"**: The original "Star Trek" was canceled in 1969, ending a run on NBC after just three seasons. Though it had low ratings, the show's devoted fans helped it become immensely popular through reruns, leading to the creation of a number of spin-off series and movies.

Military family members watch a "Sesame Street" performance at Naval Base Kitsap. [DODLIVE]

Cast photo from "The Brady Bunch:" Back from left: Christopher Knight (Peter), Barry Williams (Greg), Ann B. Davis (Alice). Second row from left: Eve Plumb (Jan), Florence Henderson (Carol), Robert Reed (Mike), Maureen McCormick (Marcia). Front: Susan Olsen (Cindy), Mike Lookinland (Bobby). [WIKIPEDIA]

GAT02_00001724

AN OUTSTANDING YEAR FOR POP CULTURE

PHOTOS: WIKIPEDIA



## Movies

The year in cinema featured some of the most notable names in the movie world — but 50 years ago they were just climbing the ranks. "Midnight Cowboy," starring Jon Voight and Dustin Hoffman, won the Academy Award for Best Picture, becoming the only X-rated film to ever win the award. John Wayne won Best Actor for "True Grit," and Maggie Smith was named Best Actress for "The Prime of Miss Jean Brodie." "Butch Cassidy and the Sundance Kid," with Paul Newman and Robert Redford, was at the top of the box office, becoming one of the highest-grossing films of all time.

Other now-classics released that year: "Sweet Charity," "Easy Rider," "On Her Majesty's Secret Service," "The Italian Job," "The Wild Bunch" and "Paint Your Wagon."



PHOTOS: WIKIPEDIA

AN OUTSTANDING YEAR FOR POP CULTURE

Summer of '69

## Books

1969 featured the release of books that are still required reading, like Eric Carle's "The Very Hungry Caterpillar," Maya Angelou's "I Know Why The Caged Bird Sings," Kurt Vonnegut's "Slaughterhouse-Five" and "The Godfather" by Mario Puzo. It also saw the release of "Naked Came the Stranger" by Penelope Ashe. The book, an erotic novel that was an instant hit, was later revealed to have been written by a group of Newsday writers who set out to write a steamy novel and prove that sex sells. Other releases that year: "Portnoy's Complaint" by Philip Roth, "The Andromeda Strain" by Michael Crichton, "The Edible Woman" by Margaret Atwood, "I Sing the Body Electric" by Ray Bradbury, "The Left Hand of Darkness" by Ursula Le Guin and "On Death and Dying" by Elisabeth Kübler-Ross.

GAT02_00001726

AN OUTSTANDING YEAR FOR POP CULTURE



END THE WAR NOW! BRING THE TROOPS HOME

STOP THE WAR

Bring OUR BOYS HOME ALIVE!

Outside Michigan Stadium, on Greene Street in Ann Arbor, Sept. 20, 1969: Beginning of a student anti-Vietnam War march.

## Protests

The year featured continued protests of the Vietnam War across not only the United States, but the globe. In April 300 students at Harvard University seized the administration building, forcing out eight deans and locked themselves in. The fall of 1969 saw some of the largest antiwar protests in history: In October an estimated 2 million people gathered in cities across the country as well as in London to protest the war, and a month later that protest continued when about half a million people gathered in Washington, D.C. The anti-Vietnam movement also saw offshoots develop in 1969, including Weatherman, later known as Weather Underground, a militant group of young white Americans that promoted violent protest. It started in the summer with an attack on professors at Harvard, and continued in the fall with assaults on the police. During the 1970s the group bombed sites around the country.

Case: 2:19-cv-04262-ALM-KAJ Doc #: 42 Filed: 04/17/20 Page: 80 of 164  PAGEID #: 1149

GAT02_00001727



AN OUTSTANDING YEAR FOR POP CULTURE

Young adults in Texas smoking cannabis. (WIKIPEDIA PHOTOS)

## Drugs

Drugs were a symbol of rebellion in 1969, as well as social upheaval and political dissent. They were also a significant presence — some credited the peaceful atmosphere at Woodstock to the fact that so many people were using psychedelic drugs. Marijuana use was prevalent, certainly at Woodstock but enough so everywhere in the United States that by 1971 President Nixon declared a "war on drugs."

GAT02_00001728

AN OUTSTANDING YEAR FOR POP CULTURE

Summer of '69

A SPRING POINT MULTROY



Cape-sleeved minidress called "Gladiator" worn with boots combining gladiator and go-go elements. Shot of a Mary Quant fashion show, March 1969.

Micro-mini dress called "Diabolo" worn with shoes and sheer pop socks.

## Fashion

In fashion, color was prominent in 1969, as tie-dye clothing became mainstream. Bell bottom jeans also continued to be popular, and would remain so into the next decade. "Hippie" trends included fringed suede jackets, kaftans, psyche-delic prints and hemp.

"The latest rule in girls' high school fashion," LIFE magazine said in 1969, "is that there isn't any." Long hair and mop tops were fashionable for both men and women, and Diahann Carroll's modern bouffant was popularized by her TV show "Julia." (Carroll was the first black actress to have her own TV show.)



AN OUTSTANDING YEAR FOR POP CULTURE

Summer of '69

## Cars

1969 marked the end of the muscle car era, cars built for speed with powerful engines and a light body. Chevrolet had its Camaro, Dodge had its Charger and Pontiac had its Firebird Trans Am, all popular in 1969. Changes in regulations resulted in changes to the manufacture of sports cars in the next decade.

**1969 Chevrolet Camaro Z28.** [PXHERE.COM]

GAT02_00001730





On May 18, 1969, Apollo 10 launched from NASA's Kennedy Space Center. The mission encompassed all aspects of an actual crewed lunar landing, except the landing. It was the first flight of a complete, crewed Apollo spacecraft to operate in lunar orbit. [NASA PHOTOS]



*"Woodstock happened in August 1969, long before the Internet and mobile phones made it possible to communicate instantly with anyone, anywhere. It was a time when we weren't able to witness world events or the horrors of war live on 24-hour news channels."*

— Richie Havens



Former President Lyndon B. Johnson and then-current Vice President Spiro Agnew were among the spectators at the launch of Apollo 11, which lifted off from Pad 39A at Kennedy Space Center at 9:32 am EDT on July 16, 1969. The crew, the first of the Apollo missions to land on the moon, safely returned to Earth on July 24, 1969.

Case: 2:19-cv-04262-ALM-KAJ Doc #: 42 Filed: 04/17/20 Page: 86 of 164 PAGEID #: 1155

PHOTOS

**Summer of '69**

The opening ceremony at Woodstock Aug. 15, 1969, was led by Sri Swami Satchidananda.
[WIKIPEDIA PHOTOS]

*"By and large, the past two generations have made such a colossal mess of the world that they have to step down and let us take over."*

– Pete Townshend



This monument marks the site of the original 1969 Woodstock Music and Art Fair site in Bethel, New York.



Aug. 17, 1969, at the Woodstock Music and Art Fair.

GAT02_00001733

PHOTOS

Summer of '69

*"Beautiful view.
Magnificent
desolation."*
— Buzz Aldrin's first
words from the surface
of the moon



Buzz Aldrin removes the passive seismometer from a compartment in the SEQ bay of the Apollo 11 Lunar Lander July 21, 1969.
[WIKIPEDIA]

GAT02_00001734

PHOTOS

Summer of '69



Demonstration, with Gay Liberation Front Banner, circa 1972.

*"He say I know you, you know me / One thing I can tell you is / You got to be free / Come together, right now / Over me"*

— Lyrics to "Come Together" by The Beatles

A photograph of the Stonewall Inn, famed and widely recognized after the events of June 28, 1969, which would change the public conception of LGBT people in the United States. [WIKIPEDIA PHOTOS]



PHOTOS

Summer of '69

*"I don't know how anyone lived through it."*

— Hurricane Camille survivor Carrolyn Denning, in 2004

**Workmen stand on the edge of the Rt. 626 bridge over the Tye River in Norwood, Virginia, washed away by Hurricane Camille.** [VIRGINIA GOVERNOR'S NEGATIVE COLLECTION, LIBRARY OF VIRGINIA/FLICKR]

GAT02_00001736



PHOTOS

Abbie Hoffman visiting the University of Oklahoma to protest the Vietnam War. [WIKIPEDIA]

A 1969 Vietnam war demonstration at Tulane University in New Orleans. [FLICKR/MANHHAI]

A U.S. Army photographer and assistant climb through the devastated landscape on Vietnam's Dong Ap Bia after the battle of Hamburger Hill in May 1969. [WIKIPEDIA]

*"Let us understand: North Vietnam cannot defeat or humiliate the United States. Only Americans can do that."*
— President Richard Nixon in his address to the nation on the war in Vietnam Nov. 3, 1969



**The Sporting News**

1969 WORLD SERIES • GAME #5

KOOSMAN SHUTS THE DOOR!

An autographed baseball card featuring Jerry Koosman of the New York Mets. [FLICKR/NOVA SCOTIA POSTAL HISTORY]

*"The last miracle I did was the 1969 Mets. Before that, I think you have to go back to the Red Sea. That was — that was a beauty."*

— God (George Burns) in 1977's "Oh, God!"

New Yorkers celebrate the Mets' World Series win with a ticker-tape parade Oct. 20, 1969. [FLICKR/GEORGE EASTMAN MUSEUM]

PHOTOS

Summer of '69

GAT02_00001738





PHOTOS

A soldier burns a dwelling in this photo from the 1970 Report of Army review into the My Lai incident.

*"It was terrible. They were slaughtering villagers like so many sheep."*

— Sgt. Larry La Croix, June 1968

South Vietnamese women and children in My Lai before being killed in the massacre March 16, 1968. According to court testimony, they were killed seconds after the photo was taken. [WIKIPEDIA PHOTOS]

PHOTOS

**Summer of '69**
A Tribute to the Apollo 11 50th Anniversary



Inside the Launch Control Center, personnel watch as the Saturn V rocket carrying the Apollo 11 astronauts lifts off the launch pad on July 16, 1969. [NASA PHOTOS]

*"I didn't feel like a giant. I felt very, very small."*
— Neil Armstrong on looking back at the Earth from the Moon in July 1969

On July 16, 1969, Apollo 11 Commander Neil A. Armstrong leads astronauts Michael Collins and Edwin E. Aldrin Jr. from the Manned Spacecraft Operations Building to the transfer van for the 8-mile trip to Pad 39A.

GAT02_00001740

45

PHOTOS



The iconic image of The Beatles on their "Abbey Road" album cover. [FLICKR/PAUL TOWNSEND]

*"I don't like people explaining albums. The only way you can explain it is to hear it. You can't really use words about music, otherwise we'd do a talking album. The album is the explanation, and it's up to you to make sure what you want of it."*

—Paul McCartney



PHOTOS

Summer of '69

1969 Ford Mustang [FLICKR/DEJAN MARINKOVIC]

Leonard Nimoy (Spock), William Shatner (Kirk) and DeForest Kelley (McCoy) from the "Star Trek," television program "Star Trek," Jan. 8, 1969. [WIKIPEDIA]

"In 1969, I gave up women and alcohol — it was the worst 20 minutes of my life."

— George Best

GAT02_00001742







SUMMER OF '69 | The Columbus Dispatch | Sunday, July 28, 2019    47

**Never Clean Your Gutters Again!®**
Eliminate Clogged Gutters for Good!

38th ANNIVERSARY SALE

$380 OFF*
Expires August 31st

Senior & Veteran Discounts

FOR OVER 38 YEARS

AMERICA'S CHOICE
FOR GUTTER PROTECTION

Eliminate Clogged Gutters for as low as $40 per Month†

Call for a FREE Quote
614-500-4021

✓ Eliminate clogged and overflowing gutters
✓ LIFETIME No Clog WARRANTY, transferable
✓ Installed by trained & certified technicians
✓ Approved by all major roofing manufacturers

Handles up to 22"/hr of RAIN

**Gutter Helmet®**
NEVER CLEAN YOUR GUTTERS AGAIN!®

*Min. purchase of 50 linear feet required, offer expires 8/31/19. Offer applies to Gutter Helmet only and must be presented at time of estimate, cannot be combined with any other offers and subject to change without notice. Void where prohibited by law. †Subject to credit approval. Fixed APR of 9.99% for 120 months. Leafier is neither a broker nor a lender. Financing is provided by 3rd party lenders, under terms & conditions arranged directly between the customer and such lenders, satisfactory completion of finance documents is required. Any finance terms advertised are estimates only. OH-HIC-L04020
© 2019 Leinnd Corporation.

GAT02_00001743



GAT02_00001744

**Exhibit B**



GAT02_00001649



# Friends for life



Our pets love us unconditionally (yes, even cats!) and we want the best for them, of course. Happy Pets is here to help as you look for a dog or cat to adopt and set your friend up for a lifetime of happiness in your home.

We also have tips for training your pets, keeping them healthy and dealing with common behavior issues, along with stories about a famous TV vet, the debate on emotional support animals and handling pet insurance claims.

*This publication was designed and produced by Tribune Content Agency, a premium content division of tronc media. Design by Erik Nelson Rodriguez*

## FEATURED CONTENT

4  FINDING THE RIGHT CAT FOR YOUR HOME

6  FINDING THE RIGHT DOG FOR YOUR HOME

10  TIPS FOR TAKING YOUR DOG ALONG FOR THE RIDE

12  HELPING ANXIOUS CATS

13  CURBING AGGRESSIVE BEHAVIOR IN DOGS

14  FLYING WITH ANIMALS

17  DEALING WITH PET INSURANCE CLAIMS

21  KEEPING PETS' WEIGHT IN CHECK

23  PET DETECTIVE ON THE CASE

26  ENCOUNTERING UNLEASHED DOGS ON WALKS

30  HOLISTIC TREATMENTS FOR PETS

34  CALMING GROOMING NERVES

38  INTRODUCING NEW CATS TO RESIDENT ONES

40  TV'S FAVORITE VET KEEPS IT REAL

45  PET PRODUCTS GUIDE

3



# Feline time

## Ready to adopt a cat? Here's what to know

**By Emily Rosenbaum**
*TRIBUNE CONTENT AGENCY*

When you're ready to welcome a new cat into your home, there are several steps to take.

First, you want to ensure you have enough time for a cat. Many people assume cats are loners and can fend for themselves for long stretches at a time. Although many cats are independent, they still need human interaction and stimulation. When you are at home, your cat likely will want to be near you, play with you or cuddle up in your lap.

If you are hankering for a kitten, strongly consider adopting two from a shelter. Kittens are very playful and can entertain each other when you are at work or relaxing on the couch. You also will be saving two lives and freeing up more space at the shelter for other adoptable cats.

Look around the shelter and scout out a few cats that interest you. Spend time with them and see which one seems to be a good fit for you. Keep in mind that cats often take a while to warm up to new people, so be patient. Cats also can experience shelter stress and may come out of their shells once they are settled in a new home.

Ask the shelter staff members or volunteers if the cat has any medical conditions, special feeding instructions, behavior issues, etc. Let them know about your home, your lifestyle and if you have a resident cat.

After the adoption, you need to make certain your cat is going to have the smoothest possible transition to his or her new life. Your new cat or kittens likely will be nervous after the car ride home. Set

GAT02_00001652



up a safe room in your home. The room should be small without any places for the cat to hide, such as a bathroom or office. Have a litter box and food and water bowls in the room and let the cat get used to the new space before opening the door and inviting the cat to explore the home.

If you have a resident cat, make it a slow transition. Let them sniff each other under the door or crack it open a bit and allow them to check each other out. There may be hissing at first, so take things slowly. Once they are in the same area together, monitor their behavior toward each other.

Your cat should always be an indoor cat. Cats that are let outside can be hit by cars, pick up diseases and/or be attacked by other animals. Put a cat bed on the windowsill so your friend can enjoy looking outside and not be at risk.

Get good solid scratching posts for your cat to dig his or her nails into. Declawing is painful and deprives cats of important behaviors. You can place double-stick tape or tin foil on couches and chairs to discourage scratching, and if you see you cat clawing your furniture, direct him or her onto the scratching post.

Keep the litter box clean and make sure your new cat is eating and drinking. Also, look out for sniffing and sneezing, signs that the litter box is not being used, excessive lethargy or sudden behavior changes. Talk to your vet if you are concerned. Spaying, neutering and vaccinations typically are included in your adoption fees, but regular vet visits still are important.

Cats can live well into their teens, so this is a long commitment. Be sure you are ready for it.

The ASPCA offers these tips to families who want to adopt a cat:

• Make sure everyone in the house is prepared to have a cat.

• Cats can be independent. Make sure children know that the fun begins only after the cat feels safe and his or her needs are met.

• Once you're sure everyone is ready for feeding, litter changing and grooming, you can divvy up chores among family members so everyone is prepared to care for kitty.

• Always monitor children to ensure they are playing appropriately with the cat. Note if your cat is uncomfortable with being held, and avoid any rough play. ❁

# PUPPY **LOVE**

The smart way to find a new family member



GAT02_00001654

**By Bill Daley**
*CHICAGO TRIBUNE*

How to find a puppy? Very carefully and with much forethought, the experts all agree. After all, you're considering the purchase of a living being, an animal that will need feeding, training, grooming, medical care and, most of all, love and attention from you and your family.

Be honest with yourself, the experts say, and really consider if you can do it. And then, think hard on what kind of dog is best for you.

"You need to find a dog that fits your lifestyle," says Bruce Haas, co-owner of Tails in the City, a Chicago dog boutique. "If you aren't an active person and you get an active dog, that's a problem. The dog needs to fit into your lifestyle. It's up to everyone to do research."

Research is key, agreed Gina DiNardo, vice president of the New York-based American Kennel Club.

"How much time and money do you have for grooming?" she asks. "How much time do you have for exercising the breed? Some dogs are more content being a couch potato. Others will go crazy if they are left in the house without stimulation and exercise."

Puppies can also be "a big drain on time," DiNardo added, and if you don't devote the necessary time for training and socializing, "your puppy may not grow up to be the best canine citizen."

If you decide to buy a purebred puppy or dog, DiNardo said, you need to look for a responsible breeder. A good breeder will want you to visit the property, meet the mother and puppies, and will be happy to educate you on the breed and help you find the right puppy, she said, noting that some breeders will even pick out the puppy they think has the best temperament for you.

Expect, too, to be ready to answer many questions from a breeder looking to gauge your willingness and ability to provide for the dog. Such auditions, DiNardo noted, are a good sign.

"They will thoroughly vet you," she said. "They will ask as many questions as you do."

If a breeder discourages you from seeing where the mother and other animals are kept or won't allow you to visit the property, walk away. This is a sign of a bad breeder, and possibly a puppy mill, where animals are kept in horrible conditions and bred repeatedly.

Animal rescue organizations, like PAWS Chicago and local SPCA and Humane Society shelters, are also ready and eager to help you find the right puppy or dog. (There are rescue groups for particular dog breeds as well, so search online if you are partial to a particular breed.) And they will likely ask questions similar to those posed by breeders to determine which animal is best for you.

"We recommend families visit a shelter," says Sarah McDonald, PAWS associate director of media and community relations. "They can find a variety of wonderful animals, all shapes and sizes and energy level."

Bring along any resident dogs and tell the adoption counselors about any other pets; they can help you pinpoint a dog that will do better with such company.

If you choose a puppy, McDonald says, you should make sure you puppy-proof your home to eliminate possible dangers (don't leave things out that might get chewed or broken), lock up poisons, watch electrical cords). Figure out who is going to walk the puppy, you will have to leave work in the middle of the day to do it or arrange for a dog walker.

Uncertain how a pet will fit in with you and your family? Consider fostering an animal from a shelter. It gives the dog a break from the shelter and allows you to see if a dog is right for your lifestyle. If you become attached to your shelter friend, you likely can adopt him or her.

Whatever you do, make acquiring a puppy or dog a fun event for the whole family, McDonald says, and go in with an open mind.

"Let yourself meet a variety of animals," she said. "Fall in love together."

**What you'll need for your new dog**
- Leash and collar
- ID tag
- Chew toys (big enough that the puppy can't swallow them)
- Food, training treats
- Bed or old blanket
- Coat or sweater for cold climates
- Carrier for small breeds
- Brush, gentle shampoo, nail clippers (unless you plan to use a groomer)
- Vet appointment 🐾



GAT02_00001656

# 10 ways having a pet makes life better

**By Barton Goldsmith**
*TRIBUNE NEWS SERVICE*

I have seen how having an animal in your life can make things much better for all concerned. Here are some reasons why.

1. A pet's love never fails. No matter what, the animal that you have bonded with will always love you and remember you. Just knowing that unconditional love is there will make your life better.

2. Caring for something other than yourself is emotionally healthy. Giving and getting a little love, even if you have to say "off the couch" 270 times a day, can take your mind off your troubles and help you to see what's really real.

3. It is also physically healthy. If you have a dog, you need to take it (and you) on walks. Cesar Millan says that dogs are happiest when they are walking. And it's common knowledge that taking regular walks is also good for your heart and brain health.

4. An animal in your life will help ease your suffering. If you are dealing with depression, trauma or anxiety, having a pet will make things better. The relationship is pure healing. There are reality shows about how dogs help veterans dealing with PTSD and paroles trying to work their way back into society.

5. You may not think you have the energy to care for a pet. I have a friend who has been battling cancer for a decade. She got a puppy about a year before her cancer was diagnosed, and that dog has, without a doubt, helped keep her alive. Having her loving pup by her side is such a comfort when she is feeling weak.

6. Yes, animals typically die before their owners. Yes, losing your pet is

very painful, but when you think about how much love this animal gave you, it's totally worth the pain of loss.

7. No, pets are not replaceable. Rescuing little Foxy has made things much nicer for our family, but I still miss my Mercy and think of her every day. The connection we had was heart to heart, and caring for her that last year truly changed me.

8. Just the act of petting a creature lowers your blood pressure and helps you relax. Next time you are feeling out of sorts, I recommend going to your local shelter and giving some love to an animal there. You won't have to take it home, but notice how you feel when the two of you are exchanging emotional energy. And don't be surprised if you do adopt!

9. Saving a life will make yours better. Some people prefer a puppy from a pet store or breeder on a farm, but what about the used ones? All my animals have been rescues, and they are as sweet as can be. All of them have been young, 1 or 2 at most, so I've gotten to have them for a long time. Rescues make the best pets.

10. Maybe you think you don't have enough room in your heart. You may already have a family to love, and that is totally wonderful. But you may want to consider adding an animal into the mix. I'm sure if you ask your family, they will agree that pets only add more love. They never take it away.

*Dr. Barton Goldsmith, a psychotherapist in Westlake Village, Calif., is the author of "The Happy Couple: How to Make Happiness a Habit One Little Loving Thing at a Time."*

GAT02_00001657



# Taking your dog along for the ride?

Expert has tips for car travel

**By Lisa Moore**
*THE MODESTO BEE*

Beautiful weather allows many dog enthusiasts to resume the enjoyable act of taking our dogs along with us in the car. Even the most dreaded errands are made easier with our happy little dog along for the ride.

Your vehicle should always be packed with the basic dog necessities: a leash (no retractable leashes in public areas, please) and secure collar for potty breaks, a supply of water and a bowl to pour it in, poop bags, and some tasty treats and chews.

Although it's obvious that dogs love hanging their heads out the window as we rush along, there is a risk of injury to the eyes from colliding with insects, weed seed and other debris. It's best to crack the windows only, or take the time to teach your dog that wearing goggles is perfectly normal and use them on car trips to protect the eyes.

Without question, the safest way for dogs to travel in the car is secured in a crate. In the event of an accident, if the dog is ejected he will most likely survive if crated, and will not be able to run away in a panic from the scene. Another option for securing your dog is a canine seatbelt.

Allowing a dog to ride loose in the back of a pickup is not only extremely dangerous, it's illegal. He must be tethered, but this is still not a safe form of transport as it leaves him exposed to flying debris and extremely vulnerable in the event of an accident. Improperly tethered dogs can jump or fall out of the truck bed and hang themselves.

A sobering fact that takes a lot of fun out of having your dog along for company is the risk of theft. It's best not to leave your dog alone in the car. If the win-

GAT02_00001658

dows are cracked, there's a risk that someone could get inside, and temperatures can soar in the vehicle, even on a mild day.

Take the time to teach your dog appropriate car riding behavior if he remains loose, which includes leaving the driver alone. Drivers have enough to focus on without having to deal with incessant barking, ear licking or overly eager lap jumpers.

Teach your dog the rules of the car during special training sessions when you are not the driver, or from a parked position if you are alone. Attach a leash if needed, and use it to gently teach your dog where his boundaries are. If limited to the back seat, make sure he is placed back there each time he attempts to move to the front. Giving him a delicious project to chew on — like a bone or Kong filled with peanut butter — will help settle him down and keep him safely in the back long term.

Well-behaved dogs are welcome in some retail locations — think outdoor nurseries, home improvement stores, and eateries with seating outside. But choose wisely if your dog doesn't particularly enjoy being around strangers, or is barky or fearful of new places, avoid these public spaces. Seek the help of a professional trainer if your dog needs help adjusting to public venues; training should take place in other, more remote locations.

It is such a treat to take our well-mannered dog along with us into some of these welcoming places, and it is our duty and responsibility to make a good impression with a polite and unobtrusive dog so we can all continue to enjoy this special privilege. And always pick up your dog's poop. 🐾

## How to help a shy dog gain confidence in you

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

Dear Cathy,

My adult daughter and her family have a female lab mix named Scooby. Despite my seeing her three to four times a year (they live in Atlanta), she is always afraid of me and will sometimes bark and growl at me. Eventually she calms down and I can pet her. Even though she jumps on our bed and seems glad to see us, she avoids me later. She also got very upset with my other son-in-law and never calmed down enough for him to pet her.

Is there anything that I can do to make her less apprehensive? I've tried treats, but have a hard time getting her to come over to take them.

— *James Cohen, Ft. Lauderdale, Fla.*

**Dear James,**

What a great guy you are to seek advice about bonding with your granddog, Scooby.

Some people may say that something bad must have happened to Scooby to make her so afraid of people. But that's not always the case. Some dogs may not have been properly socialized as a puppy or, like people, may be shyer than other dogs and more stressed by social situations. Scooby also may associate your visits with

increased activity in the house, which may make her uneasy.

There are ways to help her become a more confident dog overall, but I am going to focus on what you can do when you visit.

Scooby needs to know good things happen wherever you arrive. Bring her a treat, toy or chew you know she will enjoy. Make sure you are the one to give it to her and only give it to her in a quiet place. Put it on the ground, and then step back so she can check it out on her own.

Next, ask your daughter and her family if you can take over Scooby's care while you are there, like feeding her, taking her for her walks and playing with her, if she will let you. Pets bond with their caretakers, so these activities can help build trust and show her you are part of the family.

You also should spend quiet time together, which helps Scooby associate calmness when you are around. Get up in the morning, while everyone is still sleeping, and spend time with her, either watching TV or sitting out in the back yard. Rather than face her, sit sideways to her, like two people watching a baseball game, and wait for her to come to you. This body language is less intimating and makes it easier for shy dogs to approach.

During the visit, speak softly to her and give her a few tasty treats. Your extended arm might scare her, so toss some strong-smelling treats on the ground a few feet away from you, eventually tossing them closer to you as she gets more comfortable with your new friendship.

If she is trained to not eat things off the ground, then put her dog bowl near you and put a few treats in it at time. Whenever she comes toward you, toss a treat on the ground (or place in the bowl), and tell her "good girl."

Just be present with her and don't force anything to happen. Don't make sudden movements or use loud, booming voices that could startle her. Do these things on every visit, and eventually Scooby will be relaxed and happy to see her grandpa from Ft. Lauderdale.

*Cathy M. Rosenthal is a longtime animal advocate, author, columnist and pet expert who has more than 25 years in the animal welfare field. Send your pet questions, stories and tips to cathy@petpundit.com.* 🐾





# Scaredy cat

Give anxious felines more places to hide in the home

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

Dear Cathy,

We got our rescue cat more than two years ago as a 7-month-old kitten. As soon as she got in the house, she went under the bed and came out only to eat and use the litter box. A year later, she still hid under the bed but came out more often to snoop around the house. As soon as anyone moved, though, she raced back under the bed.

Since the beginning of this year, she comes out at night and sleeps in our bed with us. At daybreak, she is back under the bed again until nighttime. When we are watching television, she comes into the hallway and starts "talking" to us. But as soon as one of us gets up, she is back under the bed.

I have a bag of treats, and when she hears me open it, she comes running toward me. Sometimes, she stays out, and we play a little. She does not play with any of the toys we bought her.

She lets us pick her up, but not for long, and she does purr. She is not curious about anything, open bags, crawling things, etc. We do have a Chihuahua who has no interest in her. Sometimes they both end up on the bed at the same time with no conflicts.

Is this something that is going to last forever with her? Right now, she is not like a pet, she is just an animal that lives in our house.

— Mark, Las Vegas

Dear Mark,

I appreciate your patience with this sensitive soul. Believe it or not, I don't think her anxieties will last forever, even though it has been two years. She has actually made progress, so here are a few more ways to keep things moving.

Place plug-in feline pheromones around the house or get her a feline pheromone collar to wear. All animals emit pheromones, but when cats smell cat pheromones, it can trigger an endocrine response that calms them and reduces anxiety.

GAT02_00001660

13

## Nip that aggression in the bud

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

D ear Cathy,

My 8-month-old puppy has started to show aggression. He growls and tries to bite when I try to pick him up or put on a leash. Treats are not working. Suggestions?
— Eileen, Commack, N.Y.

**Dear Eileen,**

If this is a new behavior, take him to a veterinarian to rule out a health problem. If he is not neutered, get that done right away.

After doing these things, he needs to learn who is in charge, and that only comes from consistent training. Right now, your stubborn little guy has learned he can control the household with a few well-placed growls and snaps. But you can begin to reshape his responses by training him to sit, stay, and come when called. The more you train him to listen to your simple commands, the less likely he will behave this way.

For example, instead of picking him up, walk over to him, then turn away, slap the side of your leg to get his attention, and say "come" to get him to follow you. Puppies love to follow people, especially if their voices sound happy. When he moves from his spot, you should be able to pick him up with no issues.

Once he learns to come when called, call him to you at least 10 times a day, always giving him a treat to reinforce the behavior. This repetitive behavior teaches him you are more important than his spot.

If these things don't help or he gets worse, please find a dog trainer or an animal behaviorist to evaluate his behavior. ❧



Next, when she starts "talking" in the ball, open her treats and call her to you. Do not go to her because that startles her. Instead, make her come to you. Place a hideaway-type bed near or on the couch that she can dive into quickly if she is startled. That way, she doesn't have to start all over again from the other end of the house.

Finally, cats feel safer up high, so if you can afford it, buy her a tall scratching post with a hideaway hole located at the top for the living room. Leave a few liver treats in the hole to encourage her to climb up. If she doesn't discover it on her own after a week, gently place her in it. She needs lots of hiding places around the house, so she can explore safely and learn there is nothing to be afraid of in your home. ❧



# Animals in the air

The 'emotional support' debate is a tough one

GAT02_00001662

**By Katherine Vallera**
*TRAVELPULSE*

Some of us might have gotten a good chuckle when a woman tried to bring her "emotional support peacock" on a flight.

All humor aside, however, the incident served to reveal an elephant in the cabin and a far more complicated debate about how airlines treat animals and disabled passengers.

In response to negative publicity surrounding alleged emotional support animals, (including the attack of a passenger) as well as the death of a companion dog in an overhead compartment, airlines like Delta and United are revising their policies with regards to who flies inside the cabin. And American Airlines decided early this year to limit emotional support animals allowed onboard to dogs and cats.

Via a statement to The Washington Post, Sara Nelson, president of The Association of Flight Attendants-CWA, said the changes will reduce fraud and protect passengers with disabilities.

Yet, it appears that people with disabilities — as well as the organizations that advocate for them — disagree.

Toni Ann Earns, president and founder of the International Association of Assistance Dog Partners, released a statement predicting the revised policy will cause a great deal of harm to travelers with legitimate service animals. Another statement released by Christine Benninger, president and CEO of Guide Dogs for the Blind, explains how requiring people with disabilities to present a health certificate for their service dogs 48 hours before flying is discriminatory.

It denies them access to last-minute travel, which can be crucial for business or in an emergency.

"If somebody is traveling with a legitimate service animal, there should not be any additional hoops that they have to jump through," said Benninger, who believes the changes cause undue hardship and are in violation of the Air Carrier Access Act, the statute that protects people with disabilities during air travel, which is exempt from the Americans with Disabilities Act.

"If my father has another sudden need for heart surgery, I wouldn't be able to get on a plane today or tomorrow to get to see him," said traveler Alexandra Harper, who requires the assistance of her service dog, Otto.

The new policy will not only make flying less accessible for people with disabilities requiring service animals, but it will also make it more expensive. Veterinarians will charge for the certificates, which must be submitted at least 48 hours in advance and will only be valid for two weeks.

This means round-trip itineraries will often require two vets' visits: one in each direction.

Traveling with disabilities is already challenging enough. Harper notifies the airline about her service dog in advance, at which time they guarantee reasonable accommodation as is stipulated by the Air Carrier Access Act (Title 14 CFR Part 382). Yet all too often, when she arrives at the gate, the airline is unprepared to accommodate her disability as required by law.

Sometimes, it's because they've already reached the maximum number of animals allowed inside the cabin. (There's no priority for service dogs when it comes to this allowance; it's determined by when the passengers booked.) While the popularity of flying with pets keeps growing, this allowance hasn't been raised to meet the demand, thus posing an accessibility obstacle for people with disabilities.

Harper is also denied boarding when there's a stroller needing the same space that she requires for her service dog. "Half the time, the agent says there's nothing they can do."

The alternative solution is hardly better: The airline forces another passenger to give up their seat. This upsets other passengers, who direct their anger at the service animal owner.

"I think the airlines don't believe me over the phone," Harper said, "When I show up at the airport, they consider me a problem they put off dealing with until the last minute."

Case in point: Harper was recently denied access to the first four flights she wanted because they had reached the maximum animal allowance. She was then denied access to another because of a stroller. To make matters worse, her purpose for flying was to seek medical treatment for her disability.

"A theoretical piece of baby gear had priority over me," said Harper.

But then there's the counterpoint: Healthy passengers who take advantage of accommodations intended for people with disabilities so that their pets can be in the cabin.

"People will take disability because they don't want to fly (animals as) cargo," said Earns. "It's not 100 percent safe, and they don't want to lose their pet."

"I don't blame them one bit" said travel agent Ruth Dermuth, "There's no way I'd subject my fur babies to flying in cargo. There is always that risk of injury or death due to severe conditions and poor handling"

"It's important for travelers to understand that flying animals in (the) cargo area is extremely dangerous," said Colleen O'Brien, vice president of People for the Ethical Treatment of Animals. "It's not uncommon for them to be lost, injured or even killed."

The potential for tragedy is even higher when flights

are delayed and the cargo hold experiences extreme temperatures. Combined with loud noises and the lack of pressurization, flying cargo can cause animals to experience distress.

"Every business should be held accountable," said travel agent Connie Riker, who specializes in special-needs travel. "People's pets are part of their family, they rely on the promises made by airlines when making the decision to entrust their family member with them."

Meanwhile, Delta reports that the number of passengers traveling with emotional support or service animals has increased 150 percent in the past three years.

Riker said that anyone who is planning on bringing their animal around other people should know how it will behave in public. Harper agreed, describing how Otto has been attacked by wayward emotional support animals on multiple occasions.

Earns said she believes that that most doctors don't even meet the emotional support animal before signing off on letters, let alone evaluate the animal's potential to be a public hazard. Service animals, on the other hand, receive extensive training. (Otto, for example, underwent 2.5 years of training to become a service dog.)

"Our dog start training when they're 3 days old," notes Berringer, whose nonprofit organization provides guide dogs for the blind and visually impaired.

Instead of punishing passengers traveling with legitimate service dogs, Earns suggested an assessment of emotional support and service animals by security to determine if they are fit for public transportation. Denying access for ill-behaved animals would protect other passengers and deter pet owners who abuse accommodations intended for people with disabilities.

"An animal that is being given access to public transportation needs to be able to demonstrate that it can be well behaved," Riker said.

Then there's a second solution that would alleviate the problem without discriminating against people with disabilities: "Make a huge effort to make cargo safer — really put in money," said Earns.

DeMuth, the travel agent, thinks it's the airlines' responsibility to find a resolution that doesn't endanger animals or infringe on disability rights. If they don't do so willingly, then it will be up to lawmakers to design and enforce more acceptable policies.

Harper, on the other hand, is less optimistic. She's concerned that people with disabilities are too disenfranchised and underrepresented to be considered by the Federal Aviation Administration and liability lawyers that shape the rules. Then there are animals who literally cannot speak for themselves. 🐾



# Ensure your best friend is covered

Be ready to fight if a pet insurer denies a valid claim

**By David Lazarus**
*LOS ANGELES TIMES*

It's every pet owner's nightmare: Your beloved furry friend comes down with a serious, costly illness. Americans spend more than $14 billion on vet bills annually, and pet insurance in the United States has grown into a nearly $900 million business.

But, as with human health insurance, claims for critters frequently can be denied by insurers for a variety of reasons. Most often, it's because the illness is deemed a pre-existing condition, which few pet policies will cover.

Challenging such denials can be frustrating, especially if your pet's medical needs are urgent.

That's where Pasadena, Calif., resident Samantha Bonar found herself. Her pit bull, Kaya, survived cancer several years ago. Now she has cancer again.

Kaya's veterinarian said the two cancers were unrelated. But the dog's insurer, Healthy Paws of Bellevue, Wash., refused to cover Kaya's treatment, ruling the latest diagnosis a repeat of the first.

Bonar, 48, appealed that decision but got nowhere. When we first spoke, it had been more than two months since her initial claim was rejected.

Meanwhile, the costs of Kaya's care were climbing.

"With cancer, you're racing against time," Bonar told me. "It seemed like the insurance company was delaying in hopes she'd just die."

Harsh. But then, millions of people have experienced the indignity of fighting denied claims and have wondered if their insurer was making the process deliberately troublesome in hopes the patient would just give up and go away.

Healthy Paws said in a statement that Bonar's claims for Kaya's care took an unusually long time "due to the large number of claims under review."

I wrote recently about how my insurer recently



GAT02_00001665

rejected my claim for a new insulin pump because of "lack of medical necessity" — an unexpected decision in light of the fact that I have incurable Type 1 diabetes and have worn a pump for years.

It turned out my insurer was simply missing a form, which I was able to untangle with a series of time-consuming calls and emails. What steamed me, though, was the fact that a simple clerical error had resulted in a full-on claim denial.

A 2011 study by the California Nurses Association estimated that the state's top insurers rejected about a quarter of all claims. A separate federal study that year by the Government Accountability Office found that denied claims were reversed in about half of all appeals, for those with the stamina to work the system.

The same dynamics play out with pet insurance.

But because pre-existing conditions are almost always grounds for a claim denial, it's far easier for pet insurers to cut you off if your animal is prone to accidents or sickness.

Bonar's dog was diagnosed with a tumor on her larynx in 2013. Bonar described the cancer as "very rare and unusual."

And she should know. Bonar works part time as a writer for Duarte's City of Hope, a leading cancer facility. She interviews oncologists and patients for the medical center's Breakthroughs blog.

So when Healthy Paws ruled that Kaya's new cancer on her jaw was related to the first, Bonar immediately said, no, they have it wrong. "I understand this stuff," she told me.

Kaya's vet, Dr. Jared Lyons, did as well. He submitted a letter to the insurer saying the new cancer "is in no way related" to the earlier tumor.

He said "it would be incredibly unlikely" for the first cancer, after successful treatment with surgery and radiation, "to lay dormant for over four years and suddenly grow in a completely different location and spread to the rest of the body."

Just hours after I contacted Healthy Paws, Bonar received an email from the insurer saying a review of her appeal had determined that the two cancers are unrelated.

"Ms. Bonar's claim will be paid in full," Healthy Paws told me in its statement.

That includes the nearly $13,000 Bonar said she's spent so far on Kaya's illness, which some people who don't own pets might think is crazy, but which many pet owners will understand immediately.

When we spoke after the company reversed course, I told Bonar she must be pleased.

She said yes, but she's also angry because it's easy to imagine that lots of people, faced with thousands of dollars in out-of-pocket costs after a denied claim, might choose to put their pet down.

"This could have gone very differently," she said.

Her advice: Fight.

"Educate yourself and use every resource available," Bonar said. "Don't give up."

I agree. Whether we're talking pooches or people. ✤



# Newborn baby and new dog?

## Not a great idea

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

Dear Cathy,

My son and daughter-in-law are having their first baby soon. They have informed us that they plan on adopting a pit bull from a rescue. My wife and I are against it. We will fear not only for them but the baby.

I know people say it's how the dog is raised. How do you know how a dog is raised if it's a rescue? There must be a reason why the pit bull is a rescue. The dog could have been mistreated. I do know, however, that any dog can bite and cause harm. How should this be

handled? Also, the apartment they live in is about 500 square feet.

—Carol N., Syosset, N.Y.

**Dear Carol,**

Before I address your question about pit bulls, let's talk about the adoption of a pet right before the arrival of a baby. I see this happens a lot with expectant couples. They want their child to grow up with a dog, or they are "nesting" and think now is the perfect time to add a pet to the family.

Both are bad ideas. First, kids can begin growing up with a dog at any age. They don't need to rush things. My son didn't get his first dog until he was 8 years old.

Second, adopting a dog right before a baby arrives is unfair to the dog. New parents are often exhausted and don't have the time or energy to train a new dog and help him or her succeed in the home. If they can wait to adopt a dog until after the baby arrives, I think they will be in a better position to know what kind of time, energy and financial resources they will have to devote to the care of a new pet, and the dog will benefit more from waiting too.

As for your question about pit bulls — a term than encompasses about 20 breeds of dogs — they are no different than any other dog. It's not about how they were treated — almost all of quarterback Michael Vick's fighting dogs got adopted into homes, and



## Treating hot spots

### By Cathy M. Rosenthal
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

My 10-year-old dog gnaws occasionally on places on his front legs that end up looking bare of hair and inflamed. How do I treat that?

— Ann P., Moyock, N.C.

**Dear Ann,**

Dogs chew on themselves because they itch, either from fleas, allergies or even a habit formed from anxiety or boredom. That means flea preventatives, and allergy and anxiety medications can help some dogs. But dogs itch so much, there is now a new monthly injectable that stops their itch for up to a month. Talk to your veterinarian about it.

Regardless of the reason, you will need to treat the hot spots — the irritated skin lesions that result from repetitive biting, chewing, licking and scratching. You can find hydrocortisone sprays and other healing creams online and at pet stores. If that doesn't work, your veterinarian can prescribe something stronger. ❁

---

some even served as therapy pets during their lives. It's about how they are being treated and socialized now. If a dog is raised in a home around people and with training, things are generally fine. If a dog, regardless of breed, is neglected or relegated to a back yard with little to no contact with people, he or she is more likely to bite or become aggressive.

Shelters and rescue groups can behavior-test and make a personality determination before putting a dog up for adoption.

As for breed specific legislation, many communities realize that breed bans don't work. In fact, they often report the same or increased number of dog bites, perhaps because resources target dogs based on appearance rather than on behavior. So far, 20 states have passed provisions prohibiting cities from enacting breed discrimination provisions, and I expect this trend to continue.

Ironically, pit bull dogs were once America's sweethearts, owned by several presidents, many celebrities and even the children's author Dr. Seuss. If you are getting ready to become grandparents, you may remember Petey from the Little Rascals. He was a pit bull.

With any pet, no matter how sweet and lovable, new parents must remember to never leave a baby or small child alone with that pet for any reason. Regardless of breed, that's the single most important thing for new parents to remember with a dog. ❁



GAT02_00001668

# Fat cat?
## Pudgy pooch?

Time to exercise

**By Rene Lynch**
*LOS ANGELES TIMES*

Next time you're at the vet's office, you need to look your vet in the eye and say: "Doc, give it to me straight. Is my pet fat?"

And then don't freak out if the answer is, "Yes, I'm glad you mentioned that."

It's estimated that as many as 59 percent of the nation's cats and 54 percent of its dogs are struggling with obesity, according to veterinarian Ernie Ward, founder of the Association for Pet Obesity Prevention and the author of "Chow Hounds: Why Our Dogs Are Getting Fatter."

"We actually think the numbers are higher," Ward said, and that vets are underreporting and sidestepping the problem lest they risk offending clients.

Pudgy pugs and fat cats may get lots of "likes" on social media, but there's nothing amusing about pet obesity, which can dramatically shorten a pet's life by contributing to crippling arthritis, Type 2 diabetes, high blood pressure, kidney failure and a variety of cancers.

If you love your pet, "one the most important things you can do is keep your pet at a healthy weight," Ward said.

The first step is having a frank discussion with your vet and figuring out an appropriate



GAT02_00001669

# Big gulp

## Is it a medical issue when dogs inhale their food?

**By Lisa Moore**
*THE MODESTO BEE*

Julie has written in about her dog, Molly, a spayed female Labrador retriever. Molly is "absolutely crazy" about her food, and quickly gulps her kibble down at every meal. Once she is certain there is no more food available, Molly calms down, but Julie is worried about her vacuum cleaner impersonation every time she is fed. She inhales her food so quickly that she often chokes it back up again.

Julie goes on to say that she has begun to give her more at each meal now, thinking Molly is "starving" due to her behavior and is exceeding the feeding guidelines on the bag of dog kibble for a dog her size.

There are lots of dogs out there that fit your description, Julie, and there can be many contributing factors, including metabolic rate, quality of food and competition from other dogs. There can also be medical reasons for this behavior to occur, including hyperthyroidism, which is a disease that causes an overproduction of the hormone thyroxin. Symptoms of hyperthyroidism include ravenous appetite, weight loss and hyperactivity. So before making any other changes, Julie, I'd suggest a thorough examination and

blood workup at your veterinarian's office.

If there are no physical problems at the root of this behavior, then I'd start getting creative in other ways. First, I'd suggest you look carefully at the type of food you are offering. Dogs require a diet of about 70 percent protein, and contrary to what is in a lot of commercial dog food, they are not big grain eaters. Make sure the quality of the food offered is high, with no grain in the formula.

If Molly is fed in the company of other dogs, or even the family cat, I'd change the routine to be sure she eats alone. Sometimes the mere presence of another pet can cause the dog to accelerate the eating process. Molly may consider other pets as competition, and she definitely doesn't want to share, so may eat faster as a result.

Next, you will need to do something to physically slow Molly down during meal time. You can discard the food bowl and toss her kibble all over the floor, or place it single layer in a shallow pan. Doing so will require that Molly pick up each piece of kibble individually, instead of successfully gobbling up mouthfuls at a time. Don't expect her to do a lot of chewing. Dogs are carnivores, and their teeth are shaped to bite, tear

---

plan for feeding your pet and doling out the right amount of treats. (There's no way we're going to stop giving our pets treats!)

Next up, though, is the fun part: exercising with your pet to burn off calories and pent-up energy, and bringing out his or her inner wild child. Here are Ward's tips:

### If you have a cat

"Cats don't 'jog' — they are built for short spurts of energy that unleash their inner predator," he said. Think nature documentaries, where the cheetah goes full-out to capture its prey and then spends the rest of the afternoon snoozing and recharging.

Ward suggests using laser pointers and remote-control toys to drive your cat insane for three to five minutes of play at a time, working up to three or four sessions a day, for a total of about 20 minutes of play each day.

In addition, he suggests placing a few boxes around the house and other toys your cat can use to hide in and leap out at you as you are walking by.

Ward also plays "hide the food" with his cats, placing some of their food in little bowls and secreting them around the house each day. It's kitty's job to find them.

"They get to kind of stalk their 'prey'" and burn off some calories in the process.

### If you have a dog

In contrast to cats, dogs need longer workouts to help them reset their energy levels, Ward said.

This does not mean you should take a dog that has been a couch potato and try to make it run five miles behind your bike.

"That is a recipe for disaster," he said.

Instead, aim to condition your dog (and yourself) by working your way up to a brisk 30 minutes of walking each day, or two 15-minute walks. Start out with leisurely walks of about 10 minutes apiece, and increase time and intensity by about 10 percent each week until you hit your goal.

If you don't have the time, consider hiring a dog walker or a college kid or a neighbor who could use a four-legged walking buddy. Doggie day care services are helpful too.

You also want to get in some ball playing, or Frisbee time with your dog, so your pet can get in some running and jumping, if its health allows, Ward said. ❧

GAT02_00001670



# The hound hunter

## Pet detective helps locate missing dogs

**By Charles Rabin**
*MIAMI HERALD*

MIAMI — Jamie Katz and her dad were constantly evicted from apartments. The barking was ear-splitting. The stench from litter boxes on balconies was overwhelming.

"He couldn't say no to me," said Katz. "And I couldn't say no to the animals."

That was about two decades ago and Katz, 36, still can't say no to the animals — especially missing ones. In the past few weeks alone, Katz, who operates out of a cage-cluttered Fort Lauderdale, Fla, apartment, has helped track down a French bulldog that escaped a yard and a Chihuahua stolen from an animal clinic in South Miami-Dade.

Another French bulldog named Brunno went missing for 180 days before Katz reunited him with owners, a body-wagging reunion in Fort Lauderdale caught on video. And last year, she helped basketball legend Michael Jordan's daughter find her missing Pomeranian.

Katz is a bona fide pet detective. She is a registered private eye with a degree in criminology, has trained her own dogs to catch the scent of missing pets and — arguably key to her success — has mad skills for using new and old media to spotlight her mission.

"Jamie is sharp. Jamie is amazing," said Emmanuel Laboy, who got his French bulldog, Bella, back after two agonizing weeks. "And most important, Bella is super happy!"

Katz's ability to reunite cats, dogs, parrots and even ferrets with their owners, coupled with a recent surge of positive press, has made her South Florida's most well-known pet detective. Savvy at gaining attention, Katz isn't shy about highlighting her name — a serendipitous homonym — to publicize her growing business.

Since creating her company less than two years ago, Katz said she's taken on 240 cases and solved 150 of them. Most of the time, she reunites animals that have escaped homes. Stolen pets only account for about 10 percent of her business, she said.

Last year, Katz received an anonymous call and was soon

---

and shred food, not grind it to a pulp.

Another option is to buy a specialty food bowl, one with separators built in, which causes the kibble to settle in little compartments within the bowl, forcing the dog to work to retrieve each little piece.

You could also get more creative and offer Molly her food in a type of puzzle. There are numerous toys on the market that are specifically designed to hold a full meal; my favorites include the Buster Cube and the Kong Wobbler. There are various ways to make these toys dispense some of the food, but it usually involves nosing or pawing it around in some way, and a little kibble at a time falls out. Some of these toys can stretch out a meal to last 30 minutes or more.

The benefits of making sure Molly slows down while eating almost pale in comparison to the mental stimulation they provide; a win-win for your dog. These options may give Molly the feeling of getting more at each meal, although in reality you will only be adding to the length of time, not increasing the amount of kibble.

Labradors are well known for their love of food and mealtime. Consider offering Molly more activities that involve food, but not her kibble. For example, offering her a big femur bone to chew on a few days a week will likely please her to no end, while the additional calories consumed will be minimal.

Finally, when looking for guidelines as to how much kibble to feed your dog, forget about what the label on the food bag recommends; look to Molly's actual weight and activity level to determine how much to feed her. Start with a fixed, measured amount, then weigh her, reassess and adjust the quantity every couple of weeks until you're certain that the amount of food you're offering her is keeping her at a healthy weight.

If you're not sure whether or not she is overweight, ask your veterinarian to assess Molly for you. 🐾



> "I can find anybody, I love the research part of it — and I don't give up."

helping Jasmine Jordan — the daughter of the Chicago Bulls Hall of Famer — find Mila, her missing Pomeranian Yorkie. Then, an African grey parrot named Oscar Gray was reunited with its owner after a tough negotiation.

Benny, a four-year-old Chihuahua owned by South Miami-Dade veterinarian Juan Fernandez Bravo, was retrieved recently. Two women and a man had snatched Benny from inside the animal clinic as Bravo and others tended to 10 rescued animals. Katz got a local television station to air the story and Bravo received a call saying his dog was safe. The dog was returned and Bravo paid a $1,500 reward.

Maria Bravo, the clinic office manager and wife of the veterinarian, said Benny was missing for eight days. She believes the signs made by Katz and her media savvy led to his return.

But Bravo was not entirely convinced the person who had her Chihuahua and gladly accepted the $1,500 reward had nothing to do with the dog's abduction. Bravo said the man who somehow wound up with Benny was too frightened to return him to the animal clinic.

"He parked far away behind a mall," she said. "Me and my husband met him and gave him a check."

The case of Brunno the French bulldog, who escaped from his Fort Lauderdale home, dragged on for six months, more than enough time for many missing animal trails to grow cold. But tips after a blast of internet outreach, using community-focused social media sites like Nextdoor.com, led Katz to a home. From there, she surveyed the scene and eventually retrieved Brunno after an exchange of $5,000.

"I can find anybody," said Katz. "I love the research part of it — and I don't give up."

Born in a small town about 45 minutes from Boston, Katz finished high school in Baltimore. Her tracking interests started when her childhood pet cat Blackjack escaped.

Katz rode her bike all over town in search of that cat. Years later, she caught

GAT02_00001672



a television show called "Animal Cops" on the Animal Planet channel. From then on, lost pets and how to find them became an imperative.

"I never found Blackjack," said Katz. "My goal in life was then to put animals and investigations together."

After grade school, Katz and her dad moved to Baltimore, where she eventually earned a criminal justice degree from a community college. She said she spent the next decade working for pet rescue groups up and down the East Coast. During that time, Katz said began to focus on becoming a professional pet detective.

Getting a private investigators license in 2014 taught Katz how to do important background checks.

By September 2015, Katz was finally working on her own. She created P.I. Jamie Katz LLC. A Broward New Times story that told of how she solved a fake kidnapping in which a dog was actually eaten by an alligator raised her profile.

The cost of hiring Katz to find a pet: between $305 and $605, depending on exactly what needs to be done.

For the minimum, a customer gets bright yellow signs with a picture of the lost or stolen pet that includes a phone number and the amount of any reward. The signs are set up strategically through the neighborhood. Katz will spend two weeks following up on any tips.

Some of her signs, though, have caused problems. Some of Katz's clients, particularly in Miami-Dade, have been fined in excess of $1,000 by code enforcement. Zoning regulators say the signs are not permitted in public areas. They must be placed, with permission, on private property.

For $605, Katz will put her 3 1/2-year-old spaniel, Gable, and her 3-year-old terrier mix, Fletcher, to work. Not long ago a search by Fletcher for a missing ferret stopped cold, telling Katz that the animal had been spirited away in a vehicle. It was eventually found

in Atlanta.

Katz works out of her home, a small apartment just west of downtown Fort Lauderdale that is filled with dog cages and pictures of dogs and cats. Her Facebook page is filled with reunion videos.

She recently brought finality to a convoluted search for Bella, Laboy's French bulldog, who had escaped his Fort Lauderdale home through an open gate. Laboy said not long after he posted a notice on his local Nextdoor site about Bella, a woman contacted him saying she saw the dog for sale on Craigslist.

After a series of back and forth phone calls, Laboy and Katz showed up at Bella's new home and bought her back for $360 — the same price paid to acquire the dog off Craigslist. Katz's fee for her service: a well spent $405, Laboy said.

"Jamie guided me through the entire process," he said. "It was all about, let's get the dog back. It was well spent money and I don't regret it one bit." ❧



# Back off, big guy

How to handle an approaching dog on a walk

GAT02_00001674

27



## Feeding stray cats

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

I have five inside cats and feed three stray cats in my yard, which has woods behind it. I have been feeding these cats for five months. There have been others in the past that I have trapped, had neutered/spayed and rehomed.

The problem is, my family and I are moving to another town, and I am worried about these cats. I do not want to leave them, but I can't bring them with me as we are moving to a condo community.

One cat appears feral, but the other two are cats that have been left on our block. One lets me pet him and has a tipped ear. I cannot touch the other two, even though one rolls on the ground and shows me his or her belly. I would appreciate any suggestions.
— Kathy M., Sayville, N.Y.

**Dear Cathy,**

How kind of you to take care of these community cats. I am glad to hear you get them fixed and find homes for the ones who are friendly. You are certainly doing your part to help animals.

There are two things I would do. First, it's always best to leave feral cats where they are, so call the local feral cat group and let them know you are moving to see if they have any volunteers in your area who can help feed these cats. Second, ask around your neighborhood to see if there is someone who might be willing to feed these cats after you move.

If you can't find anyone to take care of them, then these cats will have to find another food source, which may make them a nuisance in neighborhood trash cans. But if a neighbor agrees to feed them, then these cats will hardly be noticed in the neighborhood. Use this argument as your selling point for convincing someone to help.

Sometimes, people moving into a new home are willing to take over this care too, if you ask them. 🐾

## Even if you haven't been cornered by a dog, it can be stressful to see a large, unleashed dog approaching you.

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

I have a 16-pound Havashu. We do not have a fenced yard, so she is walked several times a day. There are quite a few large dogs that we encounter on our walks through the neighborhood. Some are leashed and some are allowed to be loose.

Sometimes, the people with the leashed dogs want our dogs to meet. If they are really large, I am reluctant because of the size difference. The loose dogs charge at us. I am afraid of large dogs (having been cornered by a pack as a child), so my fear transfers to my dog.

What is the best course of action? Fortunately, at every encounter, the owner was nearby and came to our rescue, but I am afraid that one day we will meet a dog without its owner. Can you please advise me on what to do?
— June P., Patchogue, N.Y.

**Dear June,**

I understand your fears. My dog and I were once cornered by two dogs without their owner. My dog fought them off trying to protect me and was

injured. After that, we could not walk around the block without him feeling anxious about every passing dog.

Even if you haven't been cornered by a dog, it can be stressful to see a large, unleashed dog approaching you. Your dog will feel your tension through the leash, so whatever you can do to ease your fears, like deep breathing, can be helpful to you both.

You could carry an umbrella, which when opened can serve as a barrier between you and the approaching dog. You can shake a can of coins, toss the

can onto the street (never at the dog), or use a Pet Corrector, which emits compressed air, to startle a dog and hopefully stop him from coming any closer.

Another technique is to put your leashed dog behind you in a sit position and stand in front of her, letting your dog know that you can handle this.

Then, lean toward the approaching dog, yell "enough!" as loudly as you can and point over the dog indicating you want the dog to go away. Surprisingly, it works well in getting curious dogs (not aggressive dogs) to step back.

As for the people and pets who want to meet you, it's OK to say, "No thanks." You are allowed to set boundaries for you and your dog. 🐾





# Unhealthy attachment

Time to correct that overprotective dog

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

I have a Havanese dog who is approximately 7 years old. My daughter and I adopted him five years ago, but since she moved out he's become very attached to me. He is very loving. He follows me all over and sleeps with me. He is walked at least three times a day.

The problem is, he can sometimes become very aggressive and bark and growl when he sees strangers on our walks through the neighborhood. Sometimes, I take him to the beach with me and he will sit quietly next to me, but if someone approaches us, he will growl and bark in a very aggressive manner.

I am always very careful with him, especially around children, who he does not seem to like either. He is also very aggressive toward my significant other when I'm around, but during the day when I'm not home he is fine with him.

— Toby, Syosset, NY

**Dear Toby,**

You have an overprotective dog.

While that trait might be great if you are in danger, it's not a welcome trait in the everyday life of a family dog.

Sometimes, without knowing it, dog owners reinforce overprotective behaviors simply by not correcting a behavior

GAT02_00001676



# Getting cat to use the litter box

**By Cathy M. Rosenthal**
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

How do I get a feral cat to use the litter box? He comes in the house and is very affectionate, but he will not use the litter pan. He goes on my carpet. Help!

— Gloria, Center Valley, Pa.

**Dear Gloria,**

It can be difficult to get a feral cat to use the litter box, but you can purchase what's called a litter box attractant that you can sprinkle on your litter to attract him to the box. I would also add a second litter box, so he has two places to go.

when it happens. Correcting a behavior is basically not letting him get away with it. It's a verbal correction of "no" and removing him from the situation so he can't continue the behavior. Saying "no" at the beach for example, might make him stop growling, but it doesn't make him stop looking at the people around you whom he sees as a threat.

His eyes need to be focused on you, so he can learn from your body language and voice and tone as to whether a situation needs his attention.

The good news is, your Hawanese is a very smart and trainable dog, so through obedience training, you can teach him to shift his gaze from looking outward to always looking to you for instructions on how to behave.

Begin teaching him to look at you by saying his name about 25 times in a row during one to two-minute training sessions held three times a day. When he makes eye contact, click a clicker and give him a tiny treat. When he makes eye contact every time you say his name, then use the clicker to train him to sit. Do these sessions quickly, so he doesn't have time to think about anything else but what you are asking him to do.

Next, if he barks and growls at anyone while you are walking him on a leash, you have two options. One is to stop abruptly, turn and walk in the other direction. If you do this even when no one is around, he will begin to think he should pay attention to you.

The other option, which I use frequently when my dog barks at other dogs or people, is to step in between him and the thing he is barking at, ask him to sit, and then turn with my back to him, but facing the perceived threat. Keep the leash tight so he can't get in front of you or peak his head around you. The idea behind this is to let him know you got this and you don't need him to protect you, and that it's actually your job to protect him.

Again, you are letting him know it's OK to relax and leave things up to you.

Finally, never force him to interact with people, but socialize him little by little. Determine how far away people need to be before he relaxes and give him treats for relaxing. Slowly move closer to people as he progresses, always giving him a treat for staying calm. Stay vigilant with this training and you will begin to reshape his behavior.



# Holistic hounds

Pet owners turn to aromatherapy, massage, even psychics



GAT02_00001678

## By Sharyn Jackson
*MINNEAPOLIS STAR TRIBUNE*

Brinks wasn't eating. Although green beans are among his favorite foods, he turned his nose up at two bowls of them placed around the Minnetonka, Minn., house where the yellow Lab lives.

To help, canine massage therapist Heidi Hesse rubbed Brinks in a specific spot on his ankle, an acupressure point, to soothe his lower back, bladder and kidneys. After an hour of massage with Hesse, Brinks regained his appetite and chowed down on a bowl of the veggies.

Massage is just one of a growing body of alternative therapies that Mary Kelley and Mark Falstad, Brinks' humans, employ to ease the 10-year-old dog's stiff joints, jump-start his appetite and soothe his ailing liver. Acupuncture is another.

As people increasingly take a holistic approach to their health, they're also looking to alternatives to conventional medical care for their nonhuman family members. That's why a new breed of wellness services for dogs — from chiropractic and aromatherapy to Chinese herbs and psychic communication — is springing up all across the country.

"It stems from human stuff," said Dr. Cathy Sinning of Lake Harriet Veterinary (~lakeharrietvet.com) in Minnesota. "There's more mainstreaming now because of people learning how it can help themselves."

Almost a third of Americans seek out "complementary and alternative medicine" to enhance their medical care, according to studies by the Centers for Disease Control. That includes using natural products, such as fish oil to combat heart disease; engaging in mind and body practices, such as meditation and yoga; or other approaches such as herbal remedies, traditional Chinese medicine or homeopathic drugs.

More humans, it seems, want their pets to have the same options.

When Sinning and her husband, Jim, began practicing in south Minneapolis 20 years ago, they were among the few veterinarians in the area integrating chiropractic and herbal medicine into standard care. These days, Sinning said, "most clinics have someone on staff doing acupuncture."

Courses for veterinarians to learn additional "modalities" have been booming over the past 15 years, said Dr. Barbara Hodges, a holistic veterinarian and veterinary adviser for the California-based Humane Society Veterinary Medical Association.

Hodges doesn't view the interest in alternative therapies as a rejection of traditional veterinarian medicine, just a complement to it.

"It's simply enlarging your horizons and the array of things you can offer to your patients," she said.

For example, a drug that can help a dog with an ailment might also cause serious side effects. So some vets might recommend an herbal remedy or a diet-and-exercise plan to mitigate those effects.

Practitioners say alternative treatments can improve circulation or digestion, ease muscle and joint pain, help animals recover from injury or surgery and calm a host of behavioral issues.

Amy Williams DeLong, a certified aromatherapist who specializes in working with animals, says aromatherapy can provide all of those benefits. Oils of herbs and roots that are known to ease pain travel by scent, and in a dog "are absorbed into the brain and bloodstream in less than a second," she said.

At a recent appointment, DeLong let 8 1/2-year-old German shepherd Izzy sniff a canvas tote filled with small bottles of essential oils. Izzy seemed to choose cinnamon and ginger by repeatedly licking the caps of the bottles. DeLong said those scents indicated that Izzy wanted a "warming" fragrance to help with circulation.

"We're going to make you a holiday blend," she told



Izzy.

Izzy's human, Julie Northenscold, was looking for something to alleviate her dog's arthritis.

On DeLong's instructions, Northenscold sprays a custom scent in her home or rubs it into her hands and then onto Izzy's coat. Northenscold said that the scents have proved more effective than other medicines. The scents also help Izzy, who is deaf, find her owner. An initial aromatherapy session with DeLong (amywilliams-delong.com) costs $65.

Training and certification for holistic pet practitioners vary widely. Some are veterinarians, such as animal acupuncturists, who are required in Minnesota to have a veterinary degree. Pet massage therapists don't need any certification in Minnesota. But Hesse, Brinks' massage therapist, trained at the Chicago School of Canine Massage. Her work requires a deep understanding of dog anatomy, she said. An initial consultation with her Sound Hound Canine Massage (soundhoundmassage.com) costs $80.

Still, most practitioners caution pet owners to work with trained professionals and not to try DIY remedies found on the internet.



"People might think this is frivolous, but they're a part of our family. They've given us so much. We can give something back."

GAT02_00001680

In addition to more familiar treatments, there are other, less common pet care methods available.

Elaine Garley is a holistic practitioner who communicates telepathically with animals.

Clients send her a photo of their pet along with questions they want her to ask (packages start at $39 for three questions). Garley then writes back with a "transcript" of the conversation.

"I get a running conversation in my head just like we're talking on the phone," said Garley, whose Minneapolis company is called Animal Bridges (animalbridges.com).

Recently, a client with a cat who was howling hired Garley. "As soon as I connected with the cat, I had a sinus headache," indicating that was what was ailing the cat, Garley said.

Hesse, the massage therapist, hired Garley to "speak" to her sheepdog before it died, and then again afterward.

"It's a little out there, even for me, but it was still comforting to hear what Lulu said," Hesse said, tearfully. "I think there is something to it."

With Lena Swanson, another local animal communicator, people describe their pets' concerns during a phone call and explain their concerns. Swanson then places them on hold while she communicates telepathically with the animal. She charges $2.75 per minute for her services (lenaswanson.com).

Clients come to her to understand why a cat has stopped using its litter box, or ask a sick pet if it's time to let go.

"It sounds so outlandish," Swanson said, but she said she believes that animal communication is an important skill many people can learn to tap into.

Not all pets come to holistic care through their humans; sometimes it works the other way.

After seeing the reviving effects of acupuncture and massage on Brinks, Kelley and Falstad are considering trying it themselves. Kelley has multiple sclerosis and uses a wheelchair to get around. (Brinks is her service dog.)

Meanwhile, they'll continue to give their pets every option they can to live comfortably, from mainstream veterinary medicine to the hands-on healing that practitioners such as Hesse offer.

"People might think this is frivolous, but they're a part of our family," Kelley said.

"They've given us so much. We can give something back." 🐾





# This won't hurt a bit

How to help dogs relax while being groomed

GAT02_00001682



## By Cathy M. Rosenthal
*TRIBUNE CONTENT AGENCY*

**D**ear Cathy,

Our loving little Westie turns into a nervous wreck when it comes to professional grooming and everyday brushing. We give her a mild tranquilizer (5 mg of Acepromazine) prescribed by our vet when we need to groom her. Sadly, the wonderful woman who groomed her passed away eight months ago. She had been Katie's "Westie whisperer" for 13 years.

We have since tried various groomers, using the same medication, but to no avail. Recently, we took her to a veterinary hospital where she was groomed under anesthesia. Katie was very matted, as she did not tolerate grooming for eight months, and had to be sheared. She has worn sweaters and coats all winter.

Can you give us some advice as to how to calm Katie enough to have her properly groomed once her hair grows back and we can brush her daily?

— Elaine, Franklin Square, N.Y.

**Dear Elaine,**

Poor Katie. Change can be challenging, and 13 years is a long time to have the same groomer. You may be able to conquer some of her fears of grooming and grooming tools, however, by retraining her as if she were a puppy; a dog is never too old to learn.

Start by showing her the brush and giving her some high-value treats — treats she doesn't normally get, but absolutely loves. Do this for several days. Then one day, touch her with the brush (no brushing yet) while giving those same treats. Give her lots of verbal encouragement in happy and approving tones.

Eventually, she should become more relaxed when she sees the brush because she knows she will also get those treats. When you get to that point, brush her for a minute or two, several times a day, rather than one long session. By taking these training baby steps, Katie should eventually accept some light brushing in exchange for a few high value treats. Incorporate some calming scents in the house like lavender or plug-in canine pheromones, which can also help relax her.

Getting her used to a new groomer is much trickier, because you can't pay a groomer for this incremental training. If you can get her to where you can brush her, though, you can then hire a groomer to come to the house where she may feel more comfortable. Be patient, though, as this could take many weeks to do. 🐾

Incorporate some calming scents in the house like lavender or plug-in canine pheromones, which can also help relax her.



# Getting to the root of the matter

Is a broken tooth a problem?

GAT02_00001684

## By Jeff Kahler
*THE MODESTO BEE*

Poppy is a 3-year-old golden retriever living a happy and carefree life, according to caretakers Rod and Carla. She spends her days in a large back yard and especially enjoys her swimming pool. Another favorite activity is fetching. She is especially fond of tennis balls and sticks. Recently, Rod and Carla noticed that Poppy has a broken tooth.

Rod described a broken fang on the upper left side of her mouth. When comparing with the right side, it appeared as if about a quarter of an inch had broken off the tip of the tooth. Poppy seems to be oblivious to the break, showing no signs of problems. Carla and Rod question whether they need to be concerned because Poppy does not seem to be.

The tooth Poppy has broken is called a canine tooth, part of the group called incisions. To understand the implications of a fractured canine tooth, it is important to first understand the structure.

The canine tooth, like all of Poppy's teeth, has three main sections: the crown, which is the area visible above the gum line and covered by enamel; the neck, which is the area at the gum line and without enamel; and the root, which is anchored in the jaw bone. The protective layer of the tooth is the enamel covering over the crown. If the enamel layer is compromised, the tooth can be at risk for developing disease. This is precisely my concern in Poppy's case.

Because Poppy has fractured off about a quarter inch of the canine tooth, the protection for the inner portion of the tooth, the pulp, is gone. This exposes the pulp cavity and puts the tooth in danger of developing an abscess in its root. An abscess results from the spread of bacteria into the pulp cavity. Once the process starts, it is not curable with antibiotics. Something must be done to the tooth itself

If the root cavity is intact, the tooth may be saved by performing a root canal. With this procedure, the pulp cavity is eliminated and replaced with a synthetic paste and then the tooth is sealed. We can take the further step of capping the tooth as well, if desired.

If a root canal is not possible because of root fracture or other reasons, the next available treatment is tooth extraction. Like a root canal, this requires general anesthetic for the patient along with pain control. Once the tooth is removed, the body will heal the cavity left behind and the problem is cured.

In Poppy's case, the best course of treatment begins with a visit to her veterinarian. A diagnostic and therapeutic plan can be outlined.

I did want to address one other point brought up by Rod and Carla. In their letter, they mentioned that Poppy likes to fetch tennis balls. This is not something I would recommend. The outer covering of tennis balls is very abrasive to a dog's teeth and over time with chewing, this abrasive material will actually wear off the tooth enamel, exposing the pulp cavities and risking root abscesses.

A better alternative is a rubber ball or something similar. I use racquetballs for my dog, which is much less abrasive on the teeth and equally fun for fetching. ❀

*—Jeff Kahler is a veterinarian in Modesto, Calif.*

A better alternative is a rubber ball or something similar. I use racquetballs balls for my dog, which is much less abrasive on the teeth and equally fun for fetching.



Case: 2:19-cv-04262-ALM-KAJ Doc #: 42 Filed: 04/17/20 Page: 134 of 164  PAGEID #: 1203

GAT02_00001685



# New cats moving in

## How to help everyone get along

GAT02_00001686

## By Cathy M. Rosenthal
*TRIBUNE CONTENT AGENCY*

Dear Cathy,

All my adult life I've only had male cats. My current babies are about 4 years old. Soon a 1-year-old female cat will be joining us along with her dad, which might provide some comfort for her. Along with that, my daughter is moving out, and so I think they may experience change overload.

I know change can be traumatic, and I know I will have to isolate the new cats for a while. Everyone is fixed or will be fixed. What should I do?

— Pat

**Dear Pat,**

If you can, keep the cats separated until everyone is fixed. Set up a room where the two new cats have food, water, toys and a litter box and will be isolated from the other cats. Spend at least 60 minutes over the course of the day in the room playing with and petting the new cats.

This will help calm the new cats and facilitate the transfer of scents between the cats as you go back and forth between them. You also can facilitate a scent swap by taking a blanket or toy in and out of the room or encourage the cats to play paws with each other under the door.

A few days later, use carriers to move your two cats into the room and let your new cats out to explore the house (without them meeting). After a week, introduce the female cat, then the other male cat a day or two later. Don't leave them all alone until you know they are getting along. There may be some hissing, hiding, running, posturing, meowing and guttural noises until everyone re-establishes their new territories in the home. However, if they fight or look like they might fight, separate them and try reintroductions again the next day.

Scent can play a part in creating a calmer environment, so plug in cat pheromones around the house to reduce everyone's stress before you begin. If you give your cats time to adjust and don't rush things, they should learn to live together peacefully. P.S.: Be sure to have one more litter box than you have cats in the home. 🐾





GAT02_00001688

# Rural vet has seen it all

## Dr. Pol may be reality TV's most unlikely star

**By Lorraine Ali**
*LOS ANGELES TIMES*

He's plucked countless porcupine quills from the snouts of dogs, delivered calves in snowstorms and castrated a petite house cat and a 2-ton bull in the same day.

There isn't much that rural veterinarian Jan Pol, 75, hasn't seen or done in a half-century of practicing animal medicine in and around his Weidman, Mich., clinic.

Reindeer with a head cold? Check. Dog with a chronic erection? Check. But even weirder than that case of the bovine with a fifth leg is the twist his career has taken over the last seven years.

While most of Pol's peers have long since retired, the no-nonsense, Dutch American doctor who can fashion a goat's leg splint out of parts from an old apple barrel has become a reality TV star of global proportions.

Now in its 12th season — there are two seasons per year — Nat Geo Wild's "The Incredible Dr. Pol" surpassed the 100-episode mark last year and is still breaking ratings records at the channel. "The Incredible Dr. Pol" remains Nat Geo Wild's No. 1-watched series.

Pol met his wife, Diane, when he arrived in Michigan from the Netherlands as an exchange student in the 1960s. The two run Pol Veterinarian Services, which of course makes her a regular presence on the show. But she opts out of the frame more often than not and is the low-key yin to her husband's gregarious yang.

The cameras also follow their son, Charles, and vets on staff who include Dr. Emily and Dr. Brenda as they deliver puppies or perform surgeries on ailing pigs.

"The Incredible Dr. Pol" resonates with a diverse swath of viewers in ways that more targeted reality programming about loners roughing in the Alaskan outback, rich housewives fighting it out in the suburbs or Bigfoot hunters who find nothing week after week, have not. In a world



l



"I can't save every animal, though I wish I could," said Pol. "But that is part of life. It is important to see that side of things too. I want the show to be real, otherwise, why are we doing it?"

GAT02_00001691

more often in a five-minute stretch than talk-show host Ryan Seacrest, who had walked down the same hallway a few hours earlier.

Admirers who approach him do so with familiarity rather than fawning, and almost all of them eventually show the good doctor photos of their pets they have stored in their phone. He obliges and shows them photos of his Great Danes stretched out across the family dog's feet or hips or something."

"The Incredible Dr. Pol" was co-created by Charles, one of three children

the Pols adopted. He grew up watching his dad work miracles on the animals around them, but he was not compelled to follow in his father's footsteps and instead wanted to make movies and television shows. He moved to L.A. 10 years ago, where he worked at Nickelodeon in operations.

"There is a point where we all get in this business where you're like 'Why am I working for someone else?'" says Charles, who works on the show with Monica Austin and Jonathan Schroder. "So reality (TV) is one thing where you can just go out and do it like old-school, college filmmaking. You just need to find characters who are larger than life.

"And I said to my partners that the largest character I have ever met in my life is my father. His job has both drama and stakes — everything you want in television.'"

"It sounded interesting enough," says Pol of the first time Charles approached him with the idea. "He said just do what you do, don't look at the camera. And yeah, that has been the format ever since. So what you see is real. We once had a producer who said, 'This is what I want you to do, and people will love it if you just do this.' And I said 'I'm not doing it!' Stubborn Dutchman, you know. So he just left."

A camera crew follows Pol's team sev-



eral months out of the year. The crew's problem isn't fabricating a story from nothing, it's keeping up with Pol. He's notorious among those who know him for driving and moving quickly.

"I can't stop for the cameras or do a retake," he explains. "Once I pull that calf out, I'm not pushing it back in so they can get a better shot."

Another brush with the law, says Charles, happened when the police pulled over the camera crew for speeding and asked why they were in such a rush. They said that they were trying to keep up with Pol.

"No one can keep up with Dr. Pol," replied the cop. ❧

Case: 2:19-cv-04262-ALM-KAJ Doc #: 42 Filed: 04/17/20 Page: 142 of 164 PAGEID #: 1211

# Gifts for pets

Fun products for your dogs and cats

## Kitty exerciser

Got a fat cat? The cat exercise wheel is a fun way to get her moving. It comes in various colors and patterns, including cheetah. Purr. **Onefastcat.com**



## Delicious squeakiness

If your dog is craving some Asian takeout, this dumpling toy should make him happy. No chopsticks needed. Available in three sizes. **Barkshop.com.**



## Dog dryer

Bath time is often a drag, but the Puff-N-Fluff aims to make it more pleasant by quickly drying your dog. It comes in various sizes and the flexible hose attaches to a hair dryer. **Thedogdryer.com**



GAT02_00001693



## Taco break

You cat spends most of her life sleeping, so why not let her dream of tacos while doing so? No hot sauce necessary. **Uncommongoods.com**



## Gourmet condiments

When your dog is a foodie and insists on having the right sauce, try serving these petchup, muttstard and mutt-n-aise condiments, which are turkey-, beef- and salmon-flavored. Cats also have their own line. **Amazon.com**



## Tower toy

Keep your cats entranced with this tower toy that could have them batting the balls around for hours — or becoming real estate moguls. **Petsmart.com**

## Dog turtleneck

Dogs who have a thing for the beat poets of the 1960s will love this fashionable little turtleneck. It also comes in black, for those times when your pooch wants to be a cat burglar. **Sirdogwood.com**



## Doughnut collar

Share your love of doughnuts with your dog, in a healthy way, with this fun collar. **Petco.com**

## Chow time

Get your dog to slow down while eating with this attractive food bowl. The bone in the center can help prevent your pup from diving in like a madman, which can be bad for digestion. **Uncommongoods.com**

GAT02_00001694

**HAPPY PETS** | The Columbus Dispatch | Sunday, June 16, 2019

47





GAT02_00001696

**Exhibit C**



# NewsGuild-CWA: GateHouse-Gannett Merger Threatens Journalism

The merger of GateHouse Media and Gannett, Inc. threatens journalism. The high debt load will exert downward pressure on wages and employment. Consolidation may accelerate news deserts. And Gannett shareholders are likely to lose money.

The GateHouse purchase of Gannett will weaken newspapers in the communities currently served by the two papers. The combined company will be forced to pay off, at a usurious interest rate, the financing of the deal, which will burden operations afterwards. The merger rewards the owner of GateHouse Media, New Media Investment Group (NYSE:NEWM), for its practices of cash extraction rather than investment in the news industry. The GateHouse-Gannett merger over-compensates Fortress Investment Group, the manager of GateHouse. NEWM is a company in turmoil, with shareholders and management out of alignment. Finally, the deal is harmful to Gannett investors who are likely to receive less value than was offered by Alden Global Capital in January 2019. Gannett shareholders decisively defeated the Alden slate of directors at the annual meeting of shareholders May 16, 2019.

The NewsGuild-Communications Workers of America (TNG-CWA) represents working men and women in telecommunications, customer service, media, airlines, health care, public service and education, and manufacturing. TNG-CWA represents 1,200 news industry employees at 33 newspapers owned by Gannett Co., Inc. and GateHouse Media. Additionally, both TNG-CWA and NewsGuild local unions sponsor pension funds that invest in the public equity markets and are substantial Gannett shareholders.

## 1. The Architecture of the Deal

On August 5, 2019, GateHouse (via its parent NEWM) announced its offer to purchase Gannett. The deal provided for a hybrid cash/stock transaction. NEWM offered to pay $6.25 **plus** 0.5427 of a NEWM share for each Gannett share. Based on the August 2, 2019 closing price ($10.70) for NEWM shares, Gannett shareholders would receive $12.06 of value for each Gannett (NYSE:GCI) share. The total value of the deal was estimated to be $1.4 billion. After closing, according to this scenario, NEWM shareholders would own 50.5 percent and Gannett shareholders 49.5 percent of the new company.

The new Gannett – the merged entity would retain the Gannett name and stock ticker – would own 263 daily news organizations in 47 states, and would reach 145 unique visitors to its websites on a monthly

basis. It would also have a significant presence in the United Kingdom through the Gannett subsidiary Newsquest, which has an average weekly readership of 8 million, 25.3 million unique visitors monthly, and 2,600 employees (of which 800 are journalists).

GateHouse was built by the hedge fund Fortress Investment Group. Although its ownership stake in NEWM is now roughly 1 percent, Fortress manages NEWM and receives payments tied to the size of the company (a management fee of 1.5 percent of assets) and performance (an incentive fee of 25 percent of profits). The deal reduces the size of the incentive fee in the new Gannett to 17.5 percent.

Fortress management terminates at the end of the year 2021. When Fortress exits NEWM, it would receive 4.5 million shares, which would likely be worth at least $45 million.[1] Share values might be even be higher as NEWM CEO Michael Reed projected new Gannett to pay a quarterly dividend of $0.76, double the current dividend of NEWM but 40 percent higher than the sum of the dividends the two companies are paying individually.[2]

Michael Reed, NEWM Chairman and CEO, would be Chairman of the Board and CEO at the new Gannett. Alison Engel, Gannet CFO, would be CFO of the merged company. Paul Bescobert, Gannett CEO (appointed August 5, 2019), would be CEO of the operating subsidiary. The board of directors would consist of nine members, six from NEWM and three from GCI.

To finance the transaction, NEWM would borrow $1.792 billion from Apollo Global Management LP at an annual interest rate of 11.5 percent. The excess of the loan over the payout to Gannett shareholders ($1.4 billion) would go toward paying off existing debt of both New Media and Gannett. The term of the loan is five years, but both companies anticipate a faster payout, especially since the loan has no pre-payment penalties.

The two companies projected $275-$300 million worth of cost savings in the first 24 months after their merger.

## 2.  The Proposed Synergies Will Reduce Employment at the Merged Company

The cost savings touted by GateHouse and Gannett will lead to efforts to reduce headcount. Media analyst Ken Doctor predicted a 10 percent cut in the combined workforce of 24,338.[3] He cited Reed as suggesting the cuts will mostly be outside newsrooms – finance, advertising, circulation – but they still weaken news organizations in the various locations.

---

[1] While it is impossible to know the value of a new Gannett share on December 31, 2021, we have a couple of reference points: share prices of NEWM ($9.20) and GCI ($10.75) as of September 13, 2019 ($9.20). We can postulate that the new Gannett share price might be around $10/share.

[2] Transcript of teleconference between analysts and New Media / Gannett, August 5, 2019, SEC Form 425, August 7, 2019: https://www.sec.gov/Archives/edgar/data/1579684/000114036119014405/nc10003799x14_425.htm

[3] Ken Doctor, "The Gannett–GateHouse Merger is Really Happening, but Expect to See More than 10 percent of Jobs Cut off the Top," Neiman Lab, October 9, 2019: https://www.niemanlab.org/2019/10/newsonomics-the-gannett-gatehouse-merger-is-really-happening-but-expect-to-see-more-than-10-of-jobs-cut-off-the-top/

GateHouse has been shedding employees since it went public in 2014. That may not seem obvious from New Media's annual reports that show overall employee counts rising continually from 6,113 at the end of 2014 to 10,638 at the end of 2018. However, those numbers reflect the company's growth through acquisitions. The reality has been that after each acquisition New Media has imposed job cuts. Typically, GateHouse consolidates copy editing and page design at its Austin, Texas, shared services unit. It then targets experienced and older (and therefore more expensive) reporters for layoff or buyouts. According to the academic Penelope Muse Abernathy, "GateHouse-owned newsrooms are often half the size within a matter of months" of acquisition.[4]

Within the news industry, GateHouse appears to be seen only marginally less likely than Digital First Media to cut jobs. As the *Texas Monthly* wrote in the first sentence of its article about GateHouse buying the Austin American-Statesman, "The publishing company … is developing a bad reputation for buying newspapers and gutting their operations."[5] An article about news and private equity in *The American Prospect* noted steep staff cuts at GateHouse papers – the *Bastrop* (Louisiana) *Daily Enterprise*, the *Fayetteville Eagle*, *Colombia Daily Tribune*, and an anonymous small –city newspaper.[6] An article in *Boston Monthly* in October 2019 noted that GateHouse had consolidated 50 Massachusetts newspapers into 18.[7]

The company does not announce the precise numbers or track job cuts accomplished through layoffs and buy-outs. However, we can develop some measures to approximate the problem. Revenues per employee grew from $106,359 for 2014 to $143,448 for 2018, a 35 percent increase. Earnings before interest, tax, depreciation and amortization (EBITDA) per employee rose from $11,756 for 2014 to $14,561 for 2018, a 24 percent increase. This suggests more work being done by fewer workers.

NewsGuild-CWA bargaining units have witnessed significant reductions: between April 2014 and April 2019, 12 units within GateHouse have experienced a drop in employment of 40.1 percent. (The corresponding percentage for the same time period for nine Gannett units that could be traced was 28.8 percent.)

Already in 2019, GateHouse has had significant job cuts in February, May, and August.[8]

---

[4] Penelope Muse Abernathy, "The Expanding News Desert," Center for Innovation and Sustainability in Local Media, University of North Carolina, 2018: https://www.cislm.org/wp-content/uploads/2018/10/The-Expanding-News-Desert-10_14-Web.pdf

[5] See R.G. Ratcliff, "New Media Buys the 'Austin American-Statesman': A company with a reputation for downsizing newspapers takes over Texas's capital city publication," Texas Monthly, March 6, 2018: https://www.texasmonthly.com/news/new-mediagatehouse-buys-the-statesman/

[6] Robert Kuttner and Hildy Zenger, "Saving the Free Press From Private Equity," The American Prospect, December 27. 2017: https://prospect.org/health/saving-free-press-private-equity/

[7] Chris Faraone, "No News Is Bad News," Boston Magazine, October 29, 2019: https://www.bostonmagazine.com/news/2019/10/29/end-of-local-news/?utm_source=Daily+Lab+email+list&utm_campaign=092097644c-dailylabemail3&utm_medium=email&utm_term=0_d68264fd5e-092097644c-396127213

[8] Tom Jones, "Layoffs Hits Several GateHouse Newsrooms," Poynter, August 13, 2019: https://www.poynter.org/newsletters/2019/layoffs-hit-four-gatehouse-newsrooms/; Tom Jones, "GateHouse Media Lays off Journalists across the Country," Poynter, May 23, 2019: https://www.poynter.org/reporting-editing/2019/a-major-round-of-layoffs-at-gatehouse-media/; Benjamin Goggin, "Local newspaper giant GateHouse Media laid off at least 60 journalists across

## 3. The Financing from Apollo will Burden the Merged Company

The financing arrangement in this deal is expensive. The new Gannett will pay 11.5 percent annually over five years for a $1.792 billion loan from Apollo Global Management. New Media leadership contends the merged company will accelerate the repayment schedule and there is no pre-payment penalty. If the new Gannett takes five years to pay off Apollo, it will likely spend in the vicinity of $2.26 billion total. If the new Gannett pays off Apollo in three years, it could do so for $2.0 billion. In either case, paying down the deal will be hard given the dividend promise and the Fortress premium (at least until the end of 2021).

The interest rate is high – 3 percent higher than any current debt held by either company.  That premium over five years will add an additional $160 million to company expenses. A back-of-the-envelope calculation suggests that the interest premium could pay for roughly **320 employees** over those five years.

Where the money will come from might be a challenge. The combined free cash flow from operations in 2018 came to $313.2 million. Yet, a five-year repayment plan would necessitate a minimum of $350 million a year and likely more.

The loan from Apollo almost triples the combined long-term debt of the two companies. At June 30, 2019, Gannett had $172 million in long-term debt and New Media had $435 million in long-term debt, for a total of $607 million.  The Apollo loan pays off the old debt but replaces it with an obligation to pay off $1.792 billion.

The purchase offer also stipulates that Apollo would have appointment rights for the board of directors of the merged company. Initially, Apollo will appoint two board observers. If consolidated debt to EBITDA drops below a certain threshold, however, Apollo will have the right to full board representation.

## 4. The GateHouse Growth Model

On the surface, GateHouse appears to be a dynamic company within a long-suffering news industry. Its revenues have *increased* by 133 percent between 2014 and 2018. (See Table 1.)

Between 2014 and 2018, however, NEWM bought 53 daily newspapers, increasing daily circulation from 842,000 to 1.5 million. It bought 67 weeklies, increasing weekly circulation from 1.0 million to 1.7 million.  (See Table 2.)

---

the US after a $30 million acquisition," Business Insider, February 10, 2019: https://www.businessinsider.com/gatehouse-media-lays-off-sports-and-photo-staff-after-30-million-deal-new-media2019-2

| Table 1: NEWM Financial Information 2014-1H2019 | | | | | | | |
|---|---|---|---|---|---|---|---|
| $ million | 2014 | 2015 | 2016 | 2017 | 2018 | 1H2019 | 2014-18 |
| Revenue | $652.3 | $1,195.8 | $1,255.4 | $1,342.0 | $1,526.0 | $792.0 | $5,971.5 |
| EBITDA | $72.1 | $133.0 | $142.9 | $149.4 | $154.9 | $66.1 | $652.3 |
| Net income | -$3.2 | $67.6 | $31.6 | -$0.9 | $18.2 | -$6.3 | $113.3 |
| Total Debt | $218.8 | $353.8 | $353.2 | $359.9 | $440.6 | $1,111.3 | |
| Debt/EBITDA | 3.0 | 2.7 | 2.5 | 2.4 | 2.8 | | |
| Dividends | $18.2 | $57.4 | $59.8 | $75.6 | $87.2 | $46.0 | $298.2 |
| Stock Buybacks | $0.0 | $0.0 | $0.4 | $5.7 | $0.8 | $0.7 | $6.9 |
| Dividends + Buybacks as Percentage Net Income | -568.75% | 84.91% | 190.51% | 9033.33% | 483.52% | 741.27% | **269.29%** |
| Source: Capital IQ | | | | | | | |

Yet, as GateHouse admits, results from continuing operations (so called "same-store") results have been declining, both in terms of revenues and EBITDA. Starting in 2017, however, the company stopped reporting annual same-store numbers. This is unfortunate because it prevents us from understanding how much new acquisitions affected the company's balance sheet. From the annual reports, we note a substantial difference between overall gains and same store losses between 2014 and 2016. (See Table 3.)

Still, we can see the effects of acquisitions from 2014-2016. In 2015, the acquisition of 31 dailies and 66 weeklies generated an increase in revenues of $591.9 million, given that overall revenues increased $543.5 million *and* same store revenues decreased $48.4 million. In 2016, the acquisition of 1 daily and the loss of 8 weeklies brought an increase of $92.4 million, given that overall revenues increased $59.6 million and same store revenues decreased $32.8 million.

| Table 2: NEWM Growth in News Footprint, 2014-2018 | | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| Dailies | 93 | 124 | 125 | 142 | 146 |
| Daily Circulation | 842,000 | 1,500,000 | 1,400,000 | 1,500,000 | 1,500,000 |
| Weeklies | 256 | 322 | 314 | 326 | 323 |
| Weekly Circulation | 1,038,000 | 2,321,000 | 2,215,000 | 2,318,000 | 1,668,000 |
| Weekly Paid Circulation | 297,000 | 321,000 | 315,000 | 318,000 | 268,000 |
| Weekly Free Circulation | 741,000 | 2,000,000 | 1,900,000 | 2,000,000 | 1,400,000 |
| Shoppers (ad-only) | 103 | 118 | 124 | 140 | 132 |
| Shopper Circulation | 2,600,000 | 2,800,000 | 3,000,000 | 3,500,000 | 3,100,000 |
| Websites | 379 | 489 | 538 | 569 | 581 |
| Source: SEC Form 10-K, New Media Investment Group, various years | | | | | |

| Table 3: NEWM Same Store vs. Overall Revenues | | |
|---|---|---|
| $ million | 2015/2014 | 2016/2015 |
| Same store changes in revenue | ($48.4) | ($32.8) |
| Overall changes in revenue | $543.5 | $59.6 |
| Source: SEC Form 10-K, New Media Investment Group, various years | | |

Starting in reporting for 2017, the company claims simultaneously "same store results … are not significant from actual results" but that it has experienced "ongoing declines in same store print advertising revenue streams." It just does not specify the severity of the advertising declines.[9]

Those declines, however, are evident in quarterly earnings reports. NEWM reports regular same-store quarterly revenue declines compared to the same quarter of the previous year. See Table 4. The claim that same store revenues "are not significant from actual results" is an exaggeration if not a deliberate obfuscation. Overall revenue growth has been driven by acquisitions only. This will be hard to replicate after NEWM takes over a Gannett that is larger than itself.

| Table 4: NEWM Same Store vs. Overall Revenues Quarterly over Previous Year's Quarter | | | |
|---|---|---|---|
| 1Q2017 | -6.2% | 3Q2018 | -4.8% |
| 2Q2017 | -5.4% | 4Q2018 | -6.4% |
| 3Q2017 | -6.4% | 1Q2019 | -7.4% |
| 4Q2017 | -5.6% | 2Q2019 | -6.9% |
| 1Q2018 | -4.5% | 3Q2019 | -7.9% |
| 2Q2018 | -4.9% | | |
| Source: SEC Form 8-K, New Media Investment Group, various dates | | | |

## 5. The Extraction of Cash out of GateHouse

New Media has made a clear decision to prioritize dividends over investment in news. It has raised the quarterly dividend virtually every year since 2014 from $0.27 to its current $0.38. Between 2014 and 2018, NEWM paid $298.2 million in dividends. Combined with share repurchases, the company has paid out much more than its net income: dividends + stock buybacks equaled 269.29 percent of net income between 2014 and 2018. (See Table 1.)

---

[9] SEC Form 10-K, New Media Investment Group, February 28, 2018, quotes from pages 77 and 72: https://www.sec.gov/Archives/edgar/data/1579684/000157968418000003/newm-20171231x10k.htm

The data from 2019 suggest an uptick in this extraction process. Table 1 shows that in the first half of 2019, the company had net income of -$6.3 million, yet it gave shareholders dividends worth $46 million and bought back $0.7 million of stock.

The strategy has had mixed results. Share prices have fallen 19.24 percent between the date the company went public on February 4, 2014, until November 1, 2019, and they have fallen 26.71 percent between January 1, 2019 and November 1, 2019. (See Chart 1.)



The high dividend has its appeal, however. Accounting for dividends, the **adjusted** share price (share price with dividends reinvested) has actually risen 44.34 percent between February 4, 2014, and November 1, 2019. This discrepancy between share price and adjusted share price shows the importance of dividends in giving New Media shareholders a "sugar high" – a temporary but unsustainable boost in share value. Because Gannett shareholders are buying late in the game, they may not be able to take advantage of multiple quarters of dividends. The cash flow tug-of-war among shareholders, the Fortress premium, and the debt payoff will consume at least one victim.

## 6.  The Purchase Offer Over-Compensates Fortress Investment Group

NEWM has had an additional incentive to buy assets: the larger the company, the more its manager would receive. Fortress Investment Group, now owned by Softbank Group, bought the newspaper assets of Liberty Media in 2005. It made a number of acquisitions thereafter, but the company's indebtedness was too difficult to sustain during the collapse of advertising during and after the financial crisis of 2008-2009: The company went into bankruptcy. Fortress was both a shareholder and a creditor through its subsidiary Newcastle Investment Corporation, so it ended up controlling GateHouse.

At the time, however, Newcastle was a Real Estate Investment Trust (REIT), controlled by Fortress (both the board and the executive team). Newcastle owned Local Media, a set of New England papers formerly owned by Dow Jones. Newcastle combined GateHouse and Local Media under the auspices of New Media Investment Group with an 84.6 percent controlling stake. It then spun off its stake in New Media to its shareholders. Fortress remained the manager.

A management agreement between Fortress and NEWM provides for both management fees and incentive fees.[10] Fortress gets an annual fee equal to 1.5 percent of NEWM total assets, thereby incentivizing the manager to buy as many assets as it could. Fortress also receives "incentive compensation" dependent upon adjusted net income. Between 2014 and June 30, 2019, Fortress received $48.6 million in management fees and $62.6 million in incentive fees.[11] NEWM CEO Michael Reed is paid by Fortress. Wesley Edens – co-founder, principal, and co-CEO of Fortress – had been Chairman of the NEWM board from bankruptcy exit in 2013 to May 2019, and his director fees were paid by Fortress.

While the merger deal **provides for the exit of Fortress at the end of 2021** from its management agreement, it gives the hedge fund a very generous compensation package. The management fee, whose percentage remains the same at 1.5 percent of assets, is likely to more than double in 2020 and 2021. While the incentive fee diminishes from 25 percent to 17.5 percent, it will be a smaller percentage of a larger pie whose size we cannot yet calculate. The 4.5 million shares Fortress receives after December 31, 2021, as part of the merger deal are likely worth at least $45 million. Leon Cooperman, the largest investor in New Media, called the Fortress compensation package "morally wrong."[12]

Altogether, Fortress will likely have extracted over $250 million from New Media / GateHouse between 2014 and 2021. A back-of-the-envelope calculation suggests those fees could have paid the salaries and benefits for **336 workers**.

## 7. The Cash-Stock Purchase Offer Under-values Gannett

The August 5 offer valued Gannett shares only nominally higher (0.5 percent) than Alden's pure-cash offer of $12.00 per share in January.[13] In rejecting Alden's bid, in February 2019, the Gannett board concluded the Alden offer "undervalue[d] Gannett, its assets and its prospects."[14] We have to wonder about the change of heart at Gannett, especially since a nominally better offer from GateHouse does not compensate for the **risk** to Gannett shareholders that NEWM's stock price could lower the value of their shares.

---

[10] SEC Form 10-K, New Media Investment Group, February 28, 2019, Exhibit 10.37,"Amended and Restated Management and Advisory agreement dated as of February 14, 2014":
https://www.sec.gov/Archives/edgar/data/1579684/000119312514106565/d694452dex1037.htm and Exhibit 10.39,
"Amended and Restated Management and Advisory agreement dated as of March 6, 2015":
https://www.sec.gov/Archives/edgar/data/1579684/000157968417000005/newm-20161225ex1039.htm
[11] SEC Form 10-K, New Media Investment Group, various years.
[12] "New Media Investment Group Inc. (NEWM) CEO Mike Reed on Q3 2019 Results - Earnings Call Transcript, October 31, 2019:
https://seekingalpha.com/article/4301846-new-media-investment-group-inc-newm-ceo-mike-reed-q3-2019-results-earnings-call-transcript?part=single
[13] See letter from MNG Enterprises to John Jeffry Louis III, Chairman of the Gannett Board of Directors, January 14, 2019, included in SEC filing 13D, MNG Enterprises, Inc., January 14, 2019:
https://www.sec.gov/Archives/edgar/data/1635718/000092189519000082/0000921895-19-000082-index.htm
[14] See letter from J. Jeffry Louis to MNG Enterprises, Inc., included in Gannett press release, February 4, 2019, included in SEC filing 8-K, Gannett Co., Inc., February 4, 2019:
https://www.sec.gov/Archives/edgar/data/1635718/000134100419000072/0001341004-19-000072-index.htm

Indeed, this is what has happened. As of November 1, 2019, with the closing price for NEWM shares at $8.48, the deal is worth **9.99 percent less** than it was on August 5 and **9.57 percent less** than the Alden offer.

While the NEWM share price will continue to fluctuate, there is no guarantee that the share price will be at a level to value Gannett assets by the time the deal closes (shortly after shareholder votes at both companies on November 14, 2019). Furthermore, NEWM shareholders appear to be losing confidence in the company: NEWM share price has fallen 26.71 percent in 2019 (as of closing price on November 1, 2019).

In summary, this deal values Gannett at a lower level than did Alden and it is risky since NEWM shares could fall further.

## 8. GateHouse is a Company in Turmoil

New Media management, board and shareholders are not aligned. Shareholders have rebuked management and the board six times in the last three years.

Shareholders bucked management three times at the 2019 annual meeting of shareholders. They voted overwhelmingly (73.28 percent) to **withhold** their vote for director Theodore P. Janulis. Shareholders voted 75.07 percent *against* the annual advisory of pay, a management proposal. (This is particularly ironic since GateHouse only lists one executive – COO Kirk Davis – in its proxy statement. The others, including CEO Mike Reed, are paid by the Fortress Investment Group.) Finally, shareholders voted 67.71 percent **for** a proposal from the California Public Employees Retirement System (CalPers) that would require directors to receive a majority vote in order to be elected.

At the 2018 annual meeting, shareholders voted to **withhold** their vote (64.65 percent) for director Laurence Tarica.

At the 2017 annual meeting, shareholders voted to **withhold** their vote (66.28 percent) for director and then-chairman Wesley R. Edens. They also voted 82.96 percent **for** a proposal from TNG-CWA that required an annual election of directors.[15]

This type of shareholder rebuke is extremely rare in public companies. New Media shareholders and their management and board are not on the same page, a situation that is likely to worsen.

TNG-CWA notes with deep concern that Mr. Janulis and Mr. Tarica have been appointed to the board of the new Gannett despite their disavowal by shareholders in 2019 and 2018, respectively.

---

[15] The company modified its governance in acknowledgement of the TNG-CWA proposal. It did not demand the resignations of either Edens or Tarica.

## 9. Conclusion

Consolidation within the news industry is likely, but this deal concerns us. The combination of the Fortress payout for the next two years, the high dividend, and the extra debt appear likely to force severe "efficiencies" on the company. If the merged company decides to accelerate debt repayment, then efficiencies will have to be increased. The two companies estimated $275-$300 million in annual synergies, the majority of which are planned in the first two years after the deal closes. Of that total, $115 million would come from "newspaper operations." This may not be enough.

Also, the company does not provide scenarios for possible economic downturns. The current economic expansion is now the longest expansion in U.S. economic history. Eventually, we will have a recession and with it a decrease in advertising revenues and pressures on all news organizations.

For those stakeholders concerned about the fate of journalism, the GateHouse approach to news has to be worrisome. Stripping news staffs to bare bones – in ways that mimic the behavior of Alden Global Capital – means certain activities are no longer funded and news organization cannot play the role of independent oversight of elected officials and private organizations.

Newspapers are a public good. They educate the public and are therefore critical to democratic governance. Whether it is local government or the competition of political ideas, newspapers allow citizens to make informed choices in electing leaders. They shed light on the expenditure of monies so that citizens have insight into how their tax revenues are spent.

We encourage organized workers at Gannett and GateHouse to push the company to retain jobs and offer sensible compensation. We encourage unorganized workers at Gannett and GateHouse to join TNG-CWA. The strong voices of workers, readers, community leaders and some shareholders will help pressure the company to address fundamental issues – preserving quality journalism, protecting career-sustaining jobs, and serving our communities.


## TNG-CWA and the New Gannett

1. The NewsGuild-CWA expects to hold the new Gannett to the assurances it gave when it announced the merger on August 5, 2019: a "commitment to high-quality journalism and community leadership."[16]

2. TNG-CWA commits to ensuring that "high-quality journalism" means the continued employment of dedicated professionals with appropriate remuneration to attract and sustain them. We will watch carefully attempts to reduce headcount and short-change employees.

---

[16] Mike Reed and Kirk Davis, Communication to GateHouse Media / BridgeTower Media Employees," August 5, 2019, reproduced on SEC Form 425, New Media Investment Group, August 6, 2019:
https://www.sec.gov/Archives/edgar/data/1579684/000114036119014328/nc10003799x13_425.htm

3. TNG-CWA will monitor the application of "community leadership" to ensure that it entails a continued presence of daily and weekly newspapers in the towns and cities where they are currently located in order to report on issues of public policy and neighborhood activities.

4. TNG-CWA expects new Gannett to invest in its operations and to end the extraction of cash at the expense of employees and communities. Such investment includes both the digital and print sides of the business.

5. TNG-CWA expects management at new Gannett to remain neutral when employees make a decision to seek collective representation. Any attempt to interfere with employee choice will be seen as a collective injury to all new Gannett employees.

6. TNG-CWA expects to be active in ensuring good corporate governance at new Gannett. We are particularly appalled that two directors who received a majority of withhold votes by shareholders at New Media have been appointed directors at new Gannett.

**From:** Columbus Dispatch Support <support@columbusdispatchservice.com>
**Date:** August 27, 2019 at 9:03:41 AM EDT
**To:** "gsharonewalt@gmail.com" <gsharonewalt@gmail.com>
**Subject: Invoices**

Good morning Mr. Ewalt,


Per your request, please find your last three invoices attached in this email.


If there is anything else that we may assist you with, please feel free to contact us again.


Kind regards,


Stephanie

The Columbus Dispatch

1

**Exhibit D**

## Thank You For Subscribing To *The Columbus Dispatch*

# SUBSCRIBER INVOICE

5300 Crosswind Dr
Columbus OH 43228

Account Number:
**Bill To:**

I.I..I..II.II....I.I.II..I.I..II....IIII....I.I..II.I..II

Ctn      JobSeq

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

Route Number:    361209

**Deliver To:**

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

### Subscriber Messages:

- In an effort to provide you with uninterrrupted service, accounts in good standing may see delivery and billing continue for a period of time past your renewal date, unless you contact Customer Service by calling 1-877-7DISPATCH.
- Sign up for EZ Pay today and receive 3 Animal 24" x 36" Frame-Ready Posters from The Columbus Zoo! For more information, visit www.dispatch.com/ezpay or call 1-877-7-DISPATCH and mention code A901 for this exclusive offer!
- Schedule your vacation with our Online Subscription Manager! Visit www.dispatch.com/service for all the details!

### Billing History:

Payment Received since your last bill: 04/09/19 $301.24, 07/09/19 $294.87
Your paid through date has been extended due to :
10 Adjustments
Current paid through date: 09-09-19

| PAYMENT OPTIONS | | | Full Delivery (1 COPY) | | |
|---|---|---|---|---|---|
| Through | Weeks | Rate/Wk | Future Delivery | Past Delivery | Total Due |
| 12-09-19 | 13 | 21.99 | $285.87 | $0.00 | $285.87 |
| 03-09-20 | 26 | 21.99 | $571.74 | $0.00 | $571.74 |
| 09-07-20 | 52 | 21.99 | $1143.48 | $0.00 | $1143.48 |

## Thank You For Subscribing To *The Columbus Dispatch*

# SUBSCRIBER INVOICE

5300 Crosswind Dr
Columbus OH 43228

Account Number: ▮▮▮▮▮

**Bill To:**

Ctn     JobSeq

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

Route Number:   361209

**Deliver To:**

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

### *Subscriber Messages:*

- In an effort to provide you with uninterrrupted service, accounts in good standing may see delivery and billing continue for a period of time past your renewal date, unless you contact Customer Service by calling 1-877-7DISPATCH.
- Sign up for EZ Pay today and receive 3 Animal 24" x 36" Frame-Ready Posters from The Columbus Zoo! For more information, visit www.dispatch.com/ezpay or call 1-877-7-DISPATCH and mention code A901 for this exclusive offer!
- Schedule your vacation with our Online Subscription Manager! Visit www.dispatch.com/service for all the details!

### *Billing History:*

Payment Received since your last bill: 04/09/19 $301.24
Your paid through date has been extended due to :
25 Vacation days
3 Adjustments
Current paid through date: 06-24-19

**PAYMENT OPTIONS** — **Full Delivery (1 COPY)**

| Through | Weeks | Rate/Wk | Future Delivery | Past Delivery | Total Due |
|---|---|---|---|---|---|
| 09-23-19 | 13 | 21.99 | $285.87 | $0.00 | $285.87 |
| 12-23-19 | 26 | 21.99 | $571.74 | $0.00 | $571.74 |
| 06-22-20 | 52 | 21.99 | $1143.48 | $0.00 | $1143.48 |

3

## Thank You For Subscribing To *The Columbus Dispatch*

# SUBSCRIBER INVOICE

5300 Crosswind Dr
Columbus OH 43228

Account Number:

**Bill To:**

Ctn      JobSeq

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

Route Number:    361209

**Deliver To:**

JOHN EWALT
23 WOODLAKE TRL
MOUNT VERNON, OH 43050-9610

### *Subscriber Messages:*

- In an effort to provide you with uninterrrupted service, accounts in good standing may see delivery and billing continue for a period of time past your renewal date, unless you contact Customer Service by calling 1-877-7DISPATCH.
- Sign up for EZ Pay today and receive 3 Animal 24" x 36" Frame-Ready Posters from The Columbus Zoo! For more information, visit www.dispatch.com/ezpay or call 1-877-7-DISPATCH and mention code A901 for this exclusive offer!
- Schedule your vacation with our Online Subscription Manager! Visit www.dispatch.com/service for all the details!

### *Billing History:*

| PAYMENT OPTIONS | | | Full Delivery (1 COPY) | | |
|---|---|---|---|---|---|
| Through | Weeks | Rate/Wk | Future Delivery | Past Delivery | Total Due |
| 04-03-19 | | | $0.00 | $67.37 | $67.37 |
| 05-01-19 | 4 | 17.99 | $71.96 | $67.37 | $139.33 |
| 07-03-19 | 13 | 17.99 | $233.87 | $67.37 | $301.24 |
| 10-02-19 | 26 | 17.99 | $467.74 | $67.37 | $535.11 |

# The Columbus Dispatch

**Exhibit E**

## Still the Day's Best Value

Stories that inspire. Coverage that informs. Investigations that affect change. This is real news - just when it's needed most. This is The Columbus Dispatch.

### Subscribe Today

Get started right now by clicking one of the options below or by calling 877-734-7728.

| Digital Access | Saturday & Sunday Delivery | 7 Day Delivery |
|---|---|---|
|  |  |  |

**Digital Access**

- Unlimited web, E-Edition & mobile apps local and breaking news at home or on the go
- DMG Rewards points offers prizes for tickets, gift cards and more
- 50,000 DMG Rewards points

**Saturday & Sunday Delivery**

- In-depth coverage, two days
- Unlimited Digital Access
- Coupons save enough each week to offset the cost of your subscription
- Premium Editions, more award-winning content delivered each month

**7 Day Delivery**

- All of the in-depth coverage, every day
- Unlimited Digital Access
- Coupons save enough each week to offset the cost of your subscription
- Premium Editions, more award-winning content delivered each month

Case: 2:19-cv-04262-ALM-KAJ Doc #: 42 Filed: 04/17/20 Page: 162 of 164 PAGEID #: 1231



- DMG Rewards points offers prizes for tickets, gift cards and more
- 50,000 DMG Rewards points

SUBSCRIBE NOW

- Premium Editions, more award-winning content delivered each month
- 115,000 DMG Rewards points

SUBSCRIBE NOW

- Premium Editions, more award-winning content delivered each month
- 200,000 DMG Rewards points

SUBSCRIBE NOW

Enter zip code to see available offers     43220     SUBSCRIBE

| | |
|---|---|
| ⦿ 13 weeks - Saturday and Sunday Home Delivery | $71.37 |
| ○ 26 weeks - Saturday and Sunday Home Delivery | $142.74 |
| ○ 52 weeks - Saturday and Sunday Home Delivery | $285.48 |

### DELIVERY INFORMATION

First Name*

Delivery Instructions

Last Name*

City*

Email*

43220

Delivery Address*

Select state

Apt number

Phone number*

○ 13 weeks - Saturday and Sunday Home Delivery                    $71.37
○ 26 weeks - Saturday and Sunday Home Delivery                    $142.74
○ 52 weeks - Saturday and Sunday Home Delivery                    $285.48

## DELIVERY INFORMATION

First Name*                                    Delivery Instructions

Last Name*                                     City*

Email*                                         43220

Delivery Address*                              Select state ▼

Apt number                                     Phone number*

☐ My billing address is different from my delivery address    United States

## PAYMENT INFORMATION

Name on Card*

Card Type* ▼

Card Number*

Expiry Month* ▼        Expiry Year* ▼

**PAYMENT INFORMATION**

Name on Card*

Card Type* ▼

Card Number*

Expiry Month* ▼    Expiry Year* ▼

**$71.37** Total

SUBMIT AND SUBSCRIBE

**GENERAL INFORMATION**

Print delivery available within the newspaper distribution area only. By submitting your address and/or email, you understand that you may receive promotional offers from GateHouse Media and its related companies. You may unsubscribe from receiving any such email offers at any time by clicking on the unsubscribe link in any of the emails you may receive. The advertised price does not include the charges for any premium editions. Premium editions are published to provide additional information and value to our readers. You agree that you will be charged up to an additional $9.00 for each premium edition published and delivered to you during your subscription period, in addition to the cost of your subscription. The length of your subscription will be shortened by the publication of premium editions if those premium editions are delivered to you during your subscription. You may elect to be billed separately for premium editions by contacting Customer Service at 1-877-734-7728. Thus, unless you elect to be billed separately up to an additional $9.00 for each premium edition, you agree that the length of your subscription will be shortened in proportion to the value of the number of premium editions published and delivered to you during your subscription period.] As an illustrative example, if you select a subscription of up to 12 weeks at a cost of $48.00, and two premium editions at $2.00 each are published and delivered to you during that subscription period, your subscription will be shortened by 1 week because the weekly cost of the subscription is $4.00 per week and the premium edition charges total $4.00. Depending upon the length of your subscription and the timing of the publication and delivery of premium editions, you will not be charged for any premium editions if none are published and delivered to you during your subscription. As such, in that case only, the length of your subscription will not be shortened. The timing of the publication and delivery of premium editions is variable. There will be no more than 3 premium editions published each month during the subscription term. If you sign up for our Ezpay program, your subscription will automatically be charged to your credit card 0 to 14 days prior to your current expiration date, for the duration of your subscription or until you notify us otherwise. For more information or to cancel your subscription please call 1-877-734-7728.