**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JOHN EWALT, et al.,** | |
| **Plaintiffs,** | **Case No. 2:19-cv-4262** |
| *v.* | **Chief Judge Algenon L. Marbley** |
| **GATEHOUSE MEDIA OHIO HOLDINGS II, INC., d/b/a THE COLUMBUS DISPATCH, et al.,** | **Magistrate Judge Kimberly A. Jolson** |
| **Defendants.** | |

<u>**MEMORANDUM IN OPPOSITION OF PLAINTIFFS JOHN EWALT, STEVE WYLIE, AND BONNIE NAVARRE TO DEFENDANT GANNETT CO. INC. AND GATEHOUSE MEDIA, LLC'S MOTION TO DISMISS**</u>
**[Related Doc. 66]**

Todd H. Neuman (0059819)
Rick L. Ashton (0077768)
Jeffrey R. Corcoran (0088222)
Allen Stovall Neuman Fisher & Ashton LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone: (614) 221-8500
Facsimile: (614) 221-5988
E-mail:  neuman@aksnlaw.com
ashton@asnfa.com
corcoran@asnfa.com
*Counsel for Plaintiffs John Ewalt, Steve Wylie,*
*and Bonnie Navarre*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND FACTS.....................................................................................2

III.    LAW & ARGUMENT ..........................................................................................7

     A.  The Court Has Personal Jurisdiction Over Both Of The Publisher
        Defendants ....................................................................................................7

        1.  The Relevant Standard.........................................................................7

The Court can resolve the issue of personal jurisdiction over Defendants GateHouse Media, LLC ("GateHouse Media") and Gannett Co., Inc. ("Gannett, and collectively, the "Publisher Defendants") based on (1) the allegations in the Amended Complaint or (2) the evidence presented at a hearing on the issue.  *Malone v. Stanley Black & Decker, Inc.*, No. 19-3880, 2020 WL 3989601, *3-5 (6th Cir. July 15, 2020) (recommended for publication).   The Court cannot, as the Publisher Defendants suggest, resolve the issue based simply on the Publisher Defendants' untested, self-serving declarations.  *See id.*  If the Court conducts an evidentiary hearing, the Court should permit the Plaintiffs to pursue discovery relating to the issue of personal jurisdiction. *Id.* at *5-6.

        2.  The Court is Entitled to Exercise Jurisdiction Under
           R.C. § 2307.382(A)(1), (2), (4) & (6) ....................................................9

This case fits within four of the bases for jurisdiction identified in Ohio's long-arm statute. Though the Plaintiffs only specifically identified two of those bases in their Amended Complaint, the Court is entitled to consider all four bases.  *See, e.g.*, *Quinn-Hunt v. Bennett Enterprises, Inc.*, 122 F. App'x 205, 206-207 (6th Cir. 2005).

          i.      The Publisher Defendants Are Subject to Jurisdiction In Ohio
                Because They Caused Tortious Injury In Ohio ........................10

The Publisher Defendants have siphoned tens of millions of dollars from tens of thousands of Ohioans through intentional violations of Ohio law.   Jurisdiction is therefore proper under R.C. § 2307.382(A)(4), which provides a person is subject to jurisdiction in Ohio when the person causes tortious injury here and derives substantial revenue from Ohio, and under R.C. § 2307.382(A)(6), which provides that a person is subject to jurisdiction in Ohio when the person causes tortious injury here through intentional misconduct.  *See Haley v. City of Akron*, No. 5:13-CV-00232, 2014 WL 804761, at *11 (N.D. Ohio Feb. 27, 2014) (explaining that injuries arising from statutory violations are "tortious injury" for purposes of R.C. § 2307.382).

ii

ii. **The Contacts of GateHouse Ohio Can Be Attributed To The Publisher Defendants For Jurisdictional Purposes............11**

The Publisher Defendants compel their subsidiaries to engage in the wrongful conduct at issue here. Because the Publisher Defendants exert undue control over their subsidiaries and view themselves as a consolidated enterprise, the Ohio contacts of those subsidiaries can be attributed to the Publisher Defendants for jurisdictional purposes. *See Third Nat. Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1090 (6th Cir. 1989); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450-451 (6th Cir. 2012); *In re Telectronics Pacing Sys., Inc.*, 953 F. Supp. 909, 918 (S.D. Ohio 1997).

3. **The Court's Exercise of Jurisdiction Is Consistent With Due Process.............................................................................16**

Due process prevents a court from exercising jurisdiction when the defendant could not have anticipated behind haled into that court. *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012). For a court's exercise of jurisdiction to comport with due process, a court must find "(1) purposeful availment of the privilege of acting in the forum state or causing a consequence in the forum state, (2) a cause of action ... aris[ing] from activities in the state, and (3) a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* (quotation marks omitted).

i. **The Publisher Defendants Purposefully Availed Themselves Of The Privilege Of Acting Or Causing A Consequence In Ohio....................................................17**

The Publisher Defendants could not have been surprised by an Ohio class action. GateHouse Media had already been sued for substantially similar conduct in another state, and Ohio is one of the Publisher Defendants' largest markets. Where, as here, a defendant aims tortious conduct at a state and the brunt of the harm is felt in that state, the purposeful-availment requirement of due process has been met. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012)

ii. **The Plaintiffs' Claims Arise From The Publisher Defendants' Activities In Or Directed At Ohio .........................17**

The second requirement of due process is that the claims against the defendant arise from the defendant's contacts with the state. *Schneider*, 669 F.3d at 701. This lenient standard is met where, as here, the claims at issue arise from the defendant's conduct related to the forum state. *E.g.*, *id.* at 703; *Wood v. 1-800-Got-Junk?, LLC*, No. 2:06-CV-117, 2007 WL 895008, at *6 (S.D. Ohio Mar. 22, 2007).

iii.    **The Court's Exercise of Jurisdiction is Reasonable** .................18

When the first two requirements of due process have been met, a presumption arises that the exercise of jurisdiction is reasonable. *Schneider*, 669 F.3d at 703. Given the harm caused by the Publisher Defendants here, the exercise of jurisdiction would be preeminently reasonable.

4.   **Alternatively, If The Court Considers The Publisher Defendants' Declarations, The Court Should Allow The Plaintiffs To Conduct Discovery Relating to Jurisdiction And Present Evidence At A Hearing**...................................................19

If the Court determines a hearing is necessary, the Court should allow the Plaintiffs to pursue jurisdictional discovery. The documents produced by the Publisher Defendants' subsidiary substantiate the Plaintiffs' position on jurisdiction, but the Plaintiffs cannot lay the foundation of that evidence themselves. Further, in advance of a hearing, the Plaintiffs would need discovery of jurisdictional information exclusively in the possession of the Publisher Defendants.

B.  **The Amended Complaint States Claims for Relief Against The Publisher Defendants** ...........................................................21

1.  **The Relevant Standard**.........................................................21

To survive a motion to dismiss, a pleading need only state a claim for relief that is plausible on its face. *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017).

2.  **Since the Publisher Defendants Directed and Participated In The CSPA Violations At Issue In This Case, The Publisher Defendants Are Subject To Liability Under the CSPA**......................21

Ohio courts have repeatedly held that an officer or shareholder of a company can be liable for directing or participating in that company's violations of the Consumer Sales Practices Act ("CSPA"). *E.g., Burns v. Spitzer Mgt., Inc.*, 190 Ohio App. 3d 365, 376 (8th Dist. 2010). Since the Publisher Defendants can be liable for their subsidiaries' CSPA violations, the Plaintiffs need not show that the Publisher Defendants themselves are "suppliers" under the CSPA. But even if the Plaintiffs need to make such a showing, they have done so here.

3.  **The Amended Complaint States ODTPA Claims and Claims For Unjust Enrichment, Declaratory Relief, And Injunctive Relief Against The Publisher Defendants**.............................................25

The Publisher Defendants' miscellaneous arguments relating to the Plaintiffs' other claims are also without merit.

IV.    **CONCLUSION**......................................................................26

# **TABLE OF AUTHORITIES**

## **Cases**

*Am. Greetings Corp. v. Coh*, 839 F2d 1164 (6th Cir. 1988).................................................7

*Baaron, Inc. v. Davidson*, 9th Dist. Wayne No. 13CA50, 2015-Ohio-4217 ....................22

*Bowell v. Mowery Constr., Inc.*, No. 3:16-CV-52, 2016 WL 6634958
    (S.D. Ohio Nov. 9, 2016) ....................................................................................22,23

*Braun v. Ultimate Jetcharters, Inc.*, No. 5:12CV1635, 2013 WL 623495
    (N.D. Ohio Feb. 19, 2013) ..........................................................................................4

*Burns v. Spitzer Mgt., Inc.*, 190 Ohio App. 3d 365 (8th Dist. 2010) ...........................21,22

*Calder v. Jones*, 465 U.S. 783 (1984).................................................................................17

*Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925).......................................15

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012).......................................17

*Davis v. Hawley Gen. Contracting, Inc.*, 6th Dist. Huron No. H-14-18,
    2015-Ohio-3798 ........................................................................................................21

*Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*,
    545 F.3d 357 (6th Cir. 2008) ................................................................................15,16

*Ferron v. Dish Network, L.L.C.*, 195 Oiho App. 3d 686 (10th Dis. 2011).......................24

*Ferron v. Zomego, Inc.*, No 206-CV-751, 2007 WL 1974946
    (S.D. Ohio July 3, 2007)............................................................................................24

*Garber v. STS Concrete Co.*, 8th Dist. Cuyahoga No. 99139, 2013-Ohio-2700...............21

*Haley v. City of Akron*, No. 5:13-CV-00232, 2014 WL 804761
    (N.D. Ohio Feb. 27, 2014)..........................................................................................10

*Hahn v. Doe*, No. 94APE07-1024, 1995 WL 127863 (Mar. 23, 1995)............................23

*Hamilton v. Ball*, 4th Dist. Scioto No. 13CA3533, 2014-Ohio-1118...............................22

*Inserra v. J.E.M. Bldg. Corp.*, 9th Dist. Medina No. 2973-M, 2000 WL 1729480,
    (Nov. 22, 2000)..........................................................................................................21

v

*International Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945) ................................................................15

*Keeley v. Airgas, Inc.*, No. 2:08-CV-111, 2008 WL 5422691
    (W.D. Mich. Dec. 29, 2008) ........................................................................12

*Malone v. Stanley Black & Decker, Inc.*, No. 19-3880, 2020 WL 3989601
    (6th Cir. July 15, 2020) ......................................................................1,5,7,8,9

*McKinney v. Microsoft Corp.*, No. 1:10-CV-354, 2011 WL 13228141
    (S.D. Ohio May 12, 2011) ...........................................................................24

*Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017) ..............................................21

*Oliver v. ARS Ohio LLC*, No. 5:8-CV-967, 2019 WL 343249
    (N.D. Ohio Jan. 28, 2019) ...........................................................................23

*Pilgrim v. Universal Health Card, LLC*, No.   5:09CV879, 2010 WL 447249
    (N.D. Ohio Feb. 3, 2010) .............................................................................23

*Quinn-Hunt v. Bennett Enterprises, Inc.*, 122 F. App'x 205 (6th Cir. 2005) .....................9

*Rayco Mfg., Inc. v. Deutz Corp*, No. 5:08 CV 00074, 2009 WL 10688802
    (N.D. Ohio Sept. 18, 2009) ..........................................................................12

*Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012) ...........................................16,17,18

*In re Telectronics Pacing Sys., Inc.*, 953 F. Supp. 909 (S.D. Ohio 1997) ...................11,15

*Third Nat. Bank in Nashville v. WEDGE Grp. Inc.*, 882 F2d 1087
    (6th Cir. 1989) .............................................................................................11

*Transportation Commc'ns Int'l Union v. Sultran Ltd.*, 187 F. Supp. 2d 880
    (E.D. Mich. 2002) ........................................................................................12

*United States v. Ferguson*, 868 F.3d 514 (6th Cir. 2017) ....................................16

*Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292 (6th Cir. 1964) ....11,15,16

*Wood v. 1-800-Got-Junk?, LLC,* No. 2:06-CV-117, 2007 WL 895008
    (S.D.Ohio Mar. 22, 2007) ...........................................................................17

vi

**Statutes**

R.C. §1345.01 ...................................................................................................22,23

R.C. §2307.382 ...............................................................................................7,8,9,10

**Rules**

Federal Rule of Civil Procedure 8 ...................................................................21, 24

Federal Rule of Civil Procedure 9 ...........................................................................24

Federal Rule of Civil Procedure 12 .......................................................................4, 7

6th Circuit Local Rule 32.1...................................................................................16

**Other Authorities**

None

<u>**MEMORANDUM IN SUPPORT**</u>

**I.     <u>INTRODUCTION</u>**

The Publisher Defendants[1] are directly responsible for causing tens of millions of dollars in damages to tens of thousands of Ohioans through their intentional misconduct.   They have held themselves out as the publishers of *The Dispatch*, and they have plastered their names on the website for *The Dispatch* and on the Terms of Sale, which they claim allow for the unilateral extraction of money from the accounts of Ohio subscribers.   Prior to this lawsuit, GateHouse Media and its affiliates had already been sued for their deceptive premium-edition practices in another state, so the Publisher Defendants knew (or should have known) that a lawsuit in Ohio, one of their biggest markets, was all but inevitable.   Yet the Publisher Defendants claim they are not subject to jurisdiction in this state.

Their Motion to Dismiss is both procedurally and substantively flawed.   It is procedurally flawed because it claims that the Plaintiffs are required to respond to the Defendants untested, self-serving declarations with declarations of their own.   As explained recently in *Malone v. Stanley Black & Decker, Inc.*, No. 19-3880, 2020 WL 3989601 (6th Cir. July 15, 2020) (recommended for publication), this Court must either evaluate the Amended Complaint and the documents referenced therein by themselves or it must hold a hearing.   If the Court holds a hearing, the Court would also need to permit the Plaintiffs to pursue discovery.

The Motion to Dismiss is substantively flawed because the Plaintiffs have easily met their prima facie burden of alleging facts in support of jurisdiction.   Indeed, a complaint can meet this undemanding standard even when it "is sparse on detail[.]" *Malone*, 2020 WL 3989601, at *4. The

---

[1]  As used herein, the term "GateHouse Defendants" refers collectively to the Publisher Defendants and their subsidiaries: Copley Ohio Newspapers, Inc. ("Copley Ohio") and GateHouse Media Ohio Holdings II, Inc. d/b/a The Columbus Dispatch ("GateHouse Ohio").

1

Amended Complaint alleges facts demonstrating that the Publisher Defendants intentionally caused tortious injury in Ohio and that the Ohio contacts of GateHouse Ohio can be attributed to the Publisher Defendants. This Court's exercise of jurisdiction is therefore consistent with R.C. § 2307.382(A)(1), (2), (4), & (6) and the requirements of due process. After causing tens of millions of dollars in damages to tens of thousands of Ohioans, the Publisher Defendants cannot be heard to complain about facing litigation here.

The Publisher Defendants' arguments relating to the merits similarly fall flat. The case law reflects that the Publisher Defendants can be responsible for directing and participating in statutory violations. The Publisher Defendants' arguments relating to the Plaintiffs' other claims are also without merit, and the Motion to Dismiss should be denied in its entirety.

## II. <u>BACKGROUND FACTS</u>

For years, the GateHouse Defendants have purchased reputable local newspapers and abused the trust and loyalty of the subscribers of those newspapers with unauthorized charges to those subscribers' prepaid accounts. [R. 42, Amended Complaint at ¶ 2, Page ID # 1071.] The GateHouse Defendants' acquisition-focused business model appears to have been dictated by hedge fund Fortress Investment Group. [*Id.* at ¶ 54, Page ID # 1078.] Prior to the recent merger between GateHouse Media and Gannett, Fortress managed GateHouse Media in exchange for a fee of 1.5% of GateHouse Media's assets and 25% of GateHouse Media's profits. [*Id.* at ¶ 55, Page ID # 1078.] Under Fortress' management, GateHouse Media focused on acquisition and short-term profits at the expense of the newspapers they ran. [*Id.* at ¶ 56, Page ID # 1078.]

GateHouse Media's practice of acquiring newspapers and draining the life from those newspapers received criticism. [*Id.* at ¶ 57, Page ID # 1078.] In a scathing critique of the recent

merger between GateHouse Media and Gannett, the NewsGuild-Communications Workers of America detailed GateHouse Media's "cash extraction" model. [*Id.* at ¶ 58, Page ID # 1078.] The NewsGuild observed that the Fortress management agreement was set to terminate at the end of 2021, and that by the time of termination of the agreement, Fortress will likely have extracted $250 million from GateHouse Media between 2014 and 2021. [*Id.* at ¶ 59, Page ID #1078.]

The GateHouse Defendants' myopic premium-edition and paper-statement-fee practices fit perfectly within this cash-extraction scheme. [*Id.* at ¶ 60, Page ID #1079.] Though these practices damage the newspapers run by the GateHouse Defendants and destroy the goodwill these newspapers have spent decades building, these practices lead to millions of dollars in short-term profits that can be paid as management fees to Fortress and dividends to shareholders. [*Id.* at ¶ 61, Page ID #1079.] Further, "the stock of Gannett Co., Inc. is publicly traded, and the Gatehouse Defendants have used premium editions as a way to minimize losses caused by a decline in their core business." [*Id.* at ¶ 98, Page ID # 1086.] In other words, the GateHouse Defendants "exploit their customers by raiding those customers' prepaid accounts to shore up the GateHouse Defendants' bottom line." [*Id.* at ¶ 39, Page ID # 1075-1076.]

The Publisher Defendants implement those premium-edition and paper-statement-fee practices across their entire enterprise. Specifically, "Gannett Co., Inc. (through Denise Robbins and others) and GateHouse Media, LLC (through Lee Knapp and others) directed and participated in the premium-edition practices and paper-statement-fee practices at issue in this case." [*Id.* at ¶ 47, Page ID # 1076.] Thus, despite being owned by separate companies, both *The Dispatch* and the *Akron Beacon* have implemented the same premium-edition and paper-statement-fee practices at issue in this case. [*Id.* at ¶ 121, Page ID # 1089.] In fact, *The Dispatch* and the *Akron Beacon*

3

rely on the ***exact same*** Terms of Sale to justify those premium-edition practices. This is no coincidence, as the Publisher Defendant would have this Court believe. The Terms of Sale on both websites (like other portions of those websites) state "Gannett Co., Inc. 2020" at the bottom and thus reflect that the Publisher Defendants control those Terms of Sale. [Doc. 48-2, Terms of Sale, Page ID # 1296.][2] The Terms of Sale even state that subscribers who submit their emails to *The Dispatch* are agreeing to "receive promotional offers from GateHouse Media and its related companies." [*Id.* at § 1.2, Page ID # 1292.] Prior to the merger, *The Dispatch's* Terms of Sale referenced "GateHouse Media, LLC" at the bottom and included the same statement regarding promotional offers. [August 28, 2018 Terms of Sale (attached hereto as Ex. A).]

The Publisher Defendants, in their Motion to Dismiss, attempt to distance themselves from the newspaper they control. Yet excerpts from *The Dispatch* submitted by GateHouse Ohio state "***The Columbus Dispatch…is published every day by Gannett***." [Doc. 48-8, Dispatch Excerpts, Page ID # 1352 (emphasis added).] Prior to the merger, the paper stated "***The Columbus Dispatch…is published every day by GateHouse Media."*** [*Id.* at Page ID # 1350 (emphasis added).] Currently, the phrase "Gannett Co., Inc. 2020" is also listed on the bottom right of the paper. [*Id.* at Page ID # 1354.] Before the merger, the paper included "GateHouse Media" in the same location. [*Id.* at Page ID # 1351.]

---

[2] GateHouse contends that a court, in ruling on a motion to dismiss for lack of personal jurisdiction, should apply the same standard used when evaluating the sufficiency of a complaint under Rule 12(B)(6). As GateHouse has consistently stated, a court is entitled to consider documents referenced in the complaint when those documents are central to the plaintiff's clams. A court is also entitled to consider public records and matters of which a court may take judicial notice. *E.g.*, *Braun v. Ultimate Jetcharters, Inc.*, No. 5:12CV1635, 2013 WL 623495, at *1 n.1 (N.D. Ohio Feb. 19, 2013).

The GateHouse Defendants' premium-edition and paper-statement fee practices are detailed more fully in the Plaintiffs' response to GateHouse Ohio's Motion to Dismiss. For the sake of brevity, the Plaintiffs are only providing a brief summary of those practices here:

- The GateHouse Defendants intentionally mislead customers by offering term subscriptions to their papers (e.g., 13 weeks, 26 weeks, 52 weeks) and then significantly reducing those terms based on unwanted premium editions.
- The premium editions often have nothing to do with the news. Examples of such premium editions include (1) a calendar; (2) a pet magazine (titled "Happy Pets"); (3) a health guide; (4) a puzzle book; (5) a cookbook; and (6) publications on the summer of 1969 and The Great Depression (with pictures primarily pulled from various sources on the internet such as Wikipedia and Flickr).
- The GateHouse Defendants rely on their Terms of Sale to justify these premium editions. They purport to unilaterally establish (1) inflated prices for these premium editions (currently, $9.00 per premium edition); and (2) the frequency of these premium editions (currently, up to 3 per month, or 36 per year).
- The premium edition prices are not reasonable and have no connection to the cost of creating and sending those premium editions.
- The GateHouse Defendants are well aware that their subscribers do not want premium editions and abhor their premium-edition practices. To reduce the likelihood that their customers would notice charges for premium editions, the GateHouse Defendants (rather than charging separately for premium editions) reduce the length of their customers' subscriptions.
- The GateHouse Defendants either fail to provide disclosures (as with Steve Wylie) or provide disclosures that are seriously misleading. As an example, the GateHouse Defendants currently send invoices that imply that a subscriber may only have the subscriber's term shortened by 1 week or potentially not at all. Bonnie Navarre, however, had her subscription slashed from 52 weeks down to 8.
- To prevent customers from uncovering this misconduct, the GateHouse Defendants do not provide subscribers with access to payment summaries online.
- The GateHouse Defendants also charge a $9 fee when a subscriber requests a paper invoice.

[Doc. 53, Plaintiffs' Memo. in Opp. to Mot. to Dismiss at pp. 1-13, Page ID #1386-1398; Doc. 42, Amended Complaint at ¶¶ 89-92, Page ID # 1083.]

The Publisher Defendants contend that the Plaintiffs, in defending the Amended Complaint, cannot rely on collective allegations against the "GateHouse Defendants." They pretend not to understand which allegations have been asserted against them. The Sixth Circuit

5

is not so easily confused,[3] and this Court should not be either. For convenience, instead of stating "GateHouse Ohio, Copley Ohio, GateHouse Media, and Gannett" when such a reference was appropriate, the Plaintiffs just used the defined term "GateHouse Defendants." The reason the premium-edition and paper-statement-fee-related allegations were made against the Publisher Defendants as well is because they control these practices. Indeed, in many instances, distinguishing between the various GateHouse Defendants is all but impossible, as employees hold positions at multiple affiliated entities (as reflected in the Mark Maring declaration submitted by the Publisher Defendants). The Publisher Defendants collectively refer to themselves as the "Holding Company Defendants" in their Motion to Dismiss, so they cannot credibly claim that this practice is problematic.

The Publisher Defendants, however, claim that "Plaintiffs have conceded…that many of the collective references to the 'GateHouse Defendants' were not intended to refer to the [Publisher Defendants]." [Doc. 66, Mot. to Dismiss at p. 7 n.3, Page ID # 1730.] By "many," the Publisher Defendants mean "two." Specifically, the Plaintiffs have already acknowledged that they inadvertently referenced the Publisher Defendants in two paragraphs in the breach-of-contract section of their Amended Complaint. [Doc. 42, Amended Complaint at ¶¶ 192, 195 Page ID # 1099-1100.] The remaining paragraphs in that section and the demand for relief make clear that the Plaintiffs' breach-of-contract claims are not asserted against the Publisher Defendants. The Publisher Defendants' complaints about the Plaintiffs' use of shorthand are without merit.

---

[3] *See Malone*, 2020 WL 3989601, at *4 (reviewing jurisdictional allegation relating to all "Defendants" and assuming the allegation "include[s] Rexon[,]" the party objecting to jurisdiction).

## III.    LAW & ARGUMENT

### A.    The Court Has Personal Jurisdiction Over Both Of The Publisher Defendants

#### 1.    The Relevant Standard

A federal court sitting in diversity is entitled to exercise jurisdiction over a defendant when (1) "courts of the forum state would be authorized to do so by state law" and (2) the exercise of such jurisdiction is "compatible with the due process requirements of the United States Constitution." *Malone*, 2020 WL 3989601, at \*2 (quotation marks omitted). Ohio's long-arm statute (R.C. § 2307.382) provides nine different bases for exercising jurisdiction over an out-of-state defendant, and four of those bases are relevant here, as discussed below.

"Motions to dismiss under Rule 12(b)(2) involve burden shifting." *Malone,* 2020 WL 3989601, at \*3. "The plaintiff must first make a prima facie case, which can be done merely through the complaint." *Id.* This burden is " 'relatively slight.' " *Id.* at \*4 (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164 (6th Cir. 1988)). Contrary to the Publisher Defendants' claims [Mot. to Dismiss. at pp. 6-7, Page ID # 1729-1730], a plaintiff can meet this burden with allegations that pertain to multiple defendants. *Malone,* 2020 WL 3989601, at \*4 (reviewing jurisdictional allegation relating to all "Defendants" and assuming the allegation "include[s] Rexon[,]" the party objecting to jurisdiction). If the plaintiff meets its burden, the burden then shifts back to the defendant, who can ultimately shift the burden back to the plaintiff through the submission of proper evidence. *Id.* at \*3.

The Court has discretion in determining how to resolve this jurisdictional dispute, and the Court's choice "affects the plaintiff's burden." *Id*. at \*4. "If the court holds an evidentiary hearing and the defendant's motion is properly supported with evidence, the plaintiff must

overcome it by a preponderance of the evidence." *Id.* But when the "district court rules on written submissions alone[,] the burden consists of a prima facie showing that personal jurisdiction exists." *Id.* (quotation marks omitted).

The Publisher Defendants, notably, have not requested a hearing on their Motion to Dismiss. Instead, they have just submitted two declarations and demanded that the Court resolve their Motion based solely on the submissions of the parties. [*See* Doc. 66, Mot. to Dismiss at p. 7, Page ID # 1730 (suggesting that "plaintiffs must prove jurisdiction through [declarations] of their own" because the Publisher Defendants have filed declarations).] This approach, conveniently, would deprive the Plaintiffs of any real chance to respond to many of the Publisher Defendants' factual assertions, as the Plaintiffs do not themselves have personal knowledge regarding the Publisher Defendants' corporate structure.

Not surprisingly, the Sixth Circuit has rejected this approach. If the Court resolves the Motion to Dismiss without a hearing, the Publisher Defendants' declarations are "irrelevant." *Malone,* 2020 WL 3989601, at *4. In such a scenario, the Court would look only to the Plaintiffs' Amended Complaint. *Id.* at *4-5. If, however, the Court resolves the Motion to Dismiss with a hearing, the Court would need to allow the parties to engage in discovery. *See id.* at *5-6 (explaining that "[i]n truth, [the defendant] may very well have made the necessary contacts in Ohio, but the [plaintiffs] cannot know that without discovery").

The Plaintiffs respectfully request that the Court resolve the Motion to Dismiss based on the Amended Complaint and the documents referenced therein. In the alternative, the Plaintiffs respectfully request that the Court allow the Plaintiffs to pursue discovery relating to this jurisdictional issue and then submit evidence at a hearing.

8

## 2. The Court Is Entitled To Exercise Jurisdiction Under R.C. § 2307.382(A)(1), (2), (4) & (6)

The Publisher Defendants' Motion to Dismiss only addresses subsections (1) & (2) of Ohio's long-arm statute. While the Amended Complaint references these two provisions, the Plaintiffs are not precluded from arguing jurisdiction is proper under other subsections as well. The Complaint in *Malone*, for example, did not cite any subsections of R.C. § 2307.382 at all. [*Kevin Malone et al. v. Stanley Black & Decker, Inc., et al.*, District Court for the Northern District of Ohio Case No. 1:19-cv-257, Doc. 1-1, Complaint, Page ID # 14-25.][4] Yet the Sixth Circuit had no trouble finding that the plaintiffs had made a prima facie showing of jurisdiction. *Malone,* 2020 WL 3989601, at *4-5.

As the Publisher Defendants note, a court evaluates a motion to dismiss for lack of personal jurisdiction under a standard similar to the one used to evaluate a motion to dismiss for failure to state a claim. [Doc. 66, Mot. to Dismiss at p. 6, Page ID # 1729.] The Court must therefore look to the factual allegations in the Amended Complaint, not to the legal conclusions. *See, e.g.*, *Quinn-Hunt v. Bennett Enterprises, Inc.*, 122 F. App'x 205, 207 (6th Cir. 2005) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of the claim. Factual allegations alone are what matters.") (quotation marks omitted). And the factual allegations in the Amended Complaint show jurisdiction is proper under subsections (1), (2), (4) & (6).

---

[4] The complaint in *Malone* did allege that the defendants had caused "tortuous (sic) injury" in Ohio, but, as the GateHouse Defendants have repeatedly noted, such legal conclusions are irrelevant when evaluating the sufficiency of a complaint.

i.    <u>**The Publisher Defendants Are Subject To Jurisdiction In Ohio Because They Caused Tortious Injury In Ohio**</u>

In pertinent part, Ohio's long-arm statute states that a "court may exercise personal jurisdiction over a person" if the person "directly or by an agent" (a) "caus[es] tortious injury in this state by an act or omission outside this state" and "derives substantial revenue from goods used or consumed or services rendered in this state" or (b) "cause[es] tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state."   R.C. § 2307.382(A) (4) & (6).   For the purposes of these subsections, injuries arising from statutory violations constitute "tortious injury."   *Haley v. City of Akron*, No. 5:13-CV-00232, 2014 WL 804761, at *11 (N.D. Ohio Feb. 27, 2014) (collecting cases).

The Plaintiffs have easily met their burden of alleging facts establishing jurisdiction under subsections (4) & (6).   The Amended Complaint alleges that the Publisher Defendants have injured thousands of Ohio residents through violations of the CSPA and ODTPA.   [*See, e.g.*, Doc. 42, Amended Complaint at ¶¶ 47, 159, 226, 236, 248, Page ID # 1076, 1094, 1106, 1112.]   The Publisher Defendants' unlawful practices "lead to millions of dollars in short-term profits that can be paid as dividends to shareholders and as management fees to Fortress." [*Id.* at ¶ 61, Page ID # 1079.]   The Plaintiffs have thus adequately pled that the Publisher Defendants derive substantial revenue from Ohio residents, as required by subsection (4).   With regard to subsection (6), the Publisher Defendants knew that they would be causing injury in Ohio by deceiving subscribers to a central-Ohio newspaper.   The Plaintiffs' claims arise out of the Publisher Defendants' CSPA and ODTPA violations, as required by the statute.   R.C. § 2307.382(A) (stating jurisdiction is proper "as to a cause of action arising from" the activities identified in the statute). The Plaintiffs

10

have thus met their "relatively slight" burden of establishing jurisdiction under subsections (4) & (6).

### ii. The Contacts Of GateHouse Ohio Can Be Attributed To The Publisher Defendants For Jurisdictional Purposes

Ohio's long-arm statute also allows a court to exercise jurisdiction over a person if the person "directly or by an agent" (a) "[t]ransact[s] any business in this state" or (b) "[c]ontract[s] to supply services or goods in this state[.]" R.C. § 2307.382(A)(1) & (2). The Publisher Defendants do not deny that GateHouse Ohio is subject to jurisdiction under these provisions. The issue is consequently whether GateHouse Ohio's connections to Ohio can be attributed to the Publisher Defendants.

"[F]oreign parent corporations have been properly held amenable to the personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious, or that the parent has held the subsidiary out as its agent, *or ... that the parent exercised an undue degree of control over the subsidiary*.' " *Third Nat. Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1093 (6th Cir. 1989) (Keith, J., concurring) (emphasis added; quoting *Velandra v. Regie Nationale des Usines Renault*, 336 F.2d 292, 297 (6th Cir. 1964)); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450-451 (6th Cir. 2012) (attributing contacts of subsidiary to parent based on parent's control over subsidiary). In *Third National*, for instance, the Sixth Circuit found jurisdiction over a parent company was proper in Tennessee when the parent had "never directly conducted business, held title to property, or retained employees in Tennessee." *Id.* at 1090. The court noted, among other things, that the parent was "not a mere passive owner" of the subsidiary and that the parent's "officers served as [the subsidiary's]

11

directors and met regularly—as often as monthly—in Tennessee to review and direct [the subsidiary's] operations" *Id.*

The decision in *In re Telectronics Pacing Sys., Inc.*, 953 F. Supp. 909 (S.D. Ohio 1997) is also instructive. In that case, the court discussed two theories for jurisdiction over a parent company based on the subsidiary's contacts: (1) attribution and (2) merger. *Id.* at 918. "The attribution test implies that the in-forum subsidiary is acting on behalf of the absent parent." *Id.* at 919. "The clearest example of this theory occurs when a foreign manufacturer uses a subsidiary to distribute its products in the forum." *Id.* "Under the merger theory of jurisdiction, the two entities are so closely aligned that it reasonable for the parent to anticipate being 'haled' into court in the forum because of its relationship with its subsidiary." *Id.* The *In re Telectronics* court ultimately found that jurisdiction was proper because, among other things, the "[parent companies] exercised a great deal of control over [the subsidiaries]." *Id.* at 920.

Other cases have also found jurisdiction proper under the attribution and/or merger theories in comparable circumstances. *Rayco Mfg., Inc. v. Deutz Corp.*, No. 5:08 CV 00074, 2009 WL 10688802, at *4-5 (N.D. Ohio Sept. 18, 2009) (concluding court had jurisdiction over parent despite parent's claim that "it did not transact business in Ohio; that it maintains no offices in Ohio; does not advertise in Ohio; and so forth"); *Keeley v. Airgas, Inc.*, No. 2:08-CV-111, 2008 WL 5422691, at *11-14 (W.D. Mich. Dec. 29, 2008) (finding jurisdiction over parent company when parent's SEC filings reflected parent viewed itself and subsidiaries as one consolidated enterprise and when subsidiary's employees were compensated in stock of parent company); *see also*; *Transportation Commc'ns Int'l Union v. Sultran Ltd.*, 187 F. Supp. 2d 880, 885 (E.D. Mich. 2002)

12

(exercising jurisdiction over parent that "was not a mere passive owner, but was actively involved in directing the operations" of the subsidiary).

The Amended Complaint, along with the other documents this Court may properly consider (e.g., public records such as SEC filings), demonstrate that the Publisher Defendants are subject to jurisdiction here. The Publisher Defendants are not passive owners of GateHouse Ohio. Rather, they micromanage GateHouse Ohio by directing the very statutory violations that are at issue in this case. [*See* Doc. 42, Amended Complaint at ¶¶ 47, 226, Page ID # 1076, 1106 (explaining that "Gannett Co., Inc. (through Denise Robbins and others) and GateHouse Media, LLC (through Lee Knapp and others) directed and participated in the premium-edition practices and paper-statement-fee practices at issue in this case").] The Publisher Defendants' deceptive premium-edition and paper-statement fee practices appear to be dictated by Fortress Investment, the entity ultimately behind the Publisher Defendants' cash-extraction scheme. [*See id.* at ¶¶ 52-61, Page ID # 1077-1079.] These practices were implemented to shore up the bottom line of Gannett, a publicly traded company. [*Id.* at ¶¶ 39 & 97-98, Page ID # 1075-1076 & 1085-1086.]

The GateHouse Defendants also view themselves as a consolidated enterprise. [*Id.* at ¶ 48, Page ID # 1076] When compelled to disclose its competitors, GateHouse Ohio identified itself as a subsidiary of Gannett Co., Inc. and accordingly designated as competitors "all print and digital newspapers, magazines, websites, and other organizations that provide information regarding news, politics, sports, and other current events in the United States[.]" [*Id.* at ¶ 49, Page ID # 1077.] The SEC filings of Gannett similarly discusses the enterprise in the aggregate. [*E.g.*, Gannett 2019 Form 10-K at p. 3, 12, 13, & 24 (defining the terms "we," "us," and "our" to refer to Gannett Co., Inc.; indicating Gannett has 54 Ohio weekly publications in "our publishing

13

segment"; identifying *The Dispatch* as one of "our major publications"; and stating, as of December 13, 2019, that 12% of the individuals "we employed" in Ohio were unionized) (attached hereto as Ex. B).]

Gannett even includes its name in the paper itself. The paper states "***The Columbus Dispatch…is published every day by Gannett***." [Doc. 48-8, Dispatch Excerpts, Page ID # 1352 (emphasis added).] Prior to the merger, the paper stated "***The Columbus Dispatch…is published every day by GateHouse Media.***" [*Id.* at Page ID # 1350 (emphasis added).] At present, the phrase "Gannett Co., Inc. 2020" is also listed on the bottom right of the paper. [*Id.* at Page ID # 1354.] Before the merger, the paper included "GateHouse Media" in the same location. [*Id.* at Page ID # 1351.]

The GateHouse Defendants have relied heavily on the Terms of Sale throughout the case. Those Terms of Sale also reference Gannett:

© Gannett Co., Inc. 2020. All rights reserved.

Gannett | USA TODAY NETWORK

[Doc. 48-2, Terms of Sale, Page ID # 1296.] The Terms of Sale further state that subscribers who submit their emails to *The Dispatch* are agreeing to "receive promotional offers from GateHouse Media and its related companies." [*Id.* at § 1.2, Page ID # 1292.] Before the merger, the Terms of Sale referenced "GateHouse Media, LLC" and included the same statement regarding promotions. [August 28, 2018 Terms of Sale.]

The Publisher Defendants have also relied heavily on invoices and renewal notices they purportedly sent to the Plaintiffs. In moving to dismiss, GateHouse Ohio submitted an October

19, 2015 email that it claims contains the language for invoices sent to subscribers to *The Dispatch*. The email refers to that language as "GH approved[.]"   [Doc. 48-3, October 19, 2015 Email, Page ID # 1300.]   And the renewal notices from 2019 attached to GateHouse Ohio's motion to dismiss state "Copyright 2019 GateHouse Media, LLC."   [*E.g.*, Doc. 48-5, 12-29-2019 Renewal Notice, Page ID # 1328.]

If the Court considers the Publisher Defendants' declarations, it should also consider that GateHouse Media "enter[s] into agreements for which its subsidiaries are third-party beneficiaries."   [Doc. 66, Mot. to Dismiss at p. 5, Page ID # 1728.]   Among other things, and directly relevant to this case, GateHouse Media has entered into a license through which "various of GateHouse Media's subsidiaries were permitted to publish limited numbers of Tribune-created content" as premium editions.   [*Id.*]   GateHouse Media is thus directly responsible for procuring some of the premium editions at issue in this case, and jurisdiction is proper under the attribution theory.   *In re Telectronics*, 953 F. Supp. at 919 (stating the "clearest example of [the attribution] theory occurs when a foreign manufacturer uses a subsidiary to distribute its products in the forum").[5]

The Publisher Defendants insist that the contacts of GateHouse Ohio can only be imputed to the Publisher Defendants "when the two are alter egos and the facts support the extreme remedy of piercing the corporate veil."   [Doc. 66, Mot. to. Dismiss at p. 9, Page ID # 1732.]   This is simply incorrect.   As explained in *In re Telectronics*, the "Sixth Circuit has explicitly found that formalistic application of the alter ego doctrine under [*Cannon Mfg. Co. v. Cudahy Packing Co.*,

---

[5]  The Publisher Defendants' declarations also reflect the significant overlap in the management of the GateHouse Defendants.   [*See* Doc. 66-2, Mark Maring Declaration at ¶ 1, Page ID # 1756 (stating he is Senior Vice President at GateHouse Media, GateHouse Ohio, and Copley Ohio).]

267 U.S. 333 (1925)] was displaced by [*International Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945)]." *In re Telectronics*, 953 F. Supp. at 916 (citing *Velandra*).

The *Estate of Thompson* case cited by the Publisher Defendants does not address, much less purport to overrule, *Velandra. See Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357 (6th Cir. 2008) (analyzing whether court in Ohio had jurisdiction over Japanese automaker in lawsuit relating to accident in South Africa). In fact, the three-judge panel in *Estate of Thompson* would have lacked the authority to overrule *Velandra. See* 6th Circuit Local Rule 32.1 ("A published opinion is overruled only by the court en banc."); *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017). While the *Estate of Thompson* endorsed the alter-ego theory for personal jurisdiction, the court did not state this was the only theory for establishing personal jurisdiction over a parent company based on its subsidiary's contacts. The Publisher Defendants' reliance on *Estate of Thompson* is accordingly misplaced.

The Publisher Defendants are not mere passive owners of GateHouse Ohio. They are intimately involved in establishing the premium-edition and paper-statement-fee practices that are at issue in this case. They cannot escape this Court's jurisdiction.

### 3. The Court's Exercise Of Jurisdiction Is Consistent With Due Process

"Due process requires that a defendant have minimum contacts...with the forum State... such that he should reasonably anticipate being haled into court there." *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012) (quotation marks omitted). To conclude an exercise is consistent with due process, a court must find "(1) purposeful availment of the privilege of acting in the forum state or causing a consequence in the forum state, (2) a cause of action ... aris[ing] from activities

16

in the state, and (3) a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* (quotation marks omitted). All three prongs of this test are met here.

### i. The Publisher Defendants Purposefully Availed Themselves Of The Privilege Of Acting Or Causing A Consequence In Ohio

"The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* (quotation marks omitted). The Supreme Court has held that a "plaintiff can establish personal jurisdiction when it alleges that the defendant 'expressly aimed' tortious conduct at the forum in question and the 'brunt of the harm' is felt there." *Carrier Corp.*, 673 F.3d at 451 (quoting *Calder v. Jones*, 465 U.S. 783 (1984)).

The Publisher Defendants could not possibly have been surprised by a lawsuit in this state. GateHouse Media and its affiliates had already been sued for their deceptive premium-edition practices in Massachusetts, so it was only a matter of time before the Publisher Defendants were sued in Columbus, one of their largest markets. The Publisher Defendants aimed their tortious conduct at central Ohio, and the brunt of the harm has been felt by the Ohio residents who have had their prepaid accounts depleted by unauthorized charges. The Plaintiffs have satisfied the first requirement for the exercise of jurisdiction.

### ii. The Plaintiffs' Claims Arise From The Publisher Defendants' Activities In Or Directed At Ohio

"The second requirement is that the plaintiff's cause of action arise from the defendant's contacts with the state." *Schneider*, 669 F.3d at 703. "This requirement is subject to a lenient standard[.]" *Id.* (quotation marks omitted). "The second criteria does not require that the cause

of action formally 'arise from defendant's contacts with the forum; rather, this criterion requires only that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." *Wood v. 1-800-Got-Junk?, LLC*, No. 2:06-CV-117, 2007 WL 895008, at *6 (S.D. Ohio Mar. 22, 2007) (quotation marks omitted).

While the Publisher Defendants argue that they have no contacts with Ohio, [Doc. 66, Mot. to Dismiss at pp. 15-16, Page ID # 1738-1739], this argument is refuted above. Because the Plaintiffs' claims arise from the Publisher Defendants' contacts with this state—specifically, their control over their subsidiaries' premium-edition and paper-statement-fee practices—the second requirement has been met.

### iii.   The Court's Exercise Of Jurisdiction Is Reasonable

Where the first two requirements for the exercise of jurisdiction are met, "an inference of reasonableness arises and only the unusual case will not meet the substantial connection criterion." *Schneider*, 669 F.3d at 703 (quotation marks and alterations omitted). "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.* (quotation marks omitted).

The Publisher Defendants cannot overcome the presumption of reasonableness. "Ohio has an interest in ensuring that its residents have adequate recourse for harms inflicted by nonresidents[.]" *Schneider*, 669 F.3d at 704. The Plaintiffs also have an interest in obtaining complete relief in a single action rather than in separate actions spread across multiple jurisdictions. Further, no other state has a meaningful connection to this case.

18

The Publisher Defendants make a half-hearted argument regarding the supposed burden of this dispute. They claim that they will "face an increased burden in litigating in Ohio away from their home." [Doc. 66, Mot. to Dismiss at p. 16, Page ID # 1739.] But this argument could be made by every out-of-state defendant. And the Publisher Defendants' subsidiaries are unquestionably subject to jurisdiction in Ohio and will have to litigate this matter here. Given that the Publisher Defendants' representatives will be witnesses in this dispute and the Publisher Defendants will need to respond to document requests even if the Publisher Defendants are dismissed, there is no real additional burden associated with the Court's exercise of jurisdiction over the Publisher Defendants.

4. **Alternatively, If the Court Considers The Publisher Defendants' Declarations, The Court Should Allow The Plaintiffs To Conduct Discovery Relating To Jurisdiction And Present Evidence At A Hearing**

The Plaintiffs have easily met their prima facie burden with the allegations in the Amended Complaint. Though the Plaintiffs have ample documentation supporting their position that the Publisher Defendants are subject to jurisdiction, the Plaintiffs are not in a position to provide admissible evidence regarding jurisdiction at this time because the Plaintiffs cannot lay the foundation for those documents. To provide just a few examples, GateHouse Ohio has produced documents reflecting the significant control exerted by the Publisher Defendants and that the Publisher Defendants' premium-edition practices are consistent across their various markets:

- 10-24-2018 email regarding corporate directives to add premium editions across various GateHouse Media markets. A local *Dispatch* representative complains that it "makes no sense that Columbus bears the largest burden for these short-term improvements." Denise Robbins (a representative of Gannett and its affiliates) notes that "Columbus just isn't used to being this aggressive[,]" and that while Columbus is not happy, she is "not really here to make people happy."

19

- 10-25-2018 email from a *Dispatch* representative: "I'm sure that some of you are aware that ***we will be adding 3 additional premiums in 2018 per corporate directives***."
- 11-1-2018 email from Lee Knapp (a representative of GateHouse Media and its affiliates): "***I just got off the phone with Denise [Robbins]*** and because of the shortfall in revenue in Columbus, ***she has authorized changing their disclaimer language*** to 'there will be no more than three premium editions published each month during the subscription term' ***AND she authorized changing the amount per premium edition*** to 'up to $9.00.' "
- 12-7-2018 email from a *Dispatch* representative: "***We moved our paper billing charges to $9, per corporate directions***."
- 12-20-2018 email from *Dispatch* representative noting that customer service representatives are having trouble preventing angry subscribers for cancelling based on premium-edition charges. Denise Robbins states "These are the same issues that we have in every market. Why is [our call center] having issues with saves?"
- 1-9-2019 email from Alan Miller (*The Dispatch's* editor) stating of premium editions that we "should not only be transparent about them, but we also should stop shortening customer's subscriptions to pay for them. That just pisses people off to no end."
- 1-23-2019 email from Alan Miller stating "I thought we weren't sending $9 bills for paper bills in Columbus...If we drive [a subscriber] away as a customer over a $9 paper bill, shame on us." A *Dispatch* representative responds: "***My instructions are that we still do charge $9, as ridiculous as it is...[T]hat came from corporate***. They provided no firm sunset date on the practice. I wish we had one."
- 1-24-2019 email from Alan Miller in response to customer cancellation: "***We just gave up $700 a year for a lousy $9 – the most short-sighted money grab I've ever seen. Are the folks at the corporate level seeing this.*** It's killing us."
- 4-30-2019 email from Denise Robbins responding to complaints from *The Dispatch's* editor regarding paper-statement fees. States that editor is "overreacting."
- 8-1-2019 script to prevent cancellation by customers upset about premium editions for all of the GateHouse Defendants' papers.

[GateHouse Records (attached as Ex. C).]

Additionally, the Plaintiffs need jurisdictional discovery relating to information that is exclusively in the control of the Publisher Defendants, such as information relating to whether the GateHouse Defendants observe the corporate formalities. Therefore, if the Court is inclined to consider the Publisher Defendants' declarations, the Court should allow the Plaintiffs to pursue discovery and present evidence relating to jurisdiction at a hearing.

20

B. **The Amended Complaint States Claims For Relief Against The Publisher Defendants**

1. **The Relevant Standard**

Under Federal Rule of Civil Procedure 8, a pleading states a claim for relief if it contains a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" In reviewing the Amended Complaint, the Court must "construe it in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (quotation marks omitted). To survive a motion to dismiss, a pleading need only state a claim for relief that is plausible on its face. *Id.*

2. **Since The Publisher Defendants Directed And Participated In the CSPA Violations At Issue In This Case, The Publisher Defendants Are Subject To Liability Under The CSPA**

Time and again, Ohio courts have found that "where officers or shareholders of a company take part in or direct the actions of others that constitute a violation of the CSPA, that person may be held individually liable." *Garber v. STS Concrete Co.*, 8th Dist. Cuyahoga No. 99139, 2013-Ohio-2700, ¶ 27; *Burns v. Spitzer Mgt., Inc.*, 190 Ohio App. 3d 365, 375-377 (8th Dist. 2010); *Inserra v. J.E.M. Bldg. Corp.*, 9th Dist. Medina No. 2973-M, 2000 WL 1729480, at *5 (Nov. 22, 2000); *Davis v. Hawley Gen. Contracting, Inc.*, 6th Dist. Huron No. H-14-18, 2015-Ohio-3798, ¶¶ 26-27. "There is no need to pierce the corporate veil." *Inserra*, 2000 WL 1729480, at *5.[6] The Plaintiffs—based on GateHouse Ohio's responses to interrogatories requesting identification of the individuals responsible for developing and implementing the practices at issue in this case—

---

[6] Since there is no need for the Plaintiffs to pierce the corporate veil to recover against GateHouse Media and Gannett, the Court need not address GateHouse Ohio's veil-piercing analysis.

21

alleged that "Gannett Co., Inc. (through Denise Robbins and others) and GateHouse Media, LLC (through Lee Knapp and others) directed and participated in the premium-edition practices and paper-statement-fee practices at issue in this case." [Doc. 42, Amended Complaint at ¶ 47, Page ID # 1076.] The Amended Complaint states CSPA claims against the Publisher Defendants.

The Publisher Defendants claim they do not fall within the definition of "supplier" in the CSPA. As an initial, the Plaintiffs do not need to show that the Publisher Defendants are themselves suppliers. Rather, the Plaintiffs need only show the Publisher Defendants directed or participated in the CSPA violations of GateHouse Ohio—an entity that is undeniably a supplier. In *Burns*, for example, the plaintiffs simply asserted "Alan Spitzer, president and corporate director of the Spitzer entities, directed employees to charge a fee that he knew violated the CSPA." *Burns*, 190 Ohio App. 3d at 374-375. The court did not analyze whether Spitzer himself was a supplier because it did not need to. It found he could be personally liable because "an officer of a corporation is individually liable for each violation of the CSPA in which he personally participates." *Id.* at 376.

Even if the Plaintiffs were required to allege facts showing the Publisher Defendants are suppliers, they have done so. The term "supplier" is broadly defined to mean a person "engaged in the business of ***effecting or soliciting*** consumer transactions, ***whether or not the person deals directly with the consumer***." R.C. § 1345.01(C) (emphasis added). This term, which, like the rest of the CSPA, must be construed broadly, refers to one who "cause[s] a consumer transaction to happen or that seek[s] to enter into a consumer transaction." *Baaron, Inc. v. Davidson,* 9th Dist. Wayne No. 13CA50, 2015-Ohio-4217, ¶ 6 (quotation marks omitted). "The CSPA…does not require a claimant to have privity of contract to bring a claim under the Act." *Hamilton v.*

22

*Ball*, 4th Dist. Scioto No. 13CA3533, 2014-Ohio-1118, ¶ 60; *Bowell v. Mowery Constr., Inc,* No. 3:16-CV-52, 2016 WL 6634958, at *4 (S.D. Ohio Nov. 9, 2016), report and recommendation adopted, No. 3:16-CV-52, 2016 WL 6996234 (S.D. Ohio Nov. 30, 2016) (noting "Haas cites nothing within the text of the OCSPA requiring a direct contract with the consumer before liability can attach under the OSCPA."). And an "unfair, deceptive, or unconscionable act or practice can, by the express terms of the OCSPA, occur after the transaction." *Bowell*, 2016 WL 6634958, at *4-5 (quotation marks omitted) (finding cabinet supplier could be liable under CSPA, despite lack of contract and despite claim that supplier did not have contact with the consumer until after the cabinets had been installed).

The Publisher Defendants' argument, in substance, is that they cannot be liable under the CSPA because they are not in privity with the Plaintiffs. The CSPA, though, does not require privity. The Publisher Defendants, both directly and through their subsidiaries, effect (or bring about) consumer transactions. "[W]hether or not the [Publisher Defendants] deal[] directly with the consumer" is irrelevant. R.C. § 1345.01(A)(1).

The CSPA cases cited by GateHouse Ohio are not on point. Tellingly, most of those cases do not even address whether an officer, director, or shareholder of an entity can be held liable for CSPA violations. *Oliver v. ARS Ohio LLC*, No. 5:18-CV-967, 2019 WL 343249, at *1, 5 (N.D. Ohio Jan. 28, 2019) (addressing claims against a financing company and towing company with which plaintiff had no relationship); *Pilgrim v. Universal Health Card, LLC*, No. 5:09CV879, 2010 WL 447249, at *2-4 (N.D. Ohio Feb. 3, 2010) (considering claims against administrator of medical plan); *Hahn v. Doe*, No. 94APE07-1024, 1995 WL 127863, at *9 (Mar. 23, 1995) (analyzing claims against drywall supplier). As a result, these cases provide no guidance here.

GateHouse Ohio further claims that the allegations in the Amended Complaint relating to the role of GateHouse Media and Gannett are not sufficiently specific. This position is downright disingenuous. These allegations in the Amended Complaint regarding the Publisher Defendants' control over GateHouse Ohio's premium-edition practices were based on GateHouse Ohio's discovery responses [Doc. 36, Mot. to Amend at pp. 3-4, Page ID # 769-770]. Though the Plaintiffs requested detailed information regarding how the GateHouse Defendants established those practices, GateHouse Ohio provided vague, general answers. [Doc. 40, Reply for Mot. to Amend at p. 7, Page ID # 988.] The Publisher Defendants cannot use the lack of specificity in their subsidiary's discovery responses as a basis for defeating the Plaintiffs' claims.

With regard to the proper standard, the case law is admittedly mixed on whether CSPA claims are subject to Rule 9(b). *Compare McKinney v. Microsoft Corp.*, No. 1:10-CV-354, 2011 WL 13228141, at *14-15 (S.D. Ohio May 12, 2011); *Ferron v. Dish Network, L.L.C.*, 195 Ohio App. 3d 686, 694 (10th Dist. 2011); *with Ferron v. Zoomego, Inc.*, No. 206-CV-751, 2007 WL 1974946, at *3 (S.D. Ohio July 3, 2007). Since "fraud is not an element needed to establish a violation of the OCSPA[,]" *McKinney*, 2011 WL 13228141, *14 (quotation marks omitted), and the CSPA is a remedial statute that should be construed in favor of consumers, the better approach is to evaluate CSPA claims based on the notice-pleading standard of Rule 8.

Regardless, the Plaintiffs have adequately pled the involvement of GateHouse Media and Gannett. The Publisher Defendants complain that the Plaintiffs, for the sake of efficiency, grouped GateHouse Ohio, Copley Ohio, GateHouse Media, and Gannett together in many of the allegations in the Amended Complaint. The reason for this is simple: By GateHouse Ohio's own admission, the subject premium-edition and paper-statement-fee practices are dictated by high-

24

level executives on a companywide basis.   Since representatives of GateHouse Media and Gannett were involved in the challenged conduct, the bulk of the allegations in the Amended Complaint are directed at the GateHouse Defendants' consolidated enterprise.

The Publisher Defendants cannot seriously complain about the Plaintiffs referring to them collectively in the Amended Complaint.   The Publisher Defendants refer to themselves collectively in their own Motion to Dismiss (though they use the misleading term "Holding Company Defendants" to suggest they are passive owners).   The Plaintiffs have valid CSPA claims against the Publisher Defendants.

> **3.**     **The Amended Complaint States ODTPA Claims And Claims For Unjust Enrichment, Declaratory Relief, And Injunctive Relief Against The Publisher Defendants**

The Publisher Defendants again feign confusion regarding which claims in the Amended Complaint were directed against them.   [Doc. 66, Mot. to Dismiss at p. 24, Page ID # 1747.]   The Amended Complaint makes clear that, in addition to CSPA claims, the Plaintiffs are also asserting claims for violations of the ODTPA, for unjust enrichment, for declaratory relief, and for injunctive relief against the Publisher Defendants.   [*See, e.g.*, Amended Complaint at pp. 47-48, Page ID # 1116-1117.]

The Publisher Defendants argue that the ODTPA claims fail because there are "no allegations [that] suggest that the [Publisher Defendants] offered goods or made representatives concerning them…." [Doc. 66, Mot. to Dismiss at p. 25, Page ID # 1748.]   This ignores that the Publisher Defendants directed and participated in the ODTPA claims at issue in this case.   As explained in the CSPA section above, the Publisher Defendants can be liable for directing and participating in another's statutory violations.

25

The Publisher Defendants argue that the Plaintiffs cannot seek declaratory relief relating to the Terms of Sale because those terms "are inapplicable to the [Publisher Defendants] because…Plaintiffs never allege that they had any contract with these Terms with the [Publisher Defendants]." [*Id.*]   Yet in the same filing, the Publisher Defendants incorporate GateHouse Ohio's motion to dismiss, [*id.* at p. 18, Page ID # 1741], and GateHouse Ohio's motion repeatedly cites the Terms of Sale.   The Publisher Defendants (whose names have appeared on the Terms of Sale) are proper parties to declaratory relief relating to those terms.

Finally, the Publisher Defendants contend that the Plaintiffs' unjust enrichment claims fail because "Plaintiffs' allegations make clear they paid money only to GateHouse Ohio" and "because an express contract governs the relationship."   [*Id.* at p. 25, Page ID # 1748.]   But the Amended Complaint alleges that the money paid to GateHouse Ohio was passed through to the Publisher Defendants as part of their cash-extraction scheme.   [*See* Doc. 42, Amended Complaint at ¶¶ 60-61, Page ID # 1079.]   Moreover, as the Plaintiffs explained in their memorandum in opposition to GateHouse Ohio's motion to dismiss, a plaintiff can plead unjust enrichment in the alternative when the plaintiff alleges bad faith or that the existence of the contract is in dispute. Here, the Plaintiffs have alleged bad faith and that there is no valid contract that permits the GateHouse Defendants to charge the Plaintiffs for premium editions.   And even if the Plaintiffs had a valid contract with GateHouse Ohio, they did not have a contract directly with the Publishing Defendants.   As a result, the Plaintiffs are entitled to pursue claims for unjust enrichment.

IV.   **CONCLUSION**

The Publisher Defendants could not have been caught off guard by a class action lawsuit against them in Ohio.   They are subject to jurisdiction here, and the Amended Complaint states

26

valid claims for relief against them. The Publisher Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

/s/ Todd H. Neuman
Todd H. Neuman          (0059819)
Rick L. Ashton          (0077768)
Jeffrey R. Corcoran     (0088222)
ALLEN STOVALL NEUMAN FISHER &
ASHTON LLP
17 South High Street, Suite 1220
Columbus, Ohio 43215
Telephone:      (614) 221-8500
Facsimile:      (614) 221-5988
E-mail:         neuman@aksnlaw.com
                ashton@asnfa.com
                corcoran@asnfa.com
*Counsel for Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been served upon the following parties via the Court's e-filing notification system on July 31, 2020:

Michael J. Zbiegien, Jr.
Lynn Rowe Larsen
Daniel H. Bryan
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-2302
Telephone: 216-241-2838
Facsimile: 216-241-3707
Email: mzbiegien@taftlaw.com
    llarsen@taftlaw.com
    dbryan@taftlaw.com

James D. Abrams
Jonathan Olivito
Taft Stettinius & Hollister LLP
65 East State Street, Suite 1000
Columbus, Ohio 43215
Telephone: 614-221-2838
Facsimile: 614-221-2007
Email: jabrams@taftlaw.com
    jolivito@taftlaw.com
*Attorneys for Defendant GateHouse*
*Media Ohio Holdings II, Inc.*


    /s/ Todd H. Neuman
    Todd H. Neuman

28

**Exhibit A**

# The Columbus Dispatch

# Terms of Sale

**NOTE:** ACCESSING THIS SITE CONSTITUTES AND SHALL BE DEEMED TO BE AN ACCEPTANCE OF THE FOLLOWING TERMS AND CONDITIONS☐
Legal Information

There are important terms and conditions associated with using *The Columbus Dispatch"s* websites, mobile apps and the E-Edition digital replica (collectively, "Website") .You must read, understand, and accept these terms and conditions before entering Website or subscribing to *The Columbus Dispatch*.You should review these terms and conditions regularly as they may change at any time. If *The Dispatch* amends this Agreement or other terms of service, you will be notified before the changes takes effect by any reasonable means including by posting the change here, on the Website or in the newspaper.Should you not agree to the change, *The Dispatch* is not obligated to keep providing you the product or the Website, and you must cancel your subscription and stop using the Website prior to the change becoming effective. Otherwise, the new terms will apply to you.☐

**TERMS OF SALE**

**1. ACCEPTANCE OF TERMS**
The Dispatch Printing Company provides its news service to you, subject to the following Terms of Sale, which may be updated by us from time to time and without notice to you. In addition, when using particular services, you shall be subject to any posted guidelines or rules applicableto such services. The terms of sale listed here are for your paid home delivery service and/or Digital D subscription. Acceptance of our Website Privacy Policy and Terms of Service is also required for Digital D access.

**SUBSCRIBE TODAY**    ☐   ☐

Choose the plan that's right for you. Digital access or digital and print delivery.

**LEARN MORE**

*tch*, including home delivery evices. Digital D subscriptions ported device. Subscriptions delivery service exists.

Subscriptions delivered via US Postal Service may be arranged outside our normal delivery area for an additional fee. We may cancel or discontinue subscription services with notice to you if normal home delivery services cease to be available in any area. For more information on the applicable delivery areas and subscriptions outside of our delivery area, please contact our Customer Service Team at 1-877-734-7728 on Monday - Friday from 6:30 a.m.to 3 p.m., and Saturday from 7 a.m.to noon, or Sunday from 7 a.m. to 1 p.m. Holiday hours vary. *The Columbus Dispatch* reserves the right to modify the content, type and availability of any product at any time.

## 1.2 YOUR PRODUCT AGREEMENT

Please allow up to 10 days from the date of application for your home delivery and/or Digital D subscription service to begin. When registering as a subscriber, you must provide us with accurate, complete and up-to-date information.It is your responsibility to inform us of any changes to your subscription service details. To have your home delivery subscription service redirected to a new address or to have service stopped for vacation, you must provide at least 2 business days notice. You may update your subscription service account by contacting our Customer Service Team at 1-877-734-7728 on Monday - Friday from 6:30 a.m.to 3 p.m., and Saturday from 7 a.m.to noon, or Sunday from 7 a.m. to 1 p.m. You may also manage your account when it's most convenient for you with our 24/7 Online Customer Service at dispatch.com/service. By submitting your address and/or email, you understand that you may receive promotional offers from GateHouse Media and its related companies.You may opt out of receiving any such offers at any time by calling 1-877-734-7728.

## 1.3 BILLING & FEES

The price agreed to between *The Columbus Dispatch* and you for the product excludes all taxes and phone charges, unless stated otherwise. With the purchase of a digital copy subscription, you may incur other additional charges, such as telecommunications fees, data fees or service provider fees. You are responsible for paying any additional charges.

If you and *The Columbus Dispatch* agreed to special pricing for a certain length of time, that price will remain in force for that time. After the offer period ends, your purchase of the product will be charged at the regular price. If you are billed for the product on a monthly basis with no specific length, *The Columbus Dispatch* will notify you, by posting, mailed letter, invoice or other reasonable method, any price change at least 30 days in advance. If you do not agree to these changes, you must cancel and stop using the product before the changes take place. If you cancel, your subscription for the product ends at the end of your current period. *The Columbus Dispatch* will notify you in advance of any change in the price of the product you have purchased.

You may also elect to participate in The Columbus Dispatch's EZ pay option. By enrolling in The Columbus Dispatch's EZ pay option, your credit/debit card will be charged after your start date and your renewals automatically 7 days prior to expiration, which is based on your subscription length as adjusted for premium editions charges. This authorization will remain in effect until you notify the Columbus Dispatch to cancel.

If you elect to automatically pay with a credit card which expires or otherwise becomes invalid, the subscription service will not automatically be terminated. You will remain responsible for all charges

ALL credit card transactions are done on our secure server. The safety of your information is very important to us.

## 1.4 PREMIUM EDITIONS

The advertised price does not include the additional charge of up to $5.00 for each premium edition. Premium editions are published to provide additional information and value. Rather than bill you up to $5.00 for each premium edition, you agree that the length of your subscription will be shortened in proportion to the value of the number of premium editions published and delivered to you during your subscription period. There will be no more than 2 premium editions published each month during the subscription term. The timing of the publication and delivery of premium editions is variable.

## 1.5 DISCOUNTS, PROMOTIONS & FREE TRIALS

We occasionally offer temporary, introductory discounts for first-time and certain former subscribers of *The Columbus Dispatch*. Discount eligibility is determined at the time of the order. Discounts cannot be applied retroactively. Introductory

discounts are not valid for renewals or for customers that have been *Columbus Dispatch* subscribers in the past 60 days.

You are required to provide your payment details when you sign up for a promotion (Visa, MasterCard, American Express or Discover). The specific terms of each promotion are stated at the time the promotion is offered. Each promotion may be different. Promotions cannot be combined. We will not notify you in advance that the promotion is about to end. To cancel and avoid being charged, you must notify us before the promotion period ends.

If your promotion involves a free trial, simply cancel anytime during your free trial and you will not be charged. Upon expiration of your free trial period, your paid subscription begins immediately. After this first payment, payment will be automatically billed monthly based upon your paid subscription start date. You may cancel your paid subscription at any time. To avoid billing of the next month's subscription amount to your credit card, you must cancel your subscription before the next 30 day billing cycle. □

## 1.6 TEMPORARY SUSPENSION POLICY FOR PRINT DELIVERY SERVICE
*The Columbus Dispatch* does not provide credit for a temporary delivery suspension of 30 days or less. To temporarily suspend your home delivery service, you must give us at least 2 business days notice. During a temporary delivery suspension, electronic access to your digital copy via a supported device will be available, and you will have the option to have the printed newspapers held and delivered upon return. To place a temporary delivery suspension, please contact our Customer Service Team at 1-877-734-7728 on Monday - Friday from 6:30 a.m.to 3 p.m., and Saturday from 7 a.m.to noon, or Sunday from 7 a.m. to 1 p.m. Holiday hours vary. You may also manage your account when it's most convenient for you with our 24/7 Online Customer Service at dispatch.com/service. □

## 1.7 PRIVACY POLICY
Registration with the Website is done on our secure server. The safety of your information is very important to us.

*The Columbus Dispatch* respects the privacy of our subscribers. We do not sell subscriber information (including email addresses, names, street addresses or phone number). You agree that your name, address, email address and telephone number will be collected and stored by us and may be used for, among other things, the purposes of fulfilling your subscription and communicating with you about your subscription. We may periodically send you email communications regarding products and services of The Dispatch Printing Company. You may "opt out" of receiving promotional messages at any time by updating your email preferences in our Preference Management Center using the link found at the footer of all of our email messages. We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy although information will be shared if reasonably necessary in the view of *The Columbus Dispatch* to meet any applicable law, regulation, legal process or enforceable governmental request; enforce applicable Terms of Service; detect, prevent or otherwise address fraud, security or technical issues; or to protect against harm to the rights, property or safety of *The Columbus Dispatch*, other Website users or the public in general as required or permitted by law.

## 1.8 THIRD PARTIES
If you have purchased your product through a third party, these Terms of Sale may not apply to you. *The Columbus Dispatch* is not liable for any claims related to purchases made through third parties. Please contact the third party directly. □

*The Columbus Dispatch* is not responsible for a person's inability to access their digital copy subscription service due to equipment malfunction or other issues regarding access to the World Wide Web. □

## 1.9 CHANGES, CANCELLATIONS AND REFUNDS
*The Columbus Dispatch* may change the product or Website or add or delete features of each at any time for any reason. *The Columbus Dispatch* may also cancel or suspend your subscription or your access to the Website at any time without notice and for any reason, including but not limited to *The Columbus Dispatch* stops providing a product in your area or that you are in breach of this contract or fail to pay fees you owe to us or to our agents. If your subscription or access to the Website is canceled, your right to receive the product or use the Website ceases immediately. Cancellation of the product or your subscription will not relieve you of your existing obligation to pay all charges to your account. If *The Columbus Dispatch* terminates your subscription or access to Website without cause, you will be refunded a pro-rata portion of

payments you have previously made for future services to occur after the termination of you subscription or access to the Website. No refunds will be made related to time periods during which your subscription or access to the Website was active.

You may cancel your subscription or product at any time and for any reason. All *Columbus Dispatch* subscription services are continuous. To avoid additional charges, you must cancel your subscription by contacting our Customer Service Team at 1-877-734-7728 on Monday - Friday from 6:30 a.m.to 3 p.m., and Saturday from 7 a.m.to noon, or Sunday from 7 a.m. to 1 p.m. Holiday hours vary. If your subscription is cancelled after credit card billing, a pro-rated refund may be due to you based upon your cancellation date. If your subscription service is cancelled within the first 30 days or during its term, and a refund is requested, the refund (less the value of any premium you may have received when you subscribed), will be mailed to you by check within 7 business days. If there is an undisclosed active subscription, the monies, less the premium value, will be applied to the existing account. Monies collected will first be applied to any inactive account that has a balance due. Any subscription downgraded prior to term end, will be downgraded less the value of any premium you may have received when you subscribed.

All terms that apply after termination of this Agreement will survive any termination of this Agreement.

## 2. ACCURACY OF INFORMATION.

Information provided on this site is believed to be reliable when posted. However, we cannot guarantee that information will be accurate, complete and current at all times. All information in this site is subject to modification from time to time without notice.

## 3. ACCESS TO WEBSITE.

We will make every reasonable effort to provide you access to our site. However, there will be occasions when the site will be unavailable for use or times when we find it necessary to shut down our site for a period of time for maintenance, updates and other reasonable adjustments.

## 4. HYPERTEXT LINKS.

Sites accessed by hypertext links appearing in this site may have been independently developed by others. *The Columbus Dispatch* does not guarantee the accuracy of any information in these other sites. The listing of an organization not affiliated with *The Columbus Dispatch* in this site should not be interpreted as an endorsement of its services or products by *The Columbus Dispatch*.

## 5. LIMITATION OF LIABILITY.

Your use of this site shall be entirely at your risk. You can recover from *The Columbus Dispatch* and its affiliates, resellers, distributors, and vendors only direct damages up to an amount equal to the amount you pay for the product or Website for one month. You cannot recover any other damages, including consequential, lost profits, special, indirect, incidental, or punitive damages. The limitations and exclusions apply to anything related to all claims against *The Columbus Dispatch*, including but not limited to claims related to this Agreement, product or Website, the loss of data, content on third-party websites, viruses or other similar issues which affect your access to or use of the Website or the internet, incompatibility between the Website other services, software, and hardware, delays or failures you may have in starting or completing transmissions or transactions in connection with the service in an accurate or timely manner, claims for breach of contract; breach of warranty, guarantee or condition; strict liability; tort including but not limited to negligence or breach of statutory duty; or misrepresentation. The limitations and exclusions also apply if this remedy does not fully compensate you for any losses or fails of its essential purpose or if *The Columbus Dispatch* knew or should have known about the possibility of the damages.

## 6. NO WARRANTIES.

*The Columbus Dispatch* provides the products and Website services "as is," "with all faults," and "as available." *The Columbus Dispatch* makes no guarantee of the accuracy or timeliness of information available from the products or Website. You acknowledge that computer and telecommunications systems are not fault-free and occasional periods of

downtime occur. *The Columbus Dispatch* does not guarantee the service will be uninterrupted, timely, secure, or error-free, or that data loss will not occur nor does *The Columbus Dispatch*, its affiliates, resellers, distributors, and vendors give any express warranties, guarantees, or conditions. *The Columbus Dispatch* specifically excludes any implied warranties, including for merchantability, satisfactory quality, fitness for a particular purpose, workmanlike effort, and noninfringement. □

## 7. ASSIGNMENT.

*The Columbus Dispatch* may assign, transfer, or otherwise dispose our rights and obligations under this Agreement, in whole or in part, at any time without notice. You may not assign this Agreement or transfer any rights to use your subscription or the Website. □

## 8. NO THIRD PARTY BENEFICIARIES.

This Agreement is solely for your and *The Columbus Dispatch's* benefit. It is not for the benefit of any other person, except for permitted successors. □

## 9. CLAIMS.

Claims must be filed within one year. You must bring any claim against *The Columbus Dispatch* within one year of the date you could first bring the claim. If you fail to file your claim against *The Columbus Dispatch* within one year, the claim is permanently barred. □

## 10. NOTICES.

To be effective notice, please send all notices certified mail, return receipt requested to *The Columbus Dispatch*, Terms of Service, 5300 Crosswind Dr., Columbus, Ohio 43228. *The Columbus Dispatch* does not accept email notices. This Agreement is in electronic form. *The Columbus Dispatch* may send you, in electronic form, information about the service, additional information, and information the law requires *The Columbus Dispatch* to provide. *The Columbus Dispatch* may provide required information to you by email at the address you specified when you signed up for the product or Website. Notices emailed to you will be deemed given and received when the email is sent. If you don't consent to receive notices electronically, you must stop using the product and/or Website. □

## 11. CONFIDENTIALITY.

You acknowledge that you are responsible for the safekeeping and for ensuring the confidentiality of your username and password. *The Columbus Dispatch* is unable, and under no obligation, to confirm the identity or authority of any user of the Website.

## 12. ENTIRE AGREEMENT.

This Agreement sets forth the understanding among the Parties concerning the subject matter of this Agreement, and incorporates all prior negotiations and understandings. No covenants, promises, agreements, conditions or understandings, either oral or written, exist between the Parties relating to the subject matter of this Agreement other than those set forth herein.

## 13. SEVERABILITY.

The Parties have carefully reviewed the provisions of this Agreement and agree that they are fair and equitable. However, in light of the possibility of differing interpretations of law and changes in circumstances, the Parties agree if, in any action before any court or agency legally empowered to enforce this Agreement, any term, restriction, covenant, or promise is found to be invalid or unenforceable to any extent, then such term, restriction, covenant, or promise shall not thereby be terminated but shall be deemed modified to the minimal extent necessary to make it enforceable by such court or agency and, if it cannot be so modified, it shall be deemed amended to delete therefrom such provision or portion adjudicated to be invalid or unenforceable, such modification or amendment in any event to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made. □

## 14. Waiver of Jury Trial.

With respect to any civil action, counterclaim or proceeding, whether at law or in equity, which arises out of, concerns or

relates to you and *The Columbus Dispatch* including but without limitation to this Agreement, any transactions contemplated hereunder, the performance hereof or the relationship created hereby, whether sounding in contract, tort, strict liability or otherwise, trial shall be to a court of competent jurisdiction and not to a jury. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT (STATUTORY, CONSTITUTIONAL, COMMON LAW OR OTHERWISE) IT MAY HAVE TO A TRIAL BY JURY. Either Party may file an original counterpart or a copy of this Agreement with any court as written evidence of the waiver of the other Party's right to trial by jury. No Party has made or relied upon any oral representations by any other Party regarding the enforceability of this provision. EACH PARTY HAS READ AND UNDERSTANDS THE EFFECT OF THIS JURY WAIVER PROVISION.

**15. FORCE MAJEURE.**

*The Columbus Dispatch* will not be responsible for any failure or delay in the performance of all or any part of this Agreement caused by acts of God and nature, intervention of government, war or threat of war, acts of terrorism, conditions similar to war, sanctions, blockades, or embargoes or any other acts or events that are beyond the reasonable control of *The Columbus Dispatch*. However, *The Columbus Dispatch* so provide written notice by posting or other reasonable method of the force majeure condition, and use commercially reasonable efforts to overcome the effects of the contingency as promptly as possible.

**16. GOVERNING LAW.**

This Agreement shall be deemed to have been entered into in the State of Ohio and its interpretation, construction, and the remedies for its enforcement shall be governed in accordance with Ohio law. Any litigation or other proceedings between you and *The Columbus Dispatch*, including but not limited to proceedings to enforce this Agreement may only be initiated in the Franklin County Court of Common Pleas to the exclusion of all other courts.

I have read, understand and accept the terms and conditions described above.

# Contests & Discounts



## DMG REWARDS

DMG Rewards is our way of thanking loyal subscribers by offering a variety of contests, discounts offers and exclusive subscriber benefits!

**Activate your free membership today!**

# Business Directory



## COLUMBUS BIZLIST

Columbus BizList is your local business directory.

Search for businesses by:

- Category
- Business

# Coupons



## THEBAG

Sign up to receive coupons delivered to your doorstep.

# For Students



## NEWSPAPERS IN EDUCATION

Newspaper in Education offers tools for using The Dispatch to prepare children and teens for school and the future.

# Dispatch Events



## SPONSORED EVENTS

For over 50 years, *The Dispatch* has harnessed the people-reaching power of its print and online products � as well as those of its affiliate � to produce special events, including:

- Columbus Weddings Show
- Spring Home & Garden Show
- Fall Home & Garden Show & Holiday Fest

## Never miss a story

Choose the plan that's right for you.
Digital access or digital and print delivery.

**Subscribe Now**

## Sign up for daily e-mails

Sign up

---

**READER SERVICES**

Subscribe

**ONLINE SERVICES**

E-Edition

Manage Subscription

Live Chat

DMG Rewards

About the Dispatch

My Profile

Dispatch Photo Store

OSU Photo Store

Dispatch NIE

RSS Feeds

Podcasts

Newsletters

Mobile App

Print Archives

**ADVERTISING**

Place an Ad

Media Kit

Weekly Ads

Classifieds

DMG + ThriveHive

**CONTACT US**

Staff Directory

News Tips

Send letters to the Editor

Calendar

Dispatch careers

Privacy policy

© Copyright 2006-2018 GateHouse Media, LLC. All rights reserved • GateHouse Html-section-front

Original content available for non-commercial use under a Creative Commons license, except where noted.☐
The Columbus Dispatch ~ 62 E. Broad St. Columbus OH 43215 ~ Privacy Policy ~ Terms Of Service



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 10-K**

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-36097

# GANNETT CO., INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **38-3910250** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **7950 Jones Branch Drive,   McLean,   Virginia** | **22107-0910** |
| **(Address of principal executive offices)** | **(Zip Code)** |

Registrant's telephone number, including area code: (703) 854-6000

Securities registered pursuant to Section 12(b) of the Act:

| <u>Title of Each Class</u> | <u>Trading Symbol</u> | <u>Name of Each Exchange on Which Registered</u> |
|---|---|---|
| Common Stock, par value $0.01 per share | GCI | The New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐   No ☒

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K (Check box if no delinquent filers). ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of the voting common equity held by non-affiliates of the registrant based on the closing sales price of the registrant's Common Stock as reported on The New York Stock Exchange on June 28, 2019 was approximately $554,534,789. The registrant has no non-voting common equity.

As of February 26, 2020, 131,005,654 shares of the registrant's Common Stock were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

The definitive proxy statement relating to the registrant's Annual Meeting of Stockholders for 2020 is incorporated by reference in Part III to the extent described therein.

**Exhibit B**

**INDEX TO GANNETT CO., INC.**
**2019 FORM 10-K**

| <u>Item No.</u> | | <u>Page</u> |
|---|---|---|
| | **Part I** | |
| 1 | Business | 3 |
| 1A | Risk Factors | 15 |
| 1B | Unresolved Staff Comments | 29 |
| 2 | Properties | 29 |
| 3 | Legal Proceedings | 30 |
| 4 | Mine Safety Disclosures | 30 |
| | **Part II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| 6 | Selected Financial Data | 32 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| 7A | Quantitative and Qualitative Disclosures about Market Risk | 58 |
| 8 | Financial Statements and Supplementary Data | 60 |
| 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 110 |
| 9A | Controls and Procedures | 110 |
| | **Part III** | |
| 10 | Directors, Executive Officers and Corporate Governance | 113 |
| 11 | Executive Compensation | 114 |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 114 |
| 13 | Certain Relationships and Related Transactions, and Director Independence | 114 |
| 14 | Principal Accountant Fees and Services | 114 |
| | **Part IV** | |
| 15 | Exhibits and Financial Statement Schedules | 115 |
| 16 | Form 10-K Summary | 117 |

**PART I**

ITEM 1. BUSINESS

**Overview**

Gannett Co., Inc. ("Gannett", "we", "us", "our", or "the Company") is an innovative, digitally focused media and marketing solutions company committed to fostering the communities in our network and helping them build relationships with their local businesses. Until November 19, 2019, our corporate name was New Media Investment Group Inc. ("New Media") and Gannett Co, Inc. was a separate publicly traded company. On November 19, 2019, New Media completed its acquisition of Gannett Co., Inc. (which was renamed Gannett Media Corp. and is referred to herein as "Legacy Gannett"). In connection with the acquisition, New Media changed its name to Gannett Co., Inc. and assumed Legacy Gannett's ticker symbol "GCI" (having previously traded under "NEWM").

As a result of the acquisition, historical results for fiscal years 2018 and prior are those of legacy New Media only while fiscal year 2019 represents legacy New Media's results up to and through the date of the acquisition plus the new consolidated company's results of operations for the approximately six-week period between the date of acquisition and fiscal year end.

Our current portfolio of media assets includes USA TODAY, local media organizations in 46 states in the U.S. and Guam, and Newsquest, a wholly owned subsidiary operating in the United Kingdom ("U.K.") with more than 140 local media brands. Gannett also owns the digital marketing services companies ReachLocal, Inc. ("ReachLocal"), UpCurve, Inc. ("UpCurve"), and WordStream, Inc. ("WordStream") and runs the largest media-owned events business in the U.S., GateHouse Live.

Through USA TODAY, our local property network, and Newsquest, Gannett delivers high-quality, trusted content where and when consumers want to engage with it on virtually any device or platform. Additionally, the Company has strong relationships with hundreds of thousands of local and national businesses in both our U.S. and U.K. markets due to our large local and national sales forces and a robust advertising and marketing solutions product suite. The Company reports in two operating segments, Publishing and Marketing Solutions, plus a corporate and other category. A full description of our segments is included in Note 14 — Segment reporting of the notes to the consolidated financial statements.

The Company has made both internal and external investments to align with the shift in spending habits to digital products by both consumers and marketers. In 2019, total digital advertising and marketing services revenues were $263.0 million, or 14% of total company revenues. Our U.S. media network, which includes USA TODAY and our local properties, has more than 3,850 journalists and approximately 150.0 million[a] unique visitors as of January 2020 who access content through desktops, smartphones, and tablets. In the U.K., Newsquest is a publishing and digital leader with approximately 800 journalists and a network of web sites that attracts over 26.2 million[b] unique visitors monthly.

**Publishing Segment**

Our publishing segment is comprised of the following core products:

- 261 daily newspapers, including USA TODAY and our local property network in the U.S. and Guam, with total paid circulation of over 2.5 million and Sunday circulation of 3.3 million;

- 302 weekly newspapers (published up to three times per week) with total circulation of approximately 1.7 million;

- 383 locally-focused websites, which extend our businesses onto digital platforms;

- USA TODAY Group, which includes USATODAY.com and its mobile applications, our sports network (owned and operated and affiliate), and Reviewed.com, an affiliate marketing business;

- 143 daily and weekly newspapers and 32 magazines in the U.K. and related digital platforms;

- 74 business publications through BridgeTower Media with circulation of over 323,000; and

- Our community events platform, GateHouse Live.

In addition to our core products, we also opportunistically produce niche publications that address specific local market interests such as recreation, sports, healthcare, and real estate. Many of our publications are located in small and mid-size markets where we are often the primary provider of comprehensive local market news and information. Our content is primarily devoted to topics we believe are highly relevant and of interest to our audiences such as local news and politics, community and regional events, youth sports, opinion and editorial pages, local schools, obituaries, weddings, and police reports.

More than 80% of our daily newspapers have been published for more than 100 years. We believe the longevity of our publications demonstrates the value and relevance of the local information we provide and has created a strong foundation of reader loyalty and a highly-recognized media brand name in each community we serve.

Since its introduction in 1982, USA TODAY has been a cornerstone of the national news landscape under its recognizable and respected brand. It also serves as the foundation for our newsroom network, the USA TODAY NETWORK, which allows for content sharing capabilities across our local and national markets. In 2018, the USA TODAY NETWORK was awarded three Pulitzer Prizes for local reporting, editorial writing, and explanatory journalism, highlighting our ability to integrate in-depth reporting and cutting-edge technology.

The scale of our consumer audience across our publishing business makes us an attractive marketing partner to various national and local businesses trying to reach consumers. We are the leading newspaper publisher in the U.S. in terms of circulation and have the fifth largest digital audience in the News and Information category based on January 2020 Comscore Media Metrics; per those metrics, our content reaches more people digitally than Fox News, CBSnews.com, New York Times Digital, BuzzFeed.com, or WashingtonPost.com.[a]

- At our U.S. local property network, the average daily print readership is approximately 10.3 million on Sundays and 7.6 million daily Monday through Saturday, while the digital audience reached 65.9 million[a] unique visitors in January 2020. At USA TODAY, print readership averages around 2.5 million daily Monday to Friday, while the digital audience reached approximately 98.3 million[a] unique visitors in January 2020. While our print audience tends to skew to an older demographic, our digital audience skews younger as evidenced by 53%[a] of the total U.S. digital millennial audience (ages 18 - 34) accessing our local property network and USA TODAY NETWORK content monthly.

- In the U.K., our wholly-owned subsidiary Newsquest has a total average print readership of over 5.6 million every week. Newsquest's digital audience in 2019 had an average of 26.2 million[b] monthly unique users.

The Publishing segment generates revenue primarily through advertising and subscriptions to our print and digital publications and to a lesser extent commercial printing and distribution, events, marketing, and data services. USA TODAY and our local property network have developed an efficient operating model utilizing integrated shared support for back-office operations such as financial services and accounting, content design and layout services, print and digital creative development, and certain sales and service platforms. This model also serves as a point of leverage and synergy opportunity with respect to businesses acquired by the Company, including the acquisition of Legacy Gannett.

*Advertising:* In 2019, Publishing segment advertising and marketing services revenues of $897.6 million comprised 50% of total Publishing segment revenues, down from 52% in 2018. We track our print advertising in three primary categories: local, national, and classified. Below are descriptions of the three categories:

- Local advertising is associated with local merchants or locally owned businesses. Ads run in our print products, such as our daily or non-daily publications, and are either run-of-press (ROP) or preprinted inserts (typically stand-alone, multiple page fliers inserted into daily and Sunday print products).

- National advertising is principally associated with advertisers who are promoting national products or brands. Examples are retailers, commercial banks, airlines, and telecommunications. It also includes national brands that advertise in our local markets. Similar to local, ads are either ROP or preprints.

- Classified advertising includes the major categories of legal, obituaries, automotive, employment, and real estate or rentals. Advertising for classified segments is published in the classified sections or other sections within the publication and in certain magazines.

We split our digital advertising and marketing services revenues into three main categories: digital media, digital classified, and digital marketing services. Below are descriptions of these three categories:

- Digital media represents all display advertising either delivered on our products or off-platform on partner channels such as Facebook Instant Articles and Apple News.

- Digital classified encompasses digital advertising revenues associated with our classified partnerships including auto (cars.com) and employment (PandoLogic, ZipRecruiter) as well as real estate, legal, and obituaries.

- Digital marketing services represents the suite of ReachLocal, UpCurve, and WordStream products being offered in our local markets as well as e-mail marketing.

Our advertising teams employ a multi-platform approach to advertising sales under the LOCALiQ brand, which can be specifically tailored to the individual needs of advertisers from small, locally-owned merchants to large, complex businesses. We believe local and national advertisers find it challenging to manage the complexity of their media budgets, particularly on the digital side, and are seeking to reach a shifting audience while also desiring to influence attitudes and behavior at each stage of the purchase path. Our diverse sales force, unique industry scale, and broad portfolio of print and digital products position us well to solve these challenges. Through our media planning process, we present advertisers with targeted, integrated solutions that help advertisers reach this shifting audience.

Our advertising revenues are subject to moderate seasonality due primarily to fluctuations in advertising volumes. Our advertising revenues for Publishing are typically highest in the company's fourth quarter due to holiday and seasonal advertising and lowest in the first quarter following the holiday season. The volume of advertising sales in any period is also impacted by other external factors such as competitors' pricing, advertisers' decisions to increase or decrease their advertising expenditures in response to anticipated consumer demand, and general economic conditions.

***Circulation:*** In 2019, Publishing segment circulation revenues of $704.8 million comprised 39% of total Publishing segment revenues, up from 38% in 2018. In a trend generally consistent within the domestic publishing industry, print circulation volumes declined in 2019. Circulation revenues in the U.S. are derived from our All Access Content Subscription Model, single-copy sales, hotel sales, and digital-only subscriptions. Circulation revenues at Newsquest are more centered on single-copy sales, with a large portion of weekly paid-for titles and free titles as compared to our U.S. publications.

Our All Access Content Subscription Model in our local markets includes access to our content via multiple platforms including websites, smartphone and tablet applications, and e-newspapers, with subscription prices that vary according to the frequency of delivery of the print edition. Also available to subscribers are digital-only or digital-plus Sunday subscriptions. We currently have approximately 1.7 million digitally activated subscribers via our All Access Content Subscription Model. We offer our customers EZ Pay, a payment system which automatically deducts subscription payments from customers' credit cards or bank accounts; we see better subscriber retention with our EZ Pay customers. At the end of 2019, EZ Pay was used by 54% of all subscribers across our U.S. local property network (not including USA TODAY).

Growing our digital-only subscribers is a strategic priority and, in 2019, our digital-only subscribers increased by 25% on a consolidated company basis to approximately 812,000. Our primary digital subscriber acquisition strategies include on-site promotion, e-mail marketing, social marketing, and event marketing. A variety of pricing strategies are used throughout the year, including discounted introductory periods and sales, to encourage trial and habituation before transitioning to the full price rate. In the U.S. local markets, approximately 82% of circulation revenue is derived from our All Access Content Subscription Model and digital-only subscriptions.

In addition to the subscription model in our U.S. local markets, single-copy print editions continue to be sold at retail outlets and account for approximately 10% of daily and 19% of Sunday net paid circulation volume. Approximately 14% of net paid circulation volumes of USA TODAY are generated by single-copy sales at retail outlets, vending machines, or hotels that provide copies to their guests. The remainder is generated by home and office delivery, mail, educational, and other sales.

***Production and Distribution:*** Gannett Publishing Services (GPS) owns and operates 72 print facilities. Our print facilities produce nine publications on average and are generally located within 60 miles of the communities served. By clustering our production resources or outsourcing where cost beneficial, we are able to reduce the operating costs of our publications while increasing the quality of our small and mid-size market publications that would typically not otherwise have access to high quality production facilities. We also believe we are able to reduce future capital expenditure needs by having fewer overall pressrooms and buildings. We believe our superior production quality is critical to maintaining and enhancing our position as the leading provider of local news coverage in the markets we serve. As other print media businesses look to reduce costs, we believe we have the opportunity to leverage our unutilized press time to grow our commercial print customer base and revenue.

GPS leverages our existing assets, including employee talent and experience, physical plants and equipment, and our vast national and local distribution networks. GPS is particularly focused on maximizing our geographic footprint to most efficiently produce and transport our printed product. GPS is responsible for internal and external printing, packaging, and distribution. The distribution of our daily newspapers is typically outsourced to independent, locally based, third-party distributors that also distribute a majority of our weekly newspapers and non-newspaper publications. We continuously

evaluate lower cost options for newspaper delivery. In addition, certain of our shopper and weekly publications are delivered via the U.S. Postal Service.

Newsquest operates its publishing activities in a similar manner to GPS, through regional centers to maximize the use of management, finance, printing, and personnel resources. This regional approach allows the business to leverage a variety of back-office and administrative activities to optimize financial results and enables the group to offer readers and advertisers a range of attractive products across the market.

*Events:* GateHouse Live, our events and promotions business, was started in late 2015 by leveraging our local brands to create world-class events in the markets we serve. In 2019, GateHouse Live produced over 479 events with a collective attendance over 2.2 million for the consolidated company. Among our core event offerings are a variety of themed expos focused on target audiences, including men, women, seniors, and young families. Other signature event series produced across many of our markets include the nation's largest high school athlete recognition program and the official community's choice awards for dozens of markets across the country. We are one of the largest producers of endurance events in North America and are the largest race timing company in the U.S. GateHouse Live also offers white label event services for retailers and other media companies.

*Competition:* Our U.S. and U.K. publishing operations and affiliated digital platforms compete with other media and digital companies for advertising and marketing spend. Our publishing operations also compete for circulation and readership against other news and information outlets and amateur content creators. Each of our publications compete for advertising revenue to varying degrees with traditional media outlets such as direct mail, yellow pages, radio, outdoor advertising, broadcast and cable television, magazines, local, regional and national newspapers, shoppers, and other print and online media sources, including local blogs. We also increasingly compete with new digital and social media companies for advertising revenue.

Development of opportunities in, and competition from, digital media, including web sites, tablet, mobile, and social products continues to increase. As such, there is very little barrier to entry and limited capital requirements for new companies to enter the market with competitive digital products. The Company will continue to expand its audience reach in the digital media industry through internal audience development efforts, content distribution programs, acquisitions, and partnerships to protect its audience market share. Additionally, the Company will continue to improve its suite of advertising and marketing services products through both internal development, acquisitions, and partnerships to protect its advertising market share.

*Environmental Regulation:* The Company is committed to protecting the environment. Our goal is to ensure our production and distribution facilities comply with federal, state, local, and foreign environmental laws and to incorporate appropriate environmental practices and standards in our operations. We are one of the industry leaders in the use of recycled newsprint. During 2019, 12% of our domestic newsprint purchases contained recycled content, with average recycled content of 34%.

Our operations use inks, solvents, and fuels. The use, management, and disposal of these substances are sometimes regulated by environmental agencies. We retain a corporate environmental legal consultant who, along with internal and outside counsel, provides counsel on regulatory compliance and preventive measures. We believe we are in substantial compliance with all applicable laws and regulations for the protection of the environment and the health and safety of our employees based upon existing facts presently known to us. Compliance with federal, state, and local environmental laws and regulations relating to the discharge of substances into the environment, the disposal of hazardous wastes, and other related activities has had, and will continue to have, an impact on our operations but has been accomplished to date without having a material adverse effect on its operations. While it is difficult to estimate the timing and ultimate costs to be incurred due to uncertainties about the status of laws, regulations, and technology, based on information currently known to us and insurance procured with respect to certain environmental matters, we do not expect environmental costs or contingencies to be material or to have a material adverse effect on our financial performance. Our operations involve risks in these areas, however, and we cannot assure we will not incur material costs or liabilities in the future which could adversely affect us.

*Raw Materials:* Newsprint, which is the basic raw material used in our print publications, has been and may continue to be subject to significant price changes from time to time. For example, in the first half of 2018, many Canadian producers were subjected to significant anti-dumping and countervailing duties upon importation of newsprint into the U.S. which resulted in higher newsprint prices and tighter supply from the Canadian producers. Prices ultimately came down in the second half of the year as the duties were eliminated by the International Trade Commission in September 2018, but this example serves as a reminder of the price and supply volatility that can impact the market. Our ability to supply the needs of our publishing operations depends upon the continuing availability of newsprint at an acceptable price, and the results of operations of our Publishing segment may be impacted significantly by changes in newsprint prices. We generally maintain only a 45 to 55-day

inventory of newsprint. The availability and price of newsprint is subject to numerous risks and uncertainties, which are described more fully under "Risk Factors" in this Annual Report on Form 10-K.

We purchase newsprint primarily from 15 domestic and global suppliers. During 2019, our total newsprint consumption was approximately 135,115 metric tons, including consumption by our owned and operated print sites, third-party printing sites, and Newsquest. Newsprint consumption in 2019 was 15% greater than in 2018 primarily due to the acquisition of Legacy Gannett.

***Joint Operating Agencies:*** Our publishing subsidiaries in Detroit and York each participate in a joint operating agency (JOA). In each instance, the JOA performs the production, sales, distribution, and back office functions for our subsidiaries and the publisher of another publication pursuant to a joint operating agreement. Operating results for the Detroit and York JOAs are fully consolidated along with a charge for the minority partners' share of profits**.**

## Marketing Solutions Segment

The mission of our Marketing Solutions segment is to deliver customers to local businesses. It is comprised of three brands today:

- ReachLocal, which was founded in 2004 and acquired by Legacy Gannett in 2016, helps local businesses advertise online to find those customers;

- UpCurve, which was launched at GateHouse Media in 2012, has two main businesses: ThriveHive, which provides guided marketing solutions for small and medium businesses, and UpCurve Cloud and W-Systems, which provide cloud-based products with expert guidance and support; and,

- WordStream, which was acquired by Legacy Gannett in 2018, is a provider of cloud-based software-as-a-service (SaaS) solutions for local and regional businesses and agencies to optimize their digital advertising campaigns.

We believe local businesses want a single, unified solution to solve their digital marketing needs. Our digital marketing solutions consist of products and solutions in two categories: digital advertising (including search engine marketing, social advertising, and display advertising) and subscription solutions (including software solutions such as lead conversion software, cloud-based software for customer relationship and workflow management, and presence solutions such as websites, search engine optimization, listings management, and live chat).

***Products***: Our digital advertising products include our search engine marketing ("SEM") solution that combines search engine marketing optimized across multiple publishers, call tracking and call recording services, and industry leading campaign performance transparency. Our SEM offering is a leading product for local businesses and has won numerous awards since its rollout, including sixteen different awards in 2019 related to our platform and specific vertical campaigns. It is optimized for local markets in each of the locations in which our Marketing Solutions segment operates. Search engine marketing accounted for 71% of our Marketing Solutions segment's revenue for the year ended December 31, 2019.

We also offer online advertising products focused on maximizing local businesses' exposure by displaying their ads on websites that, in the aggregate, reach more than 90% of the U.S. online audience. We offer a Facebook advertising solution that incorporates our proprietary goal-based smart optimization. Our display products include a retargeting solution to target consumers who have previously visited a specific client's website through one of our digital advertising campaigns or who have previously searched for a client's keywords and other display products. These products are generally available in North America and selectively available in ReachLocal's international markets.

Our subscription solutions include our WordStream and ThriveHive software and related services that enable our clients to optimize their own digital advertising campaigns ("do-it-yourself"). Our lead conversion software is a marketing automation platform that includes tools for capturing web traffic information and converting leads into new customers for clients. We provide clients with tools designed to significantly improve their conversion of leads to customers and help clients stay top-of-mind during the prospect's decision-making process by using integrated marketing automation to send new prospects targeted e-mails and alerts to the client's staff reminding them to follow up on each lead. Our lead conversion software also provides reports to show clients how many leads they are getting from each marketing source and other important business insights. We also offer additional cloud-based software solutions, as a channel partner, that include a customer relationship management solution tailored for small and medium sized businesses, a market-leading collaboration and productivity tool, and voice-over-IP software. Our software solutions are available in North America and our lead conversion software is available in all of our markets.

Our subscription solutions also include presence solutions, including websites, search engine optimization, live chat, listings management, store locator, and other products and solutions, all focused on expanding and leveraging clients' web presence. Often, these products are designed to work in concert with our digital advertising products with a goal of enhancing clients' marketing return on investment. These products are generally available in North America and selectively available in our international markets.

*Distribution:* We deliver our suite of products and solutions to local businesses through a combination of our proprietary technology platform, our sales force, and select third-party agencies and resellers. Our Marketing Solutions segment has sales operations in the United States, Canada, Australia, and New Zealand. Approximately 98% of revenues are derived in North America and the remaining 2% from other international markets. All Marketing Solutions segment revenues are digital revenues.

*Competition:* The market for local online advertising solutions is intensely competitive and rapidly changing. The market is highly fragmented as there are a number of smaller companies which provide internet marketing services at highly competitive prices and, increasingly, we compete with vertical-specific SMB marketing providers who offer solutions tailored for specific verticals. In addition, the online publishers that we utilize for clients, such as Google, Yahoo!, and Microsoft, generally offer their products and services through self-service platforms. Many traditional offline media companies also offer online advertising solutions and have large, direct sales forces and digital publishing properties. With the introduction of new technologies and market entrants, we expect competition to intensify in the future.

## Amended and Restated Management Agreement

We are externally managed and advised by FIG LLC ("the Manager"), an affiliate of Fortress Investment Group LLC ("Fortress") pursuant to a management agreement. On August 5, 2019, in connection with the entry into the agreement to acquire Legacy Gannett, the Company and the Manager entered into the Amended and Restated Management and Advisory Agreement (the "Amended Management Agreement"), which became effective upon the closing of the acquisition on November 19, 2019. The Amended Management Agreement (i) established a termination date for the Manager's services of December 31, 2021, in lieu of annual renewals of the term; (ii) reduced the "incentive fee" payable under the Amended Management Agreement from 25% to 17.5% for the remainder of the term; (iii) reduced by 50% the number of options that would otherwise be issuable in connection with the issuance of shares as consideration for the acquisition, and imposed a premium on the exercise price; (iv) eliminated the Manager's right to receive options in connection with future equity raises by the Company; and (v) eliminated certain payments otherwise due at or after the end of the term of the prior management agreement.

In connection with entering into the Amended Management Agreement and the consummation of the acquisition, the Company issued to the Manager 4,205,607 shares of Company Common Stock and granted to the Manager options to acquire 3,163,264 shares of Company Common Stock. The Manager is restricted from selling the issued shares until the expiration of the Amended Management Agreement, or otherwise upon a change in control and certain other extraordinary events. The options will have an exercise price of $15.50 and become exercisable upon the first trading day immediately following the first 20 consecutive trading day period in which the closing price of the Company Common Stock (on its principal U.S. national securities exchange) is at or above $20 per share (subject to adjustment) and also upon a change in control and certain other extraordinary events.

Upon expiration of the term of the Amended Management Agreement, the Manager will cease providing external management services to the Company, and the Manager will no longer be the employer of the person serving in the role of Chief Executive Officer of the Company.

## Strategy

Gannett's vision is to become essential to consumers and marketers seeking meaningful connections with their communities across print, digital, and other channels. We are committed to a business strategy that drives audience growth and engagement by delivering deeper content experiences to our audience while offering the products and marketing expertise our advertisers desire. The execution of this strategy should allow the company to continue its evolution from a more traditional print media business to a digitally focused media and marketing services business.

We intend to create stockholder value through a variety of factors including organic growth driven by our consumer and business-to-business strategies as well as through paying down the debt assumed to consummate the acquisition. However, there is no guarantee we will be able to accomplish any of these strategic initiatives. We intend to distribute a portion of our free cash flow generated from operations and other sources as a dividend to stockholders through a quarterly dividend, subject to

satisfactory financial performance, approval by our Board of Directors, and dividend restrictions in the Gannett Credit Agreement. The Board of Directors' determinations regarding dividends will depend on a variety of factors, including the Company's GAAP net income, free cash flow generated from operations or other sources, liquidity position, and potential alternative uses of cash such as acquisitions as well as economic conditions and expected future financial results. The key elements of our strategy include:

***Leverage nationwide scale and local presence to expand and deepen our relationships with consumers.*** The broad reach of our newsroom network, linking leading national journalism at USA TODAY, our local property network in 46 states in the U.S. and Guam, and Newsquest in the U.K. with more than 140 local media brands, gives us the ability to deepen our relationships with consumers at a national and local level. We bring consumers the local news and information that impacts their day-to-day lives while keeping them informed of the national events that impact their country. This local content is not readily obtainable elsewhere, and we are able to deliver that content to our customers across multiple print and digital platforms. As such, a key element of our consumer strategy is growing our paid digital-only subscriber base and over time increasing our pricing.

***Accelerate the growth of our digital marketing services and events businesses.*** With the completion of our acquisition of Legacy Gannett in November 2019, our Company is now of significant digital scale, with unique reach at both the national and local community levels. We plan to leverage the best practices and go-to-market strategies that both prior companies employed to continue to aggressively expand our digital marketing services business into our local markets, both domestically and internationally. Given our extensive client base and volume of digital campaigns, we will also use data and insights to offer new and dynamic advertising products that can deliver superior results. Our events business will also be able to scale across the Legacy Gannett markets and innovate around new events with broader scale.

***Deliver acquisition synergies and continue to operate our traditional businesses more efficiently.*** Our acquisition of Legacy Gannett creates a large opportunity to rationalize the cost base of the consolidated company, while also investing in journalism and digital product development, both critical to our transformation. Key areas of synergy opportunity include manufacturing and distribution consolidations, back office rationalization, regionalization of sales and content management, and technology systems integration. We will also continue to drive the profitability of our traditional print operations through economies of scale, process improvements, and optimizations. We will also explore outsourcing certain business functions to reduce costs.

**Challenges**

As a publisher of locally-based print and online media, we face a number of challenges, including the risks that:

- The growing shift within the publishing industry from traditional print media to digital may compromise our ability to generate sufficient advertising revenues;

- Investments in growing our digital and marketing services and events business may not be successful, which could adversely affect our results of operations; and

- Our advertising and circulation revenues may further decline if we are unable to compete effectively with other companies in the local media industry.

For more information about Gannett's risks and challenges, see "Risk Factors" under Item 1A of this Annual Report on Form 10-K.

**Employees**

As of December 31, 2019, we employed 21,255 employees in the U.S. Approximately 13% of those employed by us in the U.S. are represented by labor unions, most of which are affiliated with one of seven international unions. As of December 31, 2019, there were approximately 73 collective bargaining agreements covering union personnel. Our U.K. subsidiaries bargain with two unions over working practices, wages, and health and safety issues only. There were approximately 3,200 employees outside of the U.S., including approximately 2,600 employed by Newsquest in the U.K. Most of our unionized employees work under collective bargaining agreements that are under negotiation or will expire in 2022. We believe relations with our employees are generally good, and we have had no work stoppages at any of our publications.

**Corporate Governance and Public Information**

The address of Gannett's website is http://www.gannett.com/. Stockholders can access a wide variety of information on Gannett's website, under the "Investor Relations" tab, including news releases, SEC filings, information Gannett is required to post online pursuant to applicable SEC rules, newspaper profiles, and online links. Gannett makes available via its website all filings it makes under the Securities and Exchange Act of 1934, as amended, including Forms 10-K, 10-Q, and 8-K, as well as any related amendments as soon as reasonably practicable after they are filed with, or furnished to, the SEC. All such filings are available free of charge. Neither the content of Gannett's corporate website nor any other website referred to in this report are incorporated by reference into this report unless expressly noted. Gannett's filings are available on the SEC website at www.sec.gov free of charge.

**References**

[a] Comscore Media Metrics

[b] Adobe Analytics

**Major Publications and Markets We Serve**

**Products**

Our traditional media product mix consists of four publication types: (i) daily newspapers, (ii) weekly newspapers, (iii) shoppers, and (iv) niche and business publications. Most of these publications have a digital presence as discussed in the following table. Some of the key characteristics of each of these types of publications are also summarized in the table below:

| | Daily Newspapers | Weekly Newspapers | Shoppers | Niche and Business Publications |
|---|---|---|---|---|
| Cost: | Paid | Paid and free | Paid and free | Paid and free |
| Distribution: | Distributed four to seven days per week | Distributed one to three days per week | Distributed weekly | Distributed on a weekly, bi-weekly, monthly, quarterly, or annual basis |
| Format: | Printed on newsprint, folded | Printed on newsprint, folded | Printed on newsprint, folded, or booklet | Printed on newsprint or glossy, folded, booklet, magazine, or book |
| Content: | Editorial (local news and coverage of community events, some national headlines) and ads (including classifieds) | Editorial (local news and coverage of community events, some national headlines for smaller markets which cannot support a daily newspaper) and ads (including classifieds) | Almost 100% ads, primarily classifieds, display, and inserts | Niche content and targeted ads (e.g., city guides, tourism guides, directories, calendars, and special interest publications focused on segments including real estate, cyber security, health care, legal, and small businesses) |
| Income: | Revenue from advertisers, subscribers, rack/box sales | Paid: Revenue from advertising, subscribers, rack/box sales Free: Advertising revenue only, provide 100% market coverage | Paid: Revenue from advertising, rack/box sales Free: Advertising revenue only, provide 100% market coverage | Paid: Revenue from advertising, rack/box sales Free: Advertising revenue only |
| Internet Availability: | Maintain locally oriented websites, mobile sites, and mobile apps for most locations | Major publications maintain locally oriented websites and mobile sites for select locations | Major publications maintain locally oriented websites | Selectively available online |

**Overview of Operations**

We reach a large, diverse audience through our print and digital daily and non-daily publications throughout the U.S. and the U.K. Our journalism network is powered by an integrated and award-winning news organization comprising more than 4,650 journalists with deep roots in 261 local communities, plus USA TODAY, and across our U.K. markets. Our combined monthly digital reach in the U.S. is approximately 150 million visitors as of January 2020, while our U.K. media organizations attract over 26.2 million visitors monthly.

11

The following table sets forth information regarding the number of publications and production facilities in our publishing segment:

**LOCAL PROPERTY NETWORK MEDIA ORGANIZATIONS**

| State / Territory | Publications | | Production Facilities |
|---|---|---|---|
| | Dailies | Weeklies | |
| Alabama | 3 | 4 | 2 |
| Arizona | 1 | — | 1 |
| Arkansas | 4 | 6 | — |
| California | 8 | 7 | 3 |
| Colorado | 3 | 2 | 1 |
| Connecticut | 1 | — | — |
| Delaware | 1 | 6 | 1 |
| Florida | 19 | 12 | 7 |
| Georgia | 3 | — | 1 |
| Guam | 1 | — | 1 |
| Illinois | 14 | 9 | 2 |
| Indiana | 10 | 3 | 4 |
| Iowa | 5 | 7 | 1 |
| Kansas | 10 | 8 | 1 |
| Kentucky | 2 | — | 2 |
| Louisiana | 7 | 6 | 1 |
| Maine | — | 2 | — |
| Maryland | 2 | — | — |
| Massachusetts | 10 | 75 | 1 |
| Michigan | 15 | 17 | 3 |
| Minnesota | 1 | 5 | — |
| Mississippi | 2 | — | 1 |
| Missouri | 10 | 6 | 3 |
| Montana | 1 | — | 1 |
| Nebraska | — | 2 | — |
| Nevada | 1 | — | — |
| New Hampshire | 2 | 3 | 1 |
| New Jersey | 10 | 6 | 2 |
| New Mexico | 6 | — | 1 |
| New York | 12 | 16 | 3 |
| North Carolina | 12 | 6 | 2 |
| North Dakota | 1 | — | 1 |
| Ohio | 21 | 54 | — |
| Oklahoma | 5 | 3 | 7 |
| Oregon | 2 | 1 | 1 |
| Pennsylvania | 13 | 2 | 1 |
| Rhode Island | 2 | — | 1 |
| South Carolina | 3 | 1 | — |
| South Dakota | 3 | 4 | 2 |
| Tennessee | 8 | 3 | 2 |
| Texas | 9 | 18 | 7 |
| Utah | 1 | 2 | — |
| Vermont | 1 | — | 1 |
| Virginia | 3 | — | 1 |
| Washington | 1 | — | — |
| West Virginia | 1 | 2 | — |
| Wisconsin | 11 | 4 | 2 |
| **Total** | **261** | **302** | **72** |

The following table lists information for our major publications and their affiliated digital platforms in the U.S. as of December 31, 2019:

| Title | Related Website(s) | Location | Daily[a] | Sunday[a] |
|---|---|---|---|---|
| USA TODAY | *www.usatoday.com* | McLean, Virginia | 1,397,220 | 832,342 |
| Detroit Free Press | *www.freep.com* | Detroit, Michigan | 131,079 | 925,505 |
| The Columbus Dispatch | *www.dispatch.com* | Columbus, Ohio | 124,339 | 135,568 |
| The Arizona Republic | *www.azcentral.com* | Phoenix, Arizona | 110,548 | 339,716 |
| Milwaukee Journal Sentinel | *www.jsonline.com* | Milwaukee, Wisconsin | 94,171 | 147,405 |
| The Oklahoman | *www.oklahoman.com* | Oklahoma City, Oklahoma | 74,019 | 78,504 |
| The Indianapolis Star | *www.indystar.com* | Indianapolis, Indiana | 69,416 | 169,347 |
| The Cincinnati Enquirer | *www.cincinnati.com* | Cincinnati, Ohio | 61,404 | 118,790 |
| The Courier-Journal | *www.courier-journal.com* | Louisville, Kentucky | 58,271 | 137,782 |
| The Austin American-Statesman | *www.statesman.com* | Austin, Texas | 56,204 | 82,780 |
| The Record | *www.northjersey.com* | Bergen, New Jersey | 52,623 | 70,682 |
| The Des Moines Register | *www.desmoinesregister.com* | Des Moines, Iowa | 51,331 | 110,787 |
| Democrat and Chronicle | *www.democratandchronicle.com* | Rochester, New York | 49,761 | 88,209 |
| The Akron Beacon Journal | *www.beaconjournal.com* | Akron, Ohio | 48,732 | 65,601 |
| The Providence Journal | *www.providencejournal.com* | Providence, Rhode Island | 43,491 | 53,016 |
| The Tennessean | *www.tennessean.com* | Nashville, Tennessee | 42,968 | 120,138 |

[a] Daily and Sunday combined average circulation is print, digital replica, digital non-replica, and affiliated publications according to the Alliance for Audited Media's September 2019 Quarterly Publisher's Statement.

Newsquest has a portfolio of over 140 news brands and more than 165 magazines, published in print and online in the U.K. With a digital audience of more than 26.2 million users a month and more than 5.6 million readers in print, Newsquest's content is read by a substantial portion of the U.K. population. In addition to local news brands, Newsquest owns the digital businesses s1, Exchange & Mart, and a specialist magazine business.

The following table presents information for our major local media organizations and affiliated digital platforms operated by Newsquest in the U.K. as of December 31, 2019. All circulation figures are according to JICREG results for the period January to June 2019.

**DAILY PAID-FOR LOCAL MEDIA ORGANIZATIONS AND AFFILIATED DIGITAL PLATFORMS / NEWSQUEST**

| Title | Related Website(s) | Location | Circulation Monday - Saturday |
|---|---|---|---|
| Basildon & Southend Echo | www.echo-news.co.uk | Basildon, Southend on Sea | 13,902 |
| Bolton News | www.theboltonnews.co.uk | Bolton | 7,589 |
| Bournemouth - The Daily Echo | www.bournemouthecho.co.uk | Bournemouth | 10,352 |
| Bradford Telegraph & Argus | www.thetelegraphandargus.co.uk | Bradford | 10,363 |
| Colchester Daily Gazette | www.gazette-news.co.uk | Colchester | 7,222 |
| Dorset Echo | www.dorsetecho.co.uk | Dorset | 7,736 |
| Glasgow - Evening Times | www.eveningtimes.co.uk | Glasgow | 18,204 |
| Greenock Telegraph[a] | www.greenocktelegraph.co.uk | Greenock | 8,116 |
| Lancashire Telegraph | www.lancashiretelegraph.co.uk | Blackburn, Burnley | 6,645 |
| Oxford Mail | www.oxfordmail.co.uk | Oxford | 8,141 |
| South Wales Argus - Newport | www.southwalesargus.co.uk | Newport | 8,110 |
| Southampton - Southern Daily Echo | www.dailyecho.co.uk | Southampton | 12,238 |
| Swindon Advertiser | www.swindonadvertiser.co.uk | Swindon | 7,547 |
| The Argus Brighton | www.theargus.co.uk | Brighton | 10,018 |
| The Herald, Scotland | www.heraldscotland.co.uk | Glasgow, Edinburgh | 22,901 |
| The National, Scotland[a] | www.thenational.scot | Glasgow, Edinburgh | 9,101 |
| The Northern Echo | www.thisisthenortheast.co.uk | Darlington | 18,089 |
| The Press - York | www.yorkpress.co.uk | York | 10,743 |
| Worcester News | www.worcesternews.co.uk | Worcester | 5,551 |
| The Leader | www.leaderlive.co.uk | Wrexham | 5,698 |
| The Mail | www.nwemail.co.uk | Cumbria | 4,869 |
| News & Star | www.newsandstar.co.uk | Carlisle | 6,208 |

[a] Circulation figures are according to ABC results for the period January to December 2018 as 2019 results are not available.

14

ITEM 1A. RISK FACTORS

*You should carefully consider the following risks and other information in this Annual Report on Form 10-K in evaluating us and our Common Stock. Any of the following risks could materially and adversely affect our results of operations, financial condition, our ability to make distributions on our Common Stock, and the market price of our Common Stock. For ease of review, the risk factors have been grouped into categories, but many of the risks described in a given category relate to multiple categories.*

### Risks Related to Our Acquisition and Integration of Legacy Gannett

***We may not achieve the intended benefits of the acquisition of Legacy Gannett.***

We completed the acquisition of Legacy Gannett in November 2019, and there can be no assurance that we will be able to realize the expected benefits of the transaction.

There are many challenges associated with integrating a material acquisition, such as our acquisition of Legacy Gannett, including the integration of executive and other employee teams with historically different cultures and priorities; the coordination of personnel located across multiple geographic locations; retaining key management and other employees; consolidating corporate and administrative infrastructures and eliminating duplicative operations; the diversion of management's attention from ongoing business concerns; retaining existing business and operational relationships, including customers, suppliers and other counterparties, and attracting new business and operational relationships; unanticipated issues in integrating information technology, communications and other systems; as well as unforeseen expenses associated with the acquisition. These and other challenges could result in unanticipated operational challenges and the failure to realize anticipated synergies in the expected timeframe or at all.

If we fail to realize anticipated synergies in the amount and within the timeframe expected, our actual financial condition and results of operations may differ materially from the illustrative financial information disclosed in connection with the acquisition, which was based on various assumptions and estimates that may prove to be incorrect. Such illustrative financial information did not constitute management's projections of future financial performance or results of operations; however, any material variance from such illustrative financial information could result in negative investor reactions that materially and adversely affect the market price of our Common Stock.

Our actual financial condition and results of operations may differ materially even if synergies are realized, due to macroeconomic factors or a variety of other risks to our business that are independent of the acquisition.

***Our future results will suffer if we do not effectively manage our expanded operations.***

With completion of the Legacy Gannett acquisition, the size of our business has increased significantly. Our continued success depends, in part, upon our ability to manage this expanded business, which poses substantial challenges for management, including challenges related to the management and monitoring of new operations and associated increased costs and complexity. We cannot assure you that we will be successful or that we will realize the expected operating efficiencies, cost savings, and other benefits from the combination that we currently anticipate.

***The diversion of resources and management's attention to the integration of Legacy Gannett could adversely affect our day-to-day business.***

The integration of Legacy Gannett places a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the transition and integration process could adversely affect our financial results.

***We incurred a substantial amount of indebtedness in connection with the Legacy Gannett acquisition, which could materially and adversely affect our business.***

In November 2019, pursuant to the acquisition of Legacy Gannett, the Company entered into a five-year, senior-secured term loan facility with Apollo Capital Management, L.P. ("Apollo") in an aggregate principal amount of approximately $1.8 billion. The term loan facility matures on November 19, 2024 and generally bears interest at the rate of 11.5% per annum. Accordingly, we are required to dedicate a substantial portion of cash flow from operations to fund interest payments. In

15

addition, we are required to repay our credit facility from time to time with (i) the proceeds of non-ordinary course asset sales and casualty and condemnation events, (ii) a percentage of excess cash flow (ranging from 50% to 90%, depending on the current leverage ratio), and (iii) any unrestricted cash at the end of the 2020 and 2021 fiscal years in excess of $40 million. Our debt service obligations reduce the amount of cash flow available to fund our working capital, capital expenditures, investments and potential distributions to stockholders. Moreover, there can be no assurance that we will be able to generate sufficient cash flow to satisfy our debt service obligations. Our ability to satisfy our debt service obligations depends on our ability to generate cash flow from operations, which is subject to a variety of risks, including general economic conditions and the strength of our competitors, which are outside our control.

We have stated our intention to refinance our indebtedness prior to maturity on more favorable terms, but there can be no assurance that we will be able to do so. Our ability to achieve more favorable terms would likely require us to substantially reduce our total outstanding indebtedness relative to current levels. Our ability to prepay our existing indebtedness is highly dependent on both the strength of our cash flow from operations as well as our ability to generate significant proceeds from sales of real estate, the timing and amount of which is highly uncertain. In addition, any refinancing would depend upon the condition of the finance and credit markets.

The terms of our indebtedness impose significant operating and financial restrictions on us. Our credit facility requires us to comply with numerous affirmative and negative covenants, including a requirement to maintain minimum liquidity of $20 million, and restrictions limiting our ability to, among other things, incur additional indebtedness, make investments and acquisitions, pay certain dividends, sell assets, merge, incur certain liens, enter into agreements with its affiliates, make capital expenditures, change our business, engage in sale/leaseback transactions, and modify our organizational documents. With respect to dividends, we are prohibited from paying cash dividends until after the thirtieth day of the second full fiscal quarter after the closing of the acquisition (i.e., April 30), and after such date, we can only pay cash dividends up to an agreed-upon amount, provided the ratio of consolidated debt to EBITDA (as such terms are defined in the credit facility) does not exceed a specified ratio. For these and other reasons generally affecting the ability to pay dividends, our stockholders will not receive dividends in an amount equal to the amount paid prior to the acquisition. Stockholders also should be aware that they have no contractual or other legal right to dividends that have not been declared.

A failure to satisfy our debt service obligations, a breach of a covenant in our credit facility, or a material breach of a representation or warranty in our credit facility, among other events specified in the credit facility, could give rise to a default, which could give rise to the right of our lenders to declare our indebtedness, together with accrued interest and other fees, to be immediately due and payable. An acceleration of our indebtedness would have a material adverse effect on our business, financial condition, results of operations, cash flows and stock price.

***One of our lenders, Apollo, has the right to appoint representatives to our Board, and Apollo's interests may conflict with those of our stockholders.***

Our credit facility grants Apollo the right to appoint two board observers to our Board. In the event that the ratio of consolidated debt to EBITDA (as such terms are defined in the term loan facility) drops below certain specified thresholds, Apollo will have the right to appoint up to two voting directors (who must be reasonably acceptable to us) in lieu of such board observer(s). The interests of Apollo, as a lender under our credit facility, may conflict with those of our stockholders.

### Risks Related to Competition from Digital Media

***Our business currently relies on sources of revenue that have been, and likely will continue to be, negatively affected by digital commerce and media.***

In recent years, we have experienced declining revenue (on a same-store basis). The majority of our revenue is from (i) advertising and marketing services and (ii) paid circulation (in each case, both in print and digital mediums). Print advertising alone accounted for approximately 37% of our total revenue as of December 31, 2019.

To date, our revenue declines have been driven primarily by a pronounced decline across all categories of print advertising revenue (national, local and classified) related to the rise of digital media and commerce. Media companies generally charge much lower rates for digital advertising than for print advertising due to the range of advertising choices across digital products and platforms and the large inventory of available digital advertising space, and mobile advertising rates typically are even lower than desktop digital rates. Additionally, brick-and-mortar businesses are significant consumers of print advertising and with the rise of digital commerce many of these types of businesses have, and continue to, close retail outlets, which adversely affects the demand for print advertising.

16

Circulation revenue has been affected to a lesser extent, but more marked future declines in circulation revenue are possible. Revenue from paid circulation is a function of the volume of subscribers and the price of subscriptions. In recent years, we have experienced significant declines in the number of subscribers to our newspapers, as a result of competition from digital media and the demographic shift of traditional print newspaper readers getting older while younger generations tend to consume media through digital platforms. We have also focused on growing the volume of digital subscribers, but there can be no assurance that we will be able to grow, or even retain, our current digital subscriber volume, especially at rates similar to the rates we are able to charge for our print products.

Declining subscriber volume can also lead to more marked declines in advertising revenue. Print subscriber volume declines directly impact preprint and other print revenues that are linked to number of subscribers. In terms of digital advertising revenues, news aggregation websites and customized news feeds (often free to users) reduce traffic on our websites and related digital advertising revenues. These types of websites also compete with us in selling digital only subscriptions to our websites which reduces our ability to monetize our content digitally. If traffic levels stagnate or decline, and/or print subscriber volume continues to decline, we may not be able to maintain or increase the advertising rates or attract new advertising customers.

We also generate revenue from a commercial printing and distribution business that manage printing and distribution of publications for third parties, which generated approximately 7% of our revenue in 2019. Our commercial and / or printing businesses could also be adversely affected by the same secular trends that are affecting our core advertising and circulation revenues. These third parties are experiencing the same print volume declines our business experiences and as such our commercial printing and distribution revenues could experience declines in the future. In addition, our relationships with these third parties are generally pursuant to short-term contracts, and a decision by any of the three largest national publications or the major local publications to cease publishing in those markets or seek alternatives to their current business practice of partnering with us could have an additional adverse effect on our revenue trends.

For all of the foregoing reasons, we may experience persistent declines in revenue, which could adversely affect our results of operations and financial condition, our ability to make distributions on our Common Stock and the market price of our Common Stock.

***We may be unsuccessful in our efforts to stabilize revenue trends.***

We have focused on offsetting traditional print advertising and circulation revenue declines in part by diversifying our sources of revenue through the development and acquisition of complementary businesses with growth potential. For example, our business UpCurve offers a suite of technology solutions to small- and medium-sized businesses (SMBs) and GateHouse Live produces local events. With the acquisition of Legacy Gannett, we expanded our digital marketing solutions businesses to include ReachLocal and WordStream.

There can be no assurance that we will be able to grow revenue from these or other complementary businesses we may develop internally or acquire, or that any revenue generated by new business lines will be adequate to offset revenue declines from our legacy businesses. For example, technological developments could adversely affect the availability, applicability, marketability and profitability of the suite of SMB services we offer. Technological developments and any changes we make to our business strategy may require significant capital investments, and such investments may be restricted by our current credit facility.

These complementary businesses also face competition from various digital media providers such as Google and Yahoo!, who may have more resources to invest in product development and marketing. Our salesforce may not be able to utilize the relationships we have throughout our local property network to effectively sell these products. If we are unable to diversify our traditional revenues with revenues from complementary businesses, we may experience persistent declines in revenue which could adversely affect our results of operations and financial condition, our ability to make distributions on our common stock and the market price of our common stock.

***Our ReachLocal business purchases most of its media from Google, and its business could be adversely affected if Google takes actions that are adverse to our interests or if we fail to meet advertiser or spend targets necessary for receiving rebates from Google. WordStream also derives significant revenue from customer spend on Google media. Similar actions from Yahoo!, Microsoft, Facebook and other media providers also could adversely affect these businesses.***

Most of ReachLocal and WordStream's cost of sales relates to the purchase of media, and a substantial majority of the media it purchases is from Google. In addition, a substantial portion of WordStream's revenue consists of rebates from Google for achieving certain advertiser or spend targets. Google accounts for a large majority of all U.S. searches, and Google's share

in foreign markets is often even greater. As a result, we expect our ReachLocal and WordStream businesses will depend upon media purchases and rebates from Google for the foreseeable future. This dependence makes that business vulnerable to actions Google may take to change the manner in which it sells AdWords, provides rebates to us, or conducts its business. In addition, any new developments or rumors of developments regarding Google's business practices that affect the local online advertising industry may adversely affect our products or create perceptions with clients that our ability to compete in the online marketing industry has been impaired. These risks also apply to other publishers with whom we do business, including Yahoo!, Facebook and Microsoft, though to a lesser degree.

### Risks Related to Macroeconomic Factors

***Our ability to generate revenue is highly sensitive to the strength of the economies in which we operate and the demographics of the local communities that we serve.***

Our advertising revenues and, to a lesser extent, circulation revenues, depend upon a variety of factors specific to the communities that our publications serve. These factors include, among others, the size and demographic characteristics of the local population, local economic conditions in general and the economic condition of the retail segments of the communities that our publications serve. If the local economy, population or prevailing retail environment of a community we serve experiences a downturn, our publications, revenues and profitability in that market could be adversely affected. Our advertising revenues are also susceptible to negative trends in the general economy that affect consumer spending. The advertisers in our newspapers and other publications and related websites are primarily retail businesses that can be significantly affected by regional or national economic downturns and other developments. For example, many traditional retail companies continue to face greater competition from online retailers and face uncertainty in their businesses, which has reduced and may continue to reduce their advertising spending. Declines in the U.S. economy could also significantly affect key advertising revenue categories, such as help wanted, real estate, and automotive.

***Uncertainty and adverse changes in the general economic conditions of markets in which we participate may negatively affect our business.***

Current and future conditions in the economy have an inherent degree of uncertainty. As a result, it is difficult to estimate the level of growth or contraction for the economy as a whole. It is even more difficult to estimate growth or contraction in various parts, sectors and regions of the economy, including the markets in which we participate. Adverse changes may occur as a result of weak global economic conditions, declining oil prices, wavering consumer confidence, unemployment, declines in stock markets, contraction of credit availability, declines in real estate values, natural disasters, or other factors affecting economic conditions in general. These changes may negatively affect the sales of our products, increase exposure to losses from bad debts, increase the cost and decrease the availability of financing, or increase costs associated with publishing and distributing our publications.

***The collectability of accounts receivable under adverse economic conditions could deteriorate to a greater extent than provided for in our financial statements and in our projections of future results.***

Adverse economic conditions in the U.S. may increase our exposure to losses resulting from financial distress, insolvency and the potential bankruptcy of our advertising customers. We recorded write-offs of accounts receivable relating to recent bankruptcies of national retailers, including Sears and Bon Ton, among others. Our accounts receivable is stated at net estimated realizable value, and our allowance for doubtful accounts has been determined based on several factors, including receivable agings, significant individual credit risk accounts and historical experience. If such collectability estimates prove inaccurate, adjustments to future operating results could occur.

### Risks Related to International Operations

***We may be unsuccessful in managing our international operations.***

Newsquest operates in the U.K., and ReachLocal has international sales operations in Australia, New Zealand and Canada, as well as campaign support services in India. Revenue from Newsquest accounted for 1.5% of our Publishing segment's total revenue for the year ended December 31, 2019. Revenue from international operations outside North America accounted for 1.8% of our Marketing Solutions segment's total revenue for the year ended December 31, 2019. Our ability to manage these international operations successfully is subject to numerous risks inherent in foreign operations, including:

- Challenges or uncertainties arising from unexpected legal, political, or systemic events;

- Difficulties or delays in developing a network of clients in international markets;

- Restrictions on the ability of U.S. companies to do business in foreign countries;

- Different legal or regulatory requirements, including with respect to internet services, privacy and data protection, censorship, banking and money transmitting, and selling, which may limit or prevent the offering of our products in some jurisdictions or otherwise harm our business;

- International intellectual property laws that may be insufficient to protect our intellectual property or permit us to successfully defend our intellectual property in international lawsuits;

- Different employee/employer relationships and the existence of workers' councils and labor unions, which could make it more difficult to terminate underperforming salespeople;

- Difficulties in staffing and managing foreign operations;

- Difficulties in accounts receivable collection;

- Currency fluctuations and price controls or other restrictions on foreign currency;

- Potential adverse tax consequences including difficulties in repatriating earnings generated abroad; and

- Lack of infrastructure to adequately conduct electronic commerce transactions.

Any of the foregoing factors could adversely impact our international operations, which could harm our overall business, operating results, and financial condition.

***Foreign exchange variability could materially and adversely affect our consolidated operating results.***

Our financial statements are denominated in U.S. dollars. Newsquest operates in the U.K., and its operations are conducted in foreign currency, primarily the British pound sterling. Weakening in the British pound sterling to U.S. dollar exchange rate has in the past, and could in the future, diminish Newsquest's contributions to our results of operations. In addition, ReachLocal conducts operations in several foreign jurisdictions. If the value of currency in any of those jurisdictions weakens as compared with the U.S. dollar, ReachLocal's operations in those jurisdictions similarly will contribute less to our results.

***The U.K. vote to leave the European Union could adversely impact our business, results of operations, and financial condition.***

The U.K. left the European Union on January 31, 2020 ("Brexit"). At this stage, the nature of the future relationship between the U.K. and the remaining European Union countries following Brexit has yet to be agreed, and negotiations with the European Union on the terms of Brexit have demonstrated the difficulties that exist in reaching such an agreement. Depending on the terms of the negotiations, the U.K. could also lose access to the single European Union market and to the global trade deals negotiated by the European Union on behalf of its members. Such a decline in trade could affect the attractiveness of the U.K. as a global investment center and, as a result, could have a detrimental impact on economic growth in the country. Furthermore, regardless of the form of any withdrawal agreement, there are likely to be changes in the legal rights and obligations of commercial parties across all industries following Brexit, and British regulatory requirements once outside the European Union could be subject to significant change. Any of the foregoing could result in an economic downturn in Newsquest's markets, which could depress the demand for our products and services.

***The potential enactment of a Digital Services Tax in the U.K. may impact future results.***

On July 11, 2019, Her Majesty's Treasury and Her Majesty's Revenue & Customs (HMRC) issued draft legislation describing the framework of a proposed Digital Services Tax (DST) in the United Kingdom. This tax would apply from April 1, 2020. The 2% DST would apply to gross revenue of specified digital business models deriving value from participation of their U.K.-based users. While the tax is intended to apply to search engines, social media platforms, and online marketplaces, it may be applied to online advertising when the users of our publications receive advertising based on their participation with the publication. If the DST is enacted, we may have to pay additional cash taxes which could adversely affect our results of operations, financial condition, and cash flows.

### Additional Risks Related to Our Business

***Our business is subject to seasonal and other fluctuations, which affects our revenues and operating results.***

Our business is subject to seasonal fluctuations that we expect to continue to be reflected in our operating results in future periods. Our first fiscal quarter of the year tends to be our weakest quarter because advertising volume is at its lowest levels

following the December holiday season. Correspondingly, our second and fourth fiscal quarters tend to be our strongest because they include heavy holiday and seasonal advertising. Other factors that affect our quarterly revenues and operating results may be beyond our control, including changes in the pricing policies of our competitors, the hiring and retention of key personnel, wage and cost pressures, distribution costs, changes in newsprint prices and general economic factors.

### *We could be adversely affected by an increase in the price of newsprint or a reduction in the availability of newsprint.*

A basic raw material for our publications is newsprint. We generally maintain a 45 to 55-day inventory of newsprint. An inability to obtain an adequate supply of newsprint at a favorable price or at all could have a material adverse effect on our ability to produce our publications. Recent and future consolidation of major newsprint suppliers may adversely affect price competition among suppliers. Tariffs, duties and other restrictions on non-U.S. suppliers of newsprint have increased and may in the future increase the price of newsprint and/or limit the supply of available newsprint. Significant increases in newsprint costs for properties and periods not covered by our newsprint vendor agreement could have a material adverse effect on our financial condition and results of operations.

### *The value of our intangible assets may become impaired, depending upon future operating results.*

At December 31, 2019 the carrying value of our goodwill was $914.3 million, the carrying value of mastheads was $178.6 million, and the carrying value of our amortizable intangible assets was $834.0 million. The indefinite-lived assets (goodwill and mastheads) are subject to annual impairment testing and more frequent testing upon the occurrence of certain events or significant changes in our circumstances that indicate all or a portion of their carrying values may no longer be recoverable, in which case a non-cash charge to earnings may be necessary in the relevant period. We may subsequently experience market pressures which could cause future cash flows to decline below our current expectations, or volatile equity markets could negatively impact market factors used in the impairment analysis, including earnings multiples, discount rates, and long-term growth rates. Any future evaluations requiring an asset impairment charge for goodwill or other intangible assets would adversely affect future reported results of operations and stockholders' equity.

We performed assessments for possible impairment of the carrying value of goodwill and indefinite-lived intangibles in connection with the Legacy Gannett acquisition and as of December 31, 2019. For the impairment assessments performed for the fourth quarter of 2019, the fair value of the Domestic Publishing and Marketing Solutions reporting units were less than 10% greater than the carrying value. Management assumptions used to calculate fair value of the reporting units involves forward looking financial information and subjectivity. Changes in key assumptions impacting the analyses could have resulted in the recognition of additional impairment. For further information on goodwill and intangible assets, see Note 6 — Goodwill and other intangible assets.

### *Failure to maintain effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on our business and stock price.*

As a public company, we are required to maintain effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002. Internal control over financial reporting is complex and may be revised over time to adapt to changes in our business, or changes in applicable accounting rules. We cannot assure you that our internal control over financial reporting will be effective in the future. We have previously discovered a material weakness with respect to a prior period for which we had previously believed that internal controls were effective. See "Our management and independent auditors have identified a material weakness in our internal control over financial reporting, and we may be unable to develop, implement and maintain appropriate controls in future periods, which may lead to errors or omissions in our financial statements" below. If we are not able to maintain or document effective internal control over financial reporting, our management and our independent registered public accounting firm will not be able to certify as to the effectiveness of our internal control over financial reporting. Matters impacting our internal controls may cause us to be unable to report our financial information on a timely basis or may cause us to restate previously issued financial information and thereby subject us to adverse regulatory consequences, including sanctions or investigations by the SEC, or violations of applicable stock exchange listing rules. There could also be a negative reaction in the financial markets due to a loss of investor confidence in us and the reliability of our financial statements. Confidence in the reliability of our financial statements is also likely to suffer if we or our independent registered public accounting firm reports a material weakness in our internal control over financial reporting. This could materially adversely affect us by, for example, a decline in our share price and impairing our ability to raise capital, if and when desirable.

***Our management and independent auditors have identified a material weakness in our internal control over financial reporting, and we may be unable to develop, implement and maintain appropriate controls in future periods, which may lead to errors or omissions in our financial statements.***

The Sarbanes-Oxley Act and related rules and regulations require that management report annually on the effectiveness of our internal control over financial reporting and assess the effectiveness of our disclosure controls and procedures on a quarterly basis. Maintaining and adapting our internal controls is expensive and requires significant management attention. Moreover, as we continue to grow, our internal controls may become more complex and require additional resources to ensure they remain effective amid dynamic regulatory and other guidance.

As described in Item 9A, "Controls and Procedures" of this 2019 Form 10-K, we concluded that our disclosure controls and procedures were not effective as of December 31, 2019 and that we had, as of such date, a material weakness in our internal control over financial reporting related to internal control deficiencies over the revenue recognition process; specifically, the Company did not maintain effective controls due to the aggregation of control deficiencies related to inadequate manual preventative and detective controls and information technology general controls. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements would not be prevented or detected on a timely basis. This material weakness identified did not result in any adjustments or restatements of our audited and unaudited consolidated financial statements or disclosures for any prior period previously reported by the Company. However, until the material weakness is remediated and our associated disclosure controls and procedures improved, or if additional material weaknesses or significant deficiencies in our internal control over financial reporting occur in the future, our future consolidated financial statements or other information filed with the SEC may contain material misstatements.

We are in the process of remediating the material weakness, but our efforts may not be successful. If we are unable to remediate the material weakness in an appropriate and timely manner, or if we identify additional control deficiencies that individually or together constitute significant deficiencies or material weaknesses, our ability to accurately record, process, and report financial information and consequently, our ability to prepare financial statements within required time periods, could be adversely affected. Failure to maintain effective internal control over financial reporting could result in violations of applicable securities laws, stock exchange listing requirements, and the covenants under our debt agreements, subject us to litigation and investigations, negatively affect investor confidence in our financial statements, and adversely impact our stock price and ability to access capital markets.

We are evaluating and developing a plan, which will include the implementation of appropriate processes and controls to remediate the material weakness described above. While we work toward the design and implementation of these processes and controls, we may rely significantly on manual procedures to assist us with meeting the objectives otherwise fulfilled by an effective control environment. The implementation of new procedures and controls could be costly and distract management from other activities.

***We may not be able to protect intellectual property rights upon which our business relies and, if we lose intellectual property protection, our assets may lose value.***

Our business depends on our intellectual property, including, but not limited to, our titles, mastheads, content and proprietary software, which we may attempt to protect through patents, copyrights, trade laws and contractual restrictions, such as confidentiality agreements. We believe our proprietary and other intellectual property rights are important to our success and our competitive position.

Despite our efforts to protect our proprietary rights, unauthorized third parties may attempt to copy or otherwise obtain and use our content, services and other intellectual property, and we cannot be certain that the steps we have taken will prevent any misappropriation or confusion among consumers and merchants, or unauthorized use of these rights. If we are unable to procure, protect and enforce our intellectual property rights, we may not realize the full value of these assets, and our business may suffer. If we must litigate to enforce our intellectual property rights or determine the validity and scope of the proprietary rights of third parties, such litigation may be costly and divert the attention of our management from day-to-day operations.

***We are subject to environmental and employee safety and health laws and regulations that could cause us to incur significant compliance expenditures and liabilities.***

Our operations are subject to federal, state and local laws and regulations pertaining to the environment, storage tanks and the management and disposal of wastes at our facilities. Under various environmental laws, a current or previous owner or operator of real property may be liable for contamination resulting from the release or threatened release of hazardous or toxic substances or petroleum at that property. Such laws often impose liability on the owner or operator without regard to fault, and the costs of any required investigation or cleanup can be substantial. Although in connection with certain of our acquisitions we have rights to indemnification for certain environmental liabilities, these rights may not be sufficient to reimburse us for all losses that we might incur if a property acquired by us has environmental contamination. In addition, although in connection with certain of our acquisitions we have obtained insurance policies for coverage for certain potential environmental liabilities, these policies have express exclusions to coverage as well as express limits on amounts of coverage and length of term. Accordingly, these insurance policies may not be sufficient to provide coverage for us for all losses that we might incur if a property acquired by us has environmental contamination.

Our operations are also subject to various employee safety and health laws and regulations, including those pertaining to occupational injury and illness, employee exposure to hazardous materials and employee complaints. Environmental and employee safety and health laws tend to be complex, comprehensive and frequently changing. As a result, we may be involved from time to time in administrative and judicial proceedings and investigations related to environmental and employee safety and health issues. These proceedings and investigations could result in substantial costs to us, divert our management's attention and adversely affect our ability to sell, lease or develop our real property. Furthermore, if it is determined that we are not in compliance with applicable laws and regulations, or if our properties are contaminated, it could result in significant liabilities, fines or the suspension or interruption of the operations of specific printing facilities.

Future events, such as changes in existing laws and regulations, new laws or regulations or the discovery of conditions not currently known to us, may give rise to additional compliance or remedial costs that could be material.

***Our possession and use of personal information and the use of payment cards by our customers present risks and expenses that could harm our business. Unauthorized access to or disclosure or manipulation of such data, whether through breach of our network security or otherwise, could expose us to liabilities and costly litigation and damage our reputation.***

Our online systems store and process confidential subscriber and other sensitive data, such as names, email addresses, addresses, and other personal information. Therefore, maintaining our network security is critical. Additionally, we depend on the security of our third-party service providers. Unauthorized use of or inappropriate access to our, or our third-party service providers' networks, computer systems and services could potentially jeopardize the security of confidential information, including payment card (credit or debit) information, of our customers. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and often are not recognized until launched against a target, we or our third-party service providers may be unable to anticipate these techniques or to implement adequate preventative measures. Non-technical means, for example, actions by an employee, can also result in a data breach. A party that is able to circumvent our security measures could misappropriate our proprietary information or the information of our customers or users, cause interruption in our operations, or damage our computers or those of our customers or users. As a result of any such breaches, customers or users may assert claims of liability against us and these activities may subject us to legal claims, adversely impact our reputation, and interfere with our ability to provide our products and services, all of which may have an adverse effect on our business, financial condition and results of operations. The coverage and limits of our insurance policies may not be adequate to reimburse us for losses caused by security breaches.

A significant number of our customers authorize us to bill their payment card accounts directly for all amounts charged by us. These customers provide payment card information and other personally identifiable information which, depending on the particular payment plan, may be maintained to facilitate future payment card transactions. Under payment card rules and our contracts with our card processors, if there is a breach of payment card information that we store, we could be liable to the banks that issue the payment cards for their related expenses and penalties. In addition, if we fail to follow payment card industry data security standards, even if there is no compromise of customer information, we could incur significant fines or lose our ability to give our customers the option of using payment cards. If we were unable to accept payment cards, our business would be seriously harmed.

There can be no assurance that any security measures we, or our third-party service providers, take will be effective in preventing a data breach. We may need to expend significant resources to protect against security breaches or to address problems caused by breaches. If an actual or perceived breach of our security occurs, the perception of the effectiveness of our

security measures could be harmed and we could lose customers or users. Failure to protect confidential customer data or to provide customers with adequate notice of our privacy policies could also subject us to liabilities imposed by United States federal and state regulatory agencies or courts. We could also be subject to evolving state laws that impose data breach notification requirements, specific data security obligations, or other consumer privacy-related requirements. Our failure to comply with any of these laws or regulations may have an adverse effect on our business, financial condition and results of operations.

### *We could incur significant liability if the separation of Legacy Gannett from its former parent were determined to be a taxable transaction.*

In connection with the separation of Legacy Gannett from its former parent, Legacy Gannett's former parent received an opinion from outside tax counsel to the effect that the requirements for tax-free treatment under Section 355 of the Code would be satisfied. The opinion relied on certain facts, assumptions, representations, and undertakings from our former parent and us regarding the past and future conduct of the companies' respective businesses and other matters. If any of these facts, assumptions, representations, or undertakings were incorrect or not satisfied, we and our stockholders may not be able to rely on the opinion of tax counsel and could be subject to significant tax liabilities. Further, notwithstanding the opinion of tax counsel, the IRS could determine upon audit that the separation is taxable if it determines that any of these facts, assumptions, representations, or undertakings were incorrect or violated, if it disagrees with the conclusions in the opinion, or for other reasons, including as a result of certain significant changes in the share ownership of Legacy Gannett or its former parent after the separation. If the separation were determined to be taxable for U.S. federal income tax purposes, Legacy Gannett's former parent and its stockholders that are subject to U.S. federal income tax could incur significant U.S. federal income tax liabilities, and we could incur significant liabilities.

### *The Internal Revenue Service may disallow all or part of a worthless stock loss and bad debt deduction.*

The IRS could challenge an election made in 2017 to treat one of our ReachLocal international subsidiaries as a disregarded entity for U.S. federal income tax purposes, which resulted in worthless stock and bad debt deductions of $101.0 million, yielding a tax benefit of $32.0 million. These tax deductions are subject to audit and possible adjustment by the IRS, which could result in the reversal of all or part of the income tax benefit. To account for this uncertainty, a reserve of $11.0 million has been established to reduce the benefit to an estimated realizable value of $21.0 million. While we believe this represents our best estimate of the benefit to be realized upon final acceptance of our tax return, the IRS could reject or reduce the amount of tax benefit related to these deductions. If the IRS rejects or reduces the amount of this income tax benefit, we may have to pay additional cash income taxes, which could adversely affect our results of operations, financial condition, and cash flows. We cannot guarantee what the ultimate outcome or amount of the benefit we receive, if any, will be.

### *We may not be able to generate future taxable income which may prevent our realization of deferred tax assets.*

We have released valuation allowance of $46.9 million relating to federal deferred tax assets. If we do not have taxable income in future years, we may be required to reestablish a valuation allowance against our federal deferred tax assets.

### Risks Related to Pension Obligations and Employees

### *We are required to use a portion of our cash flows to make contributions to our pension plans, which diverts cash flow from operations, and the amount of required future contributions may be difficult to estimate.*

We, along with our subsidiaries, sponsor various defined benefit retirement plans, including plans established under collective bargaining agreements. Our retirement plans include (i) the Gannett Retirement Plan (GRP), (ii) the Gannett 2015 Supplemental Retirement Plan, (iii) the Newsquest Pension Scheme in the U.K., (iv) the Newspaper Guild of Detroit Pension Plan, (v) a supplemental retirement plan we assumed pursuant to our acquisition of JMG, (vi) the George W. Prescott pension plan, and (vii) The Times Publishing Company pension plan.

Our pension plans invest in a variety of equity and debt securities. Future volatility and disruption in the equity and bond markets could cause declines in the asset values of our pension plans. For many of our retirement plans, our pension benefit obligations exceed the value of pension assets. As of December 31, 2019, our retirement plans were underfunded by a total of $116.9 million on a U.S. GAAP basis.

The excess of pension benefit obligations over assets is expected to give rise to required pension contributions over the next several years. We have committed to make a contribution of $35.8 million to the GRP in 2020, as well as a $15.0 million contribution in 2021. We expect to contribute approximately $26.3 million to the U.K. Pension Plans in 2020, and $24.3

million in 2021. Our ability to make contribution payments will depend on our future cash flows, which are subject to general economic, financial, competitive, business, legislative, regulatory, and other factors beyond our control. Various factors, including future investment returns, interest rates, and potential pension legislative changes, may impact the timing and amount of future pension contributions. In addition, decreases in the discount rate used to determine minimum funding requirements could result in increased future contributions. As a result, we may need to make additional pension contributions above what is currently estimated, which could reduce the cash available for our businesses.

***We depend on key personnel and we may not be able to operate or grow our business effectively if we lose the services of any of our key personnel or are unable to attract qualified personnel in the future.***

The success of our business is heavily dependent on our ability to retain our management and other key personnel and to attract and retain qualified personnel in the future. Competition for senior management personnel is intense, and we may not be able to retain our key personnel. Although we have entered into employment agreements with certain of our key personnel, these agreements do not ensure that our key personnel will continue in their present capacity with us for any particular period of time. We do not have key man insurance for any of our current management or other key personnel. The loss of any key personnel would require our remaining key personnel to divert immediate and substantial attention to seeking a replacement. An inability to find a suitable replacement for any departing executive officer on a timely basis could adversely affect our ability to operate or grow our business. On January 6, 2020, we announced that our Chief Financial Officer will resign as of the end of the first quarter of 2020. There can be no assurance that we will be able to find a suitable replacement in a timely manner.

***A shortage of skilled or experienced employees in the media industry, or our inability to retain such employees, could pose a risk to achieving improved productivity and reducing costs, which could adversely affect our profitability.***

Production and distribution of our various publications requires skilled and experienced employees. A shortage of such employees, or our inability to retain such employees, could have an adverse impact on our productivity and costs, our ability to expand, develop and distribute new products and our entry into new markets. The cost of retaining or hiring such employees could exceed our expectations which could adversely affect our results of operations.

***A number of our employees are unionized, and our business and results of operations could be adversely affected if current or additional labor negotiations or contracts were to further restrict our ability to maximize the efficiency of our operations.***

As of December 31, 2019, we employed 21,255 employees, of whom 2,807 (or approximately 13%) were represented by seven unions. 51% of the unionized employees are in four states: Michigan, Ohio, Wisconsin and Indiana and represent 15%, 12%, 13% and 11% of all our union employees, respectively.

Although our newspapers have not experienced a union strike in the recent past nor do we anticipate a union strike to occur, we cannot preclude the possibility that a strike may occur at one or more of our newspapers at some point in the future. We believe that, in the event of a newspaper strike, we would be able to continue to publish and deliver to subscribers, which is critical to retaining advertising and circulation revenues, although there can be no assurance of this. Further, settlement of actual or threatened labor disputes or an increase in the number of our employees covered by collective bargaining agreements can have unknown effects on our labor costs, productivity and flexibility.

***Sustained increases in costs of employee health and welfare benefits may reduce our profitability.***

In recent years, we have experienced significant increases in the cost of employee benefits because of economic factors beyond our control, including increases in health care costs. At least some of these factors may continue to put upward pressure on the cost of providing medical benefits. Although we have actively sought to control increases in these costs, there can be no assurance that we will succeed in limiting cost increases, and continued upward pressure could reduce the profitability of our businesses.

### Risks Related to Our Manager

***The inability of our Manager to retain or obtain key personnel could delay or hinder implementation of our investment strategies, which could impair our ability to make distributions and could reduce the value of your investment.***

Our Chief Executive Officer and certain other individuals who perform services for us are employees of our Manager. We are reliant on our Manager, which has significant discretion as to the implementation of our operating policies and strategies, to

24

conduct our business. We are dependent on the services of certain key employees of our Manager whose compensation may be partially or entirely dependent upon the amount of incentive or management compensation earned by our Manager and whose continued service is not guaranteed, and the loss of such services could adversely affect our operations. If any of these people were to cease their affiliation with us or our Manager, either we or our Manager may be unable to find suitable replacements, and our operating results could suffer.

***Because we are dependent upon our Manager and its affiliates to conduct our operations, any adverse changes in the financial health of our Manager or its affiliates, or in our relationship with them, could hinder our Manager's ability to successfully manage our operations.***

We are dependent on our Manager and its affiliates to manage our operations and acquire and manage our investments. Under the direction of our Board of Directors, our Manager makes decisions with respect to the management of our company. To conduct its operations, our Manager depends upon the fees and other compensation that it receives from us in connection with managing our company and from other entities and investors with respect to investment management services it provides. Any adverse changes in the financial condition of our Manager or its affiliates, or our relationship with our Manager, could hinder our Manager's ability to successfully manage our operations, which could materially adversely affect our business, results of operations, financial condition and ability to make distributions to our stockholders. For example, adverse changes in the financial condition of our Manager could limit its ability to attract key personnel.

***There are conflicts of interest in our relationship with our Manager.***

Our Management Agreement with our Manager was not negotiated between unaffiliated parties, and its terms, including fees payable, may not be as favorable to us as if they had been negotiated with an unaffiliated third party.

There are conflicts of interest inherent in our relationship with our Manager insofar as our Manager and its affiliates-including investment funds, private investment funds, or businesses managed by our Manager-invest in media assets and whose investment objectives may overlap with our investment objectives. Certain investments appropriate for us may also be appropriate for one or more of these other investment vehicles. Certain members of our Board of Directors and employees of our Manager who may also be our officers also serve as officers and/or directors of these other entities. Although we have the same Manager, we may compete with entities affiliated with our Manager or Fortress for certain target assets. From time to time, affiliates of Fortress may focus on investments in assets with a similar profile as our target assets that we may seek to acquire. These affiliates may have meaningful purchasing capacity, which may change over time depending upon a variety of factors, including, but not limited to, available equity capital and debt financing, market conditions and cash on hand. In addition, with respect to Fortress funds in the process of selling investments, our Manager may be incentivized to regard the sale of such assets to us positively, particularly if a sale to an unrelated third party would result in a loss of fees to our Manager.

Our Management Agreement with our Manager does not prevent our Manager or any of its affiliates, or any of their officers and employees, from engaging in other businesses or from rendering services of any kind to any other person or entity, including investment in, or advisory service to others investing in, any type of media or media related investment, including investments that meet our principal investment objectives. Our Manager may engage in additional investment opportunities related to media assets in the future, which may cause our Manager to compete with us for investments or result in a change in our current investment strategy. In addition, our certificate of incorporation provides that if Fortress or an affiliate or any of their officers, directors or employees acquire knowledge of a potential transaction or matter that may be a corporate opportunity, they have no duty, to the fullest extent permitted by law, to offer such corporate opportunity to us, our stockholders or our affiliates. In the event that any of our directors and officers who is also a director, officer or employee of Fortress or its affiliates acquires knowledge of a corporate opportunity or is offered a corporate opportunity, provided that this knowledge was not acquired solely in such person's capacity as a director or officer of ours and such person acts in good faith, then to the fullest extent permitted by law such person is deemed to have fully satisfied such person's fiduciary duties owed to us and is not liable to us if Fortress or its affiliates pursues or acquires the corporate opportunity or if such person did not present the corporate opportunity to us.

The ability of our Manager and its officers and employees to engage in other business activities, subject to the terms of our Management Agreement with our Manager, may reduce the amount of time that our Manager, its officers or other employees spend managing us. In addition, we may engage in material transactions with our Manager or another entity managed by our Manager or one of its affiliates, which may present an actual, potential or perceived conflict of interest. It is possible that actual, potential or perceived conflicts could give rise to investor dissatisfaction, litigation or regulatory enforcement actions. Appropriately dealing with conflicts of interest is complex and difficult, and our reputation could be damaged if we fail, or appear to fail, to deal appropriately with one or more potential, actual or perceived conflicts of interest. Regulatory scrutiny of, or litigation in connection with, conflicts of interest could have a material adverse effect on our reputation, which could

materially adversely affect our business in a number of ways, including causing an inability to raise additional funds, a reluctance of counterparties to do business with us, a decrease in the prices of our equity securities and a resulting increased risk of litigation and regulatory enforcement actions.

The management compensation structure that we have agreed to with our Manager, as well as compensation arrangements that we may enter into with our Manager in the future (in connection with new lines of business or other activities), may incentivize our Manager to invest in high risk investments. In addition to its management fee, our Manager is currently entitled to receive incentive compensation. In evaluating investments and other management strategies, the opportunity to earn incentive compensation may lead our Manager to place undue emphasis on the maximization of such measures at the expense of other criteria, such as preservation of capital, in order to achieve higher incentive compensation. Investments with higher yield potential are generally riskier or more speculative than lower-yielding investments.

***Our Board of Directors does not approve each investment decision made by our Manager. In addition, we may change our investment strategy without a stockholder vote, which may result in our making investments that are different, riskier or less profitable than our current investments.***

Our Manager has great latitude in determining the types and categories of assets it may decide are proper investments for us, including the latitude to invest in types and categories of assets that may differ from those in which we currently invest. Our Board of Directors periodically reviews our investment portfolio. However, our Board of Directors does not review or pre-approve each proposed investment or our related financing arrangements. In addition, in conducting periodic reviews, our Board of Directors relies primarily on information provided to them by our Manager. Furthermore, transactions entered into by our Manager may be difficult or impossible to unwind by the time they are reviewed by our Board of Directors even if the transactions contravene the terms of the Management Agreement. In addition, we may change our investment strategy, including our target asset classes, without a stockholder vote.

Our investment strategy may evolve in light of existing market conditions and investment opportunities, and this evolution may involve additional risks depending upon the nature of the assets in which we invest and our ability to finance such assets on a short- or long-term basis. Investment opportunities that present unattractive risk-return profiles relative to other available investment opportunities under particular market conditions may become relatively attractive under changed market conditions, and changes in market conditions may therefore result in changes in the investments we target. Decisions to make investments in new asset categories present risks that may be difficult for us to adequately assess and could therefore reduce our ability to pay dividends on our common stock or have adverse effects on our liquidity or financial condition. A change in our investment strategy may also increase our exposure to interest rate, real estate market or credit market fluctuations. In addition, a change in our investment strategy may increase the guarantee obligations we agree to incur or increase the number of transactions we enter into with affiliates. Our failure to accurately assess the risks inherent in new asset categories or the financing risks associated with such assets could adversely affect our results of operations and our financial condition.

***Our Manager will not be liable to us for any acts or omissions performed in accordance with the Management Agreement, including with respect to the performance of our investments.***

Pursuant to our Management Agreement, our Manager assumes no responsibility other than to render the services called for thereunder in good faith and shall not be responsible for any action of our Board of Directors in following or declining to follow its advice or recommendations. Our Manager, its members, managers, officers and employees will not be liable to us or any of our subsidiaries, to our Board of Directors, or our or any subsidiary's stockholders or partners for any acts or omissions by our Manager, its members, managers, officers or employees, except by reason of acts constituting bad faith, willful misconduct, gross negligence or reckless disregard of our Manager's duties under our Management Agreement. We shall, to the full extent lawful, reimburse, indemnify and hold our Manager, its members, managers, officers and employees, and each other person, if any, controlling our Manager, harmless of and from any and all expenses, losses, damages, liabilities, demands, charges and claims of any nature whatsoever (including attorneys' fees) in respect of or arising from any acts or omissions of an indemnified party made in good faith in the performance of our Manager's duties under our Management Agreement and not constituting such indemnified party's bad faith, willful misconduct, gross negligence or reckless disregard of our Manager's duties under our Management Agreement.

***Our Manager's due diligence of investment opportunities or other transactions may not identify all pertinent risks, which could materially affect our business, financial condition, liquidity and results of operations.***

Our Manager intends to conduct due diligence with respect to each investment opportunity or other transaction it pursues. It is possible, however, that our Manager's due diligence processes will not uncover all relevant facts, particularly with respect to any assets we acquire from third parties. In these cases, our Manager may be given limited access to information about the

investment and will rely on information provided by the target of the investment. In addition, if investment opportunities are scarce, the process for selecting bidders is competitive, or the timeframe in which we are required to complete diligence is short, our ability to conduct a due diligence investigation may be limited, and we would be required to make investment decisions based upon a less thorough diligence process than would otherwise be the case. Accordingly, investments and other transactions that initially appear to be viable may prove not to be over time, due to the limitations of the due diligence process or other factors.

**Risks Related to our Common Stock**

*There can be no assurance that the market for our stock will provide adequate liquidity.*

The market price of our common stock may fluctuate widely, depending upon many factors, some of which may be beyond our control. These factors include, without limitation:

- Our business profile and market capitalization may not fit the investment objectives of any stockholder;

- A shift in our investor base;

- Our quarterly or annual earnings, or those of other comparable companies;

- Actual or anticipated fluctuations in our operating results;

- Changes in accounting standards, policies, guidance, interpretations or principles;

- Announcements by us or our competitors of significant investments, acquisitions or dispositions;

- The failure of securities analysts to cover our Common Stock;

- Changes in earnings estimates by securities analysts or our ability to meet those estimates;

- The operating and stock price performance of other comparable companies;

- Negative public perception of us, our competitors, or industry;

- Overall market fluctuations; and

- General economic conditions.

Stock markets in general and recently have experienced volatility that has often been unrelated to the operating performance of a particular company. These broad market fluctuations may adversely affect the trading price of our Common Stock. Additionally, these and other external factors have caused and may continue to cause the market price and demand for our Common Stock to fluctuate, which may limit or prevent investors from readily selling their shares of Common Stock and may otherwise negatively affect the liquidity of our common stock.

*Sales or issuances of shares of our common stock could adversely affect the market price of our Common Stock.*

Sales or issuances of substantial amounts of shares of our Common Stock in the public market, or the perception that such sales or issuances might occur, could adversely affect the market price of our Common Stock. The issuance of our common stock in connection with property, portfolio or business acquisitions or the settlement of awards that may be granted under our Incentive Plans (as defined below) or otherwise could also have an adverse effect on the market price of our Common Stock.

*We may not be able to pay dividends in accordance with our announced intent or at all.*

We have announced our intent to distribute a portion of our free cash flow generated from operations or other sources as a quarterly dividend to the holders of our Common Stock, subject to satisfactory financial performance, approval by our Board of Directors and restrictions in our credit facility.

Under our credit facility, we are prohibited from paying cash dividends until after the thirtieth day of the second full fiscal quarter after the closing of the Legacy Gannett acquisition (i.e., April 30), and after such date, we can only pay cash dividends up to an agreed-upon amount, provided the ratio of consolidated debt to EBITDA (as such terms are defined in the credit facility) does not exceed a specified ratio. For these and other reasons generally affecting the ability to pay dividends, our stockholders will not receive dividends in an amount equal to the amount paid prior to the acquisition. Stockholders also should be aware that they have no contractual or other legal right to dividends that have not been declared.

The Board of Directors' determinations regarding dividends will depend on a variety of factors, including the Company's GAAP net income, free cash flow generated from operations or other sources, liquidity position and potential alternative uses of

cash, such as acquisitions, as well as economic conditions and expected future financial results. There can be no guarantee regarding the timing and amount of any dividends. Our ability to declare future dividends will depend on our future financial performance, which in turn depends on the successful implementation of our strategy and on financial, competitive, regulatory, technical and other factors, general economic conditions, demand and selling prices for our products and other factors specific to our industry or specific projects, many of which are beyond our control. Therefore, our ability to generate free cash flow depends on the performance of our operations and could be limited by decreases in our profitability or increases in costs, capital expenditures or debt servicing requirements.

**The percentage ownership of our existing stockholders may be diluted in the future.**

We have issued and may continue to issue equity in order to raise capital or in connection with future acquisitions and strategic investments, which would dilute investors' percentage ownership in Gannett. In addition, your percentage ownership may be diluted if we issue equity instruments such as debt and equity financing.

The percentage ownership of our existing stockholders may also be diluted in the future as result of the issuance of ordinary shares in Gannett upon the exercise of 10-year warrants (the "Gannett Warrants"). The Gannett Warrants collectively represent the right to acquire Gannett Common Stock, which in the aggregate are equal to 5% of Gannett Common Stock outstanding as of November 26, 2013 (calculated prior to dilution from shares of Gannett Common Stock issued pursuant to Drive Shack Inc.'s (formerly known as Newcastle Investment Corp.) contribution of Local Media Group Holdings LLC and assignment of related stock purchase agreement to Gannett (the "Local Media Contribution")) at a strike price of $46.35 calculated based on a total equity value of Gannett prior to the Local Media Contribution of $1.2 billion as of November 26, 2013. As a result, Gannett Common Stock may be subject to dilution upon the exercise of such Gannett Warrants. As of December 31, 2019, the Gannett Warrants are equal to 1% of Gannett Common Stock outstanding as of December 31, 2019 at a strike price of $46.35.

Furthermore, the percentage ownership in Gannett may be diluted in the future because of options issued to our Manager. As of December 31, 2019, there are 6,068,075 options outstanding at a weighted average exercise price of $14.70.

Dilution may also result from the issuances of shares under our equity compensation plans (our "Incentive Plans"), which provide for the grant of equity and equity-based awards, including restricted stock, stock options, stock appreciation rights, performance awards, and other equity-based and non-equity based awards, in each case to our directors, officers, employees, among others. As of December 31, 2019, the number of shares reserved for issuance under our Incentive Plans was 15.0 million.

**Provisions in our amended and restated certificate of incorporation and amended and restated bylaws and of Delaware law may prevent or delay an acquisition of our company, which could decrease the trading price of our Common Stock.**

Our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law contain provisions that are intended to deter coercive takeover practices and inadequate takeover bids by making such practices or bids unacceptably expensive to the raider and to encourage prospective acquirers to negotiate with our Board rather than to attempt a hostile takeover. These provisions provide for:

- Amendment of provisions in our amended and restated certificate of incorporation and amended and restated bylaws regarding the election of directors, classes of directors, the term of office of directors, the filling of director vacancies and the resignation and removal of directors only upon the affirmative vote of at least 80% of the then issued and outstanding shares of our capital stock entitled to vote thereon;

- Amendment of provisions in our amended and restated certificate of incorporation regarding corporate opportunity only upon the affirmative vote of at least 80% of the then issued and outstanding shares of our capital stock entitled to vote thereon;

- Removal of directors only for cause and only with the affirmative vote of at least 80% of the voting interest of stockholders entitled to vote in the election of directors;

- Our Board to determine the powers, preferences and rights of our preferred stock and to issue such preferred stock without stockholder approval;

- Provisions in our amended and restated certificate of incorporation and amended and restated bylaws prevent stockholders from calling special meetings of our stockholders;

- Advance notice requirements applicable to stockholders for director nominations and actions to be taken at annual meetings;

28

- A prohibition, in our amended and restated certificate of incorporation, stating that no holder of shares of our Common Stock will have cumulative voting rights in the election of directors, which means that the holders of majority of the issued and outstanding shares of our Common Stock can elect all the directors standing for election; and

- Action by our stockholders outside a meeting, in our amended and restated certificate of incorporation and our amended and restated bylaws, only by unanimous written consent.

Public stockholders who might desire to participate in these types of transactions may not have an opportunity to do so, even if the transaction is considered favorable to stockholders. These anti-takeover provisions could substantially impede the ability of public stockholders to benefit from a change in control or a change in our management and Board and, as a result, may adversely affect the market price of our Common Stock and your ability to realize any potential change of control premium.

***We are not required to repurchase our common stock, and any such repurchases may not result in effects we anticipated.***

We have authorization from our Board of Directors to repurchase up to $100 million of the Company's common stock through May 19, 2020, subject to certain restrictions in the Company's Credit Facility. We are not obligated to repurchase any specific amount of shares. The timing and amount of repurchases, if any, depends on several factors, including market and business conditions, the market price of shares of our common stock and our overall capital structure and liquidity position, including the nature of other potential uses of cash, not limited to investments in growth. There can be no assurance that any repurchases will have the effects we anticipated, and our repurchases will utilize cash that we will not be able to use in other ways, whether to grow the business or otherwise.

ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

ITEM 2. PROPERTIES

Our corporate headquarters are in McLean, VA, where we lease approximately 175,758 square feet. The lease provides for an initial term of 15 years with two five-year renewal options. We also have executive offices located in Pittsford, NY, where we lease approximately 25,870 square feet under a lease terminating in October 2022.

Our domestic facilities occupy approximately 13.3 million square feet in the aggregate, of which approximately 4.4 million square feet is leased from third parties. Many of our local media organizations also have outside news bureaus, sales offices, and distribution centers that are leased from third parties. A listing of publishing centers and key locations may be found in the Major Publications and Markets We Serve section of Item 1. Business. We own some of the plants that house most aspects of the publication process but in certain locations have outsourced printing or combined the printing of multiple publications.

Newsquest, our subsidiary headquartered in London, occupies approximately 1.2 million square feet in the U.K. spread over 80 locations. Of this, 0.3 million square feet (or 47 locations) are leased from third parties. Newsquest's owned premises include four printing facilities. A fifth printing facility is leased.

ReachLocal, our subsidiary headquartered in Woodland Hills, CA, has sales and other offices in 23 locations in 14 states - California, Colorado, Florida, Georgia, Louisiana, Maryland, Massachusetts, Minnesota, New York, North Carolina, Pennsylvania, Texas, Virginia, and Washington. Our UpCurve subsidiary has sales and other offices in six locations across five states - California, Colorado, Massachusetts, New Jersey, and New York. In addition, ReachLocal has 7 locations in four additional countries - Australia, Canada, India, and New Zealand. These properties, which total approximately 52,203 square feet, include leased buildings and data centers. Excluded from total square footage but included in location counts are serviced office spaces.

All of our material real properties owned by our material domestic subsidiaries are mortgaged as collateral for our Apollo term loan. We believe our current facilities, including the terms and conditions of the relevant lease agreements, are adequate to operate our businesses as currently conducted.

ITEM 3. LEGAL PROCEEDINGS

Information regarding legal proceedings in connection with acquisition of Legacy Gannett may be found in Note 12 — Commitments, contingencies, and other matters of the notes to consolidated financial statements, which is incorporated herein by reference.

We are and may become involved from time to time in legal proceedings in the ordinary course of our business, including but not limited to with respect to such matters as libel, invasion of privacy, intellectual property infringement, wrongful termination actions and complaints alleging employment discrimination, and regulatory investigations and inquiries. In addition, we are involved from time to time in governmental and administrative proceedings concerning employment, labor, environmental and other claims. Insurance coverage mitigates potential loss for certain of these matters. Historically, such claims and proceedings have not had a material adverse effect on our consolidated results of operations or financial position. Although we are unable to predict with certainty the eventual outcome of any litigation, regulatory investigation or inquiry, in the opinion of management, we do not expect our current and any threatened legal proceedings to have a material adverse effect on our business, financial position or consolidated results of operations. Given the inherent unpredictability of these types of proceedings, however, it is possible that future adverse outcomes could have a material effect on our financial results.

ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

**PART II**

ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our common stock trades on the New York Stock Exchange (the "NYSE") under the trading symbol "GCI". As of February 26, 2020, there were approximately 4,771 holders of record.

**Dividends**

Gannett currently intends to distribute a portion of free cash flow generated from operations and other sources as a dividend to stockholders, through a quarterly dividend, subject to satisfactory financial performance, Board approval, and dividend restrictions in the Gannett Credit Agreement. The Board of Directors' determinations regarding dividends will depend on a variety of factors, including the Company's U.S. generally accepted accounting principles ("GAAP") net income, free cash flow generated from operations or other sources, liquidity position, and potential alternative uses of cash such as acquisitions, as well as economic conditions and expected future financial results.

*Issuer Purchases of Equity Securities*

The following information describes the Company's stock repurchases during the fourth quarter of the year ended December 31, 2019.

| Period | Total Number of Shares Purchased | | Weighted-Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plan or Programs | Approximate Number of Shares that May Yet Be Purchased Under the Plan or Programs |
|---|---|---|---|---|---|
| September 30, 2019 through October 27, 2019 | 464 | [1] | $ 9.10 | — | 11,359,334 |
| October 28, 2019 through November 24, 2019 | 43,478 | [1] | $ 6.70 | — | 14,764,152 |
| November 25, 2019 through December 31, 2019 | — | | $ — | — | 15,014,152 |
| Total | 43,942 | | | — | |

[1] Pursuant to the "withhold to cover" method for collecting and paying withholding taxes for our employees upon the vesting of restricted securities, we withheld from certain employees the shares noted in the table above to cover such statutory minimum tax withholdings. These transactions took place outside of a publicly-announced repurchase plan. The weighted-average price per share listed in the above table is the weighted-average of the fair market prices at which we calculated the number of shares withheld to cover tax withholdings for the employees.

ITEM 6. SELECTED FINANCIAL DATA

The following table presents our selected historical financial data as of and for each of the years in the five-year period ended December 31, 2019. The information in this table should be read in conjunction with the information under "Management's Discussion and Analysis of Financial Condition and Results of Operations", "Business" and our historical consolidated financial statements and the related notes thereto included elsewhere in this report.

| | Year Ended | | | | |
|---|---|---|---|---|---|
| in thousands, except share data | December 31, 2019 [1] | December 30, 2018 | December 31, 2017 [3] | December 25, 2016 | December 27, 2015 |
| **Statement of Operations Data:** | | | | | |
| Revenues: | | | | | |
| Advertising and marketing services | $ 952,644 | $ 786,577 | $ 726,004 | $ 684,900 | $ 696,696 |
| Circulation | 704,842 | 574,963 | 474,324 | 421,497 | 378,263 |
| Commercial printing and other | 210,423 | 164,484 | 141,676 | 148,959 | 120,856 |
| Total operating revenues | 1,867,909 | 1,526,024 | 1,342,004 | 1,255,356 | 1,195,815 |
| Operating expenses: | | | | | |
| Operating costs | 1,079,593 | 865,234 | 742,822 | 699,312 | 656,555 |
| Selling, general and administrative | 606,917 | 502,631 | 447,133 | 413,915 | 403,510 |
| Depreciation and amortization | 111,882 | 84,791 | 74,394 | 67,774 | 67,752 |
| Integration and reorganization costs | 47,401 | 15,011 | 8,903 | 8,352 | 8,052 |
| Acquisition costs | 60,618 | 2,651 | 1,975 | 1,861 | 2,772 |
| Impairment of long-lived assets | 3,009 | 1,538 | 7,142 | — | — |
| Goodwill and mastheads impairment | 100,743 | — | 27,448 | — | 4,800 |
| Net (gain) loss on sale or disposal of assets | 4,723 | (3,971) | (1,649) | 3,564 | (51,051) |
| Total operating expenses | 2,014,886 | 1,467,885 | 1,308,168 | 1,194,778 | 1,092,390 |
| ***Operating income (loss)*** | (146,977) | 58,139 | 33,836 | 60,578 | 103,425 |
| Interest expense, amortization of deferred financing costs, loss on early extinguishment of debt, loss on derivative instruments, and other | 60,207 | 38,120 | 34,270 | 31,256 | 32,407 |
| Income (loss) before income taxes | (207,184) | 20,019 | (434) | 29,322 | 71,018 |
| Provision (benefit) for income taxes | (85,994) | 1,912 | 481 | (2,319) | 3,404 |
| Net income (loss) | (121,190) | 18,107 | (915) | 31,641 | 67,614 |
| Net loss attributable to redeemable noncontrolling interest | (1,348) | (89) | — | — | — |
| Net income (loss) attributable to Gannett | $ (119,842) | $ 18,196 | $ (915) | $ 31,641 | $ 67,614 |
| | | | | | |
| Earnings (loss) per share attributable to Gannett - basic | $ (1.77) | $ 0.31 | $ (0.02) | $ 0.70 | $ 1.54 |
| Earnings (loss) per share attributable to Gannett - diluted | $ (1.77) | $ 0.31 | $ (0.02) | $ 0.70 | $ 1.53 |
| | | | | | |
| Dividends declared per share | $ 1.52 | $ 1.49 | $ 1.42 | $ 1.34 | $ 1.29 |
| | | | | | |
| **Other Data:** | | | | | |
| Adjusted EBITDA [2] | $ 223,871 | $ 180,293 | $ 165,291 | $ 157,683 | $ 164,833 |
| Cash interest paid | $ 40,208 | $ 31,178 | $ 33,626 | $ 26,908 | $ 21,726 |

The table below shows the reconciliation of net income (loss) attributable to Gannett to Adjusted EBITDA for the periods presented:

| | | Year Ended | | | |
|---|---|---|---|---|---|
| in thousands | December 31, 2019 (1) | December 30, 2018 | December 31, 2017 (3) | December 25, 2016 | December 27, 2015 |
| Net income (loss) attributable to Gannett (GAAP basis) | $ (119,842) | $ 18,196 | $ (915) | $ 31,641 | $ 67,614 |
| Income tax expense (benefit) | (85,994) | 1,912 | 481 | (2,319) | 3,404 |
| Interest expense | 63,660 | 36,072 | 30,476 | 29,635 | 32,057 |
| Loss on early extinguishment of debt | 6,058 | 2,886 | 4,767 | — | — |
| Other non-operating items, net | (9,511) | (1,554) | (776) | — | — |
| Depreciation and amortization | 111,882 | 84,791 | 74,394 | 67,774 | 67,752 |
| Integration and reorganization costs | 47,401 | 15,011 | 8,903 | 8,352 | 8,052 |
| Acquisition costs | 60,618 | 2,651 | 1,975 | 1,861 | 2,772 |
| Impairment of long-lived assets | 3,009 | 1,538 | 7,142 | — | — |
| Goodwill and mastheads impairment | 100,743 | — | 27,448 | — | 4,800 |
| Net (gain) loss on sale or disposal of assets | 4,723 | (3,971) | (1,649) | 3,564 | (51,051) |
| Non-cash compensation | 11,324 | 3,156 | 3,135 | 2,442 | 1,319 |
| Other items | 29,800 | 19,605 | 9,910 | 14,733 | 28,114 |
| Adjusted EBITDA (non-GAAP basis) | $ 223,871 | $ 180,293 | $ 165,291 | $ 157,683 | $ 164,833 |

The following table includes certain asset information for the periods presented:

| | | As of | | | |
|---|---|---|---|---|---|
| in thousands | December 31, 2019 (1) | December 30, 2018 | December 31, 2017 | December 25, 2016 | December 27, 2015 |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 4,020,102 | $ 1,443,864 | $ 1,283,546 | $ 1,336,030 | $ 1,197,120 |
| Total long-term obligations, including current maturities | 1,642,935 | 457,391 | 375,245 | 366,463 | 363,645 |
| Redeemable noncontrolling interest | 1,850 | 1,547 | — | — | — |
| Stockholders' equity | 981,356 | 717,223 | 674,393 | 754,973 | 647,073 |

(1) Results for the year ended December 31, 2019 include six weeks of operating results attributable to Legacy Gannett. In 2018 and prior, our fiscal years ended on the last Sunday of the calendar year. Furthermore, starting in 2020, our fiscal year will coincide with the Gregorian calendar.

(2) We define Adjusted EBITDA as net income (loss) from continuing operations attributable to Gannett before (1) income tax expense (benefit), (2) interest expense, (3) gains or losses on early extinguishment of debt, (4) non-operating items, primarily pension costs, (5) depreciation and amortization, (6) integration and reorganization costs, (7) impairment of long-lived assets, (8) goodwill and intangible impairments, (9) net loss (gain) on sale or disposal of assets, (10) non-cash compensation, (11) acquisition costs, and (12) certain other non-recurring charges. Adjusted EBITDA is not a measurement of financial performance under GAAP and should not be considered in isolation or as an alternative to income from operations, net income (loss), cash flow from operating activities, or any other measure of performance or liquidity derived in accordance with GAAP. We believe this non-GAAP measure, as we have defined it, is helpful in evaluating performance and identifying trends in our day-to-day performance because the items excluded have little or no significance on our day-to-day operations. This measure provides an assessment of controllable expenses that afford management the ability to make decisions which are expected to facilitate meeting current financial goals as well as achieve optimal financial performance.

Adjusted EBITDA provides us with a measure of financial performance independent of items that are beyond the control of management in the short-term such as depreciation and amortization, taxation, non-cash impairments, and interest expense associated with our capital structure. This metric measures our financial performance based on operational factors that management can impact in the short-term, namely the cost structure or expenses of the Company. Adjusted EBITDA is one of the metrics we use to review the financial performance of our business on a monthly basis.

Not all companies calculate Adjusted EBITDA using the same methods; therefore, the Adjusted EBITDA figures set forth herein may not be comparable to Adjusted EBITDA reported by other companies. A substantial portion of our Adjusted EBITDA must be dedicated to the payment of interest on our outstanding indebtedness and to service other commitments, thereby reducing the funds available to us for other purposes. Accordingly, Adjusted EBITDA does not represent an amount of funds that is available for management's discretionary use. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this report.

(3) The year ended December 31, 2017 includes a 53rd week of operations.

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**CAUTIONARY NOTE REGARDING FORWARD LOOKING INFORMATION**

Certain statements in this report on Form 10-K may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that reflect our current views regarding, among other things, our future growth, results of operations, performance, and business prospects and opportunities as well as other statements that are other than historical fact. Words such as "anticipate(s)," "expect(s)," "intend(s)," "plan(s)," "target(s)," "project(s)," "believe(s)," "will," "aim," "would," "seek(s)," "estimate(s)" and similar expressions are intended to identify such forward-looking statements.

Forward-looking statements are based on management's current expectations and beliefs and are subject to a number of known and unknown risks, uncertainties, and other factors that could lead to actual results materially different from those described in the forward-looking statements. We can give no assurance our expectations will be attained. Our actual results, liquidity, and financial condition may differ from the anticipated results, liquidity, and financial condition indicated in these forward-looking statements. These forward-looking statements are not a guarantee of future performance and involve risks and uncertainties, and there are certain important factors that could cause our actual results to differ, possibly materially, from expectations or estimates reflected in such forward-looking statements, including, among others:

- General economic and market conditions;

- Economic conditions in the various regions of the United States;

- The growing shift within the publishing industry from traditional print media to digital forms of publication;

- Risks and uncertainties associated with our Marketing Solutions segment, including its significant reliance on Google for media purchases, its international operations, and its ability to develop and gain market acceptance for new products or services;

- Declining print advertising revenue and circulation subscribers;

- Our ability to grow our digital marketing services initiatives, digital audience, and advertiser base;

- Our ability to grow our business organically;

- Variability in the exchange rate relative to the U.S. dollar of currencies in foreign jurisdictions in which we operate;

- The risk that we may not realize the anticipated benefits of our acquisitions;

- The availability and cost of capital for future investments;

- Our indebtedness may restrict our operations and/or require us to dedicate a portion of cash flow from operations to payments associated with our debt;

- Our ability to pay dividends consistent with prior practice or at all;

- Our ability to reduce costs and expenses;

- The impact of any material transactions with the Manager (as defined below) or one of its affiliates, including the impact of any actual, potential, or perceived conflicts of interest;

- The competitive environment in which we operate; and

- Our ability to recruit and retain key personnel.

Additional risk factors that could cause actual results to differ materially from our expectations include, but are not limited to, the risks identified by us under the heading "Risk Factors" in Item 1A of this report. Such forward-looking statements speak only as of the date they are made. Except to the extent required by law, we expressly disclaim any obligation to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in our expectations with regard thereto or change in events, conditions, or circumstances on which any statement is based.

**Executive summary**

*Overview*

Gannett Co., Inc. ("Gannett", "we", "us", "our", or "the Company") is an innovative, digitally focused media and marketing solutions company committed to fostering the communities in our network and helping them build relationships with their local businesses. Until November 19, 2019, our corporate name was New Media Investment Group Inc. ("New Media") and Gannett Co, Inc. was a separate publicly traded company. On November 19, 2019, New Media completed its acquisition of Gannett Co., Inc. (which was renamed Gannett Media Corp. and is referred to herein as "Legacy Gannett"). In connection with the

34

acquisition, New Media changed its name to Gannett Co., Inc. and assumed Legacy Gannett's ticker symbol "GCI" (having previously traded under "NEWM").

Our current portfolio of media assets includes USA TODAY, local media organizations in 46 states in the U.S. and Guam, and Newsquest, a wholly owned subsidiary operating in the United Kingdom ("U.K.") with more than 140 local media brands. Gannett also owns the digital marketing services companies ReachLocal, Inc. ("ReachLocal"), UpCurve, Inc. ("UpCurve"), and WordStream, Inc. ("WordStream") and runs the largest media-owned events business in the U.S., GateHouse Live.

Through USA TODAY, our local property network, and Newsquest, Gannett delivers high-quality, trusted content where and when consumers want to engage with it on virtually any device or platform. Additionally, the Company has strong relationships with hundreds of thousands of local and national businesses in both our U.S. and U.K. markets due to our large local and national sales forces and a robust advertising and marketing solutions product suite. The Company reports in two operating segments, Publishing and Marketing Solutions, plus a corporate and other category. A full description of our segments is included in Note 14 — Segment reporting of the notes to the consolidated financial statements.

### Amended and Restated Management Agreement

We are externally managed and advised by FIG LLC (the "Manager"), an affiliate of Fortress Investment Group LLC ("Fortress"), pursuant to a management agreement. On August 5, 2019, in connection with the agreement to acquire Legacy Gannett, the Company and the Manager entered into the Amended and Restated Management and Advisory Agreement (the "Amended Management Agreement"). which became effective upon the closing of the acquisition on November 19, 2019. See "Amended and Restatement Management Agreement" under Item 1 of this report and Note 16 — Related party transactions of the notes to the consolidated financial statements for further discussion.

We recognized $11.0 million, $10.7 million, and $10.6 million for management fees and $4.1 million, $11.1 million, and $11.7 million for incentive compensation within selling, general, and administrative expenses on the Consolidated statements of operations and comprehensive income (loss) during the years ended December 31, 2019, December 30, 2018, and December 31, 2017, respectively.

## Basis of reporting

The following is a discussion of the key factors that have affected our accounting for or reporting on the business over the last two fiscal years. This commentary should be read in conjunction with our financial statements, selected financial data, and the remainder of this Form 10-K.

*Results of operations of Gannett Co., Inc.:* In November 2019, we completed the acquisition of Legacy Gannett for a combination of cash and stock. Legacy Gannett became our wholly owned subsidiary and we changed our name to Gannett Co., Inc. Historical results for fiscal years 2018 and prior (reported by us under the name New Media) are those of legacy New Media. Fiscal year 2019 represents legacy New Media's results up to and through the date of the acquisition plus the newly consolidated company's results of operations, which includes Legacy Gannett results for the approximately six-week period between the date of acquisition and fiscal year end.

*Fiscal year:* Starting in 2019 and subsequent to our acquisition of Legacy Gannett, our fiscal year coincides with the Gregorian calendar. In 2018 and prior, our fiscal years ended on the last Sunday of the calendar year. Our fiscal year for 2018 was a 52-week year ending on December 30, 2018. Our fiscal year for 2017 was a 53-week year ending on December 31, 2017.

*Advertising and marketing services revenues:* Pursuant to our acquisition of Legacy Gannett, we realigned the presentation of marketing services revenues generated by our UpCurve subsidiary from other revenues to advertising and marketing services revenue on the Consolidated statements of operations and comprehensive income (loss). As a result of this updated presentation, advertising and marketing services revenues increased and other revenues decreased $58.2 million and $42.0 million for 2018 and 2017, respectively. Operating revenues, net income, retained earnings, and earnings per share remained unchanged.

*Reportable segments:* In connection with our Legacy Gannett acquisition in 2019, we reorganized our reportable segments to include (1) Publishing, which consists of our portfolio of local, regional, national, and international newspaper publishers and (2) Marketing Solutions, which is comprised of our digital marketing solutions subsidiaries ReachLocal, UpCurve and WordStream. In addition to these operating segments, we have a corporate category that includes activities not directly attributable to a specific segment. This category primarily consists of broad corporate functions and includes legal, human

resources, accounting, analytics, finance, and marketing as well as activities and costs not directly attributable to a particular segment such as other general business costs.

**Certain matters affecting current and future operating results**

The following developments affect period-over-period comparisons and will affect period-over-period comparisons for future results:

*Acquisitions*

- In November 2019, we acquired substantially all of the assets, properties, and business of Legacy Gannett for an aggregate purchase price of $1.3 billion, net of cash acquired. The acquisition was funded by a new term loan facility with an aggregate principal balance of $1.8 billion and available cash on hand. For fiscal year 2019, Legacy Gannett contributed approximately $299.2 million in revenue and $308.0 million in expenses to our consolidated results.

- During 2019 prior to the acquisition of Legacy Gannett, we acquired substantially all the assets, properties, and business of certain publications and businesses, including 11 daily newspapers, 11 weekly publications, 9 shoppers, a remnant advertising agency, 5 events production businesses, and a business community and networking platform for an aggregate purchase price of $46.6 million, including estimated working capital. As part of one of the 2019 acquisitions, the Company also acquired a 58% equity interest in the acquiree, and the minority equity owners retained a 42% interest, which has been classified as a redeemable non-controlling interest on the Consolidated statements of operations and comprehensive income (loss). These acquisitions were financed from available cash on hand.

- During 2018, we acquired substantially all the assets, properties, and business of certain publications and businesses, which included seven business publications, eight daily newspapers, 16 weekly newspapers, one shopper, a print facility, an events production business, and cloud services, digital platforms, and the related domains for an aggregate purchase price of $205.8 million, including working capital.

- During 2017, we acquired substantially all the assets, properties, and business of certain publications and businesses, which included four business publications, 22 daily newspapers, 34 weekly publications, 24 shoppers, two customer relationship management solutions providers, a social media app, and an event production business for an aggregate purchase price of $165.1 million, including working capital.

*Dispositions*

- On May 11, 2018, we completed its sale of certain publications and related assets in Alaska for approximately $2.4 million, including working capital. As a result, a nominal pre-tax gain, net of selling expenses, is included in Net (gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 30, 2018.

- On February 27, 2018, we sold a parcel of land and a building located in Framingham, Massachusetts for a sale price of $9.3 million and recognized a pre-tax gain of approximately $3.3 million, net of selling expenses, which is included in Net (gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 30, 2018.

- On June 2, 2017, we completed the sale of the *Mail Tribune*, located in Medford, Oregon, for approximately $14.7 million, including working capital. As a result, a pre-tax gain of approximately $5.4 million, net of selling expenses, is included in Net (gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 31, 2017.

*Integration and reorganization costs*

- In 2019, the Company incurred integration and reorganization costs of $47.4 million. Of the total charges incurred, $40.6 million were related to severance activities while $6.8 million were related to other costs, including those for the purpose of consolidating operations.

- In 2018, the Company incurred integration and reorganization costs of $15.0 million. Of the total charges incurred, $11.9 million were related to severance activities while $3.1 million were related to other costs, including those for the purpose of consolidating operations.

- In 2017, the Company incurred integration and reorganization costs of $8.9 million. Of the total charges incurred, $7.7 million were related to severance activities while $1.2 million were related to other costs, including those for the purpose of consolidating operations.

*Long-lived asset impairment*

- In 2019, the Company ceased operations of 3 print publications and 12 printing facilities as part of the ongoing cost reduction programs. As a result, the Company recognized impairment charges relating to retired equipment of $3.0 million as well as accelerated depreciation of $7.9 million during the year ended December 31, 2019.

- In 2018, the Company ceased operations of seven print publications and six printing operations as part of the ongoing cost reduction programs. As a result, the Company recognized impairment charges relating to retired equipment of $0.5 million and intangibles of $0.6 million as well as accelerated depreciation of $3.6 million during the year ended December 30, 2018.

- In 2017, the Company ceased printing operations at 15 facilities as part of the ongoing cost reduction programs. As a result, the Company recognized an impairment charge related to retired equipment of $7.1 million and accelerated depreciation of $2.4 million during the year ended December 31, 2017.

*Goodwill and mastheads impairment*

- In 2019, the Company incurred $100.7 million in goodwill and masthead impairments. These impairments were the result of softening business conditions leading to declines in revenue projections that negatively impacted the fair value of our reporting units and mastheads.

- In 2017, the Company incurred $27.4 million in goodwill and masthead impairments. These impairments were primarily attributable to continuing economic pressures in the newspaper industry and a decline in the Company's stock price.

*Foreign currency*

The Company's U.K. publishing operations are conducted through its Newsquest subsidiary. In addition, the Company's ReachLocal subsidiary has foreign operations in regions such as Canada, Australia / New Zealand and India. Earnings from operations in foreign regions are translated into U.S. dollars at average exchange rates prevailing during the period, and assets and liabilities are translated at exchange rates in effect at the balance sheet date. Translation fluctuations impact revenue, expense, and operating income results for international operations.

*Newsprint supply*

The newsprint supply available to U.S. publishers can be volatile. In the first nine months of 2018, many Canadian producers were subjected to significant anti-dumping and countervailing duties upon importation of newsprint into the U.S. Those duties were ultimately eliminated by the International Trade Commission in September 2018, but their imposition in the first half of 2018 disrupted the newsprint market by driving prices higher and incentivizing Canadian producers to reduce their shipments of newsprint into the United States.

Newsprint expense at our Publishing segment was $91.1 million in 2019, a 6% increase compared to 2018, as newsprint expense from acquired entities of $13.8 million was partially offset by declines in circulation volumes.

**Outlook for 2020**

The Company's areas of focus for 2020 include (1) integrating the Legacy Gannett and New Media organizations and achieving synergy targets, (2) deleveraging the balance sheet via cash flow from operations and real estate monetization, and (3) driving improved revenue trends by focusing on complementary growth businesses. Key integration and synergy workstreams include consolidating production and distribution facilities, integrating and centralizing back office functions, centralizing and regionalizing our publishing sales, content, and circulation marketing organizations, and consolidating our marketing solutions organizations. The Company will continue to invest in our current growth businesses such as digital marketing services, digital subscriptions, and events while also experimenting with new business models, such as a marketplace model, to help offset the revenue declines from traditional businesses to enable the company to return to revenue growth over the next three to five years.

**RESULTS OF OPERATIONS**

**Consolidated summary**

The following table summarizes historical results of operations for the Company by segment for the years ended December 31, 2019, December 30, 2018, and December 31, 2017.

*In thousands, except per share amounts*

| | 2019 | 2018 | % Change | 2017 | % Change |
|---|---|---|---|---|---|
| Operating revenues: | | | | | |
| Publishing | $ 1,792,652 | $ 1,495,124 | 20% | 1,315,010 | 14% |
| Marketing Solutions | 149,242 | 95,871 | 56% | 71,274 | 35% |
| Corporate and other | 4,554 | 3,118 | 46% | 2,941 | 6% |
| Intersegment eliminations | (78,539) | (68,089) | 15% | (47,221) | 44% |
| Total operating revenues | 1,867,909 | 1,526,024 | 22% | 1,342,004 | 14% |
| Operating expenses: | | | | | |
| Publishing | 1,772,323 | 1,373,968 | 29% | 1,210,699 | 13% |
| Marketing Solutions | 164,023 | 109,917 | 49% | 92,907 | 18% |
| Corporate and other | 157,079 | 52,089 | *** | 51,783 | 1% |
| Intersegment eliminations | (78,539) | (68,089) | 15% | (47,221) | 44% |
| Total operating expenses | 2,014,886 | 1,467,885 | 37% | 1,308,168 | 12% |
| Operating income (loss) | (146,977) | 58,139 | *** | 33,836 | 72% |
| Non-operating income (expense) | 60,207 | 38,120 | 58% | 34,270 | 11% |
| Income (loss) before income taxes | (207,184) | 20,019 | *** | (434) | *** |
| Provision (benefit) for income taxes | (85,994) | 1,912 | *** | 481 | *** |
| Net income (loss) | $ (121,190) | $ 18,107 | *** | (915) | *** |
| Diluted earnings (loss) per share | $ (1.77) | $ 0.31 | *** | (0.02) | *** |

*** Indicates an absolute value percentage change greater than 100.

Intersegment eliminations in the preceding table represent digital marketing services revenues and expenses associated with products sold by our U.S. local publishing sales teams but which are fulfilled by our Marketing Solutions segment. When discussing segment results, these revenues and expenses are presented gross but are eliminated in consolidation.

**Operating revenues:**

Our Publishing segment generates revenue primarily through advertising and marketing services and subscriptions to our print and digital publications. Our advertising teams sell local, national, and classified print advertising products, digital advertising offerings such as digital classified advertisements, digital media such as display advertisements run on our platforms as well as third-party sites, and digital marketing services such as search advertising offered through and delivered by our Marketing Solutions segment. Circulation revenues are derived principally from home delivery and single copy sales of our publications and distributing our publications on our digital platforms. Other revenues are derived mainly from commercial printing and distribution arrangements and our events business.

Our Marketing Solutions segment generates advertising and marketing services revenues through multiple services including search advertising, display advertising, search optimization, social media, website development, web presence products, customer relationship management, Google-suite offerings, and software-as-a-service solutions. Other revenues in our Marketing Solutions segment are derived from system integration services, cloud offerings, and software licensing.

*Revenue comparisons 2019 - 2018:*

Total operating revenues were $1.9 billion in 2019, an increase of 22% from 2018. The increase in total revenue was comprised of a $166.1 million, or 21%, increase in advertising and marketing services revenues, a $129.9 million, or 23%, increase in circulation revenues, and a $45.9 million, or 28%, increase in other revenues. Revenue at the Publishing and Marketing Solutions segments increased by $297.5 million and $53.4 million, respectively, primarily due to acquisition-related revenues, including six weeks of revenue contributed by Legacy Gannett. The increase in Publishing segment advertising and

marketing services revenue was partially offset by declines in the local retail, classified, and preprint categories excluding acquisitions due to reduced demand consistent with secular trends adversely impacting the publishing industry as marketers shift their spend to other advertising categories. Publishing segment print circulation volumes declined, which were partially offset by price increases and increased distribution of premium editions in select locations.

*Revenue comparisons 2018 - 2017:*

Total operating revenues were $1.5 billion in 2018, an increase of 14%, from 2017. The increase in total operating revenues was comprised of a $60.6 million, or 8%, increase in advertising and marketing services revenue, a $100.6 million, or 21%, increase in circulation revenue, and $22.8 million, or 16%, increase in commercial printing and other revenue. Revenue at the Publishing and Marketing Solutions segments increased by $180.1 million and $24.6 million, respectively, primarily due to acquired revenues. The increase in Publishing segment advertising and marketing services revenue was partially offset by declines in the local retail, classified, and preprint categories due to reduced demand consistent with general trends adversely impacting the publishing industry. These trends also led to a decline in print circulation volumes that were largely offset by price increases and distribution of premium editions in select locations. The majority of the remaining increase in commercial printing and other revenue is due to events revenue and commercial print and distribution.

**Operating expenses:**

Operating expenses consist primarily of the following:

- Operating costs such as labor, newsprint, and delivery costs in our Publishing segment or the cost of online media acquired from third parties and costs to manage and operate our marketing solutions and technology infrastructure in our Marketing Solutions segment;

- Selling, general, and administrative expenses such as labor, payroll, outside services, and benefits costs;

- Depreciation and amortization;

- Integration and reorganization costs such as severance charges, facility consolidation charges, and acquisition or integration-related costs;

- Costs incurred pursuant to acquisitions or mergers;

- Impairment charges such as those for long-lived assets, goodwill, or other intangible assets; and

- Net gains or losses on the sale or disposal of assets such as property, plant, and equipment.

*Operating expense comparisons 2019 - 2018:*

Total operating expenses were $2.0 billion in 2019, an increase of 37%, or $547.0 million, compared to 2018. Total operating expenses across all segments increased primarily due to acquired operating expenses of $383.2 million, including $308.0 million from six weeks of expenses contributed by Legacy Gannett.

Operating costs were $1.1 billion in 2019, an increase of 25% compared to 2018. Publishing segment operating costs increased $186.0 million, or 22%, while Marketing Solutions segment operating costs increased $36.0 million, or 57%, due primarily to the contributions of Legacy Gannett, partially offset by continued cost efficiency efforts resulting from the consolidation and centralization of operations and costs associated with declines in revenue from continuing operations.

Selling, general, and administrative expenses were $606.9 million in 2019, an increase of 21% compared to 2018. Publishing segment selling, general, and administrative expenses increased $72.3 million, or 17%, while Marketing Solutions segment selling, general, and administrative expenses increased $14.8 million, or 36%, due primarily to the contributions of Legacy Gannett, partially offset by continued cost efficiency efforts.

Integration and reorganization costs were $47.4 million in 2019, an increase of $32.4 million compared to 2018. Integration and reorganization costs at the Corporate, Publishing, and Marketing Solutions segments increased $23.6 million, $6.8 million, and $1.9 million, respectively, primarily due to additional severance costs stemming from acquisition-related synergies and the continued consolidation of our operations resulting from the ongoing implementation of our plans to reduce costs and preserve cash flow and the integration of acquired businesses.

Acquisitions costs were $60.6 million in 2019, an increase of $58.0 million compared to 2018. The increase in acquisition costs, the vast majority of which were incurred at the Corporate segment, was primarily due to acquisition costs of $55.6 million incurred in conjunction with the acquisition of Legacy Gannett.

Impairment of long-lived assets was $3.0 million in 2019, an increase of $1.5 million compared to 2018. These impairments, which occurred exclusively at the Publishing segment, were due to the cessation of operations at 3 print publications and 12 printing operations.

Goodwill and masthead impairments were $100.7 million in 2019. No goodwill and masthead impairments occurred in 2018. Impairments in 2019, which were recorded exclusively at the Publishing segment, were the result of softening business conditions leading to declines in revenue projections that negatively impacted the fair value of our reporting units and mastheads.

***Operating expense comparisons 2018 - 2017:***

Total operating expenses were $1.5 billion in 2018, an increase of 12%, or $159.7 million, compared to 2017. Total operating expenses across all segments increased primarily due to acquired operating expenses of $144.1 million.

Operating costs were $865.2 million in 2018, an increase of 16% compared to 2017. Publishing segment operating costs increased $123.7 million, or 17%, while Marketing Solutions segment operating costs increased $16.5 million, or 35%, due primarily to costs from acquisitions of $91.4 million, partially offset by continued cost efficiency efforts.

Selling, general, and administrative expenses were $502.6 million in 2018, an increase of 12% compared to 2017. Publishing segment selling, general, and administrative expenses increased $55.2 million, or 15%, while Marketing Solutions segment selling, general, and administrative expenses increased $3.4 million, or 9%, due primarily to costs from acquisitions of $44.6 million, partially offset by continued cost efficiency efforts.

Integration and reorganization costs were $15.0 million in 2018, an increase of 69% compared to 2017. Integration and reorganization costs at the Publishing segment increased $6.5 million primarily due to severance costs related to acquisition-related synergies and the continued consolidation of our operations resulting from ongoing implementation of our plans to reduce costs and preserve cash flow, including a voluntary severance offer implemented in the third quarter of 2018. Integration and reorganization costs at the Marketing Solutions segment decreased by $0.4 million while integration and reorganization costs at the Corporate segment were essentially flat.

Impairment of long-lived assets was $1.5 million in 2018, a decrease of 78% compared to 2017. 2018 impairments, which occurred exclusively at the Publishing segment, were due to the cessation of operations at seven print publications and one printing facility. In 2017, we recorded a $7.1 million impairment of long-lived assets due to 15 printing facilities ceasing operations.

No goodwill and masthead impairments were recorded in 2018. Goodwill and masthead impairments were $27.4 million in 2017. Impairments in 2017, which were recorded exclusively at the Publishing segment, were primarily attributable to continuing economic pressures in the newspaper industry and a decline in the Company's stock price.

**Non-operating income / expenses:**

Non-operating income and expenses consist largely of interest expense and losses on the early extinguishment of debt.

***Non-operating expense comparisons 2019 - 2018:***

Interest expense was $63.7 million in 2019, an increase of 76% compared to 2018. The increase in interest expense was primarily due to acquisitions and interest on our new, larger term loan facility, partially offset by the retirement of certain outstanding debt pursuant to the Legacy Gannett acquisition.

Losses on the early extinguishment of debt were $6.1 million in 2019, an increase of $3.2 million compared to 2018. The increase in losses was the result of prepayments and debt refinancings.

***Non-operating expense comparisons 2018 - 2017:***

Interest expense was $36.1 million in 2018, an increase of 18% compared to 2017. The increase in interest expense was primarily due to increased borrowings under amendments to our legacy credit agreements.

Losses on the early extinguishment of debt were $2.9 million in 2018, a decrease of 39% compared to 2017. The decrease in losses was the result of debt refinancings.

**Publishing segment**

A summary of our Publishing segment results is presented below:

*In thousands*

|  | 2019 | 2018 | % Change | 2017 | % Change |
|---|---|---|---|---|---|
| **Operating revenues:** |  |  |  |  |  |
| Advertising and marketing services | $ 897,585 | $ 773,034 | 16% | $ 714,128 | 8% |
| Circulation | 704,811 | 574,961 | 23% | 474,320 | 21% |
| Commercial printing and other | 190,256 | 147,129 | 29% | 126,562 | 16% |
| *Total operating revenues* | 1,792,652 | 1,495,124 | 20% | 1,315,010 | 14% |
| **Operating expenses:** | — |  |  |  |  |
| Operating costs | 1,045,807 | 859,780 | 22% | 736,092 | 17% |
| Selling, general and administrative expenses | 495,511 | 423,198 | 17% | 368,022 | 15% |
| Depreciation and amortization | 101,881 | 78,075 | 30% | 69,562 | 12% |
| Integration and reorganization costs | 21,336 | 14,487 | 47% | 7,946 | 82% |
| Impairment of long-lived assets | 3,009 | 1,538 | 96% | 7,042 | (78%) |
| Goodwill and mastheads impairment | 100,743 | — | *** | 23,799 | (100%) |
| Net (gain) loss on sale or disposal of assets | 4,036 | (3,109) | *** | (1,764) | 76% |
| *Total operating expenses* | 1,772,323 | 1,373,969 | 29% | 1,210,699 | 13% |
| *Operating income* | $ 20,329 | $ 121,155 | (83%) | $ 104,311 | 16% |

*** Indicates an absolute value percentage change greater than 100.

**Operating revenues**

*Revenue comparisons 2019 - 2018:*

Advertising and marketing services revenues were $897.6 million for 2019, an increase of 16% compared to 2018, which included revenues from international operations of $16.3 million for 2019. This increase was primarily attributable to $171.8 million in acquired advertising and marketing services revenues, including $136.0 million related to Legacy Gannett.

Print advertising revenues were $688.8 million for 2019, an increase of 10% compared to 2018. Local and national print advertising revenues were $426.8 million and $51.0 million, respectively, for 2019, increases of 7% and 55%, respectively, compared to 2018. The increases in local and national print advertising revenues were attributable to $86.3 million in acquired revenues, including $61.7 million in acquired revenues related to Legacy Gannett. Classified print advertising revenues of $211.1 million for 2019 increased 8% compared to 2018, primarily attributable to acquired revenues of $29.8 million, including $23.1 million in acquired revenues related to Legacy Gannett. The increases across all categories of print advertising revenues were partially offset by reduced demand consistent with general trends adversely impacting the publishing industry.

Digital advertising and marketing services revenues were $208.8 million for 2019, an increase of 41% compared to 2018. Digital media revenues were $125.8 million for 2019, an increase of 57% compared to 2018, primarily due to $38.2 million in acquired revenues, including $35.1 million in acquired revenues related to Legacy Gannett. Digital classified revenues were $30.7 million for 2019, an increase of 15% compared to 2018 due to $6.5 million in acquired revenues, including $5.7 million in acquired revenues related to Legacy Gannett. Digital marketing services revenues were $52.3 million for 2019, an increase of 27% compared to 2018. This increase was attributable to $11.0 million in acquired revenues, including $10.4 million in acquired revenues related to Legacy Gannett.

Circulation revenues were $704.8 million for 2019, an increase of 23% compared to 2018, which included revenues from international operations of $7.4 million for 2019. Print circulation revenues were $661.8 million for 2019, an increase of 19% from 2018, due to $104.0 million in acquired revenues, including $85.2 million in acquired print circulation revenues related to Legacy Gannett, and increases from our strategic pricing programs and premium editions, partially offset by declines stemming from a reduction in volume of our single copy and home delivery sales, reflecting general industry trends. Digital circulation

revenues were $43.1 million for 2019, more than double the total from 2018, primarily due to $23.0 million in acquired revenues, including $22.1 million related to Legacy Gannett, and strong growth in the onboarding of new digital-only subscribers.

Commercial printing and other revenues of $190.3 million in 2019 increased 29% compared to 2018 due to $35.7 million in acquired other revenues, including $21.0 million in acquired revenues related to Legacy Gannett. Other revenues accounted for approximately 11% of total segment revenues for the year.

***Revenue comparisons 2018 - 2017:***

Advertising and marketing services revenues were $773.0 million for 2018, an increase of 8% compared to 2017. This increase was primarily attributable to $80.7 million in acquired revenues partially offset by reduced demand consistent with general trends adversely impacting the publishing industry.

Print advertising revenues were $625.0 million for 2018, an increase of 4% compared to 2017. Local print advertising revenues were $397.2 million, an increase of 7% compared to 2017, which included acquired local print advertising revenues of $50.1 million. National print advertising revenues were $32.9 million, effectively flat compared to 2017, included acquired national print revenues of $4.9 million. Classified print advertising revenues of $194.9 million for 2018 increased 1% compared to 2017, primarily attributable to acquired revenues of $11.6 million. The acquisition related increases across all categories of print advertising revenues were partially offset by reduced demand consistent with general trends adversely impacting the publishing industry.

Digital advertising and marketing services revenues were $148.1 million for 2018, an increase of 28% compared to 2017. Digital media revenues were $80.3 million for 2018, an increase of 27% compared to 2017, primarily due to $7.8 million in acquired revenues. Digital classified revenues were $26.7 million for 2018, an increase of 11% compared to 2017, due to $1.3 million in acquired revenues partially offset by declines in certain verticals such as automotive and employment. Digital marketing services revenues were $41.1 million for 2018, an increase of 44% compared to 2017. This increase was attributable to $4.9 million in acquired revenues as well as strong growth in the onboarding of new customers.

Circulation revenues were $575.0 million for 2018, an increase of 21% compared to 2017. Print circulation revenues were $557.1 million for 2018, an increase of 21% from 2017, due to $62.4 million in acquired revenues and increases from our strategic pricing programs, partially offset by declines stemming from a reduction in volume of our single copy and home delivery sales, reflecting general industry trends. Digital circulation revenues were $17.8 million for 2018, a 30% increase from 2017, primarily due to $3.5 million in acquired revenues.

Commercial printing and other revenues of $147.1 million in 2018 increased 16% compared to 2017 due to $11.8 million in acquired revenues. Other revenues accounted for approximately 10% of total segment revenues for the year.

**Operating expenses**

***Operating expense comparisons 2019 - 2018:***

Operating costs were $1.0 billion in 2019, an increase of 22% compared to 2018. Operating costs from acquired entities totaled $197.2 million in 2019, including $154.9 million related to Legacy Gannett. Newsprint and ink costs were $100.9 million in 2019, an increase of 9% compared to 2018, primarily as a result of acquired newsprint and ink costs of $14.1 million, including $12.1 million related to Legacy Gannett, partially offset by lower production volumes. News and editorial expenses were $31.9 million in 2019, an increase of 13% compared to 2018, primarily as a result of acquired news and editorial expenses of $3.5 million, including $2.4 million related to Legacy Gannett. Hauling and delivery costs were $185.3 million in 2019, an increase of 26%, due primarily to acquired hauling and delivery costs of $40.7 million, including $33.7 million related to Legacy Gannett. Other material categories of Legacy Gannett costs contributing to the overall increase in operating costs include $59.7 million in compensation and benefit costs and $28.5 million in outside costs.

Selling, general, and administrative expenses were $495.5 million in 2019, an increase of 17% compared to 2018. Selling, general, and administrative expenses from acquired entities totaled $86.8 million in 2019, including $63.7 million related to Legacy Gannett. Outside services costs were $35.7 million in 2019, an increase of 7% compared to 2018, primarily as a result of acquired outside services costs of $6.4 million, including $3.7 million related to Legacy Gannett. Other material categories of Legacy Gannett costs contributing to the overall increase in selling, general, and administrative expenses include $27.4 million in compensation costs and $22.5 million in other general and administrative costs.

Depreciation and amortization expense for 2019 was $101.9 million, a 30% increase compared to 2018, primarily attributable to $18.4 million in acquired depreciation and amortization expense, including $12.2 million related to the acquired property and intangibles from the Legacy Gannett acquisition.

Integration and reorganization costs were $21.3 million in 2019, an increase of 47% compared to 2018, primarily attributable to integration and reorganization costs from acquired entities of $13.1 million, including $12.9 million in acquired expenses related to Legacy Gannett, as well as additional severance costs related to acquisition-related synergies and the continued consolidation of our operations resulting from the ongoing implementation of our plans to reduce costs and preserve cash flow.

Impairment of long-lived assets was $3.0 million in 2019, an increase of $1.5 million compared to 2018, primarily due to the cessation of operations at other print publications and printing facilities.

Goodwill and masthead impairments were $100.7 million in 2019. These impairments were due largely to softening business conditions leading to declines in revenue projections and reductions in certain groups' royalty rates that negatively impacted the fair value of our reporting units. No goodwill or masthead impairments were recorded in 2018.

### *Operating expense comparisons 2018 - 2017:*

Operating costs were $859.8 million in 2018, an increase of 17% compared to 2017. Operating costs include costs from acquisitions of $91.4 million. Newsprint and ink costs were $93.0 million in 2018, an increase of 26% compared to 2017, primarily a result of acquired newsprint and ink costs of $9.5 million partially offset by lower production volumes. News and editorial expenses were $28.3 million in 2018, an increase of 14% compared to 2017. Hauling and delivery costs were $146.6 million in 2018, an increase of 17%, due primarily to acquired hauling and delivery costs of $20.5 million. Other material categories of costs from acquisitions contributing to the overall increase in operating costs include $30.3 million in compensation costs and $9.9 million in outside services.

Selling, general, and administrative expenses were $423.2 million in 2018, an increase of 15% compared to 2017. Selling, general, and administrative expenses from acquired entities totaled $44.6 million in 2018. Outside services costs were $33.3 million in 2018, an increase of 34% compared to 2017, primarily as a result of acquired outside services costs of $6.7 million. Compensation costs from acquisitions of $23.0 million also contributed to the overall increase in selling, general, and administrative expenses.

Depreciation and amortization expense for 2018 was $78.1 million, a 12% increase compared to 2017, primarily attributable to $6.1 million in acquired depreciation and amortization expense.

Integration and reorganization costs were $14.5 million in 2018, an increase of 82% compared to 2017, primarily attributable to integration and reorganization costs from acquired entities of $2.0 million as well as additional severance costs related to acquisition-related synergies and the continued consolidation of our operations resulting from the ongoing implementation of our plans to reduce costs and preserve cash flow.

Impairment of long-lived assets was $1.5 million in 2018, a decrease of $5.5 million compared to 2017, primarily due to a reduction in the number of operations at print publications and printing facilities which were ceased.

No goodwill and masthead impairments compared to $23.8 million in goodwill and masthead impairments in 2017. The impairments in 2017 were due largely to softening business conditions leading to declines in revenue projections and reductions in certain groups' royalty rates that negatively impacted the fair value of our reporting units.

**Publishing segment Adjusted EBITDA**

*In thousands*

| | 2019 | 2018 | Change | 2017 | Change |
|---|---|---|---|---|---|
| Net income (GAAP basis) | $ 22,523 | $ 122,392 | (82%) | $ 104,883 | 17% |
| Interest expense | 123 | 400 | (69%) | 656 | (39%) |
| Other non-operating items, net | (969) | (1,554) | (38%) | (776) | *** |
| Depreciation and amortization | 101,881 | 78,075 | 30% | 69,562 | 12% |
| Integration and reorganization costs | 21,336 | 14,487 | 47% | 7,946 | 82% |
| Impairment of long-lived assets | 3,009 | 1,538 | 96% | 7,042 | (78%) |
| Goodwill and mastheads impairments | 100,743 | — | *** | 23,799 | (100%) |
| Net (gain) loss on sale or disposal of assets | 4,036 | (3,109) | *** | (1,764) | 76% |
| Other items | 16,234 | 8,186 | 98% | 5,135 | 59% |
| Adjusted EBITDA (non-GAAP basis) | $ 268,916 | $ 220,415 | 22% | $ 216,483 | 2% |

*** Indicates an absolute value percentage change greater than 100.

Adjusted EBITDA for our Publishing segment increased 22% from 2018 to 2019. This increase was primarily attributable to additional adjusted EBITDA from Legacy Gannett of $55.7 million and ongoing operating efficiencies, partially offset by declines in organic print advertising and circulation revenues.

Adjusted EBITDA for our Publishing segment was effectively flat from 2017 to 2018, with additional adjusted EBITDA from acquired entities and ongoing operating efficiencies offset by declines in organic print advertising and circulation revenues.

## Marketing Solutions segment

A summary of our Marketing Solutions segment results is presented below:

*In thousands*

| | 2019 | 2018 | Change | 2017 | Change |
|---|---|---|---|---|---|
| **Operating revenues:** | | | | | |
| Advertising and marketing services | $ 131,003 | $ 80,086 | 64% | $ 58,102 | 38% |
| Other | 18,239 | 15,785 | 16% | 13,172 | 20% |
| ***Total operating revenues*** | 149,242 | 95,871 | 56% | 71,274 | 35% |
| **Operating expenses:** | | | | | |
| Operating costs | 99,272 | 63,311 | 57% | 46,839 | 35% |
| Selling, general and administrative expenses | 56,323 | 41,484 | 36% | 38,114 | 9% |
| Depreciation and amortization | 6,534 | 5,003 | 31% | 3,852 | 30% |
| Integration and reorganization costs | 1,937 | — | *** | 445 | (100%) |
| Acquisition costs | (38) | 85 | *** | 8 | *** |
| Goodwill and mastheads impairment | — | — | —% | 3,649 | (100%) |
| Net (gain) loss on sale or disposal of assets | (5) | 34 | *** | — | —% |
| ***Total operating expenses*** | 164,023 | 109,917 | 49% | 92,907 | 18% |
| ***Operating loss*** | $ (14,781) | $ (14,046) | 5% | $ (21,633) | (35%) |

*** Indicates an absolute value percentage change greater than 100.

**Operating revenues**

*Revenue comparisons 2019 - 2018:*

Advertising and marketing services revenues were $131.0 million for 2019, an increase of 64% compared to 2018, which included revenues from international operations of $5.1 million for 2019. This increase was primarily attributable to $42.6 million in acquired advertising and marketing services revenues related to Legacy Gannett and modest organic growth due to new customer growth and sales initiatives from our direct sales force. Other revenues were $18.2 million for 2019, an increase of 16% compared to 2018. This increase is primarily the result of an increase in new customers and modest organic growth stemming from an enhanced focus on larger dollar clients.

*Revenue comparisons 2018 - 2017:*

Advertising and marketing services revenues were $80.1 million for 2018, an increase of 38% compared to 2017. This increase was primarily attributable to new customer acquisition growth and increased cross selling of UpCurve products to new and existing customer bases. Other revenues were $15.8 million for 2018, an increase of 20% compared to 2017. This increase is primarily the result of new customer acquisitions and modest organic growth stemming from an enhanced focus on larger dollar clients.

**Operating expenses**

*Operating expense comparisons 2019 - 2018:*

Operating costs, which include online media acquired from third parties, costs to manage and operate the segment's solutions and technology infrastructure, and other third-party direct costs, were $99.3 million for 2019, an increase of 57% compared to 2018. This increase was primarily attributable to $24.2 million in acquired operating costs related to Legacy Gannett. Outside service costs, which include costs of online media acquired from third-party publishers, totaled $66.8 million for 2019 compared to $36.9 million for 2018. The increase is primarily the result of acquired outside service costs of $18.9 million related to Legacy Gannett and increased costs of media associated with new customer acquisition initiatives and the resulting growth. Other material categories of Legacy Gannett costs contributing to the overall increase in operating costs include $5.3 million in compensation and benefit costs.

Selling, general, and administrative expenses consist primarily of personnel and related expenses for selling and marketing staff, product development and engineering professionals, and other general and administrative functions. Total selling, general, and administrative expenses were $56.3 million for 2019, an increase of 36% compared to 2018. This increase was primarily attributable to $14.8 million in acquired selling, general, and administrative expenses related to Legacy Gannett. Outside services costs were $5.9 million in 2019, an increase of 10% compared to 2018, primarily the result of acquired outside services costs of $1.1 million related to Legacy Gannett. Other material categories of Legacy Gannett costs contributing to the overall increase in selling, general, and administrative expenses include $13.0 million in compensation and benefit costs and $1.1 million in advertising and promotional expenses.

Depreciation and amortization expense for 2019 was $6.5 million, a 31% increase compared to 2018, primarily attributable to $3.0 million in acquired depreciation and amortization expense related to Legacy Gannett.

Integration and reorganization costs were $1.9 million in 2019. No integration and reorganization costs were incurred in 2018. Integration and reorganization costs acquired from Legacy Gannett were $0.5 million. The increase in integration and reorganization costs was the result of acquisition-related synergies as part of the ongoing implementation of our plans to reduce costs and preserve cash flow.

*Operating expense comparisons 2018 - 2017:*

Operating costs, which include online media acquired from third parties, costs to manage and operate the segment's solutions and technology infrastructure, and other third-party direct costs, were $63.3 million for 2018, an increase of 35% compared to 2017. Outside service costs, which include costs of online media acquired from third-party publishers, totaled $36.9 million for 2018 compared to $26.9 million for 2017. These increases are primarily the result of additional costs of online media in line with revenue growth stemming from increased cross selling of UpCurve products to new and existing customer bases.

Selling, general, and administrative expenses consist primarily of personnel and related expenses for selling and marketing staff, product development and engineering professionals, and other general and administrative functions. Total selling, general, and administrative expenses were $41.5 million for 2018, an increase of 9% compared to 2017. This increase was primarily attributable to an increase in compensation costs of $3.9 million stemming from increases in production and fulfillment staffing needs as a result of new customer growth. Outside services costs were $5.4 million in 2018, a decrease of 3% compared to 2017, due primarily to increased operating efficiencies.

Depreciation and amortization expense for 2018 was $5.0 million, a 30% increase compared to 2017, primarily attributable to increased amortization costs stemming from new product and development initiatives.

No goodwill impairment was incurred in 2018 compared to $3.6 million of goodwill impairment in 2017. The goodwill impairment in 2017 was the result of softening business conditions leading to declines in revenue projections that negatively impacted the fair value of businesses.

**Marketing Solutions segment Adjusted EBITDA**

*In thousands*

| | 2019 | 2018 | Change | 2017 | Change |
|---|---|---|---|---|---|
| Net loss (GAAP basis) | $ (14,006) | $ (14,047) | —% | $ (21,625) | (35%) |
| Income tax expense (benefit) | — | — | —% | (8) | (100%) |
| Other non-operating items, net | (775) | — | *** | — | —% |
| Depreciation and amortization | 6,534 | 5,003 | 31% | 3,852 | 30% |
| Integration and reorganization costs | 1,937 | — | *** | 445 | (100%) |
| Acquisition costs | (38) | 85 | *** | 8 | *** |
| Goodwill and mastheads impairments | — | — | —% | 3,649 | (100%) |
| Net (gain) loss on sale or disposal of assets | (5) | 34 | *** | — | *** |
| Other items | 3,074 | 2,521 | 22% | 2,215 | 14% |
| Adjusted EBITDA (non-GAAP basis) | $ (3,279) | $ (6,404) | (49%) | $ (11,464) | (44%) |

*** Indicates an absolute value percentage change greater than 100.

Adjusted EBITDA for our Marketing Solutions segment was negative $3.3 million in 2019 compared to negative $6.4 million in 2018. This improvement was primarily attributable to additional Adjusted EBITDA from Legacy Gannett of $4.8 million and ongoing operating efficiencies.

Adjusted EBITDA for our Marketing Solutions segment was negative $6.4 million in 2018 compared to negative $11.5 million in 2017. This improvement was primarily attributable to additional adjusted EBITDA from acquisitions and ongoing operating efficiencies.

**Corporate and other**

Corporate operating revenues were $4.6 million in 2019 compared to $3.1 million in 2018. Corporate operating expenses were $157.1 million for 2019 compared to $52.1 million in 2018. This increase was primarily attributable to operating expenses from acquired entities of $31.4 million, including $30.5 million in acquired operating expenses related to Legacy Gannett and an increase in acquisition costs of $58.1 million. Also included in corporate operating expenses for 2019 were $24.1 million of integration and reorganization costs and $3.5 million of depreciation and amortization expenses.

Corporate operating revenues were $3.1 million in 2018 compared to $2.9 million in 2017. Corporate operating expenses were $52.1 million for 2018, an increase of 1% compared to 2017. Also included in corporate operating expenses for 2018 were $0.5 million of integration and reorganization costs and $1.7 million of depreciation and amortization expenses.

**Income tax expense (benefit)**

The following table summarizes the income tax benefit (expense) attributable to our pre-tax net income for the past three years:

| In thousands | 2019 | 2018 | 2017 |
|---|---|---|---|
| Pre-tax net income (loss) | $ (207,184) | $ 20,019 | $ (434) |
| Income tax expense (benefit) | (85,994) | 1,912 | 481 |
| Effective tax rate | 41.5% | 9.6% | *** |

*** Indicates a percentage that is not meaningful.

Our effective tax rate for the year ended December 31, 2019 was 41.5%. The rate was primarily impacted by release of a valuation allowance of $46.9 million relating to Legacy New Media's U.S. federal deferred tax assets. Our effective tax rate without the valuation allowance release would have been 18.9%, which is lower than the statutory rate due to non-deductible transaction costs. If we do not have taxable income in future years, we may be required to reestablish a valuation allowance against our federal deferred tax assets.

**Net income and earnings per share**

Net loss was $121.2 million for 2019 compared to net income of $18.1 million for 2018. The decrease in net income is primarily attributable to the decrease in operating income, which was the result of additional costs incurred pursuant to our 2019 acquisitions as well as goodwill and masthead impairments. Net income was $18.1 million for 2018 compared to net loss of $0.9 million for 2017. The increase in net income is primarily attributable to an increase in operating income, which was the result of acquisitions completed in 2018, partially offset by increases in non-operating expenses and income tax provisions.

Diluted loss per share was $1.77 for 2019 compared to earnings per share of $0.31 for 2018. The decrease in diluted earnings per share for 2019 compared to 2018 was primarily attributable to the decrease in net income discussed above. Diluted earnings per share were $0.31 for 2018 compared to loss per share of $0.02 for 2017. The increase in diluted earnings per share for 2018 compared to 2017 was primarily attributable to the increase in net income discussed above.

**Liquidity and capital resources**

Our primary cash requirements are for working capital, debt obligations, and capital expenditures. We expect our 2020 capital expenditures to total between $50.0 million and $60.0 million. 2020 capital expenditures will be primarily comprised of projects related to digital product development, maintenance of our print and technology systems, the consolidation of our print operations, and system upgrades.

We expect to fund our operations through cash provided by operating activities. We expect we will have adequate capital resources and liquidity to meet our working capital needs, borrowing obligations, and all required capital expenditures for at least the next twelve months.

Our leverage may adversely affect our business and financial performance and restricts our operating flexibility. The level of our indebtedness and our on-going cash flow requirements may expose us to a risk that a substantial decrease in operating cash flows due to, among other things, continued or additional adverse economic developments or adverse developments in our business, could make it difficult for us to meet the financial and operating covenants contained in our term loan. In addition, our leverage may limit cash flow available for general corporate purposes such as capital expenditures and our flexibility to react to competitive, technological, and other changes in our industry and economic conditions generally.

Details of our cash flows are included in the table below:

| In thousands | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net cash provided by operating activities | $ 25,535 | $ 109,559 | $ 110,506 |
| Net cash used for investing activities | (785,060) | (201,476) | (160,273) |
| Net cash provided by (used for) financing activities | 898,913 | 98,525 | (79,723) |
| Effect of currency exchange rate change | (3,494) | — | — |
| Net increase (decrease) in cash | $ 135,894 | $ 6,608 | $ (129,490) |

48

***Cash flows from operating activities:*** Our largest source of cash provided by our operations is advertising revenues primarily generated from local and national advertising and marketing services revenues (retail, classified, and online). Additionally, we generate cash through circulation subscribers, commercial printing and delivery services to third parties, and events. Our primary uses of cash from our operating activities include compensation, newsprint, delivery, and outside services.

Net cash provided by operating activities was $25.5 million in 2019 compared to $109.6 million in 2018. This decrease in net cash was primarily due to additional pension and postretirement payments of $90.7 million, most to which is related to an $87.8 million pay-out of SERP benefits resulting from the acquisition of Legacy Gannett and a $2.9 million increase in severance payments.

Net cash provided by operating activities was $109.6 million in 2018 compared to $110.5 million in 2017. The overall change in net cash provided by operating activities between the two years was immaterial.

***Cash flows used for investing activities:*** Net cash used for investing activities was $785.1 million in 2019 compared to $201.5 million in 2018. This increase was primarily due to year over year increases of $591.6 million to fund acquisitions and $2.3 million for capital expenditures, partially offset by a year over year increase of $12.4 million in funds received from the sale of publications and other assets.

Net cash used for investing activities was $201.5 million in 2018 compared to $160.3 million in 2017. This increase was primarily due to year over year increases of $40.7 million to fund acquisitions, $0.5 million for capital expenditures, partially offset by a $0.1 million increase in funds received from the sale of publications and other assets.

***Cash flows from financing activities:*** Net cash provided by financing activities was $898.9 million in 2019 compared to $98.5 million in 2018. This increase was primarily due to increased borrowings under term loan of $1.7 billion. Cash from the term loan was partially offset by the repayment of convertible debt as part of the acquisition of Legacy Gannett of $198.0 million and increases in the term loan repayments of $478.0 million, the issuance of common stock, net of underwriters' discount and the payment of offering costs, of $111.1 million, the payment of dividends of $4.7 million and payment of debt issuance costs of $120.4 million.

Net cash provided by financing activities was $98.5 million in 2018 compared to net cash used by financing activities of $79.7 million in 2017. This increase was primarily due to increases in the issuance of common stock, net of underwriters' discount and the payment of offering costs, of $111.1 million and borrowings under term loans of $59.7 million, as well as decreases in term loan repayments of $11.4 million, purchases of common stock $5.0 million and payments of debt issuance costs of $2.8 million. This is partially offset by an increase in the payment of dividends of $11.6 million.

**Indebtedness**

**Apollo Term Loan**

In November 2019, pursuant to the acquisition of Legacy Gannett, the Company entered into a five-year, senior-secured term loan facility with Apollo Capital Management, L.P. ("Apollo") in an aggregate principal amount of approximately $1.8 billion. The term loan facility, which matures on November 19, 2024, generally bears interest at the rate of 11.5% per annum. Origination fees totaled 6.5% of the total principal amount of the financing at closing. Pursuant to the agreement, Apollo has the right to designate two individuals to attend Board of Directors meetings as non-fiduciary and non-voting observers and participants. In addition, the Company's total gross leverage ratio, defined generally as the ratio of consolidated debt to EBITDA, cannot exceed 4:00:1:00 as of the origination date, gradually decreasing to an upper threshold of 3:00:1:00. If the total gross leverage ratio exceeds the aforementioned thresholds, Apollo has the right to appoint up to two voting directors.

The Company is permitted to prepay the principal of the term loan facility, in whole or in part, at par plus accrued and unpaid interest, without any prepayment premium or penalty. The term loan facility is guaranteed by the wholly-owned material subsidiaries of the Company, and all obligations of the Company and its subsidiary guarantors are secured by first priority liens on certain material real property, equity interests, land, buildings, and fixtures. The term loan facility contains customary representations and warranties, affirmative covenants, and negative covenants applicable to the Company and its subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, fundamental changes, dispositions, dividends and other distributions, capital expenditures, and events of default. The Company has used the proceeds of the term loan facility to partially fund the acquisition of Legacy Gannett and will use proceeds in the future to (i) repay, prepay, repurchase, redeem, or otherwise discharge in full each of the existing financing facilities (as defined in the agreement and discussed in part below) and (ii) pay fees and expenses incurred to obtain the term loan facility.

As of December 31, 2019, the Company had $1.8 billion in aggregate principal outstanding under the term loan facility. During the year ended December 31, 2019, the Company recorded $23.5 million in interest expense and incurred approximately $111.8 million of capitalized lender fees and $4.7 million in deferred financing costs and will be amortized over the term of the Term Loan Facility. Amortization of deferred financing costs totaled $2.6 million for the year ended December 31, 2019. The effective interest rate is 13.2%.

### New Media Credit Agreement

Prior to the acquisition of Legacy Gannett, the Company, through its wholly-owned subsidiary New Media Holdings II LLC (the "New Media Borrower") maintained secured credit facilities (the "Credit Facilities") under an agreement (the "New Media Credit Agreement") with a syndication of lenders, including a term loan facility and a revolving credit facility. The term loan facility was scheduled to expire on July 14, 2022 and the revolving credit facility was scheduled to expire on July 14, 2021. Maximum borrowings under the revolving credit facility, including letters of credit, totaled $40.0 million. The New Media Credit Agreement contained customary representations and warranties and affirmative covenants and negative covenants applicable to Holdings I, the New Media Borrower, and the New Media Borrower's subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, fundamental changes, dispositions, dividends and other distributions, and events of default. The New Media Credit Agreement also contained a financial covenant requiring Holdings I, the New Media Borrower, and the New Media Borrower's subsidiaries to maintain a maximum total leverage ratio of 3.25:1.00.

Pursuant to the acquisition of Legacy Gannett in November 2019 and the origination of the Apollo term loan facility, all outstanding secured term facilities, incremental facilities, revolving credit facilities, and incremental term loans under the New Media Credit Agreement were paid in full or terminated. Furthermore, all guarantees and security interests in respect of the New Media Credit Agreement were released. As a result, the Company recognized a loss on extinguishment of debt of $3.7 million.

### Advantage Credit Agreements

In connection with the purchase of the assets of Halifax Media in 2015, the Company assumed obligations of Halifax Media including the amount owing ($8.0 million at that time) under the credit agreement dated June 18, 2013 between Halifax Alabama, LLC and Southeast Community Development Fund V, LLC. This debt bore interest at an annual rate of 2% and was repaid in full on April 1, 2019.

### Convertible debt

On April 9, 2018, Legacy Gannett completed an offering of 4.75% convertible senior notes, with an initial offering size of $175.0 million aggregate principal amount. As part of the offering, the initial purchaser of the notes exercised its option to purchase an additional $26.3 million aggregate principal amount of notes, resulting in total aggregate principal of $201.3 million and net proceeds of approximately $195.3 million. Interest on the notes is payable semi-annually in arrears. The notes mature on April 15, 2024 with our earliest redemption date being April 15, 2022. The stated conversion rate of the notes is 82.4572 shares per $1,000 in principal or approximately $12.13 per share.

Upon conversion, we have the option to settle in cash, shares of our common stock, or a combination of the two. Additionally, holders may convert the notes at their option prior to January 15, 2024 only if one or more of the following conditions are present: (1) if, during any 20 of the 30 trading days immediately preceding a quarter end, our common stock trading price is 130% of the stated conversion price, (2) if, during the five business day period after any 10 consecutive trading day period, the trading price per $1,000 principal amount of notes is less than 98% of the product of (a) the last reported sale price of the Company's common stock and (b) the conversion rate on each such trading day, or (3) a qualified change in control event occurs. Depending on the nature of the triggering event, the conversion rate may also be subject to adjustment.

The Company's acquisition of Legacy Gannett constituted a Fundamental Change and Make-Whole Fundamental Change under the terms of the indenture governing the notes. At the acquisition date, the Company delivered to noteholders a notice offering the right to surrender all or a portion of their notes for cash on December 31, 2019. Holders were required to surrender their notes by December 30, 2019 and in return, the Company redeemed the notes for either (1) cash at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest from October 15, 2019 to December 29, 2019 (2) converted equity plus cash at the stated conversion rate of 82.4572 shares per $1,000 in principal, comprised of 0.5427 shares of Parent common stock, plus $6.25 of cash. On December 31, 2019, we completed the redemption of $198.0 million in aggregate principal in exchange for cash.

The $3.3 million principal value of the notes is reported as convertible debt in the Consolidated balance sheets. The effective interest rate on the notes was 6.05% as of December 31, 2019. During the year ended December 31, 2019, the Company recorded $1.3 million in interest expense, of which $1.1 million is cash interest paid on aforementioned redemption.

**Contractual obligations and commitments**

The following table reflects a summary of our contractual cash obligations, including estimated interest payments, where applicable, as of December 31, 2019:

| *in thousands* | | | | Payments Due by Period | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Total** | | **2020** | | **2021-2022** | | **2023-2024** | | **Thereafter** |
| Debt obligations [a] | $ | 2,761,045 | $ | 204,925 | $ | 409,850 | $ | 2,146,270 | $ | — |
| Operating lease obligations [b] | | 563,459 | | 76,339 | | 145,799 | | 107,706 | | 233,615 |
| Management fee | | 39,674 | | 19,837 | | 19,837 | | — | | — |
| Purchase obligations [c] | | 496,270 | | 193,690 | | 162,652 | | 96,794 | | 43,134 |
| Other noncurrent liabilities [d] | | 29,066 | | 19,080 | | 6,061 | | 2,592 | | 1,333 |
| Retirement plan contributions [e] | $ | 93,729 | | 54,439 | | 39,290 | | — | | — |
| Total | $ | 3,983,243 | $ | 568,310 | $ | 783,489 | $ | 2,353,362 | $ | 278,082 |

[a] See Note 7 — Indebtedness to the consolidated financial statements.

[b] See Note 3 — Leases to the consolidated financial statements.

[c] Includes purchase obligations related to wire services, interactive marketing agreements, professional services, paper distribution agreements, printing contracts, and other legally binding commitments. Amounts for which we are liable under purchase orders outstanding at December 31, 2019 are reflected in the Consolidated balance sheets as accounts payable and accrued liabilities and are excluded from the table above.

[d] Consists largely of unfunded or underfunded postretirement benefit plans excluding the Gannett Retirement Plan (GRP), the Newsquest Pension Scheme, the George W. Prescott Plan, and the Times Publishing Company Plan. Included in this total are several plans assumed pursuant to the acquisition of Legacy Gannett, including the Gannett 2015 Supplemental Retirement Plan, the Gannett Retiree Welfare Plan, the Newspaper Guild of Detroit Plan, and a SERP plan which was assumed pursuant to Legacy Gannett's acquisition of JMG. Contributions beyond the next fiscal year are excluded due to uncertainties regarding significant assumptions involved in estimating these contributions such as interest rate levels as well as the amount and timing of invested asset returns.

[e] Consists of amounts we are contractually obligated to contribute to the GRP, the Newsquest Pension Scheme, the George W. Prescott Plan, and the Times Publishing Company Plan. This total does not include additional contributions which may be required to meet IRS minimum funding standards as these contributions are subject to uncertainties regarding significant assumptions involved in their estimation such as interest rate levels as well as the amount and timing of invested asset returns.

Due to uncertainty with respect to the timing of future cash flows associated with unrecognized tax benefits at December 31, 2019, we are unable to make reasonably reliable estimates of the period of cash settlement. Therefore, $34.1 million of unrecognized tax benefits have been excluded from the contractual obligations table above. See Note 10 — Income taxes to the consolidated financial statements for a further discussion of income taxes.

**Off-balance sheet arrangements**

As of December 31, 2019, we had no material off-balance sheet arrangements as defined in the rules of the Securities and Exchange Commission.

**Non-GAAP Financial Measures**

A non-GAAP financial measure is generally defined as one that purports to measure historical or future financial performance, financial position, or cash flows but excludes or includes amounts that would not be so adjusted in the most comparable GAAP measure. We define and use Adjusted EBITDA, a non-GAAP financial measure, as set forth below.

**Adjusted EBITDA**

We define Adjusted EBITDA as income (loss) from continuing operations *before*:

- Income tax expense (benefit);
- Interest expense;
- Gains or losses on early extinguishment of debt;
- Non-operating items, primarily pension costs;
- Depreciation and amortization;
- Integration and reorganization costs;

- Impairment of long-lived assets;
- Goodwill and intangible impairments;
- Net loss (gain) on sale or disposal of assets;
- Non-cash compensation;
- Acquisition costs; and
- Certain other non-recurring charges.

### *Management's Use of Adjusted EBITDA*

Adjusted EBITDA is not a measurement of financial performance under GAAP and should not be considered in isolation or as an alternative to income from operations, net income (loss), cash flow from continuing operating activities, or any other measure of performance or liquidity derived in accordance with GAAP. We believe this non-GAAP measure as we have defined it is helpful in identifying trends in our day-to-day performance because the items excluded have little or no significance on our day-to-day operations. This measure provides an assessment of controllable expenses and affords management the ability to make decisions which are expected to facilitate meeting current financial goals as well as achieve optimal financial performance.

Adjusted EBITDA provides us with a measure of financial performance, independent of items that are beyond the control of management in the short-term such as depreciation and amortization, taxation, non-cash impairments, and interest expense associated with our capital structure. This metric measures our financial performance based on operational factors that management can impact in the short-term, namely the cost structure or expenses of the organization. Adjusted EBITDA is one of the metrics we use to review the financial performance of our business on a monthly basis.

### *Limitations of Adjusted EBITDA*

Adjusted EBITDA has limitations as an analytical tool. It should not be viewed in isolation or as a substitute for GAAP measures of earnings or cash flows. Material limitations in making the adjustments to our earnings to calculate Adjusted EBITDA and using this non-GAAP financial measure as compared to GAAP net income (loss) include: the cash portion of interest / financing expense, income tax (benefit) provision, and charges related to impairment of long-lived assets, which may significantly affect our financial results.

A reader of our financial statements may find this item important in evaluating our performance, results of operations, and financial position. We use non-GAAP financial measures to supplement our GAAP results in order to provide a more complete understanding of the factors and trends affecting our business.

Adjusted EBITDA is not an alternative to net income, income from operations, or cash flows provided by or used in operations as calculated and presented in accordance with GAAP. Readers of our financial statements should not rely on Adjusted EBITDA as a substitute for any such GAAP financial measure. We strongly urge readers of our financial statements to review the reconciliation of income (loss) from continuing operations to Adjusted EBITDA along with our consolidated financial statements included elsewhere in this report. We also strongly urge readers of our financial statements to not rely on any single financial measure to evaluate our business. In addition, because Adjusted EBITDA is not a measure of financial performance under GAAP and is susceptible to varying calculations, the Adjusted EBITDA measure as presented in this report may differ from and may not be comparable to similarly titled measures used by other companies.

We use Adjusted EBITDA as a measure of our day-to-day operating performance, which is evidenced by the publishing and delivery of news and other media and excludes certain expenses that may not be indicative of our day-to-day business operating results. We consider the unrealized (gain) loss on derivative instruments and the (gain) loss on early extinguishment of debt to be financing related costs associated with interest expense or amortization of financing fees. Accordingly, we exclude financing related costs such as the early extinguishment of debt because they represent the write-off of deferred financing costs, and we believe these non-cash write-offs are similar to interest expense and amortization of financing fees, which by definition are excluded from Adjusted EBITDA. Additionally, the non-cash gains (losses) on derivative contracts, which are related to interest rate swap agreements to manage interest rate risk, are financing costs associated with interest expense. Such charges are incidental to, but not reflective of, our day-to-day operating performance, and it is appropriate to exclude charges related to financing activities such as the early extinguishment of debt and the unrealized (gain) loss on derivative instruments which, depending on the nature of the financing arrangement, would have otherwise been amortized over the period of the related agreement and does not require a current cash settlement. Such charges are incidental to, but not reflective of our day-to-day operating performance of the business that management can impact in the short term.

52

The table below shows the reconciliation of (loss) income from continuing operations to Adjusted EBITDA for the periods presented:

| | | | Year Ended | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | % Change | | 2017 | % Change |
| *(in thousands)* | | | | | | | | |
| Net income (loss) attributable to Gannett (GAAP basis) | $ | (119,842) | $ | 18,196 | *** | $ | (915) | *** |
| Income tax expense (benefit) | | (85,994) | | 1,912 | *** | | 481 | *** |
| Interest expense | | 63,660 | | 36,072 | 76% | | 30,476 | 18 % |
| Loss on early extinguishment of debt | | 6,058 | | 2,886 | *** | | 4,767 | (39)% |
| Other non-operating items, net | | (9,511) | | (1,554) | *** | | (776) | *** |
| Depreciation and amortization | | 111,882 | | 84,791 | 32% | | 74,394 | 14 % |
| Integration and reorganization costs | | 47,401 | | 15,011 | *** | | 8,903 | 69 % |
| Acquisition costs | | 60,618 | | 2,651 | *** | | 1,975 | 34 % |
| Impairment of long-lived assets | | 3,009 | | 1,538 | 96% | | 7,142 | (78)% |
| Goodwill and mastheads impairment | | 100,743 | | — | *** | | 27,448 | (100)% |
| Net (gain) loss on sale or disposal of assets | | 4,723 | | (3,971) | *** | | (1,649) | *** |
| Non-cash compensation | | 11,324 | | 3,156 | *** | | 3,135 | 1 % |
| Other items | | 29,800 | | 19,605 | 52% | | 9,910 | 98 % |
| Adjusted EBITDA (non-GAAP basis) | $ | 223,871 | $ | 180,293 | 24% | $ | 165,291 | 9 % |

*** - Indicates a percentage change greater than 100.

**Seasonality**

Our revenues are subject to moderate seasonality due primarily to fluctuations in advertising volumes. Our advertising revenues for publishing are typically highest in the Company's fourth quarter due to holiday and seasonal advertising and lowest in the first quarter following the holiday season. The volume of advertising sales in any period is also impacted by other external factors such as competitors' pricing, advertisers' decisions to increase or decrease their advertising expenditures in response to anticipated consumer demand, and general economic conditions.

**Critical accounting policies and the use of estimates**

The preparation of financial statements in conformity with GAAP requires management to make decisions based on estimates, assumptions and factors it considers relevant to the circumstances. Such decisions include the selection of applicable principles and the use of judgment in their application, the results of which could differ from those anticipated.

*Business Combinations*

The Company accounts for acquisitions in accordance with the provisions of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805 "*Business Combinations*" ("ASC 805"). ASC 805 provides guidance for recognition and measurement of identifiable assets and goodwill acquired, liabilities assumed, and any noncontrolling interest in the acquiree at fair value. In a business combination, the assets acquired, liabilities assumed, and noncontrolling interest in the acquiree are recorded as of the date of acquisition at their respective fair values with limited exceptions. Any excess of the purchase price (consideration transferred) over the estimated fair values of net assets acquired is recorded as goodwill. Transaction costs are expensed as incurred. The operating results of the acquired business are reflected in the Company's consolidated financial statements after the date of the acquisition.

*Goodwill*

The application of the purchase method of accounting for business combinations requires the use of significant estimates and assumptions in the determination of the fair value of assets and liabilities in order to properly allocate the purchase price consideration or enterprise value between assets that are depreciated and amortized from goodwill. Our estimates of the fair values of assets and liabilities are based upon assumptions believed to be reasonable, and when appropriate, include assistance from independent third-party valuation firms. Refer to Note 4 — Acquisitions and dispositions of the consolidated financial statements.

We have a significant amount of goodwill. Goodwill at December 31, 2019 was $914.3 million. Historically, we have assessed the potential impairment of goodwill and intangible assets with indefinite lives on an annual basis as of the end of our second fiscal quarter in accordance with the provisions of ASC Topic 350 "*Intangibles-Goodwill and Other.*" The Company performed an assessment during the fourth quarter as a result of the acquisition of Legacy Gannett and the related restructuring.

We perform our impairment analysis on each of our reporting units. The Company has the option to qualitatively assess whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. If the Company elects to perform a qualitative assessment and concludes it is more likely than not that the fair value of the reporting unit is equal to or greater than its carrying value, no further assessment of that reporting unit's goodwill is necessary; otherwise goodwill must be tested for impairment. The reporting units have discrete financial information and are regularly reviewed by management. The fair value of the applicable reporting units is compared to their carrying values. Calculating the fair value of a reporting unit requires us to make significant estimates and assumptions. We estimate fair value by applying third-party market value indicators to projected cash flows and/or projected earnings before interest, taxes, depreciation, and amortization. In applying this methodology, we rely on a number of factors, including current operating results and cash flows, expected future operating results and cash flows, future business plans, and market data. If the carrying value of the reporting unit exceeds the estimate of fair value, we calculate the impairment as the excess of the carrying value of goodwill over its implied fair value.

The fair values of our reporting units for goodwill impairment testing are estimated using the expected present value of future cash flows, recent industry

transaction multiples, and using estimates, judgments, and assumptions that management believes are appropriate in the circumstances. The sum of the fair values of the reporting units is reconciled to our current market capitalization (based upon the stock market price) plus an estimated control premium.

Significant judgment is required in determining the fair value of our goodwill to measure impairment, including the determination of multiples of revenue and Adjusted EBITDA and future earnings projections. The estimates and judgments that most significantly affect the future cash flow estimates are assumptions related to revenue, specifically potential changes in

future advertising (including the impact of economic trends and the speed of conversion of advertising and readership to online products from traditional print products), trends in newsprint prices, and other operating expense items.

In addition to the fourth quarter assessment noted above, we performed annual impairment testing of goodwill during the second quarter of 2019, 2018, and 2017. See Note 6 — Goodwill and other intangible assets for a discussion of the impairment charges taken.

### Intangible Assets (Indefinite-Lived and Amortizable)

Intangible assets consist of mastheads, trade names, domain names, developed technology, and customer relationships. Newspaper mastheads (newspaper titles) are not subject to amortization and are tested for impairment annually or more frequently if events or changes in circumstances indicate the asset might be impaired. The impairment test consists of a comparison of the fair value of each group of mastheads with their carrying amount. We used a relief from royalty approach which utilizes a discounted cash flow model to determine the fair value of newspaper mastheads. Our judgments and estimates of future operating results in determining the reporting unit fair values are consistently applied in determining the fair value of mastheads. We performed impairment tests on newspaper mastheads during the fourth quarter of 2019 as well as the second quarter of 2019, 2018, and 2017. See Note 6 — Goodwill and other intangible assets for a discussion of the impairment charges taken.

The fair values of our newspaper mastheads are estimated using the relief from royalty method as well as estimates, judgments and assumptions that management believes are appropriate in the circumstances. Intangible assets subject to amortization (primarily advertiser and subscriber lists) are tested for recoverability whenever events or changes in circumstances indicate their carrying amounts may not be recoverable. The carrying amount of each asset group is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use of such asset group.

After the completion of its acquisition of Legacy Gannett, the Company reorganized its reporting units to align with its new segment structure. Due to the change in the composition of the reporting units, the Company performed additional impairment tests for goodwill and indefinite-lived intangible assets before and after the reorganization. Similar methodologies and assumptions were utilized for the post-reorganization impairment assessment. Fair values of the reporting units were determined to be greater than the carrying value of the reporting units, and the estimated fair value exceeded carrying value for all mastheads.

In the analysis performed before the reorganization, the fair value of the Newspapers reporting unit did not exceed the carrying value. The primary factors impacting the decrease in fair value were the Company's third and fourth quarter financial performance and its declining stock price, which was, in part, related to the announcement of the Company's acquisition of Legacy Gannett. As a result, the Company recorded a goodwill impairment of $62.3 million within the Newspapers reporting unit. In addition, the fair value of the mastheads in the east, central, west and BridgeTower regions did not exceed carrying value and accordingly the Company recorded an impairment of $38.4 million. Key assumptions within the impairment analyses included revenue and EBITDA projections, discount rates, royalty rates, long-term growth rates, and the effective tax rate that the Company considers appropriate. Revenue projections reflected continued declines in early years, which are expected to moderate to a terminal rate of loss of 1% with in the Newspapers reporting unit. EBITDA projections as a percentage of revenue show improvement over the next couple of years, largely due to continued expense reductions, and are expected to stabilize to an average rate of approximately 17% in the outer years. Discount rates were 20%, royalty rates ranged from 1.25% to 1.50%, and the effective tax rate was 27%.

Subsequent to the acquisition of legacy Gannett and management restructuring, the Company's reporting units are Domestic Publishing, Newsquest and Marketing Solutions. The Legacy New Media units of accounting remained the same (east, central, west and BridgeTower) so there was no need to test for impairment. The fair values for Domestic Publishing and Marketing Solutions goodwill are greater than the carrying values; however, the difference between the two values is less than 10%. There is no headroom for Newsquest. For Domestic Publishing, the revenue projections mirrored the Legacy New Media analysis and were increased by the revenues expected to be earned by the Legacy Gannett business. They reflected continued declines in early years and that revenues are expected to moderate to a terminal rate of loss of 0.5%. EBITDA projections as a percentage of revenue show improvement over the next couple of years, largely due to expected synergies, facility consolidation and continued expense reductions, and then average to a rate of approximately 22% in the outer years. Discount rates were 21%, and the effective tax rate was 27%. For Marketing Solutions, revenues are expected to increase at a rate of approximately 7% to 10% for several years. The terminal growth rate is 3%. EBITDA projections as a percentage of revenue show improvement over the next couple of years and then average to approximately 12% to 13% beyond that. Discount rates were 21%, and the effective tax rate was 27%. Since there were no changes to the Newsquest reporting unit as a result of the acquisition, the fair value of Newsquest was derived from the analysis performed for the purchase price allocation.

54

As of December 31, 2019, the Company performed a review of potential impairment indicators, noting its financial results and forecast had not changed materially since the assessment due to restructuring, and it was determined no indicators of impairment were present.

### Property, Plant, and Equipment

We account for long-lived assets in accordance with the provisions of ASC Topic 360, "*Property, Plant and Equipment*". We assess the recoverability of our long-lived assets, including property, plant, and equipment, whenever events or changes in business circumstances indicate the carrying amount of the assets, or related group of assets, may not be fully recoverable. Factors leading to impairment include significant under-performance relative to historical or projected results, significant changes in the manner of use of the acquired assets or the strategy for our overall business and significant negative industry or economic trends. The assessment of recoverability is generally based on management's estimates by comparing the sum of the estimated undiscounted cash flows generated by the underlying asset, or other appropriate grouping of assets, to its carrying value to determine whether an impairment existed at its lowest level of identifiable cash flows. However, in some cases the market approach is used to estimate the fair value, particularly when there is a change in the use of an asset. If the carrying amount of the asset is greater than the expected undiscounted cash flows to be generated by such asset, an impairment is recognized to the extent the carrying value of such asset exceeds its fair value.

Significant judgment is required in determining the fair value of our long-lived assets to measure impairment, including the determination of multiples of revenue and Adjusted EBITDA and future earnings projections. The estimates and judgments that most significantly affect the future cash flow estimates are assumptions related to revenue, and in particular, potential changes in future advertising (including the impact of economic trends and the speed of conversion of advertising and readership to online products from traditional print products); trends in newsprint prices; and other operating expense items.

The Company considered the impairment of goodwill and mastheads in Newspapers to be a potential indicator of impairment under ASC 360. The Company determined the long-lived asset groups were the same as its units of accounting. The Company performed an analysis of its undiscounted cash flows in the east, central and west regions to determine if there was an impairment of long-lived assets. The sum of undiscounted cash flows over the primary asset's weighted-average remaining useful life exceeded the group's carrying value, so no impairment was recorded. Additionally, there were no indicators of impairment on the long-lived asset group for BridgeTower.

As part of ongoing cost efficiency programs, the Company has ceased a number of print operations. Pursuant to these actions, certain assets and real estate to be retired are assessed for impairment. As a result of these reviews, the Company recognized impairment charges related to retired equipment of $3.0 million for the year ended December 31, 2019.

The newspaper industry and the Company have experienced declining same store revenue and profitability over the past several years. Should general economic, market or business conditions decline, and have a negative impact on estimates of future cash flow and market transaction multiples, we may be required to record additional impairment charges in the future.

### Revenue Recognition

Revenues are recognized when control of the promised goods or services is transferred to customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. Revenues are recognized as performance obligations that are satisfied either at a point in time, such as when an advertisement is published, or over time, such as customer subscriptions.

The Company's Consolidated statements of operations and comprehensive income (loss) presents revenues disaggregated by revenue type. Sales taxes and other usage-based taxes are excluded from revenues.

#### Advertising Revenues

The Company generates advertising revenues primarily by delivering advertising in local publications including newspapers and websites. Advertising revenues are categorized as local retail, local classified, online and national. Revenue is recognized upon publication of the advertisement.

For online marketing products provided by our Marketing Solutions segment, we enter into agreements for products in which our clients typically pay in advance and on a monthly basis. These prepayments include all charges for the included technology and any media services, management, third-party content, and other costs and fees, all of which are accounted for as

a single performance obligation. Revenue is then recognized as we purchase and deliver media on behalf of the customer and perform other marketing-related services.

For our advertising and marketing services revenues, we evaluate whether we are the principal (i.e., report revenues on a gross basis) or agent (i.e., report revenues on a net basis) by performing analyses regarding whether we control the provision of specified goods or services before they are transferred to our customers. We report advertising and marketing services revenues gross when we control advertising inventory before it is transferred to the customer. Our control is evidenced by us being primarily responsible or sharing responsibility for the fulfillment of services and maintaining control over transaction pricing.

Certain customers may receive credits, which are accounted for as a separate performance obligation. We estimate these amounts based on the expected amount to be provided to customers and reduce revenues recognized. We recognize revenue when the performance obligation is satisfied.

*Circulation Revenues*

Circulation revenues are derived from print and digital subscriptions as well as single copy sales at retail stores, vending racks and boxes. Circulation revenues from subscribers are generally billed to customers at the beginning of the subscription period and are typically recognized over the subscription period as the performance obligations are delivered. The term of customer subscriptions normally ranges from three to twelve months. Circulation revenues from single-copy income are recognized based on the date of publication, net of provisions for related returns.

*Commercial Printing and Other Revenues*

The Company provides commercial printing services to third parties as a means to generate incremental revenue and utilize excess printing capacity. These customers consist primarily of other publishers that do not have their own printing presses. The Company also prints other commercial materials, including flyers, business cards and invitations. Revenue is generally recognized upon delivery.

*Arrangements with Multiple Performance Obligations*

We have various advertising and circulation agreements which have both print and digital performance obligations. Advertising revenue is recognized upon publication of the advertisement. Circulation revenues from digital and home delivery subscriptions are recognized over the subscription period as the performance obligations are delivered.

*Contract Balances*

The Company records deferred revenues when cash payments are received in advance of the Company's performance. The most significant unsatisfied performance obligation is the delivery of publications to subscription customers. The Company expects to recognize the revenue related to unsatisfied performance obligations up to twelve months in accordance with the terms of the subscriptions. The increase in the deferred revenue balance for the year ended December 31, 2019 is primarily driven by acquisitions.

*Practical Expedients and Exemptions*

The Company expenses sales commissions or other costs to obtain contracts when incurred because the amortization period is generally one year or less. These costs are recorded within selling, general and administrative expenses.

The Company does not disclose unsatisfied performance obligations for (i) contracts with an original expected length of one year or less because the contracts and payment terms are short-term in nature. Additionally, the Company does not disclose unsatisfied performance obligations for contracts for which the Company recognizes revenue at the amount to which the Company has the right to invoice for services performed.

***Income Taxes***

We are subject to income taxes in the U.S. and various foreign jurisdictions in which we operate and record our tax provision for the anticipated tax consequences in our reported results of operations. Tax laws are complex and subject to different interpretations by the taxpayer and respective government taxing authorities. Significant judgment is required in determining our tax expense and in evaluating our tax positions including evaluating uncertainties in the application of tax laws and regulations.

We account for income taxes under the provisions of ASC Topic 740, "*Income Taxes*" ("ASC 740"). Under this method, deferred tax assets and liabilities are determined based on the difference between the financial statement and tax basis of assets and liabilities using tax rates in effect for the year in which the differences are expected to affect taxable income. The assessment of the realizability of deferred tax assets involves a high degree of judgment and complexity. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are expected to be realized. When we determine that it is more likely than not that we will be able to realize our deferred tax assets in the future in excess of our net recorded amount, an adjustment to the deferred tax asset would be made and reflected either in income or as an adjustment to goodwill. This determination will be made by considering various factors, including our expected future results, that in our judgment will make it more likely than not that these deferred tax assets will be realized.

Our actual effective tax rate and income tax expense could vary from estimated amounts due to the future impacts of various items, including changes in income tax laws, tax planning and our forecasted financial condition, and results of operations in future periods. Although we believe current estimates are reasonable, actual results could differ from these estimates.

FASB issued Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes, an interpretation of SFAS No. 109*" and now codified as ASC 740. ASC 740 prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that a company has taken or expects to take on a tax return. Under ASC 740, the financial statements reflect expected future tax consequences of such positions presuming the taxing authorities' full knowledge of the position and all relevant facts, but without considering time values. Recognized income tax positions are measured at the largest amount that has a greater than 50% likelihood of being realized. Changes in recognition or measurement are reflected in the period in which the change in judgment occurs.

### *Pension and Postretirement Liabilities*

ASC Topic 715, "*Compensation—Retirement Benefits*" requires recognition of an asset or liability in the consolidated balance sheet reflecting the funded status of pension and other postretirement benefit plans such as retiree health and life, with current-year changes in the funded status recognized in the statement of stockholders' equity.

The determination of pension plan obligations and expense is based on a number of actuarial assumptions. Two critical assumptions are the expected long-term rate of return on plan assets and the discount rate applied to pension plan obligations. For other postretirement benefit plans, which provide for certain health care and life insurance benefits for qualifying retired employees and which are not funded, critical assumptions in determining other postretirement benefit obligations and expense are the discount rate and the assumed health care cost-trend rates.

Our pension plans, including those assumed from Legacy Gannett, have assets valued at $2.9 billion as of December 31, 2019 and the plans' benefit obligation is $3.0 billion resulting in the plans being 96% funded.

For 2019, the assumption used for the funded status discount rate was 3.35% for our principal retirement plan obligations. As an indication of the sensitivity of pension liabilities to the discount rate assumption, a 50 basis point reduction in the discount rate at the end of 2019 would have increased plan obligations by approximately $86.0 million. A 50 basis point change in the discount rate used to calculate 2019 expense would have changed total pension plan expense for 2019 by approximately $0.8 million. To determine the expected long-term rate of return on pension plan assets, we consider the current and expected asset allocations, as well as historical and expected returns on various categories of plan assets, input from the actuaries and investment consultants, and long-term inflation assumptions. We used an assumption of 7.0% for our expected return on pension plan assets for 2019. If we were to reduce our expected rate of return assumption by 50 basis points, the expense for 2019 would have increased by approximately $1.0 million.

The assumed health care cost-trend rate also affects other postretirement benefit liabilities and expense. A 100 basis point increase in the health care cost trend rate would result in an increase of approximately $4.4 million in the December 31, 2019 postretirement benefit obligation, and a 100 basis point decrease in the health care cost trend rate would result in a decrease of approximately $3.9 million in the December 31, 2019 Legacy New Media postretirement benefit obligation. The effect of a 100 basis point change in the health care cost trend rate would have no impact on the 2019 postretirement benefit obligation and would result in no measurable change in the aggregate service and interest components of the 2019 expense for the Legacy Gannett postretirement plans.

*Self-Insurance Liability Accruals*

We maintain self-insured medical and workers' compensation programs. We purchase stop loss coverage from third parties which limits our exposure to large claims. We record a liability for healthcare and workers' compensation costs during the period in which they occur, including an estimate of incurred but not reported claims.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISKS

We are exposed to market risk from changes in interest rates and commodity prices. Changes in these factors could cause fluctuations in earnings and cash flow. In the normal course of business, exposure to certain of these market risks is managed as described below.

*Interest Rates*

This discussion is based on our average long-term debt of $540.5 million during the year ended December 31, 2019. There were no interest rate swaps in place during this period.

As of December 31, 2019, we have $1.6 billion of term debt at a fixed interest rate of 11.5%. A 100 basis point change in the fixed rate of our debt would change our interest expense on an annualized basis by approximately $16.4 million.

*Foreign Currency*

We are exposed to foreign exchange rate risk due to our publishing operations in the U.K., for which the British pound sterling is the functional currency. We are also exposed to foreign exchange rate risk due our Marketing Solutions segment which has operating activities denominated in currencies other than the U.S. dollar, including the Australian dollar, Canadian dollar, Indian rupee, and New Zealand dollar.

Translation gains or losses affecting the Consolidated statements of operations and comprehensive income (loss) have not been significant in the past.

Our cumulative foreign currency translation adjustments reported as part of our equity totaled $7.3 million at December 31, 2019. No such adjustments were reported at December 30, 2018 and December 31, 2017.

Newsquest's assets and liabilities were translated from British pounds sterling to U.S. dollars at the December 31, 2019 exchange rate of 1.31. Newsquest's financial results for the six-week period subsequent to its acquisition were translated at an average rate of 1.30.

If the price of the British pound sterling against the U.S. dollar had been 10% more or less than the actual price, operating income would have increased or decreased approximately $0.1 million for the year ended December 31, 2019. A 10% fluctuation in each of ReachLocal's currencies relative to the U.S. dollar would have had an immaterial impact on operating income for the year ended December 31, 2019.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

## INDEX TO FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Page**

### FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 61 |
| Consolidated Balance Sheets | 64 |
| Consolidated Statements of Operations and Comprehensive Income (Loss) | 65 |
| Consolidated Statements of Cash Flows | 66 |
| Consolidated Statements of Equity | 67 |
| Notes to Consolidated Financial Statements | 68 |

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Gannett Co., Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Gannett Co., Inc. (the Company) as of December 31, 2019 and December 30, 2018, the related consolidated statements of operations and comprehensive income (loss), equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and December 30, 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 2, 2020 expressed an adverse opinion thereon.

**Adoption of ASU No. 2018-11**

As discussed in Note 3 to the consolidated financial statements, the Company changed its method of accounting for leases in 2019 due to the adoption of ASU No. 2018-11, Leases.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

### Goodwill and Intangible Assets with Indefinite Lives Impairment Assessment

*Description of the Matter*

At December 31, 2019, the Company's goodwill and intangible assets with indefinite lives, which consist of newspaper mastheads, were $914.3 million and $178.6 million, respectively. As discussed in Note 1 of the consolidated financial statements, goodwill and intangible assets with indefinite lives are tested for impairment at least annually or when events occur that indicate impairment could exist. As a result of these assessments, the Company recognized impairments of $100.7 million during the year ended December 31, 2019.

Auditing management's impairment tests of goodwill and newspaper masthead intangible assets was complex and judgmental due to the estimation required in determining the fair value of the reporting units and newspaper mastheads. In particular, the estimates of the fair value of the reporting units are sensitive to significant assumptions such as the revenue growth rates, discount rates and projected EBITDA margins. The estimates of fair value of the newspaper masthead intangible assets are sensitive to significant assumptions including the royalty rates, discount rates and revenue growth rates. These assumptions are affected by expectations about future economic and industry factors.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's goodwill and intangible assets with indefinite lives impairment review process. For example, we tested controls over management's review of the significant assumptions described above as well as management's review of the reasonableness of the underlying data used in the valuation analyses.

To test the estimated fair value of the Company's reporting units and newspaper masthead intangible assets, we performed audit procedures that included, among others, assessing the valuation methodologies used, testing the significant assumptions described above and testing the completeness and accuracy of the underlying data the Company used in its analyses. For example, we compared the revenue growth rates and projected EBITDA margins used in the valuations to current industry and economic trends and assessed the historical accuracy of management's estimates. With the assistance of our internal valuation specialists, we also developed an independent range of the discount rate and royalty rate assumptions and compared them to the rates determined by management. We performed sensitivity analyses of the significant assumptions to evaluate the changes in the fair value of the reporting units and the newspaper masthead intangible assets that would result from changes in the assumptions. In addition, we tested management's reconciliation of the fair value of the reporting units to the market capitalization of the Company.

### Valuation of Intangible Assets Acquired in connection with the Gannett Media Corp. Acquisition

*Description of the Matter*

As disclosed in Note 4 to the consolidated financial statements, during 2019, the Company completed the acquisition of Gannett Media Corp. for net consideration of $1.2 billion. This transaction was accounted for as a business combination.

Auditing the Company's accounting for the acquisition of Gannett Media Corp. was complex and judgmental due to the significant estimation uncertainty in determining the fair value of identified intangible assets, which principally consisted of acquired newspaper mastheads, trade names, customer relationships and developed technology. The significant estimation uncertainty was primarily due to the sensitivity of the respective fair value estimates to underlying assumptions about the future performance of the acquired business. The Company used an income approach to measure the intangible assets including the relief from royalty method for newspaper mastheads, trade names and developed technology and the excess earnings method for customer relationships. The significant assumptions used to estimate the fair value of the identified intangible assets included revenue growth rates, discount rates, projected EBITDA margins, royalty rates, and customer attrition rates. These significant assumptions are forward-looking and could be affected by future economic and market conditions.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the recognition and measurement of assets acquired. For example, we tested controls over management's review of the valuation of intangible assets, including the review of the valuation models and significant assumptions used in the valuation.

To test the estimated fair value of the acquired intangible assets, our audit procedures included, among others, evaluating the methodologies used, evaluating the significant assumptions used in the valuation models and testing the completeness and accuracy of the underlying data. We involved our valuation specialists to assist in testing certain significant assumptions and methodologies used to value the acquired intangible assets. For example, we compared the significant assumptions to current industry, market and economic trends as well as to historical results of the acquired business and to other guidelines used by companies within the same industry. As part of this evaluation, we also compared the royalty rates used in the valuation of newspaper mastheads, trade names and developed technology to market data. In addition, we performed a sensitivity analysis on the significant assumptions to evaluate the change in the fair values of the intangible assets that would result from the changes in assumptions.

### Defined Benefit Pension Obligation

*Description of the Matter*

At December 31, 2019, the Company's aggregate obligation for its defined benefit pension plans was $3.0 billion and exceeded the gross fair value of the related plan assets of $2.9 billion, resulting in a net defined benefit pension obligation of $116.9 million as of December 31, 2019. The Company recorded a net periodic pension benefit of $8.4 million for the year-ended December 31, 2019. As described in Note 8 of the consolidated financial statements, the Company updates the estimates used to measure the defined benefit pension assets and obligations annually or upon a remeasurement event to reflect the actual return on plan assets and updated actuarial assumptions.

Auditing the defined benefit pension obligations was complex and required the involvement of specialists due to the judgmental nature of the actuarial assumptions such as the discount rate, expected return on plan assets, and participant longevity used in the measurement process. These assumptions have a significant effect on the projected defined benefit pension obligation and net periodic pension benefit expense.

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of the controls over management's measurement and valuation of the defined benefit pension obligations. For example, we tested controls over management's review of the defined benefit pension obligation calculations, the significant actuarial assumptions, and the data inputs used in the actuarial models.

To test the defined benefit pension obligation and net periodic pension benefit expense, our audit procedures included, among others, evaluating the methodology used, the significant actuarial assumptions described above, and the underlying data used by the Company. We compared the actuarial assumptions used by management to historical trends. We involved actuarial specialists in the evaluation of management's methodology for determining the discount rate that reflects the maturity and duration of the benefit payments and is used to measure the defined benefit pension obligation. To perform this evaluation, we compared the discount rate to an independent range of discount rates developed using the projected benefit cash outlays. As part of this assessment, we compared the projected cash flows to the historical cash flows and compared the current year benefits paid to the plans' prior year projected cash flows. To evaluate the mortality and participant longevity, we evaluated management's selection of mortality base tables and improvement scales, as adjusted for entity-specific factors. We also tested the completeness and accuracy of the underlying data, including the participant data provided to the Company's actuarial specialists. To evaluate the expected return on plan assets, we assessed whether management's assumption is consistent with a range of returns for a portfolio of comparative investments.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2007.

Tysons, VA

March 2, 2020

63

**GANNETT CO., INC.**
**CONSOLIDATED BALANCE SHEETS**

*In thousands, except share data*

| Assets | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| *Current assets* | | | | |
| Cash and cash equivalents | $ | 156,042 | $ | 48,651 |
| Accounts receivable, net of allowance for doubtful accounts of $19,923 and $8,042 at December 31, 2019 and December 30, 2018, respectively | | 438,523 | | 174,274 |
| Inventories | | 55,090 | | 25,022 |
| Prepaid expenses and other current assets | | 129,460 | | 49,662 |
| **Total current assets** | | **779,115** | | **297,609** |
| Property, plant and equipment, net of accumulated depreciation of $277,291 and $219,256 at December 31, 2019 and December 30, 2018, respectively | | 815,807 | | 339,608 |
| Operating lease assets | | 309,112 | | — |
| Goodwill | | 914,331 | | 310,737 |
| Intangible assets, net of accumulated amortization of $145,773 and $101,543 at December 31, 2019 and December 30, 2018, respectively | | 1,012,564 | | 486,054 |
| Deferred tax assets | | 76,297 | | — |
| Other assets | | 112,876 | | 9,856 |
| **Total assets** | $ | **4,020,102** | $ | **1,443,864** |

| Liabilities and equity | | | | |
|---|---|---|---|---|
| *Current liabilities* | | | | |
| Current portion of long-term debt | $ | 3,300 | $ | 12,395 |
| Accounts payable | | 146,995 | | 16,612 |
| Accrued expenses | | 306,633 | | 109,597 |
| Deferred revenue | | 218,823 | | 105,187 |
| Other current liabilities | | 42,702 | | 4,053 |
| **Total current liabilities** | | **718,453** | | **247,844** |
| Long-term debt | | 1,636,335 | | 428,180 |
| Convertible debt | | 3,300 | | — |
| Deferred tax liabilities | | 9,052 | | 8,282 |
| Pension and other postretirement benefit obligations | | 235,906 | | 24,326 |
| Long-term operating lease liabilities | | 297,662 | | — |
| Other long-term liabilities | | 136,188 | | 16,462 |
| **Total noncurrent liabilities** | | **2,318,443** | | **477,250** |
| **Total liabilities** | | **3,036,896** | | **725,094** |
| Redeemable noncontrolling interests | | 1,850 | | 1,547 |
| **Commitments and contingent liabilities (see Note 12)** | | | | |
| **Equity** | | | | |
| Common stock, $0.01 par value, 2,000,000,000 shares authorized;129,386,258 shares issued and 128,991,544 shares outstanding at December 31, 2019; 60,508,249 shares issued and 60,306,286 shares outstanding at December 30, 2018 | | 1,294 | | 605 |
| Treasury stock, at cost, 394,714 and 201,963 shares at December 31, 2019 and December 30, 2018, respectively | | (2,876) | | (1,873) |
| Additional paid-in capital | | 1,090,694 | | 721,605 |
| Retained earnings (accumulated deficit) | | (115,958) | | 3,767 |
| Accumulated other comprehensive loss (income) | | 8,202 | | (6,881) |
| **Total equity** | | **981,356** | | **717,223** |
| **Total liabilities and equity** | $ | **4,020,102** | $ | **1,443,864** |

*The accompanying notes are an integral part of these consolidated financial statements.*

**GANNETT CO., INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)**

*In thousands, except per share data*

| Fiscal year ended | December 31, 2019 | December 30, 2018 | December 31, 2017 |
|---|---|---|---|
| **Operating revenues:** | | | |
| Advertising and marketing services | $ 952,644 | $ 786,577 | $ 726,004 |
| Circulation | 704,842 | 574,963 | 474,324 |
| Commercial printing and other | 210,423 | 164,484 | 141,676 |
| *Total operating revenues* | **1,867,909** | **1,526,024** | **1,342,004** |
| **Operating expenses:** | | | |
| Operating costs | 1,079,593 | 865,234 | 742,822 |
| Selling, general and administrative expenses | 606,917 | 502,631 | 447,133 |
| Depreciation and amortization | 111,882 | 84,791 | 74,394 |
| Integration and reorganization costs | 47,401 | 15,011 | 8,903 |
| Acquisition costs | 60,618 | 2,651 | 1,975 |
| Impairment of long-lived assets | 3,009 | 1,538 | 7,142 |
| Goodwill and mastheads impairment | 100,743 | — | 27,448 |
| Net (gain) loss on sale or disposal of assets | 4,723 | (3,971) | (1,649) |
| *Total operating expenses* | **2,014,886** | **1,467,885** | **1,308,168** |
| *Operating income (loss)* | **(146,977)** | **58,139** | **33,836** |
| **Non-operating (income) expense:** | | | |
| Interest expense | 63,660 | 36,072 | 30,476 |
| Loss on early extinguishment of debt | 6,058 | 2,886 | 4,767 |
| Other (income) expense | (9,511) | (838) | (973) |
| *Non-operating expense* | **60,207** | **38,120** | **34,270** |
| **Income (loss) before income taxes** | **(207,184)** | **20,019** | **(434)** |
| Provision (benefit) for income taxes | (85,994) | 1,912 | 481 |
| **Net income (loss)** | $ **(121,190)** | $ **18,107** | $ **(915)** |
| Net loss attributable to redeemable noncontrolling interests | (1,348) | (89) | — |
| **Net income (loss) attributable to Gannett** | $ **(119,842)** | $ **18,196** | $ **(915)** |
| Earnings (loss) per share attributable to Gannett - basic | $ (1.77) | $ 0.31 | $ (0.02) |
| Earnings (loss) per share attributable to Gannett - diluted | $ (1.77) | $ 0.31 | $ (0.02) |
| Dividends declared per share | $ 1.52 | $ 1.49 | $ 1.42 |
| | | | |
| **Other comprehensive income (loss):** | | | |
| Foreign currency translation adjustments | $ 7,266 | $ — | $ — |
| Pension and other postretirement benefit items: | | | |
| Net actuarial (loss) gain | 12,534 | (1,509) | (1,530) |
| Amortization of net actuarial loss (gain) | 86 | 89 | 46 |
| Other | 305 | — | — |
| Total pension and other postretirement benefit items | 12,925 | (1,420) | (1,484) |
| Other comprehensive income (loss) before tax | 20,191 | (1,420) | (1,484) |
| Income tax effect related to components of other comprehensive income (loss) | (5,108) | — | — |
| Other comprehensive income (loss), net of tax | 15,083 | (1,420) | (1,484) |
| **Comprehensive income (loss)** | **(106,107)** | **16,687** | **(2,399)** |
| Comprehensive income (loss) attributable to redeemable noncontrolling interests | (1,348) | (89) | — |
| **Comprehensive income (loss) attributable to Gannett** | **(104,759)** | **16,776** | **(2,399)** |

*The accompanying notes are an integral part of these consolidated financial statements.*

**GANNETT CO., INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

*In thousands*

| Fiscal year ended | December 31, 2019 | December 30, 2018 | December 31, 2017 |
|---|---|---|---|
| *Operating activities* | | | |
| Net income (loss) | (121,190) | 18,107 | (915) |
| Adjustments to reconcile net income to operating cash flows: | | | |
| Depreciation and amortization | 111,882 | 84,791 | 74,394 |
| Facility consolidation costs | 148 | — | — |
| Stock-based compensation - equity awards | 11,324 | 3,156 | 3,135 |
| Non-cash interest expense | 3,851 | 1,996 | 2,339 |
| Non-cash acquisition related costs | 26,411 | — | — |
| (Benefit) provision for deferred income taxes | (87,765) | 202 | 294 |
| Net (gain) loss on sale or disposal of assets | 4,723 | (3,971) | (1,649) |
| Non-cash charge to investments | — | 505 | 250 |
| Non-cash loss on early extinguishment of debt | 6,058 | 2,886 | 2,344 |
| Impairment of long-lived assets | 3,009 | 1,538 | 7,142 |
| Goodwill and mastheads impairment | 100,743 | — | 27,448 |
| Pension and other postretirement benefit obligations | (100,452) | (2,575) | (1,963) |
| Change in assets and liabilities: | | | |
| Accounts receivables, net | 12,608 | 15 | 4,981 |
| Inventory | 5,150 | (4,336) | 1,073 |
| Prepaid expenses | 7,016 | 3,338 | (3,538) |
| Accounts payable | 3,958 | (2,530) | (3,996) |
| Accrued expenses | 40,353 | 8,019 | 6,645 |
| Deferred revenue | (8,326) | (7,642) | (4,607) |
| Other assets and liabilities | 6,034 | 6,060 | (2,871) |
| **Net cash provided by operating activities** | **25,535** | **109,559** | **110,506** |
| *Investing activities* | | | |
| Acquisitions, net of cash acquired | (796,502) | (204,877) | (164,155) |
| Purchases of property, plant, and equipment | (13,978) | (11,639) | (11,090) |
| Proceeds from sale of publications, real estate and other assets | 27,486 | 15,040 | 14,972 |
| Change in other investing activities | (2,066) | — | — |
| **Net cash used for investing activities** | **(785,060)** | **(201,476)** | **(160,273)** |
| *Financing activities* | | | |
| Payments of debt issuance costs | (121,223) | (800) | (3,576) |
| Borrowings under term loans | 1,792,000 | 79,675 | 20,000 |
| Borrowings under revolving credit facility | 153,900 | 20,000 | |
| Repayments under term loans | (481,058) | (3,093) | (14,443) |
| Repayments under revolving credit facility | (153,900) | (20,000) | |
| Repayments of convertible debt | (197,950) | — | — |
| Payment of offering costs | — | (369) | (431) |
| Issuance of common stock, net of underwriters' discount | — | 111,099 | — |
| Purchase of treasury stock | (1,002) | (792) | (664) |
| Repurchase of common stock | — | — | (5,001) |
| Payments of dividends | (91,936) | (87,195) | (75,608) |
| Changes in other financing activities | 82 | | |
| **Net cash provided by (used for) financing activities** | **898,913** | **98,525** | **(79,723)** |
| Effect of currency exchange rate change | (3,494) | — | — |
| Increase (decrease) in cash, cash equivalents, and restricted cash | 135,894 | 6,608 | (129,490) |
| Balance of cash, cash equivalents, and restricted cash at beginning of year | 52,770 | 46,162 | 175,652 |
| **Cash, cash equivalents, and restricted cash at end of year** | **188,664** | **52,770** | **46,162** |

*The accompanying notes are an integral part of these consolidated financial statements.*

**GANNETT CO., INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**

*In thousands, except share data*

| | Common stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Loss | Retained Earnings (Accumulated Deficit) | Treasury stock | | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | Shares | Amount | |
| **Balance: December 25, 2016** | **53,543,226** | **$  531** | **$  742,543** | **$  (3,977)** | **$  16,293** | **46,438** | **$  (417)** | **$  754,973** |
| Net loss | — | — | — | — | (915) | — | — | (915) |
| Restricted share grants | 202,758 | 7 | 218 | — | — | — | — | 225 |
| Other comprehensive income, net of income taxes of $0 | — | — | — | (1,484) | — | — | — | (1,484) |
| Non-cash compensation expense | — | — | 3,135 | — | — | — | — | 3,135 |
| Offering costs | — | — | (111) | — | — | — | — | (111) |
| Exercise of stock options | 12,989 | — | — | — | — | — | — | — |
| Purchase of treasury stock | — | — | — | — | — | 44,004 | (664) | (664) |
| Restricted share forfeiture | — | — | — | — | — | 50,530 | — | — |
| Repurchase of common stock | (391,120) | (4) | (4,997) | — | — | — | — | (5,001) |
| Dividends declared, 2017 | — | — | (57,620) | — | (18,145) | — | — | (75,765) |
| **Balance: December 31, 2017** | **53,367,853** | **$  534** | **$  683,168** | **$  (5,461)** | **$  (2,767)** | **140,972** | **$  (1,081)** | **$  674,393** |
| Net income attributable to Gannett | — | — | — | — | 18,196 | — | — | 18,196 |
| Restricted share grants | 240,396 | 2 | 223 | — | — | — | — | 225 |
| Other comprehensive income, net of income taxes of $0 | — | — | — | (1,420) | — | — | — | (1,420) |
| Non-cash compensation expense | — | — | 3,156 | — | — | — | — | 3,156 |
| Issuance of common stock, net of underwriters' discount | 6,900,000 | 69 | 110,650 | — | — | — | — | 110,719 |
| Purchase of treasury stock | — | — | — | — | — | 46,237 | (792) | (792) |
| Restricted share forfeiture | — | — | — | — | — | 14,754 | — | — |
| Dividends declared, 2018 | — | — | (75,592) | — | (11,662) | — | — | (87,254) |
| **Balance: December 30, 2018** | **60,508,249** | **$  605** | **$  721,605** | **$  (6,881)** | **$  3,767** | **201,963** | **$  (1,873)** | **$  717,223** |
| Net income attributable to Gannett | — | — | — | — | (119,842) | — | — | (119,842) |
| Restricted share grants | 300,952 | 3 | (3) | — | — | — | — | — |
| Restricted stock awards settled | 1,981,556 | 20 | (462) | — | — | — | — | (442) |
| Other comprehensive income, net of income taxes of $5.1 million | — | — | — | 15,083 | — | — | — | 15,083 |
| Non-cash compensation expense | — | — | 11,324 | — | — | — | — | 11,324 |
| Impact of adoption of ASC 842 - Leases | — | — | — | — | 117 | — | — | 117 |
| Issuance of common stock to former Legacy Gannett shareholders | 62,389,894 | 624 | 423,232 | — | — | — | — | 423,856 |
| Issuance of common stock to Fortress | 4,205,607 | 42 | 26,369 | — | — | — | — | 26,411 |
| Purchase of treasury stock | — | — | — | — | — | 68,150 | (1,002) | (1,002) |
| Restricted share forfeiture | — | — | 51 | — | — | 124,601 | (1) | 50 |
| Dividends declared, 2019 | — | — | (91,838) | — | — | — | — | (91,838) |
| Other activity | — | — | 416 | — | — | — | — | 416 |
| **Balance: December 31, 2019** | **129,386,258** | **$  1,294** | **$  1,090,694** | **$  8,202** | **$  (115,958)** | **394,714** | **$  (2,876)** | **$  981,356** |

*The accompanying notes are an integral part of these consolidated financial statements.*

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1 — Description of business, basis of presentation, and summary of significant accounting policies**

*Description of business:* Gannett Co., Inc. ("Gannett", "we", "us", "our", or "the Company") is an innovative, digitally focused media and marketing solutions company committed to fostering the communities in our network and helping them build relationships with their local businesses. On November 19, 2019, New Media Investment Group Inc. ("New Media") completed their acquisition of Gannett ("Legacy Gannett"), which retained the name Gannett Co., Inc. and trades on the New York Stock Exchange under the ticker symbol "GCI".

Our current portfolio of media assets includes USA TODAY, local media organizations in 46 states in the U.S. and Guam, and Newsquest (a wholly owned subsidiary operating in the United Kingdom (U.K.) with more than 140 local media brands. Gannett also owns the digital marketing services companies ReachLocal, Inc. ("ReachLocal"), UpCurve, Inc. ("UpCurve"), and WordStream, Inc. ("WordStream") and runs the largest media-owned events business in the U.S.

Through USA TODAY, our local property network, and Newsquest, Gannett delivers high-quality, trusted content where and when consumers want to engage on virtually any device or platform. Additionally, the Company has strong relationships with thousands of local and national businesses in both our U.S. and U.K. markets due to our large local and national sales forces and a robust advertising and marketing solutions product suite. The Company reports in two operating segments, Publishing and Marketing Solutions, plus a corporate and other category. A full description of our segments is included in Note 14 - Segment reporting of the notes to the consolidated financial statements.

*Basis of presentation and consolidation:* The consolidated financial statements include the accounts of Gannett and its subsidiaries, which includes approximately six weeks of revenues and expenses for Legacy Gannett. All significant intercompany accounts and transactions have been eliminated. The Company consolidates entities that it controls due to ownership of a majority voting interest.

*Use of estimates:* The preparation of financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Examples of significant estimates include pension and postretirement benefit obligation assumptions, income taxes, leases, self-insurance liabilities, goodwill impairment analysis, stock-based compensation, and valuation of property, plant and equipment and intangible assets. Actual results could differ from those estimates.

*Fiscal year:* Starting in 2019 and subsequent to our acquisition of Legacy Gannett, our fiscal year coincides with the Gregorian calendar. In 2018 and prior, our fiscal years ended on the last Sunday of the calendar year. Our fiscal year for 2018 was a 52-week year ending on December 30, 2018. Our fiscal year 2017 was a 53-week year ending on December 31, 2017.

*Newspaper industry:* The newspaper industry and the Company have experienced declining same-store revenue and profitability over the past several years. As a result, the Company has implemented, and continues to implement, plans to reduce costs and preserve cash flow. These actions include cost-reduction programs and the sale of non-core assets. The Company believes these initiatives along with cash provided by operating activities will provide it with the financial resources necessary to invest in the business and provide sufficient cash flow to enable the Company to meet its commitments. However, the Company did recognize goodwill and mastheads impairments during 2019 and 2017. Refer to Note 6 — Goodwill and other intangible assets for further discussion.

*Reclassifications:* Certain amounts in prior period consolidated financial statements have been reclassified to conform to the current year presentation.
*Advertising and marketing services revenues:* Pursuant to our acquisition of Legacy Gannett, we realigned the presentation of marketing services revenues generated by our UpCurve subsidiary from other revenues to advertising and marketing services revenue on the Consolidated statements of operations and comprehensive income (loss). As a result of this updated presentation, advertising and marketing services revenues increased and other revenues decreased $58.2 million and $42.0 million for 2018 and 2017, respectively. Operating revenues, net income, retained earnings, and earnings per share remained unchanged.

68

*Segment presentation:* In connection with our Legacy Gannett acquisition and as noted above, we reorganized our reportable segments to include (1) Publishing, which consists of our portfolio of regional, national, and international newspaper publishers and (2) Marketing Solutions, which is comprised of our marketing solutions subsidiaries ReachLocal, UpCurve and WordStream. In addition to these operating segments, we have a corporate category that includes activities not directly attributable to a specific segment. This category primarily consists of broad corporate functions and includes legal, human resources, accounting, analytics, finance, and marketing as well as activities and costs not directly attributable to a particular segment and other general business costs.

*Accounts receivable:* Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts. The Company's allowance for doubtful accounts is based upon several factors including the length of time the receivables are past due, historical payment trends and current economic factors. The Company generally does not require collateral.

*Inventories:* Inventory consists principally of newsprint, which is valued at the lower of cost or net realizable value. Cost is determined using the first-in, first-out ("FIFO") method.

*Property, plant, and equipment, software development costs, and depreciation:* Property, plant, and equipment are recorded at cost or at fair value for property, plant and equipment related to acquired businesses. Routine maintenance and repairs are expensed as incurred. Depreciation is calculated under the straight-line method over the estimated useful lives, principally up to 40 years for buildings and improvements, up to 30 years for machinery and equipment, and up to 10 years for furniture, fixtures and computer software. Leasehold improvements are amortized under the straight-line method over the shorter of the lease term or estimated useful life of the asset.

We capitalize costs to develop software for internal use when it is determined the development efforts will result in new or additional functionality or new products. Costs incurred prior to meeting these criteria and costs associated with ongoing maintenance are expensed as incurred and included in Operating costs, in addition to amortization of capitalized software development costs, in the accompanying Consolidated statements of operations and comprehensive income (loss). We monitor our existing capitalized software costs and reduce their carrying value as a result of releases rendering previous features or functions obsolete. Software development costs are evaluated for impairment in accordance with our policy for finite-lived intangible assets and other long-lived assets. Costs capitalized as internal use software are amortized on a straight-line basis over an estimated useful life of 3 to 5 years.

A breakout of property, plant and equipment and software is presented below:

| *In thousands* | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| Land | $ | 105,805 | $ | 39,036 |
| Buildings and improvements | | 416,537 | | 204,753 |
| Machinery and equipment | | 474,418 | | 274,748 |
| Furniture, fixtures, and computer software | | 82,651 | | 35,679 |
| Construction in progress | | 13,687 | | 4,648 |
| Total | | 1,093,098 | | 558,864 |
| Less: accumulated depreciation | | (277,291) | | (219,256) |
| Net property, plant and equipment | $ | 815,807 | $ | 339,608 |

Depreciation expense was $67.2 million, $50.8 million, and $50.4 million for the years ended December 31, 2019, December 30, 2018, and December 31, 2017, respectively.

*Business combinations:* The Company accounts for acquisitions in accordance with the provisions of Accounting Standards Codification ("ASC") 805 "*Business Combinations*" ("ASC 805"), which provides guidance for recognition and measurement of identifiable assets and goodwill acquired, liabilities assumed, and any noncontrolling interest in the acquiree at fair value. In a business combination, the assets acquired, liabilities assumed and noncontrolling interest in the acquiree are recorded as of the date of acquisition at their respective fair values with limited exceptions. Any excess of the purchase price (consideration transferred) over the estimated fair values of net assets acquired is recorded as goodwill. Transaction costs are expensed as incurred. The operating results of the acquired business are reflected in the Company's consolidated financial statements after the date of the acquisition.

***Goodwill, intangible, and long-lived assets:*** Intangible assets consist of non-compete agreements, advertiser, subscriber and customer relationships, mastheads, trade names, publication rights and acquired technology. Goodwill is not amortized pursuant to ASC Topic 350 "*Intangibles – Goodwill and Other*" ("ASC 350"). Mastheads are not amortized because it has been determined that the useful lives of such mastheads are indefinite. Intangible assets that have definite useful lives are amortized over those useful lives and are evaluated for impairment as described above.

In accordance with ASC 350, goodwill and intangible assets with indefinite lives are typically tested for impairment annually or when events indicate that an impairment could exist which may include an economic downturn in a market, a change in the assessment of future operations or a decline in the Company's stock price. As required by ASC 350, the Company performs its impairment analysis on each of its reporting units. The Company has the option to qualitatively assess whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. If the Company elects to perform a qualitative assessment and concludes it is not more likely than not that the fair value of the reporting unit is less than its carrying value, no further assessment of that reporting unit's goodwill is necessary; otherwise goodwill must be tested for impairment. The reporting units have discrete financial information which are regularly reviewed by management. The fair value of the applicable reporting unit is compared to its carrying value. Calculating the fair value of a reporting unit requires significant estimates and assumptions by the Company. The Company estimates fair value by applying third-party market value indicators to projected cash flows and/or projected earnings before interest, taxes, depreciation, and amortization (EBITDA). In applying this methodology, the Company relies on a number of factors, including current operating results and cash flows, expected future operating results and cash flows, future business plans, and market data. If the carrying value of the reporting unit exceeds the estimate of fair value, the Company calculates the impairment as the excess of the carrying value of goodwill over its estimated fair value. For indefinite-lived intangible assets, we perform an impairment test annually or more often if circumstances dictate. Intangible assets that have definite useful lives are amortized over those useful lives and are evaluated for impairment.

Prior to the acquisition of Legacy Gannett, the Company performed its annual impairment assessment on the last day of its fiscal second quarter. As a result of the acquisition of Legacy Gannett in 2019, the Company changed its reporting units. Due to the change in reporting units, goodwill and intangibles were tested for impairment immediately before and immediately after the acquisition. Refer to Note 6 — Goodwill and other intangible assets for additional information on the impairment testing of goodwill and indefinite lived intangible assets.

The Company accounts for long-lived assets in accordance with the provisions of ASC Topic 360, "*Property, Plant and Equipment*" ("ASC 360"). The Company assesses the recoverability of its long-lived assets, including property, plant and equipment and finite lived intangible assets, whenever events or changes in business circumstances indicate the carrying amount of the assets, or related group of assets, may not be fully recoverable. Impairment indicators include significant under performance relative to historical or projected future operating losses, significant changes in the manner of use of the acquired assets or the strategy for the Company's overall business, and significant negative industry or economic trends. The assessment of recoverability is based on management's estimates by comparing the sum of the estimated undiscounted cash flows generated by the underlying asset, or other appropriate grouping of assets, to its carrying value to determine whether an impairment existed at its lowest level of identifiable cash flows. If the carrying amount of the asset is greater than the expected undiscounted cash flows to be generated by such asset, an impairment is recognized to the extent the carrying value of such asset exceeds its fair value.

***Equity investments:*** The Company uses the equity method of accounting for investments over which it exercises significant influence but does not control. The Company's share of net earnings or losses from equity method investments is included in Other (income) expense in the Consolidated statements of operations and comprehensive income (loss).

Equity method investments are reviewed for impairment by comparing their fair value to their respective carrying amounts. With respect to private company investments, the Company makes its estimate of fair value by considering available information, that may include recent investee equity transactions, discounted cash flow analyses, estimates based on comparable public company operating multiples and, in certain situations, balance sheet liquidation values. If the fair value of the investment has dropped below the carrying amount, management considers several factors when determining whether an other-than-temporary decline in market value has occurred, including the length of time and extent to which the market value has been below cost, the financial condition and near-term prospects of the issuer of the security, the intent and ability of the Company to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value and other factors influencing the fair market value, such as general market conditions.

The Company accounts for non-marketable investments over which the Company does not have the ability to exercise significant influence at cost less any impairment. Equity securities without a readily determinable fair value are accounted for at cost, adjusted for impairments and observable price changes in orderly transactions.

*Redeemable noncontrolling interests:* The Company accounts for redeemable noncontrolling interests in accordance with ASC 480-10-S99-3A, "Distinguishing Liabilities from Equity" ("ASC 480-10-S99-3A"), because their exercise is outside the control of the Company. The redeemable noncontrolling interests recorded at fair value are put arrangements held by the noncontrolling interests in one of the Company's majority-owned subsidiaries. As of December 31, 2019, the redeemable noncontrolling interests are not exercisable.

*Revenue recognition:* Revenues are recognized when control of the promised goods or services is transferred to customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. Revenues are recognized as performance obligations that are satisfied either at a point in time, such as when an advertisement is published, or over time, such as customer subscriptions. The Company's Consolidated statements of operations and comprehensive income (loss) presents revenues disaggregated by revenue type. Sales taxes and other usage-based taxes are excluded from revenues. For further details surrounding our major revenue streams and specific recognition principles, refer to Note 2 — Revenues.

*Income taxes:* Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. See Note 10 — Income taxes for further discussion.

We also evaluate any uncertain tax positions and recognize a liability for the tax benefit associated with an uncertain tax position if it is more likely than not that the tax position will not be sustained on examination by the taxing authorities upon consideration of the technical merits of the position. The tax benefits recognized in the financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. We record a liability for uncertain tax positions taken or expected to be taken in a tax return. Any change in judgment related to the expected ultimate resolution of uncertain tax positions is recognized in earnings in the period in which such change occurs.

*Fair value of financial instruments:* The carrying value of the Company's cash equivalents, accounts receivable, accounts payable, and accrued expenses approximate fair value due to the short maturity of these instruments. An estimate of the fair value of the Company's debt is disclosed in Note 7 — Indebtedness. For further details surrounding our policies on fair value measurement including the fair values of our pension plan assets, refer to Note 13 — Fair value measurement.

*Cash, cash equivalents, and restricted cash:* Cash equivalents represent highly liquid certificates of deposit which have original maturities of three months or less. Restricted cash is held as cash collateral for certain business operations. Restricted cash primarily consists of funding for letters of credit, cash held in an irrevocable grantor trust for our deferred compensation plans and cash held with banking institutions for insurance plans.

The following table presents a reconciliation of cash, cash equivalents, and restricted cash:

| *In thousands* | | December 31, 2019 | | December 30, 2018 | | December 31, 2017 |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 156,042 | $ | 48,651 | $ | 43,056 |
| Restricted cash included in prepaid expenses and other current assets | | 10,800 | | 4,119 | | 3,106 |
| Restricted cash included in other assets | | 21,822 | | — | | — |
| Total cash, cash equivalents and restricted cash | $ | 188,664 | $ | 52,770 | $ | 46,162 |

*Deferred financing costs:* Deferred financing costs consist of costs incurred in connection with debt financings and are recorded as a contra-liability in long-term debt. Such costs are amortized using the effective interest method over the estimated remaining term of the debt. This amortization represents a component of interest expense.

*Advertising costs:* Advertising costs are expensed in the period incurred. The Company incurred total advertising expenses for the years ended December 31, 2019, December 30, 2018, and December 31, 2017 of $26.8 million, $18.2 million, and $14.6 million, respectively.

*Earnings (loss) per share:* Basic earnings (loss) per share is computed as net income (loss) available to common stockholders divided by the weighted average number of common shares outstanding for the period. Diluted earnings per share

reflects the potential dilution that could occur from the issuance of common shares upon conversion of common stock equivalents.

**Stock-based employee compensation:** ASC Topic 718, "*Compensation – Stock Compensation*" requires that all share-based payments to employees and the board of directors, including grants of stock options and restricted stock, be recognized in the consolidated financial statements over the service period (generally the vesting period) based on fair values measured on grant dates, less forfeitures.

**Pension and postretirement liabilities:** ASC Topic 715, "*Compensation – Retirement Benefits*" requires recognition of an asset or liability in the consolidated balance sheet reflecting the funded status of pension and other postretirement benefit plans such as retiree health and life, with current-year changes in the funded status recognized in accumulated other comprehensive (loss) income. For the year ended December 31, 2019, net actuarial gains of $7.4 million, net of taxes of $5.1 million were recognized in other comprehensive loss. A net actuarial loss of $1.5 million after valuation allowances was recognized in other comprehensive loss for both years ended December 30, 2018 and December 31, 2017. See Note 8 — Retirement plans and Note 9 — Postretirement benefits other than pension for further details.

**Self-insurance liability accruals:** The Company maintains self-insured medical and workers' compensation programs. The Company purchases stop loss coverage from third parties which limits our exposure to large claims. The Company records a liability for healthcare and workers' compensation costs during the period in which they occur, including an estimate of incurred but not reported claims.

**Concentration of risk:** Due to the distributed nature of our operations, we are not subject to significant concentrations of risk relating to customers, products, or geographic locations. Our foreign revenues, principally from businesses in the U.K. and ReachLocal international operations, totaled approximately $31.8 million in 2019. Our long-lived assets in foreign countries, principally in the U.K. and ReachLocal international operations, totaled approximately $361.9 million at December 31, 2019.

**Leases:** We determine if an arrangement is a lease at inception. Operating leases are included in Operating lease assets, Other current liabilities, and Long-term operating lease liabilities on our Consolidated balance sheets. Operating lease right-of-use (ROU) assets and operating lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. The rates implicit within the Company's leases are generally not determinable; therefore, the Company uses judgment to determine the incremental borrowing rate used to calculate the present value of lease payments. The incremental borrowing rate for each lease is primarily based on publicly available information for companies within the same industry and with similar credit profiles and adjusted for the impact of collateralization, the lease term, and other specific terms included in the Company's lease arrangements. ROU assets are assessed for impairment in accordance with the Company's accounting policy for long-lived assets.

Our lease terms include options to extend or terminate. The period which is subject to an option to extend the lease is included in the lease term if it is reasonably certain that the option will be exercised. The period which is subject to an option to terminate the lease is included if it is reasonably certain that the option will not be exercised. Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term.

For certain equipment leases, we apply a portfolio approach to account for the operating lease ROU assets and liabilities.

**Accrued expenses:** A breakout of accrued expenses is presented below:

| *In thousands* | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| Compensation | $ | 131,006 | $ | 30,922 |
| Taxes (primarily property and sales taxes) | | 18,073 | | 4,466 |
| Benefits | | 33,070 | | 8,273 |
| Interest | | 23,602 | | 3,240 |
| Other | | 100,882 | | 62,696 |
| Total accrued liabilities | $ | 306,633 | $ | 109,597 |

**Loss contingencies:** We are subject to various legal proceedings, claims, and regulatory matters, the outcomes of which are subject to significant uncertainty. We determine whether to disclose or accrue for loss contingencies based on an assessment of whether the risk of loss is remote, reasonably possible, or probable and whether it can be reasonably estimated. We accrue

for loss contingencies when such amounts are probable and reasonably estimable. If a contingent liability is only reasonably possible, we will disclose the potential range of the loss if material and estimable.

*Foreign currency translation:* The statements of income of foreign operations have been translated to U.S. dollars using the average currency exchange rates in effect during the relevant period. The balance sheets have been translated using the currency exchange rates as of the end of the accounting period. The impact of currency exchange rate changes on the translation of the balance sheets are included in Comprehensive income (loss) in the Consolidated statements of operations and comprehensive income (loss) and are classified as Accumulated other comprehensive loss (income) in the Consolidated balance sheets and Consolidated statements of equity.

*Supplementary cash flow information:* Supplementary cash flow information, including non-cash investing and financing activities, are as follows:

| *In thousands* | December 31, 2019 | | December 30, 2018 | | December 31, 2017 |
|---|---|---|---|---|---|
| Cash paid for taxes, net of refunds | $ 1,192 | $ | 1,272 | $ | 52 |
| Cash paid for interest | $ 40,208 | $ | 31,178 | $ | 33,626 |
| Accrued capital expenditures | $ 2,227 | $ | 69 | $ | 72 |
| Common stock issued in exchange for Legacy Gannett shares | $ 391,809 | $ | — | $ | — |

*New accounting pronouncements adopted:* The following are new accounting pronouncements which we have adopted in fiscal year 2019:

*Leases:* On January 1, 2019, the Company adopted ASU 2016-02: Leases (Topic 842), the FASB's new leasing standard. We utilized the modified retrospective transition method by recognizing a cumulative-effect adjustment to the opening balance of retained earnings. We also elected the package of practical expedients permitted under the transition guidance within the new standard, which allows us to carry forward 1) our historical lease classification, 2) our assessment on whether a contract is or contains a lease, and 3) our treatment of initial direct costs for any leases that exist prior to adoption of the new standard. We have also elected to combine lease and non-lease components and to keep leases with an initial term of 12 months or less off the balance sheet and recognize the associated lease payments in the consolidated statements of income on a straight-line basis over the lease term. We did not elect to apply the hindsight practical expedient when determining the lease term and assessing impairment of right-of-use assets.

Operating lease right-of-use (ROU) assets and operating lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. The rates implicit within the company's leases are generally not determinable; therefore, the company uses judgment to determine the incremental borrowing rate used to calculate the present value of lease payments. The incremental borrowing rate for each lease is primarily based on publicly available information for companies within the same industry and with similar credit profiles and adjusted for the impact of collateralization, the lease term, and other specific terms included in the company's lease arrangements.

Based on the present value of the lease payments for the remaining lease term of the Company's existing leases, we recognized net right-of-use assets of approximately $102.5 million and lease liabilities for operating leases of approximately $109.2 million on January 1, 2019. The standard did not materially impact our Consolidated statements of operations and comprehensive income (loss) or Consolidated statements of cash flow. Refer to Note 3 — Leases for further details on the Company's leases.

*Income Statement—Reporting Comprehensive Income:* In February 2018, the FASB issued ASU 2018-02, "Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income ("AOCI")". This ASU provides entities the option to reclassify tax effects to retained earnings from AOCI which are impacted by the Tax Cuts and Jobs Act ("TCJA"). The ASU is effective for fiscal years beginning after December 15, 2018 but early adoption is permitted. The Company elected not to reclassify stranded tax effects from AOCI to retained earnings, as historically we maintained a full valuation allowance for tax benefits related to AOCI. Therefore, resulting impact of adopting this guidance was not material to our consolidated financial results.

*Compensation—Stock Compensation:* In June 2018, the FASB issued ASU 2018-07: Compensation - Stock compensation (Topic 718) - Improvements to non-employee share-based payment accounting. This standard contained new guidance which expanded the scope of share based compensation accounting by applying, with limited exceptions, the specific requirements of

employee stock compensation to the accounting for non-employee awards granted in exchange for goods and services. Adopting this guidance did not have a material impact on our consolidated financial statements.

**New accounting pronouncements not yet adopted:** The following are new accounting pronouncements that we are evaluating for future impacts on our financial position:

*Intangibles—Internal-Use Software:* In August 2018, the FASB issued ASU 2018-15: Intangibles - Goodwill and other - Internal-use software (Subtopic 350-40): Customer's accounting for implementation costs incurred in a cloud computing arrangement that is a service contract. This new guidance aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software and hosting arrangements that include an internal-use software license. This guidance is effective for fiscal years beginning after December 15, 2019. Early adoption of the amendments is permitted, including adoption in any interim period. We are evaluating the provisions of the updated guidance and assessing the impact on our consolidated financial statements.

*Fair Value Measurement—Disclosure Framework:* In August 2018, the FASB issued ASU 2018-13: Fair value measurement (Topic 820) - Disclosure framework - Changes to the disclosure requirements for fair value measurement. This new guidance changes disclosure requirements related to fair value measurements as part of the disclosure framework project. The disclosure framework project aims to improve the effectiveness of disclosures in the notes to the financial statements by focusing on requirements that clearly communicate the most important information to users of the financial statements. This guidance is effective for fiscal years beginning after December 15, 2019, with early adoption permitted. We do not expect the adoption to have a material impact on our consolidated financial statements.

*Financial Instruments—Credit Losses:* In June 2016, the FASB issued ASU 2016-13: Financial instruments - Credit losses (Topic 326) - Measurement of credit losses on financial instruments, which contains new guidance amending the principles around the recognition of credit losses by mandating entities incorporate an estimate of current expected credit losses when determining the value of certain assets. The guidance also amends reporting around allowances for credit losses on available-for-sale marketable securities. This guidance is effective for fiscal years beginning after December 15, 2019, with early adoption permitted. We do not expect the adoption to have a material impact on our consolidated financial statements.

*Compensation—Retirement Plans:* In August 2018, the FASB issued ASU 2018-14: Compensation - retirement benefits - Defined benefit plans - General (Subtopic 715-20) - Disclosure framework - Changes to the disclosure requirements for defined benefit plans. This new guidance changes disclosures related to defined benefit pension and other postretirement benefit plans as part of the disclosure framework project. This guidance is effective for fiscal years beginning after December 15, 2020, with early adoption permitted. We are evaluating the provisions of the updated guidance and assessing the impact on our consolidated financial statements.

## NOTE 2 — Revenues

**Adoption of ASC Topic 606, "Revenue from Contracts with Customers"**

On January 1, 2018, the Company adopted ASC Topic 606 using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under ASC Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with the previously applicable accounting standards under ASC Topic 605.

The adoption of ASC Topic 606 resulted in no change to accumulated deficit as of January 1, 2018. Revenue and expenses related to certain license agreements and recognized during the year ended December 30, 2018 decreased by $5.9 million as a result of applying ASC Topic 606.

The following table presents our revenues disaggregated by source:

| *In thousands* | | Fiscal year ended | | | | |
|---|---|---|---|---|---|---|
| | | December 31, 2019 | | December 30, 2018 | | December 31, 2017[1] |
| Print advertising | $ | 689,595 | $ | 625,065 | $ | 598,273 |
| Digital advertising and marketing services | | 263,049 | | 161,512 | | 127,731 |
| Total advertising and marketing services | | 952,644 | | 786,577 | | 726,004 |
| Circulation | | 704,842 | | 574,963 | | 474,324 |
| Other | | 210,423 | | 164,484 | | 141,676 |
| Total revenues | $ | 1,867,909 | $ | 1,526,024 | $ | 1,342,004 |

[1] Prior period amounts have not been adjusted under the modified retrospective method.

Revenues generated from international operations comprised 2% of our 2019 revenues, which consists of approximately six weeks of operations from Legacy Gannett.

### Summary of Accounting Policies for Revenue Recognition

#### Revenue Recognition

Revenues are recognized when control of the promised goods or services is transferred to customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. Revenues are recognized as performance obligations that are satisfied either at a point in time, such as when an advertisement is published, or over time, such as customer subscriptions.

The Company's Consolidated statements of operations and comprehensive income (loss) presents revenues disaggregated by revenue type. Sales taxes and other usage-based taxes are excluded from revenues.

#### Advertising and Marketing Services Revenues

The Company generates advertising revenues primarily by delivering advertising in its national publication, USA TODAY, and in its local publications including newspapers and websites. Advertising revenues are categorized as local retail, local classified, online and national. Revenue is recognized upon publication of the advertisement.

For online marketing products provided by our Marketing Solutions segment, we enter into agreements for products in which our clients typically pay in advance and on a monthly basis. These prepayments include all charges for the included technology and any media services, management, third-party content, and other costs and fees, all of which are accounted for as a single performance obligation. Revenue is then recognized as we purchase and deliver media on behalf of the customer and perform other marketing-related services.

For our advertising and marketing services revenues, we evaluate whether we are the principal (i.e., report revenues on a gross basis) or agent (i.e., report revenues on a net basis) by performing analyses regarding whether we control the provision of specified goods or services before they are transferred to our customers. We report advertising and marketing services revenues gross when we control advertising inventory before it is transferred to the customer. Our control is evidenced by us being primarily responsible or sharing responsibility for the fulfillment of services and maintaining control over transaction pricing. Certain customers may receive credits, which are accounted for as a separate performance obligation. We estimate these amounts based on the expected amount to be provided to customers and reduce revenues recognized. We recognize revenue when the performance obligation is satisfied.

#### Circulation Revenues

Circulation revenues are derived from print and digital subscriptions as well as single copy sales at retail stores, vending racks and boxes. Circulation revenues from subscribers are generally billed to customers at the beginning of the subscription period and are typically recognized over the subscription period as the performance obligations are delivered. The term of customer subscriptions normally ranges from three to twelve months. Circulation revenues from single-copy income are recognized based on the date of publication, net of provisions for related returns.

#### Commercial Printing and Other Revenues

The Company provides commercial printing services to third parties as a means to generate incremental revenue and utilize excess printing capacity. These customers consist primarily of other publishers that do not have their own printing presses and do not compete with other Gannett publications. The Company also prints other commercial materials, including flyers, business cards and invitations. Revenue is generally recognized upon delivery.

*Accounts Receivable*

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts. The Company's allowance for doubtful accounts is based upon several factors including the length of time the receivables are past due, historical payment trends, and current economic factors. The Company recorded bad debt expense of $9.7 million, $7.7 million and $5.6 million during the years ended December 31, 2019, December 30, 2018, and December 31, 2017, respectively.

*Practical Expedients and Exemptions*

The Company expenses sales commissions or other costs to obtain contracts when incurred because the amortization period is generally one year or less. These costs are recorded within Selling, general and administrative expenses.

The Company does not disclose unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which the Company recognizes revenue at the amount to which the Company has the right to invoice for services performed.

***Deferred revenue:*** The Company records deferred revenues when cash payments are received in advance of the Company's performance. The most significant unsatisfied performance obligation is the delivery of publications to subscription customers. The Company expects to recognize the revenue related to unsatisfied performance obligations over the next three to twelve months in accordance with the terms of the subscriptions.

The Company's payment terms vary by the type and location of the customer and the products or services offered. The period between invoicing and when payment is due is not significant. For certain products or services and customer types, the Company requires payment before the products or services are delivered to the customer.

The following table presents changes in the deferred revenue balance for the twelve months ended December 31, 2019 by type of revenue:

| *in thousands* | | Year ended December 31, 2019 | | | | | |
|---|---|---|---|---|---|---|---|
| | | Advertising, Marketing Services, and Other | | Circulation | | Total | |
| Beginning balance | $ | 22,542 | $ | 82,645 | $ | 105,187 | |
| Acquired deferred revenue | | 42,369 | | 95,341 | | 137,710 | |
| Cash receipts | | 128,504 | | 529,004 | | 657,508 | |
| Revenue recognized | | (125,971) | | (555,611) | | (681,582) | |
| Ending balance | $ | 67,444 | $ | 151,379 | $ | 218,823 | |

The company's primary source of deferred revenue is from circulation subscriptions paid in advance of the service provided. The majority of our subscription customers are billed and pay on monthly terms. The remaining deferred revenue balance relates to advertising and other revenue. The $113.6 million increase in deferred revenue as compared to the year ended December 30, 2018 is primarily due to acquired deferred revenue from the acquisition of Legacy Gannett.

**NOTE 3 — Leases**

We lease certain real estate, vehicles, and equipment. Our leases have remaining lease terms of 1 to 15 years, some of which may include options to extend the leases, and some of which may include options to terminate the leases. The exercise of lease renewal options is at our sole discretion. The depreciable lives of assets and leasehold improvements are limited by the expected lease term unless there is a transfer of title or purchase option reasonably certain of exercise.

As of December 31, 2019, our Consolidated balance sheets include $309.1 million of operating lease right-to-use assets, $40.0 million of short-term operating lease liabilities included in Other current liabilities, and $297.7 million of long-term operating lease liabilities.

The components of lease expense for 2019 were as follows:

| In thousands | | 2019 |
|---|---|---|
| Operating lease cost [a] | $ | 38,985 |
| Short-term lease cost, excluding expenses relating to leases with a lease term of one month or less | | 5,086 |
| Net lease cost | $ | 44,071 |

[a] Includes variable lease costs of $8.4 million and sublease income of $2.5 million for 2019.

Future minimum lease payments under non-cancellable leases as of December 31, 2019 are as follows:

| In thousands | | Year Ending December 31, [a] |
|---|---|---|
| 2020 | | 76,339 |
| 2021 | | 76,569 |
| 2022 | | 69,230 |
| 2023 | | 57,142 |
| 2024 | | 50,564 |
| Thereafter | | 233,615 |
| Total future minimum lease payments | | 563,459 |
| Less: Imputed interest | | 225,759 |
| Total | $ | 337,700 |

[a] Operating lease payments exclude $8.4 million of legally binding minimum lease payments for leases signed but not yet commenced.

Other information related to leases for 2019 were as follows:

| In thousands, except lease term and discount rate | | 2019 |
|---|---|---|
| **Supplemental information** | | |
| Cash paid for amounts included in the measurement of operating lease liabilities | $ | 35,837 |
| Right-of-use assets obtained in exchange for operating lease obligations | | 28,545 |
| | | |
| **Weighted-average remaining lease term (in years)** | | 8.3 |
| **Weighted-average discount rate** | | 12.4% |

## NOTE 4 — Acquisitions and dispositions

**Acquisitions**

*2019 Acquisitions*

The Company acquired substantially all the assets, properties, and business of Legacy Gannett on November 19, 2019. The acquisition, which included the USA TODAY NETWORK (made up of USA TODAY ("USAT") and 109 local media organizations in 46 states in the U.S. and Guam, including digital sites and affiliates), ReachLocal, Inc. ("ReachLocal"), a marketing solutions company, and Newsquest (a wholly owned subsidiary of Legacy Gannett operating in the United Kingdom with more than 140 local media brands), was completed for an aggregate purchase price of $1.3 billion. The acquisition was financed from the new Apollo term loan facility as described in Note 7 — Indebtedness and the issuance of common stock to Legacy Gannett shareholders as described in Note 11 — Supplemental equity information. The rationale for the acquisition was primarily the attractive nature of the various publications, businesses, and digital platforms as well as the estimated cash flows and cost-saving and revenue-generating opportunities.

The allocation of the purchase price is preliminary pending the finalization of the fair value of the acquired net assets and liabilities assumed, deferred income taxes, and assumed income and non-income based tax liabilities. The following table summarizes the preliminary determination of fair values of the assets and liabilities for the Legacy Gannett acquisition:

*in thousands*

| | | |
|---|---|---:|
| Cash and restricted cash acquired | $ | 149,452 |
| Current assets | | 383,965 |
| Other assets | | 97,459 |
| Property, plant and equipment | | 536,511 |
| Operating lease assets | | 200,550 |
| Developed technology | | 47,770 |
| Advertiser relationships | | 272,740 |
| Subscriber relationships | | 104,490 |
| Customer relationships | | 63,820 |
| Trade names | | 16,470 |
| Mastheads | | 97,340 |
| Goodwill | | 644,766 |
| Total assets | | 2,615,333 |
| Current liabilities assumed | | 513,752 |
| Long-term liabilities assumed | | 787,019 |
| Total liabilities | | 1,300,771 |
| Net assets | $ | 1,314,562 |

Outside of the Legacy Gannett acquisition, the Company also acquired substantially all the assets, properties and business of certain publications and businesses in 2019, which included 11 daily newspapers, 11 weekly publications, nine shoppers, a remnant advertising agency, five events production businesses, and a business community and networking platform for an aggregate purchase price of $46.6 million including estimated working capital. The acquisitions were financed from cash on hand. The rationale for the acquisitions was primarily the attractive nature, as applicable, of the various publications, businesses, and digital platforms as well as the estimated cash flows and cost-saving and revenue-generating opportunities available.

The following table summarizes the preliminary determination of fair values of the assets and liabilities for the aforementioned acquisitions:

*in thousands*

| | | |
|---|---|---:|
| Cash acquired | $ | 323 |
| Current assets | | 9,320 |
| Other assets | | 950 |
| Property, plant and equipment | | 20,492 |
| Non-compete agreements | | 280 |
| Advertiser relationships | | 2,357 |
| Subscriber relationships | | 1,457 |
| Customer relationships | | 1,323 |
| Software | | 140 |
| Trade names | | 299 |
| Mastheads | | 2,896 |
| Goodwill | | 20,850 |
| Total assets | | 60,687 |
| Current liabilities assumed | | 11,961 |
| Long-term liabilities assumed | | 463 |
| Total liabilities | | 12,424 |
| Minority interest | | 1,651 |
| Net assets | $ | 46,612 |

The Company obtained third party independent valuations or performed similar calculations internally to assist in the determination of the fair values of certain assets acquired and liabilities assumed. Three basic approaches were used to determine value: the cost approach (used for equipment where an active secondary market is not available, building improvements, and software), the direct sales comparison (market) approach (used for land and equipment where an active secondary market is available) and the income approach (used for intangible assets).

The weighted average amortization periods for recently acquired amortizable intangible assets are equal to or similar to the periods presented in Note 6 — Goodwill and other intangible assets.

The Company expensed $60.6 million of acquisition-related costs during the year ended December 31, 2019. For tax purposes, the amount of goodwill that is expected to be deductible is $17.0 million and is related to 2019 acquisitions other than Legacy Gannett. Refer to allocation of goodwill by segment in Note 6 — Goodwill and other intangible assets.

### *2018 Acquisitions*

The Company acquired substantially all the assets, properties and business of certain publications and businesses on November 16, 2018, November 14, 2018, October 1, 2018, August 15, 2018, July 2, 2018, June 18, 2018, June 4, 2018, May 11, 2018, May 1, 2018, April 2, 2018, March 31, 2018, March 6, 2018, February 28, 2018, February 23, 2018, and February 7, 2018 ("2018 Acquisitions"), which included seven business publications, eight daily newspapers, 16 weekly publications, one shopper, a print facility, an events production business, cloud services, and digital platforms and related domains for an aggregate purchase price of $205.8 million, including working capital and contingent consideration. The acquisitions were financed from cash on hand. The rationale for the acquisitions was primarily the attractive nature, as applicable, of the various publications, businesses, and digital platforms as well as the estimated cash flows and cost-saving and revenue-generating opportunities available.

In the August 15, 2018 acquisition, the Company acquired an 80% equity interest in the acquiree, and the minority equity owners retained a 20% interest, which has been classified as noncontrolling interest in the accompanying financial statements. Noncontrolling interests with embedded redemption features, such as put rights, that are not solely within the control of the Company are considered redeemable noncontrolling interests and are presented outside of stockholders' equity on the Company's Consolidated balance sheets. At any time following the second anniversary of the closing of the acquisition, the minority equity owners shall have the right to sell all but not less than all of their shares at fair market value.

Certain of the Company's 2018 Acquisitions include contingent consideration arrangements, which are primarily payable to the sellers based on the passage of time or as a component of earnings above an agreed-upon target and are recorded at estimated fair value. As of December 31, 2019, the Company has a liability for contingent consideration of $1.1 million.

The Company accounted for the 2018 Acquisitions using the acquisition method of accounting for those acquisitions determined to meet the definition of a business. The net assets, including goodwill, have been recorded in the Consolidated balance sheets at their fair values in accordance with Accounting Standards Codification ("ASC") 805, "Business Combinations" ("ASC 805").

The 2018 Acquisitions that were determined to be asset acquisitions were measured at the fair value of the consideration transferred on the acquisition date. Intangible assets acquired in an asset acquisition have been recognized in accordance with ASC 350 "Intangibles - Goodwill and Other". Goodwill is not recognized in an asset acquisition.

The following table summarizes the determination of fair values of the assets and liabilities for the 2018 Acquisitions:

*in thousands*

| | | |
|---|---|---:|
| Cash acquired | $ | 1,688 |
| Current assets | | 29,169 |
| Other assets | | 447 |
| Property, plant and equipment | | 18,340 |
| Non-compete agreements | | 370 |
| Advertiser relationships | | 51,395 |
| Subscriber relationships | | 36,115 |
| Customer relationships | | 14,063 |
| Trade names | | 1,810 |
| Mastheads | | 13,678 |
| Goodwill | | 72,879 |
| Total assets | | 239,954 |
| Current liabilities assumed | | 32,441 |
| Long-term liabilities assumed | | 92 |
| Total liabilities | | 32,533 |
| Redeemable noncontrolling interest | | 1,636 |
| Net assets | $ | 205,785 |

The Company obtained third party independent valuations or performed similar calculations internally to assist in the determination of the fair values of certain assets acquired and liabilities assumed. Three basic approaches were used to determine value: the cost approach (used for equipment where an active secondary market is not available, building improvements, and software), the direct sales comparison (market) approach (used for land and equipment where an active secondary market is available) and the income approach (used for intangible assets).

The weighted average amortization periods for recently acquired amortizable intangible assets are equal to or similar to the periods presented in Note 6 — Goodwill and other intangible assets.

The Company expensed $2.7 million of acquisition-related costs for the 2018 Acquisitions during the year ended December 30, 2018. For tax purposes, the amount of goodwill that is expected to be deductible is $72.0 million, excluding goodwill attributable to the 20% noncontrolling interest. Refer to allocation of goodwill by segment in Note 6 — Goodwill and other intangible assets.

Goodwill is calculated as the excess of the consideration transferred over the fair value of the identifiable net assets acquired and represents future economic benefits expected to arise from other intangible assets acquired that do not qualify for separate recognition, including assembled workforce and non-contractual relationships as well as expected future synergies.

### 2017 Acquisitions

The Company acquired substantially all the assets, properties and business of certain publications and businesses on November 6, 2017, October 30, 2017, October 2, 2017, July 6, 2017, June 30, 2017, February 10, 2017, and January 31, 2017

("2017 Acquisitions"), which included four business publications, 22 daily newspapers, 34 weekly publications, 24 shoppers, two customer relationship management solutions providers, a social media app, and an event production business for an aggregate purchase price of $165.1 million, including working capital. The acquisitions were financed from cash on hand. The rationale for the acquisitions was primarily due to the attractive nature, as applicable, of the newspaper assets and event production business, and cash flows combined with cost-saving and revenue-generating opportunities available.

The Company accounted for the 2017 Acquisitions under the acquisition method of accounting. The net assets, including goodwill, have been recorded in the Consolidated balance sheets at their fair values in accordance with ASC 805.

The following table summarizes the fair values of the assets and liabilities for the 2017 Acquisitions:

| *in thousands* | | |
|---|---|---|
| Current assets | $ | 20,870 |
| Other assets | | 108 |
| Property, plant and equipment | | 49,883 |
| Noncompete agreements | | 532 |
| Advertiser relationships | | 34,077 |
| Subscriber relationships | | 26,926 |
| Customer relationships | | 5,638 |
| Software | | 704 |
| Mastheads | | 9,902 |
| Goodwill | | 37,652 |
| Total assets | | 186,292 |
| Current liabilities assumed | | 21,100 |
| Long-term liabilities assumed | | 139 |
| Total liabilities | | 21,239 |
| Net assets | $ | 165,053 |

The Company obtained third party independent valuations or performed similar calculations internally to assist in the determination of the fair values of certain assets acquired and liabilities assumed, using the same three approaches that were used to determine value in 2018: the cost approach (used for equipment where an active secondary market is not available, building improvements, and software), the direct sales comparison (market) approach (used for land and equipment where an active secondary market is available) and the income approach (used for intangible assets). The weighted average amortization periods for recently acquired amortizable intangible assets are in line with those listed in Note 6 — Goodwill and other intangible assets.

The Company expensed $2.0 million of acquisition-related costs for the 2017 Acquisitions during the year ended December 31, 2017. For tax purposes, the amount of goodwill that is expected to be deductible is $37.7 million. Refer to allocation of goodwill by segment in Note 6 — Goodwill and other intangible assets

***Dispositions***

On May 11, 2018, the Company completed its sale of certain publications and related assets in Alaska for approximately $2.4 million, including working capital. As a result, a nominal pre-tax gain, net of selling expenses, is included in Net (gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 30, 2018.

On February 27, 2018, the Company sold a parcel of land and a building located in Framingham, Massachusetts for a sale price of $9.3 million and recognized a pre-tax gain of approximately $3.3 million, net of selling expenses, which is included in Net (gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 30, 2018.

On June 2, 2017, we completed the sale of the Mail Tribune, located in Medford, Oregon, for approximately $14.7 million, including working capital. As a result, a pre-tax gain of approximately $5.4 million, net of selling expenses, is included in Net

(gain) loss on sale or disposal of assets on the Consolidated statements of operations and comprehensive income (loss) during the year ended December 31, 2017.

*Pro forma information*

The following table sets forth unaudited pro forma results of operations assuming the Legacy Gannett acquisition, along with transactions necessary to finance the acquisitions, occurred at the beginning of 2019 and 2018:

| | | Unaudited | | |
|---|---|---|---|---|
| *in thousands (except per share amounts)* | | **2019** | | **2018** |
| Total revenues | $ | 4,177,583 | $ | 4,440,491 |
| Net loss | $ | (292,395) | $ | (169,617) |
| Earnings per share - diluted | $ | (2.27) | $ | (1.31) |

This pro forma financial information is based on historical results of operations, adjusted for the allocation of the purchase price and other acquisition accounting adjustments, and is not necessarily indicative of what our results would have been had we operated the businesses since the beginning of the periods presented. The pro forma adjustments reflect depreciation expense and amortization of intangibles related to the fair value adjustments of the assets acquired, additional interest expense related to the financing of the transactions, the elimination of acquisition-related costs, and the related tax effects of the adjustments.

## NOTE 5 — Integration and reorganization costs and long-lived asset impairments

Over the past several years, in furtherance of the Company's cost-reduction and cash-preservation plans outlined in Note 1 — Description of business, basis of presentation, and summary of significant accounting policies, the Company has engaged in a series of individual restructuring programs designed primarily to right-size the Company's employee base, consolidate facilities, and improve operations, including those of recently acquired entities. These initiatives impact all of the Company's geographic regions and are often influenced by the terms of union contracts within the region. All costs related to these programs, which primarily include severance expense, are accrued at the time of the program announcement or over the remaining service period.

*Severance-related expenses:* We recorded expenses for severance and related costs by segment as follows:

| *in thousands* | | **2019** | | **2018** | | **2017** |
|---|---|---|---|---|---|---|
| **Severance and Related Costs** | | | | | | |
| Publishing | $ | 19,556 | $ | 11,678 | $ | 6,703 |
| Marketing Solutions | | 1,916 | | — | | 512 |
| Corporate and other | | 19,080 | | 262 | | 445 |
| Total | $ | 40,552 | $ | 11,940 | $ | 7,660 |

A rollforward of the accrued severance and related costs included in accrued expenses on the balance sheet for the years ended December 31, 2019 and December 30, 2018 is outlined below:

| *in thousands* | | Severance and Related Costs |
|---|---|---|
| Balance at December 31, 2017 | $ | 717 |
| Restructuring provision included in integration and reorganization costs | | 11,940 |
| Cash payments | | (10,103) |
| Balance at December 31, 2018 | | 2,554 |
| Acquired restructuring provision balances | | 692 |
| Restructuring provision included in integration and reorganization costs | | 40,552 |
| Cash payments | | (13,013) |
| Balance at December 31, 2019 | $ | 30,785 |

The restructuring reserve balance is expected to be paid out over the next twelve months.

*Facility consolidation and other restructuring-related expenses:* We recorded facility consolidation charges and other restructuring-related costs by segment as follows:

| *in thousands* | | **2019** | | **2018** | | **2017** |
|---|---|---|---|---|---|---|
| **Facility Consolidation and Other Restructuring-Related Charges** | | | | | | |
| Publishing | $ | 1,780 | $ | 2,809 | $ | 1,243 |
| Marketing Solutions | | 21 | | — | | — |
| Corporate and other | | 5,048 | | 262 | | — |
| Total | $ | 6,849 | $ | 3,071 | $ | 1,243 |

*Long-lived asset impairment charges and accelerated depreciation:* As part of ongoing cost efficiency programs, the Company has ceased a number of print

operations. Pursuant to these actions, we recorded long-lived asset impairment charges by segment as follows:

| In thousands | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|
| Publishing | $ | 3,009 | $ | 1,538 | $ | 7,042 |
| Corporate and other | | — | | — | | 100 |
| Total | $ | 3,009 | $ | 1,538 | $ | 7,142 |

In addition to the long-lived asset impairment charges outlined above, we also recorded accelerated depreciation of $7.9 million, $3.6 million, and $2.4 million for the years ended December 31, 2019, December 30, 2018, and December 31, 2017,

82

respectively. These expenses, which were recorded as a component of Depreciation and amortization on the Consolidated statements of operations and comprehensive income (loss), were incurred at the Publishing segment.

**NOTE 6 — Goodwill and other intangible assets**

Goodwill and intangible assets consisted of the following:

| *in thousands* | | December 31, 2019 | | | | |
|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| Amortized intangible assets: | | | | | | |
| Advertiser relationships | $ | 534,161 | $ | 75,363 | $ | 458,798 |
| Customer relationships | | 109,674 | | 14,303 | | 95,371 |
| Subscriber relationships | | 259,391 | | 44,878 | | 214,513 |
| Other intangible assets | | 76,552 | | 11,229 | | 65,323 |
| Total | $ | 979,778 | $ | 145,773 | $ | 834,005 |
| Nonamortized intangible assets: | | | | | | |
| Goodwill | $ | 914,331 | | | | |
| Mastheads | | 178,559 | | | | |
| Total | $ | 1,092,890 | | | | |

| | | December 30, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | | Accumulated Amortization | | Net Carrying Amount |
| Amortized intangible assets: | | | | | | |
| Advertiser relationships | $ | 260,142 | $ | 53,477 | $ | 206,665 |
| Customer relationships | | 44,630 | | 8,704 | | 35,926 |
| Subscriber relationships | | 153,923 | | 31,560 | | 122,363 |
| Other intangible assets | | 13,046 | | 7,802 | | 5,244 |
| Total | $ | 471,741 | $ | 101,543 | $ | 370,198 |
| Nonamortized intangible assets: | | | | | | |
| Goodwill | $ | 310,737 | | | | |
| Mastheads | | 115,856 | | | | |
| Total | $ | 426,593 | | | | |

As of December 31, 2019, the weighted average amortization periods for amortizable intangible assets are 11.1 years for advertiser relationships, 9.8 years for customer relationships, 10.5 years for subscriber relationships, and 4.6 years for other intangible assets. The weighted average amortization period in total for all amortizable intangible assets is 10.3 years.

Amortization expense was $44.7 million, $34.0 million, and $24.0 million for the years ended December 31, 2019, December 30, 2018, and December 31, 2017, respectively. Estimated future amortization expense as of December 31, 2019, is as follows:

*In thousands*

| | | |
|---|---|---|
| 2020 | $ | 110,136 |
| 2021 | | 109,854 |
| 2022 | | 108,179 |
| 2023 | | 102,994 |
| 2024 | | 101,026 |
| Thereafter | | 301,816 |
| Total | $ | 834,005 |

The balances and changes in the carrying amount of goodwill by segment are as follows:

*in thousands*

| | Publishing | | Marketing Solutions | | Consolidated | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2017, net of accumulated impairment losses of $25,641: | $ | 208,828 | $ | 27,727 | $ | 236,555 |
| Goodwill acquired in business combinations | | 71,011 | | 2,715 | | 73,726 |
| Measurement period adjustments | | 456 | | — | | 456 |
| Balance at December 30, 2018, net of accumulated impairment losses of $25,641: | $ | 280,295 | $ | 30,442 | $ | 310,737 |
| Goodwill acquired in business combinations | | 498,061 | | 167,555 | | 665,616 |
| Goodwill impairment | | (62,280) | | — | | (62,280) |
| Goodwill related to divestitures | | (42) | | — | | (42) |
| Measurement period adjustments | | (852) | | — | | (852) |
| Foreign currency exchange rate changes | | 1,152 | | — | | 1,152 |
| Balance at December 31, 2019, net of accumulated impairment losses of $87,921: | $ | 716,334 | $ | 197,997 | $ | 914,331 |

Historically, the Company's annual impairment assessment is made on the last day of its fiscal second quarter. In 2019, the Company performed an additional assessment during the fourth quarter as a result of the acquisition of Legacy Gannett and the related restructuring of its reporting units.

The Company performed its 2019 annual assessment for possible impairment of the carrying value of goodwill and indefinite-lived intangibles as of June 30, 2019. The fair values of the Company's reporting units, including Newspapers and BridgeTower, which include newspaper mastheads, were estimated using the expected present value of future cash flows, recent industry multiples and using estimates, judgments and assumptions that management believes were appropriate in the circumstances. The estimates and judgments used in the assessment included multiples for EBITDA, the weighted average cost of capital, and the terminal growth rate. The Company determined the future cash flow and industry multiple analyses provided the best estimate of the fair value of its reporting units. Key assumptions in the impairment analysis include revenue and EBITDA projections, discount rates, long-term growth rates, and the effective tax rate the Company determined to be appropriate. Revenue projections reflected slight declines in the current and next year, and revenues were expected to moderate to a terminal growth rate of 0.5%. The fair value of the Newspaper reporting unit exceeded the carrying value by less than 10%.

The total Company's estimate of reporting unit fair values was reconciled to its then market capitalization (based upon the stock market price and fair value of debt) plus an estimated control premium.

The Company used a "relief from royalty" approach, a discounted cash flow model, to determine the fair value of its indefinite-lived intangible assets. The estimated fair value equaled or exceeded carrying value for the masthead units of accounting, including east, central, west and BridgeTower. The fair value of mastheads exceeded carrying value by less than 10% for the central and east regions. Key assumptions within the masthead analysis included revenue projections, discount rates, royalty rates, long-term growth rates and the effective tax rate that the Company determined to be appropriate. Revenue projections reflected declines in the current and next year, and revenues were expected to moderate to a terminal growth rate of 0.5%.

After the completion of its acquisition of Legacy Gannett, the Company reorganized its reporting units to align with its new segment structure. Due to the change in the composition of the reporting units, the Company performed additional impairment tests for goodwill and indefinite-lived intangible assets before and after the reorganization. Similar methodologies and assumptions were utilized for the post-reorganization impairment assessment, as described above. Fair values of the reporting units were determined to be greater than the carrying value of the reporting units, and the estimated fair value exceeded carrying value for all mastheads.

In the analysis performed before the reorganization, the fair value of the Newspapers reporting unit did not exceed the carrying value. The primary factors impacting the decrease in fair value were the Company's third and fourth quarter financial performance and its declining stock price, which was, in part, related to the announcement of the Company's acquisition of Legacy Gannett. As a result, the Company recorded a goodwill impairment of $62.3 million within the Newspapers reporting unit. In addition, the fair value of the mastheads in the east, central, west and BridgeTower regions did not exceed carrying value and accordingly the Company recorded an impairment of $38.4 million. Key assumptions within the impairment analyses included revenue and EBITDA projections, discount rates, royalty rates, long-term growth rates, and the effective tax rate that the Company considers appropriate. Revenue projections reflected continued declines in early years, which are expected to moderate to a terminal rate of loss of 1% with in the Newspapers reporting unit. EBITDA projections as a percentage of revenue show improvement over the next couple of years, largely due to continued expense reductions, and are expected to stabilize to an average rate of approximately 17% in the outer years. Discount rates were 20%, royalty rates ranged from 1.25% to 1.50%, and the effective tax rate was 27%.

The Company considered the impairment of goodwill and mastheads in Newspapers to be a potential indicator of impairment under ASC 360. The Company determined the long-lived asset groups were the same as its units of accounting. The Company performed an analysis of its undiscounted cash flows in the east, central and west regions to determine if there was an impairment of long-lived assets. The sum of undiscounted cash flows over the primary asset's weighted-average remaining useful life exceeded the group's carrying value, so no impairment was recorded. There were no indicators of impairment on the long-lived asset group for BridgeTower.

Subsequent to the acquisition of Legacy Gannett and management restructuring, the Company's reporting units are Domestic Publishing, Newsquest and Marketing Solutions. The Legacy New Media units of accounting (east, central, west and BridgeTower) were reviewed for impairment and the Company concluded no impairment indicators were present. The fair values for Domestic Publishing and Marketing Solutions goodwill are greater than the carrying values; however, the difference between the two values is less than 10%. There is no headroom for Newsquest. For Domestic Publishing, the revenue projections mirrored the Legacy New Media analysis and were increased by the revenues expected to be earned by the Legacy Gannett business. They reflected continued declines in early years and that revenues are expected to moderate to a terminal rate of loss of 0.5%. EBITDA projections as a percentage of revenue show improvement over the next couple of years, largely due to expected synergies, facility consolidation and continued expense reductions, and then average to a rate of approximately 22% in the outer years. Discount rates were 21%, and the effective tax rate was 27%. For Marketing Solutions, revenues are expected to increase at a rate of approximately 7% to 10% for several years. The terminal growth rate is 3%. EBITDA projections as a percentage of revenue show improvement over the next couple of years and then average to approximately 12% to 13% beyond that. Discount rates were 21%, and the effective tax rate was 27%. Since there were no changes to the Newsquest reporting unit as a result of the acquisition, the fair value of Newsquest was derived from the analysis performed for the purchase price allocation.

As of December 31, 2019, the Company performed a review of potential impairment indicators, noting its financial results and forecast had not changed materially since the assessment due to restructuring, and it was determined no indicators of impairment were present.

As of December 30, 2018, the Company had performed a review of potential impairment indicators, noting its financial results and forecast had not changed materially since the annual impairment assessment, and it was determined no indicators of impairment were present.

The newspaper industry and the Company have experienced declining same-store revenue and profitability over the past several years. Should general economic, market or business conditions decline and have a negative impact on estimates of future cash flow and market transaction multiples, the Company may be required to record additional impairment charges in the future.

**NOTE 7 — Indebtedness**

**Apollo Term Loan**

In November 2019, pursuant to the acquisition of Legacy Gannett, the Company entered into a five-year, senior-secured term loan facility with Apollo Capital Management, L.P. ("Apollo") in an aggregate principal amount of approximately $1.8 billion. The term loan facility, which matures on November 19, 2024, generally bears interest at the rate of 11.5% per annum. Origination fees totaled 6.5% of the total principal amount of the financing at closing. Pursuant to the agreement, Apollo has the right to designate two individuals to attend Board of Directors meetings as non-fiduciary and non-voting observers and participants. In addition, the Company's total gross leverage ratio, defined generally as the ratio of consolidated debt to EBITDA, cannot exceed 4.00:1.00 as of the origination date, gradually decreasing to an upper threshold of 3.00:1.00. If the total gross leverage ratio exceeds the aforementioned thresholds, Apollo has the right to appoint up to two voting directors.

In connection with the Apollo term loan facility, the Company incurred approximately $4.9 million of fees and expenses, which were capitalized in deferred financing costs and will be amortized over the term of the term loan facility using the effective interest method. In addition, the Company recognized $116.6 million of lender fees, which are capitalized and will also be amortized over the term of the term loan facility.

The Company is permitted to prepay the principal of the term loan facility, in whole or in part, at par plus accrued and unpaid interest, without any prepayment premium or penalty. The term loan facility is guaranteed by the wholly-owned material subsidiaries of the Company, and all obligations of the Company and its subsidiary guarantors are or will be secured by first priority liens on certain material real property, equity interests, land, buildings, and fixtures. The term loan facility contains customary representations and warranties, affirmative covenants, and negative covenants applicable to the Company and its subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, fundamental changes, dispositions, dividends and other distributions, capital expenditures, and events of default. The Company used the proceeds of the term loan facility to (i) partially fund the acquisition of Legacy Gannett, (ii) repay, prepay, repurchase, redeem, or otherwise discharge in full each of the existing financing facilities (as defined in the agreement and discussed in part below), and (iii) pay fees and expenses incurred to obtain the term loan facility. As of December 31, 2019, the Company is in compliance with all of the covenants and obligations under the Apollo term loan facility.

As of December 31, 2019, the Company had $1.8 billion in aggregate principal outstanding under the term loan facility, $4.7 million of deferred financing costs, and $111.8 million of capitalized lender fees. During the year ended December 31, 2019, the Company recorded $23.5 million in interest expense. Amortization of deferred financing costs totaled $2.6 million for the year ended December 31, 2019. The effective interest rate is 13.2%.

**New Media Credit Agreement**

Prior to the acquisition of Legacy Gannett, the Company, through its wholly-owned subsidiary New Media Holdings II LLC (the "New Media Borrower") maintained secured credit facilities (the "Credit Facilities") under an agreement (the "New Media Credit Agreement") with a syndication of lenders, including a term loan facility and a revolving credit facility. The term loan facility was scheduled to expire on July 14, 2022 and the revolving credit facility was scheduled to expire on July 14, 2021. Maximum borrowings under the revolving credit facility, including letters of credit, totaled $40.0 million. The New Media Credit Agreement contained customary representations and warranties and affirmative covenants and negative covenants applicable to Holdings I, the New Media Borrower, and the New Media Borrower's subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, fundamental changes, dispositions, dividends and other distributions, and events of default. The New Media Credit Agreement also contained a financial covenant requiring Holdings I, the New Media Borrower, and the New Media Borrower's subsidiaries to maintain a maximum total leverage ratio of 3.25:1.00.

Pursuant to the acquisition of Legacy Gannett in November 2019 and the origination of the Apollo term loan facility, all outstanding secured term facilities, incremental facilities, revolving credit facilities, and incremental term loans under the New Media Credit Agreement were paid in full or terminated. Furthermore, all guarantees and security interests in respect of the New Media Credit Agreement were released. As a result, the Company recognized a loss on extinguishment of debt of $3.7 million.

**Advantage Credit Agreements**

In connection with the purchase of the assets of Halifax Media in 2015, the Company assumed obligations of Halifax Media including the amount owing ($8.0 million at that time) under the credit agreement dated June 18, 2013 between Halifax

86

Alabama, LLC and Southeast Community Development Fund V, LLC. This debt bore interest at an annual rate of 2% and was repaid in full on April 1, 2019.

**Convertible debt**

On April 9, 2018, Legacy Gannett completed an offering of 4.75% convertible senior notes, with an initial offering size of $175.0 million aggregate principal amount. As part of the offering, the initial purchaser of the notes exercised its option to purchase an additional $26.3 million aggregate principal amount of notes, resulting in total aggregate principal of $201.3 million and net proceeds of approximately $195.3 million. Interest on the notes is payable semi-annually in arrears. The notes mature on April 15, 2024 with our earliest redemption date being April 15, 2022. The stated conversion rate of the notes is 82.4572 shares per $1,000 in principal or approximately $12.13 per share.

Upon conversion, we have the option to settle in cash, shares of our common stock, or a combination of the two. Additionally, holders may convert the notes at their option prior to January 15, 2024 only if one or more of the following conditions are present: (1) if, during any 20 of the 30 trading days immediately preceding a quarter end, our common stock trading price is 130% of the stated conversion price, (2) if, during the 5 business day period after any 10 consecutive trading day period, the trading price per $1,000 principal amount of notes is less than 98% of the product of (a) the last reported sale price of the Company's common stock and (b) the conversion rate on each such trading day, or (3) a qualified change in control event occurs. Depending on the nature of the triggering event, the conversion rate may also be subject to adjustment.

The Company's acquisition of Legacy Gannett constituted a Fundamental Change and Make-Whole Fundamental Change under the terms of the indenture governing the notes. At the acquisition date, the Company delivered to noteholders a notice offering the right to surrender all or a portion of their notes for cash on December 31, 2019. Holders were required to surrender their notes by December 30, 2019 and in return, the Company redeemed the notes for either (1) cash at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest from October 15, 2019 to December 29, 2019 (2) converted equity plus cash at the stated conversion rate of 82.4572 shares per $1,000 in principal, comprised of 0.5427 shares of Parent common stock, plus $6.25 of cash. On December 31, 2019, we completed the redemption of $198.0 million in aggregate principal in exchange for cash.

The $3.3 million principal value of the notes is reported as convertible debt in the Consolidated balance sheets. The effective interest rate on the notes was 6.05% as of December 31, 2019. During the year ended December 31, 2019, the Company recorded $1.3 million in interest expense, of which $1.1 million is cash interest paid on aforementioned redemption.

## NOTE 8 — Retirement plans

### Defined benefit plans

The Company maintains a number of defined benefit pension plans which cover certain employees. The Company uses the accrued benefit actuarial method and best estimate assumptions to determine pension costs, liabilities, and other pension information for defined benefit plans.

In connection with the acquisition of Legacy Gannett, the Company assumed the assets and obligations of four defined benefit plans: the Gannett Retirement Plan ("GRP"), the Newsquest and Romanes Pension Schemes in the U.K. ("U.K. Pension Plans"), the Newspaper Guild of Detroit Pension Plan, the 2015 SERP, and a supplemental non-qualified retirement plan assumed pursuant to Legacy Gannett's acquisition of JMG (JMG Plan). Upon the change in control, all of the Gannett SERP benefits accrued as of the date of acquisition are to be paid out as a lump sum within 45 days following the transaction. As of December 31, 2019, the Company has paid $87.8 million of these lump sum payouts.

Additionally, the George W. Prescott Company pension plan was assumed in the Enterprise News Media, LLC acquisition in 2006. This plan was amended to freeze all future benefit accruals by December 31, 2008, except for a select group of union employees whose benefits were frozen during 2009. The Times Publishing Company pension plan, another defined benefit plan assumed pursuant to an acquisition, was frozen prior to the acquisition.

The following table provides a reconciliation of benefit obligations, plan assets, and funded status, along with the related amounts in the consolidated balance sheets, of the Company's pension plans as of December 31, 2019 and December 30, 2018:

| *in thousands* | | Year Ended | | |
|---|---|---|---|---|
| | | December 31, 2019 | | December 30, 2018 |
| **Change in projected benefit obligation:** | | | | |
| Projected benefit obligation at beginning of period | $ | 74,190 | $ | 82,344 |
| Service cost | | 999 | | 606 |
| Interest cost | | 12,408 | | 2,775 |
| Actuarial (gain) loss | | 3,701 | | (6,228) |
| Foreign currency translation | | 11,812 | | — |
| Benefits and expenses paid | | (111,842) | | (5,307) |
| Acquisitions | | 2,981,914 | | — |
| Projected benefit obligation at end of period | $ | 2,973,182 | $ | 74,190 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at beginning of period | $ | 54,035 | $ | 61,539 |
| Actual return on plan assets | | 38,054 | | (3,648) |
| Employer contributions | | 91,466 | | 1,451 |
| Acquisitions | | 2,771,796 | | — |
| Benefits paid | | (111,022) | | (4,705) |
| Foreign currency translation | | 12,787 | | — |
| Expenses paid | | (820) | | (602) |
| Fair value of plan assets at end of period | $ | 2,856,296 | $ | 54,035 |
| **Reconciliation of funded status:** | | | | |
| Benefit obligation at end of period | $ | (2,973,182) | $ | (74,190) |
| Fair value of assets at end of period | | 2,856,296 | | 54,035 |
| Funded status | | (116,886) | | (20,155) |
| Unrecognized actuarial (gain) loss | | (4,527) | | 7,986 |
| Net accrued benefit cost | $ | (121,413) | $ | (12,169) |
| **Balance sheet presentation:** | | | | |
| Other assets | $ | 58,818 | $ | — |
| Accrued expenses | | 6,771 | | — |
| Pension and other postretirement benefit obligations | | 168,933 | | 20,155 |
| Accumulated other comprehensive (loss) income | | 4,527 | | (7,986) |
| Net accrued benefit cost | $ | (121,413) | $ | (12,169) |

The following table presents information for our retirement plans for which accumulated benefits exceed assets:

| *in thousands* | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| Accumulated benefit obligation | $ | 2,039,075 | $ | 74,190 |
| Fair value of plan assets | $ | 1,865,123 | $ | 54,035 |

The following table presents information for our retirement plans for which assets exceed accumulated benefits:

*in thousands*

| | December 31, 2019 | December 30, 2018 |
|---|---|---|
| Accumulated benefit obligation | $ 932,357 | $ — |
| Fair value of plan assets | $ 991,173 | $ — |

The following table presents information for our retirement plans for which projected benefit obligations exceed assets:

*in thousands*

| | December 31, 2019 | December 30, 2018 |
|---|---|---|
| Projected benefit obligation | $ 2,040,825 | $ 74,190 |
| Fair value of plan assets | $ 1,865,123 | $ 54,035 |

The following table presents information for our retirement plans for which assets exceed projected benefit obligations:

*in thousands*

| | December 31, 2019 | December 30, 2018 |
|---|---|---|
| Projected benefit obligation | $ 932,357 | $ — |
| Fair value of plan assets | $ 991,173 | $ — |

The funded status (on a projected benefit obligation basis) of our plans at December 31, 2019 is as follows:

*in thousands*

| | Fair Value of Plan Assets | Benefit Obligation | Funded Status |
|---|---|---|---|
| GRP | $ 1,705,225 | $ 1,842,480 | $ (137,255) |
| George W. Prescott Pension Plan | 20,079 | 25,499 | (5,420) |
| Times Publishing Company Pension Plan | 36,693 | 49,830 | (13,137) |
| SERP | — | 7,360 | (7,360) |
| U.K. Pension Plans | 991,175 | 932,357 | 58,818 |
| Newspaper Guild of Detroit Plan | 103,124 | 113,189 | (10,065) |
| JMG Plan | — | 2,467 | (2,467) |
| Total | $ 2,856,296 | $ 2,973,182 | $ (116,886) |

The following table provides the components of net periodic benefit cost and other changes in plan assets recognized in other comprehensive income (loss) of the Company's pension plans for the years ended December 31, 2019, December 30, 2018, and December 31, 2017:

| *in thousands* | | Year Ended | | | | |
|---|---|---|---|---|---|---|
| | | December 31, 2019 | | December 30, 2018 | | December 31, 2017 |
| **Components of net periodic benefit cost:** | | | | | | |
| *Operating expenses:* | | | | | | |
| Service cost | $ | 999 | $ | 606 | $ | 630 |
| *Non-operating expenses:* | | | | | | |
| Interest cost | | 12,408 | | 2,775 | | 3,143 |
| Expected return on plan assets | | (22,303) | | (4,452) | | (4,157) |
| Amortization of unrecognized loss (gain) | | 158 | | 113 | | 194 |
| Other adjustment | | 305 | | — | | — |
| Total non-operating expenses included in Other (income) expense | | (9,432) | | (1,564) | | (820) |
| Net periodic expense (benefit) | $ | (8,433) | $ | (958) | $ | (190) |
| **Other changes in plan assets and benefit obligations recognized in other comprehensive income:** | | | | | | |
| Net actuarial loss (gain) | $ | (12,050) | $ | 1,872 | $ | 1,618 |
| Amortization of net actuarial (loss) gain | | (158) | | (113) | | (194) |
| Other adjustment | | (305) | | — | | — |
| Total recognized in other comprehensive income (loss) | $ | (12,513) | $ | 1,759 | $ | 1,424 |

The following assumptions were used in connection with the Company's actuarial valuation of its defined benefit plans obligation:

| | December 31, 2019 | December 30, 2018 |
|---|---|---|
| Weighted average discount rate | 2.9% | 4.1% |
| Rate of increase in future compensation levels [1] | 2.0% | — |
| Weighted average expected return on assets | 7.0% | 7.5% |

[1] Relates only to the GRP, SERP and Newspaper Guild of Detroit Pension Plans.

The following assumptions were used to calculate the net periodic benefit cost for the Company's defined benefit pension plans:

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2019 | December 30, 2018 | December 31, 2017 |
| Weighted average discount rate | 3.1% | 3.5% | 4.1% |
| Rate of increase in future compensation levels [1] | 2.0% | — | — |
| Weighted average expected return on assets | 6.1% | 7.5% | 7.5% |

[1] Relates only to the GRP, SERP and Newspaper Guild of Detroit Pension Plans.

To determine the expected long-term rate of return on pension plan assets, the Company considers the current and expected asset allocations as well as historical and expected returns on various categories of plan assets, input from the actuaries and investment consultants, and long-term inflation assumptions. The expected allocation of pension plan assets is based on a diversified portfolio consisting of domestic and international equity securities and fixed income securities. This expected return is then applied to the fair value of plan assets. The Company amortizes experience gains and losses, including the effects of changes in actuarial assumptions and plan provisions, over a period equal to the average future service of plan participants or over the average remaining life expectancy of inactive participants.

The fiduciaries of the pension plans set investment policies and strategies for the pension trusts. Objectives include preserving the funded status of the plan and balancing risk against return.

The weighted average target asset allocation of our plans for 2020 and allocations at the end of 2019 and 2018, by asset category, are presented in the table below:

| | Target Allocation | Allocation of Plan Assets | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Equity securities | 35% | 39% | 63% |
| Debt securities | 47% | 46% | 35% |
| Alternative investments[(a)] | 18% | 15% | 2% |
| Total | 100% | 100% | 100% |

[(a)]Alternative investments include real estate, private equity and hedge funds.

The aggregate amount of net actuarial gain related to the Company's pension plans recognized in other comprehensive (loss) income as of December 31, 2019 was $12.1 million, of which $107,000 is expected to be amortized in 2020.

***Cash flows:*** We expect to make the following benefit payments, which reflect expected future service. The amounts below represent the benefit payments for our pension plans.

| *in thousands* | Pension |
| --- | --- |
| 2020 | $ 202,994 |
| 2021 | $ 193,282 |
| 2022 | $ 190,764 |
| 2023 | $ 188,713 |
| 2024 | $ 175,235 |
| 2025 - 2029 | $ 826,289 |

The amounts above exclude the participants' share of the benefit cost. We expect no subsidy benefits for 2020 and beyond.

Employer contributions, for the Company's defined benefit pension plans, expected to be paid during the year ended December 31, 2020 is $61.2 million.

**Multiemployer plans that provide pension benefits**

The Company is a participant in six multiemployer pension plans covering certain employees with collective bargaining agreements ("CBAs"). Three of these multiemployer pension plans were assumed in connection with the acquisition of Legacy Gannett. The risks of participating in these multiemployer plans are different from single-employer plans in the following aspects:

- The Company plays no part in the management of plan investments or any other aspect of plan administration.

- Assets contributed to the multiemployer plan by one employer may be used to provide benefits to employees of other participating employers.

- If a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers.

- If the Company chooses to stop participating in some of its multiemployer plans, the Company may be required to pay those plans an amount based on the unfunded status of the plan, referred to as withdrawal liability.

The Company's participation in these plans for the year ended December 31, 2019 is outlined in the table below. The "EIN/Pension Plan Number" column provides the Employee Identification Number (EIN) and the three-digit plan number. Unless otherwise noted, the two most recent Pension Protection Act (PPA) zone statuses available are for the plans for the years ended 2019 and 2018, respectively. The zone status is based on information the Company received from the plan and is certified by the plan's actuary. Among other factors, plans in the red zone are generally less than 65% funded; plans in the orange zone are both a) less than 80% funded and b) have an accumulated/expected funding deficiency in any of the next six plan years, net of any amortization extensions; plans in the yellow zone meet either one of the criteria mentioned in the orange zone; and plans in the green zone are at least 80% funded. The "FIP/RP Status Pending/Implemented" column indicates plans for which a financial improvement plan (FIP) or a rehabilitation plan (RP) is either pending or has been implemented. The last column lists the expiration date(s) of the collective-bargaining agreement(s) to which the plans are subject. The Company

makes all required contributions to these plans as determined under the respective CBAs. For each of the plans listed below, the Company's contribution represented less than 5% of total contributions to the plan.

*Multiemployer Pension Plans*

| Pension Plan Name | EIN Number/ Plan Number | Zone Status Dec. 31, | | FIP/RP Status Pending/Implemented | Contributions (in thousands) | | | Surcharge Imposed | Expiration Dates of CBAs |
|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2018 | | 2019 | 2018 | 2017 | | |
| CWA/ITU Negotiated Pension Plan | 13-6212879/001 | Red | Red | Implemented | $ 51 | $ 9 | $ 10 | No | Under negotiation |
| GCIU—Employer Retirement Benefit Plan(a) | 91-6024903/001 | Red | Red | Implemented | 75 | 78 | 84 | Yes | 1/5/2022 |
| The Newspaper Guild International Pension Plan(a) | 52-1082662/001 | Red | Red | Implemented | 31 | 19 | 36 | No | Under negotiation and June 8, 2019 |
| IAM National Pension Plan(a)(b) | 51-6031295/002 | Red | Green | Implemented | 11 | — | — | Yes | 1/7/2022 |
| Teamsters Pension Trust Fund of Philadelphia and Vicinity(a) | 23-1511735/001 | Yellow | Yellow | Implemented | 139 | — | — | N/A | (c) |
| Central Pension Fund of the International Union of Operating Engineers and Participating Employers(a) | 36-6052390/001 | Green as of Jan. 31, 2019 | Green as of Jan. 31, 2018 | N/A | 6 | — | — | N/A | 1/10/2022 |
| **Total** | | | | | **$ 313** | **$ 106** | **$ 130** | | |

(a) This plan has elected to utilize special amortization provisions provided under the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010.

(b) The trustees of this plan have voluntarily elected to put the fund in critical status to strengthen its funding position.

(c) In February 2018, an interim agreement was executed to maintain the terms and contributions of the plan past the expiration date of 12/31/2017. This agreement is subject to additional negotiation.

The Company assumed three multiemployer plan withdrawal liabilities in an acquisition in 2019. The liability at the acquisition date was estimated to be approximately $40.8 million, excluding interest. The penalties are payable over twenty years. The total unpaid balance for the Company's withdrawal liabilities as of December 31, 2019 is approximately $41.8 million.

### Defined contribution plans

The Company sponsors the New Media Investment Group Inc. Retirement Savings Plan (the "New Media 401(k) Plan"), which is intended to be a qualified defined contribution plan with a cash or deferred arrangement under Section 401(k) of the Code. In general, eligible employees of the Company and participating affiliates who satisfy minimum age and service requirements are eligible to participate. Eligible employees can contribute amounts up to 100% of their eligible compensation to the New Media 401(k) Plan, subject to IRS limitations. The New Media 401(k) Plan also provides for discretionary matching and non-elective contributions that can be made in separate amounts among different allocation groups. For the years ended December 31, 2019, December 30, 2018, and December 31, 2017, the Company's matching contributions to the New Media 401(k) Plan were $4.9 million, $4.0 million, and $3.4 million, respectively. The Company did not make non-elective contributions for the reported years.

In connection with the acquisition of Legacy Gannett, the Company assumed the Gannett Co., Inc. 401(k) Savings Plan (the "Gannett 401(k) Plan"). The Gannett 401(k) Plan will continue to cover Legacy Gannett employees until it is merged with the New Media 401(k) Plan. With respect to the Gannett 401(k) Plan, employees are immediately eligible to participate while employees covered under collective bargaining agreements are eligible to participate only if participation has been bargained. Employees can elect to save up to 75% of compensation on a pre-tax basis subject to certain limits. For most participants, the plan's matching formula is 100% of the first 4% of employee contributions and 50% on the next 2% of employee contributions. The Company's matching contributions to the Gannett 401(k) Plan were immaterial for the year ended December 31, 2019.

### Deferred compensation plans

The Company maintains two non-qualified deferred compensation plans for certain of its employees. The Company maintains the GateHouse Media, Inc. Publishers' Deferred Compensation Plan ("Publishers' Plan"), a non-qualified deferred compensation plan for the benefit of certain designated publishers of the Company's newspapers. Under the Publishers' Plan, the Company credits an amount to a bookkeeping account established for each participating publisher pursuant to a pre-determined formula, which is based upon the gross operating profits of each such publisher's newspaper. The bookkeeping account is credited with earnings and losses based upon the investment choices selected by the participant. The amounts

credited to the bookkeeping account on behalf of each participating publisher vest on an installment basis over a period of 15 years. A participating publisher forfeits all amounts under the Publishers' Plan in the event that the publisher's employment with the Company is terminated for "cause", as defined in the Publishers' Plan. Amounts credited to a participating publisher's bookkeeping account are distributable upon termination of the publisher's employment with the Company and will be made in a lump sum or installments as elected by the publisher. The Publishers' Plan was frozen effective as of December 31, 2006, and all accrued benefits of participants under the terms of the Publishers' Plan became 100% vested.

The Company also maintains the GateHouse Media, Inc. Executive Benefit Plan ("Executive Benefit Plan"), a non-qualified deferred compensation plan for the benefit of certain key employees of the Company. Under the Executive Benefit Plan, the Company credits an amount, determined at the Company's sole discretion, to a bookkeeping account established for each participating key employee. The bookkeeping account is credited with earnings and losses based upon the investment choices selected by the participant. The amounts credited to the bookkeeping account on behalf of each participating key employee vest on an installment basis over a period of 5 years. A participating key employee forfeits all amounts under the Executive Benefit Plan in the event that the key employee's employment with the Company is terminated for "cause", as defined in the Executive Benefit Plan. Amounts credited to a participating key employee's bookkeeping account are distributable upon termination of the key employee's employment with the Company and will be made in a lump sum or installments as elected by the key employee. The Executive Benefit Plan was frozen effective as of December 31, 2006, and all accrued benefits of participants under the terms of the Executive Benefit Plan became 100% vested.

## NOTE 9 — Postretirement benefits other than pension

As a result of acquisitions, the Company maintains several postretirement medical and life insurance plans which cover certain employees. We provide health care and life insurance benefits to certain retired employees who meet age and service requirements. Most of our retirees contribute to the cost of these benefits and retiree contributions are increased as actual benefit costs increase.

The George W. Prescott Company postretirement medical and life insurance plan had its benefits frozen in 2008, and the plan was amended to limit future benefits to a select group of active employees under the Enterprise News Media, LLC postretirement medical and life insurance plan. Benefits under the postretirement medical and life insurance plan assumed with the Copley Press, Inc. acquisition are only available to Brush-Moore employees hired before January 1, 1976.

The cost of providing retiree health care and life insurance benefits is actuarially determined. Our policy is to fund benefits as claims and premiums are paid. We use a December 31 measurement date for these plans.

93

The following table provides a reconciliation of benefit obligations, plan assets and funded status, along with the related amounts in the consolidated balance sheets of the Company's postretirement medical and life insurance plans as of December 31, 2019 and December 30, 2018:

| in thousands | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| **Change in projected benefit obligation:** | | | | |
| Projected benefit obligation at beginning of period | $ | 4,330 | $ | 4,835 |
| Service cost | | 17 | | 7 |
| Interest cost | | 419 | | 153 |
| Actuarial gain | | (484) | | (363) |
| Benefits and expenses paid | | (1,117) | | (500) |
| Acquisitions | | 70,325 | | — |
| Participant contributions | | 200 | | 221 |
| Employer implicit subsidy fulfilled | | (23) | | (23) |
| Projected benefit obligation at end of period | $ | 73,667 | $ | 4,330 |
| **Change in plan assets:** | | | | |
| Employer contributions | $ | 844 | $ | — |
| Participant contributions | | 164 | | — |
| Benefits paid | | (1,008) | | — |
| Fair value of plan assets at end of period | $ | — | $ | — |
| **Reconciliation of funded status:** | | | | |
| Benefit obligation at end of period | $ | (73,667) | $ | (4,330) |
| Funded status | | (73,667) | | (4,330) |
| Unrecognized actuarial gain | | (1,518) | | (1,105) |
| Net accrued benefit cost | $ | (75,185) | $ | (5,435) |
| **Balance sheet presentation:** | | | | |
| Accrued expenses | $ | 6,694 | $ | 355 |
| Pension and other postretirement benefit obligations | | 66,973 | | 3,975 |
| Accumulated other comprehensive income | | 1,518 | | 1,105 |
| Net accrued benefit cost | $ | 75,185 | $ | 5,435 |

The following table provides the components of net periodic benefit cost and other changes in plan assets recognized in other comprehensive income (loss) of the Company's postretirement medical and life insurance plans for the years ended December 31, 2019, December 30, 2018, and December 31, 2017:

| in thousands | | December 31, 2019 | | December 30, 2018 | | December 31, 2017 |
|---|---|---|---|---|---|---|
| **Components of net periodic benefit cost:** | | | | | | |
| *Operating expenses:* | | | | | | |
| Service cost | $ | 17 | $ | 7 | $ | 11 |
| *Non-operating expenses:* | | | | | | |
| Interest cost | | 419 | | 153 | | 189 |
| Expected return on plan assets | | — | | — | | — |
| Amortization of unrecognized gain | | (72) | | (24) | | (148) |
| Total non-operating expense | | 347 | | 129 | | 41 |
| Net periodic expense | $ | 364 | $ | 136 | $ | 52 |
| **Other changes in plan assets and benefit obligations recognized in other comprehensive income (loss):** | | | | | | |
| Net actuarial gain | $ | (484) | $ | (363) | $ | (88) |
| Amortization of net actuarial gain | | 72 | | 24 | | 148 |
| Total recognized in other comprehensive income (loss) | $ | (412) | $ | (339) | $ | 60 |

The following assumptions were used in connection with the Company's actuarial valuation of its postretirement plans obligation:

| | December 31, 2019 | December 30, 2018 |
|---|---|---|
| Weighted average discount rate | 3.3% | 4.0% |
| Rate of increase in future compensation levels [1] | 2.0 | — |
| Current year medical trend | 5.9% | 6.2% |
| Ultimate year medical trend | 4.5% | 4.5% |
| Year of ultimate trend | 2034 | 2034 |

[1] Relates only to the Legacy Gannett postretirement plans.

The following assumptions were used to calculate the net periodic benefit cost for the Company's postretirement plans:

| | December 31, 2019 | December 30, 2018 | December 31, 2017 |
|---|---|---|---|
| Weighted average discount rate | 3.3% | 3.3% | 3.9% |
| Rate of increase in future compensation levels [1] | 2.0 | — | — |
| Current year medical trend | 6.1% | 6.4% | 6.7% |
| Ultimate year medical trend | 4.5% | 4.5% | 4.5% |
| Year of ultimate trend | 2035 | 2026 | 2026 |

[1] Relates only to the Legacy Gannett postretirement plans.

The following table summarizes the effect of a 1% change in the assumed health care cost trend rates would have on the amounts reported related to Legacy New Media:

| | | 2019 | | 2018 |
|---|---|---|---|---|
| Effect of 1% increase in health care cost trend rates | | | | |
| Accumulated postretirement benefit obligation | $ | 4,431 | $ | 4,617 |
| Dollar change | $ | 307 | $ | 287 |
| Percent change | | 7.5 % | | 6.6 % |
| Effect of 1% decrease in health care cost trend rates | | | | |
| Accumulated postretirement benefit obligation | $ | 3,858 | $ | 4,082 |
| Dollar change | $ | (265) | $ | (248) |
| Percent change | | (6.4)% | | (5.7)% |

Assumed health care cost trend rates have an effect on the amounts reported for the health care plans. The effect of a 1% change in the health care cost trend rate would have no impact on the 2019 postretirement benefit obligation and would result in no measurable change in the aggregate service and interest components of the 2019 expense for the Legacy Gannett postretirement plans.

*Cash flows:* We expect to make the following benefit payments, which reflect expected future service. The amounts below represent the benefit payments for our postretirement plans.

| *In thousands* | | Postretirement |
|---|---|---|
| 2020 | $ | 6,695 |
| 2021 | $ | 6,372 |
| 2022 | $ | 6,071 |
| 2023 | $ | 5,762 |
| 2024 | $ | 5,475 |
| 2025 - 2029 | $ | 23,181 |

The amounts above exclude the participants' share of the benefit cost. Furthermore, the postretirement plans are not funded, and we expect no subsidy benefits for 2020 and beyond.

Employer contributions, for the Company's postretirement medical and life insurance plans, expected to be paid during the year ended December 31, 2020 is $6.7 million.

## NOTE 10 — Income taxes

Income tax expense (benefit) on income (loss) from continuing operations before income taxes for the periods shown below consisted of:

| In thousands | Current | | Deferred | | Total | |
|---|---|---|---|---|---|---|
| Year Ended December 31, 2019: | | | | | | |
| U.S. Federal | $ | 113 | $ | (85,144) | $ | (85,031) |
| State and local | | 1,725 | | (2,833) | | (1,108) |
| Foreign | | (68) | | 213 | | 145 |
| Total | $ | 1,770 | $ | (87,764) | $ | (85,994) |
| Year Ended December 30, 2018: | | | | | | |
| U.S. Federal | $ | — | $ | (2,690) | $ | (2,690) |
| State and local | | 1,679 | | 2,923 | | 4,602 |
| Total | $ | 1,679 | $ | 233 | $ | 1,912 |
| Year Ended December 31, 2017: | | | | | | |
| U.S. Federal | $ | — | $ | (617) | $ | (617) |
| State and local | | 1,003 | | 95 | | 1,098 |
| Total | $ | 1,003 | $ | (522) | $ | 481 |

The components of net income (loss) before income taxes consist of the following:

| In thousands | 2019 | | 2018 | | 2017 | |
|---|---|---|---|---|---|---|
| Domestic | $ | (206,270) | $ | 20,019 | $ | (434) |
| Foreign | | (914) | | — | | — |
| Total | $ | (207,184) | $ | 20,019 | $ | (434) |

The provision for income taxes varies from the U.S. federal statutory tax rate as a result of the following differences:

| | December 31, 2019 | December 30, 2018 | December 31, 2017 |
|---|---|---|---|
| U.S. statutory tax rate | 21.0 | 21.0 | 34.0 |
| Increase (decrease) in income taxes resulting from: | | | |
| State/other income taxes, net of federal benefit | 0.7 | 21.1 | (266.0) |
| Change in valuation allowance | 22.6 | (13.4) | (612.9) |
| Non-deductible meals, entertainment, and other expenses | (0.8) | 5.0 | (232.6) |
| Transaction costs | (2.0) | — | — |
| Tax effects of 2017 legislation | — | (24.1) | 966.5 |
| Effective tax rate | 41.5 | 9.6 | *** |

*** Indicates a percentage that is not meaningful.

The tax effects of temporary differences that give rise to the deferred tax assets and deferred tax liabilities as of December 31, 2019 and December 30, 2018 are presented below[(a)]:

| In thousands | | December 31, 2019 | | December 30, 2018 |
|---|---|---|---|---|
| Deferred tax liabilities: | | | | |
| Fixed assets | $ | (30,246) | $ | (16,642) |
| Right of use asset | | (83,588) | | — |
| Definite and indefinite lived intangible assets | | (85,528) | | (13,714) |
| Total deferred tax liabilities | $ | (199,362) | $ | (30,356) |
| Deferred tax assets: | | | | |
| Accrued compensation costs | | 32,719 | | 2,185 |
| Accrued expenses | | 16,717 | | 5,697 |
| Disallowed interest | | 11,247 | | — |
| Pension and other postretirement benefit obligations | | 56,611 | | 3,122 |
| Partnership investments including impairments | | 7,971 | | 994 |
| Loss carryforwards | | 189,912 | | 71,431 |
| Lease liabilities | | 85,177 | | — |
| Other | | 25,073 | | 3,324 |
| Total deferred tax assets | $ | 425,427 | $ | 86,753 |
| Less: Valuation allowance | | (158,820) | | (64,679) |
| Total net deferred tax assets | $ | 266,607 | $ | 22,074 |
| Noncurrent net deferred tax assets/(liabilities) | $ | 67,245 | $ | (8,282) |

(a) *We changed the presentation of the components of the deferred tax liabilities and deferred tax assets as we believe the new presentation reflects better the deferred tax assets/(liabilities) at December 31, 2019, after the acquisition of Legacy Gannett. This reclassification is not material as the changes do not impact the 2018 financial statements nor the total net deferred tax assets/(liabilities) previously reported.*

In assessing the realizability of deferred tax assets, management considered whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. During the year ended December 31, 2019, the Company released $46.9 million of valuation allowance against its deferred tax assets. The Company considered all available evidence, both positive and negative, to determine whether, based on the weight of that evidence, a valuation allowance for deferred tax assets was needed. The Company reached the conclusion it was appropriate to release valuation allowance reserves against a significant portion of its federal deferred tax assets in light of strong positive evidence. We relied on evidence shown by reversing taxable temporary differences, as well as expectation of future taxable income from the acquisition of Legacy Gannett, which has a history of profitability. The Company continues to maintain its existing valuation allowance against net deferred tax assets in many of its state and foreign jurisdictions as it is not believed to be more likely than not that its deferred tax assets will be realized in such jurisdictions.

The following table summarizes the activity related to our valuation allowance for deferred tax assets for the year ended December 31, 2019:

| In thousands | | | | | |
|---|---|---|---|---|---|
| Balance at Beginning of Period | Additions / (Reductions) Charged to Expenses | Additions / (Reductions for Acquisitions / Dispositions | Other Additions to / (Deductions from) Reserves | Foreign Currency Translation | Balance at End of Period |
| $ 64,679 | $ (28,017) | $ 121,572 | $ — | $ 586 | $ 158,820 |

The aforementioned valuation allowance relates to unamortizable intangible assets, state and foreign net operating losses and other tax attributes that are deemed unrealizable as of December 31, 2019.

At December 31, 2019, the Company had approximately $435.0 million of U.S. federal net operating loss carryforwards, $52.0 million of U.S. federal disallowed business interest expense carryforwards, $989.6 million of apportioned state net operating loss carryforwards, and $233.6 million of foreign net operating loss carryforwards which are available to offset future taxable income. Additionally, the Company had $6.5 million of other business tax credits, $2.4 million of foreign tax credits, $5.8 million of state credits, and $31 million of foreign capital loss carryforwards. The federal tax loss carryforwards begin to expire in 2030 through 2037 and state loss carryforwards begin to expire in 2020. A portion of the operating losses are subject

to the limitations of Internal Revenue Code Section 382. This section provides limitations on the availability of net operating losses to offset current taxable income if significant ownership changes have occurred for federal tax purposes.

The following table summarizes the activity related to unrecognized tax benefits, excluding the federal tax benefit of state tax deductions:

| In thousands | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Change in unrecognized tax benefits** | | | |
| Balance at beginning of year | $ 1,190 | $ 1,160 | $ 1,176 |
| Additions based on tax positions related to the current year | 658 | — | — |
| Additions for tax positions of prior years | — | 30 | — |
| Reductions for tax positions or prior years | (352) | — | (16) |
| Increase due to current year business acquisitions | 32,578 | — | — |
| Balance at end of year | $ 34,074 | $ 1,190 | $ 1,160 |

At December 31, 2019, the Company's uncertain tax positions of $32.4 million, if recognized, would impact the effective tax rate. Included in the 2019 increase to unrecognized tax benefits is $31.1 million related to tax positions acquired through the acquisition of Legacy Gannett. It is reasonably possible that further adjustments to our unrecognized tax benefits may be made within the next twelve months due to audit settlements and regulatory interpretations of existing tax laws. At this time, an estimate of potential change to the amount of unrecognized tax benefits cannot be made. The Company recognizes interest and penalties related to unrecognized tax benefits as a component of income tax expense. At December 31, 2019 and December 30, 2018, the accrual for uncertain tax positions included $1.9 million and $0.3 million of interest and penalties, respectively. The increase in cumulative accrued interest and penalties was mainly a result of the acquisition of Legacy Gannett.

The Company files a U.S. federal consolidated income tax return for which the statute of limitations remains open for the 2015 tax year and subsequent years. U.S. state jurisdictions have statute of limitations generally ranging from 3 to 6 years. The federal income tax returns for calendar years 2015 - 2017 for Legacy Gannett are under federal audit. The statute of limitations for the Company's U.K. income tax return remains open for tax years for 2018 and forward.

## NOTE 11 — Supplemental equity information

### Earnings (loss) per share

The following table sets forth the computation of basic and diluted earnings (loss) per share:

| | Year Ended | | |
|---|---|---|---|
| in thousands, except share data | December 31, 2019 | December 30, 2018 | December 31, 2017 |
| Net income (loss) attributable to Gannett | $ (119,842) | $ 18,196 | $ (915) |
| | | | |
| Basic weighted average shares outstanding | 67,671,398 | 58,013,617 | 53,010,421 |
| Effect of dilutive securities: | | | |
| Stock options and restricted stock grants | — | 384,530 | — |
| Diluted weighted average shares outstanding | 67,671,398 | 58,398,147 | 53,010,421 |
| | | | |
| Basic net income (loss) per share attributable to Gannett | $ (1.77) | $ 0.31 | $ (0.02) |
| Diluted net income (loss) per share attributable to Gannett | $ (1.77) | $ 0.31 | $ (0.02) |

The Company excluded the following securities from the computation of diluted income per share because their effect would be antidilutive:

| | Year Ended | | |
|---|---|---|---|
| *in thousands, except share data* | **December 31, 2019** | **December 30, 2018** | **December 31, 2017** |
| Stock warrants | 1,362,479 | 1,362,479 | 1,362,479 |
| Stock options | 2,904,811 | 700,000 | 2,214,811 |
| Restricted stock grants | 9,494,161 | — | 342,264 |

**Equity activity**

In connection with the consummation of the acquisition of Legacy Gannett on November 19, 2019, each share of Legacy Gannett common stock issued and outstanding immediately prior to the acquisition date was converted automatically into 0.5427 of a fully paid and non-assessable share of parent common stock. As a result, approximately 62.4 million shares of parent common stock were issued to former holders of Legacy Gannett common stock at the acquisition date, including shares issued to satisfy outstanding equity-based awards that were accelerated and converted into the acquisition consideration.

During April 2018, the Company completed the sale of 6.9 million shares of the Company's common stock, including 25,000 shares of the Company's common stock sold to an officer of the Company. The estimated net proceeds of the sale were approximately $110.7 million. For the purpose of compensating the Manager for its successful efforts in raising capital for the Company, in connection with this offering, the Company granted options to the Manager to purchase 0.7 million shares of the Company's common stock at a price of $16.45, which had an aggregate fair value of approximately $1.4 million as of the grant date. The assumptions used in an option valuation model to value the options were a 2.8% risk-free rate, a 8.0% dividend yield, 28.1% volatility, and an expected life of 10 years.

In 2018, the Company issued 13,008 shares of its common stock to its Non-Officer Directors to settle a liability of $0.2 million for 2017 services.

**Share repurchase program**

On May 17, 2017, the Board of Directors authorized the repurchase of up to $100.0 million of the Company's common stock ("Share Repurchase Program") over the next twelve months. The Board of Directors has authorized extensions of the Share Repurchase Program through May 19, 2020. Under the Share Repurchase Program, the Company may purchase its shares from time to time in the open market or in privately negotiated transactions, subject to restrictions in our credit facility. No shares were repurchased under the program during 2019.

**Manager stock options and warrants**

Pursuant to the anti-dilution provisions of the Incentive Plan, the exercise price on the 862,500 options granted to the Manager in 2016 were equitably adjusted in 2018 from $16.00 to $13.24 as a result of return of capital distributions.

Pursuant to the anti-dilution provisions of the Incentive Plan, the exercise price on the 700,000 options granted to the Manager in 2015 were equitably adjusted in 2018 from $20.36 to $18.94 as a result of return of capital distributions.

Pursuant to the anti-dilution provisions of the Incentive Plan, the exercise price on the 652,311 remaining options granted to the Manager in 2014 were equitably adjusted in 2018 from $14.37 to $12.95 as a result of return of capital distributions.

In addition to the above stock options, the Company has issued warrants collectively representing the right to acquire common stock at a future date. At origination, these warrants, which have a strike price of $46.35, collectively represented approximately 5% of common stock outstanding. As of December 31, 2019, the warrants are equal to approximately 1% of common stock outstanding.

In connection with the acquisition of Legacy Gannett, the Company issued shares of its common stock as consideration for the acquisition. For the purpose of compensating the Manager for its successful efforts in facilitating the acquisition, the Company granted options to the Manager to purchase 3,163,264 shares of the Company's common stock at a price of 15.50, which had an aggregate fair value of approximately $0.3 million as of the grant date. The assumptions used in the Black-Scholes model to value the options were: a 1.7% risk-free rate, a 15.6% dividend yield, 37.8% volatility and an expected life of 10 years. The fair value of the options issued as compensation to the Manager was recorded as an increase in equity with an offsetting reduction in capital.

The following table includes additional information regarding the Manager stock options:

| in thousands, except share data | Number of Options | | Weighted-Average Grant Date Fair Value | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value ($000) |
|---|---|---|---|---|---|---|---|---|
| Outstanding at December 31, 2017 | 2,214,811 | $ | 4.08 | $ | 16.90 | 7.7 | $ | 2,245 |
| Granted | 690,000 | $ | 2.04 | $ | 16.45 | | | |
| Outstanding at December 30, 2018 | 2,904,811 | $ | 3.59 | $ | 15.31 | 7.3 | $ | — |
| Granted | 3,163,264 | $ | 0.11 | $ | 15.50 | | | |
| Outstanding at December 31, 2019 | 6,068,075 | $ | 1.78 | $ | 14.70 | 8.2 | $ | — |
| | | | | | | | | |
| Exercisable at December 31, 2019 | 2,780,253 | $ | — | $ | 13.79 | 6.3 | $ | — |

### Stock compensation

The Company recognized compensation cost for share-based payments of $11.3 million for the year ended December 31, 2019, $3.2 million for the year ended December 30, 2018, and $3.1 million for the year ended December 31, 2017. The total compensation cost not yet recognized related to non-vested awards as of December 31, 2019 was $4.2 million, which is expected to be recognized over a weighted average period of 1.8 years through October 2022.

### Restricted stock grants ("RSGs")

On February 3, 2014, the Board of Directors of legacy New Media (the "Board" or "Board of Directors") adopted the New Media Investment Group Inc. Nonqualified Stock Option and Incentive Award Plan (the "Incentive Plan") that authorized up to 15.0 million shares that may be granted under the Incentive Plan. On the same date, the Board adopted a form of the New Media Investment Group Inc. Non-Officer Director Restricted Stock Grant Agreement (the "Form Grant Agreement") to govern the terms of awards of restricted stock ("New Media Restricted Stock") granted under the Incentive Plan to directors who are not officers or employees of New Media (the "Non-Officer Directors"). On February 24, 2015, the Board adopted a form of the New Media Investment Group Inc. Employee Restricted Stock Grant Agreement (the "Form Employee Grant Agreement") to govern the terms of awards of New Media Restricted Stock granted under the Incentive Plan to employees of New Media and its subsidiaries (the "Employees"). Both the Form Grant Agreement and the Form Employee Grant Agreement provide for the grant of New Media Restricted Stock that vests in equal annual installments on each of the first, second, and third anniversaries of the grant date, subject to continued service, and immediate vesting in full upon death or disability. If service terminates for any other reason, all unvested shares of New Media Restricted Stock are forfeited. During the period prior to the lapse and removal of the vesting restrictions, a grantee of a RSG will have all the rights of a stockholder, including without limitation, the right to vote and the right to receive all dividends or other distributions. Any dividends or other distributions that are declared with respect to the shares of New Media Restricted Stock will be paid at the time such shares vest. The value of the RSGs on the date of issuance is recognized in selling, general, and administrative expense over the vesting period with a corresponding increase to additional paid-in-capital.

The following table outlines RSG activity specific to Legacy Gannett for the year ended December 31, 2019:

| | Year Ended | |
|---|---|---|
| | December 31, 2019 | |
| in thousands, except per share data | Number of RSGs | Weighted-Average Grant Date Fair Value |
| Unvested at beginning of year | — | $ — |
| Granted | 10,465,778 | 6.28 |
| Vested | (3,080,766) | 6.28 |
| Forfeited | (16,580) | 6.28 |
| Unvested at end of year | 7,368,432 | $ 6.28 |

Legacy New Media RSG activity was as follows:

| | Year Ended | | | | | |
| | December 31, 2019 | | December 30, 2018 | | December 31, 2017 | |
| *in thousands, except per share data* | Number of RSGs | Weighted-Average Grant Date Fair Value | Number of RSGs | Weighted-Average Grant Date Fair Value | Number of RSGs | Weighted-Average Grant Date Fair Value |
|---|---|---|---|---|---|---|
| Unvested at beginning of year | 384,471 | $ 16.11 | 342,264 | $ 16.86 | 335,593 | $ 18.18 |
| Granted | 300,952 | 13.62 | 227,388 | 16.43 | 186,153 | 15.85 |
| Vested | (273,845) | 15.45 | (170,422) | 18.01 | (128,952) | 18.87 |
| Forfeited | (94,489) | 15.12 | (14,759) | 16.55 | (50,530) | 16.80 |
| Unvested at end of year | 317,089 | $ 14.61 | 384,471 | $ 16.11 | 342,264 | $ 16.86 |

As of December 31, 2019, the aggregate intrinsic value of unvested RSGs was $49.0 million.

In connection with our acquisition of Legacy Gannett, we assumed management of the Gannett Co. Inc. 2015 Omnibus Incentive Compensation Plan. Pursuant to a Form S-8 filed with the Securities and Exchange Commission on November 20, 2019, we registered 16.4 million shares of common stock under this plan and two other plans assumed pursuant to the acquisition. Of this total, approximately 10.5 million shares of Legacy Gannett common stock under the Gannett Co. Inc. 2015 Omnibus Incentive Compensation Plan which were outstanding immediately prior to the acquisition were registered for issuance. When these outstanding shares vest, the payment of shares will occur under the Legacy Gannett Omnibus Plan and not the New Media Incentive Plan.

**Accumulated other comprehensive loss**

The changes in accumulated other comprehensive income (loss) by component for the years ended December 31, 2019 and December 30, 2018 are outlined below.

| *in thousands* | Retirement Plans | Foreign Currency Translation | Total |
|---|---|---|---|
| Balance at December 25, 2016 | $ (3,977) | $ — | $ (3,977) |
| Other comprehensive loss before reclassifications | (1,530) | — | (1,530) |
| Amounts reclassified from accumulated other comprehensive loss [1] | 46 | — | 46 |
| Net current period other comprehensive loss, net of taxes | (1,484) | — | (1,484) |
| Balance at December 31, 2017 | $ (5,461) | $ — | $ (5,461) |
| Other comprehensive loss before reclassifications | (1,509) | — | (1,509) |
| Amounts reclassified from accumulated other comprehensive loss [1] | 89 | — | 89 |
| Net current period other comprehensive loss, net of taxes | (1,420) | — | (1,420) |
| Balance at December 30, 2018 | $ (6,881) | $ — | $ (6,881) |
| Other comprehensive loss before reclassifications | 7,731 | 7,266 | 14,997 |
| Amounts reclassified from accumulated other comprehensive loss [1] | 86 | — | 86 |
| Net current period other comprehensive loss, net of taxes | 7,817 | 7,266 | 15,083 |
| Balance at December 31, 2019 | $ 936 | $ 7,266 | $ 8,202 |

[1] This accumulated other comprehensive income (loss) component is included in the computation of net periodic benefit cost. See Note 8 — Retirement plans and Note 9 — Postretirement benefits other than pension.

Amounts reclassified from Accumulated other comprehensive income (loss) to net income (loss) during the years ended December 31, 2019, December 30, 2018, and December 31, 2017 were not material.

**Dividends**

During the year ended December 31, 2019, the Company paid dividends of $1.52 per share of Common Stock. During the year ended December 30, 2018, the Company paid dividends of $1.49 per share of Common Stock. During the year ended December 31, 2017, the Company paid dividends of $1.42 per share of Common Stock.

**NOTE 12 — Commitments, contingencies, and other matters**

The Company is and may become involved from time to time in legal proceedings in the ordinary course of its business, including but not limited to with respect to such matters as libel, invasion of privacy, intellectual property infringement, wrongful termination actions, complaints alleging employment discrimination, and regulatory investigations and inquiries. In addition, the Company is involved from time to time in governmental and administrative proceedings concerning employment, labor, environmental, and other claims. Insurance coverage mitigates potential loss for certain of these matters. Historically, such claims and proceedings have not had a material adverse effect on the Company's consolidated results of operations or financial position.

Equity purchase arrangements that are exercisable by the counterparty to the agreement and that are outside the sole control of the Company are accounted for in accordance with ASC 480-10-S99-3A and are classified as Redeemable noncontrolling interests in the Consolidated balance sheets. Other than the arrangements classified as Redeemable noncontrolling interests, the Company is also a party to contingent consideration arrangements primarily payable based on the passage of time or as a component of earnings above an agreed-upon target.

***Litigation in connection with the Legacy Gannett acquisition:*** Following the August 5, 2019 announcement of the company's pending acquisition of Legacy Gannett, a total of six lawsuits were filed in various jurisdictions: *Stein v. Gannett Co. Inc, et al.*, filed on September 11, 2019 (D. Del.), *Scarantino v. Gannett Co. Inc., et al.*, filed on September 16, 2019 (D. Del.), *Humbert v. Gannett Co. Inc., et al.*, filed on September 30, 2019 (S.D.N.Y.), *Steiner v. Gannett Co. Inc., et al.*, filed on October 2, 2019 (D. Del.), *Litwin v. Gannett Co. Inc., et al.*, filed on October 17, 2019 (S.D.N.Y.), and *Johnson v. Gannett Co., Inc., et al.*, filed on October 23, 2019 (D. Del.). The plaintiffs in each action allege, among other things, the company and individual defendants violated Section 14(a) and Section 20(a) of the Exchange Act by providing inadequate disclosure regarding the proposed acquisition either in the registration statement on Form S-4 filed by New Media with the SEC or in the definitive proxy statement on Schedule 14A filed by the company with the SEC. The plaintiffs variously sought, among other things, to enjoin or rescind the acquisition, an award of damages in the event the acquisition is consummated, and an award of costs and attorney's fees; plaintiffs in *Scarantino* and *Steiner* also seek class action certification. All of the lawsuits have been voluntarily dismissed.

***Environmental contingency:*** We assumed responsibility for certain environmental contingencies in connection with our acquisition of Legacy Gannett. More specifically, in March 2011, the Advertiser Company (Advertiser), a subsidiary that publishes the *Montgomery Advertiser*, was notified by the U.S. Environmental Protection Agency (EPA) that it had been identified as a potentially responsible party (PRP) for the investigation and remediation of groundwater contamination in downtown Montgomery, AL. The Advertiser is a member of the Downtown Environmental Alliance, which has agreed to jointly fund and conduct all required investigation and remediation. In 2016, the Advertiser and other members of the Downtown Environmental Alliance reached a settlement with the U.S. EPA regarding the costs the U.S. EPA spent to investigate the site. The U.S. EPA has transferred responsibility for oversight of the site to the Alabama Department of Environmental Management, which has approved the work plan for the additional site investigation that is currently underway. The Advertiser's final costs cannot be determined until the investigation is complete, a determination is made on whether any remediation is necessary, and contributions from other PRPs are finalized.

***Other litigation:*** We are defendants in judicial and administrative proceedings involving matters incidental to our business. Although the Company is unable to predict with certainty the eventual outcome of any litigation, regulatory investigation or inquiry, in the opinion of management, the Company does not expect its current and any threatened legal proceedings to have a material adverse effect on the Company's business, financial position or consolidated results of operations. Given the inherent unpredictability of these types of proceedings, however, it is possible that future adverse outcomes could have a material effect on the Company's financial results.

***Rent expense:*** Total rent expense was $44.2 million in 2019, $32.8 million in 2018, and $27.2 million in 2017.

***Purchase obligations:*** We have future expected purchase obligations of $496.3 million related to wire services, interactive marketing agreements, professional services, paper distribution agreements, printing contracts, and other legally binding commitments. Amounts which we are liable for under purchase orders outstanding at December 31, 2019 are reflected in the Consolidated balance sheets as Accounts payable and are excluded from the amounts referred to above.

***Self-insurance:*** We are self-insured for most of our employee medical coverage and for our casualty, general liability, and libel coverage (subject to a cap above which third party insurance is in place). The liabilities, which are reflected in Accounts payable and Other long-term liabilities in the Consolidated balance sheets, are established on an actuarial basis with the advice

of consulting actuaries and totaled $65.4 million and $11.7 million as of December 31, 2019 and December 30, 2018, respectively.

**NOTE 13 — Fair value measurement**

*Fair value measurement*

The Company measures and records in the accompanying consolidated financial statements certain assets and liabilities at fair value on a recurring basis. ASC 820 establishes a fair value hierarchy for those instruments measured at fair value that distinguishes between assumptions based on market data (observable inputs) and the Company's own assumptions (unobservable inputs).

These inputs are prioritized as follows:

- Level 1: Observable inputs such as quoted prices in active markets for identical assets or liabilities;

- Level 2: Inputs other than quoted prices included within Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities or market corroborated inputs; and

- Level 3: Unobservable inputs for which there is little or no market data and which require the Company to develop their own assumptions about how market participants price the asset or liability.

The valuation techniques that may be used to measure fair value are as follows:

- Market approach—Uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities;

- Income approach—Uses valuation techniques to convert future amounts to a single present amount based on current market expectation about those future amounts;

- Cost approach—Based on the amount that currently would be required to replace the service capacity of an asset (replacement cost).

As of December 31, 2019 and December 30, 2018, assets and liabilities recorded at fair value and measured on a recurring basis primarily consist of pension plan assets. As permitted by U.S. GAAP, we use net asset values as a practical expedient to determine the fair value of certain investments. These investments measured at net asset value have not been classified in the fair value hierarchy.

The Term Loan Facility is recorded at carrying value, which approximates fair value, in the Consolidated balance sheets and is classified as Level 3.

The amounts presented in the table below are intended to permit reconciliation to the amounts presented in the Consolidated balance sheets.

The following tables set forth, by level within the fair value hierarchy, the December 31 measurement date fair values of our pension plans assets relating to the George W. Prescott Company pension plan, the Times Publishing Company pension plan, the GRP, the U.K. Pension Plans, and the Newspaper Guild of Detroit Pension Plan:

***Pension Plan Assets/Liabilities***

*In thousands*

**Fair value measurement as of December 31, 2019**

| | | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|---|
| *Assets:* | | | | | | | | |
| Cash and cash equivalents | $ | 27,884 | $ | 4,003 | $ | — | $ | 31,887 |
| Corporate common stock | | 537,295 | | — | | — | | 537,295 |
| Real estate | | — | | — | | 99,223 | | 99,223 |
| Interest in common/collective trusts: | | | | | | | | |
| Equities | | 19,191 | | 249,890 | | — | | 269,081 |
| Fixed income | | 12,435 | | 506,586 | | — | | 519,021 |
| Partnership/joint venture interests | | — | | — | | 149,018 | | 149,018 |
| Hedge funds | | — | | — | | 123,126 | | 123,126 |
| Derivative contracts | | — | | — | | 5 | | 5 |
| Total assets at fair value excluding those measured at net asset value | $ | 596,805 | $ | 760,479 | $ | 371,372 | $ | 1,728,656 |
| *Instruments measured at net asset value using the practical expedient:* | | | | | | | | |
| Real estate funds | | | | | | | | 10,966 |
| Interest in common/collective trusts: | | | | | | | | |
| Equities | | | | | | | | 314,955 |
| Fixed income | | | | | | | | 766,512 |
| Partnership/joint venture interests | | | | | | | | 37,145 |
| Other | | | | | | | | 1,202 |
| Total assets at fair value | | | | | | | $ | 2,859,436 |
| *Liabilities:* | | | | | | | | |
| Derivative liabilities | $ | (634) | $ | (498) | $ | (2,008) | $ | (3,140) |
| Total liabilities at fair value | $ | (634) | $ | (498) | $ | (2,008) | $ | (3,140) |

*In thousands*

**Fair value measurement as of December 30, 2018**

| | | Level 1 | | Level 2 | | Level 3 | | Total |
|---|---|---|---|---|---|---|---|---|
| *Assets:* | | | | | | | | |
| Cash and cash equivalents | $ | — | $ | 780 | $ | — | $ | 780 |
| Interest in registered investment companies | | | | | | | | — |
| Equities | | 18,746 | | — | | — | | 18,746 |
| Fixed income | | 14,074 | | — | | — | | 14,074 |
| Total assets at fair value excluding those measured at net asset value | $ | 32,820 | $ | 780 | $ | — | $ | 33,600 |
| *Instruments measured at net asset value using the practical expedient:* | | | | | | | | |
| Interest in registered investment companies | | | | | | | | |
| Equities | | | | | | | | 15,104 |
| Fixed income | | | | | | | | 4,357 |
| Other | | | | | | | | 974 |
| Total assets at fair value | | | | | | | $ | 54,035 |

Valuation methodologies used for assets and liabilities measured at fair value are as follows:

• Corporate stock is valued primarily at the closing price reported on the active market on which the individual securities are traded.

- Investments in direct real estate have been valued by an independent qualified valuation professional in the U.K. using a valuation approach that capitalizes any current or future income streams at an appropriate multiplier. Investments in real estate funds are mainly valued utilizing the net asset valuations provided by the underlying private investment companies or through proprietary models with varying degrees of complexity.

- Interests in common/collective trusts and interests in 103-12 investments are primarily equity and fixed income investments valued either through the use of a net asset value as provided monthly by the fund family or fund company or through proprietary models with varying degrees of complexity. Shares in the common/collective trusts are generally redeemable upon request.

- Interests in registered investment companies are primarily valued using the published net asset values as quoted through publicly available pricing sources or through proprietary models with varying degrees of complexity. Additionally, the interests are redeemable on request.

- Investments in partnerships and joint venture interests classified in Level 3 are valued based on an assessment of each underlying investment, considering items such as expected cash flows, changes in market outlook, and subsequent rounds of financing. These investments are included in Level 3 of the fair value hierarchy because exit prices tend to be unobservable and reliance is placed on the above methods. Most of the partnerships are general leveraged buyout funds, others include a venture capital fund, a fund formed to invest in special credit opportunities, an infrastructure fund and a real estate fund. Interest in partnership investments could be sold on the secondary market but cannot be redeemed. Instead, distributions are received as the underlying assets of the funds are liquidated. There are $7.0 million in unfunded commitments related to partnership/joint venture interests. One of the Plan's investments in partnerships and joint venture interests represents a limited partnership commingled fund valued using the net asset value as reported by the fund manager.

- Investments in hedge funds consist of investments that were formed to invest in mortgage and trading opportunities and are valued at the net asset value as reported by the fund managers. Additionally, there is an investment that consists of a fund of hedge funds whose strategy is to produce a return uncorrelated with market movements. This fund is classified as a Level 3 because its valuation is derived from unobservable inputs and a proprietary assessment of the underlying investments. Shares in the hedge funds are generally redeemable twice a year or on the last business day of each quarter with at least 60 days written notice subject to a potential 5% holdback.

- Derivatives primarily consist of forward and swap contracts. Forward contracts are valued at the spot rate, plus or minus forward points between the valuation date and maturity date. Swaps are valued at the mid-evaluation price using discounted cash flow models. Items in Level 3 are valued based on the market values of other securities for which they represent a synthetic combination.

We review appraised values, audited financial statements and additional information to evaluate fair value estimates from our investment managers or fund administrator.

The following tables set forth a summary of changes in the fair value of our pension plan assets and liabilities that are categorized as Level 3:

*Level 3 Pension Plan Assets/Liabilities*

*In thousands*

**For the year ended December 31, 2019**

| | Balance at Beginning of Year | Level 3 Assets Acquired | Actual Return on Plan Assets Relating to Assets Still Held at Report Date | Actual Return on Plan Assets Relating to Assets Sold During the Period | Purchases | Sales | Settlements | Balance at End of Year |
|---|---|---|---|---|---|---|---|---|
| *Assets:* | | | | | | | | |
| Real estate | $ — | $ 109,047 | $ (1,324) | $ 2,911 | $ — | $ (11,411) | $ — | $ 99,223 |
| Partnership/joint venture interests | — | 147,225 | 3,185 | — | 133 | — | (1,525) | 149,018 |
| Hedge funds | — | 121,588 | 1,538 | — | — | — | — | 123,126 |
| Derivative contracts | — | 4 | 1 | — | — | — | — | 5 |
| Total | $ — | $ 377,864 | $ 3,400 | $ 2,911 | $ 133 | $ (11,411) | $ (1,525) | $ 371,372 |
| *Liabilities:* | | | | | | | | |
| Derivative liabilities | $ — | $ 2,008 | $ — | $ — | $ — | $ — | $ — | $ 2,008 |

There were no Level 3 assets held for the year ended December 30, 2018.

There were no transfers between Levels 1 and 2 for the years ended December 31, 2019 and December 30, 2018.

Certain assets are measured at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments only in certain circumstances (for example, when there is evidence of impairment). Our assets that are measured on a nonrecurring basis are assets held for sale (Level 3), which are evaluated by using executed purchase agreements, letters of intent or third party valuation analyses when certain circumstances arise.

The non-financial assets measured at fair value on a nonrecurring basis in the accompanying Consolidated balance sheets are for Assets held for sale at December 31, 2019 and December 30, 2018 of $25.5 million and $1.9 million, respectively.

**NOTE 14 — Segment reporting**

We define our reportable segments based on the way the Chief Operating Decision Maker (CODM), currently the Chief Executive Officer of our operating subsidiary, manages the operations for purposes of allocating resources and assessing performance. Our reportable segments include the following:

• Publishing, which consists of our portfolio of local, regional, national, and international newspaper publishers. The results of this segment include local, classified, and national advertising revenues consisting of both print and digital advertising, circulation revenues from the distribution of our publications on our digital platforms, home delivery of our publications, single copy sales, and other revenues from commercial printing and distribution arrangements. The Publishing reportable segment is an aggregation of two operating segments: Domestic Publishing and the U.K.

• Marketing Solutions, which is comprised of our digital marketing solutions subsidiaries ReachLocal and UpCurve. The results of this segment include advertising and marketing services revenues through multiple services including search advertising, display advertising, search optimization, social media, website development, web presence products, and software-as-a-service solutions.

In addition to the above operating segments, we have a corporate and other category that includes activities not directly attributable to a specific segment. This category primarily consists of broad corporate functions and includes legal, human resources, accounting, finance, and marketing as well as other general business costs.

In the ordinary course of business, our reportable segments enter into transactions with one another. While intersegment transactions are treated like third-party transactions to determine segment performance, the revenues and expenses recognized by the segment that is the counterparty to the transaction are eliminated in consolidation and do not affect consolidated results.

The CODM uses adjusted EBITDA to evaluate the performance of the segments and allocate resources. Adjusted EBITDA is a non-GAAP financial performance measure we believe offers a useful view of the overall operation of our businesses and may be different than similarly-titled non-GAAP financial measures used by other companies. We define Adjusted EBITDA as net income (loss) from continuing operations attributable to Gannett before (1) income tax expense (benefit), (2) interest expense, (3) gains or losses on early extinguishment of debt, (4) non-operating items, primarily pension costs, (5) depreciation and amortization, (6) integration and reorganization costs, (7) impairment of long-lived assets, (8) goodwill and intangible impairments, (9) net loss (gain) on sale or disposal of assets, (10) non-cash compensation, (11) acquisition costs, and (12) certain other non-recurring charges.

Management considers adjusted EBITDA to be the appropriate metric to evaluate and compare the ongoing operating performance of our segments on a consistent basis across reporting periods as it eliminates the effect of items which we do not believe are indicative of each segment's core operating performance.

The following table presents our segment information:

| *in thousands* | Publishing | | Marketing Solutions | | Corporate and Other | | Intersegment Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2019** | | | | | | | | | | |
| Advertising and marketing services - external sales | $ | 819,046 | $ | 131,003 | $ | 2,595 | $ | — | $ | 952,644 |
| Advertising and marketing services - intersegment sales | | 78,539 | | — | | — | | (78,539) | | — |
| Circulation | | 704,811 | | — | | 31 | | — | | 704,842 |
| Commercial printing and other | | 190,256 | | 18,239 | | 1,928 | | — | | 210,423 |
| Total revenues | $ | 1,792,652 | $ | 149,242 | $ | 4,554 | $ | (78,539) | $ | 1,867,909 |
| | | | | | | | | | | |
| Adjusted EBITDA | $ | 268,916 | $ | (3,279) | $ | (41,766) | $ | — | $ | 223,871 |
| | | | | | | | | | | |
| **2018** | | | | | | | | | | |
| Advertising and marketing services - external sales | $ | 704,945 | $ | 80,086 | $ | 1,546 | $ | — | $ | 786,577 |
| Advertising and marketing services - intersegment sales | | 68,089 | | — | | — | | (68,089) | | — |
| Circulation | | 574,961 | | — | | 2 | | — | | 574,963 |
| Commercial printing and other | | 147,129 | | 15,785 | | 1,570 | | — | | 164,484 |
| Total revenues | $ | 1,495,124 | $ | 95,871 | $ | 3,118 | $ | (68,089) | $ | 1,526,024 |
| | | | | | | | | | | |
| Adjusted EBITDA | $ | 220,415 | $ | (6,404) | $ | (33,718) | $ | — | $ | 180,293 |
| | | | | | | | | | | |
| **2017** | | | | | | | | | | |
| Advertising and marketing services - external sales | $ | 666,907 | $ | 58,102 | $ | 995 | $ | — | $ | 726,004 |
| Advertising and marketing services - intersegment sales | | 47,221 | | — | | — | | (47,221) | | — |
| Circulation | | 474,320 | | — | | 4 | | — | | 474,324 |
| Commercial printing and other | | 126,562 | | 13,172 | | 1,942 | | — | | 141,676 |
| Total revenues | $ | 1,315,010 | $ | 71,274 | $ | 2,941 | $ | (47,221) | $ | 1,342,004 |
| | | | | | | | | | | |
| Adjusted EBITDA | $ | 216,482 | $ | (11,463) | $ | (39,728) | $ | — | $ | 165,291 |

The following table presents our reconciliation of adjusted EBITDA to net income:

| | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| *in thousands* | | | | | | |
| Net income (loss) attributable to Gannett (GAAP basis) | $ | (119,842) | $ | 18,196 | $ | (915) |
| Income tax expense (benefit) | | (85,994) | | 1,912 | | 481 |
| Interest expense | | 63,660 | | 36,072 | | 30,476 |
| Loss on early extinguishment of debt | | 6,058 | | 2,886 | | 4,767 |
| Other non-operating items, net | | (9,511) | | (1,554) | | (776) |
| Depreciation and amortization | | 111,882 | | 84,791 | | 74,394 |
| Integration and reorganization costs | | 47,401 | | 15,011 | | 8,903 |
| Acquisition costs | | 60,618 | | 2,651 | | 1,975 |
| Impairment of long-lived assets | | 3,009 | | 1,538 | | 7,142 |
| Goodwill and mastheads impairment | | 100,743 | | — | | 27,448 |
| Net (gain) loss on sale or disposal of assets | | 4,723 | | (3,971) | | (1,649) |
| Non-cash compensation | | 11,324 | | 3,156 | | 3,135 |
| Other items | | 29,800 | | 19,605 | | 9,910 |
| Adjusted EBITDA (non-GAAP basis) | $ | 223,871 | $ | 180,293 | $ | 165,291 |

Asset information by segment is not a key measure of performance used by the CODM. Accordingly, we have not disclosed asset information by segment. Additionally, equity income in unconsolidated investees, net, interest expense, other non-operating items, net, and provision for income taxes, as reported in the consolidated financial statements, are not part of operating income and are primarily recorded at the corporate level.

## NOTE 15 — Quarterly statements of income (unaudited)

Selected unaudited financial data for each quarter of the last two fiscal years is presented as follows:

| | | | | | Quarter Ended | | | |
|---|---|---|---|---|---|---|---|---|
| *in thousands, except per share amounts* | | March 31 | | June 30 | | September 29 | | December 31 |
| **Year Ended December 31, 2019** | | | | | | | | |
| Revenues | $ | 387,599 | $ | 404,387 | $ | 376,649 | $ | 699,274 |
| Operating income (loss) | | (1,435) | | 12,173 | | (1,942) | | (155,773) |
| Income (loss) before income taxes | | (11,309) | | 2,272 | | (11,742) | | (186,405) |
| Net income (loss) attributable to Gannett * | | (9,106) | | 2,815 | | (18,463) | | (95,088) |
| Earnings (loss) per share - Basic | | (0.15) | | 0.05 | | (0.31) | | (1.05) |
| Earnings (loss) per share - Diluted | | (0.15) | | 0.05 | | (0.31) | | (1.05) |

* *Net income (loss) figures per the table above were impacted by the following:*

• Net loss for the first quarter of 2019 includes integration and reorganization costs of $4.1 million, acquisition costs of $0.8 million, and impairment of long-lived assets of $1.2 million.

• Net loss for the second quarter of 2019 includes integration and reorganization costs of $3.2 million, acquisition costs of $2.4 million, and impairment of long-lived assets of $1.3 million.

• Net income for the third quarter of 2019 includes integration and reorganization costs of $2.2 million, and acquisition costs of $12.2 million.

• Net loss for the fourth quarter of 2019 includes integration and reorganization costs of $37.9 million, acquisition costs of $45.3 million, goodwill and mastheads impairment of $100.7 million, and impairment of long-lived assets of $0.5 million.

*in thousands, except per share amounts*

| | Quarter Ended | | | |
|---|---|---|---|---|
| | April 1 | July 1 | September 30 | December 30 |
| **Year Ended December 30, 2018** | | | | |
| Revenues | $ 340,765 | $ 388,801 | $ 380,419 | $ 416,039 |
| Operating income (loss) | 7,051 | 23,314 | 2,570 | 25,204 |
| Income (loss) before income taxes | (781) | 14,652 | (6,112) | 12,260 |
| Net income (loss) attributable to Gannett * | (665) | 11,706 | (6,105) | 13,260 |
| Earnings (loss) per share - Basic | (0.01) | 0.20 | (0.10) | 0.22 |
| Earnings (loss) per share - Diluted | (0.01) | 0.20 | (0.10) | 0.22 |

* *Net income (loss) figures per the table above were impacted by the following:*

• Net loss for the first quarter of 2018 includes integration and reorganization costs of $2.4 million and acquisition costs of $0.6 million.

• Net income for the second quarter of 2018 includes integration and reorganization costs of $1.7 million and acquisition costs of $0.7 million.

• Net loss for the third quarter of 2018 includes integration and reorganization costs of $9.1 million, acquisition costs of $0.6 million, and impairment of long-lived assets of $1.1 million.

• Net income for the fourth quarter of 2018 includes integration and reorganization costs of $1.8 million, acquisition costs of $0.8 million, and impairment of long-lived assets of $0.4 million.

**NOTE 16 — Related party transactions**

As of December 31, 2019, the Company's manager, FIG LLC (the "Manager"), which is an affiliate of Fortress Investment Group LLC ("Fortress"), and its affiliates owned approximately 4% of the Company's outstanding stock and approximately 40% of the Company's outstanding warrants. The Manager or its affiliates hold 6,068,075 stock options of the Company's stock as of December 31, 2019. During the years ended December 31, 2019, December 30, 2018 and December 31, 2017, Fortress and its affiliates were paid $1.0 million, $1.0 million, and $1.0 million in dividends, respectively.

The Company's Chief Executive Officer is an employee of Fortress (or one of its affiliates), and his salary is paid by Fortress (or one of its affiliates).

**Amended and Restated Management Agreement**

On November 26, 2013, New Media entered into a management agreement (as amended and restated, "the Management Agreement") with FIG LLC ("the Manager"), an affiliate of Fortress, pursuant to which the Manager managed the operations of New Media. New Media paid the Manager an annual management fee equal to 1.50% of New Media's Total Equity (as defined in the Management Agreement), and the Manager was eligible to receive incentive compensation.

On August 5, 2019, in connection with the execution of the Legacy Gannett acquisition agreement, the Company and the Manager entered into the Amended and Restated Management and Advisory Agreement (the "Amended Management Agreement"). Effective upon the consummation of the acquisition on November 19, 2019, the Amended Management Agreement replaced the Management Agreement. The Amended Management Agreement (i) establishes a termination date for the Manager's services of December 31, 2021, in lieu of annual renewals of the term; (ii) reduces the "incentive fee" payable under the Amended Management Agreement from 25% to 17.5% for the remainder of the term; (iii) reduces by 50% the number of options that would otherwise be issuable in connection with the issuance of shares as consideration for the acquisition, and imposes a premium on the exercise price; (iv) eliminates the Manager's right to receive options in connection with future equity raises by the Company; and (v) eliminates certain payments otherwise due at or after the end of the term of the prior management agreement.

In connection with entering into the Amended Management Agreement and the occurrence of the consummation of the acquisition, the Company issued to the Manager 4,205,607 shares of Company Common Stock and granted to the Manager options to acquire 3,163,264 shares of Company Common Stock. The Manager is restricted from selling the issued shares until the expiration of the Amended Management Agreement, or otherwise upon a change in control and certain other extraordinary events. The options will have an exercise price of $15.50 and become exercisable upon the first trading day immediately following the first 20 consecutive trading day period in which the closing price of the Company Common Stock (on its principal U.S. national securities exchange) is at or above $20 per share (subject to adjustment) and also upon a change in control and certain other extraordinary events.

Upon expiration of the term of the Amended Management Agreement, the Manager will cease providing external management services to the Company, and the Manager will no longer be the employer of the person serving in the role of Chief Executive Officer of the consolidated company.

The following table provides the management and incentive fees recognized and paid to the Manager for the years ended December 31, 2019, December 30, 2018, and December 31, 2017:

| | Year Ended | | |
| | December 31, 2019 | December 30, 2018 | December 31, 2017 |
|---|---|---|---|
| *In thousands* | | | |
| Management fee expense | $ 10,992 | $ 10,674 | $ 10,622 |
| Incentive fee expense | 4,067 | 11,143 | 11,654 |
| Management fees paid | 11,078 | 9,619 | 11,349 |
| Incentive fees paid | 6,675 | 14,129 | 9,195 |
| Reimbursement for expenses | 2,905 | 2,501 | 1,567 |

The Company had an outstanding liability for all Management Agreement related fees of $6.5 million and $10.7 million at December 31, 2019 and December 30, 2018, respectively, included in accrued expenses.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the Exchange Act). Based on this evaluation, our principal executive officer and our principal financial officer concluded that, which the exception of matters discussed below, our disclosure controls and procedures were effective as of the end of the period covered by this annual report.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining effective internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control system was designed under the supervision of our Chief Executive Officer and our Chief Financial Officer and with the participation of management in order to provide reasonable assurance regarding the reliability of our financial reporting and our preparation of financial statements for external purposes in accordance with GAAP.

All internal control systems, no matter how well designed and tested, have inherent limitations, including, among other things, the possibility of human error, circumvention or disregard. Therefore, even those systems of internal control that have been determined to be effective can provide only reasonable assurance that the objectives of the control system are met and may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision of our Chief Executive Officer and our Chief Financial Officer and with the participation of management, we conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in "Internal Control-Integrated Framework" (the "COSO" criteria) issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on management's assessment using these criteria, we concluded that, as of December 31, 2019, there was a material weakness in our internal control over financial reporting related to the revenue recognition process as further described below.

Management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Gannett Media Corp. and other 2019 acquisitions which are included in the 2019 consolidated financial statements of Gannett Co., Inc. In connection with these acquisitions, we began consolidating the results of these entities, which represented approximately 67% of total assets at December 31, 2019 and 16% of total revenue for the year ended December 31, 2019. Due to the timing of these acquisitions and as permitted by SEC guidance, management excluded Gannett Media Corp. and the other 2019 acquisitions from its December 31, 2019 assessment of internal control over financial reporting.

A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in our annual or interim financial statements will not be prevented or detected on a timely basis. With respect to the aforementioned material weakness in the revenue recognition process, the Company did not maintain effective controls due to the aggregation of control deficiencies related to inadequate manual preventative and detective controls and information technology general controls. The material weakness described above did not result in a material misstatement to the Company's consolidated financial statements for any period in the three-year period ended December 31, 2019. These deficiencies also contributed to control deficiencies identified in related accounts receivable and deferred revenue. Notwithstanding the identified material weakness, management, including our Chief Executive Officer and Chief Financial Officer, believes the consolidated financial statements included in this Form 10-K fairly represent in all material respects our financial condition, results of operations and cash flows as of and for the periods presented in accordance with U.S. GAAP.

These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent a material weakness in the Company's internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2019.

The effectiveness of our internal control over financial reporting as of December 31, 2019 has been audited by the Company's independent registered public accounting firm, Ernst & Young LLP. Their assessment is included in the accompanying Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting.

**Remediation Plan**

We continue to strengthen our internal control over financial reporting and are committed to ensuring that such controls are designed and operating effectively. We are implementing process and control improvements to address the above material weakness that includes steps to increase dedicated personnel, improve reporting processes, and enhance related supporting technology. We are committed to maintaining a strong internal control environment and implementing measures designed to help ensure that control deficiencies contributing to the material weakness are remediated as soon as possible.

We expect the implementation of our remediation plan will result in significant improvements to the overall internal control environment over financial reporting.

**Changes in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting that occurred during our fiscal quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Gannett Co., Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Gannett Co., Inc.'s internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, because of the effect of the material weakness described below on the achievement of the objectives of the control criteria, Gannett Co., Inc. (the Company) has not maintained effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

As indicated in the accompanying Management's Report on Internal Control Over Financial Reporting, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Gannett Media Corp and other 2019 acquisitions, which is included in the 2019 consolidated financial statements of the Company and constituted **67%** of total assets as of December 31, 2019 and **16%** of revenues for the year then ended. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of Gannett Media Corp and other 2019 acquisitions.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment. Management has identified a material weakness in controls related to the Company's revenue recognition process.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2019 and December 30, 2018, the related consolidated statements of operations and comprehensive income (loss), stockholders' equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes. This material weakness was considered in determining the nature, timing and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report dated March 2, 2020, which expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Tysons, Virginia

March 2, 2020

**PART III**

ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

    The information captioned "The Nominees," "Audit Committee," and "Nominating and Public Responsibility Committee" under the heading "PROPOSAL 1 – ELECTION OF DIRECTORS" and the information under the headings "ETHICS POLICY" and "SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE" in our 2020 proxy statement is incorporated herein by reference.

ITEM 11. EXECUTIVE COMPENSATION

The information under the headings "EXECUTIVE COMPENSATION," "DIRECTOR COMPENSATION," "OUTSTANDING DIRECTOR EQUITY AWARDS AT FISCAL YEAR-END," "COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION" and "RELATED TRANSACTIONS" in our 2020 proxy statement is incorporated herein by reference.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information captioned "EQUITY COMPENSATION PLAN INFORMATION" and "SECURITIES BENEFICIALLY OWNED BY DIRECTORS, EXECUTIVE OFFICERS AND PRINCIPAL STOCKHOLDERS" in our 2020 proxy statement is incorporated herein by reference.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

The information captioned "Director Independence" under the heading "PROPOSAL 1 – ELECTION OF DIRECTORS" and the information under the headings "COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION" and "RELATED TRANSACTIONS" in our 2020 proxy statement is incorporated herein by reference.

ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information under the heading "PROPOSAL 2 - RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM" in our 2020 proxy statement is incorporated herein by reference.

**PART IV**

ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) Financial Statements, Financial Statement Schedules and Exhibits.

    (1)    Financial Statements.

    As listed in the Index to Financial Statements and Supplementary Data on page 60.

    (2)    Financial Statement Schedules.

    All schedules are omitted as the required information is not applicable or the information is presented in the consolidated financial statements or related notes.

    (3)    Exhibits.

| Exhibit Number | Exhibit | Location |
|---|---|---|
| 2.5 | Agreement and Plan of Merger, dated as of August 5, 2019, by and among New Media Investment Group Inc., Gannett Co., Inc., Artic Holdings LLC and Artic Acquisition Corp. | Incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, filed August 6, 2019. |
| 2.6 | First Amendment to Agreement and Plan of Merger, dated as of October 29, 2019, by and among New Media Investment Group Inc., Gannett Co., Inc., Artic Holdings LLC and Artic Acquisition Corp. | Incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, filed October 30, 2019. |
| 3.1 | Amended and Restated Certificate of Incorporation of the Company. | Incorporated by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q, filed August 2, 2018. |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation of the Company. | Incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed November 20, 2019. |
| 3.3 | Amended and Restated Bylaws of the Company. | Incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, filed November 20, 2019. |
| 4.1 | Indenture (including Form of Note) with respect to 4.750% Convertible Senior Notes due 2024, dated as of April 9, 2018, between Gannett Co., Inc. and U.S. Bank National Association, as trustee. | Incorporated by reference to Exhibit 4.1 to Legacy Gannett's Current Report on Form 8-K, filed April 9, 2018. |
| 4.2 | First Supplemental Indenture, dated as of November 19, 2019, by and among Gannett Co. Inc., New Media Investment Group Inc., and U.S. Bank National Association. | Incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed November 20, 2019. |
| 4.3 | Form of Registration Rights Agreement between New Media Investment Group Inc. and Omega Advisors, Inc. | Incorporated by reference to Exhibit 4.5 to the Company's Registration Statement on Form 10/A (File No. 001-36097), filed November 8, 2013. |
| 4.4 | Registration Rights Agreement, dated as of November 19, 2019, by and among New Media Investment Group Inc. and Certain Stockholders. | Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed November 20, 2019. |
| 4.5 | Global Warrant Certificate of New Media Investment Group Inc. (amended) | Included in Exhibit 10.32. |
| 4.6 | Description of Securities Registered under Section 12 of the Securities Exchange Act of 1934. | Filed herewith. |
| 10.1 | Credit Agreement, dated as of November 19, 2019, by and among Gannett Co., Inc., Gannett Holdings LLC, each person listed as a guarantor on the signature pages thereto, the lenders from time to time party thereto and Cortland Capital Market Services LLC, as collateral agent and administrative agent. | Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed November 20, 2019. |
| 10.2 | Amended and Restated Management and Advisory Agreement, dated August 5, 2019, between New Media Investment Group Inc. and FIG LLC. | Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed August 6, 2019. |
| 10.3 | 2020 Omnibus Incentive Compensation Plan, adopted as of February 26, 2020 | Filed herewith. |
| 10.4 | Form of Nonqualified Stock Option Agreement between New Media Investment Group Inc. and Fortress Operating Entity I LP.* | Incorporated by reference to Exhibit 10.38 of the Company's Annual Report on Form 10-K, filed March 19, 2014. |
| 10.5 | Form of Nonqualified Stock Option Agreement between New Media Investment Group Inc. and Fortress Operating Entity I LP. | Included in Exhibit 10.2 |

| 10.6 | 2015 Omnibus Incentive Compensation Plan.* | Incorporated by reference to Exhibit 4.1 to Legacy Gannett's Registration Statement on Form S-3, filed June 29, 2015. |
|---|---|---|
| 10.7 | Amendment No. 1 to 2015 Omnibus Incentive Compensation Plan.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed May 11, 2017. |
| 10.8 | Amendment No. 2 to 2015 Omnibus Incentive Compensation Plan.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed May 9, 2018. |
| 10.9 | Form of Executive Officer Restricted Stock Unit Award Agreement (2019).* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed December 12, 2018. |
| 10.10 | Form of Executive Officer Performance Share Unit Award Agreement (2019).* | Incorporated by reference to Exhibit 10.2 to Legacy Gannett's Current Report on Form 8-K, filed December 12, 2018. |
| 10.11 | Form of Executive Officer Performance Unit Award Agreement (2019).* | Incorporated by reference to Exhibit 10.3 to Legacy Gannett's Current Report on Form 8-K, filed December 12, 2018. |
| 10.12 | 2015 Change in Control Severance Plan, as amended. | Incorporated by reference to Exhibit 10.3 to Legacy Gannett's Quarterly Report on Form 10-Q, filed August 3, 2017. |
| 10.13 | Amended and Restated Executive Severance Plan, effective as of December 7, 2018. | Incorporated by reference to Exhibit 10.58 to Legacy Gannett's Annual Report on Form 10-K, filed on February 27, 2019. |
| 10.14 | Offer Letter of Employment, dated August 4, 2019, by and between Gannett Co., Inc. and Paul J. Bascobert. | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed August 6, 2019. |
| 10.15 | Transition Services Agreement, dated as of January 6, 2020, by and between Gannett Co. Inc. and Allison K. Engel.* | Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed January 8, 2020. |
| 10.16 | Employment Retention Agreement, dated as of January 15, 2019, by and between Gannett Co., Inc. and Alison K. Engel.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed January 18, 2019. |
| 10.17 | Amended and Restated 401(k) Savings Plan of Gannett Co. Inc. as of January 1, 2019. | Incorporated by reference to Exhibit 4.16 to the Company's Post-Effective Amendment to Registration Statement on Form S-8 (Registration No. 333-233509), filed November 21, 2019. |
| 10.18 | Amendment No. 1 to 401(k) Savings Plan of Gannett Co. Inc. as of January 1, 2019. | Incorporated by reference to Exhibit 4.17 to the Company's Post-Effective Amendment to Registration Statement on Form S-8 (Registration No. 333-233509), filed November 21, 2019. |
| 10.19 | 2015 Deferred Compensation Plan Rules for Pre-2005 Deferrals.* | Incorporated by reference to Exhibit 10.8 to Legacy Gannett's Current Report on Form 8-K, filed June 30, 2015. |
| 10.20 | Amendment No. 1 to 2015 Deferred Compensation Plan Rules for Pre-2005 Deferrals.* | Incorporated by reference to Exhibit 10.2 to Legacy Gannett's Current Report on Form 8-K, filed June 6, 2017. |
| 10.21 | Amendment No. 2 to 2015 Deferred Compensation Plan Rules for Pre-2005 Deferrals.* | Incorporated by reference to Exhibit 10.2 to Legacy Gannett's Current Report on Form 8-K, filed August 1, 2018. |
| 10.22 | Amendment No. 3 to 2015 Deferred Compensation Plan Rules for Pre-2005 Deferrals.* | Incorporated by reference to Exhibit 10.4 to Legacy Gannett's Quarterly Report on Form 10-Q for the quarter ended September 30, 2018. |
| 10.23 | Amendment No. 6 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals. | Incorporated by reference to Exhibit 4.12 to the Company's Post-Effective Amendment to Registration Statement on Form S-8 (Registration No. 333-233509), filed November 21, 2019. |
| 10.24 | 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.9 to Legacy Gannett's Current Report on Form 8-K, filed June 30, 2015. |
| 10.25 | Amendment No. 1 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed December 2, 2016. |
| 10.26 | Amendment No. 2 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed June 6, 2017. |
| 10.27 | Amendment No. 3 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.1 to Legacy Gannett's Current Report on Form 8-K, filed August 1, 2018. |
| 10.28 | Amendment No. 4 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.2 to Legacy Gannett's Quarterly Report on Form 10-Q for the quarter ended September 30, 2018. |
| 10.29 | Amendment No. 5 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals.* | Incorporated by reference to Exhibit 10.21 to Legacy Gannett's Annual Report on Form 10-K, filed on February 27, 2019. |

| 10.30 | Amendment No. 6 to 2015 Deferred Compensation Plan Rules for Post-2004 Deferrals. | Incorporated by reference to Exhibit 4.12 to the Company's Post-Effective Amendment to Registration Statement on Form S-8 (Registration No. 333-233509), filed November 21, 2019. |
|---|---|---|
| 10.31 | Form of Indemnification Agreement to be entered into by New Media Investment Group Inc. with each of its executive officers and directors. | Incorporated by reference to Exhibit 10.11 to the Company's Registration Statement on Form 10/A (File No. 001-36097), filed November 8, 2013. |
| 10.32 | Amended and Restated Warrant Agreement dated January 15, 2014 between New Media Investment Group Inc. and American Stock & Transfer Company, LLC. | Incorporated by reference to Exhibit 10.37 to the Company's Registration Statement on Form S-1/A (Registration No. 333-192736), filed January 28, 2014. |
| 21.1 | List of subsidiaries. | Filed herewith. |
| 23.1 | Consent of Ernst & Young LLP. | Filed herewith. |
| 31.1 | Rule 13a-14(a)/15d-14(d) Certification of Principal Executive Officer under the Securities Exchange Act of 1934. | Filed herewith. |
| 31.2 | Rule 13a-14(a)/15d-14(d) Certification of Principal Financial Officer under the Securities Exchange Act of 1934. | Filed herewith. |
| 32.1 | Section 1350 Certification of Principal Executive Officer. | Filed herewith. |
| 32.2 | Section 1350 Certification of Principal Financial Officer. | Filed herewith. |
| 101 | The following financial information from Gannett Co., Inc. Annual Report on Form 10-K for the year ended December 31, 2019, formatted in Inline XBRL includes: (i) Consolidated Balance Sheets; (ii) Consolidated Statements of Income and Comprehensive Income (Loss); (iii) Consolidated Statements of Cash Flows; (iv) Consolidated Statements of Equity; and (v) the Notes to Consolidated Financial Statements. | Filed herewith. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). | Filed herewith. |

   We agree to furnish to the Commission, upon request, a copy of each agreement with respect to long-term debt not filed herewith in reliance upon the exemption from filing applicable to any series of debt which does not exceed 10% of our total consolidated assets.

\*   Asterisks identify management contracts and compensatory plans or arrangements.

ITEM 16. FORM 10-K SUMMARY

None.

**SIGNATURES**

    Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: March 2, 2020         GANNETT CO., INC. (Registrant)

By:    /s/ Alison K. Engel

       Alison K. Engel

       Chief Financial Officer and

       Chief Accounting Officer (principal financial officer)

    Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant in the capacities and on the dates indicated.

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Michael E. Reed |
| | Michael E. Reed |
| | Chief Executive Officer and |
| | President (principal executive officer) |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Mayur Gupta |
| | Mayur Gupta, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Theodore Janulis |
| | Theodore Janulis, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Alison K. Engel |
| | Alison K. Engel |
| | Chief Financial Officer and |
| | Chief Accounting Officer (principal financial officer) |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ John Jeffry Louis |
| | John Jeffry Louis, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Maria Miller |
| | Maria Miller, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Michael E. Reed |
| | Michael E. Reed |
| | Director, Chairman |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Kevin Sheehan |
| | Kevin Sheehan, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Laurence Tarica |
| | Laurence Tarica, Director |

| | |
|---|---|
| Dated: March 2, 2020 | /s/ Barbara Wall |
| | Barbara Wall, Director |

118

Exhibit 4.6

## DESCRIPTION OF COMMON STOCK

The following description of the common stock of Gannett Co., Inc. (formerly known as New Media Investment Group Inc.) (we, us, our or the "Company") does not describe every aspect of our common stock and is subject, and is qualified in its entirety by reference, to all the provisions of our amended and restated certificate of incorporation and all the provisions of our amended and restated bylaws.

### Authorized Capitalization

Our authorized capital stock consists of (1) 2,000,000,000 shares of common stock, par value $0.01 per share and (2) 300,000 shares of preferred stock, par value $0.01 per share.

The following is a description of the material terms of our amended and restated certificate of incorporation and amended and restated bylaws. We refer you to our amended and restated certificate of incorporation and amended and restated bylaws, copies of which have been filed as exhibits to our Annual Report on Form 10-K.

### Common Stock

Each holder of common stock is entitled to one vote for each share of common stock held on all matters submitted to a vote of stockholders. Our amended and restated certificate of incorporation and amended and restated bylaws do not provide for cumulative voting in the election of directors, which means that the holders of a majority of the outstanding shares of common stock can elect all of the directors standing for election, and the holders of the remaining shares are not able to elect any directors.

Subject to any preference rights of holders of any preferred stock that we may issue in the future, holders of our common stock are entitled to receive dividends, if any, declared from time to time by our Board out of legally available funds. In the event of our liquidation, dissolution or winding up, the holders of our common stock are entitled to share ratably in all assets remaining after the payment of liabilities, subject to any rights of holders of our preferred stock prior to distribution.

Holders of our common stock have no preemptive, subscription, redemption or conversion rights.

### Preferred Stock

Our Board has the authority, without action by our stockholders, to issue preferred stock and to fix voting powers for each class or series of preferred stock, and to provide that any class or series may be subject to redemption, entitled to receive dividends, entitled to rights upon dissolution, or convertible or exchangeable for shares of any other class or classes of capital stock. The rights with respect to a series or class of preferred stock may be greater than the rights attached to our common stock. It is not possible to state the actual effect of the issuance of any shares of our preferred stock on the rights of holders of our common stock until our Board determines the specific rights attached to that preferred stock. The effect of issuing preferred stock could include, among other things, one or more of the following:

- restricting dividends in respect of our common stock;

### Anti-Takeover Effects of Delaware Law, Our Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws

- diluting the voting power of our common stock or providing that holders of preferred stock have the right to vote on matters as a class;

- impairing the liquidation rights of our common stock; or

- delaying or preventing a change of control of us.

The following is a summary of certain provisions of our amended and restated certificate of incorporation and amended and restated bylaws that may be deemed to have an anti-takeover effect and may delay, deter or prevent a

1

Exhibit 4.6

tender offer or takeover attempt that a stockholder might consider to be in its best interest, including those attempts that might result in a premium over the market price for the shares held by stockholders.

### Authorized but Unissued Shares

The authorized but unissued shares of our common stock and our preferred stock will be available for future issuance without obtaining stockholder approval, except to the extent such approval is required by law or the listing requirements of NYSE. These additional shares may be utilized for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued shares of our common stock and preferred stock could render more difficult or discourage an attempt to obtain control over us by means of a proxy contest, tender offer, merger or otherwise.

### Delaware Business Combination Statute

We are organized under Delaware law. Some provisions of Delaware law may delay or prevent a transaction that would cause a change in our control.

Our amended and restated certificate of incorporation provides that Section 203 of the Delaware General Corporation Law (the "DGCL"), as amended, an anti-takeover law, will not apply to us. In general, this statute prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years after the date of the transaction by which that person became an interested stockholder, unless the business combination is approved in a prescribed manner. For purposes of Section 203, a business combination includes a merger, asset sale or other transaction resulting in a financial benefit to the interested stockholder, and an interested stockholder is a person who, together with affiliates and associates, owns, or within three years prior, did own, 15% or more of voting stock.

### Other Provisions of Our Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws

At the 2018 annual meeting of stockholders, our stockholders approved amendments to our Bylaws that eliminate the classification of our Board into three classes. As a result, commencing with the 2019 annual meeting of stockholders, directors of the class standing for election at that meeting were reelected for a one-year (instead of a three-year) term. The remaining directors continue to serve out their respective three-year terms. The entire Board will be elected annually commencing with the 2021 annual meeting of stockholders.

Our amended and restated certificate of incorporation and amended and restated bylaws provide that directors may be removed only for cause and only with the affirmative vote of at least 80% of the voting interest of stockholders then issued and outstanding.

Pursuant to our amended and restated certificate of incorporation, shares of our preferred stock may be issued from time to time, and the Board is authorized to determine and alter all rights, preferences, privileges, qualifications, limitations and restrictions without limitation. See "Preferred Stock" above.

### Ability of Our Stockholders to Act

Our amended and restated certificate of incorporation and amended and restated bylaws do not permit our stockholders to call special stockholders' meetings. Written notice of any special meeting so called shall be given to each stockholder of record entitled to vote at such meeting not less than 10 or more than 60 days before the date of such meeting, unless otherwise permitted or required by law.

Our amended and restated bylaws provide that nominations of persons for election to our Board may be made at any annual meeting of our stockholders, or at any special meeting of our stockholders called for the purpose of electing directors, (a) by or at the direction of our Board or (b) by any of our stockholders. In addition to any other applicable requirements, for a nomination to be properly brought by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Company. To be timely, a stockholder's notice must be delivered to or mailed and received at our principal executive offices (a) in the case of an annual meeting of stockholders, not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event that the annual meeting

2

Exhibit 4.6

is called for a date that is not within 30 days before or after such anniversary date, notice by a stockholder in order to be timely must be so received not later than the close of business on the tenth day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs; and (b) in the case of a special meeting of our stockholders called for the purpose of electing directors, not later than the close of business on the tenth day following the day on which notice of the date of the special meeting was mailed or public disclosure of the date of the special meeting was made, whichever first occurs.

Our amended and restated bylaws provide that no business may be transacted at any annual meeting of our stockholders, other than business that is either (a) specified in the notice of meeting given by or at the direction of our Board, (b) otherwise properly brought before the annual meeting by or at the direction of our Board, or (c) otherwise properly brought by any of our stockholders. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to our Secretary. To be timely, a stockholder's notice must be delivered to or mailed and received at our principal executive offices not less than 90 days nor more than 120 days prior to the anniversary date of the immediately preceding annual meeting of stockholders; provided, however, that in the event the annual meeting is called for a date that is not within 30 days before or after such anniversary date, notice by a stockholder in order to be timely must be so received not later than the close of business on the tenth day following the day on which notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs.

### *Forum Selection Clause*

Under our amended and restated certificate of incorporation, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors or officers to us or our stockholders, (iii) any action asserting a claim against us arising pursuant to any provision of the DGCL or our amended and restated certificate of incorporation or amended and restated bylaws or (iv) any action asserting a claim against us governed by the internal affairs doctrine.

### **Limitations on Liability and Indemnification of Directors and Officers**

Our amended and restated certificate of incorporation provides that our directors will not be personally liable to us or our stockholders for monetary damages for breach of a fiduciary duty as a director, except to the extent such exemption is not permitted under the DGCL, as amended from time to time.

Our amended and restated certificate of incorporation and amended and restated bylaws provide that we will indemnify our directors and officers to the fullest extent permitted by law. We are also expressly authorized to advance certain expenses (including attorneys' fees and disbursements and court costs) to our directors and officers and carry directors' and officers' insurance providing indemnification for our directors and officers for some liabilities. We believe that these indemnification provisions and insurance are useful to attract and retain qualified directors and executive officers.

We have entered into separate indemnification agreements with each of our directors and executive officers. Each indemnification agreement provides, among other things, for indemnification to the fullest extent permitted by law and our amended and restated certificate of incorporation against (i) any and all expenses and liabilities, including judgments, fines, penalties and amounts paid in settlement of any claim with our approval and counsel fees and disbursements, (ii) any liability pursuant to a loan guarantee, or otherwise, for any of our indebtedness and (iii) any liabilities incurred as a result of acting on our behalf (as a fiduciary or otherwise) in connection with an employee benefit plan. The indemnification agreements provide for the advancement or payment of all expenses to the indemnitee and for reimbursement to us if it is found that such indemnitee is not entitled to such indemnification under applicable law and our amended and restated certificate of incorporation. These provisions and agreements may have the practical effect in some cases of eliminating our stockholders' ability to collect monetary damages from our directors and executive officers.

Exhibit 4.6

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "Securities Act"), may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**Corporate Opportunity**

Under our amended and restated certificate of incorporation, to the extent permitted by law:

- the Fortress Stockholders have the right to, and have no duty to abstain from, exercising such right to, engage or invest in the same or similar business as us, do business with any of our clients, customers or vendors or employ or otherwise engage any of our officers, directors or employees;

**Transfer Agent and Registrar**

- if the Fortress Stockholders or any of their officers, directors or employees acquire knowledge of a potential transaction that could be a corporate opportunity, they have no duty to present, communicate or offer such corporate opportunity to us, our stockholders or affiliates;

- we have renounced any interest or expectancy in, or in being offered an opportunity to participate in, such corporate opportunities; and

- in the event that any of our directors and officers who is also a director, officer or employee of any of the Fortress Stockholders acquires knowledge of a corporate opportunity or is offered a corporate opportunity, provided that this knowledge was not acquired solely in such person's capacity as our director or officer and such person acted in good faith, then such person is deemed to have fully satisfied such person's fiduciary duty and is not liable to us if any of the Fortress Stockholders pursues or acquires such corporate opportunity or if such person did not present the corporate opportunity to us.

The registrar and transfer agent for our common stock is American Stock Transfer and Trust Company, LLC.

**Listing**

Our common stock is listed on the NYSE under the symbol "GCI."

4

Exhibit 10.3

**GANNETT CO., INC.**

**2020 OMNIBUS INCENTIVE COMPENSATION PLAN**

**Adopted as of February 26, 2020**

11

# TABLE OF CONTENTS

PAGE

Section 1 PURPOSE OF PLAN; DEFINITIONS 1

    1.1    Purpose   1
    1.2    Definitions   1

Section 2 ADMINISTRATION 4

    2.1    Administration   4
    2.2    Duties and Powers of Committee   4
    2.3    Majority Rule   4
    2.4    Delegation of Authority   5
    2.5    Compensation; Professional Assistance; Good Faith Actions   5

Section 3 STOCK SUBJECT TO PLAN 5

    3.1    Number of and Source of Shares   5
    3.2    Unrealized Awards   5
    3.3    Adjustment of Awards   6

Section 4 ELIGIBILITY 6

Section 5 AWARDS 6

    5.1    Stock Options   6
    5.2    Stock Appreciation Rights   7

5.3     Restricted Stock    7
5.4     Performance Awards    8
5.5     Other Awards    8

Section 6 AWARD AGREEMENTS 8

6.1     Terms of Award Agreements    8

Section 7 AMENDMENT AND TERMINATION 9

Section 8 UNFUNDED STATUS OF PLAN 10

Section 9 GENERAL PROVISIONS 10

9.1     Securities Laws Compliance    10
9.2     Certificate Legends    10
9.3     Transfer Restrictions    10
9.4     Company Actions; No Right to Employment    10
9.5     Section 409A of the Code    11
9.6     Payment of Taxes    11
9.7     Governing Law    11

Section 10 EFFECTIVE DATE OF PLAN 11

Section 11 TERM OF PLAN 11

2

**GANNETT CO., INC.**

**2020 OMNIBUS INCENTIVE COMPENSATION PLAN**

1111

## Section 1

### PURPOSE OF PLAN; DEFINITIONS

1.1  <u>Purpose</u>. This Plan is an amendment and restatement of the New Media Investment Group Inc. Nonqualified Stock Option and Incentive Award Plan, originally adopted February 3, 2014 (the "<u>Prior Plan</u>"). The purpose of the Plan is to (a) to reinforce the long-term commitment to the Company's success of those Non-Officer Directors, officers, directors, employees, advisors, service providers, consultants and other personnel who are or will be responsible for such success; to facilitate the ownership of the Company's stock by such individuals, thereby reinforcing the identity of their interests with those of the Company's stockholders; (b) to assist the Company in attracting and retaining individuals with experience and ability; and (c) to benefit the Company's stockholders by encouraging high levels of performance by individuals whose performance is a key element in achieving the Company's continued success. For the avoidance of doubt, any Awards granted pursuant to the Prior Plan, including any "Manager Awards" and any "Tandem Awards" (as defined in the Prior Plan), shall continue to be subject to all of the terms and conditions of the Prior Plan as in effect immediately prior to the Effective Date.

1.2  <u>Definitions</u>. For purposes of the Plan, the following terms shall be defined as set forth below:

(a)  "<u>Award</u>" or "<u>Awards</u>" means an award described in Section 5 hereof.

(b)  "<u>Award Agreement</u>" means an agreement described in Section 6 hereof entered into between the Company and a Participant, setting forth the terms, conditions and any limitations applicable to the Award granted to the Participant.

(c)  "<u>Beneficial Owner</u>" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

(d)  "<u>Board</u>" means the Board of Directors of the Company.

(e)  "<u>Change in Control</u>" of the Company shall be deemed to have occurred if an event set forth in any one of the following paragraphs (i)-(iii) shall have occurred unless prior to the occurrence of such event, the Board determines that such event shall not constitute a Change in Control:

(i)  any Person is or becomes a Beneficial Owner, directly or indirectly, of securities of the Company representing thirty percent (30%) or more of the combined voting power of the then outstanding securities of the Company, excluding (A) any Person who becomes such a Beneficial Owner in connection with a transaction described in clause (x) of paragraph (ii) below, and (B) any Person who becomes such a Beneficial Owner through the issuance of such securities with respect to purchases made directly from the Company; or

2211

2

(ii)    there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than (x) a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) fifty percent (50%) or more of the combined voting power of the securities of the Company or such surviving entity or any parent thereof outstanding immediately after such merger or consolidation, or (y) a merger or consolidation effected to implement a recapitalization of the Company (or similar transaction) in which no Person is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing thirty percent (30%) or more of the combined voting power of the then outstanding securities of the Company; or

(iii)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all the assets of the Company.

For each Award that constitutes deferred compensation under Section 409A of the Code, to the extent required to avoid additional tax or other penalty, a Change in Control shall be deemed to have occurred under the Plan with respect to such Award only if a change in the ownership or effective control of the Company or a change in ownership of a substantial portion of the assets of the Company shall also be deemed to have occurred under Section 409A of the Code.

(f)    "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute thereto.

(g)    "Commission" means Securities and Exchange Commission.

(h)    "Committee" means any committee the Board may appoint to administer the Plan. To the extent necessary and desirable, the Committee shall be composed entirely of individuals who meet the qualifications referred to in Rule 16b-3 under the Exchange Act. If at any time or to any extent the Board shall not administer the Plan, then the functions of the Board specified in the Plan shall be exercised by the Committee.

(i)    "Company" means Gannett Co., Inc., a Delaware corporation.

(j)    "Disability" means, with respect to any Participant, that such Participant (i) as determined by the Participant's employer or service recipient (such determination to be approved by the Committee) is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving income replacement benefits for a period of not less than three (3) months under an accident and health plan covering such Participant.

3311

3

(k)    "Effective Date" means the date provided pursuant to Section 10.

(l)    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(m)    "Fair Market Value" means, as of any given date, (i) the closing price of a share of the Company's Stock on the principal exchange on which shares of the Company's Stock are then trading, if any, on the trading day previous to such date, or, if stock was not traded on the trading day previous to such date, then on the next preceding trading day during which a sale occurred; or (ii) if such Stock is not traded on an exchange but is quoted on NASDAQ or a successor quotation system, (x) the last sales price (if the Stock is then listed as a National Market Issue under the NASDAQ National Market System) or (y) the mean between the closing representative bid and asked prices (in all other cases) for the Stock on the trading day previous to such date as reported by NASDAQ or such successor quotation system; or (iii) if such Stock is not publicly traded on an exchange and not quoted on NASDAQ or a successor quotation system, the mean between the closing bid and asked prices for the Stock, on the day previous to such date, as determined in good faith by the Committee; or (iv) if the Stock is not publicly traded, the fair market value established by the Committee using any reasonable method and acting in good faith.

(n)    "Non-Officer Director" means a director of the Company who is not an officer or employee of the Company.

(o)    "Participant" means any Person selected by the Committee, pursuant to the Committee's authority in Section 2 below, to receive Awards, including but not limited to (i) any Non-Officer Director and (ii) any director, officer or employee of the Company, any parent, affiliate or subsidiary of the Company and (iii) any consultant, service provider or advisor to the Company, any parent, affiliate or subsidiary of the Company.

(p)    "Person" shall have the meaning set forth in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof.

(q)    "Plan" means this Gannett Co., Inc. 2020 Omnibus Incentive Compensation Plan.

(r)    "Restricted Stock" means Stock as described in Section 5.3 hereof.

(s)    "Securities Act" shall have the meaning set forth in Section 9.1.

(t)    "Stock" means the common stock, par value $0.01 per share, of the Company.

(u)    "Stock Appreciation Right" shall have the meaning set forth in Section 5.2 hereof.

(v)    "Stock Option" means any option to purchase shares of Stock granted pursuant to the Plan. The Stock Options granted hereunder are not intended to qualify as "incentive stock options" within the meaning of Section 422 of the Code.

4

## Section 2

## <u>ADMINISTRATION</u>

2.1 <u>Administration</u>. The Plan shall be administered in accordance with the requirements of Rule 16b-3 under the Exchange Act ("<u>Rule 16b-3</u>"), by the Board or, at the Board's sole discretion, by the Committee, which shall be appointed by the Board, and which shall serve at the pleasure of the Board. The Plan is intended to be exempt from, or to comply with, and shall be administered in a manner that is intended to be exempt from, or comply with, Section 409A of the Code and shall be construed and interpreted in accordance with such intent, to the extent subject thereto. To the extent that an Award and/or issuance and/or payment of an Award is subject to Section 409A of the Code, it shall be awarded and/or issued or paid in a manner that will comply with Section 409A of the Code, including any applicable regulations or guidance issued by the Secretary of the United States Treasury Department and the Internal Revenue Service with respect thereto.

2.2 <u>Duties and Powers of Committee</u>. The Committee shall have the power and authority to grant Awards to Participants pursuant to the terms of the Plan, and, in its discretion, to adopt, alter and repeal such administrative rules, guidelines and practices governing the Plan as it shall from time to time deem advisable; to interpret the terms and provisions of the Plan and any Award issued under the Plan (and any agreements relating thereto); and to otherwise supervise the administration of the Plan. All decisions made by the Committee pursuant to the provisions of the Plan shall be final, conclusive and binding on all Persons.

In particular, the Committee shall have the authority to determine, in a manner consistent with the terms of the Plan:

(a) in addition to the Non-Officer Directors, those Participants who shall receive Awards under the Plan;

(b) subject to Section 3, the number of shares of Stock to be covered by each Stock Option granted hereunder;

(c) the terms and conditions of any Award granted hereunder, including, subject to the requirements of Section 409A, the waiver or modification of any such terms or conditions, consistent with the provisions of the Plan (including, but not limited to, Section 7 of the Plan); and

(d) the terms and conditions which shall govern all the Award Agreements, including the waiver or modification of any such terms or conditions.

2.3 <u>Majority Rule</u>. The Committee shall act by a majority of its members in attendance at a meeting at which a quorum is present or by a memorandum or other written instrument signed by all members of the Committee.

5511

5

2.4  <u>Delegation of Authority</u>. To the extent permitted by applicable law, the Committee or the Board may from time to time delegate to one or more Persons the authority to take administrative actions pursuant to this Section 2. Any delegation hereunder shall be subject to the restrictions and limitations that the Committee specifies at the time of such delegation, and the Committee may at any time rescind the authority so delegated or appoint a new delegatee.

2.5  <u>Compensation; Professional Assistance; Good Faith Actions</u>. Members of the Committee may receive such compensation for their services as members as may be determined by the Board. All expenses and liabilities that members of the Committee or Board may incur in connection with the administration of this Plan shall be borne by the Company. The Committee may, with the approval of the Board, employ attorneys, consultants, accountants, appraisers, brokers or other Persons. The Committee, the Board, the Company and any officers and directors of the Company shall be entitled to rely upon the advice, opinions or valuations of any such Persons. All actions taken and all interpretations and determinations made by the Committee or Board in good faith shall be final and binding upon all Participants, the Company and all other interested Persons. No member of the Committee or Board shall be personally liable for any action, determination or interpretation made in good faith with respect to this Plan or any Award, and all members of the Committee and Board shall be fully protected and indemnified to the fullest extent permitted by law, by the Company, in respect of any such action, determination or interpretation.

**Section 3**

**<u>STOCK SUBJECT TO PLAN</u>**

3.1  <u>Number of and Source of Shares</u>. The maximum number of shares of Stock reserved and available for issuance under the Plan shall be 15,000,000, as increased during the term of the Plan on the first day of each fiscal year beginning in and after calendar year 2021 by a number of shares of Stock equal to 10% of the number of shares of Stock newly issued by the Company during the immediately preceding fiscal year (and, in the case of fiscal year 2020, after the Effective Date). The Stock which may be issued pursuant to an Award under the Plan may be treasury Stock, authorized but unissued Stock, or Stock acquired, subsequently or in anticipation of the transaction, in the open market to satisfy the requirements of the Plan. Awards may consist of any combination of such Stock, or, at the election of the Company, cash.

3.2  <u>Unrealized Awards</u>. If any shares of Stock subject to an Award are forfeited, cancelled, exchanged or surrendered or if an Award otherwise terminates or expires without a distribution of shares to the Participant, the shares of Stock with respect to such Award shall, to the extent of any such forfeiture, cancellation, exchange, surrender, termination or expiration, again be available for grants under the Plan. The Company reserves the right to cancel any Stock Option which has a per-share exercise price that is equal to or greater than the Fair Market Value of an underlying share of Stock as of the date of such cancellation, and any shares of Stock which were subject to such cancelled Stock Option shall again be available for the issuance of Stock Options, including issuance to the Person that held the cancelled Stock Option, irrespective of whether such issuance would be deemed a repricing of such Stock Option.

6611

6

3.3 <u>Adjustment of Awards</u>. Upon the occurrence of any event which affects the shares of Stock in such a way that an adjustment of outstanding Awards is appropriate in order to prevent the dilution or enlargement of rights under the Awards (including, without limitation, any extraordinary dividend or other distribution (whether in cash or in kind), recapitalization, stock split, reverse split, reorganization, merger, consolidation, spin-off, combination, repurchase, or share exchange, or other similar corporate transaction or event), the Committee shall make appropriate equitable adjustments, which may include, without limitation, adjustments to any or all of the number and kind of shares of Stock (or other securities) which may thereafter be issued in connection with such outstanding Awards and adjustments to any exercise price specified in the outstanding Awards and shall also make appropriate equitable adjustments to the number and kind of shares of Stock (or other securities) authorized by or to be granted under the Plan. Such other substitutions or adjustments shall be made respecting Awards hereunder as may be determined by the Committee, in its sole discretion. In connection with any event described in this paragraph, the Committee may provide, in its discretion, for the cancellation of any outstanding Award and payment in cash or other property in exchange therefor, equal to the difference, if any, between the fair market value of the Stock or other property subject to the Award, and the exercise price, if any.

**Section 4**

**<u>ELIGIBILITY</u>**

Each Participant shall be eligible to receive Awards under the Plan. Additional Participants under the Plan may be selected from time to time by the Committee, in its sole discretion, and the Committee shall determine, in its sole discretion, the number of shares covered by each Award.

**Section 5**

**<u>AWARDS</u>**

Awards may include, but are not limited to, those described in this Section 5. The Committee may grant Awards singly, in tandem or in combination with other Awards, as the Committee may in its sole discretion determine.

5.1 <u>Stock Options</u>. A Stock Option is a right to purchase a specified number of shares of Stock, at a specified price during such specified time as the Committee shall determine.

(a) A Stock Option may be exercised, in whole or in part, by giving written notice of exercise to the Company, specifying the number of shares of Stock to be purchased.

(b) The exercise price of the Stock Option may be paid in cash or its equivalent, as determined by the Committee. As determined by the Committee, in its sole discretion, payment in whole or in part may also be made (i) by means of any cashless exercise procedure approved by the Committee (including the withholding of Stock otherwise issuable on

7711

exercise), or (ii) in the form of unrestricted Stock already owned by the Participant which has a Fair Market Value on the date of surrender equal to the aggregate option price of the Stock as to which such Stock Option shall be exercised. No fractional shares of Stock will be issued or accepted.

     5.2  <u>Stock Appreciation Rights</u>. A Stock Appreciation Right is a right to receive, upon surrender of the right, an amount payable in cash and/or shares of Stock under such terms and conditions as the Committee shall determine.

     (a)  A Stock Appreciation Right may be granted in tandem with part or all of (or in addition to, or completely independent of) a Stock Option or any other Award under this Plan. A Stock Appreciation Right issued in tandem with a Stock Option may be granted at the time of grant of the related Stock Option or at any time thereafter during the term of the Stock Option.

     (b)  The amount payable in cash and/or shares of Stock with respect to each right shall be equal in value to a percentage (including up to 100%) of the amount by which the Fair Market Value per share of Stock on the exercise date exceeds the Fair Market Value per share of Stock on the date of grant of the Stock Appreciation Right. The applicable percentage shall be established by the Committee. The Award Agreement may state whether the amount payable is to be paid wholly in cash, wholly in shares of Stock, or in any combination of the foregoing; if the Award Agreement does not so state the manner of payment, the Committee shall determine such manner of payment at the time of payment. The amount payable in shares of Stock, if any, is determined with reference to the Fair Market Value per share of Stock on the date of exercise.

     (c)  Stock Appreciation Rights issued in tandem with Stock Options shall be exercisable only to the extent that the Stock Options to which they relate are exercisable. Upon exercise of the tandem Stock Appreciation Right, and to the extent of such exercise, the Participant's underlying Stock Option shall automatically terminate. Similarly, upon the exercise of the tandem Stock Option, and to the extent of such exercise, the Participant's related Stock Appreciation Right shall automatically terminate.

     5.3  <u>Restricted Stock</u>. Restricted Stock is Stock that is issued to a Participant and is subject to such terms, conditions and restrictions as the Committee deems appropriate, which may include, but are not limited to, restrictions upon the sale, assignment, transfer or other disposition of the Restricted Stock and the requirement of forfeiture of the Restricted Stock upon termination of employment or service under certain specified conditions. The Committee may provide for the lapse of any such term or condition or waive any term or condition based on such factors or criteria as the Committee may determine. Subject to the restrictions stated in this Section 5.3 and in the applicable Award Agreement, the Participant shall have, with respect to Awards of Restricted Stock, all of the rights of a stockholder of the Company, including the right to vote the Restricted Stock and the right to receive any cash or stock dividends on such Stock. The Company may require that the stock certificates evidencing Restricted Stock granted hereunder be held in the custody of the Company until the restrictions thereon shall have lapsed, and that, as a condition of any award of Restricted Stock, the Participant shall have delivered a stock power, endorsed in blank, relating to the Stock covered by such award.

8811

8

5.4 <u>Performance Awards</u>. Performance Awards may be granted under this Plan from time to time based on such terms and conditions as the Committee deems appropriate provided that such Awards shall not be inconsistent with the terms and purposes of this Plan. Performance Awards are Awards which are contingent upon the performance of all or a portion of the Company and/or its subsidiaries and/or which are contingent upon the individual performance of a Participant. Performance Awards may be in the form of performance units, performance shares and such other forms of Performance Awards as the Committee shall determine. The Committee shall determine the performance measurements and criteria for such Performance Awards. The Company may require that the stock certificates evidencing Performance Awards granted hereunder be held in the custody of the Company until the restrictions thereon shall have lapsed, and that, as a condition of any award of Performance Awards, the Participant shall have delivered a stock power, endorsed in blank, relating to the Stock covered by such award.

5.5 <u>Other Awards</u>. The Committee may from time to time grant to its Non-Officer Directors and other Participants shares of Stock, other Stock-based and non-Stock-based Awards under the Plan, including without limitation those Awards pursuant to which shares of Stock are or may in the future be acquired, such as restricted stock units, Awards denominated in Stock, securities convertible into Stock, phantom securities, dividend equivalents and cash. The Committee shall determine the terms and conditions of such other Stock, Stock-based and non-Stock-based Awards provided that such Awards shall not be inconsistent with the terms and purposes of this Plan.

**Section 6**

**<u>AWARD AGREEMENTS</u>**

Each Award under this Plan shall be evidenced by an Award Agreement setting forth the number of shares of Stock or other securities, and such other terms and conditions applicable to the Award (and not inconsistent with this Plan) as are determined by the Committee.

6.1 <u>Terms of Award Agreements</u>. Award Agreements may include the following terms:

(a) <u>Term</u>. The term of each Award (as determined by the Committee); <u>provided</u> that, no Award shall be exercisable more than ten years after the date such Award is granted.

(b) <u>Exercise Price</u>. The exercise price per share of Stock purchasable under an Award (as determined by the Committee in its sole discretion at the time of grant); <u>provided</u> that, the exercise price shall not be less than the par value of the Stock <u>provided</u>, <u>further</u>, that Awards intended to be exempt from application of Section 409A of the Code under Section 1.409A-1(b)(5) (A) shall not be less than 100% of the Fair Market Value of the Stock on such date.

9911

9

(c) <u>Exercisability</u>. Provisions regarding the exercisability of Awards (which shall be exercisable at such time or times and subject to such terms and conditions as shall be determined by the Committee at or after grant).

(d) <u>Method of Exercise</u>. Provisions describing the method of exercising Awards.

(e) <u>Delivery</u>. Provisions regarding the timing of the delivery of Stock subject to Awards. The Award Agreements may provide that such delivery will be delayed to the extent required to avoid the imposition of a tax under Section 409A of the Code.

(f) <u>Termination of Employment or Service</u>. Provisions describing the treatment of an Award in the event of Disability, death or other termination of a Participant's employment or service with the Company, including but not limited to, terms relating to the vesting, time for exercise, forfeiture and cancellation of an Award in such circumstances.

(g) <u>Rights as Stockholder</u>. A provision that a Participant shall have no rights as a stockholder with respect to any securities covered by an Award until the date the Participant becomes the holder of record. Except as provided in Section 3.3 hereof, no adjustment shall be made for dividends or other rights, unless the Award Agreement specifically requires such adjustment, in which case, grants of dividend equivalents or similar rights shall not be considered to be a grant of any other stockholder right.

(h) <u>Nontransferability</u>. A provision that except under the laws of descent and distribution or as otherwise permitted by the Committee, in its sole discretion, the Participant shall not be permitted to sell, transfer, pledge or assign any Award, and all Awards shall be exercisable, during the Participant's lifetime, only by the Participant; <u>provided</u>, <u>however</u>, that the Participant shall be permitted to transfer one or more Stock Options to a trust controlled by the Participant during the Participant's lifetime for estate planning purposes.

(i) <u>Other Terms</u>. Such other terms as are necessary and appropriate to effectuate an Award to the Participant, including but not limited to, (1) vesting provisions, (2) deferral elections, (3) any requirements for continued employment or service with the Company, (4) any requirement to execute a general release of claims in a form acceptable to the Company prior to the lapse of any restrictions or conditions on such Award or such Award becoming exercisable, (5) any other restrictions or conditions (including performance requirements) on the Award and the method by which restrictions or conditions lapse, (6) effect on the Award of a Change in Control, (7) the right of the Company and such other Persons as the Committee shall designate ("<u>Designees</u>") to repurchase from a Participant, and such Participant's permitted transferees, all shares of Stock issued or issuable to such Participant in connection with an Award in the event of such Participant's termination of employment or service, (8) rights of first refusal granted to the Company and Designees, if any, (9) holdback and other registration right restrictions in the event of a public registration of any equity securities of the Company and (10) any other terms and conditions which the Committee shall deem necessary and desirable.

101011

**Section 7**

## AMENDMENT AND TERMINATION

The Board may at any time and from time-to-time alter, amend, suspend, or terminate the Plan in whole or in part; provided that, no amendment which requires stockholder approval in order for the Plan to comply with a rule or regulation deemed applicable by the Committee, shall be effective unless the same shall be approved by the requisite vote of the stockholders of the Company entitled to vote thereon. Notwithstanding the foregoing, no amendment shall affect adversely any of the rights of any Participant, without such Participant's consent, under any Award theretofore granted under the Plan.

**Section 8**

## UNFUNDED STATUS OF PLAN

The Plan is intended to constitute an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant by the Company, nothing contained herein shall give any such Participant any rights that are greater than those of a general creditor of the Company.

**Section 9**

## GENERAL PROVISIONS

9.1   Securities Laws Compliance. Shares of Stock shall not be issued pursuant to the exercise of any Award granted hereunder unless the exercise of such Award and the issuance and delivery of such shares of Stock pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended (the "Securities Act"), the Exchange Act and the requirements of any stock exchange upon which the Stock may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

9.2   Certificate Legends. The Committee may require each Person purchasing shares pursuant to a Stock Option to represent to and agree with the Company in writing that such Person is acquiring the Stock subject thereto without a view to distribution thereof. The certificates for such Stock may include any legend which the Committee deems appropriate to reflect any restrictions on transfer.

9.3   Transfer Restrictions. All certificates for shares of Stock delivered under the Plan shall be subject to such stock-transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Commission, any stock exchange upon which the Stock is then listed, and any applicable federal or state securities law, and the Committee may cause a legend or legends to be placed on any such certificates to make appropriate reference to such restrictions.

9.4   Company Actions; No Right to Employment. Nothing contained in the Plan shall prevent the Board from adopting other or additional compensation arrangements,

111111

11

subject to stockholder approval if such approval is necessary and desirable; and such arrangements may be either generally applicable or applicable only in specific cases. The adoption of the Plan shall not confer upon any employee, consultant, service provider or advisor of the Company any right to continued employment or service with the Company, as the case may be, nor shall it interfere in any way with the right of the Company to terminate the employment or service of any of its employees, consultants or advisors at any time.

      9.5   <u>Section 409A of the Code</u>. The intent of the parties is that payments and benefits under the Plan be exempt from, or comply with Section 409A of the Code to the extent subject thereto, and, accordingly, to the maximum extent permitted, the Plan shall be interpreted and be administered to be in compliance therewith. Any payments described in the Plan that are due within the "short-term deferral period" as defined in Section 409A of the Code shall not be treated as deferred compensation unless applicable law requires otherwise. Notwithstanding anything to the contrary in the Plan, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A of the Code, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to the Plan during the six (6) month period immediately following the Participant's termination of employment shall instead be paid on the first business day after the date that is six (6) months following the Participant's separation from service (or upon the Participant's death, if earlier). In addition, for purposes of the Plan, each amount to be paid or benefit to be provided to the Participant pursuant to the Plan, which constitute deferred compensation subject to Section 409A of the Code, shall be construed as a separate identified payment for purposes of Section 409A of the Code.

      9.6   <u>Payment of Taxes</u>. Each Participant shall, no later than the date as of which the value of an Award first becomes includible in the gross income of the Participant for federal income tax purposes, pay to the Company, or make arrangements satisfactory to the Committee regarding payment of, any federal, state, or local taxes of any kind required by law to be withheld with respect to the Award. The obligations of the Company under the Plan shall be conditional on the making of such payments or arrangements, and the Company shall, to the extent permitted by law, have the right to deduct any such taxes from any payment of any kind otherwise due to the Participant.

      9.7   <u>Governing Law</u>. The Plan shall be governed by the and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law of such state.

**Section 10**

**<u>EFFECTIVE DATE OF PLAN</u>**

The Plan, as an amendment and restatement of the Prior Plan, became effective on February 26, 2020 (the "<u>Effective Date</u>").

**Section 11**

**<u>TERM OF PLAN</u>**

121211

12

No Award shall be granted pursuant to the Plan on or after February 3, 2024, but Awards theretofore granted may extend beyond that date.

131311

13

EXHIBIT 21.1

**GANNETT CO., INC.**

**SUBSIDIARIES
OF
GANNETT CO., INC.**

| *GateHouse Legacy – 12-31-19* |
|---|
| *NAME OF ENTITY* |
| American Influencer Awards, LLC |
| Arctic Acquisition Corp. |
| Arctic Holdings LLC |
| Arizona News Service, LLC |
| BridgeTower Media DLN, LLC |
| BridgeTower Media Holding Company |
| BridgeTower Media, LLC |
| CA Alabama Holdings, Inc. |
| CA Florida Holdings, LLC |
| CA Louisiana Holdings, Inc. |
| CA Massachusetts Holdings, Inc. |
| CA North Carolina Holdings, Inc. |
| CA South Carolina Holdings, Inc. |
| Copley Ohio Newspapers, Inc. |
| Cummings Acquisition, LLC |
| CyberInk, LLC |
| Daily Journal of Commerce, Inc. |
| Daily Reporter Publishing Company |
| DB Acquisition, Inc. |
| DB Arkansas Holdings, Inc. |
| DB Iowa Holdings, Inc. |
| DB North Carolina Holdings, Inc. |
| DB Oklahoma Holdings, Inc. |
| DB Tennessee Holdings, Inc. |
| DB Texas Holdings, Inc. |
| DB Washington Holdings, Inc. |
| Dolco Acquisition, LLC |
| ENHE Acquisition, LLC |
| EnMotive Company LLC |

| Enterprise NewsMedia Holding, LLC |
| Enterprise NewsMedia, LLC |
| Enterprise Publishing Company, LLC |
| Finance and Commerce, Inc. |
| Gannett Holdings LLC |

1

| GateHouse Legacy – 12-31-19 |
|---|
| Gannett Media Corp. |
| GateHouse Live, LLC |
| GateHouse Media Alaska Holdings, Inc. |
| GateHouse Media Arkansas Holdings, Inc. |
| GateHouse Media California Holdings, Inc. |
| GateHouse Media Colorado Holdings, Inc. |
| GateHouse Media Connecticut Holdings, Inc. |
| GateHouse Media Corning Holdings, Inc. |
| GateHouse Media Delaware Holdings, Inc. |
| GateHouse Media Directories Holdings, Inc. |
| GateHouse Media Freeport Holdings, Inc. |
| GateHouse Media Georgia Holdings, Inc. |
| GateHouse Media Holdco, LLC |
| GateHouse Media Illinois Holdings II, Inc. |
| GateHouse Media Illinois Holdings, Inc. |
| GateHouse Media Indiana Holdings, Inc. |
| GateHouse Media Intermediate Holdco, LLC |
| GateHouse Media Iowa Holdings, Inc. |
| GateHouse Media Kansas Holdings II, Inc. |
| GateHouse Media Kansas Holdings, Inc. |
| GateHouse Media Lansing Printing, Inc. |
| GateHouse Media Louisiana Holdings, Inc. |
| GateHouse Media Macomb Holdings, Inc. |
| GateHouse Media Management Services, Inc. |
| GateHouse Media Maryland Holdings, Inc. |
| GateHouse Media Massachusetts I, Inc. |
| GateHouse Media Massachusetts II, Inc. |
| GateHouse Media Michigan Holdings II, Inc. |
| GateHouse Media Michigan Holdings, Inc. |
| GateHouse Media Minnesota Holdings, Inc. |
| GateHouse Media Missouri Holdings II, Inc. |
| GateHouse Media Missouri Holdings, Inc. |
| GateHouse Media Nebraska Holdings, Inc. |
| GateHouse Media New York Holdings, Inc. |
| GateHouse Media North Dakota Holdings, Inc. |
| GateHouse Media Ohio Holdings II, Inc. |
| GateHouse Media Ohio Holdings, Inc. |
| GateHouse Media Oklahoma Holdings, Inc. |

GateHouse Media Operating, LLC

2

| GateHouse Legacy – 12-31-19 |
| --- |
| GateHouse Media Oregon Holdings, Inc. |
| GateHouse Media Pennsylvania Holdings, Inc. |
| GateHouse Media South Dakota Holdings, Inc. |
| GateHouse Media Suburban Newspapers, Inc. |
| GateHouse Media Tennessee Holdings, Inc. |
| GateHouse Media Texas Holdings, Inc. |
| GateHouse Media Texas Holdings II, Inc. |
| GateHouse Media Virginia Holdings, Inc. |
| GateHouse Media, LLC |
| George W. Prescott Publishing Company, LLC |
| Giddyup Events LLC |
| Idaho Business Review, LLC |
| Lawyers Weekly, LLC |
| Liberty SMC, L.L.C. |
| LMG Maine Holdings, Inc. |
| LMG Massachusetts, Inc. |
| LMG National Publishing, Inc. |
| LMG Rhode Island Holdings, Inc. |
| LMG Stockton, Inc. |
| Local Media Group Holdings LLC |
| Local Media Group, Inc. |
| Loco Sports LLC |
| Long Island Business News, LLC |
| Low Realty, LLC |
| LRT Four Hundred, LLC |
| Milwaukee Marathon LLC |
| Mineral Daily News Tribune, Inc. |
| Missouri Lawyers Media, LLC |
| New Media Holdings I LLC |
| New Media Holdings II LLC |
| New Media Ventures Group LLC |
| New Orleans Publishing Group, L.L.C. |
| News Leader, Inc. |
| NOPG, L.L.C. |
| Rugged Events Canada LTD |
| Rugged Events Holding LLC |
| Rugged Races LLC |
| Seacoast Newspapers, Inc. |

SureWest Directories

3

| GateHouse Legacy – 12-31-19 |
| --- |
| Terry Newspapers, Inc. |
| The Daily Record Company, LLC |
| The Inquirer and Mirror, Inc. |
| The Journal Record Publishing Co., LLC |
| The Mail Tribune, Inc. |
| The Nickel of Medford, Inc. |
| The NWS Company, LLC |
| The Peoria Journal Star, Inc. |
| ThriveHive, Inc. |
| UpCurve, Inc. |
| UpCurve Cloud LLC |
| W-Systems Corp. |

| Gannett Legacy 2-4-2020 |
| --- |
| NAME OF ENTITY |

| |
| --- |
| Action Advertising, Inc. |
| Alexandria Newspapers, Inc. |
| Baxter County Newspapers, Inc. |
| Bizzy, Inc. |
| Boat Spinco, Inc. |
| Citizen Publishing Company |
| DealOn, LLC |
| Des Moines Press Citizen LLC |
| Des Moines Register and Tribune Company |
| Desert Sun Publishing, LLC |
| Desk Spinco, Inc. |
| Detroit Free Press, Inc. |
| DiGiCol, Inc. |
| Evansville Courier Company Inc. |
| Federated Publications, Inc. |

FoodBlogs, LLC

Gannett Co., Inc.

4

| |
|---|
| Gannett GP Media, Inc. |
| Gannett International Communications, Inc. |
| Gannett International Finance LLC |
| Gannett Media Services, LLC |
| Gannett MHC Media, Inc. |
| Gannett Missouri Publishing, Inc. |
| Gannett Publishing Services, LLC |
| Gannett Retail Advertising Group, Inc. |
| Gannett River States Publishing Corporation |
| Gannett Satellite Information Network, LLC |
| Gannett Supply Corporation |
| Gannett UK Media, LLC |
| Gannett Vermont Insurance, Inc. |
| Gannett Vermont Publishing, Inc. |
| GCCC, LLC |
| GCOE, LLC |
| GFHC, LLC |
| GNSS LLC |
| Grateful Media, LLC |
| Guam Publications, Incorporation (Pacific Daily News) |
| Imagn Content Services, LLC |
| Indiana Newspapers, LLC |
| Journal Community Publishing Group, Inc. |
| Journal Media Group, Inc. |
| Journal Sentinel Inc. |
| Kickserv, Inc. |
| LocalIQ, LLC |

| Memphis Publishing Company |
| Multimedia, Inc. |
| Pacific Media, Inc. |

5

| |
|---|
| Phoenix Newspapers, Inc. |
| Press-Citizen Company Inc. |
| ReachLocal Canada, Inc. |
| ReachLocal DP, Inc. |
| ReachLocal International GP LLC |
| ReachLocal International, Inc. |
| ReachLocal, Inc. |
| Reno Newspapers, Inc. |
| Salinas Newspapers LLC |
| Scripps NP Operating, LLC |
| Sedona Publishing Company, Inc. |
| State-Kilbourn Holdings, LLC |
| Texas-New Mexico Newspapers, LLC |
| Thanksgiving Ventures, LLC |
| The Advertiser Company |
| The Courier-Journal, Inc. |
| The Desert Sun Publishing Co. |
| The Sun Company of San Bernardino, California LLC |
| The Times Herald Company |
| The York Newspaper Company |
| USA Today Sports Media Group, LLC |
| Visalia Newspapers LLC |
| Wordstream, Inc. |
| x.com, Inc. |
| York Daily Record-York Sunday News LLC |
| York Dispatch LLC |
| York Newspapers Holdings, L.P. |

| York Newspapers Holdings, LLC |
| York Partnership Holdings, LLC |
| Gannett International Finance LLP |

6

| |
|---|
| Gannett International Holdings LLP |
| Gannett U.K. Limited |
| Newsquest Capital Limited |
| Newsquest Limited |
| ReachLocal Australia Pty Ltd |
| SweetIQ Analytics Corp. |
| Detroit Newspapers Partnership, L.P. |
| Newsquest Media Group Limited |
| CN Group Limited |
| CN Group Property Limited |
| Cumbrian Newspapers Limited |
| Furness Newspapers Limited |
| J. Catherall & Co. (Printers) Limited |
| ReachLocal Services Private Limited |
| ReachLocal New Zealand Ltd. |
| ReachLocal Mexico S. de R.L. de C.V. |
| RL International Investment C.V. |
| ReachLocal Europe B.V. |
| ReachLocal GmbH |
| Newsquest (Berkshire) Limited |
| Newsquest (Clyde & Forth Press) Limited |
| Newsquest (Essex) Limited |
| Newsquest (Herald & Times) Limited |
| Newsquest (Herts and Bucks) Limited |
| Newsquest (London & Essex) Limited |
| Newsquest (Midlands South) Limited |
| Newsquest (Oxfordshire & Wiltshire) Limited |

| |
|---|
| Newsquest (York) Limited |
| Newsquest Media (Southern) Limited |
| Newsquest Pension Trustee Limited |

7

| |
|---|
| Newsquest Printing (Glasgow) Limited |
| Newsquest Specialist Media Limited |
| Forest Machine Journal Limited |
| Sopress Investments Limited |
| This is Essex Limited |
| WP Publishing |
| William Trimble Limited |
| LocaliQ Limited |
| Partridge Printers Limited |

EXHIBIT 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statement (Form S-3 No. 333-224158 and Form S-8 No. 333-233509) of Gannett Co, Inc. and in the related Prospectus of our reports dated March 2, 2020, with respect to the consolidated financial statements of Gannett Co, Inc. and subsidiaries, and the effectiveness of internal control over financial reporting of Gannett Co, Inc. and subsidiaries, included in this Annual Report (Form 10-K) for the year ended December 31, 2019.

/s/ Ernst & Young LLP

Tysons, Virginia
March 2, 2020

EXHIBIT 31-1

**CERTIFICATIONS**

I, Michael E. Reed, certify that:

1.  I have reviewed this annual report on Form 10-K of Gannett Co., Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Michael E. Reed
_____
Michael E. Reed
President and Chief Executive Officer (principal executive officer)

EXHIBIT 31-2

**CERTIFICATIONS**

I, Alison K. Engel, certify that:

1.   I have reviewed this annual report on Form 10-K of Gannett Co., Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

   a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Alison K. Engel
_____
Alison K. Engel
Chief Financial Officer (principal financial officer)

EXHIBIT 32-1

**CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Gannett Co., Inc. ("Gannett") on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Michael E. Reed, president and chief executive officer of Gannett, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)     the Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Gannett.

/s/ Michael E. Reed
_____

Michael E. Reed
President and Chief Executive Officer (principal executive officer)

March 2, 2020

EXHIBIT 32-2

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Gannett Co., Inc. ("Gannett") on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Alison K. Engel, chief financial officer of Gannett, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    the Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Gannett.

/s/ Alison K. Engel
_____
Alison K. Engel
Chief Financial Officer (principal financial officer)

March 2, 2020

| | |
|---|---|
| **From:** | Robinson, Robin <robin.robinson@localmediagroupinc.com> |
| **Sent:** | Thursday, October 25, 2018 6:22 AM |
| **To:** | Robbins, Denise |
| **Cc:** | Lee Knapp |
| **Subject:** | Re: ***Important***Q4 Improvement Need your Help to Make Sure Update is in Oct Week #4/Q4 - Due at Noon on Thursday 10/24 |

Thanks for the update.

On Wed, Oct 24, 2018, 5:37 PM Robbins, Denise <drobbins@gatehousemedia.com> wrote:
Yes, I spoke to Brad at 4:00pm. He had numerous concerns, but they aren't issues we haven't addressed in other markets. Columbus just isn't used to being this aggressive.

One suggestion he made was that we combine the December premiums into one and charge $9.99 rather than $5.00 for two. Its fine with me, but Lee, you will need to make sure Lon oversees the proper execution. He was also concerned about having them 2 weeks in a row and with the turnaround time for the November 4th one. I told him ███████ turns them around in 72 hours. A

No one is happy, especially Columbus, since they're off setting variances in other markets. But I'm not really here to make people happy. 😊

On Wed, Oct 24, 2018 at 5:17 PM, Knapp, Lee <lknapp@gatehousemedia.com> wrote:
Robin,

Denise had a call with Brad Harmon this afternoon and I believe there is an understanding that this is entirely feasible.

Columbus and others do not want to add these premiums so they say it's not feasible. While it may be difficult to turn around a premium edition in a week, it can certainly be done.

I'm adding Denise to this email in case she wants to add or clarify anything.

Thanks.

Lee

On Wed, Oct 24, 2018 at 4:59 PM Robinson, Robin <robin.robinson@localmediagroupinc.com> wrote:
Lee: Looping you in; please see below concern brought forth today by Columbus in completing execution of the premium dollar indicated in plan. Need your assistance in reviewing with local site the plans built and opportunities from CND for premium ideas that can be executed for the October close. Please let me know if there is going to be any number changes. Thank you

**Exhibit C**

1

Confidential

Sincerely,
Robin Robinson
VP of Finance GHS Media Newspaper Division
845-800-6249 Cell
845-346-3090 Office

---------- Forwarded message ----------
From: **Reese, Martin** <mreese@dispatch.com>
Date: Wed, Oct 24, 2018 at 2:03 PM
Subject: Re: ***Important***Q4 Improvement Need your Help to Make Sure Update is in Oct Week #4/Q4
- Due at Noon on Thursday 10/24
To: "Robinson, Robin" <robin.robinson@localmediagroupinc.com>


I have discussed with Lon Haenel, our circulation lead, and Brad Harmon. This was an exercise to determine
how many premiums could be added and at what premium. There was no further discussion with the local
management teams to determine if these were feasible or to determine what the potential negative impacts
would be. Furthermore, there are no costs included that are associated with the additional premiums ███

It also makes no sense that Columbus bears the largest burden for these short-term improvements.

I cannot see adding revenues to the October week #4 forecast. We have no plan in place for a premium to be
added in the next 10 days - we do not know what that premium would be, or if it can be produced and printed
(externally or internally), have no plans for delivery of the product - in other words, there is not a plan!!

Marty


On Wed, Oct 24, 2018 at 1:16 PM, Robinson, Robin <robin.robinson@localmediagroupinc.com> wrote:
Marty: Do you know who your Regional Circulation lead is for Columbus? They participated in creation
of the plans and the numbers you are seeing. My advisement would be more discussions with them and/or
talking with Lee to vet out any concerns.

As you know we have to improve Q4 as the original Q4 improvement plan/tracker went away with revenue
take down across the Newspaper group; so these are part of plans to adjust for that and to offset any new Q4
RIF actions delayed (outside of Denardo earlier Q3 VSO executed in Q4). So my message is these short
term improvements are needed; but the corp./central teams are working on 2019 marketing plans ███


Sincerely,
Robin Robinson
VP of Finance GHS Media Newspaper Division
845-800-6249 Cell
845-346-3090 Office

On Wed, Oct 24, 2018 at 1:01 PM, Reese, Martin <mreese@dispatch.com> wrote:

2

Confidential

Robin, it is ridiculous to think that Columbus can add 3 premiums and increase premium rates to generate ███████████ in incremental revenues in ████

On Wed, Oct 24, 2018 at 12:17 PM, Robinson, Robin <robin.robinson@localmediagroupinc.com> wrote:
Regional Finance Team, Jennifer and Darlene: Attached is power point from Central Circ that list additional Q4 improvement that we will be adding to the forecast Q4; which above all other actions we already put into place and have included on the Q4 tracker. The excel file provides insight on the months of the actions. Some of the improvement is additional premiums, raising cost on premiums and raising costs on statements fees.

Lee will be reaching back to your Central Circulation leadership to advise the actions they worked together with Denise, Lee and corp. to improve the circ revenue variance will be done; so in a few moments all parties will be on the same page.

If you can review and make sure to update your Oct Week #4/Q4 forecast to reflect these new items. Please look at the list and expand communication to others that need to know to update forecast today.

Critical...following the improvement to revenue we need to make sure that your circulation central teams and/or other system owners for those not in the central team are involved in updating their tracker lists of timing of new premiums, new dollar amounts, other vendor and/or customer notification processes.

Sincerely,
Robin Robinson
VP of Finance GHS Media Newspaper Division
845-800-6249 Cell
845-346-3090 Office

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--
Marty Reese
Controller
Dispatch Media Group / The Columbus Dispatch
(Office) 614-469-6168
(Cell) 828-234-8638



This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

Confidential

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--

**Marty Reese**
**Controller**
Dispatch Media Group / The Columbus Dispatch
(Office) 614-469-6168
(Cell) 828-234-8638



This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--



Lee Knapp
VP
Planning & Forecasting
901 6th Street, Daytona Beach, FL 32117
T: 386-265-6851  C: 386-576-7832
www.gatehousemedia.com

This email and any files transmitted with it are confidential and intended only for the use of the individual or entity named within the message. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited. If this communication was received in error, please notify me by reply email and delete the original message.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

Confidential

GAT02_00025765

--
Denise Robbins
SVP, Consumer Marketing
Gatehouse Media
(p): 781-433-6720
(m): 917-747-0051

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

5

GAT02_00025766

| **From:** | Lovely, Lisa <llovely@dispatch.com> |
|---|---|
| **Sent:** | Thursday, October 25, 2018 11:53 AM |
| **To:** | Vince Buse; Holly Graves; Rick Grumman; Corey Elder; Aniol, Rick; Kyra Barbee |
| **Subject:** | Additional Premiums for 2018 |

All,

I'm sure that some of you are aware that we will be adding 3 additional premiums in 2018 per corporate directives. I just wanted to make sure we had our bases covered.

1. Wednesday, Oct 31st. We will be using the Wednesday subscriber draw, not the typical Sunday counts. We will be excluding premium tags.
2. Sunday Nov 11th or Sunday Nov 18th. We will exclude premium tags only.
3. Sunday Dec 30th. We will be charge $5.00 for EZ Pay customers only, all others will be $5.99. This is a Columbus Monthly publication so we will need to exclude premium tags and Columbus Monthly tags.

Additionally, the premium that was already scheduled for December 9th will have a price change. The EZ Pay customers will be charged $5.00, while the other subs will be charged $5.99. This edition will exclude premium tags only.

One special note, the Thanksgiving premium should exclude TH tags only and not premium tags.

Marketing is working on notifying our customers of the price change on premiums from $5.00 to $5.99.

Let me know if you have any questions.

Thanks,

--
**Lisa Lovely**
Assistant Controller
**The Columbus Dispatch**
5300 Crosswind Dr
Columbus, Ohio 43228
Office 614-461-5592
Cell 937-902-7897

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

1

| | |
|---|---|
| **From:** | Racki, Lori <lracki@gatehousemedia.com> |
| **Sent:** | Thursday, November 1, 2018 2:41 PM |
| **To:** | Lon Haenel |
| **Cc:** | jkraus@gatehousemedia.com; Diane Taylor; Graves, Holly; Jennifer Eichorn |
| **Subject:** | Re: Breaking update - COLUMBUS PREMIUM EDITION DISCLAIMERS |

Hi Lon,

    Please make sure the changes are updated on the Google doc so we can make the updates.

https://docs.google.com/spreadsheets/d/1IwuUYdOmW8TAST1iCvpi74fzyGE1XECT2YQ-9lEV4jM/edit?usp=sharing


**Thank You,**
**Lori-Ann Racki**
**GateHouse Media**
Director of Customer Care
Mobile: (914) 391-8294
lracki@gatehousemedia.com


On Thu, Nov 1, 2018 at 2:38 PM Haenel, Lon <lhaenel@gatehousemedia.com> wrote:
From Lee Knapp:

**also, I just got off the phone with Denise and because of the shortfall in revenue in Columbus, she has authorized changing their disclaimer language to "there will be no more than three premium editions published each month during the subscription term" AND she authorized changing the amount per premium edition to "up to $9.00"**

Please all confirm you received this and will put the disclaimer changes in motion ASAP.

Thanks,

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any

Confidential

information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

Confidential

GAT02_00009495

| | |
|---|---|
| **From:** | Haenel, Lon <lhaenel@gatehousemedia.com> |
| **Sent:** | Friday, December 7, 2018 2:40 PM |
| **To:** | Holly Graves |
| **Cc:** | Lori Racki; Robert Saurer; Lisa Lovely; Jason Cotter |
| **Subject:** | Re: Columbus $9 paper billing charges |

Will make a note of this. Saw a few IP coded stops from last week.

Thanks,

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

On Fri, Dec 7, 2018 at 2:33 PM Graves, Holly <hgraves@gatehousemedia.com> wrote:
The stop code for is IP for the paper invoice charge cancellations.

Thank you,

Holly Graves
Customer Care Manager
GateHouse Media
Office:614-883-4934



On Fri, Dec 7, 2018 at 11:16 AM Haenel, Lon <lhaenel@gatehousemedia.com> wrote:
Thanks Holly!

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

On Fri, Dec 7, 2018 at 10:22 AM Graves, Holly <hgraves@gatehousemedia.com> wrote:
Lon,

Per our conversation this morning, below is a summary of the plan to track this data.

1. Number of complaints (daily) tied directly to **paper billing complaints** coming through RDI- telephone and email. RDI is creating a paper invoice call disposition,

1

Confidential

should be up in the next day or two. I created an IP (paper invoice) complaint code when we first began charging for paper bills, I have sent out a reminder email to both my team as well as RDI to ensure that the complaint code is used on every correspondence received regarding this charge.

2. Of the daily complaints (#1 above), how many were:

    a. Converted to EZPay - a&b - I have asked Jason Cotter to assist to see what capabilities DSI has for reporting  this data.

    b. Converted to E-billing

    c. Did not wish to join EZPay or E-billing and were issued a credit instead

    d. Canceled due to the $9 paper billing charge   I am working on creating a specific stop code in DSI for paper invoice charges

    e. Or other resolution


Thank you,

Holly Graves
Customer Care Manager
GateHouse Media
Office:614-883-4934



On Fri, Dec 7, 2018 at 7:58 AM Haenel, Lon <lhaenel@gatehousemedia.com> wrote:

Holly, Lori, Robert,

We moved our paper billing charges to $9, per corporate directions.

That means we have 18,000 customer invoices at risk over the next 30 days. We would like to accurately understand the impact of this move.

I need to ask for your help quickly in setting up some measurements.

1. Number of complaints (daily) tied directly to **paper billing complaints** coming through RDI- telephone and email.

2. Of the daily complaints (#1 above), how many were:

    a. Converted to EZPay

    b. Converted to E-billing

    c. Did not wish to join EZPay or E-billing and were issued a credit instead

    d. Canceled due to the $9 paper billing charge

    e. Or other resolution

We need to make it very, very clear to RDI that we will not lose a single subscriber tied to paper billing charges.

2

Confidential

Brad asked me to report these numbers to him weekly.

Thanks,

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

3

Message

| **From:** | Robbins, Denise [drobbins@gatehousemedia.com] |
|---|---|
| **on behalf of** | Robbins, Denise <drobbins@gatehousemedia.com> [drobbins@gatehousemedia.com] |
| **Sent:** | 12/20/2018 12:36:38 PM |
| **To:** | Knapp, Lee [lknapp@gatehousemedia.com] |
| **CC:** | Saurer, Robert [rsaurer@gatehousemedia.com]; Haenel, Lon [lhaenel@gatehousemedia.com] |
| **Subject:** | Re: Feeback from RDI |

So we're not hitting some critical mass with EZ pay. This just feels like a philosophical issue that RDI needs to address with training.

On Thu, Dec 20, 2018 at 12:32 PM Knapp, Lee <lknapp@gatehousemedia.com> wrote:
CD EZ Pay is ███████████████████████████████

On Thu, Dec 20, 2018 at 12:27 PM Saurer, Robert <rsaurer@gatehousemedia.com> wrote:
I think the point is that with all of these charges combined the saves are harder and harder.

Lon, i think CD is about ████ CC pay?

On Thu, Dec 20, 2018 at 12:22 PM Robbins, Denise <drobbins@gatehousemedia.com> wrote:
Robert,

These are the same issues that we have in every market. Why is RDI having issues with saves? Also, how does Columbus' % of Ez pay subs benchmark around the rest of GHM?

On Thu, Dec 20, 2018 at 12:17 PM Saurer, Robert <rsaurer@gatehousemedia.com> wrote:
FYI...working on these CD issues.


---------- Forwarded message ---------
From: **Graves, Holly** <hgraves@gatehousemedia.com>
Date: Thu, Dec 20, 2018 at 12:15 PM
Subject: Feeback from RDI
To: Lon Haenel <lhaenel@gatehousemedia.com>, Saurer, Robert <rsaurer@gatehousemedia.com>, Racki, Lori <lracki@gatehousemedia.com>, Eichorn, Jennifer <jeichorn@gatehousemedia.com>


Good afternoon Lon,

During the weekly calibration call with RDI a few things were brought up by Lenny and Ana in regards to the hurdles that they are trying to get over:

1. Agents are finding it harder to save subscribers - this is largely due to subs being completely fed up with all of the changes with pricing, premiums, invoice fees.

2. Paper invoice stops - the options that are offered to subscribers are not satisfactory (in the subs view). Subs state they don't or won't use their email. They refuse to provide credit card information, saying that they are charged too frequently and the amount is constantly changing.

Confidential

3. <u>Handle times are becoming longer</u> - agents are having to literally explain every single detail of every charge on sub accounts. Subs are demanding full explanations because of the shortened expire date and want to know all details.

4. <u>Call Drivers</u> - Monday through Friday ███ are billing calls, Saturday-Sunday are delivery issues.

Thank you,

Holly Graves
Customer Care Manager
GateHouse Media
Office:614-883-4934

 **GateHouse** Media™

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--
**Robert Saurer**
*GateHouse Media*
Vice President
Marketing Transformation & Innovation
*Work 617-786-7378*
*Mobile 617-898-8992*

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--
Denise Robbins
SVP, Consumer Marketing
Gatehouse Media
(p): 781-433-6720
(m): 917-747-0051

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

GAT02_00022430

--

**Robert Saurer**
*GateHouse Media*
Vice President
Marketing Transformation & Innovation
*Work 617-786-7378*
*Mobile 617-898-8992*

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--



Lee Knapp
VP
Planning & Forecasting
901 6th Street, Daytona
Beach, FL 32117
T: 386-265-6851 C: 386-576-7832
www.gatehousemedia.com

This email and any files transmitted with it are confidential and intended only for the use of the individual or entity named within the message. If the reader of this message is not the intended recipient, or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, dissemination, distribution or copying of this communication is prohibited. If this communication was received in error, please notify me by reply email and delete the original message.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--

Denise Robbins
SVP, Consumer Marketing
Gatehouse Media
(p): 781-433-6720
(m): 917-747-0051

GAT02_00022431

Message

| | |
|---|---|
| **From:** | Alan Miller [amiller@dispatch.com] |
| **on behalf of** | Alan Miller <amiller@dispatch.com> [amiller@dispatch.com] |
| **Sent:** | 1/9/2019 11:37:54 AM |
| **To:** | Haenel, Lon [lhaenel@gatehousemedia.com] |
| **CC:** | Brad Harmon [bharmon@dispatch.com] |
| **Subject:** | Re: Thanks for your email |

I have said the same thing about premium editions for as long as we have been doing them. We should not only be transparent about them, but we also should stop shortening customer's subscription to pay for them. That just pisses people off to no end.

And I don't know how you explain our subscription pricing. I'd like to see it explained.

It's also no secret that I think we should stop these insane 20 percent increases every six months. We've hit the tipping point where we're driving away subscribers worth $600 or $700 a year for a short-term gain of far less. It makes no sense to me.

Alan D. Miller
Editor
**The Columbus Dispatch**
62 E. Broad St.
Columbus, Ohio 43216
Breaking news at www.dispatch.com
@dispatcheditor @amiller78

On Wed, Jan 9, 2019 at 10:56 AM Haenel, Lon <lhaenel@gatehousemedia.com> wrote:
Brad, Alan,
Want to provide you with feedback of my call with 

███ is a long-time customer and past RAB member. She had questions about our renewal pricing strategy. After a transparent explanation, she understands how it works now. This conversation led to a discussion about premium editions and paper billing charges as well.

The #1 takeaway is she understands why. But her advice is we need to be much more transparent and open. If she is confused, chances are other customers are too. She gets we are asking more of our readers financially today than ever before. But, in her opinion, if we were more transparent it could go along way in alleviating confusion about pricing practices. She thought an article on the topic would help.

Among the three of us, wondering the best model for how we provide greater transparency. A series of letter from the publisher, or occasional columns, or a page on dispatch.com that plainly spells out our pricing policies. I am sure there are other good ideas, too.

Confidential

Thanks,

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media


---------- Forwarded message ---------
From:
Date: Tue, Jan 8, 2019 at 12:21 PM
Subject: Re: Thanks for your email
To: Haenel, Lon <lhaenel@gatehousemedia.com>
Cc: alan miller <amiller@dispatch.com>, Brad Harmon <bharmon@dispatch.com>


Hi, Lon, thanks for contacting me for a follow-up chat. Would Wed. morning (January 9) work for you? Say, between 9 and 11 AM?


I look forward to talking with you.



On Jan 8, 2019, at 8:29 AM, Haenel, Lon <lhaenel@gatehousemedia.com> wrote:

Hi
Happy New Year! Alan Miller shared with me your email about subscription pricing. If you have a moment, I would like your perspective. At the same time, I can share more with you about Dispatch renewal pricing.

Let me know a good time to call.

Thanks,

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

Hello, Alan!

Happy new year! I was on the first advisory board group, and participation in that effort was one I both enjoyed and will remember the rest of my life. (BTW, is there any chance of having a reunion at some point for those of us on these boards? Might be fun to catch up a bit with people and events.)

My question to you concerns the issue of subscriptions to the Dispatch. I am hearing numerous complaints from friends not about the paper itself (which folks really want to get) but rather the weird and seemingly random pricing structure. E.g., I have paid the same amount (roughly $350 for the whole annual subscription) for some years. No problems there for me. However, friends have been billed about $550 or more. I do not understand that as the price on the Dispatch web page shows roughly the amount that I would be paying for a full year (excluding the discount). Frankly, there are also a raft of issues with subscriptions that crop up periodically, and I wonder if this falls under your bailiwick or is it the publisher's area? I could see where your folks put the paper together but hand off the payment and delivery to someone else. Is that the case? If so, how to address issues regarding the cost of subscribing? To me, this is a key area that is likely costing the paper many subscribers and that is a real shame.

This issue matters a lot to me, as does the Dispatch. I would be happy to assist in any way to tackle this issue, if I could so so.

All the best,


This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or

GAT02_00021969

any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

GAT02_00021970

| | |
|---|---|
| **From:** | Alan Miller <amiller@dispatch.com> |
| **Sent:** | Friday, January 25, 2019 4:07 PM |
| **To:** | Haenel, Lon |
| **Subject:** | Re: $9 paper bill...: EXECUTIVE ESCALATION Please call to stop save. Lon Haenel Executive Director of Consumer Marketing Columbus Dispatc... |

Crazy.

What about the follow-up with the customer?

Alan D. Miller
Editor
**The Columbus Dispatch**
62 E. Broad St.
Columbus, Ohio 43216
Breaking news at www.dispatch.com
@dispatcheditor @amiller78

On Fri, Jan 25, 2019 at 4:06 PM Haenel, Lon <lhaenel@gatehousemedia.com> wrote:
Alan,
My instructions are that we still do charge $9, as ridiculous as it is. That last time Brad asked about it, I shared
with him what I was told. And that is we will continue charging $9 and will re-evaluate at month's end. That
came from corporate. They provided no firm sunset date on the practice. I wish we had one.

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

On Fri, Jan 25, 2019 at 4:02 PM Alan Miller <amiller@dispatch.com> wrote:

Lon,

So are we still charging $9? I thought Brad said we weren't doing that here.

Also, this says we offered credit and E-billing, and makes it sound like that's the end of the conversation with
this customer. (I'm just going on what I read here.)

Does anyone follow up to see whether the customer accepts e-billing? How do we know in this scenario
whether we saved him?

1

GAT02_00021957

Alan D. Miller
Editor
**The Columbus Dispatch**
62 E. Broad St.
Columbus, Ohio 43216
Breaking news at www.dispatch.com
@dispatcheditor @amiller78


---------- Forwarded message ---------
From: **Gatehouse Subscriber Services** <support@gatehousesubscriberservices.zendesk.com>
Date: Fri, Jan 25, 2019 at 2:54 PM
Subject: Fwd: $9 paper bill...: EXECUTIVE ESCALATION Please call to stop save. Lon Haenel Executive Director of Consumer Marketing Columbus Dispatc...
To:
Cc: Alan Miller <amiller@dispatch.com>

##- Please type your reply above this line -##

You are registered as a CC on this request (756). Reply to this email to add a comment to the request.



**Heather Lauritsen** (Gatehouse Subscriber Services)

Jan 25, 15:54 AST

Hello,

I have called to offer Ebilling and also gave a credit.

The $9.00 paper invoice fee has been in place as of mid-December. Unfortunately, the only ways to avoid this charge is EZ-Pay or E-Billing.

Thank you,

Gatehouse Subscriber Services
subscriberservices@gatehousemedia.com



**Haenel, Lon**

Jan 23, 17:07 AST

Fwd: $9 paper bill...:
EXECUTIVE ESCALATION

2

GAT02_00021958

Please call to stop save.

Lon Haenel
Executive Director of Consumer Marketing
Columbus Dispatch
Gatehouse Media

---------- Forwarded message ---------
From: **Alan Miller** <amiller@dispatch.com>
Date: Wed, Jan 23, 2019 at 1:57 PM
Subject: $9 paper bill...
To: Brad Harmon <bharmon@dispatch.com>, Haenel, Lon <lhaenel@gatehousemedia.com>

I thought we weren't sending $9 bills for paper bills in Columbus.

███████████████████ called to say that a $9 bill for a paper bill is outrageous, and he is asking for a grandfather exemption as someone who has been a loyal customer for 40 years.

If we drive him away as a customer over a $9 paper bill, shame on us.

I have not called him back. I'm hoping that Lon can do that -- and waive the fee.

Thank you.

Alan

Alan D. Miller
Editor

## The Columbus Dispatch
62 E. Broad St.
Columbus, Ohio 43216
Breaking news at www.dispatch.com
@dispatcheditor @amiller78

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This email is a service from Gatehouse Subscriber Services. Delivered by **Zendesk**

Confidential

GAT02_00021959

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

4

Message

**From:** Alan Miller [amiller@dispatch.com]
**on behalf of** Alan Miller <amiller@dispatch.com> [amiller@dispatch.com]
**Sent:** 1/24/2019 9:46:25 AM
**To:** Brad Harmon [bharmon@dispatch.com]; Haenel, Lon [lhaenel@gatehousemedia.com]
**Subject:** Fwd: Subscriber

Hope you can save ▮▮▮▮▮▮▮

This steady stream of notes from long-time readers who are at the end of their patience with us is like watching a patient bleed to death.

And we're the patient.

▮▮▮▮▮▮ can't take the constant pricing, the premiums and, the last straw -- the $9 bill for a paper bill.

We just gave up $700 a year for a lousy $9 -- the most short-sighted money grab I've ever seen.

Are the folks at the corporate level seeing this? It's killing us.

Alan

Alan D. Miller
Editor
**The Columbus Dispatch**
62 E. Broad St.
Columbus, Ohio 43216
Breaking news at www.dispatch.com
@dispatcheditor @amiller78

---------- Forwarded message ---------
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: Thu, Jan 24, 2019 at 9:27 AM
Subject: Subscriber
To: <amiller@dispatch.com>

Mr Miller,

As a long time Dispatch subscriber I have reached the end of this relationship. It is with some sadness that I can no longer justify the steadily increasing costs for less actual news. I know that DMG has to recoup the large cost of the Dispatch purchase and still make a profit in an era with numerous instant sources of similar coverage. With four local TV channels and a dozen or more national news and sports channels competition is keen for your same subscribers.

The final straw for my decision is being forced to pay for "premium editions" that may not be of interest to me. Forcing me to pay for the crossword booklet or Columbus Monthly and other samples at inflated prices is like

going to the grocery for bread and milk and have a bag of dog food thrown in and charged for not knowing if I have a dog or want it. I prefer to choose what I want to purchase!

Also, the $9.00 paper billing fee to force on-line billing is also a subtle means to get e-mail addresses to bombard subscribers with more unwanted advertising. I block hundreds of e-mailers already that think I need to have this service or that product. I also have an ad blocker service for my web searches used in my business operation.

When my current paid subscription expires I will not be renewing it. If I want a copy of the Dispatch I can buy one from a retailer just a short walk away. Your carrier also loses the added tip for their service.

Respectfully,

| **From:** | Saurer, Robert <rsaurer@gatehousemedia.com> |
| **Sent:** | Tuesday, April 30, 2019 6:55 AM |
| **To:** | Denise Robbins |
| **Cc:** | Groves, Bryan; Lee Knapp |
| **Subject:** | Re: Why I am cancelling my subscription to the Dispatch |

So, is CD worse than other markets? Without a deep analysis, definitely not. Is Alan more vocal than other Editors? As they say in new england, yes, wicked. As you know they publish phone numbers for all edit employees in paper (we recently changed that) and I simply think they get more direct contact than other markets. As part of our hug Alan effort we changed the IVR to reduce editorial transfers. We made all points of contact (email, voicemail, live calls - high priority direct line to a CSR) all easily transferable to GSS as they complained filling a form out was too much. That said, one problem is they do encourage customers to recontact them by saying stuff like, "we will take care of you, I have a direct bead to CS", so why not call that reporter again? We do have Alan at a place where is not screaming customer care sucks. Now he screams "policy sucks" or "delivery sucks". We are trying to quantify the delivery stuff with satisfaction surveys and redel surveys in CD as you know. Launching this week I think. I told him Wayne et al can't manage what they cannot measure. I wanna see what these numbers come back as so we have ammo either way. Keep in mind. RDI is at ▮▮▮▮▮ abandons. We have not had answer problems in months. Those are my thoughts....

On Tue, Apr 30, 2019 at 6:14 AM Denise Robbins <drobbins@gatehousemedia.com> wrote:
You are absolutely correct. Robert has been trying to work directly with Alan on this issue but they're just overreacting. The invoice charges are ▮▮▮▮▮ f their stops

On Apr 29, 2019, at 11:13 PM, Groves, Bryan <bgroves@gatehousemedia.com> wrote:

I will be in Columbus Wednesday thru Friday this week and will discuss with Brad. He has a real problem with invoice charges. I let him know it is a big number to overcome. ▮▮▮ per month.

The editor here blows up every customer complaint and sends copies to Brad. I do not feel like we get anymore complaints in Columbus than any other market. I will work on the Editor. We are meeting on Thursday in the downtown office.

Robert you have experienced this. What are your thoughts?

---------- Forwarded message ---------
From: **Brad Harmon** <bharmon@dispatch.com>
Date: Mon, Apr 29, 2019 at 9:18 PM
Subject: Fwd: Why I am cancelling my subscription to the Dispatch
To: <rsaurer@gatehousemedia.com>, Denise Robbins <drobbins@gatehousemedia.com>,
<hgraves@gatehousemedia.com>, <bgroves@gatehousemedia.com>,
<lknapp@gatehousemedia.com>
CC: Alan Miller <amiller@dispatch.com>

1

Confidential

Please address and get this sub back on track. There has been a substantial uptick this week.

Denise, give me a call. I'd like to discuss the invoice charge. I have an idea to offset.

Brad

Sent from my iPhone

Begin forwarded message:

> **From:** bstille <bstille@dispatch.com>
> **Date:** April 29, 2019 at 10:10:19 PM EDT
> **To:** HPC <support@gatehousesubscriberservices.zendesk.com>, "Graves, Holly" <hgraves@gatehousemedia.com>
> **Cc:** "miller, alan" <amiller@dispatch.com>, Brad Harmon <BHarmon@dispatch.com>
> **Subject: Fwd: Why I am cancelling my subscription to the Dispatch**
>
> Holly
>
> May we save, please.
>
>
> Sent from my Verizon, Samsung Galaxy smartphone
>
> -------- Original message --------
> From: ███████████████████████
> Date: 4/29/19 10:06 PM (GMT-05:00)
> To: bharmon@dispatch.com, amiller@dispatch.com, bstille@dispatch.com
> Subject: Why I am cancelling my subscription to the Dispatch
>
>
> To the Columbus Dispatch:
>
> I have cancelled my subscription to the Dispatch due to what I consider unacceptable business practices. Suppose I was a paper supplier and you ordered and paid for 26 rolls of paper. While filling your order, I decided to substitute two rolls of premium paper and only send you 25 total rolls. And since you would not give me your credit card so I could charge you whenever I wanted for the next order, I charged an extra $9. That is what I feel the Dispatch is doing to me when I subscribe for 26 weeks. I don't ask for or know when you are sending out these so-called "Premium Editions" whatever that means and then you shorten my subscription to a shorter time frame which I have no idea how you are calculating it. I was assured that this would not happen on my account anymore but the latest bill shortened my subscription from May 5 to April 27 instead of lengthening it for the missed issues that I reported and never received. I want to know what I am paying for, therefore, I do not wish to do business with the Dispatch any longer.
>
> If you ever decide to correct these practices, I will consider coming back.

2

Confidential                                                                                           GAT02_00022637

Regards,



Account 46396247

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--

## Bryan Groves

*Executive Planning Director-Consumer Marketing*
*Gatehouse Media*
office 217-788-1404
cell 217-371-1422
bgroves@gatehousemedia.com



This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

This message may contain confidential and/or privileged information. If you are not the intended recipient or authorized to receive this for the intended recipient, you must not use, copy, disclose or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by sending a reply e-mail and delete this message. Thank you for your cooperation.

--
**Robert Saurer**
***GateHouse Media***
Vice President
Marketing Transformation & Innovation
*Work 617-786-7378*
*Mobile 617-898-8992*

3



Confidential



Confidential