**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JOHN EWALT, *et al.*,** | : |
| | : |
| **Plaintiffs,** | : **Case No. 2:19-cv-4262** |
| | : |
| **v.** | : **Chief Judge Algenon L. Marbley** |
| | : **Magistrate Judge Kimberly A. Jolson** |
| **GATEHOUSE MEDIA OHIO** | : |
| **HOLDINGS II, INC., d/b/a THE** | : |
| **COLUMBUS DISPATCH, *et al.*,** | : |
| | : |
| **Defendants.** | : |

## OPINION & ORDER

This matter comes before this Court on the following motions: (1) Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint[1] (ECF No. 185); (2) the Holding Company Defendants' Motion to Dismiss Second Amended Complaint[2] (ECF No. 186); and (3) the Holding Company Defendants' Objection to the March 8, 2022 Opinion and Order (ECF No. 187).

For the reasons set forth below, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 185) is **DENIED**; the Holding Company Defendants' Motion to Dismiss Second Amended Complaint (ECF No. 186) is **GRANTED** for Lack of Personal Jurisdiction, and the Holding Company Defendants' Objection (ECF No. 185) is **OVERRULED**. Plaintiffs' Motion to Strike Defendants' Reply Motion (ECF No. 202) and Defendants' Motion for Leave to File Instanter Reply in Support of their Objection (ECF No. 205) are **DISMISSED AS MOOT**.

---

[1] Notwithstanding the title of the Motion, this Court construes and refers to the same as Defendants' Motion to Dismiss for Failure to State a Claim.

[2] Notwithstanding the title of the Motion, this Court construes and refers to the same as Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.

## I.    BACKGROUND

The parties in this case are Plaintiffs John Ewalt, Steve Wylie, and Bonnie Navarre, on behalf of themselves and all those similarly situated ("Plaintiffs"), and Defendants GateHouse Media Ohio Holdings II, Inc., d/b/a The Columbus Dispatch ("GateHouse Ohio"), GateHouse Media, LLC ("GateHouse Media"), and Gannett Co., Inc. f/k/a New Media Investment Group Inc. (collectively, the "GateHouse Defendants"). (ECF No. 181 at 1). Plaintiffs are Ohio residents. (*Id.* ¶ 10). Defendants conduct business throughout Ohio. (*Id.* ¶¶ 11–13). GateHouse Ohio and GateHouse Media, LLC are subsidiaries of Gannett Co., Inc. (*Id.* ¶ 14).

At the heart of this case is the allegation that the Gatehouse Defendants fraudulently marketed to customers a term subscription to *The Dispatch* when customers were actually purchasing "a shortened subscription to *The Dispatch* and unwanted premium editions." (*Id.* ¶ 2). Various employees at *The Dispatch* have been vocal in opposing this "premium edition scheme," including editor Alan Miller and publisher Brad Harmon. (*Id.* ¶ 5–6). Despite the disapproval of several employees of *The Dispatch*, the authority to end these deceptive practices rested "primarily" with Denise Robbins and Lee Knapp during the "bulk of the relevant time period." (*Id.* ¶ 7). Robbins and Knapp are representatives of Gannett, Inc. and GateHouse Media, LLC ("the Holding Company Defendants"). (*Id.*). Robbins and Knapp repeatedly directed Gatehouse Ohio to issue additional premium editions at inflated rates in an effort to offset losses incurred from other newspapers owned by the GateHouse Defendants. (*Id.*).

The problematic scheme operated as follows: prospective customers were offered what appeared to be a fixed-term subscription of *The Dispatch* (ex. a subscription that would last "up to 52 weeks") although the GateHouse Defendants knew that the number of regular editions would be far fewer in number. (*Id.* ¶¶ 35–36). For example, Plaintiff Navarre purchased a subscription

2

for "up to 52 weeks" of Sunday-only delivers, but only received approximately 8 weeks of the paper. (*Id.*). The GateHouse Defendants knew this in advance. (*Id.*). The rest of the publications that Navarre received during her subscription term were "premium editions." (*Id.*). These premium editions "generally had nothing to do with the news," but GateHouse Ohio was often able to acquire the content for the editions at little or no cost. (*Id.* ¶¶ 42–43). Subscribers would then be charged a rate for the premium editions divorced from the cost to produce them or the value they produced. (*Id.* ¶ 44).

Although neither Robbins nor Knapp had a position with GateHouse Ohio, the pair controlled GateHouse Ohio's premium-edition practices during the relevant time period. (*Id.* at 109). For much of that time, Robbins was the approving authority for adding premiums while Knapp dictated the price. (*Id.* at 109). Robbins and Knapp both repeatedly directed GateHouse Ohio to increase the price and frequency of premium editions. (*Id.* at 111). In the fourth quarter of 2018, Robbins and Knapp directed GateHouse Ohio and its affiliates to change its disclaimers to allow for a maximum of three premium editions per month at a charge of up to $9 each. (*Id.* ¶ 116). Customers and GateHouse Ohio employees alike expressed discontent; one employee complained to Robbins with the following:

> Please explain how the premium print editions are a good idea. They are forced on print customers with only fine print explaining that they can opt-out if they call in and complain.7 Most subscribers are unaware that they have to pay extra for them. This does nothing except foster ill will, which we don't need.

(*Id.* ¶ 123).

The GateHouse Defendants themselves recognized the problematic aspect of relying on the premium-edition practices. A high-level executive for the GateHouse Defendants acknowledged that "[i]n an ideal world, we would move away from premiums almost completely…however, they are bit like a drug. Hard to lose/make-up the revenue…[i]t's a bit bait and switch (if you don't read

the fine print)." (*Id.* ¶ 128). As early as 2016, the GateHouse Defendants were searching for ways to escape the premium-edition model, but acknowledged, even after the filing of this lawsuit that 'we need to continue that practice in 2020 to hit our goals." (*Id.* ¶¶ 129–130).

According to Plaintiffs, Gannett and GateHouse Media "directed, participated, and/or cooperated in the premium-edition practices at issue." (*Id.* ¶¶ 15–16). At all relevant times, GateHouse Ohio and Gannett Co., Inc. have had the same, or substantially the same, officers and directors. (*Id.* ¶ 21). The Holding Company Defendants have both held themselves out as the publishers of *The Dispatch*; for example, Gannett's website lists *The Dispatch* as one of the newspapers in its portfolio. (*Id.* ¶ 23). GateHouse Media entered into agreements with third parties to purchase some of the premium agreements issued by GateHouse Ohio and provided some of the premium editions directly to GateHouse Ohio via its affiliates. (*Id.* ¶ 26). Various representatives of the Holding Company Defendants visited Columbus, Ohio to manage GateHouse Ohio. (*Id.* ¶ 27). These representatives also regularly communicated with GateHouse Ohio representatives about the practices at issue in this case. (*Id.*). Several subscribers to *The Dispatch* threatened to sue based on the GateHouse Defendants' premium-edition practices. (*Id.* ¶ 28). GateHouse Media, LLC and its affiliates were sued in Massachusetts for premium-edition practices identical to those at issue in this lawsuit. (*Id.*).

On August 22, 2019, Plaintiffs filed their original Complaint in the Franklin County Court of Common Pleas. (ECF No. 1-3). The original Complaint, styled as a "Class Action Complaint," contains the following claims: breach of the implied covenant of good faith and fair dealing (Count I); breach of contract (Count II); violations of the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01 *et seq* (Count III); declaratory judgment that GateHouse engaged in conduct violative of the CSPA (Count IV); violations of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et*

*seq* (Count V); declaratory judgment that the subscription agreements and various contractual limitations for liability and for filing suit are unconscionable (Count VI); declaratory judgment that the subscription agreements are illusory agreements (Count VII); unjust enrichment (Count VIII); and injunctive relief precluding the GateHouse Defendants from charging for premium editions without proper disclosure, charging inflated paper statement fees, or from committing further violations of the CSPA (Count IX).

On April 17, 2020, Plaintiffs filed their First Amended Complaint against the Gatehouse Defendants and Copley Newspapers. (ECF No. 42). Alleging individual and class claims, the First Amended Complaint set forth nine counts against Defendants. All Defendants moved to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). (ECF Nos. 48, 65, 66). Defendant Copley Ohio moved to dismiss for lack of subject-matter jurisdiction, while the Holding Company Defendants challenged the existence of personal jurisdiction. Pursuant to this Court's March 4, 2021 Order, Defendants Copley Ohio and the Holding Company Defendants were dismissed from the suit.

Following their deposition of Leon Haenel, former Director of Consumer Marketing for GateHouse Ohio, Plaintiffs moved for leave to file their Second Amended Complaint on January 11, 2022. (ECF No. 151). As presented by Plaintiffs, the Second Amended Complaint was intended to do the following:

- Joins the Holding Company Defendants and includes allegations demonstrating their liability;
- Asserts a fraud claim against GateHouse Ohio and the Holding Company Defendants;
- Clarifies the Plaintiffs' claim for breach of the duty of good faith;
- Provides additional factual detail regarding the Plaintiffs' claims for breach of contract, breach of the duty of good faith, and CPSA violations.

(*Id.* at 3).

The Second Amended Complaint also removes Plaintiffs' claims relating to GateHouse

Ohio's paper-statement fee. (*Id.*). Plaintiffs argued in their motion for leave that GateHouse Ohio did not substantially complete its document production until May 2021, at which point "GateHouse Ohio produced more than half of the pages it has produced to date." (*Id.* at 4). Plaintiffs argued that the deposition from Mr. Haenel, who played a key role in implementing the Holding Company Defendants' premium-edition program, sharply contracted with the statements made by the Holding Company Defendants in moving to dismiss. (*Id.* at 4–6). Namely, the Holding Company Defendants claimed that neither "developed or required the use of the premium-edition disclosures . . . nor was any [Holding Company] involved in determining the manner in which consumers were charged for premium editions . . . ." (*Id.* at 5). According to Plaintiffs, Haenel's deposition helped to disprove this. Further, according to Plaintiffs, "[o]ther discovery has confirmed that the Holding Company Defendants actively manage GateHouse Ohio." (*Id.* at 6).

On March 8, 2022, the Magistrate Judge granted Plaintiffs' motion for leave to file their Second Amended Complaint. (ECF No. 180). Plaintiffs' Second Amended Complaint (ECF No. 181) was docketed the same day. Soon thereafter, Defendants filed two motions to dismiss. Defendants' first Motion to Dismiss ("Defendants' Motion to Dismiss for Failure to State a Claim") moves to dismiss Plaintiffs' claims for fraud, breach of contract, and breach of the implied covenant on the merits, as well as to dismiss Ewalt's claims are time-barred. (ECF No. 185). The Holding Company Defendants together filed a second Motion to Dismiss ("Defendants' Motion to Dismiss for Lack of Personal Jurisdiction") based on lack of jurisdiction and failure plausibly to state a claim against the Holding Company Defendants. (ECF No. 186). Further still, the Holding Company Defendants then filed an Objection to the Magistrate Judge's Order which granted Plaintiffs leave to file their Second Amended Complaint. (ECF No. 187).

These motions have been briefed fully and are ripe for review.

## II.    STANDARD OF REVIEW

### A.  Objections to a Magistrate Judge's Order

District judges reviewing magistrate judges' orders on non-dispositive matters "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). Indeed, "the clearly erroneous standard applies to factual findings by the magistrate judge" in light of the considerable deference that Rule 72(a) provides to the determinations of magistrates. Fed.R.Civ.P. 72(a); *Hunter v. Booz Allen Hamilton, Inc.*, No. 2:19-CV-411, 2021 WL 2410378, at *2 (S.D. Ohio June 14, 2021) (Marbley, J.) (internal quotation marks omitted). A magistrate judge's factual finding is "clearly erroneous" only when, after reviewing the evidence, the court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). A court will overturn a magistrate judge's legal conclusions only where those conclusions "contradict or ignore applicable precepts of law, as found in the Constitution, statutes, or case precedent." *Gandee v. Glaser*, 785 F.Supp. 684, 686 (S.D. Ohio 1992) *aff'd*, 19 F.3d 1432 (6th Cir. 1994) (internal quotation marks and citation omitted).

### B.  Motion to Dismiss for Lack of Personal Jurisdiction

This Court may dismiss a cause of action due to lack of jurisdiction. Rule 12(b)(2) permits a defendant to file a motion to dismiss based on a court's lack of jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(2). In ruling on a jurisdictional motion to dismiss without conducting an evidentiary hearing, the court "must consider the pleadings and affidavits in a light most favorable to the plaintiff." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). The plaintiff "need only make a *prima facie* showing of jurisdiction" to defeat the motion. *Id.* (italics added). Making such a showing requires the plaintiff to "demonstrate facts which support

a finding of jurisdiction…." *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir. 1980) (internal quotation marks omitted). When reviewing this motion, the court "will not consider facts proffered by the defendant that conflict with those offered by the plaintiff, and will construe the facts in a light most favorable to the nonmoving party." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).

### C. Motion to Dismiss for Failure to State a Claim

This Court may also dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F. 3d 950, 958–59 (6th Cir. 2005). This Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F. 3d 430, 434 (6th Cir. 2008). If more than one inference may be drawn from an allegation, this Court must resolve the conflict in favor of the plaintiff. *Mayer v. Mylod*, 988 F. 2d 635, 638 (6th Cir. 1993). This Court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. This Court, however, is not required to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A claim is plausible

when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Finally, the Complaint should be read as a whole, even if a specific alleged fact read in isolation appears meaningless. *Ricchio v. McLean*, 853 F. 3d 553, 557 (1st Cir. 2017).

### 1. Collective Allegations

"On a motion to dismiss a putative class action complaint, courts may only consider the allegations of the named plaintiffs, and not the generalized allegations of unnamed plaintiffs or putative class members." *Tatum v. Chrysler Grp. LLC*, No. 10-cv-4269, 2012 WL 6026868, at *4 (D.N.J. Dec. 3, 2012). In addition, when a class-action complaint asserts claims against multiple defendants, "a named plaintiff must have a valid cause of action against each defendant, and cannot rely on the allegations of putative class members if he or she does not also have a claim against that defendant." *Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*, No. 2:19-CV-4262, 2021 WL 825978, at *3 (S.D. Ohio Mar. 4, 2021) (Marbley, J.) (quoting *Crissen v. Gupta*, 994 F. Supp. 2d 937, 946 (S.D. Ind. 2014)). In other words, when a class-action complaint asserts claims against multiple defendants, "potential class representatives must establish standing *vis-à-vis* each defendant; they cannot acquire standing simply by virtue of bringing a class action." *Accord v. Anderson Cnty., Tennessee*, No. 3:21-CV-00077, 2021 WL 6135691, at *4 (M.D. Tenn. Dec. 28, 2021) (*Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 693 (E.D. Mich. 2020)) (emphasis in original) (alteration adopted).

### 2. Matters Outside the Pleadings

"When ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts generally may not consider matters outside the pleadings." *Norris v. Glassdoor, Inc.*, No. 2:17-CV-00791, 2018 WL 3417111, at *2 (S.D. Ohio July 13, 2018); *Beckner v. Ohio Cent. Sys.*, No.

9

2:01-CV-873, 2002 WL 31409431, at *2 (S.D. Ohio Aug. 19, 2002) (observing that an affidavit "directly contradict[ing] an allegation contained in Plaintiffs' complaint" is outside the pleadings). A defendant cannot rely on a document outside the pleadings when the authenticity, validity, accuracy, or completeness of the document is in dispute. *See Bailey v. Hartford & Accident Ins. Co.*, No. 5:15cv406, 2016 WL 760431, *3 (N.D. Ohio Feb. 26, 2016).

But a defendant may submit a document that was not attached to the plaintiff's complaint where the document is referred to in the complaint and central to the plaintiff's claims. Where extrinsic materials "add nothing new, but, in effect, reiterate the contents of the complaint itself," they may be considered without converting a motion to dismiss to a motion for summary judgment. *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997).

## III.    LAW AND ANALYSIS

This Court's analysis is as follows. First, it addresses the Holding Company Defendants' Objection to the Magistrate Judge's grant of leave to Plaintiffs to file their Second Amended Complaint. (ECF No. 187). Second, this Court addresses the threshold question of jurisdiction in Holding Company Defendants' second Motion to Dismiss, which this Court construes as a Motion to Dismiss for Lack of Personal Jurisdiction, pursuant to Rule 12(b)(2). (ECF No. 186). Finally, this Court reviews the Gatehouse Defendants' first Motion to Dismiss, which this Court construes as a Motion to Dismiss for Failure to State a Claim. (ECF No. 185).

### A.  The Holding Company Defendants' Objection

This Court first addresses the Objection submitted by Defendants Gannett Co, Inc. and GateHouse Media, LLC ("the Holding Company Defendants") concerning the Magistrate Judge's March 8, 2022 Opinion and Order (the "March 8th Order"). (ECF No. 187). The March 8th Order granted Plaintiffs' motion for leave to file their Second Amended Complaint. (ECF No. 180). The

Holding Company Defendants notes that the Order permitted Plaintiffs to reassert their claims against them although this Court previously dismissed Plaintiffs' first amended complaint for lack of personal jurisdiction. According to the Holding Company Defendants, the March 8th Order never explained why the Court's previous dismissal order should be revisited. The Holding Company Defendants' Objection argues that the March 8th Order is clearly erroneous for four reasons: (1) it applied the wrong legal standard to Plaintiffs' attempt to reassert claims against the Holding Company Defendants; (2) it failed to account for the evidence showing Plaintiffs unduly delayed seeking leave to amend; (3) it did not analyze whether Plaintiffs had clearly and convincingly alleged personal jurisdiction; and (4) it did not apply the proper futility standard, under which Plaintiffs' claims against the Holding Company Defendants would be futile.

Specifically, the Holding Company Defendants object on the following bases. First, Defendants argue that the Order erroneously granted leave under the modest requirements of Federal Rule of Civil Procedure 15 despite being required to apply the stricter standards of Rules 59 and 60. Rules 59 and 60 apply to motions to amend a complaint after an adverse ruling. Second, the Holding Company Defendants argue that the Order improperly granted leave because the ample evidence of Plaintiffs' undue delay is not offset by Plaintiffs' justification that they discovered new evidence justifying the amendment. Third, the Holding Company Defendants argue that substantial evidence exists showing that Plaintiffs cannot meet their burden in seeking to alter this Court's previous determination that it lacks personal jurisdiction over the Holding Company Defendants. Fourth, the Holding Company Defendants argue that the March 8th Order did not apply the futility standard to granting leave as required by the Sixth Circuit, but instead "some lower bar" which "avoided addressing the Holding Company Defendants' personal-jurisdiction arguments."

Plaintiffs contest the Holding Company Defendants' standing to object because they were not parties to the case at the time this Court issued the March 8th Order. On the merits, however, Plaintiffs contest each of the Holding Company Defendants' bases for argument. First, Plaintiffs argue that Rules 59 and 60 do not apply to an interlocutory order; nonetheless, newly discovered evidence justified this Court's alteration of its previous order dismissing the Holding Company Defendants based on incomplete information. Second, Plaintiffs contend they permissibly delayed using the new testimonial evidence to amend their complaint in order to ensure that an amended complaint would contain sufficient factual support. Third, Plaintiffs argue that the Holding Company Defendants' argument about the sufficiency of evidence impacting personal jurisdiction is proper for adjudication in a motion to dismiss. Finally, Plaintiffs argue that none of the Holding Company Defendants' cited cases supports their position that a magistrate *must* deny leave if it finds that amended pleading would be futile or even that it must address all of a defendant's arguments.

A district court has broad authority to grant or deny a party leave to amend their pleadings. *See Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 330 (1971). Pursuant to Rule 15(a), The Court should, however, freely grant a party leave to amend his or her pleadings "when justice so requires." Fed. R. Civ. P. 15(a). Rule 15(a) sets forth "a liberal policy of permitting amendments to ensure the determination of claims on their merits." *DN Reynoldsburg v. Shoe Show, Inc.*, No. 2:18-CV-1190, 2019 WL 4233129, at *3 (S.D. Ohio Sept. 6, 2019) (Marbley, J.) (citing *Oleson v. United States*, 27 F. App'x 566, 569 (6th Cir. 2001) (internal quotations omitted)). Rules 59 and 60, on the other hand, apply when a plaintiff seeks leave to amend the Complaint after an entry of judgment. *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 563–64 (6th Cir. 2022). Rule 59(e) of the Federal Rules of Civil Procedure "enables a district

court to 'rectify its own mistakes in the period immediately following' its decision." *Carte v. Am. Elec. Power Serv. Corp.*, No. 2:21-CV-5651, 2022 WL 17351529, at *2 (S.D. Ohio Dec. 1, 2022) (citing *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020)). Rule 60(b) "allows a party to move for relief from relief from a *final* judgment, order, or proceeding." *Id.* (emphasis added).

As an initial point, the Holding Company Defendants were not parties to this case at the time that the March 8th Order was issued. Because Rule 72(a) only permits "a party" to file objections, the Holding Company Defendants' Objection was procedurally improper. Fed.R.Civ. 72(a); *see Quantlab Grp., LP v. Dempster,* No. CV H-18-2171, 2019 WL 7037653, at *2 (S.D. Tex. Dec. 20, 2019). Even if the Holding Company Defendants had standing to object, their Objection fails on the merits. Much of the Objection attacks the merits of the Second Amended Complaint rather than demonstrating that this Court erred in granting *leave* to amend. This is particularly detrimental to Defendants' argument given "Fed.R.Civ.P. 15(a)'s liberal policy of permitting amendments to ensure the determination of claims on their merits." *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987). The Holding Company Defendants' argument that Plaintiffs must satisfy the strictures of Rules 59 and 60 misses that these rules apply following the court's issuance of a *final* judgment or order. This Court's dismissal of Plaintiff's First Amended Complaint does not constitute a final judgment or order given that the case remained live. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 896 (6th Cir. 2019) (explaining that "most denials of motions to dismiss are non-final orders that do not fall within Congress's statutory grant of appellate jurisdiction . . . ."). Even the case upon which the Holding Company Defendants rely expressly notes that Rules 59 and 60 apply "after a judgment *against* the plaintiff" because "[c]ourts in that setting must consider[] the competing interest of protecting the finality of judgments and the expeditious termination of litigation." *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d

612, 615–16 (6th Cir. 2010) (emphasis in original) (alteration in original).

Simply put, the Holding Company Defendants' Objection fails to demonstrate that the March 8th Order was clearly erroneous. Instead, this Court used its discretion to consider factors such as undue delay and futility and determined that the balancing of those factors weighed in favor of allowing Plaintiffs to amend their complaint. The Holding Company Defendants' Objection points to no authority holding that this Court was *obligated* to deny leave to amend based on the facts of this case. Whether the Second Amended Complaint sufficiently demonstrates the presence of personal jurisdiction involves a consideration of the pleading itself. An examination of the merits of a complaint is generally better saved for the motion to dismiss stage. *See Durthaler v. Accounts Receivable Mngmt., Inc.*, 2:10-cv-1068, 2011 WL 5008552, at *4 (S.D. Ohio Oct. 20, 2011) (explaining that "it is usually a sound exercise of discretion to permit the claim to be pleaded and to allow the merits of the claim to be tested before the District Judge by way of a motion to dismiss." ); *Brown v. Worthington Steel, Inc.*, 211 F.R.D. 320, 323 (S.D. Ohio 2002) (noting that "[a] court will not ordinarily consider the merits of a proposed amended complaint in ruling on a motion for leave to amend unless it appears to be frivolous"). As such, the Holding Company Defendants' Objection (ECF No. 187) is **OVERRULED**. This Court will now consider the merits of the Holding Company Defendants' motions to dismiss.

**B. The Holding Company Defendants' Motion to Dismiss for Lack of Jurisdiction**

The Holding Company Defendants next move this Court to dismiss Plaintiffs' claims against them for lack of personal jurisdiction. In this Court's March 4, 2021 Order dismissing the Holding Company Defendants from this suit, this Court was "unconvinced" that personal jurisdiction under the alter-ego theory existed absent stronger evidence that the Holding Company Defendants were "not [] mere passive owner[s]." (ECF No. 105 at 13). More pointedly, this Court

noted that Plaintiffs failed to demonstrate "the existence of intimate, day-to-day oversight by the [Holding] Company Defendants over GateHouse Ohio." (*Id.*). Neither had Plaintiffs indicated any "deep and wide-ranging . . . undue control of the subsidiaries by the Holding companies." (*Id.*) (alterations adopted). Outside of the alter-ego theory, found this Court, Plaintiffs failed to otherwise establish that personal jurisdiction exists under Ohio-long arm-statute or comports with constitutional due-process considerations.

Plaintiffs' Second Amended Complaint fails to cure these deficiencies. Holding Company Defendants argue three bases for dismissal in their Motion: (1) that law-of-the-case doctrine should apply to avoid disturbing this Court's prior order dismissing the Holding Company Defendants; (2) that this Court lacks personal jurisdiction over the Holding Company Defendants; and (3) that Plaintiffs fail to state a claim for fraud against the Holding Company Defendants. After a brief review of the relevant allegations contained in Plaintiffs' Second Amended Complaint, this Court will consider each of Defendants' bases for dismissal in turn.

### 1. The Second Amended Complaint's Allegations

With respect to the Holding Company Defendants, the Second Amended Complaint adds several facts intended to confer personal jurisdiction. The Second Amended Complaint alleges that the Holding Company Defendants "directed, participated, and/or cooperated in the premium-edition practices at issue in this case" through the following personnel: Denise Robbins[3], Mike Reed[4], Kirk Davis[5], Lee Knapp[6], and Rebecca Roth[7]. The Second Amended Complaint alleges

---

[3] Robbins is identified as former head of Consumer Marketing for Gannett Co., Inc. and former SVP of Consumer Marketing for GateHouse Media. (ECF No. 181 ¶¶ 15–16).
[4] Reed as identified as the CEO for Gannett Co., Inc. "at all relevant times" and CEO of GateHouse Media starting in November 2019. (*Id.*).
[5] Davis is identified as former COO for Gannett Co., Inc. and former CEO, COO, and President for GateHouse Media. (*Id.*).
[6] Knapp is identified as former VP of Planning and Forecasting for GateHouse Media. (*Id.* ¶ 16).
[7] Roth is identified as SVP of Strategy and Planning. (*Id.*).

that GateHouse Ohio and GateHouse Media shared several other officers; GateHouse Ohio and Gannett Co. allegedly had the same, or substantially the same, officers and directors. The Second Amended Complaint alleges that, when these shared officers made decisions concerning premium editions, they did so only in their capacities with the Holding Company Defendants.

The Second Amended Complaint contains many allegations directed at the "GateHouse Defendants." Specific to the Holding Company Defendants and their involvement in premium-edition scheme, however, the Second Amended Complaint makes the following allegation. The Holding Company Defendants held themselves out as publishers of *The Dispatch* by listing it online as one of its publications. (ECF No. 181 ¶ 23). The Holding Company Defendants are responsible for the premium-edition disclosures/invoices and Terms of Sale that the GateHouse Defendants issued. (*Id.* ¶ 24). The Holding Company Defendants, through Lee Knapp, instructed GateHouse Ohio employees to use their standard disclaimers for premium editions. (*Id.* ¶¶ 24, 63). Expenses for the GateHouse Defendants are paid by non-Dispatch personnel and allocated across the GateHouse entities. (*Id.* ¶ 25). GateHouse Media contracted with third parties to purchase some of the premium editions issued by GateHouse Ohio; GateHouse Media, via affiliates, also provided some of the premium editions directly to GateHouse Ohio. (*Id.* ¶ 26).

Various representatives of the Holding Company Defendants also visited Columbus, Ohio "to manage" GateHouse Ohio. (*Id.* ¶ 27). Representatives of the Holding Company Defendants would also "constantly communicate" with GateHouse Ohio representatives through conference calls and emails concerning the premium-edition practices at issue in this case. (*Id.*). In April 2016, Kirk Davis demanded that Brad Harmon (the publisher for *The Dispatch*) prepare a plan to meet their revenue expectations; the publication soon added multiple premium editions in hopes of meeting budget. (*Id.* ¶¶ 70–72). Harmon reported directly to Davis and was responsible for

GateHouse Ohio's financial performance. (*Id.* ¶ 99). In February 2017, GateHouse Media, LLC and its Massachusetts affiliates settled with a group of defendants who alleged the companies were deceptively reducing their customers' subscriptions through the issuance of premium editions. (*Id.* ¶ 75). Having received a deluge of complaints after instituting the premium-edition scheme, Harmon pushed back when Denise Robbins "compelled" GateHouse Ohio to issue additional premium editions. (*Id.* ¶ 100). He was unsuccessful in the face of direction from the Holding Company Defendants to change its maximum premium edition charge to $9. (*Id.*).

Neither Robbins nor Lee Knapp had a position with GateHouse Ohio, yet these two controlled GateHouse Ohio's premium-edition practices. (*Id.* ¶ 109). The pair used revenue from *The Dispatch* to cover losses in other GateHouse markets. (*Id.* ¶ 110). In late October 2018, Robbins put forth a plan to raise revenue, which included "adding premium editions, increasing premium edition prices, and increasing paper statement fees." (*Id.* ¶ 113). Knapp instructed GateHouse Ohio to implement this plan; it was subsequently implemented over Harmon's objection. (*Id.* ¶ 114). In the fourth quarter of 2018, Robbins and Knapp also directed GateHouse Ohio and its affiliates to change their disclaimers to provide for a maximum of 3 premium editions per month at a charge of up to $9 each. (*Id.* ¶ 116). This was poorly received by customers and employees alike. (*Id.* ¶¶ 120–123). Robbins concealed the issues with premium editions from GateHouse's board and investors. (*Id.* ¶ 124). Knapp made clear that he "absolutely hate[d]" adding premium editions when he proposed to do so to the board. (*Id.* ¶ 125).

### 2. *Application of the "law of the case" doctrine*

As an initial matter, the Holding Company Defendants first argue that law of the case doctrine should apply such that Court's March 4, 2021 Order dismissing the Holding Company Defendants for lack of personal jurisdiction should remain in effect. The Holding Company

Defendants argue that the Second Amended Complaint is materially the same and suffers the same defects as the First Amended Complaint from which they were dismissed for lack of jurisdiction. But, Plaintiffs contend, to the extent the Second Amended Complaint contains "new" allegations and evidence, nearly all of it was within Plaintiffs' possession at the time this Court entered its dismissal order. At any rate, the Holding Company Defendants argue, these additional facts are not "material" because the discovery that Plaintiffs have had since July 2020 confirms that neither Robbins nor Knapp worked for the Holding Company Defendants, but rather for a management company, GateHouse Media Management Services, Inc. Like they did before, the Holding Company Defendants assert, Plaintiffs here reassert their unsuccessful theory that they exercised "corporate" control over GateHouse Ohio based on a compendium of correspondence involving Robbins, Knapp, and others. In sum, they reason, the Second Amended Complaint contains only: (i) information Plaintiffs have long possessed, including prior to this Court's dismissal of the Holding Company Defendants, or (ii) evidence that is merely cumulative of pre-existing evidence.

Plaintiffs respond that the Court's prior ruling was based on the limited allegations in the First Amended Complaint and is thus not the law of the case. Instead, they assert, law of the case doctrine only applies when the issue before the court differs from the issue the court previously considered. Here, Plaintiffs contend, this Court has never resolved the issue of whether the *Second Amended Complaint*—which includes numerous facts relating to jurisdiction that were not included in its predecessor—makes a prima facie showing of jurisdiction. According to Plaintiffs, their Second Amended Complaint includes the discovery that GateHouse Ohio delayed giving to Plaintiffs. Plaintiffs argue that the Second Amended Complaint includes allegations designed to address the issues identified in this Court's prior order, such as the finding that Plaintiffs failed to demonstrate whether the presence of "pervasive control, interlocking directorate or commonality

of officers" between the Holding Company Defendants and GateHouse Ohio. Plaintiffs argue that the new complaint adds several important details, including facts demonstrating how the Holding Company Defendants dictated the precise misconduct at issue in this case and a list of overlapping officers and directors.

According to the law of the case doctrine, "a legal decision made at one stage of a civil or criminal case . . . becomes the law of the case for future stages of the same litigation." *United States v. Faulkenberry*, 759 F. Supp. 2d 915, 920 (S.D. Ohio 2010), *aff'd*, 461 F. App'x 496 (6th Cir. 2012) (Marbley, J.) (citing *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993)). Application of the doctrine is not mandatory but discretionary; nonetheless, courts should generally avoid reopening an already decided issue in the absence of extraordinary circumstances. *Arctic Express, Inc. v. Del Monte Fresh Produce NA, Inc.*, No. 2:09-CV-00403, 2010 WL 1009777, at *2 (S.D. Ohio Mar. 15, 2010) (Marbley, J.). Such extraordinary circumstances include "where substantially different evidence is presented, or where controlling legal authority has changed, or where the initial decision was clearly erroneous and would work a manifest injustice." *McCready v. Michigan State Bar Standing Comm. on Character & Fitness*, 926 F. Supp. 618, 621 (W.D. Mich. 1995), *aff'd*, 100 F.3d 957 (6th Cir. 1996). Where the basis for revisiting a previously adjudicated claim is that Plaintiff has unearthed new evidence, this evidence should be "so materially different from what was available at the time Plaintiff's claims were dismissed that the Court is presented with 'an extraordinary circumstance' requiring the Court to revisit its [prior] dismissal." *McNulty v. Arctic Glacier, Inc.*, No. 08-CV-13178, 2016 WL 465490, at *18 (E.D. Mich. Feb. 8, 2016) (quoting *White v. Smiths Detection, Inc.*, No. CIV.A. 10-4078 KM, 2013 WL 1845072 at *19 (D.N.J. Apr. 30, 2013)).

Here, Plaintiffs are before the Court on their Second Amended Complaint, which contains

additional, substantive allegations. The Second Amended Complaint also relies on new evidence that was not readily available to them at the filing of the previous complain, including substantial discovery and the taking of the deposition from Leon Haenel. The issue at bar is whether *on these allegations*, Plaintiffs demonstrate that this Court has personal jurisdiction over the Holding Company Defendants. As such, to the extent that Plaintiffs' argument for personal jurisdiction relies on materially new facts, law-of-the-case doctrine does not apply.

### 3.  *Jurisdictional Analysis*

A federal court may only exercise personal jurisdiction over a non-resident defendant if the requirements of both the state's long-arm statute and constitutional due process are met. *Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011). When courts rule on a motion to dismiss pursuant to 12(b)(2) without an evidentiary hearing, the plaintiff "need only make a prima-facie showing." *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). This may be demonstrated by "establishing with reasonable particularity sufficient contacts between [the Defendants] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).

In their Motion to Dismiss, the Holding Company Defendants argue that the Second Amended Complaint is materially the same and suffers the same defects as the First Amended Complaint which this Court dismissed—with respect to the Holding Company Defendants—for lack of jurisdiction. So, they maintain, nothing in the Second Amended Complaint warrants departure from this Court's prior determination dismissing them because neither Ohio's long-arm statute nor constitutional due process requirements were met. Further, they argue, Plaintiffs have failed plausibly to state a claim for relief against the Holding Company Defendants, and their claims fail as a matter of law. The Holding Company Defendants contend that the SAC asserts only claims against the Holding Company Defendants that are entirely derivative of Plaintiffs'

claims against GateHouse Ohio, and that, as a result, will afford no additional relief to Plaintiffs or the proposed class. Based upon the Holding Company Defendants' interpretation, Plaintiffs conceded in their opposition motion that the Holding Company Defendants do not conduct business in Ohio directly; rather, their dealings are limited to those of their "subsidiaries and/or affiliates," which include GateHouse Ohio. The Holding Company Defendants argue that there are few pertinent allegations of wrongdoing ties to the Holding Company Defendants; instead of aiming allegations at them, Plaintiffs mainly rely on actions taken by Robbins and Knapp. But, Holding Company Defendants argue, the fact that Gannett's CEO (Mike Reed) and COO (Kirk Davis) were not in favor of price increases or premium editions run counter to Plaintiffs' theory that the Holding Company Defendants were forcing the practices on GateHouse Ohio, much less controlling it from above on a day-to-day basis.

### a. Plaintiffs' alter-ego theory for personal jurisdiction

Plaintiffs' case for personal jurisdiction over the Holding Company Defendants partially consists of the same alter-ego theory that was present in its First Amended Complaint. The thrust of this theory is that GateHouse Ohio's contacts and alleged tortious conduct can be attributed to the Holding Company Defendants due to their exercise of control over GateHouse Ohio.

The Holding Company Defendants argue that there is no basis to impute the jurisdictional contacts of GateHouse Ohio to the Holding Company Defendants. The Holding Company Defendants reason that this Court has already rejected Plaintiffs' "alter ego" theory of personal jurisdiction, given that their corporate identity is distinct from Defendant GateHouse Ohio. In particular, this Court noted that Plaintiffs fell well short of showing the required "intimate, day-to-day oversight" by the Holding Company Defendants over GateHouse Ohio. The Holding Company Defendants contend that, while Plaintiffs point to some involvement by Robbins and

Knapp (who did not work for the Holding Company Defendants), no allegations come close to suggesting intimate control over GateHouse Ohio's day-to-day operations. In any event, the Holding Company Defendants argue, courts routinely hold that a parent entity's control of a subsidiary through ownership is neither uncommon nor sufficient to pierce the corporate veil. The Holding Company Defendants argue that the alter-ego analysis is the appropriate standard, and Plaintiffs cannot meet it; therefore, dismissal is appropriate.

Plaintiffs contend that their new allegations address each of the issues that this Court identified in its prior Order precluding personal jurisdiction over the Holding Company Defendants. Plaintiffs argue that the new allegations demonstrate that there is substantial overlap between the officers and directors of GateHouse Ohio and the Parent Companies, and substantial involvement by the Holding Company Defendants. Plaintiffs also argue that they are not required to plead a claim for veil piercing to rely on attribution doctrine giving rise to personal jurisdiction in this case. Further, Plaintiffs argue, they properly pled that Robbins and Knapp acted as agents for the Parent Companies in their effective control of GateHouse Ohio's premium-edition practices.

A court may exercise personal jurisdiction over a corporation that it could not otherwise when the corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court. *Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). In the parent-subsidiary context, alter-ego theory provides that "a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Id.* Under the facts of this case, this Court must apply Ohio law "in applying the alter-ego theory of personal jurisdiction in a diversity

22

action." *Tech. & Servs., Inc. v. TACS Automation, LLC*, No. CIV.A. 2:09-CV-1113, 2010 WL 2640047, at *3 (S.D. Ohio June 29, 2010) (quoting *Est. of Thomson*, 545 F.3d at 362). Under Ohio law, an alter ego is established when "control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own . . . . " *Id.*

The extent of control a parent company must have over a subsidiary to invoke alter-ego theory must be significant. Factors that the Sixth Circuit has looked to include: "(1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns and financial statements; and (7) exerting control over the daily affairs of another corporation." *Est. of Thomson*, 545 F.3d 357, 362–63.

Under attribution theory, the Court "attributes the subsidiary's contacts to the parent because the parent 'purposefully avails' itself of doing business in the forum by accessing the market through a subsidiary." *Keeley v. Airgas, Inc.*, No. 2:08-CV-111, 2008 WL 5422691, at *12 (W.D. Mich. Dec. 29, 2008). Under merger theory, "the two entities are so closely aligned that it is reasonable for the parent to anticipate being haled into court in the forum because of its relationship with the subsidiary." *Id.*

This Court described the alter-ego theory as "arguing that the Holding Company Defendants are nothing more than an alter-ego affiliate of the GateHouse Ohio, such that the Holding Company Defendants are deemed 'present' in Ohio for purposes of jurisdiction." (ECF No. 105 at 12). More specifically, this Court summarized Plaintiffs theory as the following:

> The Holding Company Defendants (or, in their words, the Publisher Defendants) are responsible for causing tens of millions of dollars in damages to tens of thousands of Ohioans through intentional misconduct. (ECF Nos. 83, 103 at 8). The core of this argument is that personal-jurisdiction exists over the Holding Company Defendants because the holding companies control and oversee GateHouse Ohio's premium-edition and paper-statement-fee practices . . . Plaintiffs argue that the

23

Holding Company Defendants are active, rather than passive, corporate parents. (*Id.*).

Plaintiffs have not reasserted their claims concerning the paper-statement-fee practices on this go-around. In all other respects, however, Plaintiffs proceed on the same theory as before. In its prior Order, this Court identified the following deficiencies with Plaintiffs' First Amended Complaint leading to its finding that "the Holding Company Defendants' corporate identity is distinct from Defendant GateHouse Ohio." (*Id.*). While Plaintiffs demonstrated the presence of corporate ownership and corporate nomenclature, they had not shown that the Holding Company Defendants exercised the type of intimate oversight and control that would justify finding that "the subsidiary is the mere alter ego of the parent." (*Id.* at 12–13).

This Court found that the alter ego theory failed "absent stronger evidence that the parent company was not a mere passive owner." (*Id.* at 13) (citing *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 450–51 (6th Cir. 2012)). Absent sufficient evidence that the Holding Company Defendants directly initiated or solicited business in Ohio or acted in a deliberate, deceitful manner to harm Ohio newspaper subscribers, found the Court, personal jurisdiction under Ohio's long-arm statute, Ohio Revised Code §§ 2703.382(A)(1) (transacting business in Ohio) and (A)(2) (contracting to supply goods or services with Ohio) was lacking. This Court also found that personal jurisdiction was lacking under (A)(4), or (A)(6) because Plaintiffs failed to show that the Holding Company Defendants sought to deceive subscribers to the newspapers at issue. Last, found this Court, exercise of personal jurisdiction over the Holding Company Defendants would not comport with the Due Process Clause because:

> purposeful availment has not been shown since the mere existence of a contract between the defendant, and an Ohio citizen is not enough to haul the parent company into court, particularly absent more regular in-forum contacts; (2) the cause of action does not arise from the Holding Company Defendants' in-forum activities at all; and (3) the Holding Company Defendants lack a substantial

24

enough connection to the forum state to make the exercise of jurisdiction reasonable.

(*Id.* at 17–18).

This Court exhaustively recounts the basis for its previous holding to note exactly what the deficiencies were which Plaintiffs purport to cure in their Second Amended Complaint. The main piece of new evidence that Plaintiffs rely on is their deposition of Lon Haenel, the Vice President of Consumer Marketing who allegedly "played a key role in implementing the Parent Companies' premium-edition program." (ECF No. 151 at 4). According to Plaintiffs, his testimony showed that the Parent Companies mandated the disclosures; when he was asked by Miller to stop shortening subscriptions with premium editions, he explained that Miller would have to ask Robbins and Knapp because Haenel lacked the authority to end this practice. (*Id.* at 5).

At least some of Plaintiff's "new evidence" is responsive to the deficiencies previously identified by this Court. Although Plaintiffs' complaint alleges that GateHouse Ohio launched the premium-edition scheme, it also indicates that the Holding Company Defendants had extensive influence over GateHouse Ohio's continuation of the scheme by pressuring it to produce more revenue. Plaintiffs renewed their allegations that Knapp and Robbins had control over the premium-edition practices, albeit with more supporting detail. Indeed, Plaintiffs' new allegations bring them closer to establishing that the Holding Company Defendants exercised at least some degree of power over GateHouse Ohio and shared corporate officers and directors. This Court stresses, however, how high the bar is that must be overcome to disregard the corporate form. In Ohio, "control over the corporation by those to be held liable [must be] so complete that the corporation has no separate mind, will, or existence of its own." *Straight v. LG Chem, Ltd.*, No. 2:20-CV-6551, 2022 WL 16836722, at *10 (S.D. Ohio Nov. 9, 2022). Plaintiffs' allegations fall short of establishing that GateHouse Ohio is the alter ego of the Holding Company Defendants.

25

The additional allegations do not establish that the Holding Company Defendants exercised "pervasive control" over the company, even if showing some indication of "interlocking directorate or commonality of officers." (*Id.* at 13).

Even if this Court were to apply attribution or merger theory, its conclusion would be the same. All Plaintiff offers are details of sporadic communications and calls between "representatives" of the Holding Company Defendants and GateHouse Ohio and some indication that the Holding Company Defendants had influence over the premium-edition practices. The Second Amended Complaint falls short of alleging that the Holding Company Defendants had final approval or veto power over the premium-edition practice or any other practice of GateHouse Ohio. A court should consider such factors as whether "the parent and subsidiary observe corporate formalities, keep separate records and books, do not commingle funds and assets, retain their own employees and officers, [and] use separate facilities to conduct business." *Straight v. LG Chem, Ltd.*, No. 2:20-CV-6551, 2022 WL 16836722, at *10 (S.D. Ohio Nov. 9, 2022). The Second Amended Complaint not only fails to show that these factors do not exist; it instead indicates that GateHouse Ohio maintains its own finances, personnel, and facilities. As such, Plaintiffs have failed to demonstrate the applicability of alter-ego theory or any other theory dependent on demonstrating that the companies were intertwined or that the parent companies conducted business on behalf of the subsidiary. Plaintiffs have therefore again failed to establish personal jurisdiction on the basis of imputing GateHouse's jurisdictional contacts. This Court similarly concludes that Plaintiffs fail to demonstrate that personal jurisdiction is proper with respect to the Holding Company Defendants' direct activities.

### b. Ohio's Long-Arm Statute

Plaintiffs' Second Amended Complaint again alleges that jurisdiction exists under four

prongs of Ohio's long-arm statute: R.C. §§ 2703.382(A)(1), (A)(2), (A)(4), and (A)(6). In its previous analysis, this Court grouped the pairs on the reasoning that (A)(1) and (A)(2) concern whether a foreign company transacts business in or contracts to supply goods or services with Ohio, while (A)(4) and (A)(6) grant personal jurisdiction over a person arising from tortious injury. This Court does the same here.

### i. Subsections (A)(1) and (A)(2)

This Court first addresses Plaintiffs' position that this Court has jurisdiction over the Holding Company Defendants under R.C. § 2307.382(A)(1) and (A)(2) of Ohio's long-arm statute.

Section (A)(1) confers jurisdiction over a non-resident defendant if the foreign company was "transacting" business in Ohio. Ohio Rev. Code § 2307.382(A)(1). As indicated by the Ohio Supreme Court, Section (A)(1) is "very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio." *Genesis Insurance Co. v. Alfi,* 425 F.Supp.2d 876, 894 (S.D.Ohio 2006) (citing *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.,* 53 Ohio St.3d 73, 559 N.E.2d 477 (1990)). Solicitation of business by an out-of-state corporation is an important factor in this analysis, particularly where the contacts between the out-of-state resident and in-state persons or entities are "substantial." *See U.S. Sprint,* 624 N.E.2d at 1052 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985)). Section (A)(2) confers jurisdiction over a non-resident defendant "contracting to supply services or goods" in Ohio. Ohio Rev. Code § 2307.382(A)(2). There must be a "necessary nexus" between Defendants' business dealings in Ohio and the matters at issue in this case. *ALTA Analytics, Inc,* 75 F. Supp. 2d at 779. This Court previously noted that "[p]ersonal jurisdiction will be conferred under (A)(1) and (A)(2) only if the defendant's conduct in Ohio is the proximate cause of the cause of action; or, in other

words, if the cause of action arises out of the business the defendant is transacting in Ohio." (ECF No. 105 at 14) (citing *Brunner v. Hampson*, 441 F.3d 457, 465–466 (6th Cir. 2006)).

The new allegations in the Second Amended Complaint hint that the Holding Company Defendants had a more involved role in continuing the premium-edition practices than previously indicated. Nonetheless, the Second Amended Complaint suffers the same deficiency: the Complaint reveals that the complained-of business practices exist separate and apart from GateHouse Ohio's relationship with the Holding Company Defendants. There is some indication that the influence of the Holding Company Defendants *may* have interfered with the wishes of some GateHouse Ohio personnel to cease the premium-edition practices. It cannot be said, however, that the Holding Company Defendants' alleged pressure campaign upon GateHouse Ohio to generate additional revenue proximately *caused* the harm allegedly perpetuated upon Ohio newspaper subscribers. This is because the new allegations still do not establish that the Holding Company Defendants had or utilized direct power over GateHouse Ohio *causing* it to continue its premium-edition scheme. At best, the allegations show that GateHouse Ohio devised and continued the premium-edition practices as its own strategy to generate the revenue demanded by the Holding Company Defendants.

### ii. Subsections (A)(4) and (A)(6)

This Court next addresses Plaintiffs' invocation of R.C. § 2307.382(A)(4) and (A)(6). Section (A)(4) empowers a court to exercise personal jurisdiction over a defendant for "causing tortious injury in this state . . . if the person regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." Ohio Rev. Code § 2703.382(A)(4). Section (A)(6) allows a court to exercise jurisdiction over a defendant for "[c]ausing tortious injury in this state to any person

by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state." Ohio Rev. Code § 2703.382(A)(6).

Sections (A)(4) and (A)(6) require the defendant to cause tortious injury in Ohio by an act of omission taken *outside* of Ohio. *See Jackson v. State St. Bank & Tr. Co.*, 110 Ohio App.3d 388, 674 N.E.2d 706, 710 (1996) ("A determination of long-arm jurisdiction under [§] 2307.382(A)(4) first entails a finding that the tortious injury occurred in Ohio.")).

Plaintiffs argue that they cured the deficiency in their previous Complaint because the Second Amended Complaint. With respect to R.C. § 2703.382(A)(4), Plaintiffs argue that the new complaint details the revenue the Holding Company Defendants received from the premium-edition practices. Plaintiffs also argue that the new complaint demonstrates that the Holding Company Defendants expected to be sued in Ohio for the premium-edition practices because they were sued in Massachusetts on the same basis. Plaintiffs' theory, in their words, is that the Parent Companies are subject to jurisdiction because they tortiously injured Ohioans (over the objections of GateHouse Ohio employees) to make up for revenue shortfalls.

This Court finds that Plaintiffs' Second Amended Complaint here suffers the same defects as the previous complaint. Concerning (A)(4), Plaintiffs still "have not established how much revenue the Holding Company Defendants earn from Ohio consumers or the regularity with which the Holding Company Defendants engage in in-state business." (ECF No. 106 at 16). Indeed, the new Complaint details the *plan* presented to the GateHouse enterprise to generate $1.36 million in revenue from the Columbus market in late October 2018, but it does not detail how much revenue was earned that was directly attributable to the alleged tortious conduct at issue. Concerning (A)(6), Plaintiffs do not allege that the Holding Company Defendants acted at any point "with the

purpose of injuring persons"; at best, Plaintiffs present a picture of a company intent on pushing its subsidiary company to generate revenue by continuing its dubious business practices. Aside from Plaintiffs' effort to impute GateHouse Ohio's actions to the Holding Company Defendants, however, Plaintiffs make scant allegations that they directly committed any wrongful actions.

This Court's exercise of personal jurisdiction must both satisfy the requirements of Ohio's long-arm statute and comport with the defendant's constitutional right to due process. *Fraley v. Estate of Oeding*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, ¶ 29; *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012). Plaintiff fails to demonstrate that the requirements of any of the cited provisions of Ohio's long-arm statute have been met. As such, this Court need not analyze whether the due-process standards are satisfied to conclude that Plaintiff has failed to establish a prima facie case of personal jurisdiction over the Holding Company Defendants. Consequently, this Court need not address Holding Company Defendants' argument that Plaintiffs fail to state a claim against them for fraud. The Holding Company Defendants are accordingly **DISMISSED** from this lawsuit.

### C. Defendants' Motion to Dismiss for Failure to State a Claim

Having dismissed the Holding Company Defendants, this Court proceeds to Defendants' Motion to Dismiss for Failure to State a Claim. To the extent that the Second Amended Complaint contains claims that are largely unchanged from the prior filing, this Court refers to its previous analysis in its March 4, 2021 Order where relevant.

To survive a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual allegations to show that at least one named plaintiff can state a claim against each defendant that is "plausible on its face." *Twombly*, 550 U.S. at 570. Here, Defendants move to dismiss several of Plaintiff's claims for failure to state a claim upon which relief can be granted,

including fraud, breach of contract, and breach of the implied covenant of faith and fair dealing. Defendants also move to dismiss all of Plaintiff John Ewalt's claims as time-barred, as well as Plaintiffs' class allegations related to their fraud claim. This Court reviews the sufficiency of these allegations below.

### 1.  Count I: Fraud

Plaintiffs' first claim for relief in their Second Amended Complaint alleges that GateHouse Ohio committed fraud by inducing Plaintiffs to enter into subscription agreements that falsely represented that they would receive a fixed-length subscription, or, alternatively, "up to" a certain number of weeks of *The Dispatch*. (ECF No. 181 ¶ 175-76). Plaintiffs allege that GateHouse Ohio intentionally misled them, knowing that subscribers would not receive the full amount listed in the offers because "GateHouse Ohio knew that it would always be issuing premium editions that materially shorten the subscriptions."  (*Id.* ¶ 177). Plaintiffs also allege that GateHouse Ohio concealed its fraud by refusing to provide information relating to subscription terms, prices charged for premium editions, and the number of premium editions issued. (*Id.* ¶ 179). Plaintiffs represent that they and the class members relied on GateHouse Ohio's representations when they assented to the subscription agreements. (*Id.* ¶ 180). The harm suffered by Plaintiffs, they allege, is that they never received the benefits of their subscription agreements and have overpaid for their subscriptions. (*Id.* ¶ 181).

Defendants attack Plaintiffs' fraud claims on three bases: (1) that the claims fail as a matter of law; (2) that the claims are not pled with particularity; and (3) that the class action claims are improper and should be stricken. This Court will analyze each subsection accordingly.

### a. *Plaintiffs' fraud claims are sufficient as a matter of law*

Defendants allege that there are several flaws with Plaintiffs' fraud claims. The first is that Plaintiffs' fraud claims are identical to their claims for breach of contract and fail to allege that Plaintiffs were owed any duty independent of the contractual obligations. The second is that Plaintiffs' fraud claim does not identify any false or misleading statement upon which they relied; instead, the new complaint acknowledges that subscribers assented to contract terms permitting GateHouse Ohio to shorten subscriptions based on premium-edition charges. This is fatal to their claim, Defendants contend, because a party to a contract may not claim fraud upon an alleged promise that is directly contradicted by the contract's terms. Further, Defendants argue, courts regularly hold that fraud claims fail as a matter of law where, as here, a purported misrepresentation is clarified or qualified by disclosures or disclaimers.

Plaintiffs argue that they were owed an independent duty to disclose in order to dispel the misleading impression the Defendants gave Plaintiffs that there was a possibility that they would receive the newspaper for the full term. Plaintiffs contend that Defendants' representations were false because GateHouse Ohio had already planned to issue so many premium editions that each person's subscription would be effectively cut. At a minimum, Plaintiffs argue, this representation was so misleading that GateHouse had a duty to disclose its true intentions. Plaintiffs argue that Defendants' vague disclosures, that premium editions "could" shorten length of subscription term, is inadequate to communicate the truth: that the subscription would undoubtedly be shortened. The focus of the fraud claim, Plaintiffs contend, is GateHouse Ohio's breach of its duty not to deceive Plaintiffs into entering into the contract, and not about the *terms* of the contract itself. Further, argue Plaintiffs, the Second Amended Complaint alleges that GateHouse Ohio promised to provide

32

a certain subscription term with no intention of performing on these promises a classic claim for promissory fraud.

> The elements of a fraud claim under Ohio law are:
>
> (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance by the injured party upon the representation or concealment, and (6) resulting injury proximately caused by the reliance.

*Ettayem v. Land of Ararat Invest. Group, Inc.*, 10th Dist. No. 17AP-93, 2017-Ohio-8835, 100 N.E.3d 1056, ¶ 42 (citing *Burr v. Bd. of Cty. Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus).

Under Ohio law, a party may not maintain a fraud claim which "arises from the same conduct supporting a breach of contract claim unless the fraud claim stems from a separate and independent duty unrelated to the parties' contractual obligations." *King v. Hertz Corp.*, No. 1:09 CV 2674, 2011 WL 1297266, at *2 (N.D. Ohio Mar. 31, 2011). However, a party may maintain a fraud claim alongside a claim for breach of contract in instances "where an individual makes a promise concerning a future action, occurrence, or conduct and, at the time he makes it, has no intention of keeping the promise." *Williams v. Edwards,* 129 Ohio App.3d 116, 124, 717 N.E.2d 368, 374 (1st Dist.1998). Such claims of fraudulent inducement "assert[] that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract." *Xudong Song v. Rom*, No. 1:15-CV-1438, 2017 WL 2472492, at *3 (N.D. Ohio June 8, 2017). To demonstrate fraudulent inducement, the plaintiff bears the burden of proving that the defendant "made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *Dayton Children's Hosp. v. Garrett Day, LLC*, 2nd Dist. No. 28047, 2019-Ohio-4875, 149 N.E.3d 1004, ¶ 103.

33

The crux of Plaintiffs' argument is that GateHouse Ohio fraudulently induced them into signing up for subscriptions through the advertisement of term subscriptions (e.g., 13 weeks, 26 weeks, 52 weeks) for specific prices, with the subscribers expecting that they would receive the number of weeks stated in those Subscription Agreements. Plaintiffs allege that Defendants were aware that potential customers would likely misunderstand the term subscriptions to believe that they were receiving the full term—or at least more than they received. Defendants' argument overlooks that the issue is what induced customers to purchase the subscriptions at the outset. Plaintiffs allege that they were harmed because they did not receive the benefits of the subscription agreements to which they were entitled and overpaid for their subscriptions. The focus of such a fraud claim is *not* on whether Plaintiffs received what they paid for, but the behavior of the seller. *Life Changing Events, LLC v. Heitkoetter,* No. 5:19CV02057, 2020 WL 7769721, at *7 (N.D. Ohio Dec. 30, 2020) (explaining that "[a]lthough the elements for fraud and fraud in the inducement are the same under Ohio law, fraud in the inducement focuses on the facts inducing the execution of the contract, not the provisions of the contract itself."). Plaintiffs thus validly allege the necessary elements to sustain a cause of action for fraud.

### b. *Plaintiffs' fraud claims are pled with particularity*

Defendants next argue that Plaintiffs' fraud claims fail to satisfy the heightened pleading standards required by Federal Rule of Civil Procedure 9(b).

Defendants argue that Plaintiffs' fraud claim fails to indicate which statements are at issue and when or where the false or misleading statements were made. Defendants contend that this is problematic given that the named Plaintiffs—and the proposed class members—include both new and established customers, as well as customers who subscribed and communicated with *The Dispatch* through a variety of channels. Further, Defendants argue, Plaintiffs acknowledge that

GateHouse Ohio made changes to the premium-edition program and related disclosures over time—not only to the language and format of the disclosures, but also to the maximum price and frequency of the premium editions. As such, the specific timing and manner of the communications that each Plaintiff received from GateHouse Ohio must be established and is critical to Plaintiffs' fraud claim and to defending against that claim.

Plaintiffs argue that the purpose of Rule 9(b) is to put the defendants to a lawsuit on notice concerning which allegedly deceptive statements are at issue. Further, Plaintiffs contend, Rule 9(b) does not require them to recount the exact time and place that each alleged misrepresentation was made when there are numerous representations at issue. Here, Plaintiffs argue Defendants know exactly which statements are being contested. Additionally, they argue, Plaintiffs sufficiently pled reliance by indicating that they expected an agreement that would contain a certain price and length for the subscription term.

Rule 9(b) of the Federal Rules of Civil Procedure requires, at a minimum, "that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006). Put another way, under the particularity requirements imposed by Rule 9(b), a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 752 (6th Cir. 2012). The purpose of Rule 9(b)'s particularity requirement is "to provide fair notice to the defendant so as to allow him to prepare an informed pleading responsible to the specific allegations of fraud." *Rheinfrank v. Abbot Lab'ys*, No. 1:13-CV-144, 2013 WL 4067826, at *4 (S.D. Ohio Aug. 12, 2013).

This Court finds that Plaintiffs sufficiently plead fraud. Plaintiffs identified the entity responsible for communicating the statements, what the statements read, who received them, and how they received the statements. Further, Plaintiffs identified why Defendants' offers that they would receive "up to" the subscription term were fraudulent and what the harm was—inducing customers to sign up for a product that did not match what they were led to expect. Defendants' contention that Plaintiffs failed to plead adequately their fraud claim is further undermined by Defendants' ability to identify and exhaustively defend against those claims in the instant Motion.

### c. *Plaintiffs' fraud claims are adequate for class treatment at this stage*

Defendants last argue, with respect to Plaintiffs' claims for fraud, that the class fraud allegations should be stricken on the basis that the claims involve individualized issues. In other words, Defendants posit that Plaintiffs' fraud claims are improper for class treatment because they involve individual issues concerning how each subscriber received the statements and whether and how they relied upon the alleged misrepresentations therein. According to Defendants, the putative class members must show the following individualized inquiries defeating class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure: (1) that they received GateHouse Ohio's purported misrepresentation regarding the length of their subscriptions; (2) that they relied on these purported misrepresentations in making their purchasing decision; (3) that their reliance was justifiable under the full circumstances, including the class members' individual relationship and interactions with the Defendants, their relevant experiences, and their relevant knowledge; and (4) that they were injured as a result of their reliance. According to Defendants, reliance cannot be presumed on a classwide basis given that the putative class members had different interactions and relationships with GateHouse Ohio: while some subscribers were aware of the premium editions and continued receiving them, others were aware of the premium editions and requested to be

36

excluded. In sum, Defendants assert, given the wide variations between GateHouse Ohio's subscribers, almost every element of the fraud claim would require individualized evidence.

Plaintiffs argue that Defendants' motion runs counter to the legal proposition that courts must be cautious in striking class action allegations based solely on the pleadings. Instead, Plaintiffs contend, defendants bear the burden of demonstrating that, on the face of the complaint, it is apparent that it will be impossible to gain class certification based on the allegations. Contrary to Defendants' assertions, Plaintiffs argue, reliance may be presumed on a class-wide basis where there are uniform presentations of allegedly misleading information, especially when conveyed through form documents. Plaintiffs allege that courts have certified classes under similar circumstances in both *Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506, 518 (N.D. Ohio 2008) and *Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*, No. 1:16-CV-448, 2016 WL 10520133 (S.D. Ohio Dec. 15, 2016). Here, Plaintiffs argue, Defendants cannot demonstrate that there were any material variations in the underlying representations which would preclude class certification. To the contrary, Plaintiffs allege, each member of the class was misleadingly told that the member would receive a fixed-length subscription, or, alternatively, "up to" a certain number of weeks of The Dispatch. According to Plaintiffs, the fact that some subscribers may have been generally aware that Defendants were shortening subscriptions with premium editions is irrelevant.

A court may strike class action allegations prior to discovery where it is apparent from the face of the complaint that the requirements for maintaining a class action cannot be met. *See Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir. 2011). On the occasion that the "defendant moves to strike class action allegations on the basis that class certification is precluded as a matter of law, the defendant bears the burden of establishing that the plaintiff will be unable to demonstrate facts supporting certification, even after discovery and the creation of a

full factual record." *Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*, No. 1:16-CV-448, 2016 WL 10520133, at *2 (S.D. Ohio Dec. 15, 2016). A case for fraud "may be unsuited for treatment as a class action if there was material variation in the . . . kinds or degrees of reliance by the persons to whom they are addressed." Advisory Note to Subdivision (b)(3), Fed. R. Civ. P. 23. Nonetheless, whether class reliance can be presumed in a given case "does not appear to depend on any clear rules but on common-sense judgments about its appropriateness." *Hale v. Enerco Grp., Inc.*, 288 F.R.D. 139, 148 (N.D. Ohio 2012) (collecting cases).

Here, Plaintiffs allege that they "and the members of the Class" uniformly relied on GateHouse Ohio's representations that they would "receive a fixed-length subscription, or, alternatively, 'up to' a certain number of weeks of *The Dispatch*" in assenting to the subscription agreements. (ECF No. 181 ¶¶ 175, 180). Plaintiffs and "members of the Class" allege that they were harmed by this reliance because "they have not received the benefits of their subscription agreements and have overpaid for their subscriptions." (*Id.* ¶ 181). Using its common-sense judgment about the appropriateness of presuming class reliance, *Hale*, 288 F.R.D. at 148, this Court finds that this is a case where the presumption of class reliance is warranted. Plaintiffs allege that each member of the class received the same or similar misrepresentation. Plaintiffs' allegations also point to a common method through which Defendants perpetuated the fraudulent scheme and identifies specifically the misrepresentations that Defendants allegedly made. Whether there may be minor variations among the class members in demonstrating where they saw the problematic disclosure or that they would not have subscribed absent the misrepresentation is immaterial to this analysis. There is, in short, no indication from the mere face of Plaintiffs' classwide fraud claim that they "will be unable to demonstrate facts supporting certification." *Kimber Baldwin Designs, LLC*, 2016 WL 10520133, at *2.

*2. Count II: Breach of Contract*

Plaintiffs' breach of contract claim alleges that GateHouse Ohio violated the terms of the subscription agreements to *The Dispatch* under which GateHouse Ohio promised to provide subscriptions which would be shortened only "in proportion to the value" of the premium editions.

Defendants argue that Plaintiffs' claim for breach of contract should be dismissed because the plain language of the contracts enabled GateHouse Ohio to charge for premium editions. Defendants claim that GateHouse Ohio's contract disclosures repeatedly informed subscribers that they would be charged for premium editions. Further, Defendants argue, the prices charged for premium editions were within the amounts subscribers agreed to pay when assenting to the terms of the subscription agreements. Additionally, Defendants argue that Plaintiffs' theory that they "breached the subscription agreements by shortening subscriptions based on editions that did not qualify as 'premium editions'" fail because the disclosures and Section 1.4 of the Terms of Sale unambiguously define premium editions as publications that "provide additional information and value," which would include calendars and cookbooks. Acknowledging that this Court denied Defendants' previous motion to dismiss on this same issue, Defendants contend that the Court so concluded because it did not review the disclosures sent to subscribers. Finally, Defendants contend that Plaintiffs' remedy was already available to them: a unilateral right to cancel their subscription at any time.

For their part, Plaintiffs argue that GateHouse Ohio broke three promises contained in their contracts: (1) that it would only shorten subscriptions if the editions published were truly "premium editions"; (2) that the premium editions would "provide additional information and value"; and (3) that subscriptions would only be shortened in proportion to the value of the premium editions. With respect to the first breached promise, Plaintiffs argue that Defendants are

merely seeking reconsideration of this Court's previous rejection of their attempt to dismiss the claim. Concerning the second breached promise, Plaintiffs argue that the breach focuses on GateHouse's nefarious *purpose* in issuing the premium editions (to raise revenue rather than provide value) and not the content itself. On the third breached promise, Plaintiffs contend that the disclosures mandate that GateHouse's charges be tied to the "value" of the premium editions, but they violated this term. Plaintiffs finally argue that, if the Terms of Sale were incorporated, Plaintiffs would have another breach of contract claim against GateHouse because it mandated them to notify subscribers of any price change at least thirty days in advance.

Under Ohio law, a claim for breach of contract "requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458. Ohio law recognizes the doctrine of incorporation by reference. *Ace Am. Ins. Co. v. Gerling & Assocs., Inc.*, No. 2:19-CV-5627, 2022 WL 4468584, at *10 (S.D. Ohio Sept. 26, 2022) (Marbley, J.) (citing *Volovetz v. Tremco Barrier Solutions*, 74 N.E.3d 743, 751 (Ohio Ct. App. 2016)). As explained, this doctrine provides that a document becomes part of the contract when it is incorporated by reference. *Id.* To incorporate a document successfully, the contract "must clearly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." *Id.*

Contrary to Defendants' claims, only *some* of the subscription renewal notices refer to the website address where the Terms of Sale can be found. (*See* ECF Nos. 135-2, 135-4 at 36–52). In the instances where they do reference the website, the statements generally read as follows:

> Please review Terms and Conditions of Offer for further details about premium edition charges and your payment options by visiting dispatch.com/termsofsale[.]

(*See, e.g.*, ECF No. 135-2 at 20).

When this Court previously considered whether the Terms of Sale were incorporated into the subscription agreements, invoices, or renewals, it disregarded evidence of the agreements given Plaintiffs' content that they had been "deprived of the opportunity to address the exhibits." (ECF No. 105 at 19). Plaintiffs do not raise the same concerns here; further, Plaintiffs' Second Amended Complaint undoubtedly reference the documents to which Defendants cite. *See Becker v. PennyMac Loan Servs., LLC,* 583 F. Supp. 3d 1090, 1097 (S.D. Ohio 2022) (explaining that "the Court can . . . consider the documents that a defendant attaches to its motion . . . to the extent that those documents are referenced in the Complaint, or otherwise subject to judicial notice for some reason.").

This Court notes, however, that even considering the language of the Terms of Sale, Plaintiffs have again stated a claim on whether Defendant GateHouse Ohio breached the Subscription Agreements by failing to provide an edition that was truly "premium." This Court's reasoning is the same as before, which held as follows:

> While the Terms of Sale contain a roomy definition of "premium," Plaintiffs have at least stated a claim on whether the premium editions met the parties' agreed-upon terms. Many of the premium editions were not newspapers at all but were instead calendars, pet magazines, and cookbooks. (ECF No. 42 ¶ 201). These factual allegations raise a right to relief above the speculative level.

(ECF No. 105 at 26).

Plaintiffs state a valid claim for relief: they entered into agreements with GateHouse Ohio for a subscription term of *The Dispatch* but failed to receive the benefit of the bargain for which they contracted. This is because, even given that the Terms of Sale provide for potentially shortened subscription terms, Plaintiffs argue that the charges did not match the value of the premium editions.

41

### 3.  Count III: Breach of Contract (Implied Covenant of Good Faith and Fair Dealing)

Plaintiffs' second breach of contract claim concerns allegations that Defendants violated the common-law duty of good faith and fair dealing by doing the following:

> (1) arbitrarily setting the "value" of premium editions; (2) charging excess amounts for premium editions; (3) issuing premium editions solely to make up for revenue shortfalls, not to provide information or value; (4) issuing cookbooks, puzzle books, etc. as "premium editions" when these items are unrelated to the distribution of news; (5) failing to inform customers that they can opt out of receiving premium editions; (6) failing to disclose in advance the type, specific price, and number of premium editions GateHouse Ohio intended to issue; and (7) failing to adequately disclose the type, specific price, and number of premium editions GateHouse Ohio had already issued.

(ECF No. 181 ¶ 205).

Plaintiffs also allege under this count that GateHouse Ohio breached R.C. § 1302.18(B) by setting the price for its premium editions in bad faith.

Defendants move for dismissal on this count on the basis that GateHouse Ohio's premium edition charges were permitted by the subscription agreements. Defendants claim that *The Dispatch*'s disclosures and Terms of Sale allow GateHouse Ohio to issue a maximum number of premium editions per year and set a maximum amount GateHouse Ohio is permitted to charge in costs; Plaintiffs never alleged that GateHouse Ohio exceeded these authorized maximums. Further, Defendants contend, Plaintiffs cannot state an independent claim for relief for breach of an implied covenant given that the contract at issue covers the same matters. Defendants contend that Plaintiffs' assertions that GateHouse Ohio should have provided additional disclosures would improperly use the implied covenant not to interpret the contract, but to rewrite it. That, however, is not the purpose of the implied covenant.

Plaintiffs argue that GateHouse breached its common-law duty of good faith and fair dealing by arbitrarily setting prices for premium editions, issuing the editions solely to resolve revenue shortfalls, and issuing editions that subscribers did not want. Plaintiffs reason that

GateHouse provide no basis for this Court to reconsider its previous finding that Plaintiffs stated a claim for breach of contract. Here, Plaintiffs contend, their claims for breach of good faith are properly tied to GateHouse's specific contractual duties relating to subscription lengths and to the cost, timing, and content of premium editions. Further, they argue, GateHouse violated R.C. § 1302.18(B) by failing to set the prices for premium edition in good faith.

Under Ohio law, there is "an implied duty of good faith on parties to any contract." *Wendy's Int'l Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009). Ohio law, however, "does not create an independent cause of action for failure to perform or enforce a contract in good faith*." Padula v. Wagner*, 37 N.E.3d 799, 814 (Ohio Ct. App. 2015). "Instead, 'good faith is part of a contract claim and does not stand alone.'" *Id.* (quoting *Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 108 Ohio App.3d 637, 671 N.E.2d 578, 584 (1996)). There is a "limited" exception where the duty arises from the language of the contract. *Capital Equity Grp. v. Ripken Sports Inc.*, 744 F. App'x 260, 264 (6th Cir. 2018). Absent the exception, an allegation of the breach of the implied covenant is not an independent count but resides within a broader breach-of contract claim. *Padula v. Wagner*, 2015-Ohio-2374, ¶ 52, 37 N.E.3d 799, 814.

This Court notes that parties' arguments are effectively unchanged from Defendants' previous attempt to dismiss this claim. Here, the allegations of breach of the implied covenant are again tied to an identified contractual duty in Plaintiffs' claim for breach of the express terms of the contract. As previously noted, there is a basis to maintain the cause of action for breach of the implied covenant in instances where there is a breach of the underlying contract. (ECF No. 105 at 28) (citing *Doe v. Univ. of Dayton*, 766 F. App'x 275, 288 (6th Cir. 2019)). As such, this claim may go forward as a dependent part of Plaintiffs' Count II breach of contract claim.

#### 4. *John Ewalt's Individual Claims*

John Ewalt is one of the named Plaintiffs in this matter. As alleged by Plaintiffs, Ewalt was a subscriber to *The Dispatch* for thirty years before ending his subscription in early 2021. (ECF No. 181 ¶ 135). Ewalt allegedly received and paid invoices for term subscriptions to *The Dispatch* over the years. (*Id.* ¶ 136). Prior to ending his subscription, Ewalt allegedly received premium editions from *The Dispatch.* (*Id.* ¶ 137). Starting in 2015, *The Dispatch* has issued a large volume of premium editions to customers including Ewalt which had "nothing to do with the news." (*Id.* ¶ 138).

Defendants argue that the subscribers were subject to a clause in the general Terms & Conditions which provided that a subscriber may only bring suit within a year from the moment they have a cause of action against *The Dispatch*. As such, Defendants argue, Ewalt's claims are barred by his failure to sue within a year of *The Dispatch* instituting the premium editions in 2015 or at least within a year of when the renewal notices incorporated the website's terms beginning in 2017.

Plaintiffs counter that this Court has already rejected the argument that Ewalt's claims are barred by the one-year statute of limitations. According to Plaintiffs, this Court need not revisit its earlier determination that the relevant provision is ambiguous (and should be construed against the drafter) concerning when the one-year period begins—whether the one-year period starts running upon the occurrence of Defendants' misconduct or a subscriber's discovery of that misconduct. So, Plaintiffs contend, Ewalt's claims are not untimely because he did not learn of GateHouse's misconduct until shortly before asserting his claims. Plaintiffs also argue that, although some invoices cited by Defendants allude to the Terms of Sale, mere reference to another doc is not

sufficient to incorporate it into a contract. In addition, Plaintiffs contend, because each subscription agreement between GateHouse and Ewalt was separate, Ewalt had a new cause of action each time.

If there is an ambiguity in a contract, the ambiguities should be construed against the drafter. *World Harvest Church v. Grange Mut. Cas. Co.*, 148 Ohio St.3d 11, 2016-Ohio-2913, 68 N.E.3d 738, ¶ 36. The Ohio Supreme Court has recognized that parties may agree to a limitation on the time within which an action may be initiated where the applicable statute of limitations provides a longer period." *Conte v. Blossom Homes L.L.C.*, 2016-Ohio-7480, 63 N.E.3d 1245, ¶ 38 (8th Dist.) (citations omitted). A claim under the Ohio Consumer Sales Practices Act; however, "may not be brought more than two years after the occurrence of the violation which is the subject of the suit." R.C. § 1345.10(C).

As this Court acknowledged in its previous Order, § 9 of the Terms requires any claim against *The Dispatch* to be brought "within one year of the date you could first bring them." (ECF No. 105 at 28 n.10). Defendants argued before that "Plaintiffs Ewalt's . . . failure to bring claims in 2016 or, at the latest, September 2018—one year after the alleged four separate price increases—permanently bars their claims." (*Id.*). Defendants' argument that Ewalt's failure to bring claims concerning the allegedly deceptive premium-edition practices is markedly similar. This Court has already rejected Defendants' argument concerning whether Ewalt's claims are time-barred, interpreting the one-year period to begin upon Ewalt's discovery of the alleged misconduct. As the Court said in its prior Order, so it holds here:

> The relevant provision is ambiguous on when the one-year period begins and cannot be applied to OCSPA claims. Additionally, this unilaterally imposed, non-mutual, one-year statute of limitations is unconscionable. Because it is unclear when the statutory period began, this Court finds that these claims are not time barred.

(*Id.*).

## IV. CONCLUSION

Based on the foregoing, this Court **GRANTS** the Holding Company Defendants' Motion to Dismiss Second Amended Complaint (ECF No. 186) for Lack of Personal Jurisdiction; as such, the Holding Company Defendants are **DISMISSED** from this action. This Court **OVERRULES** Defendants' Objection (ECF No. 187) and **DENIES** Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 185) for Failure to State a Claim. Plaintiffs' Motion to Strike Defendants' Reply Motion (ECF No. 202) and Defendants' Motion for Leave to File Instanter Reply in Support of their Objection (ECF No. 205) are **DISMISSED AS MOOT**. As a result of this ruling, all Plaintiffs' claims may proceed except as alleged against the Holding Company Defendants.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: February 15, 2023**

46